UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY

              Plaintiff,

     -vs-

TIMOTHY F. GEITHNER, Secretary, U.S.
Department of Treasury, and BOARD OF
GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

              Defendants.
_____/

CIVIL NO. 08-15147

HON. LAWRENCE P. ZATKOFF
MAG. JUDGE MONA K. MAJZOUB

## **DEFENDANTS' MOTION TO DISMISS**

Defendants Timothy F. Geithner,[1] Secretary of the United States Department of Treasury,

and the Board of Governors of the Federal Reserve System, through their undersigned counsel,

move this court for an order, pursuant to Fed. R. Civ. P. 12(b)(1) and/or Fed. R. Civ. P. 12(b)(6),

dismissing this case with prejudice.  This motion is supported by the attached brief.

Concurrence in the relief that is sought by this motion was requested on February 27, 2009, and

was not obtained.

                                Respectfully submitted,

                                MICHAEL F. HERTZ
                                Acting Assistant Attorney General

                                TERRENCE G. BERG
                                United States Attorney

                                JAMES J. GILLIGAN
                                Assistant Director, Federal Programs Branch

---

[1] Timothy F. Geithner was sworn in as the Secretary of the United States Department of Treasury on January 26, 2009.  Secretary Geithner has been automatically substituted for former Secretary Henry M. Paulson, Jr. pursuant to Fed. R. Civ. P. 25(d).

s/ John R. Coleman
JOHN R. COLEMAN
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8460
Email: John.Coleman3@usdoj.gov

DATED: February 27, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY

               Plaintiff,

     -vs-

TIMOTHY F. GEITHNER, Secretary, U.S.
Department of Treasury, and BOARD OF
GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

               Defendants.

_____/

CIVIL NO. 08-15147

HON. LAWRENCE P. ZATKOFF
MAG. JUDGE MONA K. MAJZOUB

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

### FIRST ISSUE PRESENTED

WHETHER PLAINTIFF HAS STANDING TO INVOKE THE JURISDICTION OF THIS

COURT

### MOST PERTINENT AUTHORITY

U.S. Const. Art. III

*Hein v. Freedom From Religion Fdn.*, — U.S. — , 127 S.Ct. 2553 (2007)

### SECOND ISSUE PRESENTED

WHETHER PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF THE

ESTABLISHMENT CLAUSE

### MOST PERTINENT AUTHORITY

U.S. Const. Amd. I

*Agostini v. Felton*, 521 U.S. 203 (1997)

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     FRBNY'S CREDIT AGREEMENT WITH AIG . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    CONGRESS'S SUBSEQUENT ENACTMENT OF EESA . . . . . . . . . . . . . . . . 4

    III.   THE SECRETARY'S $40 BILLION PURCHASE OF AIG
         PREFERRED STOCK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    IV.   AIG'S SHARIAH-COMPLIANT (TAKAFUL) FINANCIAL PRODUCTS . . . . 6

    V.    THE TREASURY DEPARTMENT'S FORUM ON ISLAMIC FINANCE . . . . . 7

    VI.   PLAINTIFF'S CLAIMS AND PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . 7

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.     PLAINTIFF LACKS STANDING TO BRING THIS SUIT . . . . . . . . . . . . . . . 10

    II.    PLAINTIFF FAILS TO STATE A COGNIZABLE CLAIM FOR
         VIOLATION OF THE ESTABLISHMENT CLAUSE . . . . . . . . . . . . . . . . . . . 15

         A.     EESA Does Not Have the Purpose or Effect of Advancing Islamic
               Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

         B.     Plaintiff Has Not Alleged Facts from Which It Could Plausibly Be
               Concluded that the Defendants Have a Broad Policy of Advancing,
               Promoting, or Supporting Shariah Finance in Violation of the
               Establishment Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Mercer County, Ky.*,
  432 F.3d 624 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 20

*Agostini v. Felton*,
  521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544, 127 S.Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Bowen v. Kendrick*,
  487 U.S. 589 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bradfield v. Roberts*,
  175 U.S. 291 (1899) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. —, 126 S.Ct. 1854 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Flast v. Cohen*,
  392 U.S. 83 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Freedom From Religion Foundation, Inc. v. Nicholson*,
  536 F.3d 730 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Greenberg v. Life Ins. Co. of Virginia*,
  177 F.3d 507 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hein v. Freedom From Religion Fdn.*,
  — U.S.— , 127 S.Ct. 2553 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Helwig v. Vencor, Inc.*,

210 F.3d 612 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Henry Builders, Inc. v.  United States of America,*
Case No. 1:09-cv-0288-ENV-JMA (E.D.N.Y. Jan. 26, 2009)  . . . . . . . . . . . . . . . . 13, 14

*Hernandez v. Comm'r of Internal Revenue,*
490 U.S. 680 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Jackson v. Richards Med. Co.,*
961 F.2d 575 (6th Cir.1992)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Johnson v. Econ. Dev. Corp. of County of Oakland,*
241 F.3d 501 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Kramer v. Time Warner Inc.,*
937 F.2d 767 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lemon v. Kurtzman,*
403 U.S. 602 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Marks v. United States,*
430 U.S. 188 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ex parte McCardle,*
7 Wall. 506 (1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mitchell v. Helms,*
530 U.S. 791 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Navy Chaplaincy,*
534 F.3d 756 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ohio Nat'l Life Ins. Co. v. United States,*
922 F.2d 320 (6th Cir.1990)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Raines v. Byrd,*
521 U.S. 811 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Roemer v. Bd. of Pub. Works of Md.,*
426 U.S. 736 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rogers v. Stratton Indus., Inc.,*
798 F.2d 913 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Sly v. DFCU Fin. Fed. Credit Union*,
    443 F. Supp. 2d 885 (E.D. Mich. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Smith v. Jefferson County. School Bd. of Com'rs*,
    549 F.3d 641 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Steel Co. v. Citizens for a Better Envt.*,
    523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 14

*Steele v. Indus. Dev. Bd. of Metro. Gov't of Nashville*,
    301 F.3d 401 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State* ,
    454 U.S. 464 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 14

*Zelman v. Simmons-Harris*,
    536 U.S. 639 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 20

## STATUTES

Emergency Economic Stabilization Act of 2008, 12 U.S.C. § 5201 *et seq.* . . . . . . . . . . . .  passim

Federal Reserve Act, 12 U.S.C. § 343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

## RULES

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 15

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Fed. R. Civ. P. 25(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Fed. R. Evid. 201(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

## LEGISLATIVE HISTORY

154 Cong. Rec. H10702-06 (Oct. 3, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 16

154 Cong. Rec. H10712-02 (Oct. 3, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 16

## INTRODUCTION

On October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA"), 12 U.S.C. § 5201 *et seq.*, to address what is possibly the worst financial crisis this country has encountered since the Great Depression. The EESA provides the Secretary of the Treasury broad authority to purchase or insure the assets of financial companies for the express purpose of "restor[ing] liquidity and stability to the financial system of the United States." 12 U.S.C. §§ 5201(1), 5211, 5212. Since the passage of the EESA, the Secretary has utilized this authority to purchase or insure over $300 billion in assets of financial institutions to support economic recovery and to foster financial market stability, including the Secretary's November 25, 2008 purchase of $40 billion of preferred stock from American International Group, Inc. ("AIG") that was designed to prevent the impending failure of this systematically significant institution and thereby protect Americans' jobs, savings, and retirement security.

In this lawsuit, Plaintiff Kevin J. Murray raises an Establishment Clause challenge to the EESA on the ground that two subsidiaries of AIG, an international insurance and financial services firm with operations in over 130 countries, have recently introduced a line of insurance products that comply with certain financial tenets of Islamic law. Plaintiff also alleges that the Department of Treasury's November 2008 presentation of a forum on the principles of Islamic finance demonstrates a broad government policy of promoting Islamic religion and beliefs. This lawsuit suffers from two incurable defects.

*First*, plaintiff does not identify any legally cognizable personal interest that has been injured by the alleged violations of the Constitution, and he therefore does not have standing to invoke this Court's jurisdiction under Article III of the Constitution. Plaintiff cannot invoke the narrow exception to general standing principles described by the Supreme Court in *Hein v.*

*Freedom From Religion Fdn.*, — U.S. — , 127 S.Ct. 2553 (2007), because plaintiff cannot identify an express congressional mandate for the investment of federal funds in AIG specifically or in companies generally whose financial products comply with Islamic law. Accordingly, this lawsuit must be dismissed for lack of jurisdiction.

*Second*, plaintiff's contention that either the Department of Treasury's purchase of $40 billion of AIG preferred stock pursuant to the EESA or its sponsorship of a forum on Islamic finance violate the Establishment Clause is meritless. Plaintiff does not allege facts sufficient to raise a plausible claim that defendants' actions have either the purpose or effect of advancing or inhibiting religion. Accordingly, if the Court reaches the merits of this lawsuit, it must dismiss the lawsuit for failure to state a claim upon which relief can be granted.

## FACTUAL BACKGROUND[2]

### I.   FRBNY'S CREDIT AGREEMENT WITH AIG

In September 2008, defendant Board of Governors of the Federal Reserve System (the "Board") authorized the Federal Reserve Bank of New York ("FRBNY") to extend $85 billion of credit to AIG for general corporate purposes, including as a source of liquidity, pursuant to Section 13 of the Federal Reserve Act, 12 U.S.C. § 343. *See* Compl. ¶ 18; *see also* Credit

---

[2]   The facts relied upon by defendants in this motion to dismiss are derived from "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the [Court] may take judicial notice." *Sly v. DFCU Fin. Fed. Credit Union*, 443 F. Supp. 2d 885, 887 (E.D. Mich. 2006) (Zatkoff, J.) (quoting 2 James W. Moore, et al., *Moores Federal Practice* ¶ 12.34[2] (3d ed. 2000)). In addition, although defendants believe that the allegations contained in plaintiff's complaint are insufficient to demonstrate plaintiff's standing, the Court may review evidence outside of the complaint to determine its subject-matter jurisdiction without converting the motion into one for summary judgment. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990).

Agreement Dated September 22, 2008 ("Credit Agreement"), p. 1 (attached as Exhibit A).[3]  In

return, AIG agreed to pay interest and fees to the FRBNY and to issue Series C preferred stock

to a trust, the AIG Credit Facility Trust, that will hold the preferred stock for the benefit of the

United States Treasury.  *See* AIG September 26, 2008 Form 8-K, p.2 (attached as Exhibit B).[4]

Under the terms of the Credit Agreement, the holders of the Series C preferred stock are entitled

to approximately 79.9% (later reduced to 77.9%) of any dividend payments and will hold

approximately 79.9% (later reduced to 77.9%) of the aggregate voting power of the common

stock.  Compl. ¶ 18; AIG September 26, 2008 Form 8-K; *see also* Summary of Terms of

Preferred Stock and Related Issues (Exhibit D to the Credit Agreement).

The terms of the AIG Credit Facility Trust provide that "[i]n no event shall the Trustees

become directors of [AIG] or otherwise become responsible for directing or managing the day-

to-day operations of [AIG] or any of its subsidiaries."  *See* AIG Credit Facility Trust Agreement,

p.8, § 2.04(f) (attached as Exhibit C).[5]  Further, the trustees (and their children, spouses, and

parents) are not permitted to be officers or employees of the FRBNY, the Department of

Treasury, or AIG.  *See id.* at p. 10, § 3.01.  Nor may the trustees vote to elect to the board of

---

[3]  The Credit Agreement was filed with the Securities and Exchange Commission ("SEC") as Exhibit 99.1 to AIG's September 26, 2008 Form 8-K, and is *available at* http://www.sec.gov/Archives/edgar/data/5272/000095012308011496/y71452exv99w1.htm. Defendants request that the Court take judicial notice of the Credit Agreement and all other relevant filings of AIG with the SEC pursuant to Fed. R. Evid. 201(d).  *See Helwig v. Vencor, Inc.*, 210 F.3d 612, 618 & n.10 (6th Cir. 2000) (SEC filings proper subject of judicial notice); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-81 (11th Cir. 1999) (same); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (same).

[4]  AIG's September 26, 2008 Form 8-K is *available at* http://www.sec.gov/Archives/edgar/data/5272/000095012308011496/y71452e8vk.htm.

[5]  The AIG Credit Facility Trust Agreement was filed with the SEC as Exhibit 10.1 to AIG's January 23, 2009 Form 8-K, and is *available at* http://www.sec.gov/Archives/edgar/data/5272/000095012309001128/y74153exv10w1.htm.

directors of AIG any individual who currently or within the past year has served as an officer, director, or senior employee of the FRBNY or the Department of Treasury.  *See id.* at p. 7, § 2.03(e).

## II.     CONGRESS'S SUBSEQUENT ENACTMENT OF EESA

Subsequent to this transaction, on October 3, 2008, in response to significant turmoil in the global financial industry, Congress enacted the EESA for the express purpose of "restor[ing] liquidity and stability to the financial system of the United States."  12 U.S.C. § 5201(1); *see also* 154 Cong. Rec. H10702-06 (Oct. 3, 2008) (debate within the House of Representatives on passage of EESA); 154 Cong. Rec. H10712-02 (Oct. 3, 2008) (same).  Among other things, the EESA delegated to the Secretary of the Treasury the authority to purchase "troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary."  12 U.S.C. § 5211(a)(1).  "Troubled Assets" are defined by the EESA to include any "financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System, determines the purchase of which is necessary to promote financial market stability."  12 U.S.C. § 5202(9)(B).  Although the EESA requires the Secretary to consider certain factors when exercising his authority, 12 U.S.C. § 5213, the EESA does not direct the Secretary to exercise his authority for the benefit of any particular financial institution. *See* 12 U.S.C. § 5211.  Similarly, while as a general matter the EESA provides the Secretary with authority to purchase up to $700 billion of troubled assets, the EESA does not specifically appropriate funds for the purchase of assets from particular financial institutions.  *See* 12 U.S.C. §§ 5225, 5228.

### III.    THE SECRETARY'S $40 BILLION PURCHASE OF AIG PREFERRED STOCK

On November 25, 2008, the Secretary exercised his authority under the EESA to

purchase from AIG "$40 billion of newly issued AIG perpetual [Series D] preferred shares and

warrants to purchase a number of shares of common stock of AIG equal to 2% of the issued and

outstanding shares as of the purchase date."  *See* AIG November 10, 2008 Press Release, p. 1

(attached as Exhibit D).[6]  The 4,000,000 shares of Series D Preferred Stock pay annual dividends

at the rate of 10% of the liquidation preference of $10,000 per share.  *See* AIG November 25,

2008 Form 8-K, p.2 (attached as Exhibit E).[7]  According to the November 10, 2008 Press

Release, "[a]ll of the proceeds will be used to pay down a portion of the Federal Reserve Bank of

New York (FRBNY) credit facility."  November 10, 2008 Press Release, p. 1; *see also* Credit

Agreement, p. 24, § 2.10(c) (obligating AIG to apply 100% of the net proceeds from any Equity

Issuance to prepay outstanding loans or accrued interest under the credit facility); Credit

Agreement, p.6, § 1.01 (defining Equity Issuance).

Moreover, the warrant provides the Department of the Treasury with no voting rights

prior to the date it is exercised.  *See* Warrant to Purchase Common Stock, p. 7, ¶ 6 (attached as

Exhibit F).[8]  In addition, consistent with 12 U.S.C. § 5223(d)(1)(A), "[t]he Treasury Department

has agreed that it will not exercise any voting rights with respect to the Common Stock issued

---

[6]  The November 10, 2008 Press Release was filed with the SEC as Exhibit 99.2 to AIG's November 10, 2008 Form 8-K, and is *available at* http://www.sec.gov/Archives/edgar/data /5272/000095012308014825/y72548exv99w2.htm.

[7]  The November 25, 2008 Form 8-K is *available at* http://www.sec.gov/Archives/edgar/ data/5272/000095012308016447/y72888e8vk.htm.

[8]  The Warrant to Purchase Common Stock is attached as Exhibit 10.2 to AIG's November 25, 2008 Form 8-K, and is *available at* http://www.sec.gov/Archives/edgar/data /5272/000095012308016447/y72888exv10w2.htm.

upon exercise of the warrant."  November 25, 2008 Form 8-K, p. 3; *see also* Securities Purchase Agreement, p. 30, § 4.6 (attached as Exhibit G)[9] ("Notwithstanding anything in this Agreement to the contrary, the Investor shall not exercise any voting rights with respect to the Warrant Shares."); *id.* at p. 6, § 2.2(d) (defining "Warrant Shares" as "shares of Common Stock issuable upon exercise of the Warrant.").  In sum, AIG used the proceeds from Treasury's $40 billion purchase of AIG's Series D Preferred Stock exclusively to pay down a portion of its $85 billion credit facility with the FRBNY, and the warrants issued as part of the transaction do not provide the Department of Treasury with any voting rights or control of AIG.

## IV.    AIG'S SHARIAH-COMPLIANT (TAKAFUL) FINANCIAL PRODUCTS

Plaintiff alleges that "AIG engages in Shariah-compliant financing" by offering financial products that comply with certain dictates of Islamic law, including observing prohibitions on investments in certain "prohibited elements in Islam according to Sharia," and by "segregat[ing] policyholders funds from shareholders funds and redistribut[ing the] surplus back to the policyholders."[10]  In 2006, AIG launched AIG-Takaful-Enaya, a subsidiary based in Bahrain, to provide a "range of Takaful products" as part of a "global expansion strategy" to pursue the growing Takaful market.[11]  In December 2008, another subsidiary of AIG announced the

---

[9]  The Securities Purchase Agreement dated November 25, 2008 is attached as Exhibit 10.1 to AIG's November 25, 2008 Form 8-K, and is *available at* http://www.sec.gov/Archives/ edgar/data/5272/000095012308016447/y72888exv10w1.htm.

[10]  Compl. ¶¶ 27, 28; *See also* AIG Takaful – Frequently Asked Questions (attached as Exhibit H), *available at* www.aigtakaful-enaya.com/aig/takaful/faqs.jsp.  The Court may consider this document without converting this motion to dismiss into one for summary judgment because the complaint quotes extensively from the document and it is central to plaintiff's claim. *See Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999); *see also supra* note 2.

[11]  Compl. ¶ 30; AIG Takaful - About Us - Mission Statement (attached as Exhibit I), *available at* http://www.aigtakaful-enaya.com/aig/takaful/aboutus.jsp.  The Court may consider

introduction of a Takaful Homeowners Policy, the first in "a series of Shari'ah-compliant (Takaful) product offerings in the U.S."[12]

## V.     THE TREASURY DEPARTMENT'S FORUM ON ISLAMIC FINANCE

In November 2008 the Department of Treasury hosted a four hour forum, conducted in association with the Islamic Finance Project of the Harvard Law School, entitled "Islamic Finance 101."[13]  According to the syllabus, the Islamic Finance 101 seminar was "designed to help inform the policy community about Islamic financial services."  Ex. K.

## VI.     PLAINTIFF'S CLAIMS AND PRAYER FOR RELIEF

According to the complaint, plaintiff is a U.S. citizen residing in Michigan, a federal taxpayer, a devout Catholic, and a former U.S. Marine who served in the Iraq War in 2003. Compl. ¶¶ 11, 13, 15.  Plaintiff alleges – contrary to the clear language of the EESA – that, by enacting the EESA, "Congress appropriated taxpayer money" and "authorized and directed" the Secretary of the Treasury "to expend $40 billion of this money to directly fund and financially support the government's majority ownership interest in AIG and to directly fund and financially support Islamic religious activities."  Compl. ¶¶ 22, 56.  Plaintiff challenges this alleged

---

this document without converting this motion to dismiss into one for summary judgment because the complaint relies heavily on the document and it is central to plaintiff's claim.  *See supra* notes 2, 10.

[12]  Compl. ¶¶ 31, 32; AIG December 1, 2008 Press Release (attached as Exhibit J), *available at* http://www.aigwebcast.com/phoenix.zhtml?c=76115&p=irol-newsArticle&ID= 1231031&highlight=islamic.  The Court may consider this document without converting this motion to dismiss into one for summary judgment because the complaint quotes extensively from the document and it is central to plaintiff's claim.  *See supra* notes 2, 10.

[13] Compl. ¶ 53; *see also* Seminar at the U.S. Department of Treasury: Islamic Finance 101 (attached as Exhibit K), *available at* www.thomasmore.org/downloads/sb_thomasmore/ -AnnouncementonIslamicFinance.pdf.  The Court may consider the syllabus without converting this motion to dismiss into one for summary judgment because the complaint relies heavily on the document and it is central to plaintiff's claim.  *See supra* notes 2, 10.

"portion" of the EESA as a violation of the Establishment Clause of the First Amendment.  *Id.* at ¶¶ 1, 6, 56.  Plaintiff also challenges an alleged "policy and practice" by the government "of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance," as supposedly evidenced by the Secretary's purchase of AIG preferred stock and the Treasury Department's November 2008 Forum on Islamic Finance.  *Id.* at ¶¶ 2, 6, 52-54, 57.

According to plaintiff, the purpose and effect of these alleged actions is to advance the Islamic religion by "convey[ing] a message of disfavor and hostility toward Christians, Jews," and other non-adherents of Islam, while conveying "to those who are adherents of Shariah-based Islam that they are . . . favored members of the political community."  *Id.* at ¶¶ 4, 5, 60, 61.  Plaintiff maintains that he "objects to and is harmed by the [alleged] appropriation and disbursement of public funds to AIG" by "being forced as a taxpayer to contribute to the propagation of Islamic beliefs and practices predicated upon Shariah law."  *Id.* at ¶ 15.  He also "objects to" and is allegedly harmed in an unspecified manner by the government's alleged "policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance."  *Id.*  Accordingly, plaintiff seeks a declaration that defendants have violated the Establishment Clause of the First Amendment to the United States Constitution and a permanent injunction against the alleged "improper disbursement of public funds to AIG." Compl., Prayer for Relief.  Plaintiff also seeks a declaration that the defendants' alleged policy of endorsing, promoting and funding Shariah-compliant finance violates the Establishment Clause, and a permanent injunction against the alleged policy.  *Id.*

## LEGAL STANDARD

A motion to dismiss for lack of jurisdiction is brought pursuant to Fed. R. Civ. P. 12(b)(1).  When jurisdiction is challenged, "*plaintiff* has the burden of proving jurisdiction in order to survive the motion."  *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986).  The Court has the power to resolve factual disputes when subject matter jurisdiction is at issue without converting the motion into one for summary judgment.  *See id.*

A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted tests the legal sufficiency of plaintiff's claims.  To avoid dismissal under Rule 12(b)(6), a complaint must include "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007).  The Court must accept as true all factual allegations in the pleadings, and any ambiguities must be resolved in plaintiff's favor.  *Jackson v. Richards Med. Co.*, 961 F.2d 575, 577-78 (6th Cir.1992).  However, a plaintiff must plead sufficient facts "to provide the grounds of his entitle[ment] to relief, [which] requires more than labels and conclusions, and [for which] a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 127 S.Ct. at 1964-65 (quotations omitted).  Furthermore, "on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id*. at 1965 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Thus, a plaintiff must make "a showing, rather than a blanket assertion of entitlement to relief" and "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

## ARGUMENT

### I.   PLAINTIFF LACKS STANDING TO BRING THIS SUIT

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies,' and Article III standing . . . enforces the Constitution's case-or-controversy requirement." *Hein v. Freedom From Religion Fdn.*, — U.S. —, 127 S.Ct. 2553, 2562 (2007) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. —, —, 126 S.Ct. 1854, 1861 (2006)). "The requisite elements of Article III standing are well established: 'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The "injury-in-fact" must be "concrete and actual or imminent not conjectural or hypothetical." *Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 103 (1998) (internal quotations and citations omitted). While the Supreme Court has "always insisted on strict compliance with this jurisdictional standing requirement," the standing inquiry must be "especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). Thus,

> federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution. Rather, federal courts sit solely to decide on the rights of individuals, and must refrain from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of [their] judicial function, when the question is raised by a party whose interests entitle him to raise it.

*Hein*, 127 S.Ct. at 2562 (internal quotations and citations omitted).

Consistent with these general principles, "[a]s a general matter, the interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution does not

give rise to the kind of redressable 'personal injury' required for Article III standing." *Id.* at

2563.  As the Supreme Court recently explained, "this type of interest is too generalized and

attenuated to support Article III standing" because:

> "interest in the moneys of the Treasury . . . is shared with millions of others; is
> comparatively minute and indeterminable; and the effect upon future taxation, of
> any payment out of the funds, so remote, fluctuating and uncertain, that no basis
> is afforded for an appeal to the preventative powers of a court of equity."

*Id.* (quoting *Frothingham v. Mellon*, 262 U.S. 447, 487 (1923)).  Accordingly, "deciding a

constitutional claim based solely on taxpayer standing 'would be, not to decide a judicial

controversy, but to assume a position of authority over the governmental acts of another and co-

equal department, an authority which plainly [federal courts] do not possess." *Id.* (quoting

*Frothingham*, 262 U.S. at 489).

　　　　The Supreme Court has recognized one "narrow exception to the general constitutional

prohibition against taxpayer standing." *Id.* at 2564.[14]  This narrow exception is derived from the

Supreme Court's decision in *Flast v. Cohen*, 392 U.S. 83 (1968), and applies only to plaintiffs

who are able to satisfy *Flast's* two-part test:

> "First, the taxpayer must establish a logical link between the status and the type of
> legislative enactment attacked.  Thus, a taxpayer will be a proper party to allege
> the unconstitutionality only of exercises of congressional power under the taxing
> and spending clause of Art. I, § 8, of the Constitution.  It will not be sufficient to
> allege an incidental expenditure of tax funds in the administration of an
> essentially regulatory statute . . . Secondly, the taxpayer must establish a nexus
> between that status and the precise nature of the constitutional infringement
> alleged.  Under this requirement, the taxpayer must show that the challenged
> enactment exceeds specific constitutional limitations imposed upon the exercise

---

[14]  Defendants note that two members of the Supreme Court voted to eliminate this
exception to the general rule against taxpayer standing by overruling *Flast*. *See Hein*, 127 S.Ct.
at 2573-2584 (Scalia, J., concurring in the judgment).  Justice Alito's plurality opinion in *Hein* is
the binding opinion of the Supreme Court, however, because it expresses the narrowest position
taken by the Justices who concurred in the judgment.  *See Marks v. United States*, 430 U.S. 188,
193 (1977).

of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8."

*Id.* (quoting *Flast*, 392 U.S. at 102-03).

The Supreme Court's recent decision in *Hein* demonstrates "'the rigor with which the *Flast* exception to the *Frothingham* principle ought to be applied.'"  *Id.* at 2565 (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State*, 454 U.S. 464, 481 (1982)).  The exception applies only challenges to 1) "exercises of congressional power," 2) "under the Taxing and Spending Clause," 3) that contain "an express congressional mandate" and a "specific congressional appropriation," 4) for the expenditure of funds in violation of the Establishment Clause.  *Id.* at 2565-66 (internal quotations and citations omitted); *see also id.* at 2565 ("The expenditures challenged in *Flast*, then, were funded by a specific congressional appropriation and were disbursed to private schools (including religiously affiliated schools) pursuant to a direct and unambiguous congressional mandate.").

Plaintiff cannot employ this narrow exception to demonstrate his standing to bring this lawsuit.  The only "congressional enactment" plaintiff challenges is the EESA, Compl. ¶ 1, and plaintiff's challenge to the EESA does not fit within *Flast's* narrow exception because the EESA, unlike the statutes at issue in *Flast* and *Bowen v. Kendrick*, 487 U.S. 589, 593 (1988), does not expressly mandate (or even contemplate) or specifically appropriate funds for an investment in AIG or any other companies involved in the business of Shariah-compliant financing.  *See Hein*, 127 S.Ct. at 2567.  As the Supreme Court stressed in *Hein*, the statute at issue in *Flast*, the Elementary and Secondary Education Act of 1965, specifically appropriated funds for the benefit of religious schools.  *See Hein*, 127 S.Ct. at 2565 & n.3.  Likewise, in *Kendrick*, where the Supreme Court also found standing, the statute in question, the Adolescent

-12-

Family Life Act, "not only expressly authorized and appropriated specific funds for grant-making, it also expressly contemplated that some of those moneys might go to projects involving religious groups." *Id.* at 2567 & n. 6 (citing *Kendrick*, 487 U.S. at 595-96, 623).

By contrast, the EESA broadly authorizes – but does not mandate – the Secretary to purchase "troubled assets" from unspecified "financial institutions," 12 U.S.C. § 5211, which are generally defined as "any institution, including, but not limited to, any bank, savings association, credit union, security broker or dealer, or insurance company . . . ." 12 U.S.C. § 5202(5). Furthermore, the EESA does not contain a "specific congressional appropriation" for AIG or any other companies offering Shariah-compliant products, *Hein*, 127 S.Ct. at 2565, but rather "deem[s] appropriated" "[a]ny funds expended or obligated by the Secretary [pursuant to the EESA], including the payment of administrative expenses" "at the time of such expenditure or obligation." 12 U.S.C. § 5228. Accordingly, because the EESA does not specifically mandate or appropriate money for investments in AIG or any other institution engaged in Shariah-compliant financing, plaintiff's alleged injury as a federal taxpayer does not fall within the narrow bounds of *Flast's* exception to the bar against taxpayer standing. *Hein*, 127 S.Ct. at 2565.

As a result, plaintiff lacks standing to challenge defendants' alleged "policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance." Compl. ¶ 52. Plaintiff does not have standing to challenge any actions of the Secretary or of the Board in relation to AIG, because such actions were the product of "executive discretion, not congressional action." *Hein*, 127 S.Ct. at 2566; *see also Freedom From Religion Foundation, Inc. v. Nicholson*, 536 F.3d 730, 739 (7th Cir. 2008) ("Given that *Flast* focused on congressional action,' the plurality 'decline[d][the] invitation to extend its holding to encompass

-13-

discretionary Executive Branch expenditures.'") (quoting *Hein*, 127 S.Ct. at 2568); *Henry*

*Builders, Inc. v. United States of America*, Case No. 1:09-cv-0288-ENV-JMA (E.D.N.Y. Jan. 26,

2009) (Decision and order dismissing *sua sponte* constitutional challenge to EESA for lack of

standing) (attached as Exhibit L).  Likewise, plaintiff cannot establish his taxpayer standing

based on the Department of Treasury's hosting of a forum on Islamic finance in November 2008.

Compl. ¶ 53.  Plaintiff has not even alleged that the "expenditures at issue here were . . . made

pursuant to [an] Act of Congress" rather than "general appropriations to the Executive Branch to

fund its day-to-day activities."  *See Hein*, 127 S.Ct. at 2566.

Finally, in addition to his alleged status as a "federal taxpayer," plaintiff also alleges that

he is a "a Christian" and "a former U.S. Marine veteran of the war against Islamic terrorism."

Compl. ¶ 15.  Neither plaintiff's religion, nor his past military service provide the requisite

injury to demonstrate his standing.  *See Valley Forge*, 454 U.S. at 485-86 (psychological injury

is not sufficient to confer Article III standing); *see also In re Navy Chaplaincy*, 534 F.3d 756,

763 (D.C. Cir. 2008) (holding allegation that administration of Navy chaplaincy program made

plaintiffs "feel like second class citizens" not a sufficient allegation of injury for purposes of

Article III).  In short, plaintiff has not alleged facts sufficient to demonstrate his injury-in-fact as

required for this Court to exercise its jurisdiction under Article III of the Constitution.  This case

must be dismissed.  *See Steel Co.*, 523 U.S. at 94 ("'Without jurisdiction the court cannot

proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist,

the only function remaining to the court is that of announcing the fact and dismissing the

cause.'") (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

-14-

## II.   PLAINTIFF FAILS TO STATE A COGNIZABLE CLAIM FOR VIOLATION OF THE ESTABLISHMENT CLAUSE

But even if plaintiff's claims did not suffer from fatal jurisdictional defects resulting from plaintiff's lack of a cognizable injury-in-fact, this case would still have to be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for plaintiff's failure to state a cognizable Establishment Clause claim.  The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion," U.S. Const. Amd. I, and this prohibits the government "from enacting laws that have the purpose or effect of advancing or inhibiting religion."  *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-49 (2002) (internal quotation marks and citations omitted).  Accordingly, a court considering an Establishment Clause challenge to a government program must first "consider 'whether the government acted with the purpose of advancing or inhibiting religion.'"  *Smith v. Jefferson County. School Bd. of Com'rs*, 549 F.3d 641, 656 (6th Cir.  2008) (quoting *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997)).  Second, a court must consider "whether the aid has the 'effect' of advancing or inhibiting religion."  *Id.* (quoting *Agostini*, 521 U.S. at 223).[15]  When performing this inquiry, a court must consider the facts from the viewpoint of a "reasonable observer" knowledgeable of the legislation's history and implementation.  *See ACLU v. Mercer County, Ky.*, 432 F.3d 624, 630, 636 (6th Cir. 2005).

### A.   EESA Does Not Have the Purpose or Effect of Advancing Islamic Religion

The complaint contains no factual allegations from which it could "plausibly" be

---

[15]  In the past, a court would also consider "whether the aid program created an 'excessive entanglement between church and state'" pursuant to the Supreme Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), but recent Supreme Court precedent "folds entanglement analysis into the effect analysis because 'entanglement is . . . an aspect of the inquiry into a statute's effect.'"  *Smith*, 549 F.3d at 656 (quoting *Agostini*, 521 U.S. at 233).

concluded that EESA has either the purpose or effect of advancing religion, or that the government has adopted a "broad policy" of approving, endorsing, promoting, funding and supporting Shariah-based finance in violation of the Establishment Clause. *Twombly*, 127 S.Ct. at 1964-65. A federal aid program will have the "purpose" of advancing religion only if its "predominant purpose" is to advance religion. *See Mercer County*, 432 F.3d at 634 (citing *McCreary County, Ky. v. ACLU*, 545 U.S. 844, 860 (2005)). But, the EESA's purpose – to address a major financial crisis – is entirely secular. *See Johnson v. Econ. Dev. Corp. of County of Oakland*, 241 F.3d 501, 512 (6th Cir. 2001) ("A state's decision to assist businesses in their operation in order to create and maintain jobs – regardless of the type of business – evidences a purpose that is both secular and understandable.") (internal citations and quotation marks omitted).

Congress passed the EESA in response to what knowledgeable government officials, business leaders, and eminent economists feared might be the imminent collapse of our nation's financial system. Thus, as stated in the legislation itself, the EESA's purpose is to "restore liquidity and stability to the financial system of the United States" in a manner that – "(A) protects home values, college funds, retirement accounts, and life savings; (B) preserves home ownership and promotes jobs and economic growth; (C) maximizes overall returns to the taxpayers of the United States; and (D) provides public accountability for the exercise of [the Secretary's] authority." 12 U.S.C. § 5201; *see generally* 154 Cong. Rec. H10702-06 (debate within the House of Representatives); 154 Cong. Rec. H10712-02 (Oct. 3, 2008) (same). Consistent with the secular purposes of the EESA, the Department of Treasury purchased $40 billion in AIG preferred stock pursuant to the Systematically Significant Failing Institution ("SSFI") program, the "primary objective" of which "is to provide stability and prevent

-16-

disruption to financial markets in order to limit the impact on the economy and protect American jobs, savings, and retirement security from the failure of a systematically significant institution."[16]  Thus, plaintiff's naked assertion that the government's purchase of AIG stock "lack[ed] a valid secular purpose," Compl. ¶ 61, is nothing more than a "formulaic recitation of the elements of a cause of action," which, in the absence of supportive factual allegations, is insufficient to state a claim that Congress's passage of the EESA, and the actions of the Department of Treasury in implementing EESA, have a predominantly religious purpose. *Twombly*, 127 S.Ct. at 1964-65.

Nor need the Court credit plaintiff's "legal conclusion couched as a factual allegation," *Twombly*, 127 S.Ct. at 1965 (quoting *Papasan v. Allain*, 478 U.S. at 265, 286 (1986)), that the Department of Treasury's purchase of AIG's preferred stock pursuant to the EESA has the "primary effect [of] the advancement of Islamic religion."  Compl. ¶ 61; *see Mitchell v. Helms*, 530 U.S. 791, 807-08 (2000) (statute violates Establishment Clause if it "has a primary effect of advancing or inhibiting religion.").  The Supreme Court has identified three criteria for evaluating whether a government aid program has the effect of advancing religion: (1) whether it results in governmental indoctrination; (2) whether it defines its recipients by reference to religion; (3) and whether it creates an excessive entanglement with religion.  *See Mitchell*, 530 U.S. at 808 (quoting *Agostini*, 521 U.S. at 234); *see also Johnson*, 241 F.3d at 513.

Plaintiff makes no allegations that the Department of Treasury's $40 billion purchase of AIG preferred stock – the proceeds of which were used by AIG exclusively to pay down its

---

[16] *See* SSFI Program Description, *available at* http://www.treas.gov/initiatives/eesa/ program-descriptions/ssfip.shtml (attached as Exhibit M); *see also* AIG Nov. 10, 2008 Press Release (describing purpose of transaction as "establish[ing] a durable capital structure for AIG.").

-17-

indebtedness to the FRBNY, *see supra* at p. 5 – results in government sponsored indoctrination of religion.  Nor does the complaint contain any allegations of fact from which it could plausibly be concluded that merely making Shariah-compliant insurance products available in the marketplace to those of the Islamic faith who wish to purchase them somehow indoctrinates others in the Islamic religion.  Likewise, plaintiff does not allege that EESA defines institutions eligible for TARP funds in religious terms – nor could he, as the statute provides the Secretary authority to purchase troubled assets from any "financial institution." *See* 12 U.S.C. § 5211(a)(1).

Plaintiff also makes no allegation of fact on which to plausibly find excessive entanglement with religion.  The complaint alleges government entanglement *with AIG*, predicated solely on the government's interest in AIG's financial success.  Compl. ¶ 23.  But AIG cannot be considered a "religious institution" simply by virtue of the fact that two of its subsidiaries offer Takaful financial products.[17]  Therefore allegations of entanglement with AIG will not suffice to establish entanglement with religion.  In addition, although a majority of AIG is owned by the AIG Credit Facility Trust for the ultimate benefit of the U.S. Treasury, the trustees are private citizens who are not involved in the day-to-day management of AIG, and are certainly not involved in the day-to-day management of AIG's subsidiaries that offer Takaful insurance products.  *See generally* AIG Credit Facility Trust Agreement; *supra* at p. 3-4.  Thus, there is simply no allegation from which an "excessive entanglement between church and state"

---

[17]  *See, e.g., Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736, 755 (1976) (holding that Catholic colleges were not "pervasively sectarian" despite "formal affiliation with the Roman Catholic Church," employment of Roman Catholic chaplains, sponsored religious exercises, and mandatory religion classes taught primarily by Roman Catholic chaplains); *Bradfield v. Roberts*, 175 U.S. 291, 298 (1899) (holding that a federally-chartered hospital is not converted "into a religious or sectarian body" even if the Catholic Church "exercises great and perhaps controlling influence over the management of the hospital.")

could be found here: the government's investment in AIG involves "'no inquiries into religious doctrine, . . . no delegation of state power to a religious body, . . . and no detailed monitoring and close administrative contact between secular and religious bodies.'"  *Steele v. Indus. Dev. Bd. of Metro. Gov't of Nashville*, 301 F.3d 401, 412 (6th Cir. 2002) (quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 696-97 (1989)).  In sum, there are simply no facts alleged from which a reasonable observer could conclude that the Secretary's investment of $40 billion in AIG pursuant to the EESA, used exclusively by AIG to pay down its indebtedness under the credit facility, has the effect of endorsing religion, just because AIG offers Takaful insurance products through two of its subsidiaries.

> **B.     Plaintiff Has Not Alleged Facts from Which It Could Plausibly Be Concluded that the Defendants Have a Broad Policy of Advancing, Promoting, or Supporting Shariah Finance in Violation of the Establishment Clause**

Finally, plaintiff's allegation that the Department of the Treasury "has adopted on behalf of the United States government a broad policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance," Compl. ¶ 52, fails to "present 'enough facts to state a claim for relief that is plausible on its face.'" *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1974).  The only fact alleged in support of plaintiff's claim is the Department of Treasury's sponsorship of a "'forum' for the staffs from U.S. banking regulatory agencies, Congress, the Department of the Treasury, and other parts of the Executive Branch." Compl. ¶ 53.  The forum was intended "to help inform the policy community about Islamic financial services, which are an increasingly important part of the global financial industry."  Ex. K.  For many attendees, this four hour seminar would be "their first and only opportunity to learn formally about Islamic finance."  *Id.*  As such, the forum included presentations on "US

regulation of Islamic financial institutions," on the US and global "market[s] for Islamic

financial services," and a general overview of Islamic finance. *Id.*

This forum has an obvious secular purpose: to educate policymakers about an important

part of the global financial industry. And there is simply no fact alleged in the complaint from

which a "reasonable observer" could conclude that this forum had the "effect" of advancing

religion. *Cf. Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 840 (1995)

(holding that government aid to student religious newspaper pursuant to a program intended to

"open a forum for speech . . . in recognition of the diversity and creativity of student life" does

not "advance religion." ); *Mercer County, Ky*, 432 F.3d at 638 (reasonable observer would not

view display of Ten Commandments in county courthouse as an "endorsement" of religion).

Accordingly, plaintiff's claim that hosting such a forum has "the purpose or effect of advancing

or inhibiting religion," *Zelman*, 536 U.S. at 648-49, is not "plausible" and, therefore, fails to state

a claim for violation of the Establishment Clause. This case must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court grant

defendants' motion to dismiss.

Respectfully submitted,

Dated: February 27, 2009

MICHAEL F. HERTZ
Acting Assistant Attorney General

TERRENCE G. BERG
United States Attorney

JAMES J. GILLIGAN
Assistant Director

s/ John R. Coleman
JOHN R. COLEMAN

-20-

Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Email: John.Coleman3@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2009, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the following: Robert J. Muise.

s/ John R. Coleman
JOHN R. COLEMAN (VA Bar # 70908)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8460
Email: John.Coleman3@usdoj.gov
