## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**KEVIN J. MURRAY,**

Plaintiff,

v.

**TIMOTHY F. GEITHNER**, in his official capacity as Secretary, U.S. Department of Treasury; **BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,**

Defendants.

Case No. 08-CV-15147

Hon. Lawrence P. Zatkoff

Magistrate Mona K. Majzoub

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
Brandon Bolling, Esq. (P60195)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001
Fax: (734) 930-7160

U.S. DEPARTMENT OF JUSTICE
John R. Coleman (Va. Bar No. 70908)
Trial Attorney
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, DC 20530
john.coleman3@usdoj.gov
(202) 514-4505
Fax: (202) 616-8460
*Counsel for Defendants*

LAW OFFICES OF DAVID YERUSHALMI, P.C.
David Yerushalmi, Esq.* (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 756206)
P.O. Box 6358
Chandler, AZ 85246
david.yerushalmi@verizon.net
(646) 262-0500
Fax: (801) 760-3901
*Application for admission to this court pending
*Counsel for Plaintiff*

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## ISSUES PRESENTED

I.     Whether Plaintiff, a federal taxpayer, has standing to challenge as a violation of the Establishment Clause the appropriation and expenditure of federal funds made in the exercise of Congress' power under the Taxing and Spending Clause that are being used to finance Shariah-based Islamic religious activities engaged in by a corporation that is owned and controlled by the federal government.

II.    Whether Plaintiff's challenge to the use of federal funds to finance Shariah-based Islamic religious activities presents a cognizable claim under the Establishment Clause.

## CONTROLLING AUTHORITY

ISSUE I:

> *Flast v. Cohen*, 392 U.S. 83 (1968)

> *Bowen v. Kendrick*, 487 U.S. 589 (1988)

ISSUE II:

> *Lemon v. Kurtzman*, 403 U.S. 602 (1971)

> *Hunt v. McNair*, 413 U.S. 734 (1973)

> *Bowen v. Kendrick*, 487 U.S. 589 (1988)

**TABLE OF CONTENTS**

ISSUES PRESENTED ........................................................................................................ i

CONTROLLING AUTHORITY ......................................................................................... ii

TABLE OF CONTENTS ................................................................................................... iii

TABLE OF AUTHORITIES ............................................................................................. iv

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT ...................................................................................................................... 8

   I.   PLAINTIFF HAS STANDING TO CHALLENGE THE USE OF FEDERAL
      FUNDS TO FINANCE SHARIAH-COMPLIANT RELIGIOUS ACTIVITIES ............. 8

   II.  PLAINTIFF'S COMPLAINT STATES AN ESTABLISHMENT CLAUSE CLAIM .... 15

CONCLUSION ................................................................................................................. 20

CERTIFICATE OF SERVICE ......................................................................................... 21

## TABLE OF AUTHORITIES

*Agostini v. Felton,*
521 U.S. 203 (1997) ............................................................................................... 17, 20

*Allen v. Wright,*
468 U.S. 737 (1984) ................................................................................................. 8, 15

*Bowen v. Kendrick,*
487 U.S. 589 (1988) ...............................................................................................*passim*

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Assoc.,*
531 U.S. 288 (2001) ..................................................................................................... 20

*Committee for Pub. Educ. & Religious Liberty v. Nyquist,*
413 U.S. 756 (1973) ................................................................................................. 13, 18

*Commack Self-Service Kosher Meats, Inc. v. Weiss,*
294 F.3d 415 (2d Cir. 2002) ......................................................................................... 19

*County of Allegheny v. A.C.L.U.,*
492 U.S. 573 (1989) ...................................................................................................... 16

*Edwards v. Aguillard,*
482 U.S. 578 (1987) ...................................................................................................... 16

*Everson v. Board of Educ.,*
330 U.S. 1 (1947) .......................................................................................................... 16

*Flast v. Cohen,*
392 U.S. 83 (1968) .................................................................................................*passim*

*Frothingham v. Mellon,*
262 U.S. 447 (1932) ................................................................................................. 10, 11

*Hein v. Freedom From Religion Found.,*
127 S. Ct. 2553 (2007) ......................................................................................... 12, 13, 14

*Henry Builders, Inc. v. United States,*
Case No. 1:09-cv-0288-ENV-JMA (E.D.N.Y. Jan. 26, 2009) ..................................... 15

*Hunt v. McNair,*
413 U.S. 734 (1973) ........................................................................................... 11, 17, 20

*Jones v. City of Cincinnati*,
521 F.3d 555 (6th Cir. 2008)........................................................................... 15

*Lebron v. National R.R. Passenger Corp.*,
513 U.S. 374 (1995)...................................................................................... 6, 7

*Lemon v. Kurtzman*,
403 U.S. 602 (1971)......................................................................................... 16

*Lynch v. Donnelly*,
465 U.S. 668 (1984)......................................................................................... 17

*McCreary County v. A.C.L.U.*,
545 U.S. 844 (2005)......................................................................................... 16

*Mitchell v. Helms*,
530 U.S. 793 (2000)......................................................................................... 13

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000)................................................................................... 16, 17

*Walz v. Tax Commission*,
397 U.S. 664 (1970)......................................................................................... 16

*Weinstein Enters. v. Orloff*,
870 A.2d 499 (Del. 2005)................................................................................... 6

## Federal Rules & Statutes

Fed. R. Civ. P. 12(b)(6)..................................................................................... 15

12 U.S.C. § 343.................................................................................................... 7

12 U.S.C. § 5201.................................................................................................. 1

12 U.S.C. § 5211......................................................................................... 12, 14

12 U.S.C. § 5225......................................................................................... 3, 14

17 C.F.R. § 230.405............................................................................................ 6

**Constitutional Provision**

U.S. Const. amend. I ................................................................................................................ 15

## INTRODUCTION

This case is a federal taxpayer challenge to the impermissible use of federal funds that were appropriated and expended through the exercise of Congress' power under the Taxing and Spending Clause. Pursuant to the "Emergency Economic Stabilization Act of 2008" ("EESA"), 12 U.S.C. § 5201 *et seq.*, Congress appropriated and authorized $40 billion in taxpayer money to financially support American International Group, Inc. ("AIG"). These appropriated funds are being used to finance Shariah-based Islamic religious activities in violation of the Establishment Clause. Plaintiff, a federal taxpayer, has standing to raise this challenge.

There is little doubt that this country is facing "possibly the worst financial crisis . . . since the Great Depression." (Defs.' Br. at 1). And while our federal government may be compelled to act in unprecedented ways during these difficult times, the crisis itself does not excuse the government from the proscriptions of the federal Constitution. Moreover, contrary to Defendants' suggestion, this case does not seek to undermine Congress' efforts to "protect Americans' jobs, savings, and retirement security." (Defs.' Br. at 1). Instead, it seeks to uphold the longstanding constitutional prohibition on the use of federal funds to finance religious activities. Pursuant to Article III, the oversight necessary to ensure such compliance properly rests with this Court, which has the authority to cure constitutional violations by devising appropriate remedies, *see Bowen v. Kendrick*, 487 U.S. 589, 622 (1988), such as ordering the divestiture of impermissibly funded religious activities.

In many respects this case is *sui generis*. It presents an unprecedented set of facts which magnify the constitutional violation in that the recipient of the federal funds is owned and controlled by the federal government. Defendants' assertion that the federal government lacks

such ownership and control cannot withstand even a modest inspection. A review of the facts demonstrates that there is no "Chinese wall" between AIG and the federal government, and the one claimed by Defendants contains a giant door to which the government owns the key.

In the final analysis, Defendants' motion is not well founded and should be denied.

## STATEMENT OF FACTS

Plaintiff, a federal taxpayer and devout Catholic, objects to and is harmed by the appropriation and disbursement of public funds to AIG and being forced as a taxpayer to contribute to the propagation of Islamic beliefs and practices predicated upon Shariah law, which is hostile to his religion. Plaintiff also objects to and is harmed by Defendants' policy of endorsing Shariah-compliance. The government's endorsement of Shariah-based Islam sends a message to Plaintiff, who is a non-adherent, that he is an outsider, not a full member of the political community, and an accompanying message to those who are adherents that they are insiders, favored members of the political community. This endorsement conveys a similar message of disfavor to those Muslims who reject Shariah-based Islam. (Compl. at ¶¶ 5, 15, 51).

In September 2008, the Board of Governors of the Federal Reserve System ("Fed") took the unprecedented move of acquiring a majority ownership interest in AIG on behalf of the federal government.[1] Shortly thereafter, on October 3, 2008, Congress exercised its authority under the Taxing and Spending Clause and passed EESA. EESA authorized the Treasury

---

[1] The Credit Facility, which was created by the Fed pursuant to its authority, allowed AIG to obtain up to $85 billion in federal funds. (Defs.' Ex. A ("Credit Agreement")). In exchange for the Credit Facility, AIG signed the Credit Agreement, which required 79.9% (later reduced to 77.9%) of the dividends and voting rights of AIG to pass to the Treasury via a Trust. This transfer of ownership and control was effected through the issuance and sale of preferred shares to the Treasury (held in trust by three Trustees). Per the agreement, shares of AIG's Shariah-compliant businesses, *inter alia*, have been pledged to the government as secured collateral.

Secretary "to purchase, and to make fund commitments to purchase, troubled assets from any financial institution," which included AIG.  Pursuant to this "express congressional mandate" and "specific congressional appropriation" AIG was the recipient of $40 billion in taxpayer money, which was used to purchase additional preferred stock and further support the government's earlier ownership position.[2]  Consequently, as majority owner, the federal government has a vested interest in ensuring the success of AIG and stands to profit by that success, creating an entanglement with AIG.  And by supporting its ownership interest with taxpayer money, maintaining a vested interest in the success of AIG, and standing to profit from that success, the federal government has insinuated itself into a position of interdependence so that it is in effect a joint participant in AIG's activities, creating a symbiotic relationship such that AIG's activities can be fairly attributed to the government.  (Compl. at ¶¶ 18-24).

AIG engages in Shariah-compliant financing, which subjects certain financial activities to the dictates of Islamic law.[3]  This specifically includes any profits or interest obtained through such financial activities.[4]  Compliance with Shariah is achieved by having a Shariah authority

---

[2] When Congress passed EESA, it understood that AIG would be a direct beneficiary of the appropriated funds.  *See* 154 Cong. Rec. H10712-02 (Oct. 3, 2008) (Defs.' Br. at 4 (citing congressional record); Defs.' Ex. D ("AIG Press Release")).  With the receipt of an additional $30 billion, AIG is now the recipient of 10% of the federal funds appropriated by EESA.  *See* 12 U.S.C. § 5225; (Pl.'s Ex. 1 ("Term Sheet of March 2, 2009")).

[3] AIG describes "Sharia" as "Islamic law based on *Quran* (sic) and the teachings of the Prophet (PBUH)," which is a reference to the canonized *aHadith*.  Consequently, AIG and the federal government are taking sides in an ongoing theological debate among Muslims, some of whom believe Shariah and the *aHadith* are contrary to Islam.  (Compl. at ¶¶ 5, 34-35).

[4] An example of Shariah-compliant financing is Takaful Insurance, which is "[i]nsurance that avoids prohibited elements in accordance with the Sharia law."  These products are Islamic because, *inter alia*, AIG "do[es] not invest in anything that is haram" and it "do[es] not borrow, lend or enter into any financial transaction that is unIslamic."  According to AIG, "haram" is "[p]rohibited elements in Islam according to Sharia."  This business is pervasively sectarian; its secular purposes and its religious mission are inextricably intertwined.  (Compl. at ¶¶ 28, 29).

3

issue a *fatwa* or legal ruling which mandates a certain behavior or, in the case of Shariah-compliant finance, approves the particular investment or type of financial transaction. The role of the Shariah authorities is central to all Shariah adherents. With the aid of EESA funds, AIG employs a "Shariah Supervisory Committee." The role of this Shariah authority "is to review [AIG's] operations, supervise its development of Islamic products, and determine Shariah compliance of these products and [AIG's] investments." To choose these Shariah authorities, AIG must select among competing theological perspectives. (Compl. at ¶¶ 27-51).

Shariah compliance includes a focus on "purification," which has two elements. One element is an obligatory charitable contribution called *zakat*, which is a religious tax for assisting, *inter alia*, those that "struggle [*jihad*] for Allah." The other element is the purification of a Shariah-compliant investment or financial transaction that has been tainted with forbidden revenue under Islamic law. In this latter meaning of "purification," the forbidden funds must be disgorged by donating the money to an acceptable Islamic "charity," which excludes any Christian or Jewish charity. Thus, the federal government is now a financial supporter and majority owner of a corporation engaged in the business of collecting religious taxes to fund interests adverse to all "infidels" under Islamic law. (Compl. at ¶¶ 47-50).

AIG employs consolidated financing; all of its funds are fungible, and they flow through a single port. All funds going to AIG, including EESA funds, are used to financially support AIG's activities, including its Islamic religious activities. EESA provides no mechanism by which Defendants or any other officer or agency of the federal government could police the expenditure of federal funds to ensure that they are not being used for an impermissible purpose, such as funding AIG's Islamic activities. (Compl. at ¶¶ 25, 26, 33, 49).

AIG is the "market leader" in Shariah-complaint insurance with a "global expansion strategy."[5]  With the assistance of EESA funds, in December 2008 AIG expanded its religious activities in the United States, offering new products that "are compliant with key Islamic finance tenets."  According to AIG, "[t]he introduction of Takaful products in the U.S. represents an important and emerging growth opportunity for AIG Commercial Insurance."  Thus, AIG's Shariah-compliant financing is benefitting directly from federal funds.  (Compl. at ¶¶ 30-33).

In November 2008, the Treasury Department sponsored a forum on Shariah-complaint financing, which was directed toward government policy makers.  This forum was a government approval and endorsement of Shariah-compliant financing and thus a government endorsement of a particular view of the Islamic religion.  (Compl. at ¶¶ 52-54).

Defendants claim that the $40 billion of EESA money (first tranche) was only to be used to pay down the Credit Facility.  (*See* Defs.' Br. at 6).  This claim is illusory.  In reality, EESA funds went into one pocket of AIG in order to pay down the debt only to allow AIG to continue to borrow to fund its operations.  Indeed, after the payment toward the reduction of the $85 billion debt, the Credit Facility commitment remained at $60 billion, which simply means that AIG had available $15 billion of the $40 billion to use to fund its operations, such as its religious activities.  (*See* Defs. Ex. D ("AIG Press Release")).  This is further illustrated graphically by AIG in its March 2, 2009, Form 8-K filing with the SEC.  (Pl.'s Ex. 2).

While not necessary to defeat Defendants' motion, it is important to point out that Defendants' assertion that the federal government does not own or control AIG (or that there is a legally cognizable separation of interests between the two) is also illusory.  AIG has been

---

[5] "Takaful was estimated to be a $5.7 billion market globally with over 130 providers in 2006. The Takaful market is estimated to be in excess of $10 billion by 2010." (Compl. at ¶ 32).

nationalized and is thus an instrument of the federal government. *See, e.g., Lebron v. National R. R. Passenger Corp.*, 513 U.S. 374 (1995) (holding that Amtrak was an instrumentality of the federal government for purposes of the First Amendment). Indeed, the Credit Facility itself required a transfer of ownership and control of AIG to the Treasury. (*See* Defs.' Ex. A ("Credit Agreement") at pp. 139-41 and definitions of "Change in Control" and "Control" at pp. 9-10)).[6] Accordingly, the Trust Agreement required the Trustees to file "change of control" forms and statements to comply with state insurance regulations. (*See* Defs.' Ex. C ("Trust Agreement") at Section 2.03 (i)-(ii)). In a March 4, 2009, Form 8-K filing with the SEC, AIG reported the transfer of the preferred shares to the Trust with the following note on control:

> **Item 5.01.  Changes in Control of Registrant.**
> As a result of the Transaction, *a change in control of AIG has occurred.* Pursuant to the Purchase Agreement, AIG and AIG's Board of Directors are obligated to work in good faith with the Trust *to ensure corporate governance arrangements satisfactory to the Trust*.

(*See* Pl.'s Ex. 3) (emphasis added). The illusion that AIG is not being managed by the federal government directly is belied further by a recent press release that was filed with the SEC. In the release, the federal government announced its "commitment to the orderly restructuring of AIG." (Pl.'s Ex. 4). And in its recently filed annual report to the SEC (Form 10-K), AIG explained the control exercised by the Trust as follows:

---

[6] The definitions of "Change of Control" and "Control" used in the agreement are common in securities and corporate law. *See* 17 C.F.R. § 230.405 ("The term control . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."); *Weinstein Enters. v. Orloff*, 870 A.2d 499, 506-07 (Del. 2005) (describing "control" under Delaware corporate law as controlling a majority of voting shares and the ability to replace directors).

**Controlling Shareholder**
*Following the issuance of the Series C Preferred Stock to the AIG Credit Facility Trust, **a trust for the sole benefit of the United States Treasury**, the Trust, which is overseen by three independent trustees, **will hold a controlling interest in AIG. AIG's interests and those of AIG's minority shareholders may not be the same as those of the Trust or the United States Treasury**.*

(Pl.'s Ex. 5) (emphasis added).

In sum, there can be little doubt that the Trust is effectively an instrumentality of the federal government. It was created by the Fed pursuant to its authority under 12 U.S.C. § 343. The Trustees were appointed by the FRBNY, but only after consultation with the Treasury. Replacement Trustees must also be subject to Treasury consultation. All acts by the Trustees must be for the sole benefit of the Treasury. The Trustees are required to exercise their voting rights to ensure that corporate governance of AIG is beneficial to the Treasury and to protect the overall stability of the economy (which itself is unusual for a shareholder). All funds collected by dividend or disposition of the stock are paid into the Treasury. As a result, all interests of AIG are now subservient to the interests of the federal government. In *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374 (1995), the Supreme Court held that Amtrak was an instrumentality of the federal government for purposes of the First Amendment with far less direct governmental interests. Thus, even with the "independence" granted to the Trustees and their inability to sit on the board of AIG or to put government employees on the board, the Trustees have the authority and power of an independent agency of the federal government precisely because their sole duty is to act in the place of and for the benefit of the government. All of the beneficial interests of the Trust belong to the Treasury. The only "wall of separation" erected—and it is a low one—is that the Trustees' exercise of their decision-making authority is not directly eclipsed by the Treasury or the FRBNY. However, the Trust as a governmental

authority is in fact eclipsed and controlled in whole by the Fed.  The agreement, by its own terms, may be set aside unilaterally by the federal government at any time.  Section 1.03 provides explicitly that the Fed has unfettered authority to revoke or amend the Trust at will. (Defs.' Ex. C ("Trust Agreement")).  Given the circular control (the Fed controls the Trust and its very existence and terms; the Trust controls the voting rights of AIG shares; the voting rights of AIG shares control the board's composition and even by proxy actions on specific matters), the federal government could unilaterally alter any and all agreements it had entered into with AIG by forcing a shareholder meeting and proxy or by simply replacing the board with those who would follow its orders (the agreements could also be unilaterally changed to allow the Trustees or the Fed or the Treasury to appoint its own board members).  It is, at last, a poor attempt to create the appearance of independent action by the Trustees.  By any measure, the federal government owns and controls AIG.

## ARGUMENT

## I.   PLAINTIFF HAS STANDING TO CHALLENGE THE USE OF FEDERAL FUNDS TO FINANCE SHARIAH-COMPLIANT RELIGIOUS ACTIVITIES.

The requisite elements for standing to invoke federal court jurisdiction under Article III are well established: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).  The alleged injury must be "distinct and palpable, and not abstract or conjectural or hypothetical." *Id.* (internal quotations and citations omitted).  Here, Plaintiff's challenge to the use of federal funds to finance Shariah-compliant religious activities meets all of the elements necessary to confer taxpayer standing and to invoke this Court's jurisdiction.

Pursuant to controlling Supreme Court precedent, federal taxpayers have standing to advance Establishment Clause challenges to the exercise of Congress' taxing and spending power under Article I, § 8, of the Constitution. *Flast v. Cohen*, 392 U.S. 83, 88 (1968). Federal taxpayers also have standing to advance "as applied" challenges to the impermissible use of such funds. *See Bowen v. Kendrick*, 487 U.S. 589, 619 (1988) (finding standing to assert an "as applied" challenge to how federal funds were being used by individual grantees).

In *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court addressed the question of whether the plaintiffs had standing as taxpayers to advance a constitutional challenge to the expenditure of federal funds under the Elementary and Secondary Education Act of 1965. The Act established, *inter alia*, "a program of federal grants for the acquisition of school library resources, textbooks, and other printed and published instructional materials 'for the use of children and teachers in public and private elementary and secondary schools.'"[7]  *Id.* at 86-87 (quoting the Act). The plaintiffs alleged that federal funds were being used to finance instruction in reading, arithmetic, and other subjects, and to purchase textbooks and other instructional materials for use in religious schools in violation of the Establishment Clause. *Id.* at 87-88.

In its decision, the Court articulated the following test to determine whether a litigant can show a *taxpayer's stake* in the outcome sufficient to invoke federal court jurisdiction:

> The nexus demanded of federal taxpayers [to satisfy the Article III standing requirement] has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, *a*

---

[7] The Act did not "expressly mandate" or "specifically appropriate funds for" religious training, religious indoctrination, or any other specific religious activity. Nevertheless, the plaintiffs had standing based on their allegation that federal funds flowing from the Act were being impermissibly used to finance religious education. Here, EESA plainly mandates, contemplates, and specifically appropriated funds to finance the operations of AIG, and these funds are being used to finance religious activities in violation of the Establishment Clause.

> *taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. . . .* Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, *the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power* and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8.

*Id.* at 102-03 (emphasis added).

Applying this test, the Court concluded that the plaintiffs satisfied both nexuses to support their standing claim because (1) "[t]heir constitutional challenge [was] made to an exercise by Congress of its power under Art. I, § 8, to spend for the general welfare, and the challenged program involve[d] a substantial expenditure of federal tax funds,"[8] and (2) the challenge [was] brought under the Establishment Clause, which "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, § 8." *Id.* at 103-04.

As a federal taxpayer, Plaintiff has a stake in the outcome of this case sufficient to invoke the jurisdiction of this Court because (1) this case is a constitutional challenge to a substantial expenditure of federal tax funds made pursuant to the exercise of Congress' taxing and spending power under Art. I, § 8, and (2) the challenge is brought under the Establishment Clause, which is a specific limitation on such power.[9]

---

[8] The Court noted that Congress appropriated "[a]lmost $1,000,000,000" to implement the Act, *see Flast*, 392 U.S. at 103, n.23, which is a trifle amount compared with the billions of dollars of federal funds that are going *directly to AIG*.

[9] The correctness of this conclusion is illustrated by comparing the facts of *Flast* and those of the present case with the facts of *Frothingham v. Mellon*, 262 U.S. 447 (1932), a case in which the Court held that the plaintiff lacked taxpayer standing to challenge the Maternity Act of 1921. In *Frothingham*, the challenge was to a federal spending program, thereby establishing the first nexus requirement of *Flast*. However, the taxpayer lacked standing because she did not base her

The Supreme Court's decision in *Bowen v. Kendrick*, 487 U.S. 589 (1988), further supports Plaintiff's standing argument.  In *Bowen*, the Court rejected the argument that the plaintiffs lacked standing to assert their "as applied" challenge to the Adolescent Family Life Act ("AFLA") because such a challenge was to executive action, not to an exercise of congressional authority under the Taxing and Spending Clause.  In doing so, the Court stated, "We do not think, however, that [plaintiffs'] claim that AFLA funds are being *used improperly by individual grantees* is any less a challenge to congressional taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the Secretary." *Id.* at 619 (emphasis added).  The Court held that the federal taxpayers had standing to assert their Establishment Clause claim and remanded the case, in part, so that the district court could consider "whether in *particular cases* AFLA aid has been used to fund 'specifically religious activit[ies] in an otherwise substantially secular setting.'"[10]  *Id.* at 621 (quoting *Hunt v. McNair*, 413 U.S. 734, 743 (1973)) (emphasis added).  The Court concluded that the district court "should consider on remand whether particular AFLA grants have had the primary effect of advancing

---

constitutional challenge on an allegation that Congress exceeded a *specific limitation* on its taxing and spending power.  Rather, the taxpayer alleged that Congress exceeded its general powers delegated by Art. I, § 8, and had thereby violated the Tenth Amendment, and that by increasing her tax liability, she was being deprived of her property without due process of law.  As the Court noted in *Flast*, none of "the harm [the *Frothingham* taxpayer] alleged resulted from a breach by Congress of the specific constitutional limitations imposed upon an exercise of the taxing and spending power," *Flast*, 392 U.S. at 104-05, such as the limitations imposed by the Establishment Clause.  Thus, the plaintiff failed to meet the second nexus requirement of *Flast*.  *Id.*  Here, Plaintiff's complaint does not suffer from any of the ills of the *Frothingham* complaint.

[10] Interestingly, the Court remanded the case to determine whether funds in particular cases were being used in violation of the Establishment Clause even though Congress "expressed the view that the use of [AFLA] funds by grantees to promote religion, or to teach religious doctrines of a particular sect, would be contrary to the intent of the statute" and the Secretary had "promulgated a series of conditions to each grant, including a prohibition against teaching or promoting religion."  *Bowen*, 487 U.S. at 621-22.  Here, neither Congress nor the Treasury Secretary has prohibited AIG from using federal funds to support its Shariah-compliant religious activities.

religion," stating further that if the court should "conclude that the Secretary's current practice does allow such grants, it should devise a remedy to insure that grants awarded by the Secretary comply with the Constitution and the statute." *Bowen,* 487 U.S. at 622.

In this action, Plaintiff asserts that federal funds appropriated and authorized by EESA are being used for improper purposes (to finance Shariah-compliant religious activities) by an individual grantee (AIG). And based on controlling precedent, it makes little difference that the challenged funding flowed through and is administered by the Secretary of the Treasury, who, by the way, was given express authority by Congress to administer the spending program. (*See* Compl. at ¶ 16); 12 U.S.C. § 5211. As the Court in *Bowen* noted, "*Flast* itself was a suit against the Secretary of HEW, who had been given the authority under the challenged statute to administer the spending program that Congress had created." *Bowen,* 487 U.S. at 619.

In light of *Flast* and *Bowen*, it is evident that Plaintiff, a federal taxpayer, has standing to challenge as a violation of the Establishment Clause the congressional appropriation and expenditure of federal funds that are being used by a grantee to finance religious activities. Defendants' reliance on *Hein v. Freedom From Religion Found.*, 127 S. Ct. 2553 (2007), to the contrary is misplaced. (*See* Defs.' Br. at 12-14). Justice Alito's plurality opinion did not overrule *Flast*. Instead, it reaffirmed the two part nexus test discussed above. *See Hein*, 127 S. Ct. at 2564-65. In his discussion of *Flast*, Justice Alito pointed out that the challenged disbursements "were made pursuant to an express congressional mandate and a specific congressional appropriation" in that the challenged Act expressly provided funding to support education, including funding to support "library resources, textbooks, and other instructional materials" for both public and private schools. *Id.* at 2565. Justice Alito stated parenthetically

12

that the "private" schools also included "religiously affiliated schools"; however, the Act itself did not *expressly* mandate funds for "religious" schools, which was the gravamen of the plaintiffs' challenge, nor did it *expressly* mandate funds to finance religious education or any other religious activities.  To avoid this inconvenient fact, Justice Alito states in a footnote that "Congress surely understood that much of the aid mandated by the statute would find its way to religious schools."  *Id.* at n.3.  Similarly here, Congress fully intended that EESA funding would go to AIG and "Congress surely understood" that this federal aid would support AIG's operations, including its religious activities since AIG was well known as the world leader in Shariah-compliant insurance.  And if there were any doubt about that, around the time that EESA funds were being sent to AIG, the Treasury was hosting a conference on Islamic financing.

In *Hein*, Justice Alito also highlighted the obvious fact that the plaintiffs had standing in *Bowen* to mount an as-applied challenge to AFLA because it was "at heart" a spending program authorized by Congress.  *Id.* at 2567.  He also noted that AFLA contemplated that some of the funds might go to projects involving religious groups.  *Id.*  This point, however, is unremarkable because religious groups are not *per se* excluded from receiving federal grants.  *See Mitchell v. Helms*, 530 U.S. 793 (2000).  However, the plaintiffs' as-applied challenge was allowed to proceed <u>not</u> because religious organizations were receiving funds, but because the plaintiffs alleged that some of the money was being used for impermissible purposes by these organizations, such as funding religious activities.  *See Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 783 (1973) (focusing on what the public money bought when it reached the end point of its disbursement).  Similarly here, Plaintiff alleges that the funds appropriated and spent pursuant to EESA—a specific congressional mandate—are being used to

fund religious activities in violation of the Establishment Clause.   Thus, "[t]he link between congressional action and constitutional violation" plainly exists.   *Hein*, 127 S. Ct. at 2566.

Justice Alito's opinion in *Hein* is rather unremarkable in light of *Flast* and *Bowen*, and it does not alter Plaintiff's standing in this case.   In *Hein*, the plaintiffs did not base their claims on any congressionally enacted spending program.   Rather, the money used to fund the challenged activities came from general appropriations provided to the Executive Branch to support its day-to-day activities.   *Id.* at 2566.   Consequently, the use of these funds resulted from executive discretion, not congressional action.   If, for example, the Executive Branch wanted to use these general funds to purchase office furniture or to hold a Super Bowl party, it was within its discretion to do so.   The same cannot be said here.   Defendants do not have unfettered discretion to determine how EESA funds could be used.   *See* 12 U.S.C. §§ 5211, 5225 (limiting use of funds).   Rather, Congress specifically appropriated and expressly mandated that the funds be used to purchase assets from critical financial institutions, such as AIG, in order to support the operations of these institutions.   Thus, unlike the funds at issue in *Hein*, Defendants could not use EESA funds to buy office furniture or to hold a Super Bowl party, for example—these funds had to be used pursuant to the express mandate of Congress, and pursuant to this mandate, they are being impermissibly used to fund Shariah-compliant religious activities.   Thus, Plaintiff has a sufficient stake as a federal taxpayer in the outcome of this controversy.

In sum, Defendants' brief restates many general platitudes with regard to Article III standing, including the general rule regarding the prohibition against taxpayer standing.   (Defs.' Br. at 11).   However, the *Flast* decision, which remains controlling authority even after *Hein*, makes clear that an Establishment Clause challenge to the exercise of congressional taxing and

spending power is an established *exception* to this general rule.  Unlike actions challenging congressional taxing and spending powers generally, the Establishment Clause is a *specific limitation* imposed upon the exercise of this congressional power.[11]  Thus, as *Flast* held, plaintiffs with an Establishment Clause claim can "demonstrate the necessary stake as taxpayers in the outcome of the litigation to satisfy Article III requirements." *Flast*, 392 U.S. at 102.

In the final analysis, a federal taxpayer, such as Plaintiff, has an independent right under the Establishment Clause to challenge the impermissible use of federal funds appropriated and expended pursuant to Congress' taxing and spending power.  When such funds are being used to support religious activities, as in this case, a federal taxpayer suffers a concrete injury.  And this injury is indisputably "traceable" to the challenged spending and "likely to be redressed by" an injunction prohibiting it.  *See Allen*, 468 U.S. at 751.  Consequently, Plaintiff meets all of the elements necessary to confer standing and to invoke this Court's jurisdiction under Article III.

## II.   PLAINTIFF'S COMPLAINT STATES AN ESTABLISHMENT CLAUSE CLAIM.

Defendants' motion tests the legal sufficiency of Plaintiff's Complaint.  Fed. R. Civ. P. 12(b)(6).  When reviewing this motion, the Court must construe the Complaint in the light most favorable to Plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of Plaintiff. *See Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

The Establishment Clause famously states, "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  Despite the absence of precisely stated prohibitions, it was intended to protect against "three main evils": "sponsorship, financial

---

[11] The fact that a New York federal court dismissed *sua sponte* an <u>equal protection</u> challenge to EESA is unremarkable and wholly irrelevant.  (*See* Defs.' Br. at 14, Ex. L) (citing *Henry Builders, Inc. v. United States*, Case No. 1:09-cv-0288-ENV-JMA (E.D.N.Y. Jan. 26, 2009)).

support, and active involvement of the sovereign in religious activity.'" *Lemon v. Kurtzman*, 403

U.S. 602, 612 (1971) (quoting *Walz v. Tax Commission*, 397 U.S. 664, 668 (1970)).  In *Everson*

*v. Board of Educ.*, 330 U.S. 1 (1947), the Court stated:

> *No tax in any amount*, large or small, can be levied to support *any* religious
> activities or institutions, *whatever they may be called*, or *whatever form they may*
> *adopt* to teach or practice religion.

*Id.* at 16 (emphasis added).  Moreover, the Establishment Clause prohibits the government from

engaging in activity that "is sufficiently likely to be perceived" as an endorsement of a particular

religion.  *See County of Allegheny v. A.C.L.U.*, 492 U.S. 573, 597 (1989).

    While the Supreme Court has struggled with creating a single test for determining when

the government has violated the Establishment Clause, the test set forth in *Lemon v. Kurtzman*,

403 U.S. 602 (1971), remains the central tool for this Court's analysis.  Under the *Lemon* test, a

governmental action is unconstitutional if <u>any</u> one of the following applies: (1) it does not have a

valid secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it

excessively entangles government with religion.  *Lemon*, 403 U.S. at 612-13.

    When evaluating the "purpose" of a governmental act under *Lemon*, the reviewing court

is required to scrutinize the government's actual purpose based on the facts and not merely

accept the government's self-serving statements in its defense.  *See Edwards v. Aguillard*, 482

U.S. 578 (1987); *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290 (2000).  As the Supreme Court

stated recently, "The eyes that look to purpose belong to an 'objective observer,' one who takes

account of the traditional external signs that show up in the text, legislative history, and

implementation of the statute, or comparable official act."  *McCreary County v. A.C.L.U.*, 545

U.S. 844, 862 (2005) (internal quotations and citation omitted).  Moreover, as the Court

16

admonished in *McCreary County*, a reviewing court should not treat the "purpose enquiry" as if it "were so naive that any transparent claim to secularity would satisfy it, and [should not] cut context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances." *Id.* at 863-64.

Under *Lemon*, this Court is also required to evaluate the "effect" of the challenged act *irrespective* of its purpose. Indeed, "the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions." *Santa Fe Indep. Sch. Dist.,* 530 U.S. at 307 n.21 (internal quotations and citations omitted). In *Hunt v. McNair*, 413 U.S. 734, 743 (1973), the Court made clear that federal aid will have "a primary effect of advancing religion . . . when it funds a specifically religious activity in an otherwise substantially secular setting," as in this case. Thus, based on *Hunt*, Plaintiff has sufficiently alleged an Establishment Clause claim to defeat Defendants' motion.

In *Agostini v. Felton*, 521 U.S. 203, 218, 232-33 (1997), the Court further modified *Lemon* by folding the entanglement inquiry into the primary effect inquiry for funding cases since both inquiries tended to rely on the same evidence. The Court also acknowledged that the endorsement test was still applicable. *Id.* at 235 (concluding that the spending program "cannot reasonably be viewed as an endorsement of religion"). Pursuant to an endorsement inquiry, "[t]he purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid." *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor J., concurring).

A review of the alleged facts in light of these established legal principles leads to the firm conclusion that the Complaint states an Establishment Clause claim.  In 2008, the government took unprecedented action by acquiring a majority ownership interest in AIG.  Through EESA, the government then provided further support for its investment by granting AIG $40 billion in taxpayer money, which allowed AIG to continue its operations, including its religious activities. AIG employs consolidated financing; all of its funds are fungible and flow through a single port. Therefore, all funds going to AIG are used to financially support AIG's activities, including its religious activities.  In fact, despite the recession and the failing economy worldwide, shortly after receiving this federal money, AIG announced that it was *expanding* its religious activities in the United States.  And there are no restrictions in EESA that bar the use of the funds to support AIG's religious activities, and there is no mechanism in EESA by which the government could police this impermissible use of the funds.  Thus, it is factually correct, and entirely reasonable to infer, that EESA funds are supporting AIG's religious activities in violation of the Establishment Clause.[12]

---

[12] In *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 774 (1973), the Supreme Court struck down, *inter alia*, the "maintenance and repair" provisions of a New York statute that permitted aid to nonpublic schools.  In doing so, the Court noted that the grants were "given largely without restriction on usage."  The Court observed that

> [n]othing in the statute, for instance, bars a qualifying school from paying out of state funds the salaries of employees who maintain the school chapel, or the cost of renovating classrooms in which religion is taught, or the cost of heating and lighting those same facilities.  Absent appropriate restrictions on expenditures for these and similar purposes, it simply cannot be denied that this section has a primary effect that advances religion in that it subsidizes directly the religious activities of sectarian elementary and secondary schools.  *Id.*

Similarly here, there are no restrictions on AIG's use of the funds, thereby allowing AIG to fund its religious activities, including paying the salaries of its "Shariah Supervisory Committee." Absent an appropriate restriction, "it simply cannot be denied" that the use of these funds has the primary effect of advancing religion in that they subsidize directly AIG's religious activities.

While Plaintiff does not dispute that it is a secular purpose to "restore liquidity and stability to the financial system of the United States," that alone does not end the inquiry.  As the Supreme Court made plain, it is error to cut context out of this inquiry.  Here, the funding to AIG was not done in a vacuum.  At the time of the funding, the federal government had a majority ownership interest in and absolute control over AIG.  Certainly, the federal government was aware of AIG's activities prior to EESA funding, including knowledge of the fact that AIG was the world leader in Shariah-compliant insurance.  In fact, near the time of EESA funding, the Treasury Department itself held a forum on Shariah-compliant financing, giving this Islamic religious practice the federal government's stamp of approval.[13]  In sum, the government's ownership interest in AIG, its knowledge of AIG's religious activities, its endorsement and approval of these activities, and its failure to place any restrictions on the use of federal funds to support these activities would lead a reasonable observer to conclude that the government's purpose was unconstitutional.  It should be noted that the purpose need not be nefarious, just impermissible.  The government, for example, might rightly decide that the success of all private schools is beneficial to the over all success of our national public school system.  If, however, private schools experience a financial crisis and the government acquires a controlling ownership interest in them and then passes legislation to spend billions of taxpayer dollars to support the schools' general operations, which includes funding the religious activities of the sectarian private schools, such a purpose (and effect) would be impermissible.  It is no different here.

---

[13] It also violates the Establishment Clause for the government to throw its weight in support of a particular religious doctrine, such as supporting Shariah law.  *See Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425 (2d Cir. 2002) (holding that the State violated the First Amendment by suggesting a "preference for the views of one branch of Judaism").

19

Nonetheless, irrespective of the purpose, the illicit "effect" of the government's actions are sufficient to allege a constitutional violation. As the Supreme Court made clear in *Hunt v. McNair*, when taxpayer money is being used to fund a specifically religious activity, even when the activity occurs in an otherwise secular setting, the "effect" of such funding violates the Establishment Clause. *Hunt*, 413 U.S. at 743. In *Agostini*, the Court suggested three factors for determining whether such funding has the effect of advancing religion: (1) whether it results in governmental indoctrination; (2) whether it defines its recipients by reference to religion; or (3) whether it creates an excessive entanglement. *Agostini*, 521 U.S. at 234. EESA, as applied here, fails the first and third considerations. The federal funds are being used to financially support Shariah-centric Islamic religious activities, thus the funds necessarily result in governmental indoctrination. And this "indoctrination" is worsened by the "symbolic" union between the government and AIG, *see id.* at 223-28, which is far more than "symbolic"; it is actual. This union also creates an excessive entanglement in that the "sovereign" itself is engaging in religious activities. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 296 (2001) (identifying factors for holding that a challenged activity is state action).

## CONCLUSION

Plaintiff respectfully requests that this Court deny Defendants' motion to dismiss.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq.

LAW OFFICES OF DAVID YERUSHALMI, P.C.

David Yerushalmi, Esq. (Application for admission pending)

20

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2009, a copy of the foregoing PLAINTIFFS'
RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS with index
of exhibits and exhibits was filed electronically.  Notice of this filing will be sent to all parties
for whom counsel has entered an appearance by operation of the Court's electronic filing system.
Parties may access this filing through the Court's system.  I further certify that a copy of the
foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet
entered an appearance electronically: None.

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)