# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

KEVIN J. MURRAY,

    Plaintiff,

v.

Civil No. 08-15147
Hon. Lawrence P. Zatkoff

TIMOTHY F. GEITHNER and
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

    Defendants.

_____/

## **OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on May 26, 2009

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter comes before the Court on Defendants' motion to dismiss [dkt 6]. The parties have fully briefed the motion. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(e)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the reasons set forth below, Defendants' motion is DENIED.

## II. BACKGROUND

According to the parties, a large-scale economic crisis erupted in the United States in 2008, threatening the liquidity and stability of financial institutions domestically and abroad. The rapid

decline of the financial institutions subsequently infected the entire global economy, resulting in a state of affairs that the parties compare to the Great Depression. A full discussion of the crisis is irrelevant to this opinion; however, the underlying facts of this case would not have occurred but for the crisis, which catalyzed governmental response in unprecedented ways.

In September 2008, the Board of Governors for the Federal Reserve System acquired a majority ownership interest in American International Group, Inc. ("AIG") on behalf of the federal government. The Board of Governors accomplished this by authorizing the Federal Reserve Bank of New York ("FRBNY") to create a credit facility that enabled AIG to draw up to $85 billion for general corporate purposes, including as a liquidity source. The $85 billion credit line was collateralized by AIG's assets. In return for the credit facility, AIG signed a credit agreement whereby it agreed to pay interest and fees to the FRBNY and to issue Series C preferred stock to a trust—the AIG Credit Facility Trust ("Trust")—that held the stock for the benefit of the United States Treasury. The credit agreement provided that holders of Series C preferred stock were entitled to 79.9% (subsequently reduced to 77.9%) of the dividend payments and 79.9% (subsequently reduced to 77.9%) of the aggregate voting power of the common stock.

On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 ("EESA"), 12 U.S.C. § 5201, in order to "restore liquidity and stability to the financial system of the United States." The EESA granted the Treasury Secretary broad authority "to purchase, and to make fund commitments to purchase, troubled assets from any financial institution" without specifying any particular institution. On November 25, 2008, the Secretary exercised the authority granted to him under the EESA to purchase "$40 billion of newly issued AIG perpetual [Series D] preferred shares and warrants to purchase a number of shares of common stock of AIG equal to 2%

of the issued and outstanding shares as of the purchase date." AIG issued a press release in which it indicated that "[a]ll of the proceeds will be used to pay down a portion of the Federal Reserve Bank of New York credit facility." After the payment to reduce the $85 billion debt, the credit facility retained $60 billion in available credit.

AIG is the market leader in Sharia-compliant financing, which features financial products that comply with the dictates of Islamic law. According to AIG, "Sharia" is "Islamic law based on Quran [sic] and the teachings of the Prophet (PBUH)."[1] In Sharia-complaint financing, a Sharia authority issues a legal ruling called a fatwa, which approves or rejects particular investments or transactions. AIG's Sharia authority exists in the form of a "Sharia Supervisory Committee," the purpose of which "is to review [AIG's] operations, supervise its development of Islamic products, and determine Sharia compliance of these products and [AIG's] investments." A significant element of Sharia compliance involves "purification" of finances, accomplished in two manners: 1) an obligatory charitable contribution to those who "struggle for Allah"; and 2) disgorgement of "tainted" funds (those associated with entities forbidden under Islamic law) by donating them to acceptable Islamic charities.

One of the most prominent examples of Sharia-compliant financing is Takaful Insurance, which avoids investments in "prohibited elements in Islam according to Sharia." AIG opened a subsidiary in Bahrain called AIG-Takaful-Enaya in 2006. In December 2008, another AIG subsidiary announced the creation of a Takaful Homeowners Policy, the first in "a series of Shari'ah-compliant (Takaful) product offerings in the U.S." These subsidiaries represent elements

---

[1] The Court takes judicial notice that "PBUH" is an acronym meaning "Peace be upon him" and that practicing Muslims often include the acronym after naming a prophet of Islam.

of AIG's "global expansion strategy" to benefit from the growing Takaful Insurance field. In November 2008, the Department of Treasury hosted a forum entitled "Islamic Finance 101" in conjunction with the Islamic Finance Project of the Harvard Law School.

On March 4, 2009, AIG filed a Form 8-K with the Securities Exchange Commission ("SEC") in which AIG reported the transfer of the preferred shares of its stock to the Trust. The filing provided that "[a]s a result of the Transaction, a change in control of AIG has occurred. Pursuant to the Purchase Agreement, AIG and AIG's Board of Directors are obligated to work in good faith with the Trust to ensure corporate governance arrangements satisfactory to the Trust." In AIG's annual report to the SEC, it explained that "the Trust, which is overseen by three independent trustees, will hold a controlling interest in AIG, AIG's interests and those of AIG's minority shareholders may not be the same as those of the Trust of the United States Treasury."

Plaintiff is a federal taxpayer, United States Marine, and a practicing member of the Catholic faith. He brings this suit as a taxpayer, alleging that the "appropriated funds are being used to finance Sharia-based Islamic religious activities in violation of the Establishment Clause." As such, Plaintiff believes that the unregulated appropriation of funds to AIG was constitutionally impermissible. Defendants contend that Plaintiff lacks standing to bring this suit. In the alternative, Defendants maintain that Plaintiff has not stated a cognizable Establishment Clause claim and therefore, his case should be dismissed.

### III. LEGAL STANDARD

Defendants bring their motion under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6). When a motion is filed under Fed. R. Civ. P. 12(b)(1), the "plaintiff has the burden of proving jurisdiction in order to survive the motion." *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986).

4

The plaintiff's burden in this regard "is not onerous." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). The plaintiff may defeat the motion "by showing any arguable basis in law for the claim made." *Id.* The Court may dismiss an action for lack of subject-matter jurisdiction "because of the inadequacy of the federal claim . . . only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme Court], or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)).

A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted tests the legal sufficiency of Plaintiff's claims. The Court must accept as true all factual allegations in the pleadings, and any ambiguities must be resolved in Plaintiff's favor. *See Jackson v. Richards Med. Co.*, 961 F.2d 575, 577–78 (6th Cir. 1992). While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. *See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 319 (6th Cir. 1999). Thus, a plaintiff must make "a showing, rather than a blanket assertion of entitlement to relief" and "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007).

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), this Court may only consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the [Court] may take judicial notice." 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.34[2] (3d ed. 2000). If, in deciding the motion, the Court considers matters outside the pleadings, the motion will be treated as one for summary

judgment pursuant to Fed. R. Civ. P. 56. *See* Fed. R. Civ. P. 12(b).

## IV. ANALYSIS

### A. STANDING

Article III of the Constitution of the United States "limits the judicial power . . . to the resolution of 'Cases' and 'Controversies,' and 'Article III standing . . . enforces the Constitution's case-or-controversy requirement.'" *Hein v. Freedom From Religion Found.*, 551 U.S. 587, 127 S. Ct. 2553, 2562 (2007) (quoting *DaimerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). To satisfy Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). A plaintiff's injury must be "distinct and palpable, and not abstract or conjectural or hypothetical." *Id.* (quotations omitted). The standing inquiry is "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997). Therefore, federal courts "must 'refrai[n] from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of [their] judicial function, when the question is raised by a party whose interests entitle him to raise it." *Hein*, 127 S. Ct. at 2562 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982).

Generally speaking, "the interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution does not give rise to the kind of redressable 'personal injury' required for Article III standing." *Id.* In the vast majority of cases, a taxpayer's interest "is too generalized and attenuated to support Article III standing." *Id.* at 2563. The Supreme Court has

previously explained that taxpayer standing is complicated by the relatively minuscule interest a taxpayer has in government spending:

> Interest in the moneys of the Treasury . . . is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

*Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923).

There exists, however, one "narrow exception to the general constitutional prohibition against taxpayer standing." *Hein*, 127 S. Ct. at 2564. In *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court delineated a two-part test for determining whether a taxpayer has standing:

> First, the taxpayer must establish a logical link between the status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8.

*Id.* at 102–03. The *Flast* Court determined that the taxpayer-plaintiff had satisfied both prongs where her challenge was aimed at congressional action taken pursuant to the Constitution's Taxing and Spending Clause and she alleged a violation of the First Amendment's Establishment Clause, which mandates that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. The Supreme Court observed that the Establishment Clause "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred

7

by Art. I, § 8." *Flast*, 392 U.S. at 104. Therefore, the plaintiff in *Flast* had standing to challenge the Elementary and Secondary Education Act of 1965 because federal funds appropriated under the Act "were being used to finance instruction in reading, arithmetic, and other subjects in religious schools, and to purchase textbooks and other instructional materials for use in such schools." *Id.* at 85–86.

In *Bowen v. Kendrick*, 487 U.S. 589 (1988), the Supreme Court applied the *Flast* test and found that the plaintiffs had standing to challenge a statute both facially and as applied where the statute left disbursement decisions to the discretion of the Secretary of Health and Human Services. There, the statute at issue was the Adolescent Family Life Act ("AFLA"), which was "essentially a scheme for providing grants to public or nonprofit private organizations or agencies for services and research in the area of premarital adolescent sexual relations and pregnancy." *Id.* at 593 (quotations omitted). The *Kendrick* Court held that the statute "is at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and appellees' claims call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate." *Id.* at 619–20. The Supreme Court found this to be a "sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the role the Secretary plays in administering the statute." *Id.* at 620.

Nearly forty years after deciding *Flast* and twenty years after deciding *Kendrick*, the Supreme Court rendered its decision in *Hein*, 127 S. Ct. 2553. The petitioners in that case claimed that "conferences held as part of the President's Faith-Based and Community Initiatives program violated the Establishment Clause of the First Amendment because, among other things, President Bush . . . gave speeches that used 'religious imagery' and praised the efficacy of faith-based

programs in delivering social services." *Id.* at 2559. The federal funds used to pay for the challenged conferences came not from congressional approval, however, but out of the general Executive Branch appropriations. The Supreme Court determined that the petitioners fell outside the narrow exception of *Flast* "[b]ecause the expenditures that respondents challenge were not expressly authorized or mandated by any specific congressional enactment." *Id.* at 2568.

The *Hein* Court distinguished *Kendrick* based on the fact that the latter case "involved a 'program of disbursement of funds pursuant to Congress' taxing and spending powers' that 'Congress had created,' 'authorized,' and 'mandate[d].'" *Id.* at 2567 (quoting *Kendrick*, 487 U.S. at 619–20). Because the grants at issue in *Kendrick* were authorized by Congress, a sufficient nexus was created "notwithstanding the fact that 'the funding authorized by Congress ha[d] flowed through and been administered' by an Executive Branch official." *Id.* (quoting *Kendrick*, 487 U.S. at 619). The *Hein* Court contrasted the facts before it, stating that the "best [respondents] can do is to point to unspecified, lump-sum 'Congressional budget appropriations' for the general use of the Executive Branch—the allocation of which 'is a[n] administrative decision traditionally regarded as committed to agency discretion.'" *Id.* (quoting *Lincoln v. Virgil*, 508 U.S. 182, 192 (1993)).

In holding that the petitioners lacked standing to bring their suit, the *Hein* Court explained: "We do not extend *Flast*, but we also do not overrule it. We leave *Flast* as we found it." *Id.* at 2571–72. The Supreme Court did not articulate explicitly the condition in which it found *Flast* but suggested that it is a novelty, effectively collecting dust on a shelf somewhere in the annals of the Supreme Court: "we have repeatedly emphasized that the *Flast* exception has a 'narrow application in our precedent,' that only 'slightly lowered' the bar on taxpayer standing, and that must be applied with 'rigor.'" *Id.* at 2568 (citations and quotations omitted). The *Hein* Court further noted, "It is

9

significant that, in the four decades since its creation, the *Flast* exception has largely been confined to its facts." *Id.* at 2569–70. The *Hein* Court also criticized the *Flast* decision for giving "too little weight" to "serious separation-of-powers concerns." *Id.* at 2569.[2]

The Court turns to Plaintiff's case armed with a much-maligned taxpayer-standing exception, which, despite its fragile state, remains the law of the land. In this case, Defendants argue that Plaintiff does not fit within the *Flast* exception because the EESA "does not expressly mandate (or even contemplate) or specifically appropriate funds for an investment in AIG or any other companies involved in the business of Sharia-compliant financing." In so arguing, Defendants observe that the statute at issue in *Flast* specifically appropriated funds for "private schools," a category that necessarily entails religious schools. Similarly, Defendants argue that in *Kendrick*, the statute expressly contemplated disbursement to religious groups. Defendants further maintain that the Secretary's decision to appropriate funds to AIG amounted to "executive discretion, not congressional action" and, as such, do not fall under the purview of *Flast*. To that end, Defendants note that "Plaintiff has not even alleged that the 'expenditures at issue here were . . . made pursuant to [an] Act of Congress' rather than 'general appropriations to the Executive Branch to fund its day-to-day activities.'"

In its discussion of *Flast* and *Kendrick*, the *Hein* Court suggests that, for a taxpayer to have standing, the congressional authorization or mandate at issue must imply or contemplate, on some level, appropriation of funds to religious groups. The statute in *Flast* referenced only "private

---

[2] Criticism of *Flast* and taxpayer standing does not end with the *Hein* opinion. This area of the law has been characterized as "arbitrary," "illogical," and lacking in "comprehensiveness and rationality." *Freedom From Religion Found., Inc. v. Chao*, 447 F.3d 988, 989–90 (7th Cir. 2006) (Easterbrook, J., concurring in denial of rehearing en banc).

schools" and did not expressly reference religious schools. The *Flast* Court did not discuss the correlation between private schools and religious schools in its opinion. Regardless, the *Hein* Court intimated that the obvious relationship between private and religious schools provided a basis for the *Flast* decision, stating that "[a]t the time the Act was passed and *Flast* was decided, the great majority of nonpublic elementary and secondary schools in the United States were associated with a church. . . . Congress surely understood that much of the aid mandated by the statute would find its way to religious schools." *Id.* at 2565 n.3. The *Hein* Court made a similar attribution to the *Kendrick* decision as it related to the AFLA, which specifically contemplated the involvement of religious groups. Despite that reality, the Supreme Court held that the AFLA was constitutional on its face: "In this lawsuit, nothing on the face of the AFLA indicates that a significant proportion of the federal funds will be disbursed to 'pervasively sectarian' institutions." *Kendrick*, 487 U.S. at 610. Again, the *Hein* Court attributed much significance to Congress's alleged contemplations: "AFLA not only expressly authorized and appropriated specific funds for grant-making, it also expressly contemplated that some of those moneys might go to projects involving religious groups." *Hein*, 127 S. Ct. at 2567.

The *Hein* Court left *Flast* as it found it. As delineated, *Flast* unequivocally set forth its two-prong test: "the taxpayer must establish a logical link between the status and the type of legislative enactment attacked . . . [and] the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged." *Flast*, 392 U.S. at 102–03. The *Flast* Court applied its test without regard to whether the statute in question or Congress itself contemplated appropriations to religious groups. Therefore, the fact that the EESA contains no references whatsoever to religious groups is irrelevant to the standing inquiry. Rather, the question of whether

11

the EESA "authorized" or "mandated" expenditures relates to the nexus between Plaintiff's taxpayer status and the type of act he questions. *Hein's* retroactive assessment of *Flast* and *Kendrick*, in particular its emphasis on congressional contemplation of religious involvement, does not alter the test this Court must use.

The EESA does not specify which institutions should receive aid but broadly empowers the Secretary:

> The purposes of this Act are to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States; and to ensure that such authority and such facilities are used in a manner that protects home values, college funds, retirement accounts, and life savings; preserves homeownership and promotes jobs and economic growth; maximizes overall returns to the taxpayers of the United States; and provides public accountability for the exercise of such authority.

12 U.S.C. § 5201. The EESA authorizes the Secretary "to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with this Act and the policies and procedures developed and published by the Secretary." *Id.* § 5211. In this regard, the EESA expressly grants Defendants the authority to expend substantial funds consistent with the statute's purposes. Plaintiff maintains that Congress enacted the EESA pursuant to the Taxing and Spending Clause of the Constitution; Defendants do not dispute this. Accordingly, the Court finds that Plaintiff satisfies the first prong of *Flast*.

Defendants' argument that the Secretary's decision to appropriate funds to AIG amounted to "executive discretion, not congressional action" and, as such, does not fall under the purview of *Flast* is unpersuasive in light of *Kendrick*. The statute at issue in *Kendrick*, like the statute at issue

12

in this matter, did not specify the manner in which funds were to be distributed and to which entities. Instead, the statute empowered the Secretary of Health and Human Services to award grants pursuant to certain criteria. The Court found standing because the statute authorized the expenditure of the funds:

> The AFLA is at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and appellees' claims call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate. In this litigation there is thus a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the role the Secretary plays in administering the statute.

*Kendrick*, 487 U.S. at 619–20. The grants authorized under the AFLA are sufficiently similar to the expenditures authorized by the EESA. Both statutes expressly empowered an Executive Branch official to spend funds in accordance with the statutes. Therefore, the Court finds that the EESA expressly authorized the expenditure of funds by the Secretary of the Treasury.

With respect to the second prong of the *Flast* test, Plaintiff contends that the "appropriated funds [to AIG] are being used to finance Sharia-based Islamic religious activities in violation of the Establishment Clause." The Establishment Clause "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, § 8." *Flast*, 392 U.S. at 104. Therefore, Plaintiff has established the second prong of the *Flast* test. Accordingly, he has standing to bring this suit.

    **B.**    **ESTABLISHMENT CLAUSE**

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. The clause has been construed as preventing the government "from enacting laws that have the purpose or effect of advancing or

inhibiting religion." *Zelman v. Simmons-Harris*, 536 U.S. 639, 648–49 (2002) (internal quotation marks and citations omitted). The Court examines Establishment Clause challenges under the test delineated in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971): "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" (citations and quotation omitted). Recent Supreme Court decisions have modified the test slightly by "fold[ing] entanglement analysis into the effect analysis because 'entanglement is . . . an aspect of the inquiry into a statute's effect.'" *Smith v. Jefferson County Sch. Bd. of Comm'rs*, 549 F.3d 641, 656 (6th Cir. 2008) (quoting *Agostini v. Felton*, 521 U.S. 203, 223 (1997)). Establishment Clause queries are conducted under the objective reasonable observer standard. *See, e.g.*, *Ams. United for Separation of Church & State v. City of Grand Rapids*, 980 F.2d 1538, 1543–44 (6th Cir. 1992) (en banc).

It is beyond question that the EESA does not violate the Establishment Clause on its face. Congress enacted the EESA in response to what the parties portray as a monumental economic crisis for the sole purpose of restoring stability to financial institutions. The statute makes no mention of religion or religious institutions. Instead it focuses entirely on institutions that are primarily, and in most cases entirely, secular. Nothing from the plain text of the statute hints at an improper relationship between the government and religion.

It is the application of the EESA as it relates to AIG, however, that Plaintiff challenges. The Supreme Court has previously permitted as-applied challenges to facially constitutional statutes. The *Kendrick* Court, for example, held that the statute at issue was constitutional on its face but nevertheless remanded the case for examination of "whether particular AFLA grants have had the

primary effect of advancing religion." *Kendrick*, 487 U.S. at 622. In other words, although the Court concluded that the AFLA did not violate the Establishment Clause on its face, it did not eliminate the possibility that the AFLA was unconstitutional *as applied*. In *Hunt v. McNair*, 413 U.S. 734, 743 (1973), the Supreme Court observed that "[a]id normally may be thought to have a primary effect of advancing religion when it . . . funds a specifically religious activity in an otherwise secular setting."

In this case, the fact that AIG is largely a secular entity is not dispositive: "The question in an as-applied challenge is not whether the entity is of a religious character, but how it spends its grant." *Kendrick*, 487 U.S. at 624–25 (Kennedy J., concurring). The circumstances of this case are historic, and the pressure upon the government to navigate this financial crisis is unfathomable. Times of crisis, however, do not justify departure from the Constitution. In this case, the United States government has a majority interest in AIG. AIG utilizes consolidated financing whereby all funds flow through a single port to support all of its activities, including Sharia-compliant financing. Pursuant to the EESA, the government has injected AIG with tens of billions of dollars, without restricting or tracking how this considerable sum of money is spent. At least two of AIG's subsidiary companies practice Sharia-compliant financing, one of which was unveiled after the influx of government cash. After using the $40 billion from the government to pay down the $85 billion credit facility, the credit facility retained $60 billion in available credit, suggesting that AIG did not use all $40 billion consistent with its press release. Finally, after the government acquired a majority interest in AIG and contributed substantial funds to AIG for operational purposes, the government co-sponsored a forum entitled "Islamic Finance 101." These facts, taken together, raise a question of whether the government's involvement with AIG has created the effect of promoting

15

religion and sufficiently raise Plaintiff's claim beyond the speculative level, warranting dismissal inappropriate at this stage in the proceedings.

## V. CONCLUSION

IT IS HEREBY ORDERED that Defendants' motion to dismiss is DENIED.

IT IS SO ORDERED.


                                            S/Lawrence P. Zatkoff
                                            LAWRENCE P. ZATKOFF
                                            UNITED STATES DISTRICT JUDGE

Dated: May 26, 2009

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on May 26, 2009.

                                            S/Marie E. Verlinde
                                            Case Manager
                                            (810) 984-3290