IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KEVIN J. MURRAY,<br><br>                    Plaintiff,<br><br>          v.<br><br>TIMOTHY F. GEITHNER, in his official capacity as Secretary, U.S. Department of Treasury; BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,<br><br>                    Defendants. | Case No. 08-CV-15147<br><br>Hon. Lawrence P. Zatkoff<br><br>Magistrate Mona K. Majzoub |

LAW OFFICES OF DAVID YERUSHALMI, P.C.
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
P.O. Box 6358
Chandler, AZ 85246
david.yerushalmi@verizon.net
(646) 262-0500
Fax: (801) 760-3901
*Co-Counsel for Plaintiff*

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001
Fax: (734) 930-7160
*Co-Counsel for Plaintiff*

U.S. DEPARTMENT OF JUSTICE
John R. Coleman (Va. Bar No. 70908)
Trial Attorney
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, DC 20530
john.coleman3@usdoj.gov
(202) 514-4505
Fax: (202) 616-8460
*Counsel for Defendants*

---

**PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR PROTECTIVE ORDER**

## ISSUE PRESENTED

Whether the court should grant Defendants' motion for protective order pursuant to Rule 26(c) barring Plaintiff from deposing Defendant Geithner insofar as the depositions of the Rule 30(b)(6) deponents respectively designated by the Defendant Board of Governors of the Federal Reserve System ("Fed") and Defendant Geithner, in his capacity as Secretary of the U.S. Department of the Treasury ("Treasury Department"), have demonstrated that Defendant Geithner, both in his previous position as the president of the Federal Reserve Bank of New York ("FRBNY") and in his current capacity as the Secretary of the Treasury Department, is uniquely situated to testify about how and why American International Group, Inc. ("AIG") was the recipient of funds both from the Fed and from the Treasury Department—the very funds that are at issue.

## CONTROLLING AUTHORITY

Fed. R. Civ. P. 26(b)-(c)

Fed. R. Civ. P. 30(a)(1)

Fed. R. Civ. P. 37(a)(3)(B)(i)

*Boudreau v. Bouchard*, 2008 U.S. Dist. LEXIS 75611 (E.D. Mich. Sept. 25, 2008)

*Jackson v. City of Detroit*, 2007 U.S. Dist. LEXIS 55730 (E.D. Mich. Aug. 1, 2007)

# TABLE OF CONTENTS

ISSUE PRESENTED ......................................................................................................... ii

CONTROLLING AUTHORITY ....................................................................................... iii

TABLE OF CONTENTS ................................................................................................... iv

TABLE OF AUTHORITIES ............................................................................................... i

DEFENDANT GEITHNER'S TESTIMONY IS RELEVANT AND ESSENTIAL TO
    PLAINTIFF'S CASE ................................................................................................. 1

THE PUBLIC RECORD IS NO SUBSTITUTE FOR DEFENDANT GEITHNER'S
    TESTIMONY ........................................................................................................... 13

CONCLUSION ................................................................................................................. 17

CERTIFICATE OF SERVICE ........................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**

*Cooke v. United States*, 91 U.S. 389 (1875) ...................................................................... 9

*DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001) ............................. 13

*Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653 (E.D. Mich. 1995) ............................. 12

*Toler v. United States*, 2003 U.S. Dist. LEXIS 8565 (S.D. Ohio 2003)........................ 12

**Statutes**

12 U.S.C. § 5201 et seq.................................................................................................. 3

18 U.S.C. § 674 .............................................................................................................. 6

31 U.S.C. § 302 .............................................................................................................. 9

31 U.S.C. § 3301(a) ....................................................................................................... 9

31 U.S.C. § 3301(b) ....................................................................................................... 9

**Treatises**

Restatement 2d of Trusts, § 116 .................................................................................... 7

Restatement 2d of Trusts, § 117 .................................................................................... 7

This responsive brief in opposition to Defendants' Motion for Protective Order is in effect a continuation of Plaintiff's Reply brief in support of the Motion to Compel Defendant Geithner's deposition. Defendants filed a Motion for Protective Order which was merely a cut-and-paste of their opposition to the Motion to Compel. Plaintiff takes this opportunity to negate more fully two arguments raised in Defendants' Motion:[1] (1) that Defendant Geithner's testimony is neither relevant nor essential to Plaintiff's case; and (2) that the public record is a good alternative to Defendant Geithner's testimony.

## DEFENDANT GEITHNER'S TESTIMONY IS RELEVANT AND ESSENTIAL TO PLAINTIFF'S CASE

As the Motion to Compel and the exhibits attached thereto make clear, in September 2008, AIG was threatened with a credit rating downgrade in large part because of AIG's liquidity-debt crisis. Much of this crisis was a product of the now infamous credit default swap (CDS) business and the demands by what are termed "AIG's counterparties," which are financial institutions that were insured by AIG through CDSs and which became creditors when various trigger events or events of default occurred under the CDSs. (For a good explanation of the liquidity-debt crisis and the resulting credit rating downgrade, *see* "Factors Affecting Efforts to Limit Payments to AIG Counterparties," Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"), dated Nov. 17, 2009 ("SIGTARP Report"), attached as Exhibit A; *see also* the testimony of the Fed Chairman, Ben S. Bernanke, found in Exhibit E of Defendants' Motion for Protective Order [Doc. No. 35-6] at Ex. A-19-Ex. A.23.)

---

[1] *See* footnote 1 of Plaintiff's Reply Brief in Support of Motion to Compel (hereinafter "Reply"). (Doc. No. 38). Plaintiff hereby incorporates by reference the arguments set forth in the Reply as though fully set forth herein. Indeed, Plaintiff's Motion to Compel and Defendants' Motion for a Protective Order are inextricably linked.

Faced with the prospect of bankruptcy and financial ruin, AIG executives turned to Defendant Geithner who was then the president of the FRBNY. According to the Fed's designated Rule 30(b)(6) deponent, Jon Greenlee, Geithner went before the Fed at its September 16, 2008 hearing and made the case for an AIG bailout. According to Greenlee's testimony, the Fed called upon the "unusual and exigent circumstances" provision of Section 13(3) of the Federal Reserve Act to open up a discount window for AIG, which was not and is not a member bank of the Federal Reserve System and not otherwise permitted to borrow discount funds from the Fed. According to Greenlee's testimony, the Fed did not make any decision about the kind of financial assistance, the amount, the timing or the structure of the FRBNY-led bail out. (*See* Motion to Compel, pp. 9-11.)

According to the minutes of the September 16th Fed meeting, however, Mr. Greenlee's testimony was wrong. (*Id*.) If one credits the "minutes" the Fed <u>did</u> decide much of the structure of the FRBNY's $85 billion Credit Facility made available to AIG. At present, there is a material conflict between Greenlee's testimony and the "public record" upon which Defendants would have Plaintiff rely. Defendant Geithner is the one man who could not only testify about what he said and did at the Fed meeting, but also what instructions he took away with him when he returned to the FRBNY to carry out the Fed's directive.

The facts surrounding the structure of the FRBNY Credit Facility and its purpose or rationale are not merely usefully relevant information, they are facts essential to Plaintiff's constitutional claim.. Specifically, as laid out more specifically in Plaintiff's proposed First

Amended Complaint,[2] $40 billion of the $85 billion Credit Facility were merely a "placeholder" for $40 billion of TARP funds that followed only weeks later after the passage of the enabling legislation.[3] Because a significant portion of the Fed funds, which were run through the FRBNY Credit Facility, acted as a placeholder for the first $40 billion of TARP funds, the Fed funds are just as much at issue in this case as the subsequent $30 billion of TARP funds that followed..[4]

As detailed in the Motion to Compel, the only witness who can testify to these relevant and essential facts is Defendant Geithner. This was demonstrated by the fact that neither the Fed's nor the Treasury Department's designated Rule 30(b)(6) deponents were prepared to

---

[2] Indeed, this issue is subsumed within the original Complaint's explicit pleadings and further subsumed within its broader pleadings under Rule 8's incorporation of the doctrine of "notice pleadings." For example, the Complaint names the Fed for a reason. And, that reason is set forth clearly in the original Complaint at paragraphs 18-19, wherein it states:

> 18.    The Fed was created by and derives its authority from Congress. According to the Fed, it is charged with, *inter alia*, "maintaining the stability of the financial system and containing systemic risk that may arise in financial markets." Pursuant to its congressional authority, **in September 2008 the Fed expended federal taxpayer funds to acquire a majority (79.9%) ownership interest in AIG on behalf of the United States government**, thereby creating a sufficiently close nexus between the federal government and AIG so that the actions of AIG may be fairly treated as those of the federal government itself.

> 19.    By acquiring a majority ownership interest in AIG, maintaining a vested interest in the success of AIG, and standing to profit from that success, the United States government now exercises such coercive power or provides such significant encouragement, overtly and covertly, that in law the choices of AIG are deemed to be those of the federal government. (Emphasis added.)

[3] The Emergency Economic Stabilization Act, 12 U.S.C. § 5201 et seq. ("EESA").

[4] In a related issue, but not one before this Court at the present time, Defendants also refuse to provide any documents relative to the $30 billion of TARP funds invested in AIG by the Treasury Department after the filing of the original Complaint. Once again, while Plaintiff's proposed First Amended Complaint explicitly alleges these post-filing facts to incorporate them into Plaintiff's case explicitly, there is no absolute requirement to do so under Rule 8. That Defendants refuse to produce these documents until the Court formally rules on the Plaintiff's Motion for Leave to Amend is patently frivolous and provides further evidences of Defendants' stonewalling tactics.

answer accurately or completely. Both witnesses stated that Geithner was intimately involved in the decision-making process, but confessed that they were not privy to the information. That leaves only Defendant Geithner.

On this specific point, neither Rule 30(b)(6) deponent could explain why it was that the FRBNY created a loan to AIG in the form of a Credit Facility and then demanded 77.9% of the equity and voting power of the company, which the FRBNY allegedly turned over to the U.S. Treasury as a gift. Moreover, the evidence and commonsense dictate that this was not a gratuity, but in reality the consideration for the TARP funds that were funneled to the FRBNY through AIG because AIG had only weeks earlier received the consideration for the shares from the FRBNY. Thus, the facts related to the disbursement of the Fed funds, which merely served as a placeholder for the subsequent TARP monies, are relevant and essential to Plaintiff's constitutional claim.[5]

Defendant Geithner is also the only witness who can fully testify as to the structure and purpose of the AIG Credit Facility Trust. On its face, it is absurd that the FRBNY decided to solve AIG's debt-liquidity crisis and impending credit downgrade by giving the failing company

---

[5] At note 2 of Defendants' Motion for Protective, they argue that there could have been no "placeholder" strategy to use Fed-FRBNY funds to disguise the Treasury Department's designs to acquire equity in AIG because the initial Treasury Department proposal to Congress for EESA was to buy the toxic assets of AIG, not equity shares. But this argument is backwards. The fact that the Treasury Department did not want to openly buy equity shares and instead proposed legislation which would conceal this tact is precisely why the Treasury Department did not want to openly argue for the U.S. Government to be in the business of buying shares in major financial institutions. As set forth further in this response brief, when the U.S. Government, as both lender and regulator, is actively taking an ownership interest in some but not all financial institutions, it results in substantial market inequities and distortions, moral hazards, and the quite obvious conflicts of interest. In light of Defendants' obfuscation and lack of transparency documented herein and in the public record, it is not surprising that the Treasury Department's draft summary for EESA sought to conceal relevant and essential facts.

$85 billion worth of debt. Was Defendant Geithner not aware of his surroundings in September 2008? Did he not know that adding debt to AIG's debt crisis was a prescription for failure, or, at the very least, a sure path to more U.S. tax payer bail out funds? Was he counting on TARP funds flowing in to pay down the FRBNY Credit Facility?

We also know that neither of the Rule 30(b)(6) defendants could explain this conundrum beyond saying that it was illegal for the FRBNY to hold equity in AIG so it gave the aid in the form of debt.[6] But that doesn't explain the fact that the FRBNY set up the Trust to hold the legal shares while giving the "U.S. Treasury" the beneficial interests. Indeed, the Trust is patently a ruse and invalid. Specifically, the explanation for establishing the Trust and not just transferring AIG controlling shares directly to the U.S. Treasury or the Treasury Department, at least as explained by Defendants through their Rule 30(b)(6) deponents and in the vaunted "public record" (including in testimony before Congress as set forth in Defendants' Exhibit E [Doc. No.

---

[6] For example, Mr. Greenlee, the witness designated to testify on behalf of the Fed, testified as follows:

                                    86
        13      Q.      Why would the Federal Reserve Bank of New York
        14      assign the beneficial interest of the Series C preferred
        15      shares to the treasury if it was providing its funds to AIG?
        16      A.      It is my recollection that we -- the Federal Reserve
        17      Bank of New York nor the other Federal Reserve banks cannot
        18      hold equity interest in an organization.
        19      Q.      So it's your testimony that none of the Federal
        20      Reserve banks and the Federal Reserve Board itself ever hold
        21      actual equity interest in any of the companies that they
        22      regulate or supervise?
        23      MS. STRAUS:  Objection; mischaracterizes his
        24      testimony.
        25      BY MR. YERUSHALMI:
                                    87
        1       Q.      You may answer.
        2       A.      Yes, that's my understanding.
(Greenlee Dep. at 86-87).

35-6], pp. 14-16), was so an "independent" non-governmental trustees whose fiduciary obligation was to protect the U.S. tax payer would control the AIG shares.

But the assertion that the Trust provided for independent trustees is patently absurd given that the AIG Credit Facility Trust Agreement at § 1.03 gives the Fed <u>absolute</u> and <u>unfettered</u> authority to terminate the Trust or modify its terms. The result: the Fed ultimately controls the actions of the trustees. Consequently, this has none of the earmarks of an irrevocable trust where the trustee has independence from the trustor. *See, e.g*., 18 U.S.C. § 674 (stating that a trustor with power to control trust res and modify terms of the trust at will renders charitable grantor trust invalid). Again, we are left with only Defendant Geithner to explain why he would set up an "independent Trust" and yet give the Fed total control, eviscerating even the myth of independence.

Even more telling is the fact that the FRBNY set up the Trust and named the U.S. Treasury, and specifically not the Treasury Department, as the beneficial owner of 77.9% of AIG equity and voting rights. In fact, Defendants and the Rule 30(b)(6) deponents have consistently made reference to the AIG Credit Facility Trust Agreement to emphasize this point because the Trust Agreement explicitly names the U.S. Treasury as the beneficiary of the AIG equity and voting rights and not the Treasury Department. Presumably the FRBNY set the Trust up this way and continues to publicly insist that the trustees are "independent" despite their non-independence because it recognizes the dire conflict of interest for a government department or agency to be both regulator and owner.[7]

---

[7] In addition to the obvious and manifest conflicts-of-interest, there are additional problems of market inequities and distortions, moral hazards, and government ineptitude. The Fed deponent

Yet, almost unbelievably, it is rudimentary trust law that only "[a] person who has capacity to take and hold the legal title to property has capacity to be the beneficiary of a trust of such property." Restatement 2d of Trusts, § 116 Capacity to Be Beneficiary; *see also*, Restatement 2d of Trusts, § 117 Lack of Capacity to Be Beneficiary (stating that "a person who has no capacity to take the legal title to property has no capacity to become the beneficiary of a trust of such property, and a person has capacity to continue to be beneficiary of a trust of property only to the extent that he has capacity to hold the legal title to such property").

While the Restatement recognizes that the United States and the individual states may hold legal title to property through their respective departments and agencies, the U.S. Treasury is not such an entity. *See* Restatement 2d of Trusts, § 116, Comments b. and c. Indeed, the U.S.

---

implicitly acknowledged this problem at least relative to the FRBNY as AIG's "lender " or "creditor":

91
12    Q.    What was the rationale for the establishment of the
13    AIG Credit Facility Trust Agreement as opposed to the Federal
14    Reserve Bank of New York simply establishing some other entity
15    or holding it themselves?
16    MS. STRAUS:  Objection; vague.
17    THE WITNESS:  As I mentioned earlier, Federal
18    Reserve banks are not allowed to hold directly equity interest
19    in organizations.  The other reason that the Credit Facility
20    Trust was established was to ensure that a third party, not
21    the Federal Reserve, would oversee the management of AIG on a
22    day-to-day basis.
23    BY MR. YERUSHALMI:
24    Q.    And why was it important that a third party be
25    involved in the management of the day-to-day operations of AIG

92
1    on a day-to-day basis?
2    A.    Because we were a creditor.  We were a lender -- I
3    mean, sorry.  We're not a creditor.  We were a lender.
(Greenlee Dep. at 91-92).

Treasury is by statute, by case law, and by actual fact, only a depository room or account for the safekeeping of funds belonging to the U.S. Government, such as a storage room or vault for physical currency or things of value, or, in the case of the modern era, a digital account. It is an inanimate object with no legal status as a person or entity capable of owning anything. Thus, the Supreme Court has described the U.S. Treasury as a "room" for deposits **belonging to the U.S. Government** while the Secretary of the Treasury signs the warrants for disbursements:

> The Department of the Treasury is by law located at the seat of government as one of the executive departments, and the Secretary of the Treasury is its official head. Rev. Stat., sect. 233; 1 Stat. 65. All claims and demands against the government are to be settled and adjusted in this department (Rev. Stat., sect. 236; 3 Stat. 366), and the Treasurer of the United States is one of its officers. Rev. Stat., sect. 301; 1 Stat. 65. His duty is to receive and keep the money of the United States, and disburse it upon warrants drawn by the Secretary of the Treasury, countersigned by either comptroller, and recorded by the register, and not otherwise. Rev. Stat. sect. 305; 1 Stat. 65. **The rooms provided in the treasury-building at the seat of government for the use of the treasurer are by law the treasury of the United States.** Rev. Stat., sect. 3591; 9 Stat. 59. Assistant-treasurers are authorized and have been appointed to serve at New York and other cities. Rev. Stat., sect. 3595; 9 Stat. 60. **The rooms assigned by law to be occupied by them are appropriated to their use and for the safekeeping of the public money deposited with them.** Rev. Stat., sect. 3598; 9 Stat. 59. **The assistant-treasurers are to have the charge and care of the rooms**, &c., assigned to them, and to perform the duties required of them relating to the receipt, safe-keeping, and disbursement of the public money. Rev. Stat., sect. 3599; 9 Stat. 59. All collectors and receivers of public money of every description within the city of New York are required, as often as may be directed by the Secretary of the Treasury, to pay over to the assistant-treasurer in that city all public money collected by them or in their hands. Rev. Stat., sect. 3615; 9 Stat. 61. The Treasurer of the United States, and all assistant-treasurers, are required to keep all public money placed in their possession till the same is ordered by the proper department or officer of the government to be transferred or paid out, and, when such orders are received, faithfully and promptly to comply with the same, and to perform all other duties as **fiscal agents of the government** that may be imposed by any law or by any regulation of the Treasury Department made in conformity to law. Rev. Stat., sect. 3639; 9 Stat. 60. All money paid into the treasury of the United States is subject to the draft of the treasurer; and, for the purpose of payment on the public account, the treasurer is authorized to draw on any of the depositaries as he may think most conducive to the public interest and the convenience of the public creditors. Rev. Stat., sect. 3644; 9 Stat. 61. (Emphasis added.)

*Cooke v. United States*, 91 U.S. 389, 399 (1875); *see also*, 31 U.S.C. § 302 ("The United States Government has a Treasury of the United States. The Treasury is in the Department of the Treasury."); 31 U.S.C. § 3301(a) (stating that "the Secretary of the Treasury shall . . . (3) give receipts for money deposited in the Treasury; (4) endorse warrants for receipts for money deposited in the Treasury"); 31 U.S.C. § 3301(b) (stating that "an acknowledgment for money deposited in the Treasury is not valid if the Secretary does not endorse a warrant as required by subsection (a)(4) of this section").

Put simply, naming a bank account as the "beneficial owner" of some asset is like naming a tree log as the owner.[8] While the U.S. Department of the Treasury could own the beneficial shares as an executive arm of the U.S. Government—a result the FRBNY did not want for the reasons mentioned—the U.S. Treasury could not. So that leaves the obvious question for Defendant Geithner: How is it possible that as the President of the FRBNY and as the current Secretary of the Department of the Treasury, he authorized and continues to authorize an invalid or void trust? Why did he so distort the AIG bailout such that the Trust was forcefully bent into an invalid pretzel? Why the desperate avoidance of the Treasury Department as the real beneficiary of the transaction?[9] Could it be that to have done otherwise would have revealed the "placeholder" use of Fed funds for the TARP funds?

---

[8] Plaintiff's counsel has searched in vain for any instance in the history of this country when the U.S. Treasury was putatively named the "owner" of anything. Government ownership or "title" is acquired in the name of the U.S. Government through its department and agencies.

[9] Even the Treasury Department's deponent ultimately conceded that the real beneficiary of the AIG equity and voting rights was the Treasury Department, not some bank account to hold funds:

51

    7    Q.    What exactly is the US treasury that's now holding
    8    this beneficial interest?

9

9     MR. COLEMAN:  Objection; vague.  As best you can.
10    THE WITNESS:  It's, it's, it's something more than
11    the Treasury Department and, but...
12    BY MR. YERUSHALMI:
13    Q.      Something more or something different than?
14    A.      Different than the Treasury Department of the United
15    States, which is an administrative arm of the executive
16    branch.
17    Q.      The Treasury Department is?
18    A.      Yes.
19    Q.      Is the US treasury an agency or department of the US
20    government?
21    A.      The Department of the Treasury is.
22    Q.      Right.  I'm now referring strictly to the US
23    treasury.
24    A.      It's the Fisk.  It's the, it's the repository of our
25    funds.

52

1     Q.      Okay.  When you say the repository of our funds, our
2     funds to --
3     A.      The government's funds.  I believe.  I believe that
4     the -- should -- if as and when there are proceeds of the sale
5     of the Series C stock in accordance with the trust agreement,
6     that those funds will be turned over to the treasury, which is
7     the I guess the depository account of the United States
8     government.
9     Q.      And when you say the depository account of the
10    United States government --
11    A.      Where we keep our money.
12    Q.      -- effectively, effectively you mean the, as it were
13    the, accounts of Congress under its tax and spending
14    authority; correct?
15    MR. COLEMAN:  Objection.
16    THE WITNESS:  I don't know.  I'm not a
17    constitutional scholar.
18    BY MR. YERUSHALMI:
19    Q.      What funds go into the US treasury?
20    MR. COLEMAN:  Objection; scope, vague, speculative.
21    THE WITNESS:  I, I, I don't know.
22    BY MR. YERUSHALMI:
23    Q.      You don't know?
24    A.      I don't know.  I think the --

Finally, Defendants' argument that the entire deposition will be rendered moot because Defendant Geithner will either plead attorney-client privilege or deliberative process privilege is not grounds to bar the deposition *a priori*. Interestingly, Defendants have not actually made the privilege claim even though they know the purpose, scope, and content of Plaintiff's inquiry. Rather, they dangle the privileges out there as bait for the unsuspecting. But, upon closer inspection, this bait is rotten and unappealing fare. As an initial matter, the point of the invalidity of the Trust is not ***what*** legal advice Defendant Geithner received, but whether he sought and received legal advice on this point at all. The fact of a legal opinion is not privileged. *See, e.g., Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 669 (E.D. Mich. 1995) (stating that to assert a privilege, a party bears the burden to make a showing that [1] legal advice sought; [2] from a

---

25    Q.    In other words --

53

1    A.    My understanding, my understanding is is that should
2    there be proceeds of the Series C stock, they will be turned
3    over to the government.
4    Q.    Turned over to the government?
5    A.    The federal government.
6    Q.    Meaning paid into the US treasury?
7    A.    That's what it says.
8    Q.    And just so I'm clear, as the 30(b)(6) deponents for
9    the US Treasury Department, you don't know what funds go into
10    the US treasury?
11    MR. COLEMAN:  Objection; scope.  So your question is
12    illegitimate.  It's not one of the topics he's been designated
13    to testify.
14    MR. YERUSHALMI:  Objection, scope, is fine.  Yes,
15    sir.
16    THE WITNESS:  **I -- the -- the trust agreement refers**
17    **to the treasury, not the Department of the Treasury.  My**
18    **understanding of the meaning of that is that the funds will go**
19    **to us, the Treasury Department.**

(Millstein Dep. at 51-53) (emphasis added).

11

legal professional acting in that capacity; [3] specific communications relating to that advice; [4] made in confidence; [5] between attorney and client; and not waived); *Toler v. United States*, 2003 U.S. Dist. LEXIS 8565 (S.D. Ohio 2003) (discussing the need for a privilege log identifying the existence of a document subsumed within the attorney-client privilege: "A taxpayer need not reveal so many facts that the privilege becomes worthless but he must at least identify the . . . facts which establish all the elements of the privilege he is claiming."). Nonetheless, Plaintiff is not interested in the specific advice Defendant Geithner received from his attorneys; he is interested in discovering the reasons for the decisions that were ultimately made—and testing the veracity of these reasons in light of the contradicting facts and public record.

Second, Defendant Geithner cannot claim the deliberative process on the final structure of the AIG bailout through the FRBNY Credit Facility because his decisions were the final decisions, not the deliberative process, of the FRBNY. *See DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (stating that the "deliberative process covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated'")

And, finally, to the extent that Defendants shield the true facts behind a privilege— legitimately raised or not—Defendant Geithner's refusal to answer these questions will leave the facts, as damning as they are for Defendants, exactly where they lie for purposes of Plaintiff's upcoming motion for summary judgment. On the other hand, if Plaintiff is unable to depose Defendant Geithner and is prevented from even asking the questions, Defendants will be able to

continue to bend and twist the facts into yet more contorted pretzels to suit whatever yarn they wish to spin on that day.

## THE PUBLIC RECORD IS NO SUBSTITUTE FOR DEFENDANT GEITHNER'S TESTIMONY

A major component of Defendants' argument for a protective order barring Defendant Geithner's testimony is the assertion that the vast body of information in the public domain provides sufficient evidence to make or break Plaintiff's case. As we pointed out in our Reply, the first problem with Defendants' argument is that it is no argument at all. It is simply an unsupported assertion accompanied by hundreds of pages of useless Congressional testimony by officials from the Treasury Department, Fed, and the FRBNY or hypertext links to government reports. Not a single reference or citation to a single statement within the hundreds of pages of exhibits or linked material is provided by Defendants. That is not legal argumentation; it is more obfuscation.

But, if one spends the time to actually read the exhibits, which apparently Defendants' attorneys have not, one finds that the public record merely demonstrates Plaintiff's point: there is nothing transparent or clarifying about the public testimony of Defendant Geithner and his colleagues at the Fed or the FRBNY. Nowhere in the hundreds of pages attached as exhibits or referenced by links to government reports are there answers to the questions Plaintiff seeks to ask Defendant Geithner.

Moreover, the issue which preoccupied the hearings in the House of Representatives and in the Senate in March of 2009 (Defendants' Exhibits E and G [Doc. Nos. 35-6 and 35-8, respectively])—that is, why Defendant Geithner, in his position as head of the FRBNY, forced

13

AIG to use its government bailout funds to pay off its counterparty creditors at 100 cents on the dollar?—was not answered in the public record produced in March 2009 and has not been answered even today.

What the public record does in fact tell us is that Defendant Geithner and his colleagues at the Fed and the FRBNY have stonewalled not just Plaintiff in this litigation, but both chambers of Congress and SIGTARP. What we now know is that not only did Defendant Geithner use AIG to funnel 100% payoffs to domestic and foreign financial institutions to keep them whole[10] (unlike AIG which was acquired almost in its entirety by Defendants), he also worked overtime to keep it all secret.[11] The result is that almost a year after the March 2009 hearings trumpeted by Defendants as dispositive and transparent evidence of everything any plaintiff might want or need to know, Congress has called for more hearings (the new round was scheduled to begin Wednesday, January 27, 2010) to get to the truth about how Defendant Geithner structured the AIG takeover and who really benefited. In this context, it is ironic, if not sad, that Defendants' legal counsel cite to three separate SIGTARP reports in the Motion for Protective Order as proof positive that the public record suffices as dispositive and irrefutable evidence in this case. Yet, as reported in the media the day before the new Congressional

---

[10] According to the SIGTARP Report (p. 15), the largest AIG counterparties were: Société Générale, Goldman Sachs, Merrill Lynch, Deutsche Bank, UBS, Calyon, Barclays and Bank of America.

[11] At the House Oversight and Government Reform Committee hearing on January 27, 2010, Geithner testified that he "recused" himself from the controversial cover-up of the Fed's back door bailout of AIG's counterparties and knew nothing about the whole affair. It is a fair characterization of the record to say that no one on the Committee accepted that testimony at face value. *See generally* Committee's website, which contains a hypertext link to a webcast of the hearing wherein several members responded to Secretary Geithner's testimony with incredulity, located at

http://oversight.house.gov/index.php?option=com_content&task=view&id=4756&Itemid=2.

hearings on Defendants' obfuscations and general lack of transparency regarding the AIG

takeover, SIGTARP does not take such a sanguine attitude toward Defendants' public record,

nor should this Court:

### Bailout Watchdog Investigating Fed's AIG Secrecy

**Special inspector general for the TARP says the Fed withheld documents he requested when auditing AIG's "backdoor bailouts" of banks it did business with.**

WASHINGTON -- An independent investigator is launching two probes into the government's rescue of American International Group Inc. and the insurer's subsequent payments of billions to big banks.

Neil Barofsky, the special inspector general for the Troubled Asset Relief Program, says the Fed withheld documents he requested when auditing AIG's "backdoor bailouts" of banks it did business with, including Goldman Sachs Group Inc. Barofsky's allegations came in prepared testimony provided to members of the House Committee on Oversight and Government Reform and obtained by The Associated Press.

The Federal Reserve Bank of New York produced 250,000 pages of documents after committee Chairman Edolphus Towns, D-N.Y., issued a subpoena earlier this month.

Barofsky says in the testimony prepared ahead of his scheduled appearance before the committee on Wednesday that "issues have come to light that call into question whether the government has been and is being as transparent as possible with the American people." He blasts Treasury for issuing misleading public statements and outlines new investigations into the Federal Reserve and the New York Fed.

Because of Towns' subpoena, "documents have come to light that were not provided to the (watchdog) audit team during the course of the audit," Barofsky says, leading him to "review the extent of the Federal Reserve's cooperation."

The committee is investigating why the New York Fed, then led by Treasury Secretary Timothy Geithner, agreed to pay banks billions to cancel their contracts with AIG, which is based in New York.

Geithner approved the deals, which may have cost taxpayers billions more than necessary because he did not demand concessions from banks AIG did business with, according to Barofsky's earlier audit.

15

Barofsky, Geithner and New York Fed General Counsel Thomas Baxter will appear at a committee hearing Wednesday to answer questions about the deals. Former Treasury Secretary Henry Paulson also has been invited to appear.

"If anyone at the Fed thought that this investigation will stop after Wednesday's hearing -- they are completely mistaken," said California Republican Darrell Issa, the committee's top Republican. "There has been a widespread effort by officials at the New York Fed to thwart transparency, and we will continue to pursue this investigation for as long as it takes to get the truth."

Barofsky's second investigation is into e-mails from New York Fed lawyers instructing AIG to withhold some details of the deal from a disclosure filed with the Securities and Exchange Commission.

Full AP and Bloomberg wire stories are available at

http://www.foxnews.com/politics/2010/01/25/bailout-watchdog-investigating-feds-aig-secrecy/

and http://www.bloomberg.com/apps/news?pid=20601103&sid=a7g48W_yRRW0, respectively.

(emphasis added).

What we have in fact learned from the "public record," at least as a result of the most recent House Committee on Oversight and Government Reform hearing on January 27, 2010, is that Defendant Geithner is beginning to backtrack on Defendant's story that at no time in September 2008, when the Fed and the FRBNY were structuring the debt-laden Credit Facility did any one contemplate the need for TARP "equity" funds to come to the rescue just weeks later. Instead, the evidence is pointing to the fact that "from the beginning," a follow-on equity tranche was contemplated by Defendants. And, as we know, the only governmental agency authorized to do so was the Treasury Department using TARP funds pursuant to EESA:

From the beginning, it was clear that AIG needed a durable restructuring of its balance sheet and operations. The credit provided on September 16th stemmed the bleeding by satisfying AIG's immediate liquidity needs, but that was not enough. The problems at AIG were so deep that we had to design and implement a more permanent restructuring.

16

(Secretary Timothy H. Geithner's Written Testimony before the House Committee on Oversight and Government Reform, attached as Exhibit B, p. Ex. A-7.) This written testimony, also delivered orally by the Secretary under oath at the hearing, begs the questions Plaintiff seeks to ask at Defendant Geithner's deposition about the FRBNY's "placeholder" Credit Facility and further underscores the need to depose Defendant Geithner directly.

## CONCLUSION

Defendants have not been forthcoming—not to Congress, not to SIGTARP, not to the public, not to Plaintiff, and not to this Court. A three-hour deposition is the least burdensome way to get the information Plaintiff seeks—information that Plaintiff has a right to seek under the law. Any other approach will just extend this litigation well beyond the discovery deadline set by this Court during the initial status conference and increase the costs and burdens to all parties and to this Court.

Plaintiff respectfully requests that this Court order Defendant Geithner to submit to a three-hour deposition at his earliest opportunity and deny Defendants' Motion for Protective Order.

Respectfully submitted,

LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ David Yerushalmi
David Yerushalmi, Esq.

THOMAS MORE LAW CENTER

Robert J. Muise, Esq.

# CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2010, a copy of the foregoing PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER were filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ David Yerushalmi
David Yerushalmi, Esq.