**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

**KEVIN J. MURRAY**,

            Plaintiff,

    v.

**TIMOTHY F. GEITHNER**, in his official capacity as Secretary, U.S. Department of Treasury; and **BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM**,

            Defendants.

Case No. 08-15147

**FIRST AMENDED COMPLAINT**

[FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION]

Hon. Lawrence P. Zatkoff

Mag. Judge Mona K. Majzoub

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001
Fax: (734) 930-7160
*Co-Counsel for Plaintiff*

LAW OFFICES OF DAVID YERUSHALMI, P.C.
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
P.O. Box 6358
Chandler, AZ 85246
david.yerushalmi@verizon.net
(646) 262-0500
Fax: (801) 760-3901
*Co-Counsel for Plaintiff*

U.S. DEPARTMENT OF JUSTICE
John R. Coleman (Va. Bar No. 70908)
Trial Attorney
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, DC 20530
john.coleman3@usdoj.gov
(202) 514-4505
Fax: (202) 616-8460
*Counsel for Defendants*

Plaintiff Kevin J. Murray ("Plaintiff"), by and through his undersigned counsel, brings this First Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof alleges the following upon information and belief:

**INTRODUCTION**

1.      This civil rights action is an as-applied challenge to the "Emergency Economic Stabilization Act of 2008" (or "Act") (12 U.S.C. § 5201 et seq.) enacted by the United States Congress pursuant to Congress' taxing and spending power, which appropriated and expended, to date, $70 billion in taxpayer money to fund and financially support the United States government's majority ownership interest in American International Group, Inc. ("AIG"), which engages in Shariah-based Islamic religious activities and religious indoctrination. It also seeks to prevent any future expenditure of taxpayer funds appropriated pursuant to the Act that will be used for such illicit purposes.

2.      The use of taxpayer funds to approve, promote, endorse, support, and fund Shariah-based Islamic religious activities and religious indoctrination, including the use of such funds to acquire government ownership and control in a company that engages in such activities, violates the Establishment Clause of the First Amendment to the United States Constitution.

3.      The use of federal taxpayer funds to approve, promote, endorse, support, and fund Islamic religious activities and religious indoctrination conveys a message of endorsement and promotion of Shariah-based Islam and its religious beliefs and an accompanying message of disfavor of and hostility toward Christianity and Judaism and their religious beliefs in violation of the Establishment Clause of the First Amendment to the United States Constitution.

4.      As our history reveals, this Nation was founded upon values that acknowledge the importance of religion, respect for the right of conscience, and respect for the free exercise of religion. These values are enshrined in the religion clauses of the First Amendment to the United States Constitution.

5.      The Shariah-based Islamic religious practices, activities, and indoctrination that the government-owned AIG engages in—activities that are funded and financially supported by American taxpayers, including Plaintiff, who is forced to contribute to them—are antithetical to our Nation's values, customs, and traditions with regard to religious liberty, religious tolerance, and the proscriptions of the First Amendment.  These government-funded activities not only convey a message of disfavor of and hostility toward Christians, Jews, and those who do not follow or abide by Islamic law based on the *Quran* or the teachings of the Prophet Mohammed, but they also embody actual commercial practices which are pervasively sectarian, which seek to indoctrinate non-Muslims, and which disfavor Christians, Jews, and other "infidels," including Americans.

6.      The Act and the policies, practices, and actions of Defendants with regard to Shariah-compliant finance as set forth in this First Amended Complaint send a message to those who are non-adherents to Shariah-based Islam that they are outsiders, not full members of the political community, and an accompanying message to those who are adherents to Shariah-based Islam that they are insiders, favored members of the political community.

7.      Plaintiff seeks a declaration that Defendants violated his clearly established constitutional rights as set forth in this First Amended Complaint; a declaration that Congress' disbursement of public funds to AIG violated the Establishment Clause; a declaration that the United States government's policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance violates the Establishment Clause; a declaration that the United States government's ownership interest in and the use of taxpayer money to financially support AIG and its Takaful insurance business, which is pervasively sectarian, violate the Establishment

Clause; and a preliminary and permanent injunction enjoining the impermissible disbursement of public funds to AIG, enjoining the United States government's ownership interest in AIG's pervasively sectarian businesses, and enjoining the United States government's policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance. Plaintiff also seeks an award of attorney fees and costs pursuant to 28 U.S.C. § 2412 (the Equal Access to Justice Act), and other applicable laws.

## JURISDICTION AND VENUE

8.     This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1346.

9.     Plaintiff's claims for declaratory and preliminary and permanent injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

10.     Venue is proper under 28 U.S.C. § 1391(e) because this is the judicial district in which Plaintiff resides.

## PLAINTIFF

11.     Plaintiff Kevin J. Murray is a United States citizen, a resident of Washtenaw County, Michigan, a federal taxpayer, and a devout Catholic.  Plaintiff is also a former U.S. Marine who served honorably in harm's way to defend our country against Islamic terrorists.

12.     On September 11, 2001, Islamic terrorists, guided by fundamental principles of Shariah-mandated *jihad* against "infidels," attacked U.S. soil and killed thousands of innocent American civilians.  Shortly thereafter, the United States went on the offensive by engaging Islamic

terrorists overseas in Iraq and in Afghanistan. As in the past when our Nation faced a foreign threat to its national security, American service men and women were called to action. Plaintiff Murray answered the call.

13. From March 2003 to October 2003, Plaintiff was deployed overseas in support of Operation Enduring Freedom and Operation Iraqi Freedom. During this time, Plaintiff served as a Marine infantryman and was tasked with providing security for vital refueling and arming points throughout the initial combat phase of the war. These duties consisted of countless and stressful hours devoted to convoy security, manning perimeter defensive positions, and conducting combat patrols in hostile enemy territory in numerous locations throughout southern Iraq.

14. Later in his deployment, Plaintiff was tasked with providing anti-terrorism defenses for Camp Commando, Kuwait—the hub of Marine Corps operations throughout the Iraqi theater.

15. As a Christian, a federal taxpayer, and a former U.S. Marine veteran of the war against Islamic terrorism, Plaintiff objects to and is harmed by the appropriation and disbursement of public funds to AIG and being forced as a taxpayer to contribute to the propagation of Islamic beliefs and practices predicated upon Shariah law, which is hostile to his religious beliefs and practices and which forms the basis for the global jihadist war against the West and the United States in particular. Plaintiff also objects to and is harmed by the United States government's policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance as set forth in this First Amended Complaint. The government's endorsement of Islamic law sends a message to Plaintiff, who is a non-adherent to Islam, that he is an outsider,

not a full member of the political community, and an accompanying message to those who are adherents to Islam that they are insiders, favored members of the political community.

16.     As a result of the United States government's use of federal funds to acquire a majority ownership interest in and to support the operations of AIG for the benefit of federal taxpayers, Plaintiff is a beneficiary of, and has a stake in, the federal government's ownership and control of AIG.

## DEFENDANTS

17.     Defendant Timothy F. Geithner is the Secretary of the United States Department of Treasury.  At all times relevant herein, Timothy F. Geithner, or his predecessor, former Secretary of the U.S. Department of Treasury, Henry M. Paulson, was charged by Congress with administering the Act, including the "Troubled Assets Relief Program" (12 U.S.C. § 5211). During former Secretary Paulson's tenure, Defendant Geithner was the president of the Federal Reserve Bank of New York ("FRBNY").

18.     As Treasury Secretary, Defendant Geithner is also responsible for creating, adopting, and implementing the United States government's policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance.  Defendant Geithner is sued in his current official capacity.

19.     Defendant Board of Governors of the Federal Reserve System ("Fed") is an agency of the United States government.  At all times relevant herein, the Fed was acting as an instrument of the United States government.

20.     The Fed was created by and derives its authority from Congress.  According to the Fed, it is charged with, *inter alia*, "maintaining the stability of the financial system and containing systemic risk that may arise in financial markets," which is a public function.

## STATEMENT OF FACTS

**I.      Emergency Economic Stabilization Act.**

21.     Pursuant to its authority under the taxing and spending clause of Article I, section 8 of the United States Constitution, Congress passed the "Emergency Economic Stabilization Act of 2008" (12 U.S.C. § 5201 et seq.), which is an express congressional mandate and a specific congressional appropriation to expend taxpayer funds.  The Act took effect on October 3, 2008.

22.     The Act authorizes Defendant Geithner to establish the Troubled Asset Relief Program (or "TARP") (12 U.S.C. § 5211) "to purchase, and to make fund commitments to purchase, troubled assets from any financial institution."

23.     As defined by the Act (12 U.S.C. § 5202), the term "financial institution" means, *inter alia*, "any institution, including, but not limited to, any bank, savings association, credit union, security broker or dealer or insurance company, established and regulated under the laws of the United States . . . and having significant operations in the United States."

24.     According to the Act, the term "troubled assets" means, *inter alia*, "any other financial instrument that [Defendant Geithner], after consultation with the Chairman of the Board of Governors of the Federal Reserve System [the Fed], determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress."

25.     Decisions by Defendant Geithner pursuant to the Act are subject to congressional control and oversight.  The taxpayer funds appropriated pursuant to the Act may not be used at the sole discretion of Defendant Geithner.  These funds are not general appropriations provided to the Executive Branch to support its day-to-day activities.

26.     The Act seeks to "maximize[] overall returns to the taxpayers of the United States."  (12 U.S.C. § 5201).  Consequently, as an owner of AIG, the United States government has a vested interest in ensuring the success of AIG and stands to profit by that success, thus creating an excessive government entanglement with the activities of AIG.

27.     When Congress passed the Act, it understood that AIG would be a direct beneficiary of a significant sum of the appropriated taxpayer funds.  Congress also understood that AIG was a "market leader" in Shariah-compliant financial products such as Takaful insurance, as AIG announces on its website and in other public documents.

28.     Pursuant to the Act, Congress authorized and directed Defendant Geithner to expend, to date, $70 billion in taxpayer funds to purchase preferred stock in AIG, which further supports and funds the United States government's earlier acquisition of a 79.9% ownership position in AIG.

29.     The Act does not require Defendant Geithner, the Fed, or any other officer or agency of the federal government to police the expenditure of taxpayer funds to ensure that they are not being used for impermissible purposes, such as funding Islamic beliefs and practices or promoting religious indoctrination as set forth in this First Amended Complaint.  In fact, the Act does not provide any mechanism by which the federal government or its agents could police such expenditures.

30.     Pursuant to the Act, the federal government has injected AIG with tens of billions of dollars, without restricting or tracking how this considerable sum of money is spent.

## II.     United States Governments' Acquisition and Control of AIG.

### A.     AIG: "Too Big to Fail."

31.     In early to mid September 2008, Congress, the Fed, the FRBNY, and the U.S. Department of Treasury believed that AIG was imminently in danger of collapsing, which would have had a devastating effect on the financial markets.  It was believed that AIG was "too big to fail."

32.     During this time, Congress was in the process of working out the details of the Act in order to gain control of AIG, authorize the use of federal taxpayer funds to financially support the operations of AIG, and to prevent AIG's collapse.

33.     Prior to the passage of the Act, Defendant Geithner, who was then president of the FRBNY, Fed Chairman Ben Bernanke, and then Secretary of the Treasury Paulson, who were closely collaborating and essentially operating as co-equal partners, determined that it would be necessary to immediately expend massive sums of federal funds to acquire and gain federal control over AIG.  This unprecedented decision was made with the confidence of knowing that Congress was working out the details of a federal taxpayer-funded bailout, which it would soon enact, but possibly not soon enough to prevent the collapse of AIG.

34.     To accomplish this unprecedented task, Defendant Geithner, Paulson, and Bernanke, with the approval of Congress, decided that the United States government must take over the ownership and control of AIG by acquiring a super-majority equity interest in the company.

35.    The unprecedented sums of money that would be "loaned" from the Fed or the FRBNY to AIG would merely serve as a "placeholder" for the federal taxpayer funds that would soon be arriving pursuant to the Act.  Any "loans" from the Fed or the FRBNY would thus be tied to funds that would be forthcoming from the Act.

36.    Rather than simply provide a bridge loan from the Fed or the FRBNY to AIG, the government's plan was to wipe out the shareholders and put AIG under government control since it would ultimately be taxpayer money from Congress that would fund AIG and prevent its collapse and bankruptcy.

37.    Prior to the acquisition of AIG by the federal government, neither the Fed nor the FRBNY had ever been authorized to acquire large, controlling equity interests in non-member financial institutions.

38.    Consequently, AIG is a corporation that is owned and controlled by the federal government.  The federal government acquired the ownership and control of AIG through the expenditure of federal funds, including the expenditure of federal taxpayer funds authorized by the Act.

39.    By virtue of the Act and the actions of the federal government prior to and subsequent to the Act, all of which were done to effectuate the government's ownership and control of AIG, AIG has become a government entity and an instrument of the government such that its acts may fairly be attributed to the federal government.

40.    By acquiring a majority ownership interest in AIG, maintaining a vested interest in the success of AIG, and standing to profit from that success, the United States government now exercises such coercive power or provides such significant encouragement, overtly and covertly,

that in law the choices of AIG are deemed to be those of the federal government.  Consequently, through the ownership and control of AIG, the United States government is engaging in Islamic religious activities and religious indoctrination.

**B.    Federal Taxpayer Funding Scheme of AIG**

**1.    The First $40 Billion of Federal Taxpayer Funds.**

41.    On or about September 22, 2008, an agreement was reached among Defendant Geithner, Paulson, Bernanke, and AIG, with the knowledge and approval of Congress, to accomplish the ultimate goal of funneling tens of billions of taxpayer funds to AIG in exchange for a super-majority equity interest in the company that would put the company under the control of the federal government.  The September 22, 2008, agreement was memorialized in the AIG Credit Facility Agreement putatively entered into between the FRBNY and AIG (the "Credit Facility Agreement").

42.    The Credit Facility Agreement purportedly authorized the FRBNY, pursuant to the emergency powers granted to the Fed by Congress under § 13(3) of the Federal Reserve Act (12 U.S.C. § 343), to open up a credit facility to loan AIG up to $85 billion in federal funds.  In consideration, AIG agreed to provide the FRBNY with a security interest in effectively all of AIG's assets, which were available for collateralization pursuant to a Guarantee and Pledge Agreement that was also dated September 22, 2008.

43.    With the expectation that Congress would pass the Act in a matter of days, the Credit Facility Agreement obligated AIG to transfer into a trust (the "AIG Credit Facility Trust" or "Trust") for the benefit of the U.S. Treasury, which is essentially Congress's "account" to be used pursuant to its authorized powers, approximately 79.9% (later reduced to 77.9%) of the

aggregate voting power of AIG's common stock and a like percentage of any of AIG's dividend payments. This massive transfer of voting power and dividend payments was obligated notwithstanding that neither the AIG Credit Facility Trust, the U.S. Treasury, nor the U.S. Department of Treasury were named parties to the Credit Facility Agreement.

44. While the Credit Facility Agreement is an attempt to give the appearance that a super-majority controlling interest in AIG was transferred to the U.S. Treasury in consideration for loan funds from the FRBNY, in reality the massive transfer of ownership and control over AIG to the U.S. Treasury (and thus, the federal government) was in consideration for at least $40 billion of TARP funds authorized under the Act 11 days later. Thus, $40 billion of the FRBNY loan funds were a "placeholder" for the real consideration—funds authorized by Congress under the Act.

45. Consequently, after the expected passage of the Act on October 3, 2008, and pursuant to the prior agreement, then Secretary Paulson, in coordination with Defendant Geithner and Chairman Bernanke, and with the approval of Congress, authorized the transfer of $40 billion of TARP funds to AIG on the condition that AIG transfer those funds to reduce the outstanding balance due under the Credit Facility Agreement, thereby completing the real transaction contemplated by the federal government through the Credit Facility Agreement. This second agreement was memorialized in the Securities Purchase Agreement dated November 25, 2008, between AIG and the U.S. Department of Treasury.

46. While the Securities Purchase Agreement nominally identifies the consideration for the $40 billion of TARP funds as 4,000,000 shares of Series D Fixed Rate Cumulative Perpetual Preferred Stock ("Series D Preferred") and a warrant to purchase 53,798,766 shares of AIG's

common stock, given the market value of AIG and its balance sheet at the time of this transaction, this consideration was trivial in comparison to the super-majority controlling interest transferred for the benefit of the U.S. Treasury (and thus Congress and the federal government) via the Series C Perpetual, Convertible, Participating Preferred Stock ("Series C Preferred), which was the actual consideration for the $40 billion of TARP funds authorized by the Act.

47.     The "redemption" provision of the $40 billion Securities Purchase Agreement (i.e., TARP funds to acquire Series D Preferred) entered into between the U.S. Department of Treasury and AIG requires AIG and its shareholders, now effectively the government, to grant a liquidation preference to the Series D Preferred over the earlier acquired Series C Preferred. This is best explained in the context of the placeholder agreement: the purpose of Series C Preferred was to transfer 77.9% of the voting rights of AIG to the government through debt and the purpose of the Series D Preferred was to provide the liquidation preference over all other shareholders, including other preferred shareholders, through equity.  The end result is that the government gained super-majority controlling voting rights and liquidation preference with a TARP equity investment.

48.     In sum, the circular, *quid pro quo* nature of the placeholder transaction allowed Defendants to provide taxpayer funds to support AIG's operations and to effect government ownership and control of AIG.  First, the FRBNY paid for the super-majority controlling voting rights through the Credit Facility Agreement.  Second, a "Trust" was established to exercise those voting interests, but the Trustees are required to act and vote their interests on behalf of the public and the government's concerns, mirroring the responsibilities of a government agency and not those of a private, profit-driven shareholder.  Third, to control these Trustees the Fed

maintained absolute discretion and authority over the powers, term, and even existence of the Trust itself. And, finally, the U.S. Department of Treasury used TARP funds pursuant to the Act to acquire $40 billion of Series D Preferred, which provided substantial capital to AIG so that AIG could continue its operations and purportedly pay down the loan funds FRBNY used to acquire the voting rights provided by the Series C Preferred in the first instance.

49.     Consequently, the Fed and the FRBNY, with the knowledge, advice, and consent of Defendant Geithner, Chairman Bernanke, then Secretary Paulson, and Congress, provided an unprecedented amount in federal loans to AIG to fund its general operations with the understanding that at least $40 billion of those funds would be immediately replaced with federal taxpayer funds pursuant to the Act. Thus, at least $40 billion of the loan funds were in actuality federal taxpayer funds appropriated and expended pursuant to the Act.

**2.      The Next $30 Billion of Federal Taxpayer Funds.**

50.     On April 17, 2009, pursuant to the authority granted under the Act, Defendant Geithner entered into an agreement with AIG to provide an additional $29.835 billion of TARP funds to AIG. Under the April 17, 2009, agreement, AIG is free to draw on this equity line at its discretion to fund all of its operations and activities, including its Islamic religious activities. To date, AIG has expended at least $1.15 billion of these additional TARP funds.

51.     Unlike traditional grants of federal money that are provided for a specific purpose, there are no restrictions on AIG's use of federal taxpayer dollars that are provided pursuant to the Act. Instead, these federal funds are provided to support the overall operations and vitality of AIG, which is now a government entity, agency, or instrumentality as a result of the expenditure of taxpayer funds pursuant to the Act.

52.     Hundreds of billions of taxpayer dollars remain available to Defendants to fund AIG and its operations and activities, including its religious activities, pursuant to the Act.

**III.    AIG Is an Entity, Agency, or Instrumentality of the United States.**

53.     By financially supporting and funding its ownership interest in AIG with $70 billion in taxpayer money, maintaining a vested interest in the success of AIG, and standing to profit from that success, Defendant Geithner and the United States government have insinuated themselves into a position of interdependence with AIG so that they are in effect joint participants in the challenged activities of AIG.   Consequently, as a result of the Act and in conjunction with the federal government's prior ownership interest, Defendant Geithner and the United States government have created a symbiotic relationship with AIG such that AIG's activities can be fairly attributed to the federal government.

54.     AIG is a corporation that Congress rescued from collapse and extinction by virtue of the appropriation and expenditure of federal tax funds pursuant to the Act and placed under governmental control for the specific purpose of achieving a governmental objective (namely, to avert the threatened collapse of the financial markets in the United States).   Consequently, AIG exists today because of congressional action, which specifically includes the appropriation and expenditure of significant sums of federal tax funds pursuant to the Act.

55.     On or about September 17, 2008, then Secretary Paulson forced the ouster of AIG's Chief Executive Officer Robert Willumstand, and on or about September 18, 2008, Paulson forced the appointment of Edward Liddy as the Chairman and Chief Executive Officer to run AIG on behalf of the federal government.   Liddy was compensated $1 a year for his service.

56.     In March 2009, while testifying before Congress, Liddy stated, "Six months ago I came out of retirement to help my country.  At the government's request I've had the duty and extraordinary challenge of serving as chairman and chief executive officer of American International Group, or A.I.G."

57.     On May 13, 2009, Liddy again testified before Congress, admitting that as a result of "[t]he infusion of substantial U.S. Government capital to AIG," the Fed and the U.S. Department of Treasury have become AIG's "primary day-to-day partners in government."

58.     Upon stepping down from the post in the wake of congressional criticism, Defendant Geithner publicly praised Liddy for his work, stating that Liddy "shouldered this burden out of a strong sense of duty and patriotism."

59.     Government officials are intimately involved in the operations of AIG, which remain under close congressional oversight and scrutiny.  Federal agents and officials routinely attend and participate in operational planning meetings of AIG.

60.     AIG is entwined with governmental policies, and the federal government is entwined in its management and control.

61.     The AIG Credit Facility Trust, which was created in anticipation of the passage of the Act in order to facilitate the transfer of federal taxpayer funds to AIG, is effectively an instrumentality of the federal government that provides government control of AIG.

62.     The AIG Credit Facility Trust was created by the Fed pursuant to its authority under 12 U.S.C. § 343.  The Trustees were appointed by the FRBNY, but only after consultation with the U.S. Department of Treasury.  Replacement Trustees must also be subject to U.S. Department of Treasury consultation.

63.     All acts by the Trustees must be for the sole benefit of the U.S. Treasury.  The Trustees are required to exercise their voting rights to ensure that corporate governance of AIG is beneficial to the U.S. Treasury and to protect the overall stability of the economy (which itself is unusual for a shareholder).  Thus, unlike a private shareholder who acts for his own profit motive, the Trust has a public function by operating for the federal government and for the benefit of federal taxpayers and the public interest.

64.     All funds collected by dividend or disposition of AIG stock are paid into the U.S. Treasury for the use of Congress acting on behalf of and as representative for federal taxpayers.  As a result, all interests of AIG are now subservient to the interests of the federal government and serve to promote a public function and the public interest.

65.     The Trustees have the authority and power of an independent agency of the federal government precisely because their sole duty is to act in the place of and for the benefit of the government.  All of the beneficial interests of the Trust belong to the U.S. Treasury, which is ultimately controlled by Congress for the benefit of federal taxpayers.  The Trust as a governmental authority is also eclipsed and controlled in whole by the Fed.  The agreement, by its own terms, may be set aside unilaterally by the federal government at any time.  Section 1.03 of the Trust provides explicitly that the Fed has unfettered authority to revoke or amend the Trust at will.

66.     Given the circular control (the Fed controls the Trust and its very existence and terms; the Trust controls the voting rights of AIG shares; the voting rights of AIG shares control the board's composition and even by proxy actions on specific matters), the federal government could at any time unilaterally alter any and all agreements it had entered into with AIG by forcing a

shareholder meeting and proxy or by simply replacing the board with those who would follow its orders (the agreements could also be unilaterally changed to allow the Trustees, the Fed, the U.S. Department of Treasury, or Congress to appoint its own board members).

67.     On May 13, 2009, the Trustees of the AIG Credit Facility Trust made the following joint statement to the Committee on Oversight and Government Reform, U.S. House of Representatives: "The Committee has posed this question: 'Is the U.S. taxpayer investment in AIG being adequately protected?'  This is the critical question; it motivates all of our considerations and all of our actions.  Under the Trust Agreement, we are charged with exercising the voting rights of the shares held in the Trust in the best interests of the U.S. Treasury and with a view towards maximizing the value of the AIG stock held by the Trust.  Of course, we are not the only actors with this goal.  The Federal Reserve Bank of New York (the "FRBNY"), the Federal Reserve Board, the U.S. Treasury Department, this Committee and the U.S. Congress also have as a goal the maximizing the value of the taxpayers' stock so that the taxpayers can be paid back for the extraordinary financial assistance given to AIG."

68.     During this congressional testimony, the Trustees stated, "As representatives of the majority shareholder—the U.S. Treasury—we have pursued and will continue to pursue our obligation with the utmost vigor and in the public interest."  The Trustees further stated, "In defining our role as Trustees, we recognize that other agencies and instrumentalities of the government have significant roles in AIG's future—especially the Federal Reserve and the Treasury Department.  Each is involved in issues that range from AIG's financial performance and evolving restructuring plans to its compensation policies and corporate governance, risk management and control practices."

69.     AIG is an entity, agency, or instrumentality of the United States for the purpose of individual rights guaranteed against the government by the Constitution, including the Establishment Clause.

**IV.     AIG's Use of Federal Taxpayer Funds to Promote Islam.**

70.     AIG employs consolidated financing; all of its funds are fungible and they flow through a single port.   Therefore, all funds going to AIG, including those public funds provided in anticipation of the passage of the Act and the funds appropriated by Congress pursuant to the Act, are used to financially support all of AIG's activities, including its Islamic religious activities.   Consequently, taxpayer money is being used to directly fund and financially support Islamic religious activities and religious indoctrination.

**A.     AIG's Shariah-Compliant Financing.**

71.     AIG engages in Shariah-compliant financing, which subjects certain financial activities, including investments, to the dictates of Islamic law and the Islamic religion.   This specifically includes any profits or interest obtained through such financial activities.

72.     An example of Shariah-compliant financing offered by AIG is Takaful Insurance plans. According to AIG, Takaful Insurance is "[i]nsurance that avoids prohibited elements in accordance with the Sharia law."   According to AIG, its Takaful products are Islamic because, *inter alia*, AIG "do[es] not invest in anything that is haram" and it "do[es] not borrow, lend or enter into any financial transaction that is unIslamic."   According to AIG, "haram" is "[p]rohibited elements in Islam according to Sharia."

73.     The Takaful Insurance business of AIG is pervasively sectarian.   Its secular purposes and its Sharia-based Islamic religious mission are inextricably intertwined.   Consequently, federal aid

in the form of taxpayer funds is flowing directly to a pervasively sectarian entity. And by virtue of the use of federal funds, including those funds appropriated and expended pursuant to the Act, the federal government owns and controls a pervasively sectarian entity that is engaged in Islamic religious activities and indoctrination.

74. According to AIG, it is "expanding its scope and vision to global proportions providing a range of Takaful products, including property & casualty, energy, accident & health, financial lines, motor, [and] personal contents just to name a few. The phenomenal growth of the Takaful market is something that [AIG] as a market leader recognize[s]." AIG's Sharia-compliant financing "benefit[s] from AIG's disciplined global underwriting and standards and 89 years of experience in delivering innovative insurance solutions to the international community through a network that currently spans more than 130 countries and jurisdictions, reaching 74 million customers." AIG has a "global expansion strategy" for its Sharia-compliant financing, seeking to expand its products to non-Muslims.

75. According to a December 2008 AIG news release, AIG has introduced "a series of Shari'ah-compliant (Takaful) product offerings in the U.S." These "newly announced Takaful products are compliant with key Islamic finance tenets."

76. In the December 2008 news release, AIG states, "The introduction of Takaful products in the U.S. represents an important and emerging growth opportunity for AIG Commercial Insurance." Citing Ernst & Young's 2008 World Takaful Report in the news release, AIG claims that "Takaful was estimated to be a $5.7 billion market globally with over 130 providers in 2006. The Takaful market is estimated to be in excess of $10 billion by 2010."

77.     According to AIG, its efforts to market Shariah-compliant insurance products globally, including in the United States, to non-Muslims is not to accommodate pent-up demand, but as a way to "introduce[] them to a new way of life."  Thus, AIG is seeking to indoctrinate non-Muslims into a Shariah-based view of Islam.

78.     Consequently, AIG, which is under the ownership and control of the federal government, is engaging in religious indoctrination, and AIG's Shariah-compliant financing is benefitting directly from federal taxpayer funds.

**B.     Shariah Law and Islam.**

79.     Shariah, while often referred to as Islamic law, is considered by Islamic religious authorities to be the divine law of Allah which is articulated directly to man through the *Quran* and indirectly through the canonical stories of Mohammed's life as told through the *Sunna*.  AIG describes "Sharia" as "Islamic law based on Quran and the teachings of the Prophet (PBUH)."  The "teachings of the Prophet" are a reference to the canonized *Sunna*.

80.     The *Quran* is considered by Islam to be the perfect expression of Allah's will for man.  Every word is considered perfect and unalterable except and unless altered by some subsequent word of Allah.  The *Sunna*—stories of Mohammed's life and behavior—are also considered binding authority of how a Muslim must live.

81.     Islam holds that Allah is the sole true sovereign.  He revealed to Mohammed all matters of life, politics, and religious law.  Consequently, the religion of Islam is not merely one segment of life; it regulates life completely, from the social and the political to the diplomatic, economic, and military.  This combination of religion and politics as one is the foundation of Islam, an inseparable political/religious doctrine of Islamic governments, and the basis of Muslim

loyalties. In this respect, the theo-political doctrine of Islam is contrary to the dictates of the First Amendment's religion clauses.

82.     As explained by two international authorities of Shariah-compliant finance, Mervyn K. Lewis, a professor of finance in Australia, and Latifa M. Algaoud, a senior official in the Bahrain Ministry of Finance, in their collaborative work, *Islamic Banking*:

> Since Islamic law reflects the will of [Allah] rather than the will of a human lawmaker, it covers all areas of life and not simply those which are of interest to a secular state or society. It is not limited to questions of belief and religious practice, but also deals with criminal and constitution [sic] matters, as well as many other fields which in other societies would be regarded as the concern of the secular authorities. In an Islamic context there is no such thing as a separate secular authority and secular law, since religion and state are one. Essentially, the Islamic state as conceived by orthodox Muslims is a religious entity established under divine law.

83.     In Shariah-based Islam's view, the world and mankind are divided into two irreconcilable groups: *Dar Al Islam*, the house of Islam, which is made up of adherents to Islam and where Islamic law rules; and *Dar Al Harb*, the house of war, which is made up of nonadherents and where "infidels" (known as *kuffars*, or nonbelievers) live. Included among the "infidels" are Christians and Jews.

84.     According to Shariah-based Islamic teaching, all people will one day accept Islam or submit to its rule. The *Quran* commands, "Fight them until all opposition ends and all submit to Allah." (Quran 8:39).

85.     *Jihad* is another component of the theo-political doctrine of Shariah. It is considered a communal religious duty for all Muslims throughout the world. The *Quran* informs its followers that there is always a holy war being waged, and instructs them to participate. For example, the *Quran* sura 9:29 commands adherents of Islam to "fight against those who do not believe in God

or the judgment day, who permit what God and his messenger have forbidden, and who refuse allegiance to the true faith." This *Quranic* verse is codified as normative law among all extant schools of Islamic jurisprudence.

86.     The objective of *jihad* is not only to convert people to Islam, but also to gain political control and exercise Islamic authority over a population so that society lives and abides by the principles of Islam—that is, so that society ultimately becomes Shariah compliant.

###     C.     AIG's Shariah Authority.

87.     Compliance with Shariah with regard to war, politics, or financial matters is achieved by having a Shariah authority issue a *fatwa* or legal ruling which mandates a certain behavior or in the case of Shariah-compliant finance, approves the particular investment or type of financial transaction.

88.     The role of the Shariah authorities is central to all Shariah adherents. As explained by Professors Frank Vogel and Samuel Hayes, two of the leading experts and proponents of Shariah-compliant finance:

> Islamic legal rules encompass both ethics and law, this world and the next, church and state. The law does not separate rules enforced by individual conscience from rules enforced by a judge or by the state. Since scholars alone are capable of knowing the law directly from revelation, laypeople are expected to seek an opinion (*fatwa*) from a qualified scholar on any point in doubt; if they follow that opinion sincerely, they are blameless even if the opinion is in error.

89.     With the aid of public funds provided by the Act, AIG employs a "Shariah Supervisory Committee," which is comprised of the following members: Sheikh Nizam Yaquby from Bahrain, Dr. Mohammed Ali Elgari from Saudi Arabia, and Dr. Muhammed Imran Ashraf Usmani from Pakistan. Dr. Usmani is the son, student, and dedicated disciple of Mufti Taqi Usmani, who is the leading Shariah authority for Shariah-compliant finance in the world and the

author of a book translated into English in 1999 that includes an entire chapter dedicated to explaining why a Western Muslim must engage in violent *jihad* against his own country or government.

90.     According to AIG, the role of its Shariah authority "is to review our operations, supervise its development of Islamic products, and determine Shariah compliance of these products and our investments."

       **D.**     **AIG's Compliance with Shariah Law.**

91.     Shariah compliance in financing is achieved by the avoidance of interest, risk (typically understood as uncertainty or speculation), and certain types of prohibited industries (relating to activities considered *haram* or "forbidden," such as the pork and alcohol-beverage industries, pornography, gambling, interest-based financing, and industries supporting the United States military). According to AIG, its Shariah-compliant subsidiary does not enter into any financial transaction that is "unIslamic."

92.     Shariah compliance also includes a focus on "purification," which has two separate elements. One element of this "purification" is a form of obligatory charitable contribution called *zakat*, which is considered a spiritual purification. *Zakah* (sometimes referred to as *zakat*), which literally means purification, is a form of religious tax for assisting, *inter alia*, those that "struggle [*jihad*] for Allah." The amount is between 2.5% and 20%, depending upon the source of the wealth.

93.     The *zakat* religious tax is used to financially support Islamic "charities," some of which have ties to terrorist organizations that are hostile to the United States and all other "infidels," which includes Christians and Jews. The Holy Land Foundation for Relief and Development,

recently convicted for providing material support to Islamic terrorist organizations, is an example of an Islamic "charity" that qualifies for receipt of the *zakat*. A Catholic charity, however, is not qualified to receive this religious tax because Catholicism is considered *kufr* or idol worship, which is a far more serious "crime" under Islamic law than even pornography.

94. As a direct consequence of the taxpayer funds appropriated and expended by the Act to purchase and financially support AIG, the United States government is now the owner of a corporation engaged in religious indoctrination and in the business of collecting religious taxes to fund interests adverse to the United States, Christians, Jews, and all other "infidels" under Islamic law.

95. The other "purification" element is the purification of a Shariah-compliant investment or financial transaction that has been tainted with forbidden revenue, whether from interest, illicit speculation, or a forbidden commercial enterprise, such as the pork industry or an industry that supports the United States military. In this latter meaning of "purification," the forbidden funds must be disgorged by donating the money to an acceptable Islamic "charity," but this charitable donation will not count toward a Muslim investor's *zakat* requirement. Acceptable Islamic "charities" necessarily exclude any Christian or Jewish charity.

96. Shariah compliance requires strict adherence to Islamic law; it is not "moderate" in its application of the dictates of Islam as set forth in the *Quran* and the *Sunna*.

**V.     Defendants' Promotion and Support of Shariah-Compliant Financing.**

97. In addition to the government funding and owning of AIG through the appropriation and expenditure of taxpayer funds, Defendant Geithner has adopted on behalf of the United States government a broad policy and practice of approving, endorsing, promoting, funding, and

supporting Shariah-compliant finance. This policy and practice has been adopted by the Fed, and it was implemented through the federal government's ownership of AIG.

98. In November 2008, then Secretary of the Treasury Paulson sponsored on behalf of the federal government a "forum" for the staffs from U.S. banking regulatory agencies, Congress, the U.S. Department of Treasury, and other parts of the Executive Branch. This governmental forum was conducted in association with the Islamic Finance Project from Harvard Law School and was directed toward government policy makers. The forum, entitled "Islamic Finance 101," was a government approval, endorsement, and promotion of Shariah-compliant financing and thus a government endorsement of the Islamic religion and its beliefs.

99. This policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance is applicable throughout the United States government and its agencies.

## CLAIM FOR RELIEF

### (First Amendment—Establishment Clause)

100. Plaintiff hereby incorporates by reference all above-stated paragraphs.

101. By reason of the aforementioned Act, which was enacted by the United States Congress pursuant to Congress' taxing and spending power, Congress appropriated taxpayer money and authorized Defendant Geithner to expend, to date, $70 billion of this money to directly fund and financially support the government's majority ownership interest in AIG and to directly fund and financially support Islamic religious activities and indoctrination. As a direct consequence of the Act, Defendant Geithner has authorized the use of taxpayer money to fund Islamic religious activities that are anti-Christian, anti-Jewish, and anti-American. The use of these taxpayer

funds to approve, promote, endorse, support, and fund Islamic religious activities and practices that are hostile to Christians, Jews, and other "infidels" violates the Establishment Clause of the First Amendment to the United States Constitution.

102.     Defendants' policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance as set forth in this First Amended Complaint violates the Establishment Clause.

103.     The United States government's ownership interest in and control of AIG, which includes AIG's Takaful insurance, a pervasively sectarian business that engages in Islamic religious activities and indoctrination, violates the Establishment Clause.

104.     The use of taxpayer money to directly fund and financially support AIG's Takaful insurance, a pervasively sectarian business, violates the Establishment Clause.

105.     The appropriation and expenditure of taxpayer funds to AIG pursuant to the Act and the policies and practices of Defendants with regard to Shariah-compliant finance as set forth in this First Amended Complaint send a message to Plaintiff, who is a non-adherent to Islam, that he is an outsider, not a full member of the political community, and an accompanying message to those who are adherents to Islam that they are insiders, favored members of the political community in violation of the Establishment Clause.

106.     The appropriation and expenditure of taxpayer funds to AIG pursuant to the Act and the policies and practices of Defendants with regard to Shariah-compliant finance as set forth in this First Amended Complaint lack a valid secular purpose, have as their primary effect the advancement of the Islamic religion, and require excessive entanglement between the federal government and the Islamic religion in violation of the Establishment Clause.

107.    As a direct and proximate result of Defendants' violation of the Establishment Clause of the First Amendment, Plaintiff has suffered irreparable harm, including the loss of his constitutional rights, entitling him to declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court:

A)    to declare that Defendants violated the Establishment Clause of the First Amendment to the United States Constitution as set forth in this First Amended Complaint;

B)    to declare that Congress' disbursement of public funds to AIG pursuant to the Act violated the Establishment Clause of the First Amendment to the United States Constitution as set forth in this First Amended Complaint;

C)    to declare that Defendants' policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance violates the Establishment Clause of the First Amendment to the United States Constitution as set forth in this First Amended Complaint;

D)    to declare that the United States government's majority ownership interest in and control of AIG violates the Establishment Clause of the First Amendment to the United States Constitution as set forth in this First Amended Complaint;

E)    to permanently enjoin the improper disbursement of public funds to AIG as set forth in this First Amended Complaint;

F)    to permanently enjoin Defendants' policy and practice of approving, endorsing, promoting, funding, and supporting Shariah-compliant finance as set forth in this First Amended Complaint;

G)    to permanently enjoin the United States government's improper ownership interests in and control of AIG as set forth in this First Amended Complaint;

H)    to award Plaintiff his reasonable attorney fees, costs, and expenses pursuant to 28 U.S.C. § 2412 (the Equal Access to Justice Act), and other applicable law;

I)    to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

LAW OFFICES OF DAVID YERUSHALMI

/s/ David Yerushalmi
David Yerushalmi, Esq. (Ariz. Bar No. 009616; DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2010, a copy of the foregoing FIRST AMENDED COMPLAINT was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)