UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY

             Plaintiff,

    -vs-

TIMOTHY F. GEITHNER, Secretary, U.S.
Department of the Treasury, and BOARD OF
GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

             Defendants.

_____/

CIVIL NO. 08-15147

HON. LAWRENCE P. ZATKOFF
MAG. JUDGE MONA K. MAJZOUB

**DEFENDANT TIMOTHY F. GEITHNER'S RESPONSE
TO PLAINTIFF'S REQUESTS FOR ADMISSION**

      Pursuant to Federal Rules of Civil Procedure 26 and 36, Defendant Timothy F. Geithner

("Defendant") responds to Plaintiff's Requests for Admission Directed to Defendant Timothy F.

Geithner ("Requests for Admission") as follows:

**GENERAL OBJECTIONS**

      1.     Defendant objects to Plaintiff's Requests for Admission insofar as they seek

information that is irrelevant to Plaintiff's Establishment Clause claim. The nature of the claim

at issue determines the permissible scope of discovery. Plaintiff's Establishment Clause claim is

that the Emergency Economic Stabilization Act of 2008 ("EESA"), as applied to the Department

of the Treasury's purchase of preferred stock of American International Group, Inc. ("AIG"),

violates the First Amendment's command that "Congress shall make no law respecting an

establishment of religion." Thus, to the extent that any of the Requests below relate to

government assistance provided to AIG pursuant to alternative statutory authority, including the

- 1 -

Federal Reserve Act, or otherwise do not relate to Plaintiff's as-applied challenge to the EESA, such Requests are irrelevant, overbroad, unduly burdensome, and, therefore, not "within the scope of Rule 26(b)(1)." Fed. R. Civ. P. 36(a)(1).

2.      Defendant objects to Plaintiff's Requests for Admission to the extent that Plaintiff seeks information protected from disclosure by the attorney-client privilege, the work product doctrine, the deliberative process privilege, or any other applicable privilege or immunity recognized under statute or applicable case law.

3.      Defendant objects to Plaintiff's Requests for Admission to the extent Plaintiff's requests are directed toward conclusions of law.

4.      Defendant objects to Plaintiff's Requests for Admission to the extent Plaintiff's requests are directed toward theological or religious propositions.

5.      Defendant objects to Plaintiff's Requests for Admissions to the extent they are vague, ambiguous, unintelligible, or compound.  Where possible, Defendant will construe an ambiguous request that is not otherwise objectionable, and answer to the best of his ability based on a reasonable interpretation of the request.

6.      Defendant objects to the sheer volume of these Requests for Admission as unduly burdensome, particularly given the fact that most of these Requests are objectionable.

7.      The following responses are based upon information currently known to Defendant based on a reasonable inquiry, and Defendant reserves the right to withdraw or amend his responses should additional or different information become available.

8.      Nothing contained in the following responses constitutes a waiver of any applicable objection or privilege as to the requested discovery.

- 2 -

9.      All of the General Objections set forth herein are incorporated by reference into and made a part of each individual response set forth below.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**1.      The use of taxpayer funds to approve, promote, endorse, support, or fund Shariah-based Islamic religious activities violates the Establishment Clause of the First Amendment to the U.S. Constitution.**

Defendant objects to this request as vague, argumentative, and as seeking a legal conclusion.

**2.      The use of taxpayer funds to acquire government control of a company that engages in Shariah-based Islamic religious activities violates the Establishment Clause of the First Amendment to the U.S. Constitution.**

Defendant objects to this request as vague, argumentative, and as seeking a legal conclusion.

**3.      Defendant Geithner is the Secretary of the U.S. Department of Treasury.**

Admit only that Defendant Geithner is the Secretary, United States Department of the Treasury.

**4.      Defendant Geithner is charged by Congress with administering the Act, including TARP.**

Defendant objects to this request as seeking a legal conclusion.

**5.      Prior to assuming his duties as the Secretary, U.S. Department of Treasury, Timothy Geithner was the President of the FRBNY.**

Admit.

**6.      The Fed is an agency of the U.S. Government.**

Admit.

- 4 -

7.     **Pursuant to its authority under the taxing and spending clause of Article I, section 8 of the U.S. Constitution, Congress passed the Act.**

Defendant objects to this request as vague, argumentative, and as seeking a legal conclusion.  To the extent a response is required, deny, except to admit that Congress passed the Emergency Economic Stabilization Act of 2008 ("EESA" or the "Act").

8.     **The Act is an express congressional mandate and a specific congressional appropriation to expend taxpayer funds.**

Defendant objects to this request as vague, argumentative, and as seeking a legal conclusion.

9.     **The Act took effect on October 3, 2008.**

Admit.

10.     **The Act authorizes Defendant Geithner to establish TARP "to purchase, and to make fund commitments to purchase, troubled assets from any financial institution."**

Defendant objects to this request as seeking a legal conclusion.

11.     **As defined by the Act (12 U.S.C. § 5202), the term "financial institution" means, inter alia, "any institution, including, but not limited to, any bank, savings association, credit union, security broker or dealer or insurance company, established and regulated under the laws of the United States . . . and having significant operations in the United States."**

Defendant objects to this request as seeking a legal conclusion.

12.     **According to the Act, the term "troubled assets" means, inter alia, "any other financial instrument that [Defendant Geithner], after consultation with the**

- 5 -

Chairman of the Board of Governors of the Federal Reserve System [the Fed], determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress."

Defendant objects to this request as seeking a legal conclusion.

13.     Decisions by Defendant Geithner pursuant to the Act are subject to congressional control and oversight.

Defendant objects to this request as vague and as seeking a legal conclusion.

14.     The taxpayer funds appropriated pursuant to the Act may not be used at the sole discretion of Defendant Geithner.

Defendant objects to this request as vague, argumentative, and as seeking a legal conclusion.

15.     The taxpayer funds appropriated pursuant to the Act are not general appropriations provided to the Executive Branch to support its day-to-day activities.

Defendant objects to this request as vague, argumentative, and as seeking a legal conclusion.

16.     The Act seeks to "maximize[] overall returns to the taxpayers of the United States." (12 U.S.C. § 5201).

Defendant objects to this request as seeking a legal conclusion.

17.     When Congress passed the Act, it understood that AIG would be a beneficiary of some of the appropriated taxpayer funds.

Defendant objects to this request as vague, ambiguous, and, to the extent it seeks to establish a legislative purpose for the EESA, as seeking a legal conclusion.  Defendant also

objects to this request, as the underlying premise, that an entire branch of the federal government — as opposed to individuals within that branch of the federal government — can have an understanding of some factual matter, is nonsensical.

18.     **When Congress passed the Act, the U.S. Department of Treasury understood that AIG would be a beneficiary of some of the appropriated taxpayer funds.**

Defendant objects to this request, as the underlying premise, that a government agency – as opposed to individuals within a government agency — can have an understanding of some factual matter, is nonsensical.  To the extent a response is deemed required, deny.

19.     **Takaful insurance is an example of a Shariah-compliant financial product.**

Defendant objects to this request as it asks a federal agency to admit or deny a specific interpretation of religious terms, not a fact, the application of law to fact, or an opinion about either.

20.     **When Congress passed the Act, it understood that AIG offered Shariah-compliant financial products such as Takaful insurance.**

Defendant objects to this request as vague, ambiguous, and, to the extent it seeks to establish a legislative purpose for the EESA, as seeking a legal conclusion.  Defendant also objects to this request, as the underlying premise, that an entire branch of the federal government — as opposed to individuals within that branch of the federal government — can have an understanding of some factual matter, is nonsensical.  To the extent a response is required, Defendant states that, after a reasonable inquiry, he is unable to admit or deny, except to deny that any of the available legislative history suggests that any member of Congress understood that AIG offered Shariah-compliant financial products when Congress passed the EESA.

21.     **When Congress passed the Act, the U.S. Department of Treasury understood that AIG offered Shariah-compliant financial products such as Takaful insurance.**

Defendant objects to this request, as the underlying premise, that a government agency – as opposed to individuals within a government agency — can have an understanding of some factual matter, is nonsensical.  To the extent a response is deemed required, deny.

22.     **Pursuant to the Act, Congress authorized the Secretary, U.S. Department of Treasury, to expend taxpayer funds to support the operations of AIG.**

Defendant objects to this request as vague, and as seeking a legal conclusion.

23.     **The Act does not require Defendant Geithner, the Fed, or any other officer or agency of the U.S. Government to police the expenditure of taxpayer funds to ensure that they are not being used to fund businesses providing Shariah-compliant financial products.**

Defendant objects to this request as vague, argumentative, and as seeking a legal conclusion.

24.     **The Act does not provide any mechanism by which the U.S. Government or its agents, including Defendant, could police the expenditure of taxpayer funds to businesses providing Shariah-compliant financial products.**

Defendant objects to this request as vague, argumentative, and as seeking a legal conclusion.

25.     **Pursuant to the Act, the U.S. Government has provided federal taxpayer funds to AIG without prohibiting AIG from using this money for its Shariah-compliant businesses or Shariah compliant financial products.**

Defendant objects to this request as the terms "federal taxpayer funds" and "Shariah-compliant" are vague, ambiguous, and ask a federal agency to admit or deny a specific interpretation of a religious term, not a fact, or the application of law to fact. To the extent a response is required, deny, except to admit that the Securities Purchase Agreement between the United States Department of the Treasury and AIG dated April 17, 2009 does not prohibit AIG from using funds provided pursuant to that agreement to support any specific subsidiary.

**26.     In early- to mid-September 2008, the Fed, the FRBNY, and the U.S. Department of Treasury believed that AIG was imminently in danger of collapsing, which would have had a devastating effect on the financial markets.**

Defendant objects to this request, as the underlying premise, that a government agency – as opposed to individuals within a government agency — can have an understanding of some factual matter, is nonsensical. To the extent a response is deemed required, deny, except to admit that by September 16, 2008 certain officials in the United States Department of the Treasury concluded that AIG faced the imminent prospect of a disorderly failure, and that such failure was likely to have a systemic effect on financial markets that were already experiencing a significant level of fragility.

**27.     During early- to mid-September 2008, Congress was in the process of working out the details of the Act.**

Deny.

**28.     The Act authorized the use of federal taxpayer funds to financially support the operations of AIG to prevent AIG's collapse.**

Defendant objects to this request as vague, argumentative and as seeking a legal

conclusion.

**29.    Prior to the passage of the Act, Defendant Geithner, who was then President of the FRBNY, determined that it would be necessary to immediately expend federal funds to prevent the collapse of AIG.**

Defendant objects to this request as vague and as seeking irrelevant information.  To the extent a response is required, deny.

**30.    Through the expenditure of federal funds provided by the FRBNY ("the Credit Facility"), the U.S. Government acquired a super-majority equity interest (77.9%) in AIG.**

Defendant objects to this request as vague and as seeking irrelevant information.  To the extent a response is required, deny.

**31.    The U.S. Government acquired control of AIG through the expenditure of federal funds, including the expenditure of federal taxpayer funds authorized by the Act.**

Deny.

**32.    At the time of the Credit Facility, neither the Fed nor the FRBNY was authorized to acquire controlling equity interests in member or non-member financial institutions as an element or deal-term of a financial assistance effort.**

Defendant objects to this request as seeking a legal conclusion, and as seeking irrelevant information.

**33.    At the time of the Credit Facility, the U.S. Department of Treasury was not authorized to acquire controlling equity interests in member or non-member financial institutions as an element or deal-term of a financial assistance effort.**

Defendant objects to this request as seeking a legal conclusion.

**34.      Pursuant to the Act, Congress, through the Secretary, U.S. Department of Treasury, authorized the expenditure of $40 billion in TARP funds to AIG.**

Defendant objects to this request as seeking a legal conclusion.

**35.      When Congress, through the Secretary, U.S. Department of Treasury, authorized the expenditure of $40 billion in TARP funds to AIG, Congress understood that AIG offered Shariah-compliant financial products such as Takaful insurance.**

Defendant objects to this request as argumentative, ambiguous, vague, and to the extent it seeks to establish a legislative purpose for the EESA, as seeking a legal conclusion.  Defendant also objects to this request, as the underlying premise, that an entire branch of the federal government — as opposed to individuals within that branch of the federal government — can have an understanding of some factual matter, is nonsensical.  To the extent a response is required, Defendant states that, after a reasonable inquiry, it is unable to admit or deny, except to deny that any of the available legislative history suggests that any member of Congress understood that AIG or any of its subsidiaries marketed Shariah-compliant financial products when Congress passed the EESA.

**36.      When Congress, through the Secretary, U.S. Department of Treasury, authorized the expenditure of $40 billion in TARP funds to AIG, the U.S. Department of Treasury understood that AIG offered Shariah-compliant financial products such as Takaful insurance.**

Defendant objects to this request as argumentative, ambiguous, vague, and, to the extent it seeks to establish a legislative purpose for the EESA, as seeking a legal conclusion.  Defendant

also objects to this request, as the underlying premise, that a government agency – as opposed to individuals within a government agency — can have an understanding of some factual matter, is nonsensical.  To the extent a response is deemed required, deny.

**37.     The first $40 billion in TARP funds provided to AIG pursuant to the Act were used to replace $40 billion in federal funds that were previously loaned to AIG by the FRBNY and/or the Fed.**

Deny, except to admit that the proceeds of AIG's sale of Series D Preferred Shares to the Department of the Treasury were used to pay down a portion of AIG's indebtedness to the FRBNY.

**38.     Rather than provide a bridge loan from the Fed or the FRBNY to AIG, Congress, through the Act, funded AIG to prevent AIG's collapse and bankruptcy.**

Defendant objects to this request as argumentative, ambiguous, vague, and to the extent it seeks to establish a legislative purpose for the EESA, as seeking a legal conclusion.

**39.     As a result of the expenditure of federal funds, including the expenditure of TARP funds pursuant to the Act, the U.S. Government acquired a majority ownership interest in AIG.**

Deny.

**40.     As a result of the expenditure of federal funds, including the expenditure of TARP funds pursuant to the Act, the U.S. Government has a vested interest in the success of AIG.**

Defendant objects to this request as argumentative, ambiguous, and vague.

**41.     As a result of the expenditure of federal funds, including the expenditure of**

TARP funds pursuant to the Act, the U.S. Government stands to profit from the success of AIG.

Defendant objects to this request as argumentative, ambiguous, and vague.

42.     On or about September 22, 2008, an agreement was reached to send tens of billions of taxpayer funds to AIG in exchange for a super-majority equity interest in AIG, which would put the company under the control of the U.S. Government.

Defendant objects to this request as argumentative, ambiguous, vague, as seeking a legal conclusion, and as seeking irrelevant information.  To the extent a response is required, deny.

43.     The September 22, 2008, agreement was memorialized in the AIG Credit Facility Agreement putatively entered into between the FRBNY and AIG (the "Credit Facility Agreement").

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, Defendant denies, except to admit that on September 22, 2008 representatives of the FRBNY and AIG signed a credit agreement, which has since been amended several times ("Credit Agreement").

44.     The Credit Facility Agreement purportedly authorized the FRBNY, pursuant to the emergency powers granted to the Fed by Congress under § 13(3) of the Federal Reserve Act (12 U.S.C. § 343), to open up a credit facility to loan AIG up to $85 billion in federal funds.

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, Defendant denies, except to admit that pursuant to the Credit Agreement, the FRBNY initially agreed to extend credit to AIG of up to $85 billion.

- 13 -

45.     In consideration for the loan described above, AIG agreed to provide the FRBNY with a security interest in effectively all of AIG's assets subject to collateralization pursuant to a Guarantee and Pledge Agreement that was also dated September 22, 2008.

Defendant objects to this request as seeking irrelevant information. To the extent a response is required, Defendant denies, except to admit that, according to the FRBNY, "the loan is collateralized by all of the assets of AIG, and of its primary non-regulated subsidiaries."

46.     The Credit Facility Agreement obligated AIG to transfer into a trust (the "AIG Credit Facility Trust" or "Trust") for the benefit of the U.S. Treasury approximately 79.9% (later reduced to 77.9%) of the aggregate voting power of AIG's common stock and a like percentage of any of AIG's dividend payments.

Defendant objects to this request as seeking irrelevant information. To the extent a response is required, admit.

47.     The transfer of voting power and dividend payments described above required the creation of the AIG Credit Facility Trust Agreement dated January 16, 2009.

Defendant objects to this request as seeking irrelevant information. To the extent a response is required, Defendant Geithner denies, except to admit that the FRBNY and Jill M. Considine, Chester B. Feldberg, and Douglas Foshee signed the AIG Credit Facility Trust Agreement on January 16, 2009.

48.     The transfer of voting power and dividend payments described above was obligated notwithstanding that neither the AIG Credit Facility Trust, the U.S. Treasury, nor the U.S. Department of Treasury was named as a party to the Credit Facility Agreement.

- 14 -

Defendant objects to this request as argumentative, and as seeking irrelevant information. To the extent a response is required, deny, except to admit that the AIG Credit Facility Trust, the United States Department of the Treasury, and the United States Treasury (*i.e.*, the General Fund) were not signatories to the Credit Agreement.

**49.    The U.S. Treasury is not a valid beneficiary for the Trust because it is not an entity, government body, agency, or department capable of acquiring a legal or beneficial interest in any asset.**

Defendant objects to this request as argumentative, as seeking irrelevant information, and as seeking a legal conclusion.

**50.    After the passage of the Act on October 3, 2008, the Secretary, U.S. Department of Treasury, authorized the transfer of $40 billion of TARP funds to AIG on the condition that AIG use those funds to replace $40 billion of the federal funds provided under the Credit Facility Agreement.**

Deny, except to admit that on November 25, 2008, the Department of the Treasury purchased $40 billion of AIG preferred stock, the proceeds of which were to be used exclusively to pay down AIG's indebtedness to the FRBNY.

**51.    The agreement described above was memorialized in the Securities Purchase Agreement dated November 25, 2008, between AIG and the U.S. Department of Treasury.**

Deny, except to admit the existence of the Securities Purchase Agreement dated November 25, 2008 between AIG and the United States Department of the Treasury.

**52.    While the Securities Purchase Agreement nominally identifies the consideration for the $40 billion of TARP funds as 4,000,000 shares of Series D Fixed Rate**

**Cumulative Perpetual Preferred Stock ("Series D Preferred") and a warrant to purchase 53,798,766 shares of AIG's common stock, given the market value of AIG and its balance sheet at the time of this transaction, this consideration was less valuable than the controlling interest transferred for the benefit of the U.S. Treasury via the Series C Perpetual, Convertible, Participating Preferred Stock ("Series C Preferred").**

Defendant objects to this request as argumentative, ambiguous, vague, and as seeking a speculative response.  To the extent a response is required, deny.

**53.     The controlling interest transferred for the benefit of the U.S. Treasury via the Series C Perpetual, Convertible, Participating Preferred Stock ("Series C Preferred") was the actual consideration for the $40 billion of TARP funds authorized by the Act.**

Defendant objects to this request as vague, irrelevant, and as seeking a legal conclusion. To the extent a response is required, deny.

**54.     The "redemption" provision of the $40 billion Securities Purchase Agreement (i.e., TARP funds to acquire Series D Preferred) entered into between the U.S. Department of Treasury and AIG requires AIG and its shareholders to grant a liquidation preference to the Series D Preferred over the earlier acquired Series C Preferred.**

Defendant objects to this request as vague, irrelevant, and as seeking a legal conclusion. To the extent a response is required, deny.

**55.     The primary purpose of Series C Preferred was to transfer 77.9% of the equity and voting rights of AIG to the U.S. Government through debt.**

Defendant objects to this request as argumentative, vague, and as seeking irrelevant information.  To the extent a response is required, deny.

- 16 -

**56.      The primary purpose of the Series D Preferred was to provide the liquidation preference over all other shareholders, including other preferred shareholders, through equity.**

Defendant objects to this request as argumentative, ambiguous, and vague.  To the extent a response is required, deny.

**57.      As a result of the combined Series C Preferred and Series D Preferred transaction, the Trustees gained super-majority controlling voting rights and liquidation preference in AIG.**

Defendant objects to this request as argumentative, ambiguous, and vague.  To the extent a response is required, deny.

**58.      Through the Act, the U.S. Government provided taxpayer funds to support AIG's operations.**

Deny, except to admit that pursuant to the EESA, the United States Department of the Treasury has purchased AIG preferred stock, the proceeds of which were used to pay down indebtedness to the FRBNY and to enhance the company's capital and liquidity in order to facilitate the orderly completion of the company's global divestiture program.

**59.      Through the Act, the U.S. Government provided taxpayer funds to prevent AIG's collapse.**

Deny, except to admit that pursuant to the EESA, the United States Department of the Treasury has purchased AIG preferred stock, the proceeds of which were used to pay down indebtedness to the FRBNY and to enhance the company's capital and liquidity in order to facilitate the orderly completion of the company's global divestiture program.

60.     Through the Act and the expenditure of federal funds, the U.S. Government gained control of AIG.

Deny.

61.     The Trust was established to exercise the controlling voting interests, but the Trustees are required to act and vote their interests on behalf of the public and the U.S. Government's concerns.

Defendant objects to this request as seeking irrelevant information and as seeking a legal conclusion.  To the extent a response is required, deny.

62.     The Fed maintains ultimate discretion and authority over the powers, terms, and existence of the Trust.

Defendant objects to this request as argumentative, as seeking a legal conclusion, and as seeking irrelevant information.  To the extent a response is required, deny, except to admit that the AIG Credit Facility Trust Agreement states "that the Board of Governors may terminate or amend its authorization pursuant to Section 13(3) of the Federal Reserve Act, thereby revoking or amending the Trust in accordance with Federal law. . . ."

63.     The U.S. Department of Treasury used TARP funds pursuant to the Act to acquire $40 billion of Series D Preferred, which provided substantial capital to AIG so that AIG could continue its operations and purportedly pay down the loan funds FRBNY used to acquire the voting rights provided by the Series C Preferred.

Defendant objects to this request as vague, ambiguous, and argumentative.  To the extent a response is required, deny, except to admit that, pursuant to the EESA, the United States Department of the Treasury purchased $40 billion of AIG Series D Preferred Stock, the proceeds

of which were used by AIG exclusively to pay down its indebtedness to the FRBNY.

**64.     The Fed and the FRBNY, with the knowledge, advice, and consent of Defendant Geithner, Chairman Bernanke, and then U.S. Department of Treasury Secretary Paulson, provided federal loans to AIG to fund its general operations with an understanding that some of those funds would be replaced with funds authorized by the Act.**

Defendant objects to this request as vague, ambiguous, argumentative, and as seeking irrelevant information.  To the extent a response is required, deny.

**65.     On April 17, 2009, pursuant to the authority granted under the Act, Defendant Geithner entered into an agreement with AIG to provide an additional $29.835 billion of TARP funds to AIG.**

Deny, except to admit that on April 17, 2009, the Department of the Treasury and AIG finalized an agreement ("the Series F Securities Purchase Agreement"), pursuant to the EESA, whereby the Department of the Treasury agreed to provide up to $29.835 billion dollars to AIG in exchange for preferred stock and a warrant to purchase common stock.

**66.     Under the April 17, 2009, agreement, AIG is free to draw on this equity line at its discretion to fund all of its operations and activities, including its Shariah-compliant business activities.**

Deny.

**67.     There are no restrictions on AIG's use of federal taxpayer dollars that are provided pursuant to the Act other than the use of funds for employee compensation.**

Deny.

68.     **The federal funds provided to AIG pursuant to the Act are provided to support the overall operations and vitality of AIG.**

Defendant objects to this request as vague and ambiguous.  To the extent a response is required, Defendant admits only that funds provided pursuant to the Act were provided to AIG to enhance the company's capital and liquidity in order to facilitate the orderly completion of the company's global divestiture plan.

69.     **Hundreds of billions of taxpayer dollars remain available to Defendant Geithner to fund AIG and its operations and activities pursuant to the Act.**

Defendant objects to this request as vague, argumentative, speculative, and as seeking a legal conclusion.  To the extent a response is required, deny, except to admit that of the $700 billion authorized to be expended for the purchase of troubled assets pursuant to the EESA, as of February 28 2010, the United States Department of the Treasury has obligated nearly $485 billion to specific institutions under executed legal agreements.

70.     **As a result of the Act, the U.S. Government and AIG are joint participants in the business activities of AIG.**

Defendant objects to this request as vague, argumentative and as seeking a legal conclusion.  To the extent a response is required, deny.

71.     **AIG is a corporation that Congress rescued from collapse and extinction by virtue of the appropriation and expenditure of federal tax funds pursuant to the Act.**

Defendant objects to this request as vague, argumentative, speculative, and as seeking a legal conclusion.  To the extent a response is required, deny.

72.     **With the assistance of federal tax dollars expended pursuant to the Act,**

Congress placed AIG under governmental control for the purpose of achieving a governmental objective (namely, to avert the threatened collapse of the financial markets in the United States).

Defendant objects to this request as vague, argumentative, speculative, and as seeking a legal conclusion.  To the extent a response is required, deny.

73.     AIG exists today because of congressional action, which specifically includes the appropriation and expenditure of federal tax funds pursuant to the Act.

Defendant objects to this request as vague, argumentative, speculative, and as seeking a legal conclusion.  To the extent a response is required, Defendant states that, after a reasonable inquiry, he is unable to admit or deny Plaintiff's speculation regarding what effect Congress's failure to pass the EESA may have had on AIG.

74.     On or about September 17, 2008, then U.S. Department of Treasury Secretary Paulson made the decision that AIG must terminate its relationship with Robert Willumstand as AIG's Chief Executive Officer.

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, deny except to admit that as a condition of government assistance, the government, with Mr. Paulson's involvement, requested Mr. Willumstad's resignation as AIG's Chief Executive Officer.

75.     On or about September 17, 2008, then FRBNY President Geithner made the decision that AIG must terminate its relationship with Robert Willumstand as AIG's Chief Executive Officer.

Defendant objects to this request as seeking irrelevant information.  To the extent a

response is required, deny except to admit that as a condition of government assistance, the government, with Mr. Geithner's involvement, requested Mr. Willumstad's resignation as AIG's Chief Executive Officer.

**76. On or about September 17, 2008, Fed Chairman Bernanke made the decision that AIG must terminate its relationship with Robert Willumstand as AIG's Chief Executive Officer.**

Defendant objects to this request as seeking irrelevant information. To the extent a response is required, deny.

**77. On or about September 18, 2008, then U.S. Department of Treasury Secretary Paulson played a primary role in the appointment of Edward Liddy as the Chairman and Chief Executive Officer to run AIG on behalf of the U.S. Government's interests.**

Defendant objects to this request as argumentative, as seeking irrelevant information, and because the term "primary" is ambiguous. To the extent a response is required, deny.

**78. On or about September 18, 2008, then FRBNY President Geithner played a primary role in the appointment of Edward Liddy as the Chairman and Chief Executive Officer to run AIG on behalf of the U.S. Government's interests.**

Defendant objects to this request as argumentative, as seeking irrelevant information, and because the term "primary" is ambiguous. To the extent a response is required, deny.

**79. On or about September 18, 2008, Fed Chairman Bernanke played a primary role in the appointment of Edward Liddy as the Chairman and Chief Executive Officer to run AIG on behalf of the U.S. Government's interests.**

Defendant objects to this request as argumentative, as seeking irrelevant information, and because the term "primary" is ambiguous. To the extent a response is required, deny.

**80.      Edward Liddy was compensated $1 a year for his service as the Chairman and Chief Executive Officer of AIG.**

Defendant Geithner objects to this request as vague and as seeking irrelevant information. To the extent a response is required, deny.

**81.      In March 2009, while testifying before Congress, Edward Liddy stated, "Six months ago I came out of retirement to help my country. At the government's request I've had the duty and extraordinary challenge of serving as chairman and chief executive officer of American International Group, or A.I.G."**

Admit only that this is a substantially accurate quotation of Mr. Liddy's testimony during a hearing before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises of the Committee on Financial Services, U.S. House of Representatives.

**82.      On May 13, 2009, Edward Liddy testified before Congress, stating that as a result of "[t]he infusion of substantial U.S. Government capital to AIG," the Fed and the U.S. Department of Treasury have become AIG's "primary day-to-day partners in government."**

Deny.

**83.      Edward Liddy testified truthfully before Congress with regard to the above testimony.**

Defendant objects to this request as compound, ambiguous, and as being based on the false premise that Plaintiff's requests accurately reflect Mr. Liddy's testimony.

- 23 -

84.    After Edward Liddy stepped down from his post at AIG, Defendant Geithner publicly praised Liddy for his work, stating that Liddy "shouldered this burden out of a strong sense of duty and patriotism."

Admit.

85.    U.S. Government officials are involved in the operations of AIG, which remain under congressional oversight and scrutiny.

Defendant objects to this request, specifically the terms "U.S. Government officials," "involved," "oversight," "operations," and "scrutiny," as vague, ambiguous and unduly burdensome.

86.    U.S. Government agents and officials have attended and participated in meetings at AIG following the passage of the Act.

Admit.

87.    The AIG Credit Facility Trust provides U.S. Government control of AIG.

Defendant objects to this request as seeking irrelevant information and as seeking a legal conclusion.  To the extent a response is required, deny.

88.    The AIG Credit Facility Trust was created by the Fed pursuant to its authority under 12 U.S.C. § 343.

Defendant objects to this request as seeking irrelevant information and as seeking a legal conclusion.  To the extent a response is required, deny.

89.    The Trustees were appointed by the FRBNY, but only after consultation with the U.S. Department of Treasury.

Defendant objects to this request as seeking irrelevant information.  To the extent a

response is required, admit.

**90.    Replacement Trustees are subject to U.S. Department of Treasury consultation.**

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, admit only that, pursuant to section 3.02(e) of the AIG Credit Facility Trust Agreement, "[i]n the event of any vacancy in the office of Trustee as a result of removal, the FRBNY, after consultation with the Treasury Department and the Trustees then in office, shall, by written instrument or instruments delivered to the successor Trustee, fill such vacancy by appointing a successor Trustee who shall satisfy the requirements of Section 3.01 [of the AIG Credit Facility Trust Agreement]."

**91.    All acts by the Trustees must be for the benefit of the U.S. Treasury.**

Defendant objects to this request as seeking irrelevant information and as seeking a legal conclusion.  To the extent a response is required, deny, except to admit that the trustees must, in their capacity as trustees of the AIG Credit Facility Trust, act for the benefit of the U.S. Treasury, which, for the avoidance of doubt, means the General Fund and not the United States Department of the Treasury.

**92.    The Trustees are required to exercise their voting rights to ensure that corporate governance of AIG is beneficial to the U.S. Treasury and to protect the overall stability of the economy.**

Defendant objects to this request as seeking irrelevant information and as seeking a legal conclusion.  To the extent a response is required, deny.

**93.    As a result of the Trust and subsequent transactions between the U.S.**

- 25 -

**Department of Treasury and AIG pursuant to the Act, all funds collected by dividend or disposition of AIG stock and paid to the FRBNY, the Trust, or the U.S. Department of Treasury are paid into the U.S. Treasury.**

Defendant objects to this request as vague, ambiguous, and confusing.  To the extent a response is required, deny.

**94.    Funds held in the U.S. Treasury are for the use of the U.S. Government and expended by Congress.**

Defendant objects to this request as vague, ambiguous, and as seeking a legal conclusion.

**95.    As a result of the Act, the interests of AIG are subservient to the interests of the U.S. Government.**

Defendant objects to this request, specifically the terms "interests" and "subservient," as vague, ambiguous, and argumentative.  Defendant also objects to this request as seeking a legal conclusion.  To the extent a response is required, deny.

**96.    The Trustees have the authority and power of an independent agency of the U.S. Government because their sole duty is to act in the place of and for the benefit of the U.S. Government.**

Defendant objects to this request as vague, ambiguous, and argumentative.  Defendant also objects to this request as seeking a legal conclusion and as seeking irrelevant information.  To the extent a response is required, deny.

**97.    All of the beneficial interests of the Trust belong to the U.S. Treasury.**

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, Defendant admits only that the U.S. Treasury (*i.e.*, the General Fund) is the

beneficiary of the AIG Credit Facility Trust.

**98.     The funds held in the U.S. Treasury are ultimately controlled by Congress**

**for the benefit of federal taxpayers.**

Defendant objects to this request as vague, ambiguous, as seeking a legal conclusion, and

as seeking irrelevant information.

**99.     The Trust is ultimately controlled in whole by the Fed.**

Defendant objects to this request as vague, ambiguous, as seeking a legal conclusion, and

as seeking irrelevant information.  To the extent a response is required, deny.

**100.    The Trust agreement may be set aside unilaterally by the Fed at any time**

**subject to the terms of Section 1.03 of the Credit Facility Trust Agreement.**

Defendant objects to this request as vague, ambiguous, as seeking a legal conclusion, and

as seeking irrelevant information.  To the extent a response is required, deny, except to admit that

Section 1.03 of the AIG Credit Facility Trust Agreement states, "*Trust is Irrevocable*.  This Trust

Agreement and the Trust shall be irrevocable and, except as provided in Section 5.01 hereof,

unamendable except that the Board of Governors may terminate or amend its authorization

pursuant to Section 13(3) of the Federal Reserve Act, thereby revoking or amending the Trust in

accordance with Federal law, provided, however, that a Trustee's rights to resign as a trustee

hereunder and to compensation and indemnification with respect to acts or omissions occurring

prior to any such revocation or amendment may not be modified without the written consent of

that Trustee."

**101.    Section 1.03 of the Credit Facility Trust Agreement provides that the Fed has**

**authority to revoke or amend the Trust.**

Defendant objects to this request as vague, ambiguous, as seeking a legal conclusion, and as seeking irrelevant information.  To the extent a response is required, deny, except to admit that Section 1.03 of the AIG Credit Facility Trust Agreement states, "*Trust is Irrevocable*.  This Trust Agreement and the Trust shall be irrevocable and, except as provided in Section 5.01 hereof, unamendable except that the Board of Governors may terminate or amend its authorization pursuant to Section 13(3) of the Federal Reserve Act, thereby revoking or amending the Trust in accordance with Federal law, provided, however, that a Trustee's rights to resign as a trustee hereunder and to compensation and indemnification with respect to acts or omissions occurring prior to any such revocation or amendment may not be modified without the written consent of that Trustee."

**102.    The U.S. Government could unilaterally alter any and all agreements it had entered into with AIG by forcing a shareholder meeting and the use of a proxy statement or by simply replacing the board with those who would follow its orders (the agreements could also be unilaterally changed to allow the Trustees, the Fed, the U.S. Department of Treasury, or Congress to appoint its own board members).**

Defendant objects to this request as vague, ambiguous, speculative, as seeking a legal conclusion, and as seeking irrelevant information.

**103.    The Trustees could unilaterally alter any and all agreements it or the U.S. Government had entered into with AIG by forcing a shareholder meeting and the use of a proxy statement or by simply replacing the board with those who would follow its orders (the agreements could also be unilaterally changed to allow the Trustees, the Fed, the U.S. Department of Treasury, or Congress to appoint its own board members).**

Defendant objects to this request as vague, ambiguous, speculative, as seeking a legal conclusion, and as seeking irrelevant information.

**104.    On May 13, 2009, the Trustees of the AIG Credit Facility Trust made the following joint statement to the Committee on Oversight and Government Reform, U.S. House of Representatives: "The Committee has posed this question: 'Is the U.S. taxpayer investment in AIG being adequately protected?' This is the critical question; it motivates all of our considerations and all of our actions. Under the Trust Agreement, we are charged with exercising the voting rights of the shares held in the Trust in the best interests of the U.S. Treasury and with a view towards maximizing the value of the AIG stock held by the Trust. Of course, we are not the only actors with this goal. The Federal Reserve Bank of New York (the 'FRBNY'), the Federal Reserve Board, the U.S. Treasury Department, this Committee and the U.S. Congress also have as a goal the maximizing the value of the taxpayers' stock so that the taxpayers can be paid back for the extraordinary financial assistance given to AIG."**

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, deny, except to admit that this is an accurate quotation of a portion of the prepared statement of the trustees of the AIG Credit Facility Trust submitted to the Committee on Oversight and Government Reform of the U.S. House of Representatives.

**105.    During congressional testimony, the Trustees stated, "As representatives of the majority shareholder-the U.S. Treasury-we have pursued and will continue to pursue our obligation with the utmost vigor and in the public interest."**

Defendant objects to this request as seeking irrelevant information.  To the extent a

response is required, deny, except to admit that this is an accurate quotation of a portion of the prepared statement of the trustees of the AIG Credit Facility Trust submitted to the Committee on Oversight and Government Reform of the U.S. House of Representatives.

**106.   During congressional testimony, the Trustees stated, "In defining our role as Trustees, we recognize that other agencies and instrumentalities of the government have significant roles in AIG's future-especially the Federal Reserve and the Treasury Department.  Each is involved in issues that range from AIG's financial performance and evolving restructuring plans to its compensation policies and corporate governance, risk management and control practices."**

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, deny, except to admit that this is an accurate quotation of a portion of the prepared statement of the trustees of the AIG Credit Facility Trust before the Committee on Oversight and Government Reform of the U.S. House of Representatives.

**107.   The Trustees testified truthfully before Congress with regard to the above joint statement and testimony.**

Defendant objects to this request as vague, ambiguous, compound, and as seeking irrelevant information.

**108.   AIG employs consolidated financing; all of its funds are fungible and they flow down to business units and subsidiaries through a single port.**

Defendant objects to this request as vague, ambiguous, and as seeking a legal conclusion. To the extent a response is required, deny.

**109.   All funds appropriated by Congress pursuant to the Act that go to AIG are**

**used to support AIG's financial activities.**

Defendant objects to this request as vague, ambiguous, and as seeking a legal conclusion. To the extent a response is required, deny.

**110.    AIG engages in Shariah-compliant financing, which subjects certain financial activities, including investments, to the dictates of Islamic law and the Islamic religion.**

Defendant objects to this request as vague, ambiguous, and argumentative.  Furthermore, Defendant objects to this request as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.  To the extent a response is required, Defendant states that, after a reasonable inquiry, it is unable to admit or deny, except that Defendant admits that certain subsidiaries of AIG offer or have offered insurance products that are marketed as Shariah-compliant.

**111.    Shariah-compliant financing is an Islamic religious activity.**

Defendant objects to this request as vague, ambiguous, and argumentative.  Furthermore, Defendant objects to this request as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**112.    Shariah-complaint financing is financing that comports with Islamic law.**

Defendant objects to this request as vague, ambiguous, and argumentative.  Furthermore, Defendant objects to this request as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**113.    Islamic law is a central part of the Islamic religion.**

Defendant objects to this request as vague, ambiguous, and argumentative.  Furthermore,

- 31 -

Defendant objects to this request as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**114.    Islamic law is most often referred to as Shariah.**

Defendant objects to this request as vague, ambiguous, and argumentative.  Furthermore, Defendant objects to this request as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**115.    An example of Shariah-compliant financing offered by AIG is Takaful.**

Defendant objects to this request as vague, ambiguous, and argumentative.  Furthermore, Defendant objects to this request as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.  To the extent a response is required, Defendant states that, after a reasonable inquiry, it is unable to admit or deny, except that Defendant admits that certain subsidiaries of AIG offer or have offered insurance products that are marketed as Takaful.

**116.    According to AIG, Takaful is "[i]nsurance that avoids prohibited elements in accordance with the Sharia law."**

Deny, except to admit that this is a substantially accurate quotation of text from a website, which Defendant is no longer able to locate on the world wide web, of a subsidiary of AIG that is based in Bahrain.

**117.    According to AIG, its Takaful products are Islamic because, inter alia, AIG "do[es] not invest in anything that is haram" and it "do[es] not borrow, lend or enter into any financial transaction that is unIslamic."**

Deny, except to admit that this is a substantially accurate quotation of text from a website,

which Defendant is no longer able to locate on the world wide web, of a subsidiary of AIG that is based in Bahrain.

**118.   According to AIG, "haram" is "[p]rohibited elements in Islam according to Sharia."**

Deny, except to admit that this is a substantially accurate quotation of text from a website, which Defendant is no longer able to locate on the world wide web, of a subsidiary of AIG that is based in Bahrain.

**119.   The Takaful insurance business of AIG is pervasively sectarian.**

Defendant objects to this request as seeking a legal conclusion.  To the extent a response is required, deny.

**120.   The secular purposes of AIG's Takaful insurance business and its Shariah-based Islamic religious mission are inextricably intertwined.**

Defendant objects to this request as argumentative, as based on a false premise, and as seeking a legal conclusion.  To the extent a response is required, deny.

**121.   According to AIG, it is "expanding its scope and vision to global proportions providing a range of Takaful products, including property & casualty, energy, accident & health, financial lines, motor, [and] personal contents just to name a few. The phenomenal growth of the Takaful market is something that [AIG] as a market leader recognize[s]."**

Deny, except to admit that, with the exception of the bracketed material, this is a substantially accurate quotation of text from a website, which Defendant is no longer able to locate on the world wide web, of a subsidiary of AIG that is based in Bahrain.

**122.   AIG's Sharia-compliant financing "benefit[s] from AIG's disciplined global**

- 33 -

**underwriting and standards and 89 years of experience in delivering innovative insurance solutions to the international community through a network that currently spans more than 130 countries and jurisdictions, reaching 74 million customers."**

Defendant objects to this request as vague, especially with respect to the meaning of the term "benefits." To the extent a response is required, Defendant, after a reasonable inquiry, is unable to admit or deny.

**123.    AIG has a "global expansion strategy" for its Sharia-compliant financing, seeking to expand its products to non-Muslims.**

Defendant, after a reasonable inquiry, is unable to admit or deny.

**124.    In December 2008, AIG publicly announced that it has introduced "a series of Shari'ah compliant (Takaful) product offerings in the U.S."**

Deny.

**125.    In December 2008, AIG publicly stated that its "newly announced Takaful products are compliant with key Islamic finance tenets."**

Admit.

**126.    In December 2008, AIG publicly stated, "The introduction of Takaful products in the U.S. represents an important and emerging growth opportunity for AIG Commercial Insurance."**

Defendant admits only that this is an accurate quotation of a statement contained in a press release issued by AIG in December 2008 attributed to Matthew F. Power, who served as President, Risk Specialists Companies, Inc. at the time.

**127.    Citing Ernst & Young's 2008 World Takaful Report, in December 2008, AIG**

**publicly stated that "Takaful was estimated to be a $5.7 billion market globally with over 130 providers in 2006. The Takaful market is estimated to be in excess of $10 billion by 2010."**

Admit.

**128.    AIG publicly stated that its efforts to market Shariah-compliant insurance products globally, including in the United States, to non-Muslims is a way to "introduce[] them to a new way of life."**

Defendant, after a reasonable inquiry, is unable to admit or deny.

**129.    AIG's Shariah-compliant financing is benefitting from federal taxpayer funds.**

Deny.

**130.    Shariah is considered by Islamic religious authorities to be the divine law of Allah which is articulated directly to man through the Quran and indirectly through the canonical stories of Mohammed's life as told through the Sunna.**

Defendant objects to this request as vague, ambiguous, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**131.    AIG describes "Sharia" as "Islamic law based on Quran and the teachings of the Prophet (PBUH)."**

Deny, except to admit that this is a substantially accurate quotation of text from a website, which Defendant is no longer able to locate on the world wide web, of a subsidiary of AIG that is based in Bahrain.

**132.    The "teachings of the Prophet" referred to by AIG are a reference to the**

- 35 -

canonized Sunna.

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.  To the extent a response is required, Defendant, after a reasonable inquiry, is unable to admit or deny.

**133.   The Quran is considered by Islam to be the perfect expression of Allah's will for man.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**134.   Every word of the Quran is considered by Islam to be perfect and unalterable except and unless altered by some subsequent word of Allah.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**135.   The Sunna-stories of Mohammed's life and behavior-are considered by Islam to be binding authority of how a Muslim must live.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**136.   Islam holds that Allah is the sole true sovereign; he revealed to Mohammed all matters of life, politics, and religious law.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**137.    The religion of Islam regulates life completely, from the social and the political to the diplomatic, economic, and military.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**138.    The combination of religion and politics as one is the foundation of Islam, an inseparable political/religious doctrine of Islamic governments, and the basis of Muslim loyalties.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**139.    Two international authorities of Shariah-compliant finance, Mervyn K. Lewis, a professor of finance in Australia, and Latifa M. Algaoud, a senior official in the Bahrain Ministry of Finance, in their collaborative work, Islamic Banking, explained Islamic law as follows:**

> **Since Islamic law reflects the will of [Allah] rather than the will of a human lawmaker, it covers all areas of life and not simply those which are of interest to a secular state or society. It is not limited to questions of belief and religious practice, but also deals with criminal and constitution [sic] matters, as well as many other fields which in other societies would be regarded as the concern of the secular authorities. In an Islamic context there is no such thing as a separate  secular authority and secular law, since religion and state**

**are one. Essentially, the Islamic state as conceived by orthodox Muslims is a religious entity established under divine law.**

Defendant, after a reasonable inquiry, is unable to admit or deny.

**140.    In Shariah-based Islam's view, the world and mankind are divided into two irreconcilable groups: Dar Al Islam, the house of Islam, which is made up of adherents to Islam and where Islamic law rules; and Dar Al Harb, the house of war, which is made up of nonadherents and where "infidels" (known as kuffars, or nonbelievers) live.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**141.    According to Shariah-based Islam, Christians and Jews are considered "infidels."**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**142.    According to Shariah-based Islam, atheists are considered "infidels."**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**143.    According to Shariah-based Islamic teaching, all people will one day accept Islam or submit to its rule.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information,

and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**144.    The Quran commands, "Fight them until all opposition ends and all submit to Allah." (Quran 8:39).**

Defendant objects to this request as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**145.    Jihad is a component of the theo-political doctrine of Shariah.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**146.    Jihad is considered a communal religious duty for all Muslims throughout the world.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**147.    The Quran informs its followers that there is always a holy war being waged and instructs them to participate.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**148.    The Quran sura 9:29 commands adherents of Islam to "fight against those**

who do not believe in God or the judgment day, who permit what God and his messenger have forbidden, and who refuse allegiance to the true faith."

Defendant objects to this request as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**149.    The Quran sura 9:29 is codified as normative law among all extant schools of Islamic jurisprudence.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**150.    The objective of jihad is not only to convert people to Islam, but also to gain political control and exercise Islamic authority over a population so that society lives and abides by the principles of Islam.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**151.    Compliance with Shariah with regard to war, politics, or financial matters is achieved by having a Shariah authority issue a fatwa or legal ruling which mandates a certain behavior or in the case of Shariah-compliant finance, approves the particular investment or type of financial transaction.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or

opinions about either.

**152.   The role of the Shariah authorities is central to all Shariah adherents.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**153.   Professors Frank Vogel and Samuel Hayes, two of the leading experts and proponents of Shariah-compliant finance, explained the role of Shariah authorities as follows:**

> **Islamic legal rules encompass both ethics and law, this world and the next, church and state. The law does not separate rules enforced by individual conscience from rules enforced by a judge or by the state. Since scholars alone are capable of knowing the law directly from revelation, laypeople are expected to seek an opinion (fatwa) from a qualified scholar on any point in doubt; if they follow that opinion sincerely, they are blameless even if the opinion is in error.**

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, Defendant, after a reasonable inquiry, is unable to admit or deny.

**154.   AIG employs a "Shariah Supervisory Committee," which is comprised of the following members: Sheikh Nizam Yaquby from Bahrain, Dr. Mohammed Ali Elgari from Saudi Arabia, and Dr. Muhammed Imran Ashraf Usmani from Pakistan.**

Deny, except to admit that according to an unsworn affidavit provided by AIG attached to Plaintiff's second subpoena of AIG, these individuals have been contracted to serve as an External Sharia Advisory Board for the Bahraini corporation, CHARTIS Takaful-Enaya B.S.C. (c), which is a subsidiary of Chartis Overseas Limited, which is a subsidiary of Chartis International, LLC, which is a subsidiary of AIG.

**155.    Dr. Usmani is the son, student, and dedicated disciple of Mufti Taqi Usmani, who is a leading Shariah authority for Shariah-compliant finance in the world.**

Defendant objects to this request as vague, ambiguous, and as seeking irrelevant information.  To the extent a response is required, Defendant, after a reasonable inquiry, is unable to admit or deny.

**156.    Mufta Taqi Usmani is the author of a book translated into English in 1999 that includes an entire chapter dedicated to explaining why a Western Muslim must engage in violent jihad against his own country or government.**

Defendant objects to this request as seeking irrelevant information.  To the extent a response is required, Defendant, after a reasonable inquiry, is unable to admit or deny.

**157.    The role of AIG's Shariah authority "is to review our operations, supervise its development of Islamic products, and determine Shariah compliance of these products and our investments."**

Defendant, after a reasonable inquiry, is unable to admit or deny, except to admit that this is a substantially accurate quotation of text from a website, which Defendant is no longer able to locate on the world wide web, of a subsidiary of AIG that is based in Bahrain.

**158.    Shariah compliance in financing is achieved by the avoidance of interest, risk (typically understood as uncertainty or speculation), and certain types of prohibited industries (relating to activities considered haram or "forbidden," such as the pork and alcohol-beverage industries, pornography, gambling, interest-based financing, and industries supporting the United States military).**

Defendant objects to this request as vague, ambiguous, and as seeking to establish a

theological proposition, not fact, the application of law to fact, or opinions about either.

**159.   According to AIG, its Shariah-compliant businesses do not enter into any financial transaction that is "unIslamic."**

Defendant, after a reasonable inquiry, is unable to admit or deny, except to admit that a website, which Defendant is no longer able to locate on the world wide web, of a Bahrainian subsidiary of AIG stated that its products are takaful because, *inter alia*, they do not enter into any financial transaction that is "unIslamic."

**160.   Shariah compliance includes a focus on "purification."**

Defendant objects to this request as vague, ambiguous, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**161.   One element of Shariah-compliance "purification" is a form of obligatory charitable contribution called zakat, which is considered a spiritual purification.**

Defendant objects to this request as vague, ambiguous, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**162.   Under Shariah law, Zakah (sometimes referred to as zakat), which literally means purification, is a form of religious tax for assisting, inter alia, those that "struggle [jihad] for Allah."**

Defendant objects to this request as vague, ambiguous, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**163.   Under Shariah law, the amount of the zakat is between 2.5% and 20%, depending upon the source of the wealth.**

Defendant objects to this request as vague, ambiguous, and as seeking to establish a

theological proposition, not fact, the application of law to fact, or opinions about either.

**164.   The zakat religious tax is used to financially support Islamic "charities."**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**165.   The zakat religious tax cannot be used to support Christian or Jewish charities.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**166.   A Catholic charity is not qualified to receive a zakat religious tax because Catholicism is considered kufr or idol worship, which is a "crime" under Islamic law.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**167.   Another "purification" element of Shariah-compliance is the purification of a Shariah compliant investment or financial transaction that has been tainted with forbidden revenue, whether from interest, illicit speculation, or a forbidden commercial enterprise, such as the pork industry or an industry that supports the United States military.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or

- 44 -

opinions about either.

**168.    In this latter meaning of "purification" described above, the forbidden funds must be disgorged by donating the money to an acceptable Islamic "charity," but this charitable donation will not count toward a Muslim investor's zakat requirement.**

Defendant objects to this request as vague, ambiguous, as seeking irrelevant information, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**169.    Shariah compliance requires adherence to Islamic law.**

Defendant objects to this request as vague, ambiguous, and as seeking to establish a theological proposition, not fact, the application of law to fact, or opinions about either.

**170.    In November 2008, U.S. Department of Treasury sponsored "Islamic Finance 101," which was a "forum" for the staffs from U.S. banking regulatory agencies, Congress, the U.S. Department of Treasury, and other parts of the Executive Branch that was conducted in association with the Islamic Finance Project from Harvard Law School.**

Admit.

**171.    The Islamic Finance 101 forum was directed toward government policy makers.**

Admit.

**172.    The Islamic Finance 101 forum discussed Shariah-compliant financial products.**

Admit.

**173.    The Islamic Finance 101 forum discussed Shariah-complaint financial**

**products in a positive light.**

Defendant objects to this request as the meaning of "positive" is vague, ambiguous, and argumentative, and to the assumption that a "forum," rather than individuals participating in a forum, can discuss a topic.  To the extent a response is required, deny.

**174.   During the Islamic Finance 101 forum, no government official publicly expressed concern about the fact that AIG engages in Shariah-compliant business activities.**

Defendant objects to this request as argumentative and as based on an unsubstantiated premise, that any government official was even aware that certain foreign subsidiaries of AIG offered Shariah-compliant insurance products.  To the extent a response is required, Defendant, after a reasonable inquiry, can neither admit nor deny this request because no transcript of the forum's proceedings exists.

**175.   AIG's liquidity crisis in September 2008 was a result of the threat of a material credit rating downgrade.**

Defendant objects to this request as seeking irrelevant information, as argumentative, and, as vague, especially with respect to the time frame, the term "threat," the term "result," and the term "material."  To the extent a response is required, deny, except to admit that actual credit ratings downgrades contributed to AIG's liquidity shortage in September 2008.

**176.   The threatened AIG credit rating downgrade in September 2008 related directly to AIG's liquidity crisis which in turn was related directly to the amount of debt accumulating on AIG's balance sheet as a result of demands by creditors (e.g., counterparties).**

Defendant objects to this request as seeking irrelevant information, as ambiguous and argumentative, confusing, and based on false premises. To the extent a response is required, deny.

**177. At the time of the creation of the Credit Facility, then FRBNY President Geithner knew that adding up to $85 billion of debt to AIG's balance sheet would create further pressures for a credit rating downgrade in a matter of weeks.**

Defendant objects to this request as seeking irrelevant information. To the extent a response is required, deny.

**178. At the time of the creation of the Credit Facility, then U.S. Department of Treasury Secretary Paulson knew that adding up to $85 billion of debt to AIG's balance sheet would create further pressures for a credit rating downgrade in a matter of weeks.**

Defendant objects to this request as seeking irrelevant information. To the extent a response is required, deny.

**179. At the time of the creation of the Credit Facility, then U.S. Department of Treasury Secretary Paulson contemplated a subsequent equity infusion from the Government to pay down AIG's debt.**

Deny.

**180. At the time of the creation of the Credit Facility, the Fed, through the FRBNY, was able to buy AIG-held securities or assets through loans to off-balance sheet special purpose vehicles ("SPVs") such as Maiden Lane II and III, which provided AIG liquidity without adding debt to AIG's balance sheet.**

Defendant objects to this request as argumentative, as seeking irrelevant information and

as seeking a legal conclusion.

      **181.**   **The Credit Facility Trust is invalid.**

      Defendant objects to this request as seeking irrelevant information and as seeking a legal conclusion.

      **182.**   **The Credit Facility Trust is illegal.**

      Defendant objects to this request as seeking irrelevant information and as seeking a legal conclusion.

                                  Respectfully submitted,

Dated: March 26, 2010                   TONY WEST
                                    Assistant Attorney General

                                    BARBARA L. MCQUADE
                                    United States Attorney

                                    JOHN R. GRIFFITHS
                                    Assistant Director, Federal Programs Branch

                                    s/ *John R. Coleman*
                                    JOHN R. COLEMAN
                                    JULIE STRAUS
                                    Trial Attorneys, U.S. Department of Justice
                                    Civil Division, Federal Programs Branch
                                    20 Massachusetts Ave., N.W., Room 6118
                                    Washington, D.C. 20530
                                    Telephone: (202) 514-4505
                                    Email: John.Coleman3@usdoj.gov

                                    Attorneys for Defendants

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 26, 2010, I caused to be served a copy of the foregoing

paper upon Robert J. Muise and David Yerushalmi, counsel for plaintiff in this action, by email

per stipulation and agreement of the parties.

*/s/ John R. Coleman*
John R. Coleman
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
