IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY,

        Plaintiff,

    v.

TIMOTHY F. GEITHNER, in his official
capacity as Secretary, U.S. Department of
Treasury; BOARD OF GOVERNORS OF
THE FEDERAL RESERVE SYSTEM,

        Defendants.

Case No. 08-CV-15147

Hon. Lawrence P. Zatkoff

Magistrate Mona K. Majzoub

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001
Fax: (734) 930-7160
*Co-Counsel for Plaintiff*

U.S. DEPARTMENT OF JUSTICE
John R. Coleman, Esq.
Julie Straus, Esq.
Trial Attorneys
Civil Division, Federal Programs Branch
20 Massachusetts, Ave., N.W., Rm 6118
Washington, DC 20530
john.coleman3@usdoj.gov
(202) 514-4505
Fax: (202) 616-8460
*Counsel for Defendants*

LAW OFFICES OF DAVID YERUSHALMI, P.C.
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
P.O. Box 6358
Chandler, AZ 85246
david.yerushalmi@verizon.net
(646) 262-0500
Fax: (801) 760-3901
*Co-Counsel for Plaintiff*

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT & BRIEF IN SUPPORT**

Plaintiff Kevin J. Murray ("Plaintiff"), by and through his undersigned counsel, hereby moves this court pursuant to Fed. R. Civ. P. 56 for summary judgment because there is no genuine issue of material fact and he is entitled to judgment as a matter of law.

In support of his motion, Plaintiff relies upon the pleadings and papers of record, as well as his brief filed with this motion and the affidavits, declarations, and exhibits attached thereto.

As demonstrated more fully in Plaintiff's brief, the use of taxpayer money to approve, endorse, and support Shariah-based Islamic religious activities and religious indoctrination, including the use of such funds to acquire government ownership and control in a company that engages in such activities, violates the Establishment Clause of the First Amendment to the United States Constitution.

Pursuant to E.D. Mich. LR 7.1, there was a conference between attorneys for the parties in which Plaintiff's counsel requested but did not obtain concurrence in the relief sought.

WHEREFORE, Plaintiff respectfully requests that this court grant his motion and enter judgment in his favor.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/Robert J. Muise
Robert J. Muise (P62849)

LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ David Yerushalmi
David Yerushalmi, Esq.

*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY,

        Plaintiff,

  v.

TIMOTHY F. GEITHNER, in his official
capacity as Secretary, U.S. Department of
Treasury; BOARD OF GOVERNORS OF
THE FEDERAL RESERVE SYSTEM,

        Defendants.

Case No. 08-CV-15147

Hon. Lawrence P. Zatkoff

Magistrate Mona K. Majzoub

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**ISSUES PRESENTED**

I.      Whether the use of taxpayer funds to approve, endorse, and support Shariah-based Islamic religious activities and religious indoctrination, including the use of such funds to acquire government ownership and control of a company that engages in such activities, violates the Establishment Clause of the First Amendment to the United States Constitution.

II.     Whether the government's ownership and control of a company that engages in Islamic religious activities and indoctrination violates the Establishment Clause of the First Amendment to the United States Constitution.

III.    Whether the government's approval and support of Shariah-based Islam is sufficiently likely to be perceived as conveying a message of endorsement of religion in violation of the Establishment Clause of the First Amendment to the United States Constitution.

## CONTROLLING AND MOST APPROPRIATE AUTHORITY

*American Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278 (6th Cir. 2009)

*Bowen v. Kendrick*, 487 U.S. 589 (1988)

*Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir. 2002)

*Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973)

*Flast v. Cohen*, 392 U.S. 83 (1968)

*Hunt v. McNair*, 413 U.S. 734 (1973)

*Larson v. Valente*, 456 U.S. 228 (1982)

*Lemon v. Kurtzman*, 403 U.S. 602 (1971)

*Murray v. Geithner*, 624 F. Supp. 2d 667 (E.D. Mich. 2009)

*Tilton v. Richardson*, 403 U.S. 672 (1971)

**TABLE OF CONTENTS**

**Page**

ISSUES PRESENTED..................................................................................................... i

CONTROLLING AND MOST APPROPRIATE AUTHORITY ................................... ii

TABLE OF CONTENTS................................................................................................ iii

TABLE OF AUTHORITIES ..........................................................................................v

SUMMARY JUDGMENT STANDARD........................................................................1

STATEMENT OF MATERIAL FACTS.........................................................................2

I.    AIG: WORLD LEADER IN SHARIAH-COMPLIANT FINANCIAL PRODUCTS........2

      A.    AIG's Operations ............................................................................2

      B.    AIG's Consolidated Accounting...............................................................2

      C.    AIG's Promotion of SCF Products ............................................................3

      D.    SCF: A Shariah-Based Islamic Religious Activity................................4

II.   IMPLICATIONS OF DEFENDANTS' OWNERSHIP AND CONTROL OF AIG...........5

      A.    Defendants Take Ownership and Control of AIG ................................5

      B.    $40 Billion of Credit Facility Funds Replaced by TARP Funds ............7

      C.    Defendants Invest Additional TARP Funds Used to Support SCF .........9

      D.    AIG Promotes SCF without Safeguards ...............................................10

      E.    Defendants Officially Endorse SCF.......................................................12

ARGUMENT..................................................................................................................13

I.    THE ESTABLISHMENT CLAUSE PROHIBITS DEFENDANTS FROM
      APPROVING, ENDORSING, AND SUPPORTING SHARIAH-BASED ISLAM.........13

      A.    "Three Main Evils" and "Three Pence"................................................13

B.      Prohibition on *Perceived* Endorsement of Shariah-Based Islam ..........................13

C.      The Modified *Lemon* Test....................................................................................14

      1.      The "Purpose" of Promoting Shariah-Based Islam ...................................14

      2.      The "Effect" of Promoting Shariah-Based Islam......................................15

      3.      The "Effect" of Funding Shariah-Based Islamic Religious Activities ......16

      4.      The Lack of Constitutionally Required "Safeguards" ...............................16

II.     THE MATERIAL FACTS DEMONSTRATE AN ESTABLISHMENT CLAUSE VIOLATION AS A MATTER OF LAW ..........................................................................18

CONCLUSION.........................................................................................................................20

CERTIFICATE OF SERVICE ................................................................................................21

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                    **Page**

*Agostini v. Felton,*
521 U.S. 203 (1997)................................................................................................16, 19

*American Atheists, Inc. v. City of Detroit Downtown Dev. Auth.,*
567 F.3d 278 (6th Cir. 2009) .................................................................................16, 17

*Board of Education v. Mergens,*
496 U.S. 226 (1990)......................................................................................................15

*Bowen v. Kendrick,*
487 U.S. 589 (1988)......................................................................................................17

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Assoc.,*
531 U.S. 288 (2001)......................................................................................................19

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)........................................................................................................2

*Commack Self-Service Kosher Meats, Inc. v. Weiss,*
294 F.3d 415 (2d Cir. 2002)....................................................................................1, 20

*Committee for Pub. Educ. & Religious Liberty v. Nyquist,*
413 U.S. 756 (1973)..........................................................................................17, 18, 19

*County of Allegheny v. A.C.L.U.,*
492 U.S. 573 (1989)......................................................................................................14

*Edwards v. Aguillard,*
482 U.S. 578 (1987)......................................................................................................14

*Everson v. Board of Educ.,*
330 U.S. 1 (1947)..........................................................................................................13

*Flast v. Cohen,*
392 U.S. 83 (1968)........................................................................................................13

*Hunt v. McNair,*
413 U.S. 734 (1973)................................................................................................16, 19

*Larson v. Valente,*
456 U.S. 228 (1982)..................................................................................................1, 20

*Lemon v. Kurtzman,*
403 U.S. 602 (1971)...................................................................................... *passim*

*Lynch v. Donnelly,*
465 U.S. 668 (1984)....................................................................................14, 15, 16

*McCreary County v. A.C.L.U.,*
545 U.S. 844 (2005).............................................................................................15

*Mitchell v. Helms,*
530 U.S. 793 (2000).............................................................................................17

*Murray v. Geithner,*
624 F. Supp. 2d 667 (E.D. Mich. 2009).............................................................1, 4

*Santa Fe Indep. Sch. Dist. v. Doe,*
530 U.S. 290 (2000)....................................................................................13, 14, 15

*Tilton v. Richardson,*
403 U.S. 672 (1971).......................................................................................16, 19

*Walz v. Tax Commission,*
397 U.S. 664 (1970).............................................................................................13

## **Constitution**

U.S. Const. amend. I ...................................................................................... *passim*

## **Statutes**

12 U.S.C. § 342.....................................................................................................6

12 U.S.C. § 343 .................................................................................................6, 10

12 U.S.C. § 5201 *et seq.* ............................................................................... *passim*

12 U.S.C. § 5211.....................................................................................................8

12 U.S.C. § 5235.....................................................................................................8

## **Rules**

Fed. R. Civ. P. 56(c) ..............................................................................................2

**<u>Other Authority</u>**

David Yerushalmi, *Shariah's "Black Box": Civil Liability and Criminal Exposure Surrounding Shariah-Compliant Finance*,
2008 Utah L. Rev. 1019 (2008) ........................................................................................3

This case challenges the United States government's approval, endorsement, and support of Shariah-based Islam.[1]  To that end, Plaintiff seeks to enjoin Defendants' official endorsement of Shariah-based Islam and the use of taxpayer funds to support Islamic religious activities.

In an unprecedented move, Defendant Board of Governors of the Federal Reserve System (hereinafter "FED") authorized the Federal Reserve Bank of New York ("FRBNY") to loan billions of dollars to American International Group, Inc. ("AIG"), a company that engages in Islamic religious activities, in exchange for Defendants' ownership and control of AIG. Immediately following this infusion of capital and in further support of the government takeover of AIG, Congress, through the "Emergency Economic Stabilization Act of 2008" ("EESA"), 12 U.S.C. § 5201 *et seq*., appropriated and authorized billions in taxpayer dollars to further fund AIG.  These taxpayer dollars were used to fund and financially support Defendants' ownership interest in AIG, and, in addition to the FED loan funds, they were used to support Islamic religious activities—religious activities that Defendants officially endorse.

In the final analysis, upon review of the undisputed material facts in light of the controlling case law, Defendants' endorsement and support of Shariah-based Islam violates the Establishment Clause.  *See Murray v. Geithner*, 624 F. Supp. 2d 667 (E.D. Mich. 2009).

## SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to

---

[1] Defendants' actions are particularly egregious here in that they promote a *particular sect* of Islam (i.e., Shariah-based Islam).  *Larson v. Valente*, 456 U.S. 228, 244 (1982) (preferring one religious denomination over another violates the Establishment Clause); *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425 (2d Cir. 2002) (suggesting a "preference for the views of one branch" of a religion violates the First Amendment).

secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotations omitted).  Rule 56 provides that a summary judgment motion should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

## STATEMENT OF MATERIAL FACTS

### I.  AIG: WORLD LEADER IN SHARIAH-COMPLIANT FINANCIAL PRODUCTS.

#### A.  AIG's Operations.

AIG owns directly and indirectly (through its direct subsidiaries) a myriad of domestic and foreign insurance and insurance-related companies.  AIG exercises control over these subsidiaries through its direct and indirect ownership interests in these companies, represented typically by 100% of the equity and voting rights of the subsidiaries.  (*See* AIG GC Aff. at ¶¶ 5 at Ex.1; AIG 2009 SEC Form 10K filing (period ending Dec. 31, 2009)[2] ("AIG 10K") at 3, 372-78 at Ex.2; *see generally* AIG 2010 SEC Form 10Q filing (period ending Mar. 31, 2010)).[3]

#### B.  AIG's Consolidated Accounting.

AIG employs consolidated accounting, and it "manages liquidity at both the parent and subsidiary levels."  This means that AIG provides funds to its subsidiaries when necessary, and subsidiaries similarly provide money to AIG and to other AIG subsidiaries as liquidity requirements dictate.  (AIG 10K at 19 at Ex.2; AIG 2010 SEC Form 10Q filing ("AIG 10Q") at 12 at Ex.3; AIG Treas. Aff. at ¶ 5 at Ex.4).  Cash flows move from AIG through a single port to its subsidiaries and from and through its subsidiaries to AIG.  Specifically, the cash flows from

---

[2] Available at http://www.aigcorporate.com/investors/2654275_15501T04_CNB.pdf.
[3] Available at http://www.aigcorporate.com/investors/2010_May/41301T05_v1.zip.

AIG to its subsidiaries relevant to this litigation are neither sourced in nor destined for segregated accounts.  (AIG 10K at Ex.2; AIG Treas. Aff. at ¶¶ 5-7 at Ex.4).

C.     **AIG's Promotion of SCF Products.**

AIG promotes and provides Shariah-compliant finance ("SCF") products worldwide, with a specific focus on SCF insurance products known as "takaful."  In addition to marketing and promoting SCF products as a market leader, AIG itself, through several of its wholly-owned subsidiaries, engages in SCF, which subjects aspects of its financial activities to the dictates of Islamic law.  (Defs.' Admis. at No. 110 at Ex.5; AIG Takaful (Defs.' Ex.I at Doc. No. 6-11) at 1 at Ex.6; AIG GC Aff. at ¶¶ 2, 4, 6 at Ex.1; AIA Takaful Aff. at ¶¶ 7, 9-10 at Ex.7; ALICO Aff. at ¶ 5 at Ex.8; AIA Financial Aff. at ¶ 7 at Ex.9; Takaful-Enaya Aff. at ¶ 5 at Ex.10; Lexington-A.I. Risk Aff. at ¶ 5 at Ex.11).  SCF products and finance in general, and AIG's SCF activities in particular, are different from other financial products and activities in that they are developed, funded, and maintained according to the religious tenets and dictates of Islamic law.[4]  (Coughlin Decl., Ex.A at ¶¶ 7-9 at Ex.12; Spencer Decl., Ex.A at ¶¶ 1, 5, 17 at Ex.13).  AIG, through its wholly-owned subsidiaries, complies with Shariah by employing or otherwise engaging Shariah authorities who collectively act as "Shariah Supervisory Committees" for their SCF subsidiaries. These Shariah authorities issue authoritative legal rulings (*fatawa*, singular *fatwa*) pursuant to Islamic legal tenets, which mandate certain behavior by AIG (or by AIG's Shariah-compliant subsidiaries).  (AIG GC Aff. at ¶ 4 at Ex.1; AIA Takaful Aff. at ¶¶ 9-10 at Ex.7; ALICO Aff. at ¶ 7 at Ex.8; AIA Financial Aff. at ¶ 9 at Ex.9; Takaful-Enaya Aff. at ¶ 7 at Ex.10; Lexington-A.I. Risk Aff. at ¶ 7 at Ex.11; Spencer Decl., Ex.A at ¶¶ 15-16 at Ex.13).  The role of Shariah

---

[4] *See generally* David Yerushalmi, *Shariah's "Black Box": Civil Liability and Criminal Exposure Surrounding Shariah-Compliant Finance*, 2008 Utah L. Rev. 1019 (2008).

authorities is central to all Shariah adherents.  Indeed, the role of AIG's Shariah authorities "is to review [AIG's] operations, supervise its development of Islamic products, and determine Shariah compliance of these products and [AIG's] investments."  (AIG Takaful-FAQs (Defs.' Ex.H at Doc. No. 6-10) at 3 at Ex.14; AIG GC Aff. at ¶ 4 at Ex.1; AIA Takaful Aff. at ¶¶ 9-10 at Ex.7; ALICO Aff. at ¶ 7 at Ex.8; AIA Financial Aff. at ¶ 9 at Ex.9; Takaful-Enaya Aff. at ¶ 7 at Ex.10; Lexington-A.I. Risk Aff. at ¶ 7 at Ex.11; Spencer Decl., Ex.A at ¶¶ 15-16 at Ex.13).  Thus, AIG's SCF business is pervasively sectarian in that its "secular" business purposes and its Islamic religious mission are inextricably intertwined.  (Coughlin Decl. at Ex.A at ¶ 13 at Ex.12).

### D.      SCF: A Shariah-Based Islamic Religious Activity.

AIG's Shariah-compliant financial activities and products are religious and Islamic in content and in practice.  More particularly, they serve the theological purposes of a Shariah-based Islam.  When AIG chooses to engage in Sharia-based Islamic practices, it is by necessity selecting among competing theological perspectives on Shariah and on the role of Shariah in Islam.  (Coughlin Decl., Ex.A at ¶¶ 4-13 at Ex.12; Spencer Decl., Ex.A at ¶¶ 1-21 at Ex.13).  Thus, AIG describes "Sharia" as "Islamic law based on *Quran* [sic] and the teachings of the Prophet (PBUH)."[5]  (AIG Takaful-FAQs at 1 at Ex.14; Defs.' Admis. at No. 131 at Ex.5).  This in itself is taking a theological position on an ongoing debate among Muslims and between Muslims and non-Muslims—notably including Plaintiff.  (Coughlin Decl., Ex.A at ¶¶ 4-13 at Ex.12; Spencer Decl., Ex.A at ¶¶ 1-21 at Ex.13; Murray Decl. at ¶¶ 1-5 at Ex.15).  Specifically, the *Quran* is considered by the majority but not all of Islamic adherents to be the perfect expression of Allah's will for man.  Presumably, most non-Muslims, and this is certainly true of

---

[5] An acronym for "Peace Be Upon Him."  *See Murray*, 624 F. Supp. 2d at 670, n.1.

4

Plaintiff, don't accept the *Quran* as divine or as an expression—perfect or otherwise—of Allah or of any divinity.  (Coughlin Decl., Ex.A at ¶¶ 4-13 at Ex.12; Spencer Decl., Ex.A at ¶¶ 1-21 at Ex.13; Murray Decl. at ¶¶ 1-5 at Ex.15).  Further, AIG states that Shariah is also based upon the "teachings of the Prophet," which is a reference to the canonized *Sunnah*.  Again, many Muslims and non-Muslims, including Plaintiff, do not consider the *Sunnah* as authentic teachings of Mohammed or of any other purported prophet.  (Coughlin Decl., Ex.A at ¶¶ 4-13 at Ex.12; Spencer Decl., Ex.A at ¶¶ 1-21 at Ex.13; Murray Decl. at ¶¶ 1-5 at Ex.15).  AIG, and by clear extension and implication Defendants on behalf of the government, are taking a particular theological position by supporting a specific interpretation of Shariah-based Islam.[6]

## II.     IMPLICATIONS OF DEFENDANTS' OWNERSHIP AND CONTROL OF AIG.

### A.     Defendants Take Ownership and Control of AIG.

In mid-September 2008, in response generally to a crisis in the financial markets in 2008 and, in particular, to AIG's impending debt- and liquidity-driven demise, Defendant Geithner, as then-President of FRBNY, met and consulted with Henry Paulson, who was at the time the Secretary of the U.S. Department of the Treasury ("Treasury Department"), and Ben Bernanke, who was and is the Chairman of the FED.  Defendant Geithner, Paulson, and Bernanke agreed that the government must prevent AIG's collapse.  (FED § 129 EESA Rep.[7] ("FED Rep.") at 1-2

---

[6] Defendants in effect concede that AIG is fully engaged in theologically-driven behavior in their numerous responses to Plaintiff's Request for Admissions.  Specifically, for every request for admission that sought a response relating to AIG's Shariah-based business practices and to AIG's own statements about its SCF products and financial activities, Defendants responded by objecting to the request by stating that the request was "seeking to establish a theological proposition."  (Defs.' Admis. at Nos. 110-15; 130; 132-38; 140-52; 158-69 at Ex.5).  Indeed, AIG—and by extension the government—establishes theological propositions by word and by deed every day they engage in SCF business practices.

[7] Available at http://www.federalreserve.gov/monetarypolicy/files/129aigsecborrowfacility.pdf.

at Ex.16; FED Mins. of Sep. 16, 2008 ("FED Mins.") at 3-4 at Ex.17; Millstein Dep. at 10-11 at Ex.18; Bernanke Ltr. to Paulson of Nov. 9, 2008 (Greenlee Dep. Ex.8) ("Bernanke Ltr.") at Ex.19. At the time, there was no statutory or other legal authority for the Treasury Department to provide debt or equity financing to AIG. (Millstein Dep. at 20-21 at Ex.18).

Thus, at the FED meeting on September 16, 2008, Defendant Geithner formally proposed to the FED that AIG be provided massive financial assistance by having the FED invoke the "unusual and exigent circumstances clause" of Section 13(3) of the Federal Reserve Act ("FRA") in order to permit AIG to obtain "discount" (i.e., loan) funds from the FRBNY.[8] (Greenlee Dep. at 31-32 at Ex.20). As a result, the FED immediately authorized the FRBNY to (1) provide a credit facility of up to $85 billion; (2) secure collateralization through all of AIG's assets; (3) obtain a 79.9 % equity interest in AIG; and (4) reserve for itself the right to veto the payment of dividends to common and preferred shareholders. (FED Mins. at 3-4 at Ex.17). By September 22, 2008, the FRBNY had implemented the FED's directives by negotiating, drafting, and executing the Credit Agreement. (*See* Credit Agreement at Defs.' Ex.A (Doc. No. 6-3); *see also* Credit Agreement (excerpts) at Ex.21).

The Credit Agreement tracked the FED's mandate and provided for the FRBNY to provide AIG with an $85 billion loan ("Credit Facility"). In exchange, the FRBNY obtained

---

[8] Sections 13(1) and (2) of the FRA provide that only "member banks" may obtain loan funds from one of the regional Federal reserve banks through discounted commercial paper. 12 U.S.C. §§ 342 & 343. AIG was not and is not a member bank. Section 13(3) provides, in relevant part, that under "unusual and exigent circumstances" the FED may "authorize any Federal reserve bank" to provide funds to "any individual, partnership, or corporation . . . [p]rovided, that before" providing such funds, "the Federal reserve bank shall obtain evidence that such individual, partnership, or corporation is unable to secure adequate credit accommodations from other banking institutions. *All such [funds] shall be subject to such limitations, restrictions, and regulations as [the FED] may prescribe.*" 12 U.S.C. § 343 (emphasis added).

collateral in the form of a security interest in effectively all of AIG's assets and AIG agreed to issue preferred shares ("Series C Preferred Shares"), providing equity upon conversion equal to 79.9% of the total equity in AIG and voting rights in AIG equal to 79.9% of the total voting rights allotted to the common shareholders.  (Subsequent amendments to the Credit Agreement reduced the total amount available under the Credit Facility to $60 billion and reduced the 79.9% equity and voting rights to 77.9%.).[9]

Under the Credit Agreement, however, AIG did not issue the Series C Preferred Shares to the FRBNY.  Instead, AIG issued the legal ownership interest of the Series C Preferred Shares to a trust ("Trust") established pursuant to the AIG Credit Facility Trust Agreement ("Trust Agreement") and issued the beneficial interest to the U.S. Treasury.[10]  According to the Trust Agreement, the FED (not the FRBNY) retains absolute and unilateral control over the existence of the Trust itself and the terms of the Trust Agreement.[11]  (Trust Agreement at Ex.22).  Thus, the federal government acquired a majority interest in AIG and effectively took control of the company.

**B.      $40 Billion of Credit Facility Funds Replaced by TARP Funds.**

As a result of the failures and impending failures of several major financial institutions, including AIG, Congress exercised its authority under the Taxing and Spending Clause and

---

[9] *See* list of amendments to Credit Agreement and references to respective SEC filings in which they appear at AIG 10K at 352 at Ex.2.

[10] The Trust was required because there is no authority under the FRA for the FED or the Federal reserve regional banks to provide equity financing or to obtain equity as consideration for discount funds.  In addition, there are conflict-of-interest issues for a Federal reserve regional bank acting as both lender through a credit facility and controlling shareholder.  (Bernanke Ltr. at 2 at Ex.19; Geithner Test. to Senate Banking Comm. at 13 at Ex.23; Millstin Dep. at 50-51 at Ex.18; Greenlee Dep. at 91-92 at Ex.20).

[11] Section 1.03 of the Trust Agreement expressly permits the FED to terminate or amend the Trust pursuant to its Section 13(3) authority of the FRA.  (Trust Agreement at 3 at Ex.22).

passed EESA on October 3, 2008.[12]   EESA established legislative authority for the Troubled

Asset Relief Program ("TARP"), which authorized the Treasury Secretary to expend up to $700

billion in taxpayer funds "to purchase, and to make fund commitments to purchase, troubled

assets from any financial institution."   12 U.S.C. §5211(a)(1).   Pursuant to this express

congressional mandate and specific congressional appropriation, AIG, as the single largest

recipient of TARP funds, received $40 billion in November 2008.   These funds were used to

replace $40 billion of the Credit Facility funds provided to AIG just a few weeks earlier—funds

that were used to support SCF.   At that time, AIG had already drawn down approximately $62

billion.[13]   As a result, AIG's debt to the FRBNY under the Credit Facility was reduced by $40

billion and AIG issued the Treasury Department non-voting, preferred shares ("Series D

Preferred Shares").   (AIG 10K at 309 at Ex.2).   As a result of the Series D Preferred Shares and

the replacement of $40 billion of the Credit Facility funds with TARP funds, the federal

government as a whole, using both FED funds and EESA funds, became the majority and

controlling owner of AIG.   As such, the federal government has a vested interest in ensuring the

success of AIG and stands to profit by that success, creating a government entanglement with

AIG.   And by supporting its ownership interest with taxpayer money, maintaining a vested

interest in the success of AIG, and standing to profit from that success, the federal government

---

[12] When Congress passed the EESA, it understood that AIG was in financial trouble and would
be a direct beneficiary of the EESA funds.  (*See, e.g.,* Legislative History at Ex.24).  EESA itself
(§ 129) required the FED to report the exercise of its Section 13(3) authority as it applied to
AIG.   12 U.S.C. § 5235(a) & (d); (*see also* FED Rep. at Ex.16; AIG Nov. 2008 Press Release
(Defs.' Ex.D at Doc. No. 6-6) at 1 at Ex.25; *see generally* SIGTARP Rep. at Ex.26).
[13] Prior to the execution of the Credit Agreement on Sept. 22, 2008, the FED loaned AIG
approximately $37 billion in four tranches evidenced by four separate demand promissory
notes.  Pursuant to the Credit Agreement, this sum of $37 billion was converted to debt under the
Credit Facility.  (Credit Agreement (excerpts) at Ex.21).

has insinuated itself into a position of interdependence so that it is in effect a joint participant in AIG's activities, thereby creating a symbiotic relationship such that AIG's activities can be fairly attributed to the government.  (*See* Millstein Dep. at  48-49 at Ex.18; *see also* Test. of Foshee (Trustee) at 1 at Ex.27; Test. of Feldberg (Trustee) at 3, 5 at Ex.28; Test. of Liddy on May 13, 2009, at 5-6 at Ex.29 ("The infusion of substantial U.S. government capital to AIG brought with it a substantial new set of relationships for the company: first and foremost, ***with the American taxpayer as AIG's largest single shareholder***; with the ***taxpayers' representatives here in Congress***; with the Federal Reserve and U.S. Treasury as our ***primary day-to-day partners in government***; and more recently, with the trustees also appearing today.") (emphasis added)).

Moreover, the federal government's insinuation into the day-to-day management of AIG is evidenced not only by the shareholder control the FED exercises through the Trust it controls, but also by the fact that federal officials, including certain Defendants, acted directly to force the resignation of board members and the appointment of other board members  (*See, e.g.*, Defs.' Admis. at Nos. 74-75 at Ex.5; Test. of Liddy on March 18, 2009, at 1 at Ex.30).

### C.    Defendants Invest Additional TARP Funds Used to Support SCF.

On April 17, 2009, AIG and the Treasury Department entered into the Securities Purchase Agreement, which, *inter alia*, provided that the Treasury Department would provide AIG with up to $30 billion in equity financing.[14]  AIG would be able to draw down on this equity line as needed.   While the Securities Purchase Agreement requires that AIG provide an "expected uses" for each drawdown, there is no requirement that AIG in fact use the drawdown

---

[14] The exact sum available under the Securities Purchase Agreement is $29.835 billion.

proceeds as "expected"—nor any prohibition on using the funds to support SCF.  AIG has to date drawn down more than $7.5 billion under the Securities Purchase Agreement.[15]

### D.      AIG Promotes SCF without Safeguards.

As set forth above, AIG, through its wholly-owned subsidiaries, engages in, practices, and promotes SCF, which is a form of Islamic religious observance.  AIG would not have survived its financial crisis without the financial support provided by Defendants on behalf of the federal government.  This financial "life-support" included, *inter alia*, (1) FED funds (authorized by the FED) provided by the FRBNY through the Credit Facility, which provided the federal government with its majority and controlling ownership interest in AIG (Credit Facility-Series C Preferred Shares transaction); (2) the replacement of $40 billion of Credit Facility funds with TARP funds (Series D Preferred Shares transaction), which further supported the federal government's ownership interest in AIG and AIG's SCF activities; and (3) the most recent $30 billion TARP funds equity draw down agreement.  Each of these transactions was and continues to be essential and necessary for AIG's continued survival.[16]  Without the direct support of the federal government through the investment of taxpayer funds, AIG would not and could not survive as a corporate entity—consequently, AIG could not engage in its SCF businesses.  Thus, taxpayer funds have been and continue to be used to support AIG's Shariah-based Islamic religious activities.

---

[15] For the dates and amounts for the specific drawdowns see AIG Treas. Aff. at ¶ 11 at Ex.4.

[16] There can be no credible argument that AIG would have survived without financial support from the government.  This is demonstrated at every level of government involvement and by AIG's government filings.  Defendants concede this point.  (Greenlee Dep. at 110 at Ex.20; Millstein Dep. at 13-16, 25, 28-29, 45-47 at Ex.18; *see also* Bernanke Ltr. at Ex.19).  Indeed, pursuant to Section 13(3) of the FRA, the FED may only open its discount window to non-member banks after a determination that the financial institution has <u>no</u> private financing available.  12 U.S.C. § 343.

Further, to date AIG has directly and indirectly provided financial support in excess of one billion dollars to its SCF businesses while receiving taxpayer funds.[17]   Because AIG uses consolidated accounting and receives and funnels money through an unsegregated single port, taxpayer funds have been effectively diverted to support AIG's Shariah-based Islamic activities and are divertible in the future for such uses with no meaningful restrictions or safeguards.

The future diversion of taxpayer funds in support of AIG's SCF businesses and Shariah-based Islamic practices is more than theoretical for two reasons.   One, the TARP program continues.   In fact, there remains approximately $215 billion available to distribute, of which the Treasury Department has contractually committed to providing AIG with an additional $22.5 billion under the $30 billion Securities Purchase Agreement.   (*See* Defs.' Admis. at No. 69 at Ex.5).   And two, there are absolutely no statutory, regulatory, or contractual safeguards in place to prevent such diversions.   Nothing in EESA, the TARP regulations, or the $30 billion Securities Purchase Agreement prohibits AIG from applying the TARP money to support AIG's Shariah-based Islamic activities.   Indeed, AIG has provided extensive testimony that there are "***no*** [***AIG***] ***policies, whether required by the U.S. government or otherwise, created or implemented to prevent the use of any government funds from promoting, supporting, or funding*** [***AIG's Shariah-based Islamic practices***]."   (Lexington-A.I. Risk Aff. at ¶ 10 at Ex.11; ALICO Aff. at ¶ 11 at Ex.8; AIA Takaful Aff. at ¶ 15 at Ex.7; AIA Financial Aff. at ¶ 14 at Ex.9; and Takaful-Enaya Aff. at ¶ 10 at Ex.10).

---

[17] The details of AIG's financial transactions are covered by a protective order.  For specific examples of transactions funding SCF, see Exhibit 36, which was filed under seal.

### E.    Defendants Officially Endorse SCF.

Beyond financial support, Defendants actively promote and endorse both SCF generally and in particular AIG's involvement in SCF.  This is evidenced by the Treasury Department's active endorsement of SCF through published writings posted on its website (publications actually edited with updates by Treasury Department Staff);[18] providing for and publicly announcing the official position at the Treasury Department of the "Islamic Finance Scholar-in-Residence Program";[19] published presentations by senior Treasury Department officials lauding SCF and stating explicitly that the U.S. government "*places significant importance on promoting . . . Islamic finance*" and has "*recently deepened our engagement in Islamic finance in a number of ways,*" including a "*call*[] *for harmonization of Shari'a standards at the national and international levels.*"[20]  All of this was followed by a promotion of SCF through a Treasury Department sponsored conference entitled "Islamic Finance 101."  The program, which took place immediately following the acquisition of AIG by Defendants, was specifically designated for *government policy makers*, and the published materials are replete with theological propositions that implicitly and explicitly inform the objective audience that the U.S. government is promoting, endorsing, and encouraging the religious premises of Shariah-based Islam.[21]

---

[18] "Overview of Islamic Finance: Occasional Paper No. 4 (August 2006)" published by the Treasury Department and posted at its Web site at http://www.ustreas.gov/offices/international-affairs/occasional-paper-series/08042006_OccasionalPaper4.pdf.  (*See* Ex.31).

[19] June 2, 2004, Treasury Department Press Release posted at the Treasury Department Web site at http://www.ustreas.gov/press/releases/js1706.htm.  (*See* Ex.32).

[20] May 8, 2004, Treasury Department Press Release posted at the Treasury Department's Web site at http://www.ustreas.gov/press/releases/js1543.htm.  (*See* Ex.33) (emphasis added).

[21] (Defs.' Admis. at Nos. 170-72 at Ex.5; Kiwan Dep. at 32-33 at Ex.34; *see also* Islamic Finance 101 presentation materials (Kiwan Dep. Ex.21) at Ex.35).

**ARGUMENT**

**I.    THE ESTABLISHMENT CLAUSE PROHIBITS DEFENDANTS FROM APPROVING, ENDORSING, AND SUPPORTING SHARIAH-BASED ISLAM.**

**A.    "Three Main Evils" and "Three Pence."**

The Establishment Clause famously states, "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  Despite the absence of precisely stated prohibitions, it was intended to protect against "three main evils": "'[1] sponsorship, [2] financial support, and [3] active involvement of the sovereign in religious activity.'"  *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (quoting *Walz v. Tax Commission*, 397 U.S. 664, 668 (1970)).

In *Everson v. Board of Educ.*, 330 U.S. 1 (1947), the Court further emphasized:

> *No tax in any amount*, large or small, can be levied to support *any* religious activities or institutions, *whatever they may be called*, or *whatever form they may adopt* to teach or practice religion.

*Id.* at 16 (emphasis added).  This is consistent with James Madison's objection to even "three pence" being used for religion.  *See Flast v. Cohen*, 392 U.S. 83 (1968) (quoting James Madison's famous *Memorial and Remonstrance Against Religious Assessments*).

All of the "main evils" are present in this case, which involves not just "three pence," but billions of dollars of federal government support.

**B.    Prohibition on *Perceived* Endorsement of Shariah-Based Islam.**

The Supreme Court has warned that "the Constitution . . . requires that [courts] keep in mind the myriad, subtle ways in which Establishment Clause values can be eroded, and guard against other different, yet equally important, constitutional injuries."  *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 314 (2000) (internal citation omitted).  In fact, "[e]*very* government practice must be judged *in its unique circumstances* to determine whether it constitutes an

endorsement or disapproval of religion." *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor J., concurring) (emphasis added). Consequently, another way in which Establishment Clause "values" are eroded—a way that is not so subtle—is when the government uses taxpayer money to not only fund religious activities, but to take *de facto* control of a private entity that engages in religious activities. And this "unique circumstance" is further worsened when the government favorably endorses the religious activities in question, as in this case. Indeed, as controlling case law makes plain, the Establishment Clause prohibits the government from engaging in <u>any</u> activity that "is sufficiently likely to be perceived" as an endorsement of a particular religion. *See County of Allegheny v. A.C.L.U.*, 492 U.S. 573, 597 (1989).

### C.      The Modified *Lemon* Test.

While the Supreme Court has struggled with creating a single test for determining when the government has violated the Establishment Clause, the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), remains the starting point for the court's analysis. Under the *Lemon* test, a governmental action is unconstitutional if <u>any</u> one of the following applies: (1) it does not have a valid secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion. *Id.* at 612-13.

### 1.      The "Purpose" of Promoting Shariah-Based Islam.

When evaluating the "purpose" of governmental acts under *Lemon*, the reviewing court must not simply accept the government's self-serving statements in its defense. *See Edwards v. Aguillard*, 482 U.S. 578 (1987); *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 290. As the Supreme Court stated recently, "The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and

implementation of the statute,' or comparable official act." *McCreary County v. A.C.L.U.*, 545 U.S. 844, 862 (2005) (citation omitted).  In fact, the Court admonished in *McCreary County* that a reviewing court should not treat the "purpose enquiry" as if it "were so naive that any transparent claim to secularity would satisfy it, and [*should not*] *cut context out of the enquiry, to the point of ignoring history*, no matter what bearing it actually had on the significance of current circumstances."[22]  *Id.* at 863-64.

### 2.    The "Effect" of Promoting Shariah-Based Islam.

When evaluating the "effect" of the challenged acts under *Lemon*, the reviewing court is required to do so *irrespective* of the government's purpose.  Indeed, "the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions." *Santa Fe Indep. Sch. Dist.,* 530 U.S. at 307, n.21 (internal quotations and citations omitted).  While "[t]he purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion[, t]he effect prong asks whether, irrespective of the government's actual purpose, the practice under review in fact *conveys a message of endorsement* or disapproval.  An affirmative answer to either question should render the challenged practice invalid." *See Lynch*, 465 U.S. at 690 (O'Connor J., concurring) (emphasis added).  As Justice O'Connor explained in *Lynch,* "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the

---

[22] It should be noted that the "purpose" of a challenged act need not be nefarious, just impermissible, from an objective observer's perspective.  Thus, Plaintiff need only prove that the "purpose" of the challenged acts, which extend beyond a facial challenge to EESA to include Defendants' endorsement and support of Shariah-based Islam, is impermissible.  He is not required to prove that Defendants had a bad "motive." *See Board of Education v. Mergens*, 496 U.S. 226, 249 (1990).

political community." *Id.* at 688 (O'Connor, J., concurring). The inquiry as to whether the challenged acts are "sufficiently likely to be perceived" as "convey[ing] a message of endorsement" of religion is from the perspective of a "reasonable" and "reasonably informed observer." *See American Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 292 (6th Cir. 2009) (applying "endorsement" test to a funding scheme); *Agostini v. Felton*, 521 U.S. 203, 235 (1997) (same).

### 3.      The "Effect" of Funding Shariah-Based Islamic Religious Activities.

In *Hunt v. McNair*, 413 U.S. 734, 743 (1973), the Court made clear that federal aid will have "a primary effect of advancing religion . . . when it funds a specifically religious activity in an otherwise substantially secular setting," as in this case. In *Agostini v. Felton*, 521 U.S. 203, 218, 232-33 (1997), the Court further modified *Lemon* by folding the entanglement inquiry into the primary effect inquiry for funding cases since both inquiries *tended* to rely on the same evidence. The Court suggested three factors for determining whether government funding has the impermissible *effect* of advancing religion: (1) whether it results in the indoctrination of religion; (2) whether it defines its recipients by reference to religion; or (3) whether it creates an excessive entanglement. *Agostini*, 521 U.S. at 234. The first and third factors are present here.

### 4.      The Lack of Constitutionally Required "Safeguards."

When the government provides open-ended money grants without effective safeguards against the diversion of such funds for religious purposes, as in this case, the government violates the Establishment Clause. *See Tilton v. Richardson*, 403 U.S. 672, 682-84 (1971) (finding that "the statute's enforcement provisions are inadequate to ensure that the impact of the federal aid will not advance religion"); *American Atheists, Inc.* 567 F.3d at 293 ("[A] program

may have the primary effect of advancing religion if the recipient diverts secular aid to further its religious mission.") (quotations and citation omitted).   In *American Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 296 (6th Cir. 2009), for example, the court upheld the funding program, but did so upon finding that there was "ample reason to think that the distributed aid did not (and will not) result in government-sponsored faith-based activities" because "the mechanics of the program ensured that the aid would go just to the approved uses."[23]  *See also Mitchell v. Helms*, 530 U.S. 793, 861 (2000) (O'Connor J., concurring) (concluding that "[t]he safeguards employed by the [funding] program are constitutionally sufficient"); *cf. Bowen v. Kendrick*, 487 U.S. 589, 621-22 (1988) (remanding to determine whether funds in particular cases were being used in violation of the Establishment Clause even though Congress "expressed the view that the use of [government] funds by grantees to promote religion, or to teach religious doctrines of a particular sect, would be contrary to the intent of the statute" and the Secretary had "promulgated a series of conditions to each grant, including a prohibition against teaching or promoting religion").  In *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 774 (1973), the Court struck down, *inter alia*, the "maintenance

---

[23] In *American Atheists, Inc.*, the court observed:

> Not only did eligible recipients have to satisfy three levels of review verifying that the project conformed to the program's guidelines and criteria, [**which restricted the use of funds to purely secular purposes**,] but they also had to finance 100% of the project on their own at the outset and 50% of the program by the end.  Whatever "special dangers" exist when [the government] makes open-ended money grants to religious recipients, which may spend the funds on whatever they wish, those dangers do not exist when [the government] releases funds for completed work on approved projects that the recipient initially finances on its own.

*American Atheists, Inc.,* 567 F.3d at 296 (internal citation omitted).

and repair" provisions of a New York statute that permitted aid to nonpublic schools.  The Court

found that the grants were "given largely without restriction on usage," stating that

> [*n*]*othing in the statute*, for instance, bars a qualifying school from paying out of
> state funds the salaries of employees who maintain the school chapel, or the cost
> of renovating classrooms in which religion is taught, or the cost of heating and
> lighting those same facilities.  *Absent appropriate restrictions* on expenditures for
> these and similar purposes, *it simply cannot be denied that this section has a
> primary effect that advances religion* in that it subsidizes directly the religious
> activities of sectarian elementary and secondary schools.

*Id*. (emphasis added).  Similarly here, there is "nothing in the statute" that prohibits AIG from

using government (taxpayer) funds to support its religious activities.   Absent appropriate

safeguards, "it simply cannot be denied" that the use of government funds has the primary effect

of advancing religion in that they subsidize directly AIG's religious activities.

## II.     THE MATERIAL FACTS DEMONSTRATE AN ESTABLISHMENT CLAUSE VIOLATION AS A MATTER OF LAW.

A review of the material facts in light of established legal principles leads to the firm

conclusion that Defendants violated the Establishment Clause.  In 2008, the federal government,

through the FED, took unprecedented action by acquiring a majority ownership interest in AIG.

The funds used to acquire this ownership were also used to support AIG's religious activities.

Through EESA, the government then provided further support for its investment by granting

AIG $40 billion in taxpayer money, which replaced a portion of the FED funds and allowed AIG

to continue its operations, including its Islamic religious activities.  This disbursement of EESA

funds was followed within a few months by an additional $30 billion of taxpayer funds.   The

funds provided pursuant to EESA are unrestricted (except for executive compensation), open-

ended grants of taxpayer money.  Moreover, AIG employs consolidated financing; all of its

funds are fungible and flow through a single port.  Consequently, all funds going to AIG are used

to financially support AIG's activities, including its religious activities.  Because there are no restrictions or safeguards in EESA that bar the use of the funds to support AIG's religious activities, and there is no true mechanism in EESA by which the government could police this impermissible use of funds, it "simply cannot be denied" that disbursement of EESA funds to AIG "has a primary effect that advances religion." *Nyquist*, 413 U.S. at 774.  Thus, the lack of <u>any</u> constitutionally sufficient safeguards regarding the use of the billions of taxpayer dollars going to AIG is sufficient to find a constitutional violation.  *Id.*; *Tilton*, 403 U.S. at 682-84.

The Supreme Court has also made clear that when taxpayer money is being used to fund a religious activity, even when the activity occurs in an otherwise secular setting, as in this case, the "effect" of such funding violates the Establishment Clause.  *Hunt*, 413 U.S. at 743.  The Court has similarly made clear that funding resulting in either religious indoctrination or excessive government entanglement with religion, as in this case, has an unconstitutional "effect."  *Agostini*, 521 U.S. at 234.  And this "effect" is worsened by the "symbolic" union between the government and AIG as a result of the government's ownership and control of AIG. *See id.* at 223-28.  Consequently, this union creates a further "excessive entanglement" problem in that the "sovereign" itself is engaging in religious activities.  *See Lemon*, 403 U.S. at 612; *see also Brentwood Acad. v. Tennessee Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 296 (2001) (identifying factors for holding that a challenged activity is government action for constitutional purposes, including, *inter alia*, "entwinement" between the government and the private actor).

Indeed, the taxpayer funding of AIG was not done in a vacuum.  As noted above, at the time of this funding, the federal government had a majority ownership interest in and *de facto* control over AIG.  Furthermore, AIG was *publicly known* as the world leader in SCF.  In fact,

19

shortly after receiving the first grant of EESA money, AIG publicly announced that it was *expanding* its SCF activities in the United States. (Coughlin Decl., Ex.C at Ex.12). Moreover, near the time of EESA funding, the Treasury Department itself held a forum on SCF *for government policy makers*, giving this religious practice the federal government's stamp of approval. And that official approval is further endorsed by Defendants through documents found on the Treasury Department's website. Indeed, it is a *clear violation* of the Establishment Clause when the government throws its weight in support of a *particular* religious doctrine, such as Shariah-based Islam. *Larson,* 456 U.S. at 244 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *Commack Self-Service Kosher Meats, Inc.*, 294 F.3d at 425 (holding that the government violated the First Amendment because it suggested a "preference for the views of one branch of Judaism").

In sum, the totality of the undisputed facts in light of the controlling law compels one conclusion: Defendants' approval and support of Shariah-based Islam is sufficiently likely to be perceived as conveying a message of endorsement of religion in violation of the Establishment Clause.

## CONCLUSION

Plaintiff respectfully requests that the court grant his motion.

Respectfully submitted,

THOMAS MORE LAW CENTER            LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ Robert J. Muise                             /s/ David Yerushalmi
Robert J. Muise, Esq. (P62849)          David Yerushalmi, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2010, a copy of the foregoing PLAINTIFF'S MOTION

FOR SUMMARY JUDGMENT & BRIEF IN SUPPORT with index of exhibits and exhibits was

filed electronically.  Certain exhibits were filed <u>under seal</u> pursuant to a protective order entered

in this case.  Notice of this filing will be sent to all parties for whom counsel has entered an

appearance by operation of the Court's electronic filing system.  Parties may access this filing

through the Court's system.  I further certify that a copy of the foregoing has been served by

ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance

electronically: None.  Furthermore, I certify that a copy of the exhibits filed <u>under seal</u> have been

served upon the following via email per the written agreement and stipulation of the parties:

> John R. Coleman, Esq.
> Julie Straus, Esq.
> U.S. DEPARTMENT OF JUSTICE
> Trial Attorney
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., N.W., Room 6118
> Washington, DC 20530
> john.coleman3@usdoj.gov
> julie.straus@usdoj.gov
>
> *Counsel for Defendants*
>
> THOMAS MORE LAW CENTER
>
> /s/ Robert J. Muise
> Robert J. Muise, Esq. (P62849)