# MURRAY v. GEITHNER, ET AL

# JIM MILLSTEIN

November 17, 2009

*Prepared for you by*



Bingham Farms | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888   FAX: 248.644.1120

www.bienenstock.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


KEVIN J. MURRAY,                        :

       Plaintiff,                       :

       v.                               :

TIMOTHY F. GEITHNER, in his             : Case No. 08-CV-15147

official capacity as Secretary,         :

U.S. Department of Treasury;            :

BOARD OF GOVERNORS OF THE               :

FEDERAL RESERVE SYSTEM,                 :

       Defendants.                      :


30(b)(6) DEPOSITION OF THE BOARD OF GOVERNORS OF THE

FEDERAL RESERVE BOARD

BY AND THROUGH ITS REPRESENTATIVE JIM MILLSTEIN


Washington, D.C.

Tuesday, November 17, 2009

9:06 a.m.


Job No. 32-168061

Pages: 1 - 91

Reported by: Janet A. Steffan, RDR



BENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Page 10

1  funds that Congress made available to the Treasury Department
2  under EESA.
3      Q.  And what does TARP stand for?
4      A.  Troubled Asset Relief Program which was the moniker
5  that the previous administration gave to the funds available
6  under EESA.
7      Q.  What TARP funds has AIG received to date?
8      MR. COLEMAN:  Objection.  To the extent that this
9  answer seeks information that is beyond the November 2008
10 transaction, it's outside the scope of the notice.
11     MR. YERUSHALMI:  If we can, Counsel, just outside
12 the scope so that we don't need to --
13     MR. COLEMAN:  Agreed to.
14     MR. YERUSHALMI:  Good.
15     THE WITNESS:  To date AIG has received approximately
16 $43 billion of capital from the Treasury Department; 39.8
17 billion is now in the form of a Series E preferred stock; and
18 the additional amounts, the 3 or 4 billion incremental, is
19 provided under a Series F preferred stock.
20 BY MR. YERUSHALMI:
21     Q.  What was the Treasury's role in the funding that's
22 referred to under paragraph 1 of your Notice of Deposition,
23 the September 2008 transaction between the Federal Reserve
24 Bank of New York and AIG?
25     A.  The funds referred to in that paragraph were

Page 11

1  provided by the Federal Reserve Bank of New York.  Treasury
2  was consulted in connection with the making of that loan, but
3  the funds themselves were actually provided by the Federal
4  Reserve Bank of New York, not by Treasury.
5      Q.  Now, when you say consulted, what do you mean?
6      A.  I mean that the Secretary of the Treasury was -- at
7  the time, Henry Paulson -- was consulted by the Federal
8  Reserve Board and Federal Reserve Bank of New York in
9  connection with the making of those loans.
10     Q.  Let's try to narrow that consultation down.
11 Secretary of Treasury Paulson was consulted by the Federal
12 Reserve Board you indicated; correct?
13     A.  I did.
14     Q.  And who on the Federal Reserve Board consulted with
15 Secretary Paulson?
16     A.  I believe both the Chairman Bernanke as well as --
17 on the Board, and as well as then President of the New York
18 Federal Reserve Bank Tim Geithner.
19     Q.  So Secretary Paulson, Bernanke and Geithner
20 consulted regarding exactly what?  Let me strike that.  When
21 was the first consultation between these three gentlemen,
22 Bernanke, Geithner and Paulson?
23     A.  I'm not sure.  I can't say with specificity.  I know
24 they talked about the making of the loan.
25     Q.  Would it have been prior to September 2008?

Page 12

1      MR. COLEMAN:  Objection; scope.
2      THE WITNESS:  I, I, I don't know for sure, but my
3  understanding is, is that the, that the making by the Federal
4  Reserve of this loan was after an effort by private banking
5  parties failed; and so it was, it was happening in
6  relatively a, in a crisis atmosphere and done relatively short
7  period of time in advance of the actual making of the loan.
8      So I think the consultation was probably in the
9  couple of days prior to the date of the loan agreement and the
10 funding of the loan.
11 BY MR. YERUSHALMI:
12     Q.  And did Mr. Paulson, Mr. Bernanke and Mr. Geithner
13 meet together or discuss this together as --
14     A.  I, I don't know.
15     Q.  So you don't know the content or the, the logistics
16 of any consultation between these three gentlemen?
17     A.  No.  I know that the Treasury Department was
18 consulted in connection with making of the loan.  I can't gave
19 you any of the details as to who met when and where.
20     Q.  But you do know that Mr. Paulson was consulted, and
21 consulted with Mr. Bernanke and Mr. Geithner who was then the
22 President of the Federal Reserve Bank of New York --
23     A.  Yes.
24     Q.  -- prior to the Federal Reserve Board taking the
25 decision to create the credit facility?

Page 13

1      A.  Yes.
2      MR. COLEMAN:  For the record, the substance of their
3  conversations in our view is information beyond the scope of
4  the notice.
5  BY MR. YERUSHALMI:
6      Q.  And just to be clear, you're not aware of the
7  content of that consultation?
8      A.  No.
9      Q.  And other than knowing that the consultation took
10 place prior to the Federal Reserve Board's decision to
11 actually authorize the credit facility, you're not sure when
12 that consultation might have taken place?
13     A.  No.
14     Q.  It could have been one meeting; it could have been a
15 dozen meetings?
16     A.  I doubt it was a dozen, but I'm sure it was more
17 than one.
18     Q.  Was the decision for the Federal Reserve Board to
19 provide the credit facility a rather momentous decision for
20 the Federal Reserve Board?
21     MR. COLEMAN:  Objection; vague.
22     THE WITNESS:  The making of the loan was under the
23 authority of a section called 13(3) of the Federal Reserve Act
24 of 1913 which has been rarely invoked by the Federal Reserve
25 Board over the, over its history since 1913.  So yes, I would



cfd58da0-8498-46db-816b-c377320485af

Page 14

1  say that it was -- I don't know whether it was momentous, but
2  it was certainly rare and unusual.
3  BY MR. YERUSHALMI:
4     Q.   And indeed, it's only used for exigent
5  circumstances; correct?
6     A.   That's the specification in the statute, yes.
7     Q.   So it is rarely used and it is only used when
8  circumstances are fairly dire?
9     A.   Well, I don't know.  It hasn't been used all that
10 often, and the circumstances in which it has been used have
11 been in connection with the possibility of major financial
12 institution failures.
13    Q.   And when you say major financial institution
14 failures, it isn't simply the failure of a major financial
15 institution; it's the failure of that institution and its
16 impact on the broader financial system; correct?
17    A.   I, I can't speak for all of the times it's been
18 invoked, but certainly the invocation of that in 2008 in
19 connection with AIG was a, was both to avert the failure of
20 AIG and to mitigate its -- the impact that a failure of AIG
21 would have had on the system as a whole.
22    Q.   And what was the concern about the threat on the
23 system as a whole at that time?
24    A.   AIG is the -- at the time, AIG was the issuer of
25 credit default insurance, is the way to colloquially refer to

Page 15

1  it, credit default insurance on hundreds of billions of
2  dollars of credit products, and the pos- -- its possible
3  default on its ability to provide that continuing insurance
4  coverage, it was, was viewed as a potentially destabilizing
5  force in the credit markets, in an already quite unstable
6  credit market as a result of the filing by Lehman Brothers for
7  bankruptcy on September 15th.
8          In turn, AIG provides life insurance to more than a
9  hundred individuals worldwide (sic) and --
10    Q.   I'm sorry.  If I may interrupt.  More than a hundred
11 individuals?
12    A.   A hundred million --
13    Q.   Hundred million individuals.
14    A.   -- individuals worldwide.  The number is more than
15 20 million in the United States.  People generally refer to it
16 as the largest life insurance company in the world; and the
17 possibility of its inability to meet its obligations in
18 respect of its life insurance was also viewed as possibly
19 destabilizing to consumer confidence already on shaky ground
20 after the filing of Lehman Brothers.
21         In turn, AIG is a -- was a significant issuer of
22 commercial paper and a provider of wrap insurance on a
23 variation of money market mutual funds that various pension
24 funds and -- so-called stable value funds.  And again, the
25 its -- the possible default by it on its insurance of those

Page 16

1  stable value funds and on its commercial paper was again
2  viewed as, as, as, as creating additional volatility and havoc
3  in credit markets already, already quite unstable as a result
4  of the filing of Lehman Brothers for bankruptcy.
5          So as a result of the -- its many and manifold
6  extensions of credit support to the system as a whole, both in
7  the life insurance business, stable value funds, its role as
8  an issuer of commercial paper and its role as a major player
9  in the credit default insurance market, the failure of AIG was
10 viewed as potentially having significant systemic effects
11 adverse to the system as a whole.
12    Q.   Thank you for the thorough answer.
13    A.   No.  It's all right.  You're welcome.
14    Q.   You indicated that AIG has received approximately
15 $43 billion of capital under EESA, and I assume that the
16 capital it's received has been under the acronym of TARP
17 funds.  Would that be correct?
18    A.   Yes.
19    Q.   Has AIG received other funding or financial
20 assistance under the Emergency Economic Stabilization Act
21 other than capital?
22    A.   Not under that act, no.
23    Q.   Under a different piece of legislation?
24    A.   No.  The Federal Reserve, acting pursuant to Section
25 13(3) of the Federal Reserve Act of 1913, has provided

Page 17

1  additional funding support to AIG.  The original loan
2  agreement referred to in paragraph 1 of the Deposition Notice
3  was restructured in November of 2008.  The committed amount of
4  $85 billion was reduced to $60 billion, and shortly thereafter
5  the Federal Reserve established two special purpose vehicles
6  known colloquially as Maiden Lane II and Maiden Lane III, and
7  -- I can't remember -- and pursuant to those facilities, the
8  Federal Reserve provided in the aggregate an incremental $40
9  billion to AIG, in effect buying from AIG certain real estate
10 mortgage backed securities from it, as well as certain
11 collateralized debt obligations or facilitating the purchase
12 of buying from it and its counterparties certain
13 collateralized debt obligations.
14         So the Treasury has 43 billion outstanding in the
15 form of TARP funds as you call them, and the Federal Reserve
16 has both provided a credit facility directly to the company
17 now in the committed amount of $60 billion as well as provided
18 funds to AIG to facilitate the purchase of certain securities
19 that were otherwise owned by it or guaranteed by it.
20    Q.   The credit facility that was reduced from 85 billion
21 to 60 billion, is the $60 billion figure that you reference
22 the amount of funds available or is that the amount of funds
23 that had been drawn down by AIG?
24    A.   No.  That's the amount now available.  The
25 outstanding amount today is approximately $41 billion.



JIM MILLSTEIN
November 17, 2009

### Page 18

1  Q. Now, it's my understanding that the Federal Reserve
2  Board also put together a program where it was loaning cash
3  and borrowing securities from AIG. Are you familiar with that
4  program?
5      MR. COLEMAN: Objection; scope.
6      THE WITNESS: Loaning cash and buying securities.
7  No, I'm not.
8  BY MR. YERUSHALMI:
9  Q. Borrowing securities from AIG.
10 A. No. I'm not aware of that.
11 Q. When the Treasury was consulted, did it generally
12 approve of the Federal Reserve Board's action prior to the
13 Federal Reserve Board's action?
14     MR. COLEMAN: Objection; vague.
15 BY MR. YERUSHALMI:
16 Q. And we're speaking here in reference to the 13(3)
17 designation.
18 A. Yeah. I'm now -- I do not recall whether the, under
19 the Federal Reserve Act of 1913 the Secretary treasury --
20 Treasurer has to agree with the designation of the
21 circumstances being unusual and exigent, but, but I know he
22 was consulted.
23 Q. Generally speaking, was the Treasury Department in
24 agreement with the Federal Reserve Board's decision to
25 designate AIG under 13(3) as requiring these funds?

### Page 19

1  A. I believe it was.
2  Q. You believe it was or you know that as your
3  position --
4  A. I only --
5  Q. Excuse me one second. Let me just finish, please.
6  A. Yeah.
7  Q. -- in relationship to your position here today as a
8  30(b)(6) deponent?
9  A. I cannot say anything more than I believe it was.
10 Q. Did the Treasury Department have anything to do with
11 the, the drafting or the idea to create a special law that we
12 now know as EESA?
13     MR. COLEMAN: Objection; scope.
14     THE WITNESS: Yes. I believe it was the Treasury
15 Department's proposal to Congress in October, all three pages
16 of it. It was the genesis of the -- what ultimately became
17 the Emergency Economic Stabilization Act of 2008.
18 BY MR. YERUSHALMI:
19 Q. Right. So in -- as I understand it then, it was the
20 Treasury's proposal to Congress, not other way around, to
21 draft and legislate EESA?
22     MR. COLEMAN: Objection; scope.
23     THE WITNESS: My understanding is that it was
24 Treasury's proposal that led to ultimately the passage of the
25 EESA -- what you call EESA.

### Page 20

1  BY MR. YERUSHALMI:
2  Q. Right. We're referring now EESA, Economic --
3  Emergency Economic Stabilization Act; correct?
4  A. Correct.
5  Q. Okay. When did Treasury first decide that such
6  legislation was required?
7      MR. COLEMAN: Objection; scope. Objection; vague.
8      THE WITNESS: It was proposed at the, in early
9  October or late September. I think it was proposed hard on
10 the heels of the Lehman Brothers bankruptcy on September 15th,
11 the AIG bailout by the Federal Reserve on September 18th, the
12 failure of Wachovia and its ultimate merger with Wells Fargo
13 in the week thereafter.
14     There were a series of threatened financial
15 institution failures during the last two weeks of September
16 which led the administration to conclude that it needed
17 funding to support the financial system, and so it went to
18 Congress to seek that funding.
19 BY MR. YERUSHALMI:
20 Q. So the decision by the Treasury was that funds other
21 than the Federal Reserve Board's funds or the Federal Reserve
22 Bank of New York's funds were required to stem the financial
23 crisis?
24     MR. COLEMAN: Objection; scope.
25     THE WITNESS: The Treasury Department had no

### Page 21

1  authority to make loans or capital investments in the banking
2  system or any of the individual financial institutions that
3  comprise the banking system in the middle of September as the
4  banking system was collapsing around it. The Federal Reserve
5  has the authority under Section 13(3) and under its other
6  powers to make secured loans to members of the Federal Reserve
7  System and other financial institutions. Treasury Department
8  concluded it needed more financial flexibility than it, than
9  the Federal Reserve merely had at the time, so sought
10 authority from Congress, sought funding authority from
11 Congress.
12 BY MR. YERUSHALMI:
13 Q. And did it seek funding authority to make loans and
14 invest capital or just one or the other?
15     MR. COLEMAN: Objection; scope.
16     THE WITNESS: It sought broad authority from the
17 Congress to do what it needed to do to deal with the crisis in
18 front of it.
19 BY MR. YERUSHALMI:
20 Q. And as I understand it, part of that need to do what
21 it had to do was in direct relationship to the collapse or the
22 threatened collapse of AIG and its impact on the financial
23 system?
24 A. AIG was one of a number of institutions that
25 appeared to be on the verge of collapse in the last two weeks



6 (Pages 18 to 21)

Page 22

1  of September.
2      Q.   Of all the institutions that were of concern to the
3  Treasury during this period of time, were any of the
4  institutions, any of the other institutions, as grave a risk
5  to the financial system as AIG's collapse?
6          MR. COLEMAN: Objection; outside the scope, vague,
7  speculative.
8          THE WITNESS: I, I, I don't know.
9  BY MR. YERUSHALMI:
10     Q.   And let me just be more specific on my question.
11 I'm referring now to the Treasury Department's attitude at the
12 time. Did it consider at the time when you mentioned these
13 other institutions -- strike that.
14         During this analysis that the Treasury Department
15 apparently made to arrive at the decision that it needed to
16 suggest to Congress to pass authority under EESA to make loans
17 or invest capital in these various institutions, did it
18 conduct any analysis of the various institutions and the
19 threats that their collapse would have posed?
20         MR. COLEMAN: Objection; outside the scope. I mean,
21 to the extent you're seeking deliberative process material, we
22 would instruct the witness not to answer.
23 BY MR. YERUSHALMI:
24     Q.   Can you answer the question?
25     A.   I don't know.

Page 23

1      Q.   Do you understand the question?
2      A.   I do.
3      Q.   So you don't know whether or not the Treasury did
4  any kind of analysis on the, the specific institutions and
5  their impact on the financial system in reaching its decision
6  to seek this authority by Congress?
7          MR. COLEMAN: Objection; scope.
8          THE WITNESS: I mean, I don't know.
9  BY MR. YERUSHALMI:
10     Q.   Did the Treasury Department do any analysis -- and
11 I'm not asking for the substance yet. Did the Treasury
12 Department do any analysis of AIG and its financial situation
13 during September 2008 prior to the Federal Reserve Board's
14 decision to designate it under Section 13(3)?
15         MR. COLEMAN: Objection; scope.
16         THE WITNESS: I'm not aware of any analysis the
17 Treasury Department did independent of the Federal Reserve.
18 As I said before, I think the Federal Reserve, in a relatively
19 limited amount of time available to it, determined that the
20 collapse of AIG would have potentially significantly adverse
21 consequences to the financial system and consulted with the
22 Treasury Department in reaching that conclusion. I don't
23 think the Treasury did any independent analysis in the short
24 time available to it before the loan was made.
25 BY MR. YERUSHALMI:

Page 24

1      Q.   Did the Federal Reserve Board make that analysis
2  available to the Treasury Department during that --
3      A.   As I say, I think they can --
4      Q.   -- excuse me -- during that time prior to the
5  Federal Reserve Board's designation?
6      A.   I'm not aware of there -- in the sense of there
7  being any written analysis, I'm not aware of that.
8      Q.   Again, just for clarity purposes, when you say
9  you're not aware of it, you're not aware of it as a 30(b)(6)
10 testifying on behalf of the Treasury?
11     A.   That's correct.
12     Q.   Did the Treasury Department undertake any analysis
13 at AIG and its financial condition and the threat it might
14 pose to the financial system after the 13(3) designation by
15 the Federal Reserve Board but prior to the passage of EESA?
16         MR. COLEMAN: Objection; scope.
17         THE WITNESS: I don't know.
18 BY MR. YERUSHALMI:
19     Q.   You don't know?
20     A.   I don't know.
21     Q.   Who would know in the Treasury Department?
22     A.   I, I don't know who would know. It's been a change
23 of administrations between the time that these transactions
24 occurred and now.
25     Q.   If there were a, some written analysis both prior to

Page 25

1  the 13(3) designation by the Federal Reserve Board and after
2  but prior to the passage of EESA, where would those documents
3  or analysis be kept typically?
4      A.   I'm going to have to ask counsel.
5          MR. COLEMAN: Objection to the question was
6  impossibility, but it's also outside the scope.
7  BY MR. YERUSHALMI:
8      Q.   Do you know the answer?
9      A.   I am, I am not a custodian of the Treasury
10 Department's records.
11     Q.   Since the passage of EESA, has the Treasury
12 Department conducted any analysis of AIG's financial condition
13 and the impact its failure might have on the financial system?
14         MR. COLEMAN: Objection; scope. Vague.
15         THE WITNESS: Not, not, not of its -- we've done,
16 we've done a lot of work on AIG, but I don't think we've done,
17 that we've specifically looked at the impact of its failure on
18 the financial system in any kind of theoretical way anymore.
19 We now own a significant investment in the company, so we
20 have, with the -- the aim of which was to avoid its collapse
21 and its adverse impacts on the financial system.
22 BY MR. YERUSHALMI:
23     Q.   So as I understand it then, you are either not aware
24 or none exist of any analysis by the Treasury Department of
25 AIG's financial condition or its impact on the financial



Page 26

1  system of the United States from September 2008 through today?
2       MR. COLEMAN: Objection.
3  BY MR. YERUSHALMI:
4     Q.  Other than what might have been provided by the
5  Federal Reserve Board of New York?
6       MR. COLEMAN: Objection --
7  BY MR. YERUSHALMI:
8     Q.  Excuse me. The Federal Reserve Board.
9       MR. COLEMAN: Objection; scope and misstates his
10 testimony.
11      THE WITNESS: Yeah --
12 BY MR. YERUSHALMI:
13    Q.  Excuse me. It was a question. You can correct it.
14    A.  Yeah. Well, no, I think I testified that I'm not
15 aware of any analysis that the Treasury Department did prior
16 to the period that they, they made a -- that the proposed TARP
17 bill was submitted to Congress, relating to the impact of
18 AIG's collapse on the failure of the system as a whole.
19 That's what I testified to.
20    Q.  So from September 2008 until the passage of EESA,
21 the Treasury Department as far as you know has not conducted
22 any of its own analysis of AIG's financial condition or its
23 impact on the United States financial system?
24      MR. COLEMAN: Objection; scope, asked and answered.
25      THE WITNESS: I mean, EESA passed in second week of

Page 27

1  October. So between September 15th and the second week of
2  October, did AI- -- did the Treasury -- am I aware of whether
3  the Treasury Department did any independent analysis of the
4  impact of AIG's collapse on the financial system as a whole?
5  I'm not aware of such analysis.
6  BY MR. YERUSHALMI:
7     Q.  And after the passage of EESA until today, has the
8  Treasury Department conducted such analysis?
9       MR. COLEMAN: Objection. To the extent that you're
10 seeking deliberative process privileged material, we would
11 object and instruct the witness not to answer.
12      THE WITNESS: Okay. As I mentioned, the -- I think
13 the -- AIG was the recipient of funds under EESA in the form
14 of a Series D preferred stock in November I believe of 2008;
15 and since becoming a preferred stockholder in AIG, the
16 Treasury Department has done -- has been supervising its
17 investment and done a number of analyses of AIG. I don't
18 believe any of those has specifically directed to its
19 continuing, that they -- directed to the impact of AIG's
20 failure on the financial system as a whole.
21 BY MR. YERUSHALMI:
22    Q.  When the Treasury Department went to Congress with
23 its proposal to ask Congress to pass EESA, what institutions,
24 financial institutions or other institutions, was the Treasury
25 concerned about relative to its need to provide funding?

Page 28

1       MR. COLEMAN: Objection; scope, and seeks
2  deliberative process privileged material. Instruct the
3  witness not to answer.
4       THE WITNESS: I'm not going to answer. I'm going to
5  follow my counsel's instructions.
6  BY MR. YERUSHALMI:
7     Q.  Did the Treasury Department make known to Congress,
8  either individual members of Congress or committees of
9  Congress, the institutions about which it was concerned at the
10 time it proposed this legislation?
11      MR. COLEMAN: Objection; scope.
12      THE WITNESS: I'm not aware.
13 BY MR. YERUSHALMI:
14    Q.  ==But AIG was one of those institutions that the==
15 ==Treasury Department was concerned about; correct?==
16      ==MR. COLEMAN: Objection; scope. Objection; assumes==
17 ==facts not in evidence.==
18      ==THE WITNESS: I'm not aware. The Federal Reserve at==
19 ==that time had already made an investment in AIG. So I think==
20 ==my testimony was is that the Treasury Department was consulted==
21 ==in connection with the making of those loans to AIG, and that==
22 ==the reason for the making of the loans was -- is consistent==
23 ==with Section 13(3), the unusual and exigent circumstances, the==
24 ==fear of the failure of AIG would have a significantly adverse==
25 ==impact on the financial system as a whole. So I, I -- when==

Page 29

1  ==they were in front of Congress seeking the legislation, that==
2  ==investment or that loan had already been made.==
3  BY MR. YERUSHALMI:
4     Q.  Understood. At the time that the Treasury
5  Department went before Congress seeking the passage of EESA,
6  did it have in mind that it was going to require to provide
7  funds under EESA to AIG?
8     A.  No --
9       MR. COLEMAN: Objection; scope.
10      THE WITNESS: -- I don't -- I'm not aware that it
11 had in mind that it was going to provide funds to AIG.
12 BY MR. YERUSHALMI:
13    Q.  Did the Treasury Department consider AIG -- strike
14 that. At the time that the Treasury Department came to
15 Congress with a proposal to pass EESA, did it believe that AIG
16 would require additional funding from any of the government
17 sources?
18      THE WITNESS: I don't believe anybody knew at that
19 time whether it would require additional funding.
20 BY MR. YERUSHALMI:
21    Q.  Why wouldn't the Treasury Department know whether
22 AIG would require additional funding?
23      MR. COLEMAN: Objection; scope. That's speculative.
24      THE WITNESS: It goes to the unique nature of AIG's
25 financial condition and the sources of its instability. The



Page 42

1  let's just move on.  We'll get through it.
2       THE WITNESS:  In March of 2009 the Treasury
3  Department committed to provide AIG with an incremental 30
4  billion -- no, not 30 billion, sorry -- 29.86 or 84 billion
5  dollars of incremental preferred stock financing; and that is
6  a sort of standby equity commitment that can be drawn by the
7  company so long as it hasn't filed for bankruptcy prior to the
8  draw.
9  BY MR. YERUSHALMI:
10     Q.   And as of today, how much of that equity commitment
11 has been drawn down?
12     A.   Approximately $3 billion.
13     Q.   And how have those funds been used by AIG?
14     A.   Generally to recapitalize its -- certain of its
15 insurance subsidiaries, certain of its insurance subsidiaries.
16     Q.   And is the Treasury Department aware of exactly
17 these funds have been invested by AIG?
18          MR. COLEMAN:  Objection; scope.
19          THE WITNESS:  Yes.  Before they draw the funds, they
20 review use of the draw with us.
21 BY MR. YERUSHALMI:
22     Q.   And does the Treasury Department have the authority
23 to deny an equity drawdown based upon use of funds?
24          MR. COLEMAN:  Objection; scope.
25          THE WITNESS:  No.  Under the terms of the Series F

Page 43

1  preferred stock facility, the conditions to draw are, are very
2  limited.  The conditions precedent to AIG's ability to draw
3  the funds are very limited.
4  BY MR. YERUSHALMI:
5       Q.   Are there any restrictions on use of funds at all?
6       A.   The --
7            MR. COLEMAN:  Objection; scope.
8            THE WITNESS:  No.  The Federal Reserve credit
9  facility requires a -- requires the -- effectively requires
10 the Federal Reserve Board to -- I'm sorry, the Federal Reserve
11 Bank of New York to approve any financing; and so this is
12 financing within the meaning of that credit facility, and
13 therefore indirectly the proceeds -- the use of proceeds have
14 to be approved by the Federal Reserve effectively.
15 BY MR. YERUSHALMI:
16      Q.   By the Federal Reserve Bank of New York?
17      A.   Yes.  But the Treasury Department does not have a
18 specific consent right to use the proceeds.
19      Q.   Does the Federal Reserve Bank of New York have
20 specific restrictions on use of funds when they do their
21 review?
22           MR. COLEMAN:  Objection; scope.
23           THE WITNESS:  The credit facility I think speaks for
24 itself, but they have -- the credit, the terms of the credit
25 facility have limitations on use of proceeds.

Page 44

1  BY MR. YERUSHALMI:
2       Q.   So if someone wanted to find out what those
3  restrictions are, you would just look at the credit
4  facility --
5       A.   That's correct.
6       Q.   -- to determine that?
7       A.   That's correct.
8       Q.   What -- strike that.  You indicated that the funds
9  have been used to recapitalize certain insurance subsidiaries;
10 correct?
11      A.   Correct.
12      Q.   Do you know which subsidiaries those are?
13           MR. COLEMAN:  Objection; scope.
14           THE WITNESS:  Yes.
15 BY MR. YERUSHALMI:
16      Q.   What are they?
17           MR. COLEMAN:  Objection; scope.
18           THE WITNESS:  The -- I'm -- the only reason I'm
19 hesitating is some of the -- I cannot -- sitting here now, I
20 cannot distinguish in my own mind as to which draws -- with
21 regard to the draws that have already been made, which
22 insurance companies the Series F proceeds went to recapitalize
23 versus draws that may be made in the future.  So I'm having
24 trouble distinguishing.
25           MR. COLEMAN:  If you don't remember.

Page 45

1            THE WITNESS:  Can't remember.
2            MR. COLEMAN:  It's publicly available.
3            MR. YERUSHALMI:  Where would it be publicly
4  available?
5            MR. COLEMAN:  In the filings of the company.
6            MR. YERUSHALMI:  I'm sorry?
7            MR. COLEMAN:  SEC filings of the company.
8  BY MR. YERUSHALMI:
9       Q.   Why did the Treasury Department authorize the Series
10 F transaction?
11           MR. COLEMAN:  Objection; scope.  And to the extent
12 it seeks deliberative process privilege, I instruct you not to
13 answer.
14 BY MR. YERUSHALMI:
15      Q.   And let me refine my question given the objection.
16 I'm not looking for the internal deliberations.  I'm looking
17 for the final rationale for that decision.
18           MR. COLEMAN:  Objection; scope.
19           THE WITNESS:  AIG required more liquidity in order
20 to satisfy its auditors that it was a going concern.  In
21 connection with the audit of a company's annual financial
22 statements, the auditors issue a letter and say that they have
23 reviewed the company's financial statements and that those
24 financial statements fairly present the financial condition of
25 the company.

JIM MILLSTEIN
November 17, 2009

Page 46

1          The words "fairly present" is a -- in quotes,
2    "fairly presents" -- is a term of art that embraces a number
3    of standards; and among the standards embraced by those words
4    is that the company has sufficient capital and liquidity
5    available to it for the next 12 months or 15 -- some depends
6    on which company, but 12 to 15 months after -- from the date
7    of the auditor's opinion to meet its obligations in the
8    ordinary course of business.  Sufficient capital and liquidity
9    to meet its obligations in the ordinary course of business.
10         And the auditors of AIG were concerned in March of
11   2009 that AIG might not have sufficient capital and liquidity
12   to meet its obligations in the ordinary course of business
13   and, therefore, required incremental capital to be available
14   to AIG in order to maintain its status as a going concern.
15         If AIG failed to be a going concern in the eyes of
16   its auditors, that would have led to a ratings downgrade and
17   the entire parade of horribles that the rescue theretofore had
18   been intended to prevent would have once again ensued.  So it
19   was determined to provide AIG with an incremental $30 billion
20   of potential liquidity in the form of the Series F stock.
21   BY MR. YERUSHALMI:
22      Q.   And would it be fair to say that the Treasury
23   Department made this decision because private sources were not
24   available?
25         MR. COLEMAN:  Objection; scope.

Page 47

1          THE WITNESS:  Yes.  I think we were -- I think the
2    company had -- could not obtain the funding from other
3    sources.
4    BY MR. YERUSHALMI:
5       Q.   And this was the Treasury Department's determination
6    at that time?
7       A.   Yes.
8          MR. COLEMAN:  Objection; scope.
9    BY MR. YERUSHALMI:
10      Q.   Same question with regard to the Series D preferred
11   shares.  That purchase was authorized by the Treasury
12   Department because AIG did not have those kinds of funds
13   available to it in the private sector?
14      A.   Because AIG could not obtain them elsewhere, yes.
15      Q.   Since September 2008 until the passage of EESA, did
16   the Treasury Department have any officials or employees on
17   site at AIG?
18         MR. COLEMAN:  Objection; scope.
19         THE WITNESS:  Not that I'm aware.
20   BY MR. YERUSHALMI:
21      Q.   After the passage of EESA until today, does the
22   Treasury Department have any employees on site at AIG?
23         MR. COLEMAN:  Objection; scope.
24         THE WITNESS:  From time to time.  At least since the
25   beginning of the new administration there have been, there

Page 48

1    have been employees of the Treasury Department on site at AIG
2    offices in New York from time to time.
3    BY MR. YERUSHALMI:
4       Q.   And by the new administration you mean the Obama
5    administration?
6       A.   Yes.
7       Q.   And what is their role on site at AIG?
8       A.   Just --
9          MR. COLEMAN:  Objection; scope.  Objection to the
10   extent that -- well, you can answer the question.
11         THE WITNESS:  Yeah.  We're just -- we are monitoring
12   AIG's performance.
13   BY MR. YERUSHALMI:
14      Q.   What exactly are they monitoring?
15      A.   The -- its business and operations and the progress
16   they are making in the development of its strategic plan to
17   repay the taxpayers.
18      Q.   Do they just monitor or do they also provide
19   supervision or instruction?
20         MR. COLEMAN:  Objection; scope.
21         THE WITNESS:  We are -- the Treasury Department is a
22   significant investor in the equity of AIG.  The Federal
23   Reserve Bank of New York has established a trust into which a
24   Series C preferred stock has been deposited.  That Series C
25   stock is convertible into 79 percent of their common equity

Page 49

1    and votes with the common, and therefore is -- trustees have
2    significant influence over the election of directors.
3    BY MR. YERUSHALMI:
4       Q.   What do those trustees have to do with the Treasury
5    Department?
6       A.   They are part of the -- they're part of the
7    architecture of our investment as a government in this entity.
8       Q.   When you say our investment, you mean the Treasury
9    Department?
10      A.   I mean the government as a whole.
11      Q.   I'm going to show you what has been previously
12   marked Exhibit 6.  Are you familiar with this document?
13      A.   Yes.
14      Q.   What is that document?
15      A.   That's the credit agreement dated as of September
16   22nd, 2008, between AIG as borrower and the Federal Reserve
17   Bank of New York as lender.
18      Q.   And that is the credit facility that we have been
19   referring to when we've been speaking of the $85 billion
20   credit facility?
21      A.   Yes, sir.
22      Q.   I'm also going to show you what was marked as
23   Exhibit 7 in an earlier deposition.  Are you familiar with
24   that document?
25         MR. COLEMAN:  Take the time to review it.

JIM MILLSTEIN
November 17, 2009

Page 50

1      THE WITNESS:  Yes, I am.
2   BY MR. YERUSHALMI:
3      Q.   And what is that document?
4      A.   That is the trust agreement between Federal Reserve
5   Bank of New York and the three trustees.
6      Q.   And is that the agreement that you were referring to
7   earlier when you spoke about the trust that was established?
8      A.   Yes.
9      Q.   Mr. Millstein -- Millstein -- why did the -- strike
10  that.  Under that trust agreement before you, Exhibit 7, the
11  Federal Reserve Bank of New York had the Series C preferred
12  shares placed in the name of the trustees with the beneficial
13  interest to the US treasury; correct?
14     A.   Correct.
15     Q.   And why was that?  Why was the transfer to the US
16  treasury of the beneficial interest?
17     A.   I don't know.  The -- well, the -- my understanding
18  is the Federal Reserve generally cannot own an equity
19  security, and so the trust was established to hold the equity
20  security that the, was part of the quid pro quo for the loan.
21  Since AIG had failed to be able to muster private financing on
22  its own and was forced to come to the Federal Reserve Bank as
23  a lender of last resort to meet its liquidity needs in
24  September of 2008, the penalty for that was to, to suffer the
25  substantial dilution associated with the issuance of the

Page 51

1   Series C preferred stock; and since the Federal Reserve could
2   not own the equity security, a trust was established for the
3   benefit of the treasury to hold that security.
4      Q.   So when you refer to the Federal Reserve could not
5   own the equity, you mean the Federal Reserve Bank of New York?
6      A.   Yes.
7      Q.   What exactly is the US treasury that's now holding
8   this beneficial interest?
9         MR. COLEMAN:  Objection; vague.  As best you can.
10        THE WITNESS:  It's, it's, it's something more than
11  the Treasury Department and, but...
12  BY MR. YERUSHALMI:
13     Q.   Something more or something different than?
14     A.   Different than the Treasury Department of the United
15  States, which is an administrative arm of the executive
16  branch.
17     Q.   The Treasury Department is?
18     A.   Yes.
19     Q.   Is the US treasury an agency or department of the US
20  government?
21     A.   The Department of the Treasury is.
22     Q.   Right.  I'm now referring strictly to the US
23  treasury.
24     A.   It's the Fisk.  It's the, it's the repository of our
25  funds.

Page 52

1      Q.   Okay.  When you say the repository of our funds, our
2   funds to --
3      A.   The government's funds.  I believe.  I believe that
4   the -- should -- if as and when there are proceeds of the sale
5   of the Series C stock in accordance with the trust agreement,
6   that those funds will be turned over to the treasury, which is
7   the I guess the depository account of the United States
8   government.
9      Q.   And when you say the depository account of the
10  United States government --
11     A.   Where we keep our money.
12     Q.   -- effectively, effectively you mean the, as it were
13  the, accounts of Congress under its tax and spending
14  authority; correct?
15        MR. COLEMAN:  Objection.
16        THE WITNESS:  I don't know.  I'm not a
17  constitutional scholar.
18  BY MR. YERUSHALMI:
19     Q.   What funds go into the US treasury?
20        MR. COLEMAN:  Objection; scope, vague, speculative.
21        THE WITNESS:  I, I, I don't know.
22  BY MR. YERUSHALMI:
23     Q.   You don't know?
24     A.   I don't know.  I think the --
25     Q.   In other words --

Page 53

1      A.   My understanding, my understanding is is that should
2   there be proceeds of the Series C stock, they will be turned
3   over to the government.
4      Q.   Turned over to the government?
5      A.   The federal government.
6      Q.   Meaning paid into the US treasury?
7      A.   That's what it says.
8      Q.   And just so I'm clear, as the 30(b)(6) deponents for
9   the US Treasury Department, you don't know what funds go into
10  the US treasury?
11        MR. COLEMAN:  Objection; scope.  So your question is
12  illegitimate.  It's not one of the topics he's been designated
13  to testify.
14        MR. YERUSHALMI:  Objection, scope, is fine.  Yes,
15  sir.
16        THE WITNESS:  I -- the -- the trust agreement refers
17  to the treasury, not the Department of the Treasury.  My
18  understanding of the meaning of that is that the funds will go
19  to us, the Treasury Department.
20  BY MR. YERUSHALMI:
21     Q.   Okay.  Do you know today who are the board of
22  directors of AIG?
23        MR. COLEMAN:  Objection; scope.
24        THE WITNESS:  I do.
25  BY MR. YERUSHALMI:

