UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY

          Plaintiff,

     -vs-

TIMOTHY F. GEITHNER, Secretary, U.S.
Department of Treasury, and BOARD OF
GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

          Defendants.

_____/

CIVIL NO. 08-15147

HON. LAWRENCE P. ZATKOFF
MAG. JUDGE MONA K. MAJZOUB

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants Timothy F. Geithner, Secretary of the United States Department of the

Treasury, and the Board of Governors of the Federal Reserve System, through their undersigned

counsel, hereby move for summary judgment pursuant to Fed. R. Civ. P. 56(b).  This motion is

supported by the attached brief.  Concurrence in the relief that is sought by this motion was

requested on Tuesday, June 1, 2010 and was not obtained.

Respectfully submitted,

TONY WEST
Assistant Attorney General

BARBARA L. MCQUADE
United States Attorney

JOHN R. GRIFFITHS
Assistant Director, Federal Programs Branch

/s/ John R. Coleman
JOHN R. COLEMAN
JULIE STRAUS
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118

Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8460
Email: John.Coleman3@usdoj.gov

DATED: June 7, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY

        Plaintiff,

   -vs-

TIMOTHY F. GEITHNER, Secretary, U.S.
Department of Treasury, and BOARD OF
GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

        Defendants.

_____/

CIVIL NO. 08-15147

HON. LAWRENCE P. ZATKOFF
MAG. JUDGE MONA K. MAJZOUB

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**ISSUE PRESENTED**

Whether the Emergency Economic Stabilization Act of 2008, as applied to the Secretary of the Treasury's purchase of American International Group, Inc. preferred stock, had either the predominant purpose or the primary effect of establishing religion.

## MOST PERTINENT AUTHORITY

*Mitchell v. Helms*, 530 U.S. 793 (2000)

*Agostini v. Felton*, 521 U.S. 203 (1997)

*Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278 (6th Cir. 2009)

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     The Emergency Economic Stabilization Act of 2008 . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    The Secretary Purchased AIG Preferred Stock Pursuant to the EESA to Protect
          the Economy and the Taxpayers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    III.   The Treasury Department Has Not Provided EESA Funds to Any Entity That
          Markets Shariah-Compliant Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    IV.   AIG Has Not Provided EESA Funds to Any Entity that Markets Shariah-
          Compliant Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    V.    The Lone Shariah-Compliant Insurance Product Offered in the United States by
          Subsidiaries of AIG Has Made A *De Minimis* Contribution to AIG's Consolidated
          Results And is Very Similar to Traditional Insurance Policies . . . . . . . . . . . . . . 8

    VI.   The Shariah-Compliant Products Offered by Foreign Subsidiaries in Majority
          Muslim Nations Have Made a *De Minimis* Contribution to AIG's Consolidated
          Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    VII.  Treasury Department Officials Have Had No Involvement in AIG's Subsidiaries'
          Sale of Shariah-Compliant Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.     The Government Acted With A Valid Secular Purpose in Enacting and
          Implementing the EESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.    The Treasury Department's Purchase of AIG Preferred Stock Has Not Had the
          Primary Effect of Advancing the Islamic Religion . . . . . . . . . . . . . . . . . . . . . . 13

          A.    The Treasury Department's Purchase of AIG Preferred Stock Has Not Led
                to Religious Indoctrination that Could Reasonably Be Attributed to the
                Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          B.    The TARP Does Not Define Its Recipients By Reference to Religion . . 19

          C.    The Treasury Department's Purchase of AIG Preferred Stock Has Not
                 Created an Excessive Entanglement Between Government and Religion 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**INTRODUCTION**

In the fall of 2008, this nation confronted the most severe financial panic since the Great Depression.  The federal government took unprecedented measures to address this panic, providing trillions of dollars of credit and, pursuant to the Emergency Economic Stabilization Act of 2008 ("EESA"), purchasing hundreds of billions of dollars of assets from hundreds of domestic financial institutions.  These extraordinary actions were undertaken for a single purpose: to protect the American economy.  Appropriately, these actions have been the subject of intense scrutiny, and, at times, vigorous debate.

But, as the record in this case demonstrates, plaintiff's claim—that the Secretary of the Treasury (the "Secretary") violated the Establishment Clause by investing in American International Group, Inc. ("AIG") pursuant to the EESA—is *not* worthy of debate.  The sole basis of plaintiff's claim is the fact that among AIG's hundreds of direct and indirect subsidiaries, a handful (most of which operate in majority Muslim nations) offer Shariah-compliant insurance products (*i.e.*, insurance products that are consistent with Islamic law).  Together these products account for less than 0.01% of AIG's total consolidated revenue.  No reasonable observer could conclude, on this basis, that the Secretary's investment in AIG had either the predominant purpose or the primary effect of advancing religion.  *None* of the funds provided to AIG pursuant to the EESA have been used even indirectly to promote the sale of these products, and no official of the United States Department of the Treasury ("Treasury Department") has been involved in the sale of these products in any manner.  The Secretary's purpose in investing in AIG was to spare the economy from the consequences of AIG's failure, and that has been the investment's primary effect.  Accordingly, defendants are entitled to summary judgment.

# BACKGROUND

## I.     The Emergency Economic Stabilization Act of 2008

Congress enacted the EESA on October 3, 2008.  *See* Pub. L. No. 110-343, Div. A, 122

Stat. 3765 (2008) (codified as amended at 12 U.S.C. § 5201 *et seq.*).  Congress's stated purpose

was:

> [T]o immediately provide authority and facilities that the Secretary of the
> Treasury can use to restore liquidity and stability to the financial system of the
> United States . . . in a manner that (A) protects home values, college funds,
> retirement accounts, and life savings; (B) preserves homeownership and promotes
> jobs and economic growth; (C) maximizes overall returns to the taxpayers of the
> United States; and (D) provides public accountability for the exercise of such
> authority.

12 U.S.C. § 5201.  Likewise, the legislative history is clear that the bill was designed to respond

to "a real crisis situation that could mushroom into something worse than the Great Depression."

*See* 154 Cong. Rec. H10361 (Statement of Rep. Watt); *see also* 154 Cong. Rec. S10220-283

(Senate Debate of Oct. 1, 2008); 154 Cong. Rec. H10712-806 (House Debate of Oct. 2, 2008).

To accomplish this purpose, the EESA provides the Secretary of the Treasury (the

"Secretary") with the authority "to establish the Troubled Asset Relief Program (or 'TARP') to

purchase, and to make and fund commitments to purchase, troubled assets from any financial

institution, on such terms and conditions as are determined by the Secretary."  12 U.S.C.

§ 5211(a)(1).  The EESA defines "troubled assets" as, *inter alia*, "financial instrument[s] that the

Secretary, after consultation with the Chairman of the Board of Governors of the Federal

Reserve System, determines the purchase of which is necessary to promote financial market

stability."  *Id.* at § 5202(9)(B).  In exercising this authority, the Secretary must "take into

consideration" several goals, including, *inter alia*, "protecting the interests of taxpayers;"

"providing stability and preventing disruption to financial markets in order to limit the impact on

the economy and protect American jobs, savings, and retirement security;" and "ensuring that all

financial institutions are eligible to participate in the program, without discrimination based on size, geography, form of organization, or the size, type, and number of assets eligible for purchase." *Id.* at § 5213.

The Secretary's authority to purchase troubled assets is limited to approximately $700 billion outstanding at any one time. *Id.* at § 5225. As of April 30, 2010, the Secretary has purchased, or made commitments to purchase, approximately $490 billion of troubled assets from over 700 different financial institutions. Millstein Decl. ¶ 7. Of this amount, $206 billion has already been repaid, and a March 2010 report of the non-partisan Congressional Budget Office estimates that the total cost of the TARP will ultimately be $109 billion, far less than the nearly $700 billion authorized by Congress. *Id.* The Secretary's authority to purchase troubled assets expires on October 3, 2010. 12 U.S.C. § 5230.

The TARP is subject to numerous reporting requirements, *id.* at § 5215,[1] and the oversight of the relevant Congressional committees, the specially-created Congressional Oversight Panel ("COP"), *id.* at § 5233, the Comptroller General, *id.* at § 5226, and the Special Inspector General for the TARP ("SIGTARP"). *Id.* at § 5231.[2] In addition, the actions of the Secretary pursuant to the EESA are subject to limited judicial review. *Id.* at § 5229.

## II. The Secretary Purchased AIG Preferred Stock Pursuant to the EESA to Protect the Economy and the Taxpayers

The basic facts surrounding the government's assistance to AIG are a matter of public record. In September 2008, "for the first time in 80 years, the United States risked a complete collapse of our financial system." *The Federal Bailout of AIG: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 111th Cong. (Jan. 27, 2010) (written testimony of Timothy F.

---

[1] These reports are available at http://www.financialstability.gov/latest/reportsanddocs.html.
[2] Reports and hearing testimony issued by these oversight bodies are publically available at the committees' websites, the COP's website (http://cop.senate.gov); the GAO's website (www.gao.gov); and the SIGTARP's website (http://www.sigtarp.gov/), respectively.

Geithner, Secretary of the Treasury) (Ex. A to Coleman Decl.) (hereinafter "Geithner 1.27.10").
This crisis accelerated through the first two weeks of September 2008, causing the failure of
Lehman Brothers, and threatening the failure of AIG.  *Id.* at 2-4.  At the time, AIG was one of
the world's largest and most complex financial institutions.  *Id.* at 2.  AIG and its subsidiaries
had roughly $1 trillion in assets, tens of millions of individual and corporate customers, and
contractual relationships across the financial industry.  *Id.* at 2-3.  Officials of the Federal
Reserve System, in consultation with officials of the Treasury Department, "concluded that
AIG's failure would be catastrophic" for the United States' and world economy.  *Id.* at 4-5; *see
also* Millstein Decl. ¶¶ 3, 4.

After the attempt to organize a private-sector rescue failed, these officials "determined
that it was in the best interests of the United States to rescue AIG in order to slow the panic and
prevent further damage to our economy."  Geithner 1.27.10 at 5-6; *see also* Herzog Decl. ¶¶ 10-
15.  As a result, on September 16, 2008, the Federal Reserve Bank of New York ("FRBNY"),
with the authorization of the Federal Reserve Board, agreed to extend up to $85 billion in credit
to AIG pursuant to the Section 13(3) of the Federal Reserve Act, 12 U.S.C. § 343, the only
mechanism then available for providing government financial assistance to an institution like
AIG.  Geithner 1.27.10 at 7; Millstein Decl. ¶ 5.[3]

Even after the FRBNY's provision of credit, however, "AIG remained extremely
vulnerable to the ongoing and intensifying financial crisis."  *Id.* at 8.  "Falling asset prices
generated both substantial losses on its balance sheet and increases in required payments to
AIG's counterparties under the terms of its credit protection contracts."  *Id.*  As a result, AIG
faced the distinct possibility that the announcement of its third quarter results would result in a

---

[3] The constitutionality of the Federal Reserve Act—either facially or as applied to this transaction—is not
challenged by plaintiff.  *See* First Am. Compl. ¶ 1 ("This civil rights action is an as-applied challenge to
the [EESA]. . . .").

downgrade of its credit rating, which would further undermine confidence in its insurance

subsidiaries and require additional payments to its counterparties. *Id.*; *see also* Millstein Decl.

¶ 9. As former Secretary Paulson recently explained:

> Unfortunately, [the FRBNY's provision of credit] did not sufficiently abate the
> problems at AIG. The company faced mounting losses, and it faced potential
> ratings downgrades which would trigger tens of billions of dollars in collateral
> calls which, without an equity infusion, would have led to its failure—a failure
> that would have collapsed our financial system and devastated millions of
> Americans.

*The Federal Bailout of AIG: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 111th

Cong. (Jan. 27, 2010) (written testimony of Henry M. Paulson, Jr., former Secretary of the

Treasury, at 1) (Ex. B to Coleman Decl.) (hereinafter "Paulson 1.27.10"); *see also* Millstein

Decl. ¶ 9.

To avoid this collapse, the Treasury Department agreed, as part of a larger restructuring

of AIG's balance sheet, to invest $40 billion in AIG pursuant to the newly-enacted EESA, on the

condition that AIG use the proceeds solely to pay down its indebtedness with the FRBNY.

Millstein Decl. ¶ 10. Accordingly, on November 25, 2008, AIG sold $40 billion of Series D

Preferred Stock to the Treasury Department, and the entire $40 billion was paid directly to the

FRBNY. *Id.*; Gender Decl. ¶ 10. "The combined actions of Treasury and the Fed were effective.

Despite AIG's breathtaking third-quarter losses, the company did not fail, and we avoided the

disastrous consequences that would have accompanied such a failure." Paulson 1.27.10, at 2; *see

also* Millstein Decl. ¶ 11.

AIG continued to suffer extraordinary losses, however, and as the company prepared to

announce its results for the fourth quarter of 2008, it again faced the possibility of a calamitous

ratings downgrade. Millstein Decl. ¶ 12. On March 2, 2009, when AIG reported a net loss of

$61.7 billion for the fourth quarter of 2008, the Treasury Department "announced a [further]

restructuring of the government's assistance to AIG in order to stabilize this systemically

important company in a manner that best protects the US taxpayer." *Id.* at ¶ 13.  As the Treasury

Department explained:

> Given the systemic risk AIG continues to pose and the fragility of markets today,
> the potential cost to the economy and the taxpayer of government inaction would
> be extremely high.  AIG provides insurance protection to more than 100,000
> entities including small businesses, municipalities, 401(k) plans, and Fortune 500
> companies who together employ over 100 million Americans.  AIG has over 30
> million policyholders in the U.S. and is a major source of retirement insurance
> for, among others, teachers and non-profit organizations.  The company also is a
> significant counterparty to a number of major financial institutions.

*Id.* at ¶ 14.  Accordingly, on April 17, 2009, the Treasury Department entered into an agreement

to purchase AIG Series F Preferred Shares pursuant to the EESA ("Series F SPA").  *Id.* at ¶ 16.

The Series F SPA creates an equity capital commitment ("Commitment") of just under $30

billion, which allows AIG to draw capital from the Commitment over time in exchange for an

increase in the liquidation preference of the Series F Preferred Shares.  *Id.*



Decl.).  In short, AIG advised the Treasury Department that it would use funds drawn from the

Commitment for purposes that are entirely secular—and it has.

**III.   The Treasury Department Has Not Provided EESA Funds to Any Entity That Markets Shariah-Compliant Products**

As noted, the Treasury Department paid the $40 billion purchase price for the Series D Preferred Stock directly to the FRBNY.  Gender Decl. ¶ 10.  Funds drawn from the Commitment are paid directly to AIG, "and decisions regarding whether and how to further distribute funds drawn from the Commitment to any of AIG's subsidiaries are made by AIG, not by the Treasury Department."  Millstein Decl. ¶ 17. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████   Thus, the Treasury Department has not provided funds to any entity that markets Shariah-compliant products, nor is there evidence that Treasury Department officials were even aware that AIG's subsidiaries marketed Shariah-compliant insurance products. Millstein Decl. ¶ 28.

**IV.   AIG Has Not Provided EESA Funds to Any Entity that Markets Shariah-Compliant Products**

According to its most recent Form 10-K filing with the Securities and Exchange Commission, AIG has approximately 290 direct and indirect subsidiaries that operate around the world.  Coleman Decl. ¶¶ 4-5; AIG Subsidiaries (Ex. C to Coleman Decl.). █████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

[REDACTED]

**V.     The Lone Shariah-Compliant Insurance Product Offered in the United States by Subsidiaries of AIG Has Made A *De Minimis* Contribution to AIG's Consolidated Results And is Very Similar to Traditional Insurance Policies**

[REDACTED]

By way of comparison, AIG's insurance subsidiaries generated $64.702 *billion* in premiums and other consideration in fiscal year 2009 alone.  *See* Coleman Decl. ¶ 8.  Thus, even assuming a comparable time period, this product contributed less than [REDACTED] to AIG's gross premiums on a consolidated basis.

[REDACTED]

**VI.**   **The Shariah-Compliant Products Offered by Foreign Subsidiaries in Majority Muslim Nations Have Made a *De Minimis* Contribution to AIG's Consolidated Results**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

## VII.    Treasury Department Officials Have Had No Involvement In AIG's Subsidiaries' Sale of Shariah-Compliant Products

Notwithstanding the Treasury Department's significant investment in AIG and its officials' interaction with the management of AIG regarding AIG's restructuring plans, these officials have not had any conversations with officials or employees of AIG about AIG's subsidiaries' sale of Shariah-compliant insurance products.  Millstein Decl. ¶ 28. ████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████   Indeed, Jim Millstein, the Treasury Department official with primary responsibility for monitoring the Treasury Department's investment in AIG, was not even aware that AIG's subsidiaries offered these products until he was contacted regarding this lawsuit in October 2009.  Millstein Decl. ¶¶ 1, 28; *see also* Hsu Depo. at 37-39 (former Treasury Department official involved in Series F transaction did not know AIG subsidiaries offered Shariah-compliant products until contacted about this lawsuit) (Ex. J to Coleman Decl.)

### STANDARD OF REVIEW

Summary judgment is appropriate if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support, show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  A factual dispute is material if its resolution "might affect the

outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted).  By contrast, "[f]actual disputes that are irrelevant or unnecessary" will not preclude the entry of summary judgment.  *Id.* (citations omitted).  Further, a dispute over a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Thus, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted).  In sum, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at 587 (citations omitted).

## ARGUMENT

This lawsuit presents a single claim: that the EESA, as applied to the Treasury Department's purchase of AIG preferred stock, violates the First Amendment's prohibition against the establishment of religion.  *See* Am. Compl. ¶ 1.  To prevail, plaintiff must present evidence sufficient to show either that the EESA was enacted "with the ostensible and predominant purpose of advancing religion," *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005), or that the EESA, as applied to the Treasury Department's purchase of AIG preferred stock, has had "the primary effect of advancing religion."  *Am. Atheists, Inc. v. Detroit Downtown Dev. Auth.*, 567 F.3d 278, 288-89 (6th Cir. 2009) (citations omitted).[4]  When determining the purpose of a statute or the effect of its implementation, the Court must view the evidence from "the perspective of an objective observer."  *ACLU v. Grayson County, Ky.*, 591

---

[4] Courts also consider whether there is an "excessive entanglement" between government and religion. The Supreme Court recently "reformulated the excessive entanglement prong of the test to include it in the inquiry into the second prong – the primary effect test."  *Johnson v. Econ. Dev. Corp. of County of Oakland*, 241 F.3d 501, 512 (6th Cir. 2001) (citing *Agostini v. Felton*, 521 U.S. 203, 234 (1997)).

F.3d 837, 848, 854 (6th Cir. 2010) (citing *McCreary County*, 545 U.S. at 862).  "The 'objective observer' is credited with knowledge of 'readily discoverable fact,' including 'the traditional external signs that show up in the text, legislative history, and implementation of the statute or comparable official act.'"  *Id.* (quoting *McCreary County*, 545 U.S. at 862).  As shown below, no objective observer could conclude that the EESA, as applied to the Treasury Department's investment in AIG, had either the predominant purpose or primary effect of advancing the Islamic religion.  As a result, defendants' motion for summary judgment should be granted.

## I.      The Government Acted With A Valid Secular Purpose In Enacting And Implementing the EESA

The undisputed evidence demonstrates that Congress enacted the EESA for the valid secular purpose of addressing the financial panic confronting the country in the Fall of 2008.  Indeed, Congress articulated its purpose in the EESA itself, stating that the legislation was intended "to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States." 12 U.S.C. § 5201(1).  Thus, as the Court has already concluded, "Congress enacted the EESA in response to what the parties portray as a monumental economic crisis *for the sole purpose of restoring stability to financial institutions.*"  *Murray v. Geithner*, 624 F. Supp. 2d 667, 676 (E.D. Mich. 2009) (emphasis added).

Likewise, any reasonable observer must conclude, based on a review of readily available fact, that the Treasury Department purchased AIG preferred stock for a secular purpose.  As former Secretary Paulson recently explained, the initial investment in AIG, in November 2008, was motivated by the concern that "without an equity infusion" AIG would have failed, which "would have collapsed our financial system and devastated millions of Americans."  Paulson 1.27.2010, at 1-2 (Ex. B to Coleman Decl.); *see also* Geithner Prepared Remarks 1.27.10, at 8

(Ex. A to Coleman Decl.); Troubled Asset Determination 11.9.08 (Ex. B to Millstein Decl.);

Henry M. Paulson, *On the Brink: Inside the Race to Stop the Collapse of the Global Financial

System*, 376-94 (2010) (recounting decision to purchase AIG preferred shares pursuant to the

TARP).  Similarly, the March 2009 decision to purchase AIG's Series F Preferred Shares was

intended "to stabilize this systemically important company in a manner that best protects the U.S.

taxpayer."  Millstein Decl. ¶ 13; *see also* Millstein Depo. at 45-46 (Ex. K to Coleman Decl.).  By

contrast, there is no evidence that the Treasury Department officials responsible for the

investments were even aware that any of AIG's subsidiaries marketed insurance products as

Shariah-compliant.  *See, e.g.,* Millstein Decl. ¶ 28; Hsu Depo. at 37-39 (Ex. J to Coleman Decl.).

Accordingly, no reasonable observer could conclude that Congress, in enacting the

EESA, or the Treasury Department, in purchasing AIG preferred stock pursuant to the EESA,

acted with the "ostensible and predominant purpose of advancing religion."  *McCreary County*,

545 U.S. at 860.

## II.   The Treasury Department's Purchase of AIG Preferred Stock Has Not Had The Primary Effect of Advancing the Islamic Religion

A reasonable observer could not conclude that the Treasury Department's purchase of

AIG preferred stock pursuant to the EESA has had the "*primary effect* of advancing religion."

*Am. Atheists*, 567 F.3d at 291 (citing *Agostini*, 521 U.S. at 234-35; *Bowen v. Kendrick*, 487 U.S.

589, 609 (1988)).  The Supreme Court has identified three criteria for evaluating whether a

government aid program impermissibly advances religion: (1) whether it results in religious

indoctrination that could be attributed to the government; (2) whether it defines its recipients by

reference to religion; and (3) whether it creates an excessive entanglement with religion.  *See*

*Mitchell v. Helms*, 530 U.S. 791, 808 (2000) (plurality opinion) (citing *Agostini*, 521 U.S. at

234); *id.* at 845 (O'Connor, J., concurring) (same); *see also Am. Atheists*, 567 F.3d at 291-94.

The EESA, as applied to the Treasury Department's purchase of AIG preferred stock, has none of these characteristics.

### A.  The Treasury Department's Purchase of AIG Preferred Stock Has Not Led to Religious Indoctrination that Could Reasonably Be Attributed to the Government

There are three independent reasons why a reasonable observer could not conclude that the Treasury Department's investment in AIG has led to religious indoctrination that could be attributed to the Treasury Department.  First, no EESA funds have been used directly or indirectly to support the sale of Shariah-compliant products.  Second, even assuming *arguendo* that the sale of Shariah-compliant products has benefitted from AIG's receipt of EESA funds, this benefit would have resulted from the private choice of AIG employees, and could not be attributed to Treasury Department officials.  Third, the sale of Shariah-compliant products does not constitute religious indoctrination.

*First*, Plaintiff cannot "prove that the aid in question actually is, or has been, used for religious purposes," *Mitchell*, 530 U.S. at 857 (O'Connor, J., concurring),[5] or that EESA funds are "flowing to [financial institutions] that can be considered 'pervasively sectarian' religious institutions."  *Bowen*, 487 U.S. at 621.[6]  Pursuant to the EESA, the Treasury Department has purchased preferred stock from AIG.  Gender Decl. ¶¶ 10-11; Millstein Decl. ¶¶ 10, 16.  ████

███████████████████████████████████████████████████████████████████████████████

██████  And, although a handful of AIG's approximately 290 subsidiaries do market Shariah-compliant products, that fact does not render AIG a sectarian institution.  ███████████

████████████████████████████████████████████████████████████████████

████████████████  It is a fundamental principle of corporate law that, so long as corporate

---

[5] A *de minimis* use of EESA funds for religious purposes would not implicate the Establishment Clause. *Mitchell*, 530 U.S. at 820-24 (plurality opinion); *id.* at 860-66 (O'Connor, J., concurring).

[6] An institution is considered pervasively sectarian if it "is so 'subsumed in the religious mission' that it is impossible to separate the religious from the secular and to channel aid only to the latter."  *Am. Atheists*, 567 F.3d at 295 (quoting *Hunt v. McNair*, 413 U.S. 734, 743 (1973)).

formalities are observed, the actions of corporate subsidiaries are not imputed to parent corporations. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citations omitted). Accordingly, plaintiff's allegation that "AIG engages in Shariah-compliant financing," Am. Compl. ¶ 71, has no support in fact.

Furthermore, there is no evidence that the proceeds from AIG's sale of preferred stock to the Treasury Department were used to promote the sale of Shariah-compliant products by AIG's subsidiaries. All of the $40 billion in proceeds from AIG's sale of Series D Preferred Stock were used to pay down AIG's indebtedness with the FRBNY. Millstein Decl. ¶ 10; Gender Decl. ¶ 10. ███████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████. As a result, plaintiff cannot show that any of the proceeds of the Secretary's purchase of AIG preferred stock have been used—even indirectly— "to fund 'specifically religious activities in an otherwise substantially secular setting[,]'" *Bowen*, 487 U.S. at 621 (quoting *Hunt v. McNair,* 413 U.S. 734, 743 (1993)), even assuming *arguendo* that the sale of Shariah-compliant products is a "specifically religious activity" (which it is not, *see infra*).

Indeed, although the fact is not material to plaintiff's Establishment Clause claim,[7] it is worth noting that, since the Treasury Department's investment, █████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

---

[7] Even if plaintiff were able to show that the use of EESA funds to pay down debt or for any other purpose allowed AIG to use funds from other sources to support the sale of Shariah-compliant products, such a showing would be legally irrelevant. As the Sixth Circuit recently explained, "[t]he Supreme Court has repeatedly rejected 'the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends." *Am. Atheists*, 567 F.3d at 296 (quoting *Hunt*, 413 U.S. at 743); *see also Mitchell*, 530 U.S. at 825 (plurality opinion).

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████[8]

*Second*, even assuming that funds provided to AIG by the Treasury Department pursuant to the EESA had, after a series of intermediate transactions, been used by AIG's subsidiaries to support the sale of Shariah-compliant insurance products, such support could not be attributed to the Treasury Department.  As noted, the Treasury Department has not provided funds directly to any AIG entity that markets Shariah-compliant products.  Lee Decl. ¶ 5; Millstein Decl. ¶¶ 10, 17.  It is also undisputed that the Treasury Department cannot direct AIG to use the funds provided by the Commitment for any specific purpose.  Millstein Decl. ¶ 17.  Finally, it is also undisputed that Treasury Department officials have not had any communication with employees of AIG or its subsidiaries about Shariah-compliant products.  Millstein Decl. ¶ 28; Power Decl. ¶¶ 9-10; Rahdi Decl. ¶ 10; Zain Decl. ¶ 14; Kamdani Decl. ¶ 14; Homsi Decl. ¶ 11.

Indeed, no reasonable observer could conclude that Treasury Department officials even considered the possibility that funds provided to AIG would ultimately be used to promote the

---

[8] ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

sale of Shariah-compliant products.  The initial $40 billion was used exclusively to pay down

debt to the FRBNY, per the terms of the Series D Securities Purchase Agreement.  Millstein ¶

10. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  The undisputed evidence demonstrates that Treasury

officials were not even aware that AIG subsidiaries sold Shariah-compliant products until they

learned of this lawsuit, Hsu Depo. at 37-39; Millstein Decl. ¶ 28, which is not surprising given

these products' *de minimis* contribution to AIG's consolidated revenue.[9]

Accordingly, even if plaintiff could show that EESA funds were passed through to a

subsidiary that markets Shariah-compliant insurance products and that the subsidiary actually

used the funds to promote the sale of such products (he cannot), the link between such promotion

and the Treasury Department would be "broken by the independent and private choice of

recipients."  *Locke v. Davey*, 540 U.S. 712, 719 (2004) (citing cases).  As a result, any

"incidental advancement of a religious mission, or . . . perceived endorsement of a religious

message" resulting from the sale of Shariah-compliant products would be "reasonably

attributable to [employees of AIG and its subsidiaries], not to the government, whose role ends

with the disbursement of [the purchase price]."  *Zelman v. Simmons-Harris*, 536 U.S. 639, 652

(2002).  Accordingly, for this reason alone, the sale of such products could not be attributed to

the Treasury Department.

*Third*, although the Court need not reach the issue for either of the two independent

reasons set forth above, the Court could also grant defendants' motion because the sale of

Shariah-compliant products does not "inculcate religion."  *Mitchell*, 530 U.S. at 847 (O'Connor,

---

[9]  *Compare* ███████████████████████████████

███████████████████████████████████████████████ *with* Coleman Decl. ¶ 8 (AIG's FY 2009 results

included total premiums of $64.7 billion and total revenue of $96.0 billion).

J., concurring).  Shariah-compliant products serve the same purposes as standard insurance

products, but are simply structured differently.  For example, 

Nobody is compelled to purchase these products or prevented from purchasing standard

insurance policies, and even those individuals who do purchase the products are not "coerce[d]

. . . to support or participate in religion or its exercise."  *Lee v. Weisman*, 505 U.S. 577, 587

(1992). ███████████████████████████████████████████████

████████████████████ and are offered for an entirely secular purpose—to meet consumer

demand.  *See, e.g.,* AIG Press Release 12.1.08 (Ex. D to Coleman Decl.). The secularly-

motivated offer of a range of insurance products, including those that "coincide with the beliefs

of certain religious" consumers, [10] is not constitutionally impermissible, just as it "would [not] be

unconstitutional if . . . a government employer directly sent a portion of an employee's paycheck

to a religious institution designated by that employee pursuant to a neutral charitable program."

---

[10] *See Bowen*, 487 U.S. at 604 n.8 (citing *Harris v. McRae*, 448 U.S. 297, 319-20 (1980) (law limiting use of federal funds for abortion does not violate Establishment Clause notwithstanding the law's consistency with "the doctrines of the Roman Catholic Church concerning the sinfulness of abortion and the time at which life commences."); *McGowan v. Maryland*, 366 U.S. 420, 442 (1961) ("the 'Establishment' Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions.")).

*Mitchell*, 530 U.S. at 819 n.8 (plurality opinion).  In sum, even if the offer of Shariah-compliant insurance products could be attributed to the government, a reasonable observer would not conclude that the "government [is] appearing to take a position on questions of religious belief or . . . 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. ACLU*, 492 U.S. 573, 594 (1989) (citing *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)).  Accordingly, the Court may grant defendants' motion for summary judgment on this basis as well.

### B.  The TARP Does Not Define Its Recipients By Reference to Religion

The TARP is a broad based program that is entirely neutral as to religion, and which "allocates benefits in an evenhanded manner to a broad and diverse spectrum of beneficiaries." *Am. Atheists*, 567 F.3d at 289 (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 114 (2001); *Mitchell*, 530 U.S. at 809-13 (plurality opinion); *id.* at 838 (O'Connor, J., concurring)). The EESA provides the Secretary broad authority to purchase "troubled assets" from any "financial institution." 12 U.S.C. § 5211.  The terms "troubled assets" and "financial institutions" are defined without reference to religion.  *Id.* at § 5202.  In exercising this authority, the EESA instructs the Secretary to consider several factors, none of which have religious content.  *Id.* at § 5213.  Accordingly, the benefits of participation in the TARP are "allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion."  *Mitchell*, 530 U.S. at 813 (plurality opinion) (quoting *Agostini*, 521 U.S. at 231).

Furthermore, the Secretary has not administered the TARP in a manner that defines recipients according to religious criteria.  As of April 30, 2010, the Secretary has purchased or made commitments to purchase approximately $490 billion of troubled assets from over 700 different financial institutions, including AIG.  *See* Millstein Decl. ¶ 7.  The criteria used to select TARP participants "are not religious in nature, and do not draw distinctions between

19

financial institutions based on religious distinctions." *Id.* at ¶ 8.[11]  As a result, neither the TARP nor any of the programs created under the TARP "employ[] skewed selection criteria that stack the deck in favor of groups that engage in religious indoctrination, encouraging potential recipients to take part in religious activity by rewarding them for doing so." *Am. Atheists*, 567 F.3d at 291 (citing *Agostini*, 521 U.S. at 231).

### C.  The Treasury Department's Purchase of AIG Preferred Stock Has Not Created An Excessive Entanglement Between Government and Religion

Finally, the undisputed facts show that the Treasury Department's purchase of preferred stock pursuant to the EESA has not "excessively entangle[d] the government in religious affairs." *Am. Atheists*, 567 F.3d at 294 (citing *Agostini*, 521 U.S. at 232-33). ███████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████ Accordingly, the Treasury Department's investment in AIG involves "no inquiries into religious doctrine, . . . no delegation of state power to a religious body, . . . and no detailed monitoring and close administrative contact between secular and religious bodies." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 696-97 (1989) (citations and internal quotations omitted).

### CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant defendants' motion for summary judgment.

Respectfully submitted,

TONY WEST
Assistant Attorney General

---

[11] *See generally* www.financialstability.gov/roadtostability/programs.htm (last accessed May 27, 2010) (briefly describing programs created under the TARP and providing links for further information); *see also* Third Tranche Report to Congress 12.2.08 (Ex. L to Coleman Decl.) (setting forth criteria for participation in the Systemically Significant Failing Institutions Program).

BARBARA L. MCQUADE
United States Attorney

JOHN R. GRIFFITHS
Assistant Director, Federal Programs Branch

/s/ John R. Coleman
JOHN R. COLEMAN
JULIE STRAUS
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8460
Email: John.Coleman3@usdoj.gov

DATED: June 7, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2010, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system, which will send notification of such filing to the

following: Robert J. Muise, David Yerushalmi.  I further certify that I provided unredacted

copies of Defendants' Motion for Summary Judgment and any exhibits filed under seal to Robert

J. Muise and David Yerushalmi by electronic mail.

/s/ *John R. Coleman*
John R. Coleman
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
