**EXHIBIT 1**
**to Defendants' Motion for Summary Judgment**

**Declaration of Jim Millstein (Redacted)**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY

        Plaintiff,

    -vs-

TIMOTHY F. GEITHNER, Secretary, U.S.
Department of the Treasury, and BOARD OF
GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

        Defendants.

_____/

CIVIL NO. 08-15147

HON. LAWRENCE P. ZATKOFF
MAG. JUDGE MONA K. MAJZOUB

## DECLARATION OF JIM MILLSTEIN

I, Jim Millstein, declare as follows:

1.  I currently serve as the Chief Restructuring Office within the Office of Financial Stability
    of the United States Department of the Treasury ("Treasury Department"). In my
    capacity as Chief Restructuring Officer, I supervise the Treasury Department's
    investment in American International Group, Inc. ("AIG"). I joined the Treasury
    Department as Chief Restructuring Officer in May of 2009. Prior to my service with the
    Treasury Department, I spent 28 years working in the private sector focused on financial
    restructurings.

2.  The statements herein are based on my personal knowledge and information obtained in
    the course of my official duties. I have previously provided testimony in this litigation on
    behalf of the Treasury Department pursuant to Rule 30(b)(6) of the Federal Rules of Civil
    Procedure. I make this declaration in support of Defendants' Motion for Summary
    Judgment.

3.  On September 16, 2008, in the midst of a significant financial crisis, the Federal Reserve Bank of New York ("FRBNY") extended unprecedented assistance to American International Group, Inc. ("AIG"), having determined that, in the absence of such assistance, AIG would have defaulted on more than $2 trillion notional of derivative obligations and over $100 billion of debts to institutions.  Those defaults would have inevitably forced AIG to commence Chapter 11 proceedings for itself, its Financial Products subsidiary ("AIGFP"), its aircraft leasing subsidiary, and its consumer finance subsidiary.  In addition, had AIG filed for Chapter 11 relief, insurance regulators in 20 states and in more than 130 countries around the world would have begun proceedings against its insurance subsidiaries.

4.  By virtue of both the size of its balance sheet and the nature of its liabilities, an AIG bankruptcy in September of 2008 would have been catastrophic to global financial and insurance markets.  As explained in greater detail in my prepared testimony before the Congressional Oversight Panel, a true and correct copy of which is attached hereto as Exhibit A, an uncoordinated bankruptcy filing by AIG and the consequent seizure of AIG's insurance subsidiaries would have had devastating "run" effects.  Ex. A at 4-5.  At the time, the world economy was already under severe stress, and the failure of AIG would have greatly amplified that stress.

5.  As a result, the FRBNY, with the authorization of the Board of Governors of the Federal Reserve System and in consultation with the Treasury Department, decided to extend up to $85 billion in credit to AIG, in the form of a revolving credit facility ("FRBNY Facility"), pursuant to its authority under the Federal Reserve Act.  12 U.S.C. § 343.

6. Notwithstanding this extraordinary measure, the global economy continued to deteriorate. In response, on October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA"). The EESA authorizes the Secretary of the Treasury to establish the Troubled Asset Relief Program ("TARP") to purchase, and to make and fund commitments to purchase, "troubled assets" from any financial institution, on such terms and conditions as are determined by the Secretary. A "troubled asset" is defined by the EESA as, *inter alia*, "any . . . financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System, determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress." Congress directed the Secretary to create the Office of Financial Stability to implement the TARP.

7. The EESA authorizes the Secretary of the Treasury to purchase up to just under $700 billion in troubled assets from financial institutions pursuant to the TARP. As of April 30, 2010, the Treasury Department has purchased, or made commitments to purchase, approximately $490 billion of troubled assets from over 700 different financial institutions. Of this amount, $206 billion has already been repaid in the form of capital, dividends, and interest, and a March 2010 report of the non-partisan Congressional Budget Office estimates that the total cost of the TARP will ultimately be $109 billion, far less than the nearly $700 billion authorized by Congress for the purchase of troubled assets.

8. The criteria employed by the Treasury Department in purchasing troubled assets pursuant to the TARP are consistent with the EESA's purpose: "to restore liquidity and stability to

the financial system of the United States . . . in a manner that—(A) protects home values, college funds, retirement accounts, and life savings; (B) preserves homeownership and promotes jobs and economic growth; (C) maximizes overall returns to the taxpayer of the United States; and (D) provides public accountability for the exercise of such authority." 12 U.S.C. § 5201. The criteria used in purchasing troubled assets pursuant to the TARP are not religious in nature, and do not draw distinctions between financial institutions based on religious distinctions.

9. By the end of October 2008, it had become clear that although the FRBNY Facility had solved AIG's immediate liquidity problems, AIG's substantial draws on that Facility in order to meet its cash requirements, in combination with significant further losses, caused AIG's debt to equity ratios to become inconsistent with its investment grade rating. A downgrade of AIG's credit rating would have had serious negative implications for its insurance businesses, and would have likely resulted in significant incremental collateral calls and termination payments. As a result, on November 9, 2008, the Secretary determined that "the restructuring of a credit facility originally extended by the [FRBNY] to [AIG], is required to stabilize that financial institution and to mitigate significant risks to the financial markets that would occur in the event of AIG's failure." *See* Troubled Asset Determination dated November 9, 2008 (attached as Exhibit B). The Secretary and the Chairman of the Board of Governors of the Federal Reserve System "jointly concluded that the purchase of $40 billion of preferred stock and warrants issued by AIG is necessary to restructure the AIG credit facility and promote financial market stability." *Id.*

10. Accordingly, on November 25, 2008, the Treasury Department purchased $40 billion of AIG Series D Preferred Shares pursuant to the TARP.  By the terms of the Securities Purchase Agreement between the Treasury Department and AIG dated November 25, 2008 ("Series D SPA"), AIG was required to use the proceeds from its sale of Series D Preferred Shares exclusively to pay down its outstanding indebtedness with the FRBNY. *See* Series D SPA, §1.2(b) (selected portions attached as Exhibit C).

11. As a result of the Treasury Department's November 25, 2008 purchase of AIG Series D Preferred Shares, in combination with the other elements of the November 2008 restructuring, AIG maintained its investment grade credit rating notwithstanding the losses AIG announced on November 10, 2008, and continued to meet its obligations to creditors and counterparties.  As a result, the already fragile economy was not forced to withstand the repercussions of a disorderly failure of AIG.

12. While the actions taken in November 2008 left AIG with sufficient liquidity to weather the continuing deterioration of the credit and equity markets, AIG's record fourth quarter 2008 losses (in excess of $60 billion) prompted the ratings agencies and AIG's auditors to insist that AIG obtain incremental equity in order to ensure that it had sufficient liquidity.  Failure to obtain such a commitment would have led to a "going concern" qualification on its annual audit opinion,[1] and with that qualification, the loss of its investment grade rating.

---

[1] The company's auditors must consider whether the use of the going concern assumption is appropriate, and whether there are material uncertainties about the entity's ability to continue to operate as a going concern that need to be disclosed in the financial statements.  An auditor who concludes that substantial doubt exists with regard to the appropriateness of the going concern assumption is required to issue an opinion reflecting this—a "going concern qualification."

13. On March 2, 2009, AIG reported a net loss of $61.7 billion for the fourth quarter of 2008. On the same day, the Treasury Department "announced a restructuring of the government's assistance to AIG in order to stabilize this systemically important company in a manner that best protects the US taxpayer." *See* Treasury Department Press Release 3.2.09 (attached as Exhibit D).  As accurately stated in the press release, "the government's restructuring [was] designed to enhance the company's capital and liquidity in order to facilitate the orderly completion of the company's global divestiture plan." *Id.*

14. As the Treasury Department explained at the time, "Given the systemic risk AIG continues to pose and the fragility of markets today, the potential cost to the economy and the taxpayer of government inaction would be extremely high.  AIG provides insurance protection to more than 100,000 entities including small businesses, municipalities, 401(k) plans, and Fortune 500 companies who together employ over 100 million Americans.  AIG has over 30 million policyholders in the U.S. and is a major source of retirement insurance for, among others, teachers and non-profit organizations.  The company also is a significant counterparty to a number of major financial institutions." *Id.*

15. As it related to the EESA, the March 2009 restructuring contained two elements.  First, the Treasury Department agreed to exchange the Series D Preferred Shares it had purchased in November 2008 with Series E Preferred Shares.  The Series E Preferred Shares "more closely resemble common equity and thus improve the quality of AIG's equity and its financial leverage." *Id.*

6

16. Second, pursuant to the EESA, the Treasury Department and AIG entered into an agreement dated April 17, 2009 ("Series F SPA"), whereby the Treasury Department agreed to provide an equity capital commitment ("Commitment") of just under $30 billion in exchange for the issuance of AIG Series F Preferred Stock to the Treasury Department. *See* Series F SPA (Selected Portions attached as Exhibit E). The Series F SPA permits AIG to draw funds from the Commitment over time, subject to the fulfillment or waiver of certain conditions. *Id.* at § 1.3. The liquidation preference of the Series F Preferred Shares automatically increases as the funds are drawn from the Commitment. *Id.* at § 1.7.

17. According to the terms of the Series F SPA, only AIG may draw funds from the Commitment. *Id.* at § 1.3. None of AIG's subsidiaries may draw funds from the Commitment, and decisions regarding whether and how to further distribute funds drawn from the Commitment to any of AIG's subsidiaries are made by AIG, not by the Treasury Department.

18. Section 1.5(e)(vii) of the Series F SPA required AIG to provide the Treasury Department, prior to the closing of the transaction, a use of capital plan (the "Initial Capital Use Plan") reasonably satisfactory to the Treasury Department that described the expected use of aggregate proceeds received under the Commitment created by the Series F SPA. *See* Series F SPA at § 1.5(e)(vii), p. 5 (Ex. E).

19. ███████████████████████████████████████████████████



22. Section 1.6(c) of the Series F SPA requires AIG, as a condition of the obligation of the

Treasury Department to consummate any drawdown pursuant to that agreement, to have

provided the Treasury Department with an outline, in a form reasonably acceptable to the

Treasury Department, of the expected uses by AIG of the funds from that drawdown (an

"Outline of Expected Uses"). *See* Series F SPA § 1.6(c), p. 5 (Ex. E). Although AIG

must provide an Outline of Expected Uses prior to any drawdown, the Treasury

Department does not generally have authority under the Series F SPA to deny proceeds

based on AIG's planned use of funds.

23.

24.

25.





26.

27.

28. Despite the fact that I am the official within the Treasury Department primarily

responsible for monitoring the Treasury Department's investment in AIG pursuant to the

EESA, I was not aware that any of AIG's subsidiaries marketed insurance products as Shariah-compliant until I was contacted regarding this lawsuit in October 2009. I have not had conversations with any official or employee of AIG or any of its subsidiaries regarding insurance products marketed as Shariah-compliant, nor am I aware of any official within the Office of Financial Stability who has had any such conversations.

29.



I declare under penalty of perjury that the foregoing is true and correct.

Executed on  **6/4/10**  .

Jim Millstein

11

**EXHIBIT A**
**to the Declaration of Jim Millstein**

**Millstein Testimony Before Congressional Oversight Panel 5.26.10**

**Written Testimony of Jim Millstein**

**Chief Restructuring Officer**

**U.S. Department of the Treasury**

**before the Congressional Oversight Panel**

**May 26, 2010**

Good morning.

Chair Warren, and members of the Congressional Oversight Panel, thank you for the opportunity to testify today. Since joining the Treasury Department (the "Treasury") in May of 2009, I have been primarily responsible for overseeing the taxpayers' significant investment in American International Group ("AIG" or the "Company"). Prior to joining the Treasury, I spent 28 years working in the private sector focused on financial restructurings.

I am here today in response to the Panel's request for an explanation of the terms of the government's investments in AIG, the evolution of those investments and the strategy for the government's exit. The Treasury is very much a reluctant shareholder, and while we leave the day-to-day management of the Company to the CEO and the Board of Directors, we actively monitor progress on the restructuring front. Our primary goals are to protect the taxpayers' investment in AIG, promote financial stability, and expedite the government's exit.

As of today, the Federal Reserve Bank of New York (the "FRBNY") and the Treasury Department have extended $132.3 billion of financial support to AIG in a variety of forms.[1]

The FRBNY has provided $83.2 billion of this support. This support is in three different forms. First, there $26.3 billion outstanding on the FRBNY loan (the "FRBNY Facility") that was first extended to AIG in September of 2008.[2] Second, the FRBNY holds $25.4 billion of preferred interests in two investment vehicles which hold, respectively, AIG's two largest international life insurance companies, AIA and ALICO (the "AIA and ALICO Preferred Interests").[3] Third, there is $31.5 billion outstanding on loans that the FRBNY made to two other investment vehicles, Maiden Lane 2 and Maiden Lane 3, which purchased certain troubled financial assets from AIG.

The Treasury has provided $49.1 billion of the total support. $41.6 billion of this support is in the form of Series E Preferred and $7.5 billion is in the form of Series F Preferred. The proceeds of the Treasury's preferred stock investments were used to reduce the Company's debt burden, to help buttress the regulatory capital of certain insurance subsidiaries, and to untangle the web of cross-ownership and intercompany funding arrangements between and among AIG and its various subsidiaries.

Finally, the AIG Credit Facility Trust (the "Series C Trust"), established for the benefit of the taxpayers in connection with the original funding of the FRBNY Facility, holds AIG's Series C Preferred, which is convertible into approximately 79.8% of AIG's common stock. The Series C Trust is governed by three independent trustees who act as fiduciaries on behalf of taxpayers.

The purpose of my testimony today is to explain how the taxpayer came to own this varied portfolio of AIG interests and the plan to extract the government from these positions, as soon as practicable.

---

[1] This represents the existing outstanding amounts. Currently, there is approximately $12 billion of undrawn capacity under the FRBNY Facility, and approximately $22 billion of undrawn capacity under the Treasury Series F Preferred commitment.
[2] Amount includes accrued fees and interest.
[3] The AIA and ALICO Preferred Interests were taken in transactions that closed on December 1, 2009 in satisfaction of a portion of the debt then outstanding under the FRBNY Facility.

AIG's rescue in September 2008 sought to avoid the catastrophic consequences to our economy and to American families and businesses that would have resulted from its sudden collapse. As a result of necessary government intervention, the taxpayer became a substantial equity holder in AIG, and taxpayers' ultimate recovery on their investment in AIG depends on the strength of the Company's underlying insurance subsidiaries. Today, AIG is a "going concern" [4] with an "A-"[5] investment grade rating only because of government support. Therefore, the objective of the restructuring plan is to restructure AIG's balance sheet and business profile so that it can maintain this status on its own, thereby permitting the government to monetize the taxpayers' investment.

As a substantial equity holder in AIG, the taxpayers' ultimate recovery on its equity interests in AIG depends on the ability of AIG's management to improve the results of its core insurance businesses. Together with the trustees of the Series C Trust, the government has worked with the Company to recruit an almost entirely new Board of Directors,[6] a new CEO, a new Chief Risk Officer, a new General Counsel and a new Chief Administrative Officer. All of these executives and directors are committed to the objective of protecting the taxpayers' investment in the Company and paying back the taxpayers as promptly as practicable.

The mechanics of the restructuring plan itself are relatively straightforward in concept: sell sufficient assets at fair prices to pay off AIG's obligations to the FRBNY, streamline AIG's business portfolio, and recapitalize AIG's balance sheet to support investment grade status without the need for ongoing government support. At that point, the Company will be a simplified life, property and casualty insurer with solidly capitalized insurance subsidiaries, adequate liquidity, and a stable balance sheet. Executing this plan will enable the government to sell its equity interests in the Company as soon as market conditions permit.

**The Structure of USG Assistance**

On September 16, 2008 the government committed to provide unprecedented assistance to AIG. In the absence of such assistance, AIG would have then defaulted on more than $2 trillion notional of derivative obligations and on over $100 billion of debt to institutions. Those defaults would have inevitably forced AIG to commence Chapter 11 proceedings for itself, its Financial Products subsidiary (AIGFP), its aircraft leasing subsidiary, and its consumer finance subsidiary.

The initial decision to loan money to AIG fell to the Federal Reserve because, at that time, no one else could act in the same manner as the Federal Reserve. The Emergency Economic Stabilization Act (EESA) was not authorized by Congress until October 2008, and none of the agencies with supervisory authority over AIG had any tools to help directly meet the funding requirements of AIG. No one in the federal government had a mechanism, as we do for banks, to provide for the orderly unwinding, dismantling, selling, or liquidating of a global, non-bank financial institution like AIG.

---

[4] In accounting terminology "going concern" refers to a company's ability to continue functioning as a business entity.
[5] Throughout this testimony Standard & Poor's ratings are used as a proxy for all agencies that rate the Company's debt.
[6] The Series C Trust has elected 11 of the 13 existing board members. The two remaining directors were nominated and elected by the Treasury pursuant to rights under the documents that govern the Treasury's Series E and Series F Preferred shares.

Many observers, with the benefit of hindsight, have concluded that AIG could have been handled differently.  Some have suggested that AIG should have simply been allowed to file for bankruptcy and let the losses fall where they may so as to diminish "moral hazard."  Others have suggested that AIG could have negotiated a prepackaged plan of reorganization with its creditors and fixed itself without government support.  Finally, there has been the suggestion that the government should have structured its rescue financing so as to protect the valuable insurance franchises without protecting the creditors who enabled and underwrote the growth in AIG's leverage.

My colleagues at the Treasury and the FRBNY have devoted thousands of hours over the past year and a half to try to maintain the Company's stability in extremely volatile markets while also de-risking and deleveraging the Company so as to protect the taxpayers' substantial investments.  I am convinced today—with the benefit of hindsight and significant experience with AIG, the Treasury, and the FRBNY—that the support provided to the Company in the fall of 2008 was the only responsible and viable option on the table.  I will explain why as I address certain suggested alternatives and illustrate the challenges that we still face as we attempt to exit the taxpayers' extraordinary investments in AIG.

Many observers have argued that AIG simply should have been left alone to fail and file for bankruptcy.  By virtue of both the size of its balance sheet and the nature of its liabilities, an AIG bankruptcy in September of 2008 would have been catastrophic to global financial and insurance markets.

AIG was one of the largest life insurers in the United States.  An uncoordinated bankruptcy filing and the consequent seizure of AIG's insurance subsidiaries could have had devastating "run" effects.[7]  In rehabilitation or wind down proceedings for AIG's subsidiaries, AIG's policyholders' access to the cash and the surrender values of their life and annuity policies would have been restricted as regulators sorted out the adequacy of capital and reserves to pay all claims in full.  As those restrictions became widely known, other life and annuity providers could have experienced a sharp increase in surrenders and redemptions, forcing those firms to meet the run against them with asset sales of their own.  That, of course, would have put even further pressure on markets.

AIG's failure directly threatened the savings of millions of Americans.  AIG had provided financial protection to municipalities, pension funds, and other public and private entities through guaranteed investment contracts and products that protect participants in 401(k) retirement plans.  Doubts about the value of AIG life insurance products could have generated doubts about similar products provided by other life insurance companies, and opened an entirely new channel of contagion.

Upon the filing of a bankruptcy petition by AIG, holders of hundreds of billions of dollars of financial assets "insured" by AIGFP would have been entitled to:  (i) immediately terminate their

---

[7] Total weekly surrenders in AIG's Retirement Services division spiked to almost $800 million per week in the fall of 2008, before returning to a normalized level of $200 million per week after the November 2008 TARP investment.

insurance contracts with AIG,[8] (ii) apply the collateral AIG had previously posted with them to their termination claims against AIG, and (iii) offset remaining contractual claims they had against AIG against any other obligation they might owe AIG on any other qualified financial contract.

The market consequences of this rapid unwinding of AIG's credit insurance would have been severe.  Having lost the benefit of AIG's insurance or "wrap" on hundreds of billions of dollars of credit instruments, AIG's counterparties would have sought to replace the insurance if it were available, or (because such insurance was largely unavailable in September of 2008) to sell the underlying credit instruments so as to mitigate future losses.  The widespread sale of hundreds of billions of dollars of a concentrated class of financial assets would have created significant incremental downward selling pressure on financial assets, amplifying the selling panic that had already started following the Lehman bankruptcy.  Of equal concern, the default by AIG and AIGFP on more than $100 billion of institutional indebtedness, including $15 billion of commercial paper and $85 billion of short-term repurchase obligations,[9] would have exacerbated the stresses in the money market and repo markets driven by Lehman's bankruptcy.

At that time, with the world economy under severe stress, the failure of a large, global, highly-rated financial institution that had written hundreds of billion dollars of insurance on a range of financial instruments would have dramatically amplified the crisis. Investors around the world would have pulled back from funding, out of fear that other financial institutions would fail as well.  Investors would have completely lost confidence in their ability to evaluate the financial sector and distinguish between firms that were viable and those that were not. Financial firms would have been forced into even more dramatic selling of assets.

This damage would have rapidly spread beyond Wall Street. Borrowing costs for businesses would have increased dramatically, the value of pension funds would have fallen even more sharply, and job losses would have skyrocketed.  While the decision to save AIG was not an easy one, it was a better choice for the American people than letting it fail.

Some have suggested that the choice between rescue and bankruptcy is a false one and that the government could have helped to arrange a prepackaged bankruptcy.   As a way to shorten the Chapter 11 restructuring process, prepackaged plans only have a chance of success if there is sufficient time, before a company defaults, to organize creditors into a negotiating committee, and to negotiate and agree on a comprehensive restructuring plan which can be implemented in an expedited proceeding before the bankruptcy court.

At the end of 2008, in my private sector role as a financial advisor to companies experiencing financial distress, I negotiated just such a prepackaged plan of reorganization for Charter Communications, using the urgency of the financial crisis and Charter's imminent default to accelerate a normally cumbersome, time consuming process.  However, even on that accelerated basis, it still took three months to negotiate and agree on the restructuring plan and another six

---

[8] Under the qualified financial contract exceptions to the automatic stay provisions of the Bankruptcy Code otherwise applicable to creditors in a Chapter 11 proceeding.
[9] Includes securities lending obligations.

months to implement it through the courts (and Charter was only a fraction of the size and complexity of AIG).

In the second week of September 2008, barely a week before AIG would have defaulted on hundreds of billions of dollars of obligations, the FRBNY, having had no previous regulatory or supervisory authority over AIG or AIGFP, simply had no time to organize AIG's thousands of creditors into an effective negotiating committee, let alone negotiate a plan of reorganization with them and implement it.

In addition, the impracticality of a prepackaged plan process for AIG was not merely about timing. Rather, there was a more fundamental problem. AIG's revenues and funding depend on its customers' and lenders' perception of its long-term viability. Unlike a manufacturing company, or a retailer, or a cable company like Charter, the stability of a financial institution like AIG depends entirely on its customers' and counterparties' confidence that it will be "good for the money." A manufacturer or a retailer or a cable company can continue to sell its products through the restructuring of its balance sheet so long as it has cars, clothes or a cable signal to sell. A financial institution like AIG cannot.

A balance sheet restructuring involving the compromise of its debt obligations, whether in or out of formal bankruptcy proceedings, is fundamentally inconsistent with the basic commitment that an insurance company gives to its customers: that it has the financial wherewithal to honor a long-term payment obligation. To seek to compromise indebtedness or to compromise counterparties' credit insurance claims is fundamentally inconsistent with what an insurance company is trying to sell to its customers – its ability to pay valid claims in full as they come due.

For illustrative purposes, assume that:
  i.    There existed a regulatory regime in which someone had robust supervisory authority over AIG,
  ii.   That regulator was vigilant and ready to prompt the Company to take actions to improve its capital position well ahead of its potential ratings downgrade,
  iii.  AIG's thousands of creditors could have been organized into an effective negotiating committee well in advance of its possible default, and
  iv.   AIG's insurance regulators in the United States and in the 130 countries in which its insurance subsidiaries operate could have been convinced to forebear from ring-fencing the subsidiaries' assets or from pushing them into protective rehabilitation proceedings while AIG negotiated with its creditors.

Even assuming all four of these held true, the highly public negotiations among creditors and regulatory uncertainties would have completely undermined the viability of AIG's insurance businesses. This is because, at the first hint of financial distress (such as any public announcement that the Company had commenced negotiations with its creditors over the potential restructuring of their debt), AIG's ability to sell new insurance policies would have evaporated. Equally, redemptions of old policies would have accelerated. Together, the loss of new sales and the increase in redemptions would have quickly created a huge drain on the insurance subsidiaries' liquidity. Similarly, short-term creditors, such as AIG's securities

lending counterparties, would have refused to roll over their loans, demanding immediate payment to avoid being caught up in AIG's prepackaged plan negotiations. That "run" on AIG and its subsidiaries' liquidity would have been a regulatory trigger, forcing the hands of regulators to protect all policyholders by ring-fencing the insurers' assets or, in the extreme case, forcing the insurer into wind down proceedings.

The rating agencies would also have complicated, if not completely undermined, the possible success or utility of a prepackaged plan. Upon the announcement of a prepackaged plan, under the rating agencies' "distressed exchange" guidelines, AIG at the very least would have immediately been put on "watch negative" and, at the commencement of any plan that sought to reduce AIG's debt burden by paying AIG's creditors less than what they were owed, the rating agencies would have immediately downgraded AIG below investment grade. Further downgrades would have triggered additional collateral calls at AIGFP, putting AIG's liquidity under stress. The policyholder run on AIG's insurance subsidiaries and the counterparty run on AIGFP would have started in earnest before the prepackaged plan could be put to vote.

In my opinion, there were only two practical choices in September of 2008: (i) allow AIG to fail and put the entire financial system at risk of collapse, or (ii) fund AIG to avoid the severe financial maelstrom that would otherwise have ensued had it filed for bankruptcy.

Some have suggested that the rescue should have been structured so as to protect the valuable insurance franchises without protecting the creditors who enabled and underwrote the growth in AIG's leverage. In September 2008, there was no TARP authority nor was there any other federal government mechanism to provide for the orderly dismantling of a large, systemic, non-bank financial institution like AIG. This made it impossible to decouple the ratings of the insurance subsidiaries from the AIG parent company, and therefore impossible to extract concessions from the parent company's creditors without impairing the operating abilities of the insurance subsidiaries.

This situation could have been avoided if certain of the elements of financial reform advancing in Congress had been in place then. Despite regulators in 20 different states being responsible for the primary regulation and supervision of AIG's U.S. insurance subsidiaries, despite AIG's foreign insurance activities being regulated by more than 130 foreign governments, and despite AIG's holding company being subject to supervision by the Office of Thrift Supervision, no one was adequately aware of what was really going on at AIG. If there had there been a systemic regulator with robust oversight authority over AIG and AIGFP in the years preceding September 2008, that regulator would have been in a position to constrain AIG's risk taking. It could have imposed higher capital and liquidity requirements on AIG in the run up to the crisis, and if so AIG might never have needed government support. Both the House and Senate versions of financial reform provide such authority.

Moreover, had the resolution authority included in the regulatory reform bills been available in the fall of 2008, any support from the government that was needed would have taken an entirely different path. For example, if the systemic regulator had been required to supervise the coordination of a resolution plan involving AIG's insurance regulators, it could have pre-arranged the ownership transfer of certain insurance subsidiaries in the months leading up to

AIG's liquidity shortfall.  Then, when AIG failed, the systemic regulator could have formed a "bridge bank" and transferred – with all necessary insurance regulatory approvals secured in advance – all of AIG's valuable operating businesses to it.  Government financial support would have then been effectively secured by the unencumbered assets of those operating businesses, and limited to the amounts necessary to bridge the insurance subsidiaries' liquidity needs.  This would have effectively decoupled the ratings of the insurance subsidiaries from the rating of the AIG parent company, and would have ensured that AIG's unsecured creditors received a recovery only after government support had been repaid.

The comprehensive financial reform legislation proposed by the Administration and advancing in Congress would remedy both deficiencies.

First, the government needs the ability to limit risk-taking for institutions that threaten the overall stability of the system and can cause extraordinary damage to the American economy.  The government needs this ability not just for banks, but for institutions that operate like banks.  These non-bank financial institutions existed alongside banks and yet were not subject to those constraints in the period leading up to this crisis. The government also needs to make sure that regulators have accountability and flexibility, and that they enforce sensibly-designed constraints on risk.  The systemic regulatory authority that is part of financial reform addresses these needs.

Second, the government must have the ability to resolve failing major financial institutions in an orderly manner, with losses absorbed not by taxpayers but by equity holders, unsecured creditors and, if necessary, other large financial institutions. This resolution authority would allow an orderly response to a potential future crisis, protecting both the taxpayer and the overall economy.  Both the Senate and House versions of financial reform generally include such tools.

**The Evolution of Government Support**

Forced to fund AIG's immediate liquidity needs, the government structured its rescue financing as secured debt; that is, amounts outstanding under the FRBNY Facility have priority against the value of AIG's unrestricted assets.  That structure protected taxpayers in the short term if AIG had proved not to be viable in the longer term.  Fortunately, AIG is proving to be viable.  In addition, the FRBNY took nearly 80% of AIG's fully diluted common equity[10] to provide additional compensation to taxpayers for their assistance, and to penalize the shareholders of the Company for the fact that the Company had no alternative but to ask the government for extraordinary assistance.

The FRBNY Facility solved AIG's immediate liquidity problems, but did not alleviate the pressure on its long term credit ratings.  By having drawn down a substantial amount of the FRBNY Facility to meet its cash requirements, AIG's debt to equity ratio[11] became inconsistent with its investment grade rating.  A further downgrade would have brought with it the potential of significant incremental collateral calls and termination payments at AIGFP.  Similarly, given the link between the parent's and insurance subsidiaries' ratings, if the parent company was

---

[10]  In the form of the Series C Preferred Stock placed into the Series C Trust for the benefit of the taxpayer, convertible into 79.8% of the fully-diluted AIG common equity.
[11]  A company's debt to equity ratio is a fundamental metric by which credit rating agencies derive corporate credit ratings.

downgraded below investment grade, it could have been the death knell to the insurance subsidiaries' abilities to write new business. A substantial and immediate reduction in the amounts outstanding under the FRBNY Facility was required to avoid another downgrade. With TARP authority having become available in early-October 2008, the Treasury injected $40 billion of preferred equity into the Company in November 2008. This allowed AIG to reduce the outstanding debt under the FRBNY Facility and increase its equity by an equal amount. This avoided downgrade and was essential for protecting the taxpayers' investment in the Company.

At the same time, to protect AIG's balance sheet against further mark-to-market losses on the RMBS portfolio it had acquired as part of its securities lending activities, and to protect AIG's liquidity position against further collateral calls arising from the deterioration in the market prices of the CDOs on which AIGFP had written credit insurance, the FRBNY created Maiden Lane 2 and Maiden Lane 3, respectively.[12]

While the actions taken in November 2008 left AIG with sufficient liquidity to weather the continuing deterioration of the credit and equity markets, its record fourth quarter losses due to deterioration in its asset portfolio (in excess of $60 billion) prompted AIG's auditors and rating agencies to require incremental equity in order to ensure that it had sufficient liquidity. Failure to obtain such a commitment would have led to a "going concern" qualification on its annual audit opinion,[13] and with that qualification, the failure of the Company. To solve this problem, the Treasury committed in April 2009 to purchase nearly $30 billion of AIG preferred stock if and when such funds were needed in the future. Since that time, AIG has requested and the Treasury has purchased $7.5 billion of the Series F Preferred. At all points since April 2009, the Company's auditors have required the Treasury to reiterate its commitment to fund the Series F Preferred – up through and including the Company's first quarter 2010 financials.[14] Without this continuing support, the auditors would issue a "qualified opinion," the rating agencies would downgrade the Company, and the taxpayers' investment would be severely impaired.

**The AIG Restructuring Plan**

To protect the taxpayers' now substantial investment in AIG, the restructuring plan must ultimately ensure that public confidence in AIG is restored. The Company's policyholders must be confident that AIG will be able to pay claims. The people and firms that lend money to AIG must be confident that they will be paid back. All stakeholders must be confident that AIG can independently meet all of its obligations, in full, as they come due. This is the concept upon which "investment grade status" is built, and this why the restructuring plan is centered on the maintenance of this status.

---

[12] On January 27, 2010 Secretary Geithner testified before the House Committee on Oversight and Government Reform regarding the Maiden Lane investment vehicles. Please see that testimony for a more robust discussion of the formation of Maiden Lane 2 and Maiden Lane 3.

[13] The company's auditor must consider whether the use of the going concern assumption is appropriate, and whether there are material uncertainties about the entity's ability to continue to operate as a going concern that need to be disclosed in the financial statements. An auditor who concludes that substantial doubt exists with regard to the appropriateness of the going concern assumption is required to issue an opinion reflecting this – a "going concern qualification."

[14] Currently, there is approximately $12 billion of undrawn capacity under the FRBNY Facility and approximately $22 billion of undrawn capacity under the Treasury's Series F Preferred commitment.

The reason for this is simple:  businesses and consumers do not buy insurance products from firms whose long-term viability is in question.  Credit ratings are a short hand by which consumers and businesses alike evaluate an insurance companies' financial condition and its prospects.  An investment grade rating represents a ratings agency's assessment, upon which businesses and consumers alike rely, that there is a very low probability that the entity will default on its long-term obligations.  All of the Company's primary competitors in the property and casualty insurance market are rated "A-" or higher,[15] making it impossible to compete in this market without an investment grade rating.

The need to maintain an investment grade rating makes it extremely complicated, and perhaps impossible, to pursue the creditor negotiations that some have advocated should have been pursued with AIG's CDO counterparties in connection with the creation of Maiden Lane 3.  The promise of full payment is the very essence of an investment grade credit rating.  To act in any way inconsistent with that promise, such as by trying to coerce counterparties to give concessions on their credit insurance claims, as the agencies have made clear in their criteria governing "distressed exchanges," is a path to a downgrade.

As the last eighteen months have unfolded, the rating agencies have begun to clarify the interaction between their rating for AIG and the substantial government support it has received.  Currently, as a result of the government's financial support, AIG enjoys an upward "notching" of its ratings above what it would otherwise receive on a standalone basis.  Standard & Poor's has provided the most detailed public description of this relationship, specifying that the Company receives a five-notch uplift due to government financial support.  In April 2010, S&P reaffirmed the Company's ratings and indicated that, absent government support, the Company would have a senior unsecured rating of BB, which is two notches below investment grade.

In order to regain a standalone "A" rating the Company needs to eliminate this gap.  The elimination of that gap is a key objective of the government's resolution plan for AIG.  Once AIG can maintain an investment grade rating without government support, the government can begin to sell down its equity interests in the Company.  This requires substantial improvements to AIG's operations and to its leverage and capital profile.  The essential elements of the resolution plan are as follows:

First, the Company will have to substantially reduce its debt.  The two metrics by which this is measured are (i) "leverage," which is the amount of debt on a company relative to the amount of equity in a company, and (ii) "coverage," which is the amount of earnings or cash flow the company generates relative to the annual interest payments on its debt.

Next, the Company will have to demonstrate independent access to the capital markets and secure standby lines of credit.  Policyholders, potential customers and investors must be confident that the Company has access to liquidity in times of potential stress.  Finding a private market participant or facility to replace the government's support will be a key milestone.

Third, the risk profile of AIGFP will need to be reduced to the level where potential losses are inconsequential to the parent company's financial condition.  More specifically, investors must

---

[15]  Primary competitors include Ace Group, Chubb Group, Hartford, Liberty Mutual, Travelers, XL, and Zurich.

be satisfied that AIGFP does not pose a substantial threat to the Company's liquidity position, even in times of stress.

Fourth, AIG will need to divest those subsidiaries that are deemed to be non-core to its long-term strategy, and it will need to deconsolidate any businesses whose potential cash needs represent a potential drag on the AIG parent company.

Fifth, the Company will have to demonstrate that its core insurance subsidiaries are profitable, well capitalized, and have repaired the damage to the franchise caused by the financial crisis and the negative attention that the government's rescue has generated.

Finally, the Company will have to demonstrate that it has improved its risk management policies and procedures.  In short, AIG will have to demonstrate that it can appropriately identify, monitor, manage and mitigate the risks inherent in its operating businesses.

### Taxpayer Exit
Taxpayer exit from AIG will be in a series of steps.  We expect that AIG will sell sufficient assets at fair prices to pay off obligations to the FRBNY, and the assets of Maiden Lane 2 and 3 will continue to generate cash flows sufficient to repay the loans FRBNY made to those entities. We expect that AIG will streamline its business portfolio and reduce its debt to a level that is consistent with an "A" rated company.  This will enhance the value of the taxpayers' equity interests in AIG, and the Treasury will then seek to sell these interests as soon as practicable.

### Asset Sales
In March 2010 the Company reached a substantial milestone, having signed separate definitive agreements to sell its two largest international life insurance subsidiaries – AIA to Prudential PLC and ALICO to MetLife.  Prudential PLC is currently seeking shareholder and regulatory approvals for its $35.5 billion purchase of AIA, and MetLife is seeking regulatory approvals for its $15.5 billion purchase of ALICO.  Combined with the additional financings and asset sales that the Company is currently pursuing, the proceeds from these two sales are expected to be sufficient to pay off the Company's obligations to the FRBNY in full: that is, the FRBNY Facility ($26.3 billion) and the AIA and ALICO Preferred Interests ($25.4 billion).

The consummation of the AIA and ALICO sale transactions will be a significant step on the path towards a standalone investment grade rating.  First, the transactions will eliminate over $50 billion of "senior" debt, significantly reducing AIG's leverage.   Second, by repaying the FRBNY Facility in full, the Company will free up assets that AIG can then use to secure new lines of credit with commercial banks — facilitating access to independent, non-governmental sources of liquidity.

### AIGFP
While the Company works to close the divestitures of AIA and ALICO, it is also continuing to wind down AIGFP.  The Company has reduced the notional amount of derivatives at AIGFP from $2.0 trillion in September of 2008 to $755 billion.[16]  Similarly, AIGFP has reduced total number of trade positions from 44,000 to 14,300.

---

[16] As of March 31, 2010.

When you look specifically at credit derivatives, the notional amount of exposure has been reduced from nearly $400 billion to $136 billion. $109 billion of this remaining exposure relates to transactions with European banks, whereby AIGFP provided regulatory capital relief to these banks under the Basel I regime. Thus far, these positions have generally been eliminated at no cost to AIGFP.

With respect to AIGFP's other derivative exposures, the firm has made significant progress towards removing complex and illiquid positions – an important step because these positions would be the most challenging to manage over time. These removals ensure that the reductions in notional and trade count metrics are not achieved simply by closing out only the most "plain vanilla" derivatives exposures.

While several hundred billion dollars of notional amount of positions will remain on AIGFP's books at year-end, most will be hedged positions that do not pose a threat to the Company's rating profile or, more importantly, the financial system. Overall, the wind down of AIGFP's riskiest positions is expected to be largely completed by year-end 2010. The wind down of AIGFP has already significantly reduced the interconnectedness between the Company and other large financial institutions — reducing the risk that, in the future, AIG could pose a systemic threat.

### Non-Core Asset Sales and Divestitures
The Company continues to explore opportunities to divest itself of its non-core businesses and deconsolidate subsidiaries that represent a drag on the parent company's ratings. These actions will reduce potential liquidity or capital drains from the parent company and strengthen AIG's independent credit profile. After the consummation of the AIA and ALICO sales and the divestiture of other non-core businesses and assets, the Company will be a streamlined version of the financial behemoth it once was. The largest remaining core businesses will be AIG's property and casualty insurance business (Chartis) and AIG's life and retirement services business in the United States (SunAmerica Financial). Overall, the reduction in both the number and diversity of its business units as well as the shrinking of its geographic footprint will make the Company easier to monitor and to manage.

### Maiden Lane 2 and 3
The FRBNY loans to the Maiden Lane 2 and Maiden Lane 3 vehicles will be repaid over time as the assets in those vehicles generate income and are sold or otherwise retired. According to current projections, it is expected that cash inflows from those assets will significantly exceed the principal and interest due on the outstanding FRBNY loans to those entities. Even under a very adverse set of assumptions, it is expected that the loans made by the FRBNY to each of the entities will be paid in full. Currently, the fair value of the Maiden Lane 2 assets is $15.8 billion versus a FRBNY loan balance of $14.9 billion. The fair value of Maiden Lane 3 assets is $23.4 billion versus a FRBNY loan balance of $16.6 billion.

### Taxpayer Recovery
Of course, the key question with respect to AIG is whether taxpayers will get all of their money back. Let me review the current prospects.

If the AIA and ALICO divestitures close as planned, proceeds of those sales are expected to be sufficient to repay the FRBNY Facility and redeem the AIA and ALICO Preferred Interests held by FRBNY almost in full.  Any shortfall will be made up by other non-core asset sales that the Company is currently pursuing.  It is likely that the FRBNY loans to Maiden Lane 2 and 3 will not only be fully repaid, but could also earn a profit.  As a result, it seems likely that all of the credit extended by the FRBNY to AIG will be repaid in full.

At current market prices, the common stock that the Series C preferred shares represents has value.[17]  Market conditions can change before the Series C Trustees have the opportunity to sell those shares and, given the number of shares that the Series C represents compared to shares currently held by the public, the sale itself may put some significant downward pressure on the trading price of AIG's common stock. That said, given today's market prices it seems that the Series C Preferred has value that will inure to the taxpayers' benefit.

That leaves the Treasury's Series E and Series F preferred equity interests (together, approximately $49 billion).   The recovery on the Series E and F will largely depend on the performance of the then-remaining businesses in the AIG portfolio after it completes its asset sales and how they are valued in the stock market.

With AIA and ALICO divested, AIG's core businesses will be centered on Chartis (its global property and casualty insurance business) and SunAmerica Financial Group (its U.S. life and retirement services business).  Chartis is one of the largest property and casualty insurers both in the U.S. and globally, and holds leading positions in both commercial insurance and specialty lines.  SunAmerica Financial is a leading player in the U.S. life insurance and annuity sector, and a provider of comprehensive retirement services — primarily in the education and healthcare markets.

The Company has work to do in order to return these businesses to their previous levels of profitability, and it will take time to repair fully the damage to their franchises, particularly in the United States.  That said the Company's progress to date is encouraging.  At Chartis, first quarter 2010 operating income was $879 million (versus $710 million in the first quarter of 2009).[18] Premium retention has risen, pricing has stabilized and employee turnover has reverted to normal levels.  At SunAmerica, first quarter 2010 operating income was $1.1 billion (versus a loss of $160 million in the first quarter of 2009).[19]   Aggregate assets under management in the retirement services businesses have increased and premiums in the life insurance businesses have stabilized.

While it remains unclear what the Treasury's ultimate recovery on its Series E and F preferred interests will be, it is clear that the prospects for the recovery on those interests have improved, and the government remains committed to protecting the value of these taxpayer investments. The steps taken during the crisis were solely to prevent further financial contagion, and

---

[17] The Series C Preferred shares are convertible into 79.8% of AIG's common stock.  At the closing price of $34.49 on May 25, 2010, the market capitalization of the publicly held AIG common stock, which represents 20.2% of the fully-diluted common equity (i.e., the amount not controlled by the Series C Trust), is approximately $5 billion.
[18] Before net realized capital gains and losses.
[19] Before net realized capital gains and losses.

ownership of AIG was a byproduct of these steps.  As the government exits it seeks to do so in a manner that recoups as much money for the taxpayer as possible.

The timing of the Treasury's ability to monetize its investments in AIG will depend on the pace at which the other steps of the resolution plan outlined earlier in my testimony are accomplished. Whether the taxpayers ultimately recover all of their investment or make a profit will depend on the Company's operating performance and market multiples for insurance companies at the time the government seeks to monetize the taxpayers' stock interests.   But AIG has made significant progress towards being able to garner standalone market confidence, without the government's continuing support.  And as soon as we are confident that the stability is durable we will move to exit the taxpayers' investments as promptly as practicable.

Thank you very much for your time.

**EXHIBIT B**
**to the Declaration of Jim Millstein**

**Troubled Asset Determination 11.9.08**



# DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

November 9, 2008

# DETERMINATION

WHEREAS, section 101 of the Emergency Economic Stabilization Act of 2008 (the "Act") authorizes the Secretary of the Treasury (the "Secretary") to establish the Troubled Asset Relief Program (the "TARP") to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with the Act and the policies and procedures developed and published by the Secretary;

WHEREAS, section 3(9)(A) of the Act defines the term "troubled assets" to mean residential or commercial mortgages and any securities, obligations, or other instruments that are based on or related to such mortgages, that in each case was originated or issued on or before March 14, 2008, the purchase of which the Secretary determines promotes financial market stability;

WHEREAS, section 3(9)(B) of the Act further defines the term "troubled assets" to mean any other financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System (the "Chairman"), determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress;

WHEREAS, the restructuring of a credit facility originally extended by the Federal Reserve Bank of New York to American International Group, Inc. ("AIG"), is required to stabilize that financial institution and to mitigate significant risks to the financial markets that would occur in the event of AIG's failure; and

WHEREAS, as Secretary, I have consulted with the Chairman, and we have jointly concluded that the purchase of $40 billion of preferred stock and warrants issued by AIG is necessary to restructure the AIG credit facility and promote financial market stability.

NOW, THEREFORE, I HEREBY DETERMINE that shares of preferred stock and warrants issued by AIG are financial instruments the purchase of which is necessary to promote financial market stability, and, as such, are "troubled assets," as that term is defined in section 3(9)(B) of the Act, eligible to be purchased under the TARP; and

I HEREBY direct that this determination be transmitted to the appropriate committees of Congress.

_Henry M. Paulson, Jr._

November 9, 2008

DEF000000124

**EXHIBIT C**
**to the Declaration of Jim Millstein**

**Series D Securities Purchase Agreement (Selected Portions)**

EX-10.1 3 y72888exv10w1.htm EX-10.1: SECURITIES PURCHASE AGREEMENT

**Exhibit 10.1**

**SECURITIES PURCHASE AGREEMENT**

**dated as of**

**November 25, 2008**

**between**

**American International Group, Inc.**

**and**

**United States Department of the Treasury**

# TABLE OF CONTENTS

PAGE

**ARTICLE 1**
**PURCHASE; CLOSING**

| | | |
|---|---|---|
| 1.1 | *Purchase* | 1 |
| 1.2 | *Closing* | 1 |
| 1.3 | *Interpretation* | 4 |

**ARTICLE 2**
**REPRESENTATIONS AND WARRANTIES**

| | | |
|---|---|---|
| 2.1 | *Disclosure* | 4 |
| 2.2 | *Representations and Warranties of the Company* | 5 |

**ARTICLE 3**
**COVENANTS**

| | | |
|---|---|---|
| 3.1 | *Consummation of Purchase and Charter Amendment* | 13 |
| 3.2 | *Expenses* | 15 |
| 3.3 | *Sufficiency of Authorized Common Stock; Exchange Listing* | 15 |
| 3.4 | *Certain Notifications Until Closing* | 15 |
| 3.5 | *Information and Confidentiality* | 15 |

**ARTICLE 4**
**ADDITIONAL AGREEMENTS**

| | | |
|---|---|---|
| 4.1 | *Purchase of Restricted Securities* | 16 |
| 4.2 | *Legends* | 16 |
| 4.3 | *Certain Transactions* | 18 |
| 4.4 | *Transfer of Purchased Securities, the Warrant and Warrant Shares* | 18 |
| 4.5 | *Registration Rights* | 18 |
| 4.6 | *Voting of Warrant Shares* | 30 |
| 4.7 | *Depositary Shares* | 30 |
| 4.8 | *Restriction on Dividends and Repurchases* | 30 |
| 4.9 | *Repurchase of Investor Securities* | 31 |
| 4.10 | *Executive Compensation* | 33 |
| 4.11 | *Restrictions on Lobbying* | 35 |
| 4.12 | *Restrictions on Expenses* | 35 |
| 4.13 | *Risk Management Committee* | 36 |
| 4.14 | *Dividend Rate Adjustment* | 36 |

i

PAGE

**ARTICLE 5**
**MISCELLANEOUS**

5.1     *Termination*                                                                36
5.2     *Survival of Representations and Warranties*                                  36
5.3     *Amendment*                                                                   37
5.4     *Waiver of Conditions*                                                        37
5.5     *Governing Law: Submission to Jurisdiction, Etc.*                             37
5.6     *Notices*                                                                     37
5.7     *Definitions*                                                                 *38*
5.8     *Assignment*                                                                  39
5.9     *Severability*                                                                39
5.10    *Entire Agreement*                                                            39
5.11    *No Third Party Beneficiaries*                                                39


SCHEDULE A:     ADDITIONAL TERMS AND CONDITIONS
SCHEDULE B:     CAPITALIZATION
SCHEDULE C:     LITIGATION
SCHEDULE D:     COMPLIANCE WITH LAWS
SCHEDULE E:     REGULATORY AGREEMENTS

LIST OF ANNEXES

ANNEX A:        FORM OF CERTIFICATE OF DESIGNATIONS FOR PREFERRED STOCK
ANNEX B-1:      FORM OF WAIVER FOR THE SENIOR EXECUTIVE OFFICERS AND THE SENIOR PARTNERS
ANNEX B-2:      FORM OF WAIVER FOR THE COMPANY
ANNEX C:        FORM OF OPINION
ANNEX D:        FORM OF WARRANT

ii

**INDEX OF DEFINED TERMS**

| Term | Location of Definition |
|------|------------------------|
| Affiliate | 5.7(b) |
| Agreement | Recitals |
| Appraisal Procedure | 4.9(c)(i) |
| Bankruptcy Exceptions | 2.2(d) |
| Benefit Plans | 1.2(d)(iv) |
| Board of Directors | 2.2(f) |
| Business Combination | 5.8 |
| business day | 1.3 |
| Capitalization Date | 2.2(b) |
| Certificate of Designations | 1.2(d)(iii) |
| Charter | 2.2(a) |
| Closing | 1.2(a) |
| Closing Date | 1.2(a) |
| Code | 2.2(n) |
| Common Stock | 2.1 |
| Company | Recitals |
| Company Financial Statements | 2.2(h) |
| Company Material Adverse Effect | 2.1(a) |
| Company Reports | 2.2(i)(i) |
| Company Subsidiary; Company Subsidiaries | 2.2(i)(i) |
| Control | 4.9(c)(iii) |
| control; controlled by; under common control with | 5.7(b) |
| Controlled Group | 2.2(n) |
| Credit Agreement | 1.2(b) |
| EESA | 1.2(d)(iv) |
| Equity Interests | 5.7(b) |
| ERISA | 2.2(n) |
| Exchange Act | 2.1(b) |
| Fair Market Value | 4.9(c)(ii) |
| FRBNY | 1.2(b) |
| Fund | 5.7(b) |
| GAAP | 2.1(a) |
| Governmental Entities | 1.2(c) |
| Holder | 4.5(k)(i) |
| Holders' Counsel | 4.5(k)(ii) |
| Indemnitee | 4.5(g)(i) |
| Information | 3.5(b) |
| Investor | Recitals |
| Junior Stock | 4.8(c) |
| knowledge of the Company; Company's knowledge | 5.7(c) |

iii

| Term | Location of Definition |
|------|------------------------|
| Last Fiscal Year | 2.1(b) |
| officers | 5.7(c) |
| Parity Stock | 4.8(c) |
| Pending Underwritten Offering | 4.5(l) |
| Permitted Repurchases | 4.8(a)(ii) |
| Piggyback Registration | 4.5(a)(iv) |
| Plan | 2.2(n) |
| Preferred Stock | Recitals |
| Previously Disclosed | 2.1(b) |
| Proprietary Rights | 2.2(u) |
| Purchase | Recitals |
| Purchase Price | 1.1 |
| Purchased Securities | Recitals |
| register; registered; registration | 4.5(k)(iii) |
| Registrable Securities | 4.5(k)(iv) |
| Registration Expenses | 4.5(k)(v) |
| Regulatory Agreement | 2.2(s) |
| Rule 144; Rule 144A; Rule 159A; Rule 405; Rule 415 | 4.5(k)(vi) |
| SEC | 2.1(b) |
| Securities Act | 2.2(a) |
| Selling Expenses | 4.5(k)(vii) |
| Senior Executive Officers | 4.10 |
| Senior Partners | 4.10 |
| Series C Preferred Stock | 2.2(b) |
| Share Dilution Amount | 4.8(a)(ii) |
| Shelf Registration Statement | 4.5(a)(ii) |
| Signing Date | 2.1(a) |
| Special Registration | 4.5(i) |
| Stockholder Proposal | 3.1(b) |
| subsidiary | 5.7(a) |
| Tax; Taxes | 2.2(o) |
| Transfer | 4.4 |
| Warrant | Recitals |
| Warrant Shares | 2.2(d) |

iv

### SECURITIES PURCHASE AGREEMENT

Recitals:

WHEREAS, American International Group, Inc. (the "**Company**") intends to issue in a private placement 4,000,000 shares of the Series D Fixed Rate Cumulative Perpetual Preferred Stock (the "**Preferred Stock**") and a warrant (the "**Warrant**", and together with the Preferred Stock, the "**Purchased Securities**") to purchase 53,798,766 shares of the Company's common stock and the United States Department of the Treasury (the "**Investor**") intends to purchase (the "**Purchase**") from the Company the Purchased Securities; and

WHEREAS, the Purchase will be governed by this Securities Purchase Agreement (including the Schedules and Annexes hereto) (the "**Agreement**").

**NOW, THEREFORE**, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

### Article 1
### Purchase; Closing

1.1 *Purchase*. On the terms and subject to the conditions set forth in this Agreement, the Company agrees to sell to the Investor, and the Investor agrees to purchase from the Company, at the Closing (as hereinafter defined), the Purchased Securities for $40,000,000,000 (the "**Purchase Price**").

1.2 *Closing*.

(a) On the terms and subject to the conditions set forth in this Agreement, the closing of the Purchase (the "**Closing**") will take place at the location specified in Schedule A, at the time and on the date set forth in Schedule A, or as soon as practicable thereafter, or at such other place, time and date as shall be agreed between the Company and the Investor. The time and date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**".

(b) Subject to the fulfillment or waiver of the conditions to the Closing in this Section 1.2, at the Closing (i) the Company will deliver the Preferred Stock and the Warrant, in each case as evidenced by one or more certificates dated the Closing Date and bearing appropriate legends as hereinafter provided for, (ii) upon verification of receipt of the Preferred Stock and Warrant at the Investor's custodian, the Investor shall pay the Purchase Price by instructing the Federal Reserve Bank of New York (the "**FRBNY**"), acting as fiscal agent of the Investor, to debit the Investor's General Account for the Purchase Price, and the Investor is hereby directed by the Company to pay the Purchase Price directly to the FRBNY as a credit to the account on the books of the FRBNY evidencing a prepayment in the amount of the Purchase Price of the Company's indebtedness to the FRBNY under the Credit Agreement dated as of September 22,

2008 between the Company and the FRBNY, as amended from time to time (the "**Credit Agreement**").

(c) The respective obligations of each of the Investor and the Company to consummate the Purchase are subject to the fulfillment (or waiver by the Investor and the Company, as applicable) prior to the Closing of the conditions that (i) any approvals or authorizations of all United States and other governmental, regulatory or judicial authorities (collectively, "**Governmental Entities**") required for the consummation of the Purchase shall have been obtained or made in form and substance reasonably satisfactory to each party and shall be in full force and effect and all waiting periods required by United States and other applicable law, if any, shall have expired and (ii) no provision of any applicable United States or other law and no judgment, injunction, order or decree of any Governmental Entity shall prohibit the purchase and sale of the Purchased Securities as contemplated by this Agreement.

(d) The obligation of the Investor to consummate the Purchase is also subject to the fulfillment (or waiver by the Investor) at or prior to the Closing of each of the following conditions:

(i) (A) the representations and warranties of the Company set forth in (x) Section 2.2(g) of this Agreement shall be true and correct in all respects as though made on and as of the Closing Date, (y) Sections 2.2(a) through (f) shall be true and correct in all material respects as though made on and as of the Closing Date (other than representations and warranties that by their terms speak as of another date, which representations and warranties shall be true and correct in all material respects as of such other date) and (z) Sections 2.2(h) through (v) (disregarding all qualifications or limitations set forth in such representations and warranties as to "**materiality**", "**Company Material Adverse Effect**" and words of similar import) shall be true and correct as though made on and as of the Closing Date (other than representations and warranties that by their terms speak as of another date, which representations and warranties shall be true and correct as of such other date), except to the extent that the failure of such representations and warranties referred to in this Section 1.2(d)(i)(A)(z) to be so true and correct, individually or in the aggregate, does not have and would not reasonably be expected to have a Company Material Adverse Effect and (B) the Company shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing;

(ii) the Investor shall have received a certificate signed on behalf of the Company by a senior executive officer certifying to the effect that the conditions set forth in Section 1.2(d)(i) have been satisfied;

(iii) the Company shall have duly adopted and filed with the Secretary of State of its jurisdiction of organization or other applicable Governmental Entity the certificate of designations for the Preferred Stock in substantially the form attached hereto as Annex A (the "**Certificate of Designations**") and such filing shall have been accepted;

2

(iv) (A) the Company shall have taken all necessary action to effect such changes to its compensation, bonus, incentive and other benefit plans, arrangements and agreements (including golden parachute, severance and employment agreements) (collectively, "**Benefit Plans**") with respect to the Senior Executive Officers (and to the extent necessary for such changes to be legally enforceable, each of the Senior Executive Officers shall have duly consented in writing to such changes), as may be necessary, during the period that the Investor owns any debt or equity securities of the Company acquired pursuant to this Agreement or the Warrant, in order to comply with Section 111(b) of the Emergency Economic Stabilization Act of 2008 ("**EESA**"), including the provisions for Systemically Significant Failing Institutions, as implemented by guidance or regulation thereunder, including Notice 2008-PSSFI, that has been issued and is in effect as of the Closing Date, including provisions prohibiting severance payments to the Senior Executive Officers, (B) the Company shall have taken all necessary action to effect such changes to its Benefit Plans with respect to the U.S.-based Senior Partners (and to the extent necessary for such changes to be legally enforceable, each of the U.S.-based Senior Partners shall have duly consented in writing to such changes), as may be necessary, during the period that the Investor owns any debt or equity securities of the Company acquired pursuant to this Agreement or the Warrant, in order to comply with the requirements in Section 4.10 of this Agreement, (C) the Company shall have used its best efforts to take all necessary action to effect such changes to its Benefit Plans with respect to the other Senior Partners (and to the extent necessary for such changes to be legally enforceable, to have each of the other Senior Partners duly consent in writing to such changes), as may be necessary, during the period that the Investor owns any debt or equity securities of the Company acquired pursuant to this Agreement or the Warrant, in order to comply with the requirements in Section 4.10 of this Agreement and (D) the Investor shall have received a certificate signed on behalf of the Company by a senior executive officer certifying to the effect that the conditions set forth in Section 1.2(d)(iv)(A) and (B) have been satisfied;

(v) each of the Company's Senior Executive Officers and the U.S-based Senior Partners shall have delivered to the Investor, and the Company shall have delivered to the Investor, a written waiver in the form attached hereto as Annex B-1 (for the Senior Executive Officers and Senior Partners) or Annex B-2 (for the Company) releasing the Investor and the Company, and in the case of the Company's waiver, releasing the Investor, from any claims that such Senior Executive Officers or Senior Partners may otherwise have against the Company or the Investor, and in the case of the Company, any claims it may have against the Investor, in each case as a result of the issuance, on or prior to the Closing Date, of any such guidance or regulations or as a result of the requirements in Section 4.10 of this Agreement which require the modification of, and the agreement of the Company hereunder to modify, the terms of any Benefit Plans with respect to the Senior Executive Officers and, as applicable, with respect to the Senior Partners to eliminate or modify any provisions of such Benefit Plans that would not be in compliance with the requirements of Section 111(b) of the EESA, including the provisions for Systemically Significant Failing Institutions, as implemented

3

by guidance or regulation thereunder, including Notice 2008-PSSFI, that has been issued and is in effect as of the Closing Date, and the requirements in Section 4.10 of this Agreement;

(vi) the Company shall have delivered to the Investor a written opinion from counsel to the Company (which may be internal counsel), addressed to the Investor and dated as of the Closing Date, in substantially the form attached hereto as Annex C;

(vii) the Company shall have delivered certificates in proper form or, with the prior consent of the Investor, evidence of shares in book-entry form, evidencing the Preferred Stock to the Investor or its designee(s); and

(viii) the Company shall have duly executed the Warrant in substantially the form attached hereto as Annex D and delivered such executed Warrant to the Investor or its designee(s).

1.3 *Interpretation*. When a reference is made in this Agreement to "Recitals," "Articles," "Sections," "Annexes" or "Schedules" such reference shall be to a Recital, Article or Section of, or Annex or Schedule to, this Agreement. The terms defined in the singular have a comparable meaning when used in the plural, and vice versa. References to "herein", "hereof", "hereunder" and the like refer to this Agreement as a whole and not to any particular section or provision, unless the context requires otherwise. The table of contents and headings contained in this Agreement are for reference purposes only and are not part of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation." No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel. All references to "$" or "dollars" mean the lawful currency of the United States of America. Except as expressly stated in this Agreement, all references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and to any section of any statute, rule or regulation include any successor to the section. References to a "business day" shall mean any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close.

**Article 2**
**Representations and Warranties**

2.1 *Disclosure*.

(a) "**Company Material Adverse Effect**" means a material adverse effect on (i) the business, results of operation or financial condition of the Company and its consolidated subsidiaries taken as a whole; *provided, however*, that Company Material Adverse Effect shall

4

In witness whereof, this Agreement has been duly executed and delivered by the duly authorized representatives of the parties hereto as of the date written below.

AMERICAN INTERNATIONAL GROUP, INC.

By:  /s/ David L. Herzog
     Name:  David L. Herzog
     Title:  Executive Vice President and
             Chief Financial Officer

UNITED STATES DEPARTMENT OF THE TREASURY

By:  /s/ Neel Kashkari
     Name:  Neel Kashkari
     Title:  Interim Assistant Secretary
             for Financial Stability

Date: November 25, 2008

**EXHIBIT D**
**to the Declaration of Jim Millstein**

**Treasury Department Press Release 3.2.09**

## THE LATEST

## Press Releases

Updated:March 2, 2009

**U.S. Treasury and Federal Reserve Board Announce Participation in AIG Restructuring Plan**

March 2, 2009
tg44

**Washington, DC –** The U.S. Treasury Department and the Federal Reserve Board today announced a restructuring of the government's assistance to AIG in order to stabilize this systemically important company in a manner that best protects the US taxpayer. Specifically, the government's restructuring is designed to enhance the company's capital and liquidity in order to facilitate the orderly completion of the company's global divestiture program.

The company continues to face significant challenges, driven by the rapid deterioration in certain financial markets in the last two months of the year and continued turbulence in the markets generally. The additional resources will help stabilize the company, and in doing so help to stabilize the financial system.

As significantly, the restructuring components of the government's assistance begin to separate the major non-core businesses of AIG, as well as strengthen the company's finances. The long-term solution for the company, its customers, the U.S. taxpayer, and the financial system is the orderly restructuring and refocusing of the firm. This will take time and possibly further government support, if markets do not stabilize and improve.

Given the systemic risk AIG continues to pose and the fragility of markets today, the potential cost to the economy and the taxpayer of government inaction would be extremely high. AIG provides insurance protection to more than 100,000 entities, including small businesses, municipalities, 401(k) plans, and Fortune 500 companies who together employ over 100 million Americans. AIG has over 30 million policyholders in the U.S. and is a major source of retirement insurance for, among others, teachers and non-profit organizations. The company also is a significant counterparty to a number of major financial institutions.

AIG operates in over 130 countries with over 400 regulators and the company and its regulated and unregulated subsidiaries are subject to very different resolution frameworks across their broad and diverse operations without an overarching resolution mechanism. Within the options available, the restructuring plan offers a multi-part approach which brings forward the ultimate resolution of the company, has received support from key stakeholders and the rating agencies, and provides the best possible protection for taxpayers in connection with this commitment of resources.

The steps announced today provide tangible evidence of the U.S. government's commitment to the orderly restructuring of AIG over time in the face of continuing market dislocations and economic deterioration. Orderly restructuring is essential to AIG's repayment of the support it has received from U.S. taxpayers and to preserving financial stability. The U.S. government is committed to continuing to work with AIG to maintain its ability to meet its obligations as they come due.

Treasury has stated that public ownership of financial institutions is not a policy goal and, to the extent public ownership is an outcome of Treasury actions, as it has been with AIG, it will work to replace government resources with those from the private sector to create a more focused, restructured and viable economic entity as rapidly as possible. This restructuring is aimed at accelerating this process. Key steps of the restructuring plan include:

**Preferred Equity**

The U.S. Treasury will exchange its existing $40 billion cumulative perpetual preferred shares for new preferred shares with revised terms that more closely resemble common equity and thus improve the quality of AIG's equity and its financial leverage. The new terms will provide for non-cumulative dividends and limit AIG's ability to redeem the preferred stock except with the proceeds from the issuance of equity capital.

**Equity Capital Commitment**

The Treasury Department will create a new equity capital facility, which allows AIG to draw down up to $30 billion as needed over time in exchange for non-cumulative preferred stock to the U.S. Treasury. This facility will further strengthen AIG's capital levels and improve its leverage.

**Federal Reserve Revolving Credit Facility**

The Federal Reserve will take several actions relating to the $60 billion Revolving Credit Facility for AIG established by the Federal Reserve Bank of New York (New York Fed) in September, 2008, to further the goals described above.

*Repayment by Preferred Stock Interests*

 The Revolving Credit Facility will be reduced in exchange for preferred interests in two special purpose vehicles created to hold all of the outstanding common stock of American Life Insurance Company (ALICO) and American International Assurance Company Ltd. (AIA), two life insurance holding company subsidiaries of AIG.  AIG will retain control of ALICO and AIA, though the New York Fed will have certain governance rights to protect its interests.  The valuation for the New York Fed's preferred stock interests, which may be up to approximately $26 billion, will be a percentage of the fair market value of ALICO and AIA based on valuations acceptable to the New York Fed.

*Securitization of Life Insurance Cash Flows*

 The New York Fed is authorized to make new loans under section 13(3) of the Federal Reserve Act of up to an aggregate amount of approximately $8.5 billion to special purpose vehicles (SPVs) established by domestic life insurance subsidiaries of AIG.  The SPVs would repay the loans from the net cash flows they receive from designated blocks of existing life insurance policies held by the parent insurance companies.  The proceeds of the New York Fed loans would pay down an equivalent amount of outstanding debt under the Revolving Credit Facility.  The amounts lent, the size of the haircuts taken by the New York Fed, and other terms of the loans would be determined based on valuations acceptable to the New York Fed.

*Restructuring of Other Terms*

 After the transactions described above, the total amount available under the Facility will be reduced from $60 billion to no less than $25 billion. In addition, the interest rate on the Facility, which is three-month LIBOR plus 300 basis points, will be modified by removing the existing floor (3.5 percent) on the LIBOR rate.  The Facility will continue to be secured by a lien on a substantial portion of AIG's assets, including the businesses AIG plans to retain.  The other material terms of the Facility remain unchanged.

*Issuance of Preferred Stock*

As required by the credit agreement governing the Revolving Credit Facility, AIG has agreed to issue on March 4, 2009, shares of convertible preferred stock representing an approximately 77.9% equity interest in AIG to an independent trust for the sole benefit of the United States Treasury.

AIG must be in compliance with the executive compensation and corporate governance requirements of Section 111 of the Emergency Economic Stabilization Act, including the most stringent limitations on executive compensation as required under the newest amendments to the Emergency Economic Stabilization Act.  Additionally, AIG must continue to maintain and enforce newly adopted restrictions put in place by the new management on corporate expenses and lobbying as well as corporate governance requirements.

###

**REPORTS**

- AIG Term Sheet

**EXHIBIT E**
**to the Declaration of Jim Millstein**

**Series F Securities Purchase Agreement (Selected Portions)**

EX-10.1 3 y76468exv10w1.htm EX-10.1: SECURITIES PURCHASE AGREEMENT

Exhibit 10.1

**SECURITIES PURCHASE AGREEMENT**

**dated as of**

**April 17, 2009**

**between**

**American International Group, Inc.**

**and**

**United States Department of the Treasury**

# TABLE OF CONTENTS

PAGE

ARTICLE 1
COMMITMENT; CLOSING

| | |
|---|---|
| 1.1 *Commitment* | 1 |
| 1.2 *Commitment Fee* | 2 |
| 1.3 *Draws on Commitment* | 2 |
| 1.4 *Termination of Investor's Obligations* | 2 |
| 1.5 *Commencement of Commitment* | 2 |
| 1.6 *Conditions to Closing of Each Drawdown* | 5 |
| 1.7 *Increases in Liquidation Preference* | 5 |
| 1.8 *Interpretation* | 6 |

ARTICLE 2
REPRESENTATIONS AND WARRANTIES

| | |
|---|---|
| 2.1 *Disclosure* | 6 |
| 2.2 *Representations and Warranties of the Company* | 7 |

ARTICLE 3
COVENANTS

| | |
|---|---|
| 3.1 *Consummation of Purchase and Charter Amendment* | 16 |
| 3.2 *Expenses* | 17 |
| 3.3 *Sufficiency of Authorized Common Stock; Exchange Listing* | 17 |
| 3.4 *Certain Notifications Until Closing* | 18 |
| 3.5 *Information and Confidentiality* | 18 |
| 3.6 *Additional Inspection Rights* | 19 |
| 3.7 *Compliance with the Employ American Workers Act* | 19 |
| 3.8 *Compliance with Guidelines of the Home Affordable Modification Program* | 19 |
| 3.9 *Exchange of Series F Preferred Stock* | 19 |
| 3.10 *Internal Controls* | 20 |

ARTICLE 4
ADDITIONAL AGREEMENTS

| | |
|---|---|
| 4.1 *Purchase of Restricted Securities* | 20 |
| 4.2 *Legends* | 21 |
| 4.3 *Certain Transactions* | 22 |
| 4.4 *Transfer of Purchased Securities, the Warrant and the Warrant Shares* | 22 |
| 4.5 *Registration Rights* | 22 |
| 4.6 *Voting of Warrant Shares* | 34 |

i

|  |  | PAGE |
|---|---|---|
| 4.7 | *Depositary Shares* | 34 |
| 4.8 | *Restriction on Dividends and Repurchases* | 35 |
| 4.9 | *Repurchase of Investor Securities* | 36 |
| 4.10 | *Executive Compensation* | 37 |
| 4.11 | *Restrictions on Lobbying* | 40 |
| 4.12 | *Restrictions on Expenses* | 40 |
| 4.13 | *Risk Management Committee* | 41 |
| 4.14 | *Dividend Rate Adjustment* | 41 |

ARTICLE 5
MISCELLANEOUS

| 5.1 | *Termination* | 41 |
| 5.2 | *Survival of Representations and Warranties* | 42 |
| 5.3 | *Amendment* | 42 |
| 5.4 | *Waiver of Conditions* | 42 |
| 5.5 | *Governing Law; Submission to Jurisdiction, Etc* | 42 |
| 5.6 | *Notices* | 42 |
| 5.7 | *Definitions* | 43 |
| 5.8 | *Assignment* | 44 |
| 5.9 | *Severability* | 44 |
| 5.10 | *Entire Agreement* | 44 |
| 5.11 | *No Third Party Beneficiaries* | 44 |

LIST OF SCHEDULES

SCHEDULE A:    ADDITIONAL TERMS AND CONDITIONS
SCHEDULE B:    CAPITALIZATION
SCHEDULE C:    LITIGATION
SCHEDULE D:    COMPLIANCE WITH LAWS
SCHEDULE E:    REGULATORY AGREEMENTS

LIST OF ANNEXES

ANNEX A:    FORM OF CERTIFICATE OF DESIGNATIONS FOR PREFERRED STOCK
ANNEX B:    FORM OF COMMENCEMENT OPINION
ANNEX C:    FORM OF DRAWDOWN OPINION
ANNEX D:    WARRANT

ii

## INDEX OF DEFINED TERMS

| Term | Location of Definition |
|---|---|
| Affiliate | 5.7(c) |
| Agreement | Recitals |
| Appraisal Procedure | 4.9(c)(i) |
| Available Amount | 1.1 |
| Bankruptcy Exceptions | 2.2(d) |
| beneficially owns | 1.4 |
| Benefit Plans | 1.5(e)(iv) |
| Board of Directors | 1.5(a) |
| Business Combination | 5.8 |
| business day | 1.8 |
| Capitalization Date | 2.2(b) |
| Certificate of Designations | 1.5(e)(iii) |
| Charter | 2.2(a) |
| Closing | 1.5(b) |
| Code | 2.2(n) |
| Commencement Date | 1.5(b) |
| Commitment | 1.1 |
| Commitment Fee | 1.2 |
| Commitment Fee Payment Date | 1.2 |
| Common Stock | Recitals |
| Company | Recitals |
| Company Financial Statements | 2.2(h) |
| Company Material Adverse Effect | 2.1(a) |
| Company Reports | 2.2(i)(i) |
| Company Subsidiary; Company Subsidiaries | 2.2(e)(ii) |
| Compensation Regulations | 4.10(a) |
| Control | 4.9(c)(iii) |
| control; controlled by; under common control with | 5.7(c) |
| Controlled Group | 2.2(n) |
| Covered Employee | 4.10(b)(3) |
| Credit Agreement | 3.5(a) |
| Drawdown Amount | 1.3 |
| Drawdown Date | 1.3 |
| EESA | 1.5(e)(iv) |
| employee benefit plan | 2.2(n) |
| Equity Interests | 5.7(b) |
| ERISA | 2.2(n) |
| Exchange Act | 1.4 |
| Fair Market Value | 4.9(c)(ii) |
| FP Retention Payment Amount | 1.1 |
| FRBNY | 3.5(a) |

iii

| Term | Location of Definition |
|---|---|
| Fund | 5.7(b) |
| Funds | 4.10(e) |
| GAAP | 2.1(a) |
| Governmental Entities | 1.5(d) |
| Holder | 4.5(k)(i) |
| Holders' Counsel | 4.5(k)(ii) |
| Indemnitee | 4.5(g)(i) |
| Information | 3.5(b) |
| Investor | Recitals |
| Junior Stock | 4.8(c) |
| knowledge of the Company; Company's knowledge | 5.7(d) |
| Last Fiscal Year | 2.1(b) |
| Maximum Amount | 1.1 |
| officers | 5.7(d) |
| Parity Stock | 4.8(c) |
| Pending Underwritten Offering | 4.5(l) |
| Permitted Repurchases | 4.8(a)(ii) |
| Piggyback Registration | 4.5(a)(iv) |
| Plan | 2.2(n) |
| Plans | 1.5(e)(iv) |
| Previously Disclosed | 2.1(b) |
| Proprietary Rights | 2.2(u) |
| Purchase | Recitals |
| Purchased Securities | Recitals |
| register; registered; registration | 4.5(k)(iii) |
| Registrable Securities | 4.5(k)(iv) |
| Registration Expenses | 4.5(k)(v) |
| Regulatory Agreement | 2.2(s) |
| Relevant Period | 1.5(e)(iv) |
| Rule 144; Rule 144A; Rule 159A; Rule 405; Rule 415 | 4.5(k)(vi) |
| SEC | 2.1(b) |
| Securities Act | 2.2(a) |
| Selling Expenses | 4.5(k)(vii) |
| Senior Executive Officers | 4.10(b) |
| Senior Partners | 4.10(b) |
| Series C Preferred Stock | 2.2(b) |
| Series C Preferred Stock Purchase Agreement | 4.5(a)(vi) |
| Series E Preferred Stock | 2.2(c) |
| Series E Preferred Stock Exchange Agreement | 4.5(a)(vi) |
| Series F Preferred Stock | Recitals |
| Share Dilution Amount | 4.8(a)(ii) |
| Shelf Registration Statement | 4.5(a)(ii) |

iv

| Term | Location of Definition |
|---|---|
| significant subsidiary | 2.2(a) |
| Signing Date | 2.1(a) |
| Special Registration | 4.5(i) |
| Stockholder Proposal | 3.1(b) |
| subsidiary | 5.7(a) |
| Tax; Taxes | 2.2(o) |
| Termination Date | 1.4 |
| Transfer | 4.4 |
| Transfer Agent | 1.7 |
| Trust | 1.4 |
| underwritten | 4.5(o) |
| Warrant | Recitals |
| Warrant Shares | 2.2(d) |

v

## SECURITIES PURCHASE AGREEMENT

Recitals:

WHEREAS, American International Group, Inc. (the "**Company**") intends to issue in a private placement 300,000 shares of the Series F Fixed Rate Non-Cumulative Perpetual Preferred Stock (the "**Series F Preferred Stock**") and a warrant (the "**Warrant**", and together with the Preferred Stock, the "**Purchased Securities**") to purchase 3,000 shares of the Company's common stock ("**Common Stock**"), and the United States Department of the Treasury (the "**Investor**") intends to purchase (the "**Purchase**") the Purchased Securities from the Company; and

WHEREAS, the Purchase will be governed by this Securities Purchase Agreement (including the Schedules and Annexes hereto) (the "**Agreement**").

**NOW, THEREFORE**, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

Article 1
**Commitment; Closing**

1.1 *Commitment*. The Investor hereby commits to provide to the Company on or after the Commencement Date (as defined below) and prior to the Termination Date (as defined below), on the terms and conditions set forth herein, immediately available funds in an amount up to, but not in excess of, the Available Amount, as determined from time to time (the "**Commitment**"); *provided* that in no event shall the aggregate amount funded under the Commitment exceed $29,835,000,000 (twenty nine billion eight hundred and thirty five million dollars) (it being understood that this amount is equal to $30,000,000,000 (thirty billion dollars) *minus* the FP Retention Payment Amount (as defined below)). "**FP Retention Payment Amount**" means $165,000,000 (one hundred and sixty five million dollars), which represents all retention payments made by AIG Financial Products Corp., AIG Trading Group Inc. and their respective subsidiaries to their employees in March 2009. The aggregate liquidation preference of the Series F Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 1.7. "**Available Amount**" means, as of any date of determination, (a) the Maximum Amount *minus* (b) the aggregate amount of financial assistance (other than funding under the Commitment) that the Investor has, following the Commencement Date, provided or agreed to provide to the Company, its subsidiaries or any special purpose vehicle established by or for the benefit of the Company or any of its subsidiaries, unless otherwise specified by the Investor, in its sole discretion, under the terms of any such financial assistance. "**Maximum Amount**" means, as of any date of determination, (a) $29,835,000,000 (twenty nine billion eight hundred and thirty five million dollars) *minus* (b) the aggregate amount of the liquidation preference of the Series F Preferred Stock as of that date.

1.2 *Commitment Fee.* The Company shall pay to the Investor from the operating cash flow of the Company an aggregate amount of $165,000,000 (the "**Commitment Fee**"), representing a fee payable to the Investor for the agreement by the Investor to enter into the Commitment. The Commitment Fee shall be payable to the Investor in three installment payments of $55,000,000 on each of the following dates: December 17, 2010, August 17, 2012 and April 17, 2014 (each such date, a "**Commitment Fee Payment Date**"); *provided* that if the aggregate amount of the Commitment Fee has not been paid on or prior to the Termination Date the amount equal to $165,000,000 *minus* the aggregate amount of the installment payments paid prior to the Termination Date shall be immediately payable on the Termination Date. In the event that any Commitment Fee Payment Date would otherwise fall on a day that is not a Business Day, the Commitment Fee Payment Date shall be the next Business Day.

1.3 *Draws on Commitment.* Subject to the fulfillment or waiver of the conditions to each drawdown as set forth in Section 1.6, at any time on or after the Commencement Date and prior to the Termination Date, the Company's Chief Executive Officer, Chief Financial Officer or Treasurer may, on behalf of the Company, request that the Investor provide immediately available funds to the Company in an amount up to but not in excess of the Available Amount (the "**Drawdown Amount**") as of the date of such request (the "**Drawdown Date**"); *provided* that each request shall be for an amount that equals or exceeds the lesser of (a) $1,000,000,000 (one billion dollars) and (b) the Available Amount as of the date of such request. Any such request shall be valid only if it is in writing and specifies the account of the Company to which such funds are to be transferred and contains a certification of the Company's Chief Executive Officer, Chief Financial Officer or Treasurer that the requested amount does not exceed the Available Amount as of the date of such request. The Investor shall provide such funds to the Company within five (5) business days of its receipt of such request or such shorter period as may be agreed to by the parties hereto.

1.4 *Termination of Investor's Obligations.* All of the Investor's obligations under and in respect of the Commitment shall terminate upon the earliest to occur of (i) April 17, 2014, (ii) the date on which the Available Amount equals zero, (iii) the date the Company becomes a debtor in a pending case under Title 11, United States Code and (iv) the date the AIG Credit Facility Trust (or any successor entity established for the sole benefit of the United States Treasury) (the "**Trust**") and the Investor do not, in the aggregate, beneficially own more than 50% of the aggregate voting power of the Company's voting securities (the "**Termination Date**"). "**Beneficially owns**" as used in this Agreement is as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended from time to time (the "**Exchange Act**").

1.5 *Commencement of Commitment.*

(a) On the terms and subject to the conditions set forth in this Agreement, the Company agrees to sell to the Investor the Purchased Securities in exchange for the Investor's entry into the Commitment, with an understanding that the Board of Directors of the Company (the "**Board of Directors**") has determined that the value of the Investor's entry into the Commitment is at least equal to the aggregate of (i) the Commitment Fee, (ii) the aggregate par value of the Series F Preferred Stock (iii) the value of the Warrant and (iv) the aggregate par value of the Warrant Shares less the aggregate Exercise Price (as defined in the Warrant) of the Warrant Shares (it being understood that the value received by the Company includes, but is not

2

limited to, consideration in the amount of the aggregate par value of the Warrant Shares less the aggregate Exercise Price of the Warrant Shares, such value received shall take the form of the Investor's entry into the Commitment, and so long as the par value of the Common Stock is $2.50 per share, the aggregate par value of the Warrant Shares less the aggregate Exercise Price of the Warrant Shares shall be reserved and credited on the books and records of the Company in a special reserve as directed by the Board of Directors).

(b) On the terms and subject to the conditions set forth in this Agreement, the closing of the Purchase (the "**Closing**") will take place at the location specified in <u>Schedule A</u>, at the time and on the date set forth in <u>Schedule A</u>, or as soon as practicable thereafter, or at such other place, time and date as shall be agreed between the Company and the Investor. The time and date on which the Closing occurs is referred to in this Agreement as the "**Commencement Date**".

(c) Subject to the fulfillment or waiver of the conditions to the Closing in this Section 1.5, at the Closing (i) the Company will deliver to the Investor the Series F Preferred Stock and the Warrant, in each case as evidenced by one or more certificates dated the Commencement Date and bearing appropriate legends as hereinafter provided for and (ii) upon verification of receipt of the Preferred Stock and the Warrant by the Investor's duly appointed custodian, the Investor shall consummate the Purchase.

(d) The respective obligations of each of the Investor and the Company to consummate the Purchase are subject to the fulfillment (or waiver by the Investor and the Company, as applicable) prior to the Closing of the conditions that (i) any approvals or authorizations of all United States and other governmental, regulatory or judicial authorities (collectively, "**Governmental Entities**") required for the consummation of the Purchase shall have been obtained or made in form and substance reasonably satisfactory to each party and shall be in full force and effect and all waiting periods required by United States and other applicable law, if any, shall have expired and (ii) no provision of any applicable United States or other law and no judgment, injunction, order or decree of any Governmental Entity shall prohibit the Purchase.

(e) The obligation of the Investor to consummate the Purchase is also subject to the fulfillment (or waiver by the Investor) at or prior to the Closing of each of the following conditions:

(i) (A) the representations and warranties of the Company set forth in Section 2.2 shall be true and correct in all material respects as though made on and as of the Commencement Date (other than representations and warranties that by their terms speak as of another date, which representations and warranties shall be true and correct in all material respects as of such other date) and (B) the Company shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Commencement Date;

(ii) the Investor shall have received a certificate signed on behalf of the Company by a senior executive officer certifying to the effect that the conditions set forth in Section 1.5(e)(i) have been satisfied;

3

(iii) the Company shall have duly adopted and filed with the Secretary of State of Delaware the certificate of designations for the Series F Preferred Stock in substantially the form attached hereto as Annex A (the "**Certificate of Designations**") and such filing shall have been accepted;

(iv) (A) the Company shall have taken all necessary action to effect such changes to its existing compensation, bonus, incentive and other benefit plans, arrangements and agreements (including golden parachute, severance and employment agreements) (collectively, "**Plans**", and together with all such plans, arrangements and agreements hereafter adopted, created or entered into, "**Benefit Plans**") with respect to the Senior Executive Officers (and to the extent necessary for such changes to be legally enforceable, each of the Senior Executive Officers shall have duly consented in writing to such changes), as may be necessary, during the Relevant Period, in order to comply with Section 111 of the Emergency Economic Stabilization Act of 2008, as amended (the "**EESA**"), including the provisions for Systemically Significant Failing Institutions, as implemented by guidance or regulation issued thereunder, including Notice 2008-PSSFI, that has been issued and is in effect as of the Commencement Date, including provisions prohibiting severance payments to the Senior Executive Officers, (B) the Company shall have taken all necessary action to effect such changes to its Plans with respect to the U.S.-based Senior Partners (and to the extent necessary for such changes to be legally enforceable, each of the U.S.-based Senior Partners shall have duly consented in writing to such changes), as may be necessary, during the Relevant Period, in order to comply with the requirements in Section 4.10 of this Agreement (as the requirements referred to in such Section are in effect as of the Commencement Date), (C) the Company shall have used its best efforts to take all necessary action to effect such changes to its Plans with respect to the other Senior Partners (and to the extent necessary for such changes to be legally enforceable, to have each of the other Senior Partners duly consent in writing to such changes), as may be necessary, during the Relevant Period, in order to comply with the requirements in Section 4.10 of this Agreement (as the requirements referred to in such Section are in effect as of the Commencement Date) and (D) the Investor shall have received a certificate signed on behalf of the Company by a senior executive officer certifying to the effect that the conditions set forth in Section 1.5(e)(iv)(A) and (B) have been satisfied; "**Relevant Period**" means the period in which any obligation of the Company arising from financial assistance provided under the Troubled Asset Relief Program remains outstanding (excluding any period during which the Federal government only holds warrants to purchase the Company's Common Stock);

(v) the Company shall have delivered to the Investor a written opinion from counsel to the Company (which may be internal counsel), addressed to the Investor and dated as of the Commencement Date, in substantially the form attached hereto as Annex B;

(vi) the Company shall have delivered certificates in proper form evidencing the Series F Preferred Stock to the Investor or its designee(s);

4

(vii) the Company shall have provided to the Investor, on the Commencement Date, a use of capital plan in a form reasonably satisfactory to the Investor that describes the expected use of the aggregate proceeds received under the Commitment; and

(viii) the Company shall have duly executed the Warrant in substantially the form attached hereto as Annex D and delivered such executed Warrant to the Investor or its designee(s).

1.6 *Conditions to Closing of Each Drawdown*. The obligation of the Investor to consummate any drawdown on or following the Commencement Date is subject to the fulfillment (or waiver by the Investor), on the applicable Drawdown Date, of each of the following conditions:

(a) on such Drawdown Date, the Company is not a debtor in a pending case under Title 11, United States Code;

(b) on such Drawdown Date, the Trust and the Investor beneficially own in the aggregate more than 50% of the aggregate voting power of the Company's voting securities;

(c) on or before such Drawdown Date, the Company shall have provided to the Investor an outline, in a form reasonably satisfactory to the Investor, of the expected uses by the Company of the Drawdown Amount for such Drawdown Date;

(d) the Investor shall have received a certificate signed on behalf of the Company by the Chief Executive Officer, Chief Financial Officer or Treasurer certifying to the effect that (A) as of such Drawdown Date, the representations and warranties of the Company set forth in Sections 2.2(a) relating solely to the due incorporation, valid existence and good standing of the Company and the last sentence thereof, 2.2(b), 2.2(c), 2.2(d) and 2.2(e)(i) are true and correct in all material respects as though made on and as of such Drawdown Date (other than representations and warranties that by their terms speak as of another date, which representations and warranties shall be true and correct in all material respects as of such other date, and the representations in Section 2.2(b), which speak only as of the Commencement Date) and (B) the Company shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to such Drawdown Date; and

(e) the Company shall have delivered to the Investor a written opinion from counsel to the Company (which may be internal counsel), addressed to the Investor and dated as of the Drawdown Date, in substantially the form attached hereto as Annex C;

1.7 *Increases in Liquidation Preference.* The aggregate liquidation preference of the outstanding shares of Series F Preferred Stock shall be automatically increased by an amount equal to the amount of each Drawdown pursuant to Section 1.3 that is actually funded by the Investor to the Company, and such increase shall occur simultaneously with such funding and shall be allocated ratably to the shares of Series F Preferred Stock. The Company shall duly mark its records and the transfer agent for the Series F Preferred Stock (the "**Transfer Agent**") shall complete the Schedule of Increases of the Series F Preferred Stock Liquidation Preference in the

5

form attached to the Series F Preferred Share Certificate (as defined in the Certificate of Designations) to reflect each increase in the liquidation preference of the Series F Preferred Stock contemplated herein (but, for the avoidance of doubt, such increase shall be effective regardless of whether the Company has properly marked its records or the Transfer Agent has properly completed such schedule).

1.8 *Interpretation*. When a reference is made in this Agreement to "Recitals," "Articles," "Sections," "Annexes" or "Schedules" such reference shall be to a Recital, Article or Section of, or Annex or Schedule to, this Agreement. The terms defined in the singular have a comparable meaning when used in the plural, and vice versa. References to "herein", "hereof", "hereunder" and the like refer to this Agreement as a whole and not to any particular section or provision, unless the context requires otherwise. The table of contents and headings contained in this Agreement are for reference purposes only and are not part of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation." No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel. All references to "$" or "dollars" mean the lawful currency of the United States of America. Except as expressly stated in this Agreement, all references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and to any section of any statute, rule or regulation include any successor to the section. References to a "business day" shall mean any day except Saturday, Sunday and any day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close.

Article 2
**Representations and Warranties**

2.1 *Disclosure*.

(a) **Company Material Adverse Effect**" means a material adverse effect on (i) the business, results of operation or financial condition of the Company and its consolidated subsidiaries taken as a whole; provided, however, that Company Material Adverse Effect shall not be deemed to include the effects of (a) changes after the date of this Agreement (the "**Signing Date**") in general business, economic or market conditions (including changes generally in prevailing interest rates, credit availability and liquidity, currency exchange rates and price levels or trading volumes in the United States or foreign securities or credit markets), or any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism, in each case generally affecting the industries in which the Company and its subsidiaries operate, (b) changes or proposed changes after the Signing Date in generally accepted accounting principles in the United States ("**GAAP**") or regulatory accounting requirements, or authoritative interpretations thereof, (c) changes or proposed changes after the Signing Date in securities, insurance and other laws of general applicability or related policies or interpretations of

6

In witness whereof, this Agreement has been duly executed and delivered by the duly authorized representatives of the parties hereto as of the date written below.

AMERICAN INTERNATIONAL GROUP, INC.

By: /s/ Anastasia D. Kelly
      Name: Anastasia D. Kelly
      Title: Vice Chairman

UNITED STATES DEPARTMENT OF THE TREASURY

By: /s/ Neel Kashkari
      Name: Neel Kashkari
      Title: Interim Assistant Secretary
             For Financial Stability

Date: April 17, 2009

**EXHIBIT F**
**to the Declaration of Jim Millstein**

**Initial Capital Use Plan (Filed Under Seal)**

**EXHIBIT G**
**to the Declaration of Jim Millstein**

**Drawdown Request No. 1 (Filed Under Seal)**

**EXHIBIT H**
**to the Declaration of Jim Millstein**

**Drawdown Request No. 2 (Filed Under Seal)**

**EXHIBIT I**
**to the Declaration of Jim Millstein**

**Drawdown Request No. 3 (Filed Under Seal)**

**EXHIBIT J**
**to the Declaration of Jim Millstein**

**Drawdown Request No. 4 (Filed Under Seal)**

**EXHIBIT K**
**to the Declaration of Jim Millstein**

**Outline for Drawdown Request No. 1 (Filed Under Seal)**

**EXHIBIT L**
**to the Declaration of Jim Millstein**

**Outline for Drawdown Request No. 2 (Filed Under Seal)**

**EXHIBIT M**
**to the Declaration of Jim Millstein**

**Outline for Drawdown Request No. 3 (Filed Under Seal)**

**EXHIBIT N**
**to the Declaration of Jim Millstein**

**Outline for Drawdown Request No. 4 (Filed Under Seal)**

**EXHIBIT O**
**to the Declaration of Jim Millstein**

**Series F Actual Use of Funds (Filed Under Seal)**