**EXHIBIT 2**
**to Defendants' Motion for Summary Judgment**

**Declaration of John R. Coleman**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY

           Plaintiff,

    -vs-

TIMOTHY F. GEITHNER, Secretary, U.S.
Department of the Treasury, and BOARD OF
GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

           Defendants.

CIVIL NO. 08-15147

HON. LAWRENCE P. ZATKOFF
MAG. JUDGE MONA K. MAJZOUB

_____/

## DECLARATION OF JOHN R. COLEMAN

I, John R. Coleman, declare as follows:

1.   I am a trial attorney with the Department of Justice, Civil Division, Federal Programs Branch, and have been a trial attorney since October 2, 2006.  I am lead counsel for defendants in Civil Action No. 08-15147.  I submit this declaration in support of Defendant's Motion for Summary Judgment.  The statements herein are based on my personal knowledge and information obtained in the course of my official duties.

2.   Attached hereto as Exhibit A is a true and correct copy of the Written Testimony of Secretary of the Treasury Timothy F. Geithner submitted to the House Committee on Oversight and Government Reform for its January 27, 2010 hearing entitled, "The Federal Bailout of AIG."

3.   Attached hereto as Exhibit B is a true and correct copy of the Written Testimony of former Secretary of the Treasury Henry M. Paulson, Jr. submitted to the House Committee on Oversight and Government Reform for its January 27, 2010 hearing entitled, "The Federal Bailout of AIG."

4.  Attached hereto as Exhibit C is Exhibit 21 of the Form 10-K filing of American

    International Group, Inc. ("AIG") with the Securities and Exchange Commission

    ("SEC") for the year ending December 31, 2009.  Exhibit 21 to AIG's 2009 Form 10-K is

    a listing of AIG's subsidiaries.  I obtained Exhibit 21 to AIG's 2009 Form 10-K from the

    SEC's EDGAR database on May 24, 2010.  It is publicly available at

    http://www.sec.gov/Archives/edgar/data/5272/000104746910001465/a2196553zex-

    21.htm.

5.  I have counted the direct and indirect subsidiaries of AIG listed in Exhibit 21.  According

    to my count, as of December 31, 2009, AIG had approximately 290 direct and indirect

    subsidiaries.

6.  Attached hereto as Exhibit D is a press release issued by AIG on December 1, 2009

    entitled, "Risk Specialists Companies Announces First Takaful Homeowners Product for

    U.S."

7.  Attached hereto as Exhibit E are selected portions AIG's Form 10-K filing with the SEC

    for the year ended December 31, 2009.  Specifically, Exhibit E consists of Item 1 in

    AIG's 2009 Form 10-K filing, which discusses AIG's consolidated business, and Item 6

    of AIG's 2009 Form 10-K filing, which presents selected financial data of AIG and its

    subsidiaries.  The entirety of AIG's Form 10-K filing with the SEC for the year ended

    December 31, 2009 is publically available at

    http://www.sec.gov/Archives/edgar/data/5272/000104746910001465/a2196553z10-

    k.htm#ca15501_item_1._business.

8.  AIG's Form 10-K filing with the SEC for the year ended December 31, 2009 states that AIG and its subsidiaries generated total premiums of $64.702 billion and total revenue of $96.004 billion. *See* Selected Financial Data at p. 33 (Ex. E).

9.  Attached hereto as Exhibit F is the United States Department of State's Background Note on the Kingdom of Saudi Arabia, available at http://www.state.gov/r/pa/ei/bgn/3584.htm, which I accessed on June 2, 2010. According to Exhibit F, Islam is the only recognized religion, and "the Holy Qur'an is the constitution of the country, which is governed on the basis of Islamic law (Shari'a)."

10. Attached hereto as Exhibit G is the United States Department of State's Background Note on the Kingdom of Bahrain, available at http://www.state.gov/r/pa/ei/bgn/26414.htm, which I accessed on May 25, 2010. According to Exhibit G, 98% of the population of the Kingdom of Bahrain is Muslim.

11. Attached hereto as Exhibit H is the United States Department of State's Background Note on Malaysia, available at http://www.state.gov/r/pa/ei/bgn/2777.htm, which I accessed on June 2, 2010. According to Exhibit H, over 60% of the population of Malaysia is Muslim.

12. Attached hereto as Exhibit I is the United States Department of State's Background Note on the Republic of Indonesia, available at http://www.state.gov/r/pa/ei/bgn/2748.htm, which I accessed on June 2, 2010. According to Exhibit I, over 86% of the population of Indonesia is Muslim.

13. Attached hereto as Exhibit J is a true and correct copy of selected portions of the deposition transcript of Michael Hsu, a former official of the United States Department of the Treasury.

14. Attached hereto as Exhibit K is a true and correct copy of selected portions of the deposition transcript of Jim Millstein, an official of the United States Department of the Treasury.

15. Attached hereto as Exhibit L is a true and correct copy of the United States Department of the Treasury's Third Tranche Report to Congress dated December 2, 2008, which was submitted pursuant to Section 105(b) of the EESA, 12 U.S.C. § 5215(b).  The Third Tranche Report is publically available at

http://www.financialstability.gov/latest/reportsanddocs.html.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 6/7/10.

John R. Coleman

**EXHIBIT A**
**to the Declaration of John R. Coleman**

**Geithner Prepared Remarks 1.27.10**

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

Secretary Timothy F. Geithner
Written Testimony
House Committee on Oversight and Government Reform
January 27, 2010

Chairman Towns, Ranking Member Issa, members of the Committee on Oversight and
Government Reform, thank you for the opportunity to testify today.

Let me begin by saying how important it is that the government's decisions regarding American
International Group, Inc. (AIG), as well as our broader strategy to address this financial crisis,
are subject to careful, independent review and analysis.

The decisions regarding AIG have already been the focus of thoughtful examinations by the
Government Accountability Office (GAO) and the Treasury Special Inspector General for the
Troubled Asset Relief Program (SIGTARP). They have also been the focus of many hearings by
this and other committees in Congress. And recently, with my full support, Chairman Bernanke
asked the GAO to conduct another review.

I welcome the Committee's attention to this issue. And the Administration will continue to work
closely with all relevant oversight bodies to make sure they have the information they need to
properly assess the government's actions.

The decision to rescue AIG was exceptionally difficult and enormously consequential.

At that time, our economy stood at the brink. The financial institutions that Americans rely on to
protect their savings, help finance their children's education, and help pay their bills were at risk
in ways few had ever experienced. The institutions and markets that businesses rely on to make
payroll, build inventories, fund new investments, and create new jobs were threatened like at no
time since the Great Depression. Across the country, people were rapidly losing confidence in
our financial system and in the government's ability to safeguard their economic future.

Action was required. The world was watching. And the government did not have the luxury of
time.

The steps the government took to rescue AIG were motivated solely by what we believed to be
in the best interests of the American people. We did not act because AIG asked for assistance.
We did not act to protect the financial interests of individual institutions. We did not act to help
foreign banks. We acted because the consequences of AIG failing at that time, in those
circumstances, would have been catastrophic for our economy and for American families and
businesses.

The government responded to this crisis in a coordinated way. The Federal Reserve Bank of
New York (FRBNY) did not act alone. It did not have the authority to do so. Every action it
took was under the direction of the Board of Governors of the Federal Reserve and in
cooperation with the Department of the Treasury and the Executive Branch.

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

Almost a year and a half removed from that terrible week in September 2008, I believe that the government's strategy regarding AIG was essential to our success in confronting the worst financial crisis in generations.  Government support for AIG and our financial system more broadly will ultimately cost taxpayers far less than many feared. And importantly, if Congress adopts the President's proposed Financial Responsibility Fee, American taxpayers will not have to pay one cent for the rescue of our financial system.

The government has not yet repaired all the extensive damage caused by this crisis.  For every American out of work, for every family facing foreclosure, and for every small business facing a credit crunch, this recession remains acute.  But everyone should realize that because of the actions of the Treasury and the Federal Reserve, the American financial system is now in a position where it can provide the credit necessary for economic growth, not stand in its way.  That is an important achievement necessary to lay the foundation for job growth and long-term economic stability.

## AIG and the Great Recession

The extraordinary events surrounding AIG took place during what was already the most severe financial crisis the United States and the global economy had seen since the Great Depression.  This context is critical to understanding the decisions we made.

Over the two decades preceding the crisis, the financial system had grown rapidly in an environment of economic growth and stability.  Ample credit and accommodative monetary policy around the world fueled an unsustainable housing boom in the first half of the last decade, and when the housing market inevitably turned down, starting in early 2006, the pace of mortgage defaults accelerated at an unprecedented rate.  By mid-2007, rising mortgage defaults were undermining the performance of many investments held by major financial institutions.

The current financial crisis began in the summer of 2007, gradually increasing in intensity and momentum over the course of the following year.  A series of major institutions, including Countrywide Financial, Bear Stearns, and IndyMac collapsed; and Fannie Mae and Freddie Mac, the largest players in the mortgage market, came under severe stress.

By September 2008, for the first time in 80 years, the United States risked a complete collapse of our financial system.  Americans were starting to question the safety of their money in the nation's banks, and a growing sense of panic was producing the classic signs of a generalized run.  Peoples' trust and confidence in the stability of major institutions, such as AIG, and the capacity of the government to contain the damage was vanishing.

AIG is one of the largest and most complex financial firms in the world.  At its peak, AIG had more than $1 trillion in assets, with its core businesses divided into two parts.  AIG was the largest provider of conventional insurance in the world, with approximately 75 million individual and corporate customers in over 130 countries.  Those insurance activities were organized in separate subsidiaries that were regulated and supervised independently.

2

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

More ominously, AIG's parent holding company, which was largely unregulated, engaged in a broad range of financial activities that strayed well beyond the business of life insurance and property and casualty insurance.  Operating in Wilton, Connecticut, and in London and Paris, AIG's Financial Products subsidiary (AIGFP) expanded rapidly into some of the newest, riskiest, and most complex parts of the financial system.

AIG used its strong credit rating, which was based on the strength and profitability of its insurance subsidiaries, to become one of the largest providers of credit and rate-of-return protection for other financial products.  Imprudent risk-taking in better times meant that, when the financial cycle turned, AIG had hundreds of billions of dollars in commitments without the capital and liquid assets to back them up.

Such excessive risk-taking should not have been allowed.  But it was.  Despite regulators in 20 different states being responsible for the primary regulation and supervision of AIG's U.S. insurance subsidiaries, despite AIG's foreign insurance activities being regulated by more than 130 foreign governments, and despite AIG's holding company being subject to supervision by the Office of Thrift Supervision (OTS), no one was adequately aware of what was really going on at AIG.

It is important to remember that the Federal Reserve, under the law, had no role in supervising or regulating AIG, investment banks, or a range of other institutions that were at the leading edge of crisis.  But Congress gave the Federal Reserve authority to provide liquidity to the financial system in times of severe stress.  Given that responsibility, the Federal Reserve had to act.  The Federal Reserve was the only fire station in town.

**Three Days in September**

On Friday, September 12, 2008, AIG officials informed the Federal Reserve and the Treasury that the company was facing potentially fatal liquidity problems.

As we obtained more details about AIG's financial condition, it became clear they had massive liquidity needs and faced huge losses.  Moreover, neither AIG's management nor any of AIG's principal supervisors -- including the state insurance commissioners and the OTS -- understood the magnitude of risks AIG had taken or the threat that AIG posed to the entire financial system.

That weekend, we brought together a team of people from the Federal Reserve, the New York State Insurance Department, and other experts to consider how to respond to AIG's problems. We addressed two basic questions:

1. How would the failure of AIG affect the financial system and the broader economy?
2. What were the options for containing the damage from an AIG failure?

By Sunday night, it became clear that we did not have a willing buyer for Lehman Brothers and that it would have to file for bankruptcy.  At that moment, we knew the crisis was about to intensify and spread more broadly.  We also knew AIG was highly vulnerable.  Nonetheless,

even with those new complications, it still seemed inconceivable that the Federal Reserve could or should play any role in preventing AIG's collapse.

The pressures that had caused the failure of Lehman Brothers and had brought AIG to the edge of collapse were symptoms of a broader adjustment moving swiftly through the financial system. In mid-September 2008, virtually all financial institutions were aggressively shedding risk that had been acquired over the long run-up to the crisis. Confidence was fragile and financial firms were trying to shore up their balance sheets by selling risky assets, reducing exposure to other financial institutions, and hoarding cash.

The impending Lehman bankruptcy added to that destructive cycle. Starting Sunday night, we saw not just an escalating run on banks, but also a broad withdrawal of funds from money market funds. These funds, always thought of as one of the safest investments for Americans, had begun trading at a discount. The run on these funds, in turn, severely disrupted the commercial paper market, which was a vital source of funding for many brick and mortar businesses.

The panic spread. Major institutions such as Washington Mutual and Wachovia experienced debilitating deposit withdrawals, eventually collapsed, and were acquired by competitors. These pressures spilled over to virtually all credit markets. Markets for instruments backed by consumer loans, such as auto loans, credit card receivables, and home-equity lines of credit collapsed, and in response banks tightened standards and sharply curtailed the issuance of new loans.

These events had real and immediate economic consequences. State and local governments halted public works projects because they couldn't obtain financing. School construction and renovation projects stopped. Hospitals postponed plans to add beds and equipment. Universities across the nation faced difficulty paying employees. High school students changed plans for college education, which suddenly appeared much more expensive. Ships that transport goods sat empty, in part because trade credit was simply unavailable. Factories were closing and millions of Americans were losing their jobs.

That was the world we were facing as the team of officials from the Federal Reserve and the New York State Insurance Department, working through the weekend, sought to answer those two basic questions about AIG.

*How would the failure of AIG affect the financial system and the broader economy?*

The team concluded that AIG's failure would be catastrophic. AIG was much larger than Lehman, it was spread across more countries than Lehman, and while it posed many of the same basic risks as Lehman, they were actually greater because of AIG's role as an insurance company.

AIG was one of the largest life and health insurers in the United States. AIG was also one of the largest property and casualty insurers in the United States, providing insurance to 180,000 small businesses and other corporate entities, which employ about 100 million people. History

4

Embargoed Until 10:00 a.m. EST, January 27, 2010

suggests that the withdrawal of a major underwriter from a particular market can have large, long-lasting effects on the households and businesses that rely on basic insurance protection.

AIG's failure directly threatened the savings of millions of Americans in ways that the Lehman bankruptcy did not.  AIG had provided financial protection to municipalities, pension funds, and other public and private entities through guaranteed investment contracts and products that protect participants in 401(k) retirement plans.

More broadly, if AIG had failed, the crisis almost certainly would have spread to the entire insurance industry.  Life insurance posed a particular threat.  Many life insurance products are effectively a form of long-term savings.  In the wake of a failure of AIG, policy holders could have sought to liquidate life insurance policies underwritten by AIG.  Doubts about the value of AIG life insurance products could have generated doubts about similar products provided by other life insurance companies, opening up an entirely new channel of contagion.

And, at that time, with the world economy under severe stress, the failure of a large, global, highly-rated financial institution that had written hundreds of billion dollars of insurance on a range of financial instruments would have dramatically amplified the crisis.  Investors around the world would have pulled back from funding, out of fear that other financial institutions would fail as well. Investors would have completely lost confidence in their ability to evaluate the financial sector and distinguish between firms that were viable and those that were not. Financial firms would have been forced into even more dramatic selling of assets.

This damage would have rapidly spread beyond Wall Street.  Borrowing costs for businesses would have increased dramatically, the value of pension funds would have fallen even more sharply, and job losses would have skyrocketed.  We were witnessing these effects in the wake of Lehman's failure.  The effects of the failure of AIG would have been much worse.

*What were the options for containing the damage from an AIG failure?*

As they were trying to evaluate the potential systemic risk of AIG, the team also explored, at my direction, a range of questions pertaining to containing the damage of AIG's failure: Was there a private sector solution that could have avoided putting taxpayer dollars at risk?  Were there effective existing mechanisms for limiting the damage from the failure of an insurance company like AIG?  If AIG were to fail, did we have the ability to limit contagion by providing support to other vulnerable institutions?

Because of the scale of AIG's losses and its financial needs, and because of the force of the storm enveloping the rest of the financial system, there was no capacity for a consortium of private firms to find the resources necessary to solve this without government assistance.

The team concluded that there was no effective existing mechanism to limit the damage of an AIG failure.  There was no legal tool available to handle the failure of AIG, comparable to the one available to the Federal Deposit Insurance Corporation for managing the orderly wind-down of a troubled bank.  In particular, we did not have the ability to quickly separate the stable underlying insurance businesses from the complex and dangerous financial activities carried out

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

primarily by the parent holding company.  Experts suggested that achieving that separation would take several years.

Without assistance, the AIG parent holding company would have been forced to file for bankruptcy protection like Lehman Brothers, resulting in default on over $100 billion of debt, as well as trillions of dollars of derivatives.  Such a filing would have caused insurance regulators in the United States and around the world to take over AIG's insurance subsidiaries, potentially disrupting households' and businesses' access to basic insurance.  And since many of the insurance products that AIG sold were a form of long-term savings, the seizure by local regulators of AIG's insurance subsidiaries could have delayed Americans' access to their savings, potentially triggering a run on other institutions.

Finally, the team concluded that the tools then available to the government to limit contagion in the wake of a failure of AIG to other insurance companies were not likely to be effective.

**The Choice**

On Monday, September 15, 2008, Fitch Ratings, Moody's Investors Service, and Standard and Poor's downgraded AIG's credit rating, which generated new demands for AIG to post $20 billion in additional collateral at a time when raising new cash was virtually impossible for the company.

It was clear to everyone that AIG did not have the resources to meet such obligations.

That left us with probably the most difficult choice we faced in this entire financial crisis: whether to rescue AIG by putting billions of taxpayer dollars at risk, or to let AIG fail and accept potentially catastrophic damage to the economy.

It is worth repeating that this choice fell to the Federal Reserve because Congress had given it unique responsibility and policy tools to protect the stability of the financial system. No one else could act in the same manner as the Federal Reserve. The only authority the President of the United States had, before Congress authorized the Emergency Economic Stabilization Act (EESA), was to close markets or declare a bank holiday. None of the agencies with supervisory authority over AIG -- the OTS, insurance commissioners, or regulators in Connecticut, London or Paris -- had any tools to help directly meet the funding requirements of AIG.  And no one in the federal government had a mechanism, as we do for banks, to provide for the orderly unwinding, dismantling, selling, or liquidating of a global, non-bank financial institution like AIG.

Aware that we were the only ones capable of acting, and convinced that the failure of AIG would be catastrophic for a financial system already in free fall, the Federal Reserve and the Treasury determined that it was in the best interests of the United States to rescue AIG in order to slow the panic and prevent further damage to our economy.

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

In that moment, making that wrenching decision, we could not be certain it would work.  We could not be confident, given the significant risks, that our actions would be enough or that our initial investment would be our last.

But we knew that not acting would have caused enormous damage, putting the country and the savings of millions of Americans and businesses in greater economic jeopardy.  Congress granted the Federal Reserve emergency authority precisely so that the government had some capacity to act to contain a systemic financial crisis. Not to have used that authority at that time would have been deeply irresponsible.

**The Restructuring of AIG**

On the afternoon of September 16, 2008, the Federal Reserve extended AIG an $85 billion line of credit, secured by a substantial proportion of the assets of AIG.  In addition to that collateral, U.S. taxpayers received a 79.9% ownership stake in what was still the world's largest insurance company.

The government's offer required AIG's CEO to step down.  Immediately after AIG agreed, the government began the process of changing the Board of Directors.  In designing our intervention, the government made sure that there were appropriately tough conditions that put the burden of failure on AIG's existing equity holders and management and started the process of designing a comprehensive restructuring plan.

From the beginning, it was clear that AIG needed a durable restructuring of its balance sheet and operations.  The credit provided on September 16th stemmed the bleeding by satisfying AIG's immediate liquidity needs, but that was not enough.  The problems at AIG were so deep that we had to design and implement a more permanent restructuring.

Of course, as Federal Reserve and Treasury officials were considering options for AIG in the second half of September and October, we were facing escalating challenges on many fronts. The actions we took to meet these challenges were without precedent. They were exceptionally complicated to design and execute.

Between September 16th and November 10th, the following actions were taken:
- To provide liquidity in U.S. dollars to overseas markets, the Federal Reserve expanded the scope and scale of its swap lines with central banks (Sep. 18, 24, 26; Oct. 14, 29).
- To stop the run on money market funds—key providers of short-term credit in our economy and investment vehicles for millions of Americans—Treasury established the Money Market Guarantee Program (Sep. 19).
- To protect the critical commercial paper market, the Federal Reserve established Asset-Backed Commercial Paper Money Market Fund Liquidity Facility (Sep. 19) and the Commercial Paper Funding Facility (Oct. 7).
- Washington Mutual was closed by the Office of Thrift Supervision and taken over by the FDIC (Sep. 25).

7

Embargoed Until 10:00 a.m. EST, January 27, 2010

- Congress passed EESA (Oct. 3).  EESA provided Treasury with the authority to purchase or guarantee assets in financial institutions.  EESA also increased the limit on FDIC deposit insurance to $250,000 per account.
- As part of an unprecedented coordinated action, the Federal Reserve and other central banks lowered short-term rates (Oct. 8).
- Treasury announced a plan to inject up to $250 billion of capital into U.S. financial institutions using EESA authority (Oct. 14).  As the first step of this plan, nine of the largest U.S. banks received $125 billion.
- To stabilize and restore confidence in U.S. financial institutions, the FDIC established the Temporary Liquidity Guarantee Program to guarantee senior bank debt and transaction accounts above $250,000 (Oct. 14).
- To provide additional liquidity for short-term credit markets, the Federal Reserve established the Money Market Investor Funding Facility (Oct. 21).
- The Federal Reserve lowered the Federal Funds rate further, to 1.0 percent (Oct. 29).

In this chaotic environment, AIG remained extremely vulnerable to the ongoing and intensifying financial crisis.  Falling asset prices generated both substantial losses on its balance sheet and increases in required payments to AIG's counterparties under the terms of its credit protection contracts.  These factors undermined market confidence in AIG and put its investment-grade credit rating again at risk.

Avoiding any downgrade of AIG's credit rating was absolutely essential to sustaining the firm's viability and protecting the taxpayers' investment. Under credit protection contracts that AIG had written and the terms of various funding arrangements, further downgrades would have forced additional payments to AIG's counterparties.

In addition, further rating downgrades of the AIG parent holding company would have significantly undermined confidence in its insurance subsidiaries.  People do not buy insurance products from firms they do not believe have the financial capacity to make good on those commitments over the long term – firms that they do not believe will pay out a life insurance policy or compensate a business if a factory burns down.  Credit ratings are central to how people judge that viability.

As Federal Reserve and Treasury staff considered options for AIG, it became clear that two things were needed.  First, AIG needed capital, not just a line of credit.  Second, the vulnerability of AIG's balance sheet to further deterioration in financial conditions generally, and in AIG's own financial position, had to be reduced.

On November 10, 2008, the Federal Reserve and the Department of the Treasury jointly announced a package of actions designed to achieve these goals.

To address AIG's need for capital and to reduce its leverage, the Treasury Department agreed to invest $40 billion in senior preferred stock of AIG under the authority recently granted by EESA. This investment provided new equity capital to AIG, a tool not available to the U.S. government at the time the initial credit line was provided in September 2008.

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

To reduce potential demands on AIG's balance sheet, the FRBNY helped establish and fund two new companies. The purpose of these companies was to purchase troubled assets that AIG had either acquired or insured, and to manage those assets for the benefit of the taxpayer. Purchasing those assets removed significant exposure from AIG's balance sheet and helped prevent the company from being downgraded and failing. One company, Maiden Lane II, purchased assets from AIG's insurance subsidiaries. The other company, Maiden Lane III, purchased securities from third parties and insured by AIG's Financial Products subsidiary. This vehicle is described in more detail later.

The Board of Governors of the Federal Reserve and the FRBNY worked closely together in establishing these vehicles. We believed then, and I continue to believe today, that without these transactions, AIG would have failed.

## AIG Counterparties

This brings me to the question that has been the source of so much understandable concern and frustration among the American people: the question of how we treated AIG's counterparties when we purchased securities in establishing Maiden Lane III.

While the financial contracts involved were complex, basically, AIG had agreed to insure the value of certain risky securities called multi-sector CDOs. The value of these securities was tied to pools of other assets, mostly subprime mortgages. As the financial crisis intensified, the value of the securities fell sharply and AIG incurred losses on these contracts and had to post collateral or make payments on the insurance.

To help understand this kind of contract, imagine AIG had provided insurance on the value of a tangible asset, such as a house, to the homeowner. If the price of the house fell, AIG would be required to post collateral, or essentially make a payment to the owner, equal to the decline in the value of the house. So, if the house was originally worth $200,000, and fell to $125,000, AIG had to give $75,000 to the homeowner as collateral and would incur a loss of the same amount. In addition, if AIG's credit rating fell, it would have to post even more collateral because the homeowner would be concerned about whether AIG could ultimately pay on the insurance.

The problem was AIG had written billions of dollars of such insurance without sufficient capital. AIG was fine as long as the prices of the assets they were insuring -- housing prices, in the example -- didn't fall, and their own credit rating didn't fall. But if either happened, it would be in trouble. In the fall of 2008, both events occurred. The value of the assets and AIG's credit rating fell, bringing AIG to the brink of bankruptcy.

By August, AIG had already paid out over $16 billion on contracts similar to the ones that Maiden Lane III was designed to address. When the Federal Reserve established the credit facility on September 16th, it knew that there would be substantial further demands of this sort. In the midst of the ongoing financial crisis, the underlying securities were likely to continue to fall in value.

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

We faced the following options:  let AIG default on these contracts; continue to lend AIG money so it could meet its obligations; or restructure these contracts so that we could stop the hemorrhaging, and potentially recover value for the taxpayers in the future.

If we had let AIG default, it would have gone into bankruptcy, triggering all the disastrous economic consequences we had feared since September.

If we had simply continued to lend AIG money, it could have made these payments, but this would have increased AIG's debt at a time when the rating agencies felt AIG already had too much leverage.  Again, any downgrade by the rating agencies would have threatened AIG's viability, driving more uncertainty and panic through the entire financial system.  And simply lending AIG the money to make payments could have been an open-ended commitment by taxpayers and would not have given them any assets in return.

Instead, we sought to restructure the contracts.  In order to cancel the insurance, we purchased the assets.  We paid the fair market value at that time for the assets.  Going back to the housing example, we paid $125,000 for a house that AIG had insured at $200,000.  The counterparties kept what they already had -- in our example, the $75,000 cash collateral.   Taken together, these two amounts essentially equaled par value.

This simple example does not capture the complexity of the transactions.  But, essentially what the Federal Reserve did was to purchase these securities (CDOs) with a par value of $62 billion for the purchase price of $27 billion.  In designing and implementing this transaction our objective was, as it always is, to get the best deal for the taxpayer.  We made judgments about these transactions carefully with the advice of outside counsel and financial experts.

However, we faced constraints.  The counterparties held insurance entitling them to full or par value of the contract.  We could not credibly threaten not to pay.  That meant putting AIG into bankruptcy.  At the time, we were working desperately to rebuild confidence in the financial system.  Any suggestion that we might let AIG fail would have worked against that vital aim.  We could not risk a protracted negotiation.  AIG's financial position was deteriorating rapidly and the prospect of a downgrade was imminent.

Some have suggested that the FRBNY should have used its regulatory authority, or some other means, to effectively coerce AIG's counterparties to accept concessions.  This was not a viable option either.  Once a company refuses to meet its full obligations to a customer, other customers will quickly find other places to do business. If we had sought to force counterparties to accept less than they were legally entitled to, market participants would have lost confidence in AIG and the ratings agencies would have downgraded AIG again.  This could have led to the company's collapse, threatened our efforts to rebuild confidence in the financial system, and meant a deeper recession, more financial turmoil, and a much higher cost for American taxpayers.

Operating with these constraints, the FRBNY and AIG initiated discussions with the major counterparties about whether they would be prepared to accept concessions on the prices of the securities.  We knew that the likelihood of success was modest.  Relatively quickly, and not

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

unexpectedly, we discovered that most firms would not, on any condition, provide such a concession.  One said that it was willing, but only if everybody else would agree to equal concessions on their prices.

In the end, the prices paid for the securities were their fair market value.  Because of the way the contracts worked, those prices were essentially equal to the difference between the par value of the CDOs and the payments that counterparties had already received.

Since Maiden Lane III purchased these securities, they have generated significant cash flows that have been used to pay down the FRBNY's loan by more than 25 percent.  We expect Maiden Lane III to pay the FRBNY back in full and to generate a substantial profit for U.S. taxpayers.

I strongly believe that strategy that the Federal Reserve and the Treasury pursued in establishing Maiden Lane III will generate a better outcome than any alternative.

**Disclosure**

I had no role in making decisions regarding what to disclose about the specific financial terms of Maiden Lane II and Maiden Lane III, and payments to AIGs counterparties.

On November 24th, President-elect Barack Obama announced that he intended to nominate me to be Secretary of the Treasury.  And after consulting with the Chairman of the Federal Reserve Board, the General Counsel of the Federal Reserve Board, the General Counsel of the FRBNY, the Chairman of the Board of Directors of the FRBNY, and the President-elect's advisers, I was asked to stay on as President of the Federal Reserve Bank of New York on an interim basis.  We made this judgment, in part, to protect the independence of the Federal Reserve, and, in part, because I was going to be spending the bulk of my time helping shape the President-elect's economic strategy.

Starting on November 24, I withdrew from involvement in monetary policy decision, policies involving individual institutions, and day-to-day management of FRBNY.  In accordance with established practice, my colleagues at the Federal Reserve Bank of New York, led by the First Vice President, Christine Cumming, carried out the day-to-day management decisions in close cooperation with their colleagues in at the Federal Reserve Board.

**The Broad Strategy**

More than a year has passed since the Federal Reserve and Treasury decided to rescue AIG, and substantial challenges remain for our financial system.  The economic crisis is not over.  Too many Americans face unemployment and too many families face the risk of foreclosure.  Many small banks are still experiencing significant losses.  That is contributing to a contraction in bank lending, which hurts small businesses especially.  Many parts of the financial system remain impaired.

But the broad strategy that the government adopted to contain the financial crisis has been remarkably effective at stemming the crisis and repairing the damage. This has been achieved at

11

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

a much lower cost in terms of taxpayer resources than many people anticipated.  I want to highlight some important facts that I don't think are well understood in the Congress or among the American people.

We have already recovered two-thirds of TARP investments in banks that my predecessor appropriately made in the fall of 2008.  And we have earned $17 billion on those investments through dividends and warrants.  That means that the American government has a dramatically smaller stake in banks than it had when I came into office, and the taxpayer is earning a profit on those investments.  The rapid repayment and income from TARP investments in banks are the direct result of government financial policies.  In February, the Administration announced a strategy to get private capital to replace public investments and carry the burden of repairing our financial system.  The stress tests of our largest financial institutions provided the transparency and confidence necessary for those institutions to raise substantial capital in private markets. Since the results of the stress tests were announced in May, these institutions have raised over $140 billion in high-quality capital and over $60 billion in non-guaranteed unsecured debt.

The Government is terminating the exceptional guarantee programs that were put in place during the darkest days of the fall of 2008.   In September, Treasury closed its Money Market Fund Guarantee Program at a profit.  At its peak, the program guaranteed $3.2 trillion in assets.  October was the last month to issue new debt under the FDIC's Temporary Liquidity Guarantee Program (TLGP).  That program has generated roughly $10 billion in net income.  The FDIC's TLGP transaction account guarantee program is scheduled to terminate in June.  In sum, guarantees through these exceptional programs have been reduced by more than 75 percent since this Administration took office.  The Capital Purchase Program, under which the bulk of support to banks was provided, has been closed.

The expected cost of financial stabilization efforts has fallen sharply since last year.  In President Obama's February Budget, the projected impact of financial stabilization efforts on the deficit was over $550 billion, including TARP and a reserve in case of continued instability.  Today, the Treasury expects that impact will be less than $120 billion.  If Congress adopts the President's proposed Financial Responsibility Fee, American taxpayers will not have to pay one penny of loss for the financial rescue.

Over the past year and a half, credit conditions for American consumers and businesses have improved.  Rates on consumer and business loans have fallen substantially.  Securities markets have reopened.  The housing market is more stable.

**AIG Today**

The situation of AIG today is substantially better than it was six or twelve months ago.  AIG's insurance subsidiaries are open for business and generating positive returns.  A number of those subsidiaries are attracting attention from external investors.  We anticipate that AIG will generate substantial proceeds from the sale of some of those entities.  Under the terms of the support we have provided, the first call on the proceeds from any sales of AIG's subsidiaries will be to repay the support that the U.S. government has provided to AIG.

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

It is also important to note that AIG has made substantial progress in winding down its Financial Products subsidiary, the division where AIG's problems were concentrated.  The gross value of AIGFP derivatives positions are down by more than half since September of 2008, and the company actually generated a profit in the last two quarters for which public information is available.

The U.S. government is still exposed to substantial risk of losses on its investments in AIG.  That risk was inevitable, was unavoidable and we cannot know at this point what the scale of those looses will be.  While the Federal Reserve's investments in Maiden Lane II and Maiden Lane III are likely to earn a profit, based on what we know now, the government is unlikely to fully recover the direct costs of Treasury's capital investments in AIG.  But, today, on the basis of a range of measures, those losses are likely to be substantially lower than we expected even just a few months ago.  And I want to emphasize if Congress adopts the President's proposed Financial Responsibility Fee, American taxpayers will not have to pay one cent for the rescue of our financial system.

Our latest audited financial statements show that, as of September 30, 2009, Treasury had invested $43 billion in AIG under TARP.  At that time, the "market value" of that investment was $13 billion, implying an expected loss of about $30 billion. We believe that, depending on market conditions and the future performance of AIG's businesses, the actual recovery on the Treasury's Preferred stock could be significantly higher.  We are confident that the FRBNY Credit Facility, its loans to Maiden Lane II and Maiden Lane III, and its preferred interests in certain of AIG's subsidiaries will be fully repaid, and FRBNY should earn a profit on its financial support of AIG.

**Financial Reform**

There are two central lessons from this crisis, both applicable to AIG, that have guided the President's proposals and the legislation now working through Congress to reform our financial system.

First, we need the ability to limit risk-taking for institutions that threaten the overall stability of the system and can cause extraordinary damage to the American economy.  We need this ability not just for banks, but for institutions that operate like banks.  These non-bank financial institutions have existed alongside banks and yet were not subject to those constraints in this crisis.  We also need to make sure that regulators have clear accountability and enforce sensibly-designed constraints on risk.

As I underscored earlier in my testimony, AIG, one of the largest and most complex financial institutions in the world, was allowed to take on an enormous level of risk that eventually threatened our entire financial system.  None of the regulators overseeing AIG or any of its subsidiaries understood anything close to the complete scope or scale of that risk.  And they clearly failed to contain it.  That failure of oversight must not happen again.

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

Second, the federal government must have the ability to resolve failing major financial institutions in an orderly manner, with losses absorbed not by taxpayers but by equity holders, unsecured creditors and, if necessary, other large financial institutions.

Under our proposed special resolution authority, a failing firm, such as AIG, would be placed into an FDIC-managed receivership.  The purpose of the receivership would be to unwind, dismantle, sell, or liquidate the firm in an orderly way that protects the financial system at the lowest cost to taxpayers.

Shareholders and other providers of regulatory capital of the failing firm would be forced to absorb losses, and managers responsible for the failure would be replaced.  Such an approach allows the government to reduce the risk that failure would result in panic by creditors and shareholders of other firms and helps maximize recovery of the value of the firm's assets.

I join the American people and Members of Congress in feeling a deep sense of outrage over this crisis, and over the fact that better tools were not available for the government to confront it.  For that reason, we should be working as hard as possible to make sure we put in place a set of financial reforms that would create a safer, more stable financial system, where opportunity can rise, risk can be mitigated, and where there are stronger protections for consumers, investors, and taxpayers.

**Conclusion**

It is very hard to judge a decision through the prism of hindsight and on the basis of the events that followed.  The crisis that unfolded was so severe, damaging the lives of so many Americans, that it's hard for people to imagine how things could have been dramatically worse if AIG had been allowed to default.  But I am personally very confident that if we not acted, the crisis would have caused more devastation and would have cost far more money.

Many Americans look at what happened with AIG, and the rest of the financial rescue, and simply ask:  Why was it necessary?  Why was it fair for the government to take taxpayer money and put it into an institution that had mismanaged itself to the edge of collapse?

The answer is that it was not fair, and it was not something our government should ever have to do.  But those Americans, those families and business owners who played by the rules and played no role in giving rise to this recession, should understand that if the government had failed to act, that failure would have unleashed substantially greater damage upon them.

There is an adage the President cites, that if your neighbor's house is burning, even if they've acted irresponsibly, your first priority is to put out the fire before it spreads to your own house.

If we had not put out the fire that was AIG, it would have spread.  And if you have any doubt, look at what happened after the failures of Lehman Brothers, Washington Mutual, Wachovia and Countrywide.   Look at the impact not just on the savings of Americans, which fell by over 10 trillion dollars, but on the thousands of businesses that had to close, and the millions of workers who were laid off.

14

**Embargoed Until 10:00 a.m. EST, January 27, 2010**

Some people have criticized the actions of the Federal Reserve and Treasury. They argue that we should have done nothing and that government intervention would sow the seeds for an even greater crisis.

I suspect such critics would have agreed with one of my predecessors, who eight decades ago, facing another moment of severe crisis said, "Liquidate labor, liquidate stocks, liquidate the farmer, liquidate real estate. It will purge the rottenness out of the system."

That crisis, of course, was the Great Depression. And the Great Depression became the Great Depression because Andrew Mellon was not alone in his beliefs. In 1930, many people thought that the financial system was going through a necessary adjustment, that the healthy process was to let the fire burn itself out, and that the best thing the government could do was to do nothing.

Today, few believe that. Today, we know that when confronting a severe economic crisis the government must respond with overwhelming force. That is the basic lesson of the Great Depression. That is the basic insight that informed every judgment we made. And that is the reason we are now emerging from a recession and not still in the midst of a second Great Depression.

In confronting this crisis, we learned from the past. Now we must learn from more recent failures, especially those that required AIG's rescue.

If we had stronger supervision and regulation in place, the government could have acted sooner to avert the crisis. If we had better crisis management tools in place, the government would have had better options. If we could have done it any differently, we would have done it differently.

Instead, we had no other choice. That is the basic lesson of this great recession.

In the future, when another generation of Americans confronts a new crisis born of new risks, the question will be whether we provided them the tools we did not have, whether we turned our collective outrage into concrete action, whether we passed comprehensive financial reform.

I hope we will.

Thank you.

**EXHIBIT B**
**to the Declaration of John R. Coleman**

**Paulson Prepared Remarks 1.27.10**

**Embargoed until:**
**10:00 a.m.**
**January 27, 2010**

### Testimony by Henry M. Paulson
### Before the House Committee on
### Oversight and Government Reform
### January 27, 2010, 10:00 a.m.

Chairman Towns, Ranking Member Issa, and distinguished Members of the Committee.

I appreciate the invitation to testify before the Committee.

I was Secretary of the Treasury in 2008.  In that role, I had the privilege to work with the many talented men and women in government and the private sector who labored to pull our nation back from the brink of disaster.

The decision to rescue AIG was correct, and I strongly supported it.  An AIG failure would have been devastating to the financial system and the economy.

Today's hearing relates to payments to AIG's credit default swap counterparties.  I was not involved in any of the decisions made with respect to those payments, nor was I involved in any of the decisions about AIG's public disclosure of those payments.  Those matters were handled by the Federal Reserve Bank of New York and the Federal Reserve Board.  They sought to make appropriate decisions on those matters, and I am confident that this review will show that they did.

*        *        *

I have limited knowledge on the topic of immediate interest to the Committee, but I will share my observations.

The basic facts of the government's involvement with AIG are well known.  I will recount them only in brief.  On September 16, 2008, the Federal Reserve Board, with the full support of Treasury, announced that it was authorizing the Federal Reserve Bank of New York to lend up to $85 billion to AIG pursuant to its authority under the Federal Reserve Act.  This loan was secured by AIG's ownership interest in its subsidiaries, and the U.S. government received a 79.9% equity interest in AIG.  Simultaneously, the CEO of AIG was replaced.  In early October, the New York Fed extended AIG another $37.8 billion in credit.

Unfortunately, these actions did not sufficiently abate the problems at AIG.  The company faced mounting losses, and it faced potential ratings downgrades which would trigger tens of billions of dollars in collateral calls which, without an equity infusion, would have led to its failure—a failure that would have collapsed our financial system and devastated millions of Americans.

To address these problems, on November 10, 2009, Treasury and the Federal Reserve announced plans to restructure AIG's finances.  Treasury announced that it would provide $40 billion from its TARP funds to stabilize AIG's capital structure, in return for

**Embargoed until:**
**10:00 a.m.**
**January 27, 2010**

senior preferred shares in AIG and stringent restrictions on golden parachutes and executive bonuses. At the same time, the Federal Reserve announced that it had authorized the New York Fed to set up two facilities which would handle certain AIG assets that were subject to the greatest risk of a devastating collateral call in the event of ratings downgrades.

The combined actions of Treasury and the Fed were effective. Despite AIG's breathtaking third-quarter losses, the company did not fail, and we avoided the disastrous consequences that would have accompanied such a failure. Although the road to complete recovery is slow and unemployment is still high, had AIG failed I believe we would have seen a complete collapse of our financial system, and unemployment easily could have risen to the 25% level reached in the Great Depression.

\*       \*       \*

The rescue of AIG was necessary, and I believe that we in government who acted to rescue it—including Secretary Geithner, Chairman Bernanke, and me—acted properly and in the best interests of our country. The reasons the rescue of AIG was necessary are well worth examining. I believe they are representative of the causes of other aspects of the crisis and indicate where regulatory reform is necessary. There are three reasons we needed to intercede to save AIG that stand out in my mind.

<u>First</u>, AIG was incredibly large and interconnected. It had a $1 trillion dollar balance sheet; a massive derivatives business that connected it to hundreds of financial institutions, businesses, and governments; tens of millions of life insurance customers; and tens of billions of dollars of contracts guaranteeing the retirement savings of individuals. If AIG collapsed, it would have buckled our financial system and wrought economic havoc on the lives of millions of our citizens.

<u>Second</u>, AIG was seriously under-regulated. Although, many of AIG's subsidiaries—including its insurance companies—were subject to varying levels of regulation, the parent entity was, for all practical purposes, an unregulated holding company. Consequently, there was no one regulator with a complete picture of AIG or a comprehensive understanding of how it was run. It was not until AIG started to fail, that regulators began to understand how badly managed it had been and how much the toxic aspects of parts of its business had infected otherwise healthy parts.

<u>Third</u>, AIG could not be effectively wound down. Unlike failed depository institutions which can be taken over by the FDIC with little or no harm to depositors, or the GSEs which were seamlessly placed into conservatorship by Treasury and the Federal Housing Finance Agency, there was—and is—no resolution authority available to wind down a failing institution like AIG. The only option is bankruptcy, a process that is simply not capable of protecting the millions of Americans whose finances are intertwined with AIG's.

**Embargoed until:**
**10:00 a.m.**
**January 27, 2010**

The government rescue of AIG in the Fall of 2008 was directly shaped by these realities. We had to protect the economy and the finances of millions of Americans; we could not have anticipated the magnitude of AIG's problems; and we had no way of letting it fail without disastrous collateral consequences.  We had to intervene, and I am thankful that we did.

I do not mean to say that I am happy that we needed to intervene.  Taxpayer money should not have to be spent to save a mismanaged and misguided enterprise.  But the fundamental problem lies not in *how* we intervened, but in *why* we needed to intervene.  We need to modernize our regulatory structure by creating a systemic risk regulator and resolution authority so any large firm that fails can be liquidated without de-stabilizing the system.  Large financial enterprises in this country will always play a role that is essential to our economic growth, but they must only be permitted to grow and interconnect throughout our economy under careful oversight and with a mechanism for allowing those connections to be broken safely.

Thank you, and I would be happy to answer any questions.

**EXHIBIT C**
**to the Declaration of John R. Coleman**

**AIG Subsidiaries**

EX-21 7 a2196553zex-21.htm EXHIBIT 21

American International Group, Inc., and Subsidiaries

Exhibit 21

**Subsidiaries of Registrant**

| As of December 31, 2009 | Jurisdiction of Incorporation or Organization | Percentage of Voting Securities held by Immediate Parent[1] |
|---|---|---|
| American International Group, Inc.[2] | Delaware | [3] |
| AIG Capital Corporation | Delaware | 100 |
| AIG Capital India Private Limited | India | 99.99[4] |
| AIG Global Asset Management Company (India) Private Limited | India | 99.99[5] |
| AIG Consumer Finance Group, Inc. | Delaware | 100 |
| AIG Holdings Andes I | Cayman Islands | 100 |
| AIG Holdings Andes II | Cayman Islands | 100 |
| Inversora Pichincha S.A. Compania de Financiamiento Comercial | Colombia | 89.98[6] |
| AIG Bank Polska S.A. | Poland | 99.92 |
| AIG Credit S.A. | Poland | 100 |
| Compania Financiera Argentina S.A. | Argentina | 100 |
| AIG Credit Corp. | Delaware | 100 |
| A.I. Credit Consumer Discount Company | Pennsylvania | 100 |
| A.I. Credit Corp. | New Hampshire | 100 |
| AICCO, Inc. | Delaware | 100 |
| AICCO, Inc. | California | 100 |
| AIG Credit Corp. of Canada | Canada | 100 |
| Imperial Premium Funding, Inc. | Delaware | 100 |
| AIG Equipment Finance Holdings, Inc. | Delaware | 100 |
| AIG Commercial Equipment Finance, Inc. | Delaware | 100 |
| AIG Commercial Equipment Finance Company, Canada | Canada | 100 |
| AIG Rail Services, Inc. | Delaware | 100 |
| AIG Finance Holdings, Inc. | New York | 100 |
| AIG Global Asset Management Holdings Corp. | Delaware | 100 |
| AIG Asset Management (Asia) Limited | Hong Kong | 100 |
| AIG Asset Management (U.S.), LLC | Delaware | 100 |
| AIG Asset Management Services, Inc. | Delaware | 100 |
| AIG Global Real Estate Investment Corp. | Delaware | 100 |
| AIG Ports America, Inc. | Delaware | 100 |
| Port America Holdings, Inc. | Delaware | 100 |
| Ports America, Inc. | Delaware | 100 |
| Ports Insurance Company, Inc. | New York | 100 |
| AIG Securities Lending Corp. | Delaware | 100 |
| Brazos Capital Management, L.P. | Delaware | 100 |
| PineBridge Capital Partners, LLC.* | Delaware | 100 |
| AIGCP RTA Advisors, LLC* | Delaware | 100 |
| PineBridge Global Investments LLC* | Delaware | 100 |
| PineBridge International Services LLC* | Delaware | 100 |
| PineBridge Investments LLC* | Delaware | 100 |
| PineBridge Securities LLC* | Delaware | 100 |
| American General Finance, Inc. | Indiana | 100 |
| American General Auto Finance, Inc. | Delaware | 100 |
| American General Financial Services of Alabama, Inc. | Delaware | 100 |
| American General Finance Corporation | Indiana | 100 |

| | | |
|---|---|---|
| Merit Life Insurance Co. | Indiana | 100 |
| MorEquity, Inc. | Nevada | 100 |
|     Wilmington Finance, Inc. | Delaware | 100 |
| Ocean Finance and Mortgages Limited | England | 100 |
| Yosemite Insurance Company | Indiana | 100 |

American International Group, Inc., and Subsidiaries

| As of December 31, 2009 | Jurisdiction of Incorporation or Organization | Percentage of Voting Securities held by Immediate Parent[(1)] |
|---|---|---|
| CommoLoCo, Inc. | Puerto Rico | 100 |
| International Lease Finance Corporation | California | 100 |
| AIG Federal Savings Bank | USA | 100 |
| AIG Financial Advisor Services, Inc. | Delaware | 100 |
| AIG Global Investment (Luxembourg) S.A. | Luxembourg | 100 |
| AIG Financial Products Corp. | Delaware | 100 |
| AIG-FP Matched Funding Corp. | Delaware | 100 |
| AIG Matched Funding Corp. | Delaware | 100 |
| Banque AIG S.A. | France | 90[(7)] |
| AIG Funding, Inc. | Delaware | 100 |
| AIG Global Services, Inc. | New Hampshire | 100 |
| AIG Israel Insurance Company Ltd. | Israel | 50.01 |
| AIG Kazakhstan Insurance Company S.A. | Kazakhstan | 60 |
| AIG Life Holdings (International) LLC | Delaware | 100 |
| AIG Star Life Insurance Co., Ltd. | Japan | 100 |
| American International Reinsurance Company, Ltd. | Bermuda | 100 |
| AIG Mexico Seguros Interamericana, S.A. de C.V. | Mexico | 100 |
| AIA Aurora LLC | Delaware | 99[(8)] |
| AIA Group Limited | Hong Kong | 100 |
| American International Assurance Company, Limited | Hong Kong | 100 |
| American International Assurance Bhd | Malaysia | 100 |
| AIA Takaful International Bhd | Malaysia | 100 |
| TH Central Holdings Limited | Hong Kong | 100 |
| AIA Australia Limited | Australia | 100 |
| AIA Financial Services Limited | Australia | 100 |
| American International Assurance Company (Bermuda) Limited | Bermuda | 100 |
| AIA (Vietnam) Life Insurance Company Limited | Vietnam | 100 |
| PT AIA Financial | Indonesia | 80[(9)] |
| PT Asta Indah Abadi | Indonesia | 100 |
| The Philippine American Life and General Insurance Company | Philippines | 99.78 |
| BPI-Philam Life Assurance Corporation | Philippines | 51 |
| Philam Equitable Life Assurance Company, Inc. | Philippines | 95 |
| Tata AIG Life Insurance Company Limited | India | 26 |
| Nan Shan Life Insurance Company, Limited* | Taiwan | 97.57 |
| AIG Edison Life Insurance Company | Japan | 90[(10)] |
| AIG Life Holdings (US), Inc. | Texas | 100 |
| AGC Life Insurance Company | Missouri | 100 |
| AIG Life of Bermuda, Ltd. | Bermuda | 100 |
| American General Life Insurance Company of Delaware | Delaware | 100 |
| American General Life and Accident Insurance Company | Tennessee | 100 |
| American General Bancassurance Services, Inc. | Illinois | 100 |
| American General Property Insurance Company | Tennessee | 100 |
| American General Life Insurance Company | Texas | 100 |
| AIG Enterprise Services, LLC | Delaware | 100 |
| American General Annuity Service Corporation | Texas | 100 |
| American General Life Companies, LLC | Delaware | 100 |
| The Variable Annuity Life Insurance Company | Texas | 100 |
| VALIC Retirement Services Company | Texas | 100 |
| American International Life Assurance Company of New York | New York | 100 |
| The United States Life Insurance Company in the City of New York | New York | 100 |
| Western National Life Insurance Company | Texas | 100 |

| | | |
|---|---|---|
| American General Assurance Company | Illinois | 100 |
| American General Indemnity Company | Illinois | 100 |

American International Group, Inc., and Subsidiaries

| As of December 31, 2009 | Jurisdiction of Incorporation or Organization | Percentage of Voting Securities held by Immediate Parent[1] |
|---|---|---|
| American General Investment Management Corporation | Delaware | 100 |
| American General Realty Investment Corporation | Texas | 100 |
| Knickerbocker Corporation | Texas | 100 |
| AIG Life Insurance Company (Switzerland) Ltd. | Switzerland | 100 |
| AIG Liquidity Corp. | Delaware | 100 |
| AIG Lotus LLC | Delaware | 100 |
| AIG Retirement Services, Inc. | Delaware | 100 |
| SunAmerica Life Insurance Company | Arizona | 100 |
| SunAmerica Annuity and Life Assurance Company | Arizona | 100 |
| SunAmerica Asset Management Corp. | Delaware | 100 |
| SunAmerica Capital Services, Inc. | Delaware | 100 |
| SunAmerica Investments, Inc. | Georgia | 100 |
| AIG Advisor Group, Inc. | Maryland | 100 |
| SagePoint Financial, Inc. | Delaware | 100 |
| Advantage Capital Corporation | New York | 100 |
| Financial Service Corporation | Delaware | 100 |
| FSC Securities Corporation | Delaware | 100 |
| Royal Alliance Associates, Inc. | Delaware | 100 |
| SunAmerica (Cayman) Co., Ltd. | Cayman Islands | 100 |
| First SunAmerica Life Insurance Company | New York | 100 |
| AIG Trading Group Inc. | Delaware | 100 |
| AIG International Inc. | Delaware | 100 |
| AIUH LLC | Delaware | 100 |
| Chartis Holdings, Inc. | Delaware | 100 |
| ALICO Holdings LLC | Delaware | 100 |
| American Life Insurance Company | Delaware | 100 |
| AIG Hayat Sigorta A.S | Turkey | 100 |
| ALICO Mexico, Compania de Seguros de Vida, S.A. de C.V. | Mexico | 99.9[11] |
| ALICO Akcioardslco Dnistvoza Zivotno Osiguranje | Serbia | 99.9[12] |
| ALICO Asigurari Romania SA | Romania | 98[13] |
| ALICO (Bulgaria) Zhivotozastrahovatelno Druzhestvo EAD | Bulgaria | 100 |
| ALICO Colombia Seguros de Vida, S.A. | Colombia | 94.99[14] |
| ALICO Compania de Seguros de Retiro | Argentina | 90[15] |
| ALICO Compania de Seguros de Vida, S.A. | Uruguay | 100 |
| ALICO Compania de Seguros S.A. | Argentina | 90[16] |
| ALICO, S.A. | France | 100 |
| ALICO European Holdings Limited | Ireland | 100 |
| "Master-D" ZAO | Russia | 100 |
| ZAO ALICO Insurance Company | Russia | 51[17] |
| ALICO Italia S.p.A. | Italy | 100 |
| ALICO Life International Limited | Ireland | 100 |
| ALICO Operations Inc. | Delaware | 100 |
| American Life Insurance Company (Pakistan) Limited | Pakistan | 66.47 |
| American Life Insurance Company Gestora de Fondos y Planos de Pensiones, S.A. | Spain | 100 |
| AMSLICO AIG Life poist'ovna a.s. | Slovakia | 100 |
| First American Polish Life Insurance & Reinsurance Company, S.A. | Poland | 100 |
| Hellenic ALICO Life Insurance Company Ltd. | Greece | 27.5 |
| International Technical and Advisory Services Limited | Delaware | 100 |
| Inversiones Interamericana S.A. | Chile | 99.99[18] |

| | | |
|---|---|---|
| La Interamericana Compania de Seguros de Vida S.A. | Chile | 100 |
| Inversiones Inversegven, C.A. | Venezuela | 50 |
| Seguros Venezuela, C.A. | Venezuela | 92.79 |

American International Group, Inc., and Subsidiaries

| As of December 31, 2009 | Jurisdiction of Incorporation or Organization | Percentage of Voting Securities held by Immediate Parent[1] |
|---|---|---|
| El Pacifico-Peruano Suiza Compania de Seguros S.A. | Peru | 14.94[19] |
| Pacifico S.A. Empresa Prestadora de Salud | Peru | 100 |
| El Pacifico Vida Compania y Reaseguros | Peru | 61.99[20] |
| Pharaonic American Life Insurance Company | Egypt | 74.88[21] |
| UBB-ALICO Insurance Company JSC | Bulgaria | 40 |
| American Security Life Insurance Company, Ltd. | Liechtenstein | 100 |
| Chartis Inc. | Delaware | 100 |
| Chartis U.S., Inc. | Delaware | 100 |
| AIG Risk Management, Inc. | New York | 100 |
| American Home Assurance Company | New York | 100 |
| American International Realty Corp. | Delaware | 31.5[22] |
| Chartis Non-Life Holding Company (Japan), Inc. | Delaware | 100 |
| Fuji Fire & Marine Insurance Company, Limited | Japan | 18.13[23] |
| American Fuji Fire & Marine Insurance Company | Illinois | 100 |
| Fuji Life Insurance Company, Limited | Japan | 100 |
| Fuji International Insurance Company Limited | United Kingdom | 100 |
| Pine Street Real Estate Holdings Corp. | New Hampshire | 31.47[24] |
| Audubon Insurance Company | Louisiana | 100 |
| Audubon Indemnity Company | Mississippi | 100 |
| Chartis Aerospace Insurance Services, Inc. | Georgia | 100 |
| Chartis Property Casualty Company | Pennsylvania | 100 |
| Chartis Insurance Agency, Inc. | New Jersey | 100 |
| Chartis Insurance Company of Canada | Canada | 100 |
| Commerce and Industry Insurance Company | New York | 100 |
| The Insurance Company of the State of Pennsylvania | Pennsylvania | 100 |
| Landmark Insurance Company | California | 100 |
| National Union Fire Insurance Company of Pittsburgh, Pa | Pennsylvania | 100 |
| Chartis Claims, Inc. | Delaware | 100 |
| Chartis Select Insurance Co. | Delaware | 100 |
| Chartis Excess Limited | Ireland | 100 |
| Chartis Specialty Insurance Company | Illinois | 70[25] |
| Lexington Insurance Company | Delaware | 70[26] |
| JI Accident & Fire Insurance Company, Ltd. | Japan | 50 |
| Mt. Mansfield Company, Inc. | Vermont | 100 |
| National Union Fire Insurance Company of Louisiana | Louisiana | 100 |
| National Union Fire Insurance Company of Vermont | Vermont | 100 |
| United Guaranty Corporation | North Carolina | 45.88[27] |
| AIG Centre Capital Group, Inc. | North Carolina | 100 |
| A.I.G. Mortgage Holdings Israel Ltd. | Israel | 100 |
| E.M.I. – Ezer Mortgage Insurance Company Ltd. | Israel | 100 |
| AIG United Guaranty Agenzia di Assicurazione S.R.L | Italy | 100 |
| AIG United Guaranty Insurance (Asia) Limited | Hong Kong | 100 |
| AIG United Guaranty Mexico, S.A. | Mexico | 99.99[28] |
| AIG United Guaranty Mortgage Insurance Company Canada | Canada | 100 |
| AIG United Guaranty Re Limited | Ireland | 100 |
| United Guaranty Insurance Company | North Carolina | 100 |
| United Guaranty Mortgage Insurance Company | North Carolina | 100 |
| United Guaranty Mortgage Insurance Company of North Carolina | North Carolina | 100 |
| United Guaranty Partners Insurance Company | Vermont | 100 |
| United Guaranty Residential Insurance Company | North Carolina | 75.03[29] |

| | | |
|---|---|---|
| United Guaranty Credit Insurance Company | North Carolina | 100 |
| United Guaranty Commercial Insurance Company of North Carolina | North Carolina | 100 |
| United Guaranty Mortgage Indemnity Company | North Carolina | 100 |

American International Group, Inc., and Subsidiaries

| As of December 31, 2009 | Jurisdiction of Incorporation or Organization | Percentage of Voting Securities held by Immediate Parent[1] |
|---|---|---|
| United Guaranty Residential Insurance Company of North Carolina | North Carolina | 100 |
| United Guaranty Services, Inc. | North Carolina | 100 |
| New Hampshire Insurance Company | Pennsylvania | 100 |
| Chartis Casualty Company | Pennsylvania | 100 |
| Granite State Insurance Company | Pennsylvania | 100 |
| Illinois National Insurance Co. | Illinois | 100 |
| New Hampshire Insurance Services, Inc. | New Hampshire | 100 |
| Risk Specialists Companies, Inc. | Delaware | 100 |
| A.I. Risk Specialists Insurance, Inc. | Massachusetts | 100 |
| Agency Management Corporation | Louisiana | 100 |
| The Gulf Agency, Inc. | Alabama | 100 |
| Design Professionals Association Risk Purchasing Group, Inc. | Illinois | 100 |
| Chartis International, LLC | Delaware | 100 |
| AIG Egypt Insurance Company S.A.E. | Egypt | 95.02 |
| AIG Global Trade & Political Risk Insurance Company | New Jersey | 100 |
| AIU Insurance Company | New York | 100 |
| Chartis Insurance Company China Limited | China | 100 |
| Chartis Taiwan Insurance Co., Ltd. | Taiwan | 100 |
| Chartis Africa Holdings, Inc. | Delaware | 100 |
| Chartis Kenya Insurance Company Limited | Kenya | 66.67 |
| Chartis Latin American Investments, LLC | Delaware | 100 |
| Chartis Central Europe & CIS Insurance Holdings Corporation | Delaware | 100 |
| Chartis Ukraine Insurance Company CJSC | Ukraine | 74.08[30] |
| UBB-AIG Insurance and Reinsurance Company JSC | Bulgaria | 40 |
| Chartis Memsa Holdings, Inc. | Delaware | 100 |
| AIG Hayleys Investment Holdings (Private) Ltd. | Sri Lanka | 100 |
| CHARTIS Insurance Limited | Sri Lanka | 100 |
| Chartis Iraq, Inc. | Delaware | 100 |
| CHARTIS Lebanon S.A.L. | Lebanon | 100 |
| Chartis Libya, Inc. | Delaware | 100 |
| Tata AIG General Insurance Company Limited | India | 26 |
| Chartis Overseas Limited | Bermuda | 100 |
| Chartis Overseas Association | Bermuda | 67[31] |
| Chartis Malaysia Insurance Berhad | Malaysia | 100 |
| Chartis North America, Inc. | New York | 100 |
| CHARTIS Sigorta A.S | Turkey | 100 |
| American International Underwriters del Ecuador S.A. | Ecuador | 100 |
| AIG Metropolitana Compania de Seguros y Reaseguros S.A. | Ecuador | 32.06[32] |
| Chartis Chile Compania de Seguros Generales S.A. | Chile | 100 |
| CHARTIS Cyprus Ltd | Cyprus | 100 |
| Chartis Europe Holdings Limited | Ireland | 29.52[33] |
| Chartis Europe, S.A. | France | 91.32[34] |
| Chartis Insurance Ireland Limited | Ireland | 100 |
| Chartis UK Holdings Limited | England | 100 |
| AIG Germany Holding GmbH | Germany | 100 |
| Chartis UK Financing Limited | England | 100 |
| Chartis UK Sub Holdings Limited | England | 100 |
| Chartis Insurance UK Limited | England | 100 |
| Chartis UK Services Limited | England | 100 |
| Chartis Insurance Hong Kong Limited | Hong Kong | 100 |
| Chartis Insurance (Thailand) Company Limited | Thailand | 100 |

| CHARTIS MEMSA Insurance Company Limited | United Arab Emirates | 100 |
| Chartis Philippines Insurance Inc. | Philippines | 100 |

American International Group, Inc., and Subsidiaries

| As of December 31, 2009 | Jurisdiction of Incorporation or Organization | Percentage of Voting Securities held by Immediate Parent[1] |
|---|---|---|
| Chartis Seguros Brasil S.A. | Brazil | 100 |
| Chartis Seguros Columbia S.A. | Colombia | 100 |
| Chartis Seguros Guatemala, S.A. | Guatemala | 100 |
| Chartis Seguros, El Salvador, Sociedad Anonima | El Salvador | 99.99[35] |
| Chartis Seguros Uruguay S.A. | Uruguay | 100 |
| Chartis Uganda Insurance Company Limited | Uganda | 100 |
| Chartis Vida, Sociedad Anonima, Seguros de Personas | El Salvador | 100 |
| Chartis Vietnam Insurance Company Limited | Vietnam | 100 |
| Hellas Insurance Co. S.A. | Greece | 50 |
| Inversiones Segucasai, C.A. | Venezuela | 50 |
| C.A. de Seguros American International | Venezuela | 93.72 |
| Johannesburg Insurance Holdings (Proprietary) Limited | South Africa | 100 |
| Chartis South Africa Limited | South Africa | 100 |
| Chartis Life South Africa Limited | South Africa | 100 |
| Latin American Investment Guarantee Company Ltd. | Bermuda | 50 |
| PT Chartis Insurance Indonesia | Indonesia | 61.01 |
| Richmond Insurance Company Limited | Bermuda | 100 |
| Richmond Insurance Company (Barbados) Limited | Barbados | 100 |
| Underwriters Adjustment Company, Inc. | Panama | 100 |
| Uzbek American Insurance Company | Uzbekistan | 51 |
| Arabian American Insurance Company (Bahrain) E.C | Bahrain | 100 |
| CHARTIS Takaful-Enaya B.S.C.(c) | Bahrain | 100 |
| Chartis Insurance Company — Puerto Rico | Puerto Rico | 100 |
| La Meridional Compania Argentina de Seguros S.A. | Argentina | 95[36] |
| Chartis Technology and Operations Management Corporation | New York | 100 |
| Travel Guard Worldwide, Inc. | Wisconsin | 100 |
| Livetravel, Inc. | Wisconsin | 100 |
| Travel Guard Group, Inc. | Delaware | 100 |
| Travel Guard Group Canada, Inc. | Canada | 100 |
| Delaware American Life Insurance Company | Delaware | 100 |
| MG Reinsurance Limited | Vermont | 100 |
| PineBridge Investments Schweiz GmBH | Switzerland | 100 |

[*]  In connection with AIG's asset disposition plan, through February 26, 2010, AIG has entered into agreements to sell this company.

[1]  Percentages include directors' qualifying shares.

[2]  Substantially, all subsidiaries listed are consolidated in the accompanying financial statements. Certain subsidiaries have been omitted from the tabulation. The omitted subsidiaries, when considered in the aggregate as a single subsidiary, do not constitute a significant subsidiary.

[3]  The common stock is owned approximately 10.5 percent by C.V. Starr & Co., Inc., Edward E. Matthews, Maurice R. Greenberg Starr International Company, Inc., Universal Foundation, Inc. (according to an amended Schedule 13D dated June 5, 2009 and filed on that date).

[4]  Also owned 0.01 percent by PineBridge Investments LLC.

[5]  Also owned 0.01 percent by AIG Capital Corporation.

[6]  Also owned 10 percent by AIG Andes Holdings I.

[7]  Also owned 10 percent by AIG Matched Funding Corp.

[8]  Also owned 1 percent by American International Group, Inc.

(9)        *Also owned 20 percent by PT Asta Indah Abadi.*

(10)       *Also owned 10 percent by a subsidiary of AIG Financial Assurance Japan K.K.*

(11)       *Also owned less than 0.01 percent by International Technical and Advisory Services Limited.*

(12)       *Also owned 0.1 percent by International Technical and Advisory Services Limited.*

American International Group, Inc., and Subsidiaries

(13)   Also owned 1 percent by International Technical and Advisory Services Limited and 1 percent by Societatea de Asigurari AIG Romania SA.

(14)   Also owned 5.01 percent by International Technical and Advisory Services Limited.

(15)   Also owned 10 percent by International Technical and Advisory Services Limited.

(16)   Also owned 10 percent by International Technical and Advisory Services Limited.

(17)   Also owned 49 percent by American Life Insurance Company.

(18)   Also owned 0.01 percent by International Technical and Advisory Services Limited.

(19)   Also owned 2.77 percent by Chartis Overseas Limited and 2.38 percent by Inversiones Interamericana S.A.

(20)   Also owned 38.01 percent by American Life Insurance Company.

(21)   Also owned 7.5 percent by Chartis Egypt Insurance Company S.A.E.

(22)   Also owned by 9 other AIG subsidiaries.

(23)   Also owned 10.36 percent by AIU Insurance Company, 2.76 percent by American Home Assurance Company, 7.73 percent by Chartis Europe, S.A., and 2.58 percent by Chartis Overseas Limited. On January 21, Chartis International, LLC announced that it had reached an agreement, subject to regulatory approval, to increase it stake from 41.55 percent to 54.65 percent.

(24)   Also owned by 9 other AIG subsidiaries.

(25)   Also owned 20 percent by the Insurance Company of the State of Pennsylvania and 10 percent by Chartis Property Casualty Company.

(26)   Also owned 20 percent by the Insurance Company of the State of Pennsylvania and 10 percent by Chartis Property Casualty Company.

(27)   Also owned 35.12 percent by New Hampshire Insurance Company and 19 percent by The Insurance Company of the State of Pennsylvania.

(28)   Also owned less than 0.01 percent by United Guaranty Services, Inc.

(29)   Also owned 24.97 percent by United Guaranty Residential Insurance Company of North Carolina.

(30)   Also owned 20.18 percent by American International Group, Inc. and 5.73 percent by Steppe Securities, L.L.C.

(31)   Also owned 12 percent by New Hampshire Insurance Company, 11 percent by National Union Fire Insurance Company of Pittsburgh, Pa., and 10 percent by American Home Assurance Company.

(32)   Also owned 19.72 percent by Chartis Overseas Association.

(33)   Also owned 66.92 percent by Chartis Overseas Association, 2.01 percent by Chartis Bermuda Limited, and 1.55 percent by Chartis Luxembourg Financing Limited.

(34)   Also owned 8.68 percent by Chartis Overseas Limited.

(35)   Also owned 0.01 percent by Chartis Latin America Investments, LLC.

(36)   Also owned 4.99 percent by Chartis Global Management Company Limited.

**EXHIBIT D**
**to the Declaration of John R. Coleman**

**AIG Press Release 12.1.08**

# News



Contact:        Peter Tulupman
                Public Relations Manager
                (212) 770-3141

## RISK SPECIALISTS COMPANIES ANNOUNCES FIRST TAKAFUL HOMEOWNERS

## PRODUCT FOR U.S.

NEW YORK, December 1, 2008 -- Risk Specialists Companies, Inc. (RSC), a subsidiary of AIG Commercial Insurance, today announced it is introducing a Takaful Homeowners Policy, the first installment in Lexington Takaful Solutions[sm], a series of Shari'ah-compliant (Takaful) product offerings in the U.S. The newly announced Takaful products are compliant with key Islamic finance tenets and based on the concept of mutual insurance.

    "The introduction of Takaful products in the U.S. represents an important and emerging growth opportunity for AIG Commercial Insurance. We are pleased to offer socially responsible solutions to this segment of the domestic market," said Matthew F. Power, President, Risk Specialists Companies, Inc.

    The Takaful Homeowners Policy is underwritten through RSC member company A.I. Risk Specialists Insurance, Inc., in conjunction with Lexington Insurance Company and in association with AIG Takaful Enaya. Headquartered in Bahrain, AIG Takaful Enaya was established in 2006 to provide a range of Takaful products, including accident and health, auto, energy, property and casualty products. AIG Takaful Enaya is licensed by the Central Bank of Bahrain and its Shari'ah Supervisory Board is composed of well known Shari'ah scholars Sheikh Nizam Yaquby, Dr. Mohammed Ali Elgari and Dr. Muhammad Imran Usmani.

    "This is truly a global effort on the part of AIG" said Abdallah Kubursi, Global Head of AIG Takaful Enaya. "Being first to market in the U.S. is a testament to Lexington, RSC and AIG Takaful Enaya's commitment to offer consumers greater choice based not only on need but also social preference."

    According to Ernst & Young's 2008 World Takaful Report, Takaful was estimated to be a $5.7 billion market globally with over 130 providers in 2006. The Takaful market is estimated to be in excess of $10 billion by 2010.

    The Takaful Homeowners Policy builds on LexElite[®], the highly successful Homeowners policy from Lexington Insurance Company that combines broad coverages, high limits and individually tailored coverages to thousands of customers throughout the United States. Takaful Homeowners Policy is available in all 50 states.

    Risk Specialists Companies, Inc. is a leader in the U.S. surplus lines brokerage industry, providing access to specialty casualty, property and personal lines insurance from Lexington Insurance Company and other AIG companies.

*-more-*

**Risk Specialists Companies Announces First Takaful Homeowners Product for U.S.**
**December 1, 2008**
Page two

For more information on Takaful Homeowners Policy, contact Jim Crain at 617-345-4105 or jim.crain@aig.com.

AIG Commercial Insurance serves a wide range of entities from multinational and middle-market companies to non-profit organizations and small entrepreneurs. Its extensive product offerings include general and excess liability, property, management and professional liability, workers' compensation, accident and health, environmental liability, and integrated global programs for multinational companies. AIG Commercial Insurance also maintains dedicated industry groups to serve the insurance needs of the aviation, energy, marine, healthcare, construction, financial institution, real estate and education sectors.

AIG Commercial Insurance is the marketing name for the domestic commercial property casualty insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com. All products are written by insurance company subsidiaries of AIG Commercial Insurance Group, Inc. Coverage may not be available in all jurisdictions and is subject to actual policy language. Non-insurance products and services may be provided by independent third parties.

American International Group, Inc. (AIG), a world leader in insurance and financial services, is the leading international insurance organization with operations in more than 130 countries and jurisdictions. AIG companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer. In addition, AIG companies are leading providers of retirement services, financial services and asset management around the world. AIG's common stock is listed on the New York Stock Exchange, as well as the stock exchanges in Ireland and Tokyo.

# # #

**EXHIBIT E**
**to the Declaration of John R. Coleman**

**AIG 2009 Form 10-K (Selected Portions)**

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

(Mark One)

☑ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2009

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number 1-8787

# American International Group, Inc.

### (Exact name of registrant as specified in its charter)

| Delaware | 13-2592361 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 70 Pine Street, New York, New York | 10270 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (212) 770-7000

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, Par Value $2.50 Per Share | New York Stock Exchange |
| 5.75% Series A-2 Junior Subordinated Debentures | New York Stock Exchange |
| 4.875% Series A-3 Junior Subordinated Debentures | New York Stock Exchange |
| 6.45% Series A-4 Junior Subordinated Debentures | New York Stock Exchange |
| 7.70% Series A-5 Junior Subordinated Debentures | New York Stock Exchange |
| Corporate Units (composed of stock purchase contracts and junior subordinated debentures) | New York Stock Exchange |
| NIKKEI 225® Index Market Index Target-Term Securities® due January 5, 2011 | NYSE Arca |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑   Accelerated filer ☐   Non-accelerated filer ☐   Smaller reporting company ☐
(Do not check if a smaller reporting

company)
Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☑

The aggregate market value of the voting and nonvoting common equity held by nonaffiliates of the registrant computed by reference to the price at which the common equity was last sold of $23.20 as of June 30, 2009 (the last business day of the registrant's most recently completed second fiscal quarter), was approximately $2,794,000,000.

As of January 29, 2010, there were outstanding 134,926,293 shares of Common Stock, $2.50 par value per share, of the registrant.

## DOCUMENTS INCORPORATED BY REFERENCE

| Document of the Registrant | Form 10-K Reference Locations |
|---|---|
| Portions of the registrant's definitive proxy statement for the 2010 Annual Meeting of Shareholders | Part III, Items 10, 11, 12, 13 and 14 |

American International Group, Inc., and Subsidiaries

**Table of Contents**

| Index | | | Page |
|---|---|---|---|
| **PART I** | | | |
| | Item 1. | Business | 3 |
| | Item 1A. | Risk Factors | 17 |
| | Item 1B. | Unresolved Staff Comments | 30 |
| | Item 2. | Properties | 30 |
| | Item 3. | Legal Proceedings | 30 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | 30 |
| **PART II** | | | |
| | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 31 |
| | Item 6. | Selected Financial Data | 33 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| | Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 190 |
| | Item 8. | Financial Statements and Supplementary Data | 191 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 346 |
| | Item 9A. | Controls and Procedures | 346 |
| | Item 9B. | Other Information | 347 |
| **PART III** | | | |
| | Item 10. | Directors, Executive Officers and Corporate Governance | 348 |
| | Item 11. | Executive Compensation | 348 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 348 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 348 |
| | Item 14. | Principal Accounting Fees and Services | 348 |
| **PART IV** | | | |
| | Item 15. | Exhibits, Financial Statement Schedules | 349 |
| **Signatures** | | | 350 |

AIG 2009 Form 10-K    2

Table of Contents

American International Group, Inc., and Subsidiaries

**Part I**

**Item 1.  Business**

American International Group, Inc. (AIG), a Delaware corporation, is a holding company which, through its subsidiaries, is engaged primarily in a broad range of insurance and insurance-related activities in the United States and abroad.

Since September 2008, AIG has been working to protect and enhance the value of its key businesses, execute an orderly asset disposition plan, and position itself for the future. AIG has entered into several important transactions and relationships with the Federal Reserve Bank of New York (FRBNY), the AIG Credit Facility Trust (together with its trustees, acting in their capacity as trustees, the Trust) and the United States Department of the Treasury (the Department of the Treasury). As a result of these arrangements, AIG is controlled by the Trust, which was established for the sole benefit of the United States Treasury.

AIG's four reportable segments are as follows:

- General Insurance;

- Domestic Life Insurance & Retirement Services;

- Foreign Life Insurance & Retirement Services; and

- Financial Services.

The principal business units in each of AIG's reportable segments at year-end 2009 are shown below. For information on AIG's reportable segments, including geographic areas of operation, and changes made in 2009, see Note 4 to the Consolidated Financial Statements.

| General Insurance | Domestic Life Insurance & Retirement Services |
|---|---|
| American Home Assurance Company (American Home) | American General Life Insurance Company (American General) |
| National Union Fire Insurance Company of Pittsburgh, Pa. (National Union) | American General Life and Accident Insurance Company (AGLA) |
| New Hampshire Insurance Company (New Hampshire) | The United States Life Insurance Company in the City of New York (USLIFE) |
| Lexington Insurance Company (Lexington) | The Variable Annuity Life Insurance Company (VALIC) |
| Chartis Overseas, Ltd. | Western National Life Insurance Company (Western National) |
| AIU Insurance Company (AIUI) | SunAmerica Annuity and Life Assurance Company (SunAmerica Annuity) |
| American International Reinsurance Company Limited (AIRCO) | |

3      AIG 2009 Form 10-K

Table of Contents

American International Group, Inc., and Subsidiaries

| **Foreign Life Insurance & Retirement Services** | **Financial Services** |
|---|---|
| American Life Insurance Company (ALICO) | International Lease Finance Corporation (ILFC) |
| AIG Star Life Insurance Co., Ltd. (AIG Star Life) | AIG Financial Products Corp. and AIG Trading Group Inc. and their respective subsidiaries (AIGFP) |
| AIG Edison Life Insurance Company (AIG Edison Life) | American General Finance, Inc. (AGF) |
| American International Assurance Company, Limited, together with American International Assurance Company (Bermuda) Limited (AIA) | AIG Consumer Finance Group, Inc. (AIGCFG) |
| The Philippine American Life and General Insurance Company (Philamlife) | AIG Credit Corp. (A.I. Credit) |

Throughout this Annual Report on Form 10-K, AIG presents its operations in the way it believes will be most meaningful, as well as most transparent. Certain of the measurements used by AIG management are "non-GAAP financial measures" under SEC rules and regulations. Underwriting profit (loss) is utilized to report results for AIG's General Insurance operations. Pre-tax income (loss) before net realized capital gains (losses) is utilized to report results for AIG's life insurance and retirement services operations. For an explanation of why AIG management considers these "non-GAAP measures" useful to investors, see Management's Discussion and Analysis of Financial Condition and Results of Operations.

Following is additional information about AIG's operations:

**General Insurance Operations**

AIG's General Insurance subsidiaries are multiple line companies writing substantially all lines of property and casualty insurance both domestically and abroad and comprise the Commercial Insurance and the Foreign General Insurance operating segments. In July 2009, AIG's General Insurance subsidiaries were rebranded as Chartis (Commercial Insurance operates as Chartis U.S. and Foreign General Insurance operates as Chartis International). Chartis Private Client Group (Private Client Group) is part of Chartis U.S.

AIG is diversified both in terms of classes of business and geographic locations. In General Insurance, general and auto liability business is the largest class of business written and represented approximately 15 percent of net premiums written for the year ended December 31, 2009. During 2009, 8 percent, 6 percent and 6 percent of the direct General Insurance premiums written (gross premiums less return premiums and cancellations, excluding reinsurance assumed and before deducting reinsurance ceded) were written in the states of California, New York and Texas, respectively, and 11 percent and 9 percent were written in Japan and the United Kingdom, respectively. No other state or foreign country accounted for more than five percent of such premiums.

The majority of AIG's General Insurance business is in the casualty classes, which tend to involve longer periods of time for the reporting and settling of claims. This may increase the risk and uncertainty with respect to AIG's loss reserve development.

Commercial Insurance

Commercial Insurance's business in the United States and Canada is conducted through American Home, National Union, Lexington and certain other General Insurance company subsidiaries of AIG.

Chartis U.S. writes substantially all classes of business insurance, accepting such business mainly from insurance brokers. This provides Chartis U.S. the opportunity to select specialized markets and retain underwriting control. Any licensed broker is able to submit business to Chartis U.S. without the traditional agent-company contractual relationship, but such broker usually has no authority to commit Chartis U.S. to accept a risk.

In addition to writing substantially all classes of business insurance, including large commercial or industrial property insurance, excess liability, inland marine, environmental, workers' compensation and excess and umbrella

AIG 2009 Form 10-K    4

Table of Contents

American International Group, Inc., and Subsidiaries

coverages, Chartis U.S. offers many specialized forms of insurance such as aviation, accident and health, equipment breakdown, directors and officers liability (D&O), difference-in-conditions, kidnap-ransom, export credit and political risk, and various types of professional errors and omissions coverages. Also included in Chartis U.S. are the operations of Commercial Casualty, which provides insurance and risk management programs for large corporate customers and is a leading provider of customized structured insurance products, and Chartis Environmental, which focuses on providing specialty products to clients with environmental exposures. Lexington writes surplus lines for risks on which conventional insurance companies do not readily provide insurance coverage, either because of complexity or because the coverage does not lend itself to conventional contracts. The Chartis Worldsource Division introduces and coordinates AIG's products and services to U.S.-based multinational clients and foreign corporations doing business in the U.S. Private Client Group provides a broad range of coverages for high net worth individuals.

Foreign General Insurance

Chartis International writes both commercial and consumer lines of insurance through a network of agencies, branches and foreign-based insurance subsidiaries. Chartis International uses various marketing methods and multiple distribution channels to write both commercial and consumer lines of insurance with certain refinements for local laws, customs and needs. Chartis International operates in Asia, the Pacific Rim, Europe, the U.K., Africa, the Middle East and Latin America.

Discussion and Analysis of Consolidated Net Losses and Loss Expense Reserve Development

The reserve for net losses and loss expenses represents the accumulation of estimates for reported losses (case basis reserves) and provisions for losses incurred but not reported (IBNR), both reduced by applicable reinsurance recoverable and the discount for future investment income, where permitted. Net losses and loss expenses are charged to income as incurred.

The Liability for unpaid claims and claims adjustment expense (loss reserves) established with respect to foreign business is set and monitored in terms of the currency in which payment is expected to be made. Therefore, no assumption is included for changes in currency rates. See also Note 1(v) to the Consolidated Financial Statements.

Management reviews the adequacy of established loss reserves utilizing a number of analytical reserve development techniques. Through the use of these techniques, management is able to monitor the adequacy of AIG's established reserves and determine appropriate assumptions for inflation. Also, analysis of emerging specific development patterns, such as case reserve redundancies or deficiencies and IBNR emergence, allows management to determine any required adjustments.

The "Analysis of Consolidated Losses and Loss Expense Reserve Development" table presents the development of net losses and loss expense reserves for calendar years 1999 through 2009. Immediately following this table is a second table that presents all data on a basis that excludes asbestos and environmental net losses and loss expense reserve development. The opening reserves held are shown at the top of the table for each year-end date. The amount of loss reserve discount included in the opening reserve at each date is shown immediately below the reserves held for each year. The undiscounted reserve at each date is thus the sum of the discount and the reserve held.

The upper half of the table presents the cumulative amounts paid during successive years related to the undiscounted opening loss reserves. For example, in the table that excludes asbestos and environmental losses, with respect to the net losses and loss expense reserve of $28.65 billion at December 31, 2002, by the end of 2009 (seven years later) $39.64 billion had actually been paid in settlement of these net loss reserves. In addition, as reflected in the lower section of the table, the original undiscounted reserve of $30.15 billion was reestimated to be $50.79 billion at December 31, 2009. This increase from the original estimate generally results from a combination of a number of factors, including claims being settled for larger amounts than originally estimated. The original estimates will also be increased or decreased as more information becomes known about the individual claims and overall claim frequency and severity patterns. The redundancy (deficiency) depicted in the table, for any particular calendar year, presents the aggregate change in estimates over the period of years subsequent to the calendar year reflected at the top of the respective column heading. For example, the deficiency of $2.62 billion at December 31, 2009 related to December 31, 2008 net losses and loss expense reserves of $73.64 billion represents the cumulative amount by which reserves in 2008 and prior years have developed unfavorably during 2009.

5    AIG 2009 Form 10-K

Table of Contents

American International Group, Inc., and Subsidiaries

The bottom of each table below presents the remaining undiscounted and discounted net loss reserve for each year. For example, in the table that excludes asbestos and environmental losses, for the 2001 year-end, the remaining undiscounted reserves held at December 31, 2009 are $9.71 billion, with a corresponding discounted net reserve of $8.98 billion.

Analysis of Consolidated Losses and Loss Expense Reserve Development

The following table presents for each calendar year the losses and loss expense reserves and the development thereof including those with respect to asbestos and environmental claims. See also Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations — Segment Results — General Insurance Operations — Liability for unpaid claims and claims adjustment expense.*

| (in millions) | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Reserves Held | $ 25,636 | $ 25,684 | $ 26,005 | $ 29,347 | $ 36,228 | $ 47,253 | $ 57,476 | $ 62,630 | $ 69,288 | $ 72,455 | $ 67,899 |
| Discount (in Reserves Held) | 1,075 | 1,287 | 1,423 | 1,499 | 1,516 | 1,553 | 2,110 | 2,264 | 2,429 | 2,574 | 2,655 |
| Net Reserves Held (Undiscounted) | 26,711 | 26,971 | 27,428 | 30,846 | 37,744 | 48,806 | 59,586 | 64,894 | 71,717 | 75,029 | 70,554 |
| Paid (Cumulative) as of: | | | | | | | | | | | |
| One year later | 8,266 | 9,709 | 11,007 | 10,775 | 12,163 | 14,910 | 15,326 | 14,862 | 16,531 | 24,267 | |
| Two years later | 14,640 | 17,149 | 18,091 | 18,589 | 21,773 | 24,377 | 25,152 | 24,388 | 31,791 | | |
| Three years later | 19,901 | 21,930 | 23,881 | 25,513 | 28,763 | 31,296 | 32,295 | 34,647 | | | |
| Four years later | 23,074 | 26,090 | 28,717 | 30,757 | 33,825 | 36,804 | 40,380 | | | | |
| Five years later | 25,829 | 29,473 | 32,685 | 34,627 | 38,087 | 43,162 | | | | | |
| Six years later | 28,165 | 32,421 | 35,656 | 37,778 | 42,924 | | | | | | |
| Seven years later | 30,336 | 34,660 | 38,116 | 41,493 | | | | | | | |
| Eight years later | 31,956 | 36,497 | 41,055 | | | | | | | | |
| Nine years later | 33,489 | 38,943 | | | | | | | | | |
| Ten years later | 35,359 | | | | | | | | | | |

| (in millions) | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Reserves Held (Undiscounted) | $ 26,711 | $ 26,971 | $ 27,428 | $ 30,846 | $ 37,744 | $ 48,806 | $ 59,586 | $ 64,894 | $ 71,717 | $ 75,029 | $ 70,554 |
| Undiscounted Liability as of: | | | | | | | | | | | |
| One year later | 26,358 | 26,979 | 31,112 | 32,913 | 40,931 | 53,486 | 59,533 | 64,238 | 71,836 | 77,800 | |
| Two years later | 27,023 | 30,696 | 33,363 | 37,583 | 49,463 | 55,009 | 60,126 | 64,764 | 74,318 | | |
| Three years later | 29,994 | 32,732 | 37,964 | 46,179 | 51,497 | 56,047 | 61,242 | 67,303 | | | |
| Four years later | 31,192 | 36,210 | 45,203 | 48,427 | 52,964 | 57,618 | 63,872 | | | | |
| Five years later | 33,910 | 41,699 | 47,078 | 49,855 | 54,870 | 60,231 | | | | | |
| Six years later | 38,087 | 43,543 | 48,273 | 51,560 | 57,300 | | | | | | |

Powered by Morningstar® Document Research℠

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Seven years later | 39,597 | 44,475 | 49,803 | 53,917 | | | | | |
| Eight years later | 40,217 | 45,767 | 52,034 | | | | | | |
| Nine years later | 41,168 | 47,682 | | | | | | | |
| Ten years later | 42,727 | | | | | | | | |
| Net Redundancy (Deficiency) | (16,016) | (20,711) | (24,606) | (23,071) | (19,556) | (11,425) | (4,286) | (2,409) | (2,601) | (2,771) |
| Remaining Reserves (Undiscounted) | 7,368 | 8,739 | 10,979 | 12,424 | 14,376 | 17,069 | 23,492 | 32,656 | 42,527 | 53,533 |
| Remaining Discount | 511 | 609 | 723 | 856 | 988 | 1,124 | 1,309 | 1,552 | 1,893 | 2,261 |
| Remaining Reserves | 6,857 | 8,130 | 10,256 | 11,568 | 13,388 | 15,945 | 22,183 | 31,104 | 40,634 | 51,272 |

AIG 2009 Form 10-K   6

Source: AMERICAN INTERNATIONAL GROUP INC, 10-K, February 26, 2010                    Powered by Morningstar® Document Research℠

Table of Contents

American International Group, Inc., and Subsidiaries

The following table presents the gross liability (before discount), reinsurance recoverable and net liability recorded at each year end and the restimation of these amounts as of December 31, 2009:

| (in millions) | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Liability, End of Year | $ 37,278 | $ 39,222 | $ 42,629 | $ 48,173 | $ 53,388 | $ 63,430 | $ 79,279 | $ 82,263 | $ 87,929 | $ 91,852 | $ 88,041 |
| Reinsurance Recoverable, End of Year | 10,567 | 12,251 | 15,201 | 17,327 | 15,644 | 14,624 | 19,693 | 17,369 | 16,212 | 16,803 | 17,487 |
| Net Liability, End of Year | 26,711 | 26,971 | 27,428 | 30,846 | 37,744 | 48,806 | 59,586 | 64,894 | 71,717 | 75,029 | 70,554 |
| Reestimated Gross Liability | 64,160 | 71,146 | 76,143 | 77,873 | 78,829 | 79,883 | 86,444 | 86,462 | 92,086 | 94,932 | |
| Reestimated Reinsurance Recoverable | 21,433 | 23,464 | 24,109 | 23,956 | 21,529 | 19,652 | 22,572 | 19,159 | 17,768 | 17,132 | |
| Reestimated Net Liability | 42,727 | 47,682 | 52,034 | 53,917 | 57,300 | 60,231 | 63,872 | 67,303 | 74,318 | 77,800 | |
| Cumulative Gross Redundancy/(Deficiency) | (26,882) | (31,924) | (33,514) | (29,700) | (25,441) | (16,453) | (7,165) | (4,199) | (4,157) | (3,100) | |

*During 2009, Transatlantic Holdings, Inc. (Transatlantic) was deconsolidated and 21st Century Insurance Group and Agency Auto Division (excluding AIG Private Client Group) (21st Century) and HSB Group, Inc. (HSB) were sold. Immediately preceding these sales, the loss and loss expense reserves for these entities totaled $9.7 billion. As a result of the sales and deconsolidation, these obligations ceased being the responsibility of AIG. The sales and deconsolidation are reflected in the table above as a reduction in December 31, 2009 net reserves of $9.7 billion and as a $8.6 billion increase in paid losses for the years 1999 through 2008 to reflect no impact on incurred losses for these periods.*

### Analysis of Consolidated Losses and Loss Expense Reserve Development Excluding Asbestos and Environmental Losses and Loss Expense Reserve Development

The following table presents for each calendar year the losses and loss expense reserves and the development thereof excluding those with respect to asbestos and environmental claims. See also Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations — Segment Results — General Insurance Operations — Liability for unpaid claims and claims adjustment expense.*

| (in millions) | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Reserves Held | $ 24,745 | $ 24,829 | $ 25,286 | $ 28,651 | $ 35,559 | $ 45,742 | $ 55,226 | $ 60,451 | $ 67,597 | $ 71,062 | $ 66,588 |
| Discount (in Reserves Held) | 1,075 | 1,287 | 1,423 | 1,499 | 1,516 | 1,553 | 2,110 | 2,264 | 2,429 | 2,574 | 2,655 |
| Net Reserves Held (Undiscounted) | 25,820 | 26,116 | 26,709 | 30,150 | 37,075 | 47,295 | 57,336 | 62,715 | 70,026 | 73,636 | 69,243 |
| Paid (Cumulative) as of: | | | | | | | | | | | |
| One year later | 8,195 | 9,515 | 10,861 | 10,632 | 11,999 | 14,718 | 15,047 | 14,356 | 16,183 | 24,028 | |
| Two years later | 14,376 | 16,808 | 17,801 | 18,283 | 21,419 | 23,906 | 24,367 | 23,535 | 31,204 | | |
| Three years later | 19,490 | 21,447 | 23,430 | 25,021 | 28,129 | 30,320 | 31,163 | 33,555 | | | |
| Four years later | 22,521 | 25,445 | 28,080 | 29,987 | 32,686 | 35,481 | 39,009 | | | | |
| Five years later | 25,116 | 28,643 | 31,771 | 33,353 | 36,601 | 41,600 | | | | | |
| Six years later | 27,266 | 31,315 | 34,238 | 36,159 | 41,198 | | | | | | |
| Seven years later | 29,162 | 33,051 | 36,353 | 39,637 | | | | | | | |
| Eight years later | 30,279 | 34,543 | 39,055 | | | | | | | | |
| Nine years later | 31,469 | 36,752 | | | | | | | | | |
| Ten years later | 33,101 | | | | | | | | | | |

Source: AMERICAN INTERNATIONAL GROUP INC, 10-K, February 26, 2010            Powered by Morningstar® Document Research℠

Table of Contents

American International Group, Inc., and Subsidiaries

| (in millions) | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Reserves Held (Undiscounted) | $25,820 | $26,116 | $26,709 | $30,150 | $37,075 | $47,295 | $57,336 | $62,715 | $70,026 | $73,636 | $69,243 |
| Undiscounted Liability as of: | | | | | | | | | | | |
| One year later | 25,437 | 26,071 | 30,274 | 32,129 | 39,261 | 51,048 | 57,077 | 62,043 | 70,096 | 76,251 | |
| Two years later | 26,053 | 29,670 | 32,438 | 35,803 | 46,865 | 52,364 | 57,653 | 62,521 | 72,423 | | |
| Three years later | 28,902 | 31,619 | 36,043 | 43,467 | 48,691 | 53,385 | 58,721 | 64,904 | | | |
| Four years later | 30,014 | 34,102 | 42,348 | 45,510 | 50,140 | 54,908 | 61,195 | | | | |
| Five years later | 31,738 | 38,655 | 44,018 | 46,925 | 51,997 | 57,365 | | | | | |
| Six years later | 34,978 | 40,294 | 45,201 | 48,584 | 54,272 | | | | | | |
| Seven years later | 36,283 | 41,213 | 46,685 | 50,786 | | | | | | | |
| Eight years later | 36,889 | 42,459 | 48,761 | | | | | | | | |
| Nine years later | 37,795 | 44,219 | | | | | | | | | |
| Ten years later | 39,199 | | | | | | | | | | |
| Net Redundancy/(Deficiency) | (13,379) | (18,103) | (22,052) | (20,636) | (17,197) | (10,070) | (3,859) | (2,189) | (2,397) | (2,615) | |
| Remaining Reserves (Undiscounted) | 6,098 | 7,467 | 9,706 | 11,149 | 13,074 | 15,765 | 22,186 | 31,349 | 41,219 | 52,223 | |
| Remaining Discount | 511 | 609 | 723 | 856 | 988 | 1,124 | 1,309 | 1,552 | 1,893 | 2,261 | |
| Remaining Reserves | 5,587 | 6,858 | 8,983 | 10,293 | 12,086 | 14,641 | 20,877 | 29,797 | 39,326 | 49,962 | |

The following table presents the gross liability (before discount), reinsurance recoverable and net liability recorded at each year end and the reestimation of these amounts as of December 31, 2009:

| (in millions) | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Liability, End of Year | $34,666 | $36,777 | $40,400 | $46,036 | $51,363 | $59,790 | $73,808 | $77,311 | $83,551 | $87,973 | 84,467 |
| Reinsurance Recoverable, End of Year | 8,846 | 10,661 | 13,691 | 15,886 | 14,288 | 12,495 | 16,472 | 14,396 | 13,525 | 14,337 | 15,224 |
| Net Liability, End of Year | 25,820 | 26,116 | 26,709 | 30,150 | 37,075 | 47,295 | 57,336 | 62,715 | 70,026 | 73,636 | 69,243 |
| Reestimated Gross Liability | 55,041 | 62,549 | 68,075 | 70,148 | 71,492 | 72,836 | 79,818 | 80,494 | 86,995 | 90,589 | |
| Reestimated Reinsurance Recoverable | 15,842 | 18,330 | 19,314 | 19,362 | 17,220 | 15,471 | 18,623 | 15,590 | 14,572 | 14,338 | |
| Reestimated Net Liability | 39,199 | 44,219 | 48,761 | 50,786 | 54,272 | 57,365 | 61,195 | 64,904 | 72,423 | 76,251 | |
| Cumulative Gross Redundancy/(Deficiency) | (20,375) | (25,772) | (27,675) | (24,112) | (20,129) | (13,046) | (6,010) | (3,383) | (3,444) | (2,616) | |

*During 2009, Transatlantic was deconsolidated and 21st Century and HSB were sold. Immediately preceding these sales, the loss and loss expense reserves for these entities totaled $9.6 billion. As a result of the sales and deconsolidation, these obligations ceased being the responsibility of AIG. The sales and deconsolidation are reflected in the table above as a reduction in December 31, 2009 net reserves of $9.6 billion and as a $8.6 billion increase in paid losses for the years 1999 through 2008 to reflect no impact on incurred losses for these periods.*

The Liability for unpaid claims and claims adjustment expense as reported in AIG's Consolidated Balance Sheet at December 31, 2009 differs from the total reserve reported in the Annual Statements filed with state insurance departments and, where appropriate, with foreign regulatory authorities. The differences at December 31, 2009 relate primarily to reserves for certain foreign operations not required to be reported in the United States for statutory reporting purposes. Further, statutory practices in the United States require reserves to be shown net of applicable reinsurance recoverable.

The reserve for gross losses and loss expenses is prior to reinsurance and represents the accumulation for reported losses and IBNR. Management reviews the adequacy of established gross loss reserves in the manner previously described for net loss reserves.

For further discussion regarding net reserves for losses and loss expenses, see Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations — Segment Results — General Insurance Operations — Liability for unpaid claims and claims adjustment expense.

Source: AMERICAN INTERNATIONAL GROUP INC, 10-K, February 26, 2010   Powered by Morningstar® Document Research℠

Table of Contents

American International Group, Inc., and Subsidiaries

### Domestic Life Insurance & Retirement Services Operations

AIG's Domestic Life Insurance & Retirement Services segment, rebranded as SunAmerica Financial Group in December 2009, is comprised of several life insurance and retirement services businesses that market their products and services under the brands of American General, AGLA, VALIC, Western National, SunAmerica Retirement Markets, SunAmerica Mutual Funds, SunAmerica Affordable Housing Partners, FSC Securities, Royal Alliance and SagePoint Financial. The businesses offer a comprehensive suite of life insurance, retirement savings products and guaranteed income solutions through an established multi-channel distribution network that includes banks, national, regional and independent broker-dealers, career financial advisors, wholesale life brokers, insurance agents and a direct-to-consumer platform.

AIG's Domestic Life Insurance businesses offer a broad range of protection products, including individual term and universal life insurance and group life and health products. In addition, Domestic Life Insurance offers a variety of payout annuities, which include single premium immediate annuities, structured settlements and terminal funding annuities.

Domestic Retirement Services businesses offer group retirement products and individual fixed and variable annuities. Certain previously acquired closed blocks and other fixed and variable annuity blocks that have been discontinued are reported as "runoff" annuities. Domestic Retirement Services also maintains a runoff block of Guaranteed Investment Contracts (GICs) that were written in (or issued to) the institutional market place prior to 2006.

Results for certain brokerage service, mutual fund, GIC and other asset management activities previously reported in the Asset Management segment are now included in Domestic Life Insurance & Retirement Services.

### Foreign Life Insurance & Retirement Services Operations

AIG's Foreign Life Insurance & Retirement Services operations include insurance and investment-oriented products such as whole and term life, investment linked, universal life and endowments, personal accident and health products, group products, including pension, life and health, and fixed and variable annuities. The Foreign Life Insurance & Retirement Services products are sold through independent producers, career agents, financial institutions and direct marketing channels.

AIG's principal Foreign Life Insurance & Retirement Services operations include ALICO, AIG Star Life, AIG Edison Life, AIA and Philamlife ,which is now an AIA subsidiary. ALICO is incorporated in Delaware and all of its business is written outside the United States. ALICO has operations either directly or through subsidiaries in Europe, including the U.K., Latin America, the Caribbean, the Middle East, and Japan. AIA operates primarily in China (including Hong Kong), Singapore, Malaysia, Thailand, Korea, Australia, New Zealand, Vietnam, Indonesia and India. The operations in India are conducted through a joint venture, Tata AIG Life Insurance Company Limited. Philamlife is the largest life insurer in the Philippines. AIG Star Life and AIG Edison Life operate in Japan.

On October 12, 2009, AIG entered into an agreement to sell its 97.57 percent share of Nan Shan Life Insurance Company, Ltd. (Nan Shan), for approximately $2.15 billion. As a result of this transaction, Nan Shan qualified as a discontinued operation and met the criteria for "held-for-sale" accounting in the fourth quarter of 2009. See Note 2 to the Consolidated Financial Statements for further discussion.

### Reinsurance Operations

Chartis subsidiaries operate worldwide primarily by underwriting and accepting risks for their direct account and securing reinsurance on that portion of the risk in excess of the limit which they wish to retain. This operating policy differs from that of many insurance companies that will underwrite only up to their net retention limit, thereby requiring the broker or agent to secure commitments from other underwriters for the remainder of the gross risk amount.

Source: AMERICAN INTERNATIONAL GROUP INC, 10-K, February 26, 2010          Powered by Morningstar® Document Research℠

Table of Contents



Various AIG classes of business, including Commercial Insurance, AIU and AIG Risk Finance, as well as certain life insurance subsidiaries, use AIRCO as a reinsurer for certain of their businesses. In Bermuda, AIRCO discounts reserves attributable to certain classes of general insurance business assumed from other AIG subsidiaries.

For a further discussion of reinsurance, see Item 1A. Risk Factors — Reinsurance; Management's Discussion and Analysis of Financial Condition and Results of Operations — Risk Management — Insurance Risk Management — Reinsurance.

**Insurance Investment Operations**

A significant portion of AIG's General Insurance and Domestic and Foreign Life Insurance & Retirement Services revenues are derived from AIG's insurance investment operations.

**The following table summarizes the investment results of AIG's insurance operations, excluding the results of discontinued operations:**

| Years Ended December 31, *(in millions)* | Annual Average Investments[a] | Net Investment Income | Pre-tax Return on Average Investments[b] |
|---|---|---|---|
| General Insurance: | | | |
| **2009** | **$ 89,236** | **$ 3,295** | **3.7%** |
| 2008 | 92,313 | 2,606 | 2.8 |
| 2007 | 96,207 | 5,348 | 5.6 |
| Domestic Life Insurance & Retirement Services: | | | |
| **2009** | **$ 148,202** | **$ 9,553** | **6.4%** |
| 2008 | 196,515 | 9,134 | 4.6 |
| 2007 | 248,720 | 13,582 | 5.5 |
| Foreign Life Insurance & Retirement Services: | | | |
| **2009** | **$ 182,183** | **$ 11,502** | **6.3%** |
| 2008 | 180,833 | 157 | 0.1 |
| 2007 | 182,216 | 10,184 | 5.6 |

*(a)* *Includes real estate investments and collateral assets invested under the securities lending program.*

*(b)* *Net investment income divided by the annual average investments.*

AIG's worldwide insurance investment policy places primary emphasis on investments in government and fixed income securities in all of its portfolios and, to a lesser extent, investments in high-yield bonds, common stocks, real estate, hedge funds and other alternative investments, in order to enhance returns on policyholders' funds and generate net investment income. The ability to implement this policy is somewhat limited in certain territories as there may be a lack of attractive long-term investment opportunities or investment restrictions may be imposed by the local regulatory authorities.

**Financial Services Operations**

AIG's Financial Services subsidiaries engage in diversified activities including aircraft leasing, capital markets, consumer finance and insurance premium finance. Together, the Aircraft Leasing, Capital Markets and Consumer Finance operations generate the majority of the revenues produced by the Financial Services operations. A.I. Credit also contributes to Financial Services results principally by providing insurance premium financing for both AIG's policyholders and those of other insurers.

Aircraft Leasing

AIG's Aircraft Leasing operations are the operations of ILFC, which generates its revenues primarily from leasing new and used commercial jet aircraft to foreign and domestic airlines. Revenues also result from the remarketing of commercial jet aircraft for ILFC's own account, and remarketing and fleet management services for airlines and financial institutions.



Source: AMERICAN INTERNATIONAL GROUP INC, 10-K, February 26, 2010 Powered by Morningstar® Document Research℠

Table of Contents

American International Group, Inc., and Subsidiaries

Capital Markets

Capital Markets is comprised of the operations of AIGFP, which engaged as principal in a wide variety of financial transactions, including standard and customized financial products involving commodities, credit, currencies, energy, equities and interest rates. AIGFP also invests in a diversified portfolio of securities and principal investments and engages in borrowing activities that involve issuing standard and structured notes and other securities and entering into guaranteed investment agreements (GIAs). Due to the extreme market conditions experienced in 2008, the downgrades of AIG's credit ratings by the rating agencies, as well as AIG's intent to refocus on its core businesses, beginning in late 2008 and continuing through 2009 AIGFP has been unwinding its businesses and portfolios. See Management's Discussion and Analysis of Financial Condition and Results of Operations — 2010 Business Outlook — Financial Services.

Consumer Finance

AIG's Consumer Finance operations in North America are principally conducted through AGF. AGF derives most of its revenues from finance charges assessed on real estate loans, secured and unsecured non-real estate loans and retail sales finance receivables.

AIG's foreign consumer finance operations are principally conducted through AIGCFG. AIGCFG operates primarily in emerging and developing markets. During 2009, AIG divested most of the AIGCFG operations. As of December 31, 2009, AIGCFG had operations in Argentina, Taiwan, India, Colombia and Poland. The operations in Poland, at December 31, 2009, were under contract for sale and met the criteria for held for sale accounting in 2009.

**Other Operations**

AIG's Other operations includes results from Parent & Other operations, after allocations to AIG's business segments, results from noncore businesses and gains and losses on sales of divested businesses.

Parent & Other

AIG's Parent & Other operations consists primarily of interest expense, restructuring costs, expenses of corporate staff not attributable to specific reportable segments, expenses related to efforts to improve internal controls, corporate initiatives, certain compensation plan expenses, corporate level net realized capital gains and losses, certain litigation related charges and net gains and losses on sale of divested businesses.

Noncore Businesses

Noncore businesses include results of certain businesses that have been divested or are being wound down or repositioned.

**Noncore Insurance Businesses**

Beginning in 2009, in order to better align financial reporting with the manner in which AIG's chief operating decision makers review AIG's businesses to make decisions about resources to be allocated and to assess performance, the results for United Guaranty Corporation (UGC), Transatlantic, 21st Century and HSB are included in AIG's Other operations category. These amounts were previously reported as part of General Insurance operations. Prior period amounts have been revised to conform to the current presentation. As a result of the current year dispositions of 21st Century and HSB, and the deconsolidation of Transatlantic, only UGC is still reporting ongoing results of operations. See Management's Discussion and Analysis of Financial Condition and Results of Operations — Capital Resources and Liquidity — AIG's Strategy for Stabilization and Repayment of its Obligations as They Come Due — Asset Disposition Plan — Sales of Businesses and Specific Asset Dispositions for further discussion.

11     AIG 2009 Form 10-K

Source: AMERICAN INTERNATIONAL GROUP INC, 10-K, February 26, 2010                    Powered by Morningstar® Document Research℠

Table of Contents

American International Group, Inc., and Subsidiaries

## Mortgage Guaranty

The main business of the subsidiaries of UGC is the issuance of residential mortgage guaranty insurance, both domestically and internationally, that covers the first loss for credit defaults on high loan-to-value first-lien mortgages for the purchase or refinance of one- to four-family residences.

During 2008, UGC tightened underwriting guidelines and increased premium rates for its first-lien business, ceased insuring second-lien business as of September 30, 2008 and during the fourth quarter of 2008 ceased insuring new private student loan business and suspended insuring new business throughout its European operations. All of these actions were in response to the worsening conditions in the global housing markets and resulted in a significant decline in new business written during the second half of 2008 through 2009.

## Transatlantic

On June 10, 2009, AIG closed the previously announced secondary public offering of 29.9 million shares of Transatlantic common stock owned directly and indirectly by AIG for aggregate gross proceeds of $1.1 billion. As of the close of the offering, AIG indirectly retained 13.9 percent of the Transatlantic common stock issued and outstanding. As of December 31, 2009, after confirmation from the New York Insurance Department that AIG is not considered to control Transatlantic, AIG no longer considers Transatlantic to be a related party.

## Noncore Asset Management Operations

With the announced sale of AIG's investment advisory and third party Institutional Asset Management business (excluding the Global Real Estate investment management business), AIG will no longer benefit from the management fee and carried interest cash flows from these businesses, but the sale will reduce operating costs related to AIG's asset management activities. Asset Management is no longer considered a reportable segment, and the results for these Asset Management operations described below have been presented as a Noncore business in AIG's Other operations category. Brokerage service commissions, other asset management fees, and investment income from GICs previously reported in the Asset Management segment are now included in the Domestic Life Insurance & Retirement Services segment. Results for prior periods have been revised accordingly.

## Matched Investment Program

AIG's Matched Investment Program (MIP) is a spread-based investment operation which invests primarily in fixed maturity securities (corporate and structured), loans and, to a lesser extent, single name credit default swaps. Due to the extreme market conditions experienced in 2008 and the downgrades of AIG's credit ratings, the MIP is currently in run-off. No additional debt issuances are expected for the MIP for the foreseeable future.

## Institutional Asset Management Business

AIG's Institutional Asset Management business, conducted through AIG Global Asset Management Holdings Corp. and its subsidiaries and affiliated companies (collectively, AIG Investments), provides an array of investment products and services globally to institutional investors, pension funds, AIG subsidiaries, AIG affiliates and high net worth investors. These products include traditional equity and fixed maturity securities, and a wide range of real estate and alternative asset classes. Services include investment advisory and sub-advisory services, investment monitoring and transaction structuring. Within the equity and fixed maturity asset classes, AIG Investments offers various forms of structured investments. Within the alternative asset class, AIG Investments offers hedge and private equity funds and fund-of-funds, direct investments and distressed debt investments. AIG Global Real Estate Investment Corp. (AIG Global Real Estate) provides a wide range of real estate investment, development and management services for AIG subsidiaries, as well as for third-party institutional investors, pension funds and high net worth investors. AIG Global Real Estate also maintains a proprietary real estate investment portfolio through various joint venture platforms.

On September 5, 2009, AIG entered into an agreement to sell its investment advisory and third party Institutional Asset Management businesses. This sale will exclude those asset management businesses providing traditional fixed

AIG 2009 Form 10-K    12

Table of Contents

American International Group, Inc., and Subsidiaries

income asset and liability management for AIG's insurance company subsidiaries and the AIG Global Real Estate investment management business, as well as proprietary real estate and private equity investments. AIG expects to continue relationships with the divested businesses for other investment management services used by its insurance company subsidiaries. Upon completion of the sale, AIG will no longer benefit from the management fee and carried interest cash flow from these businesses, but the sale will reduce operating costs related to AIG's asset management activities.

For additional information regarding the business of AIG on a consolidated basis, the contributions made to AIG's consolidated revenues and pre-tax income and the assets held by General Insurance, Domestic Life Insurance & Retirement Services, Foreign Life Insurance & Retirement Services, Financial Services and the Other operations category, see Selected Financial Data, Management's Discussion and Analysis of Financial Condition and Results of Operations and Notes 1 and 4 to the Consolidated Financial Statements.

**Locations of Certain Assets**

As of December 31, 2009, approximately 44 percent of the consolidated assets of AIG were located in foreign countries (other than Canada), including $6.9 billion of cash and securities on deposit with foreign regulatory authorities. Foreign operations and assets held abroad may be adversely affected by political developments in foreign countries, including tax changes, nationalization and changes in regulatory policy, as well as by consequence of hostilities and unrest. The risks of such occurrences and their overall effect upon AIG vary from country to country and cannot easily be predicted. If expropriation or nationalization does occur, AIG's policy is to take all appropriate measures to seek recovery of such assets. Certain of the countries in which AIG's business is conducted have currency restrictions which generally cause a delay in a company's ability to repatriate assets and profits. See also Item 1A. Risk Factors — Foreign Operations and Notes 1 and 4 to the Consolidated Financial Statements.

**Regulation**

AIG's operations around the world are subject to regulation by many different types of regulatory authorities, including insurance, securities, investment advisory, banking and thrift regulators in the United States and abroad. AIG's operations have become more diverse and consumer-oriented, increasing the scope of regulatory supervision and the possibility of intervention. In light of AIG's liquidity problems beginning in the third quarter of 2008, AIG and its regulated subsidiaries have been subject to intense review and supervision around the world. Regulators have taken significant steps to protect the businesses of the entities they regulate. These steps have included:

- restricting or prohibiting the payment of dividends to AIG parent and its subsidiaries;
- restricting or prohibiting other payments to AIG parent and its subsidiaries;
- requesting additional capital contributions from AIG parent;
- requesting that intercompany reinsurance reserves be covered by assets locally;
- restricting the business in which the subsidiaries may engage;
- requiring pre-approval of all proposed transactions between the regulated subsidiaries and AIG parent or with any affiliate; and
- requiring more frequent reporting, including with respect to capital and liquidity positions.

These and other actions have made it challenging for AIG to continue to engage in business in the ordinary course. AIG does not expect these conditions to change significantly in the foreseeable future.

In 1999, AIG became a unitary thrift holding company within the meaning of the Home Owners' Loan Act (HOLA) when the Office of Thrift Supervision (OTS) granted AIG approval to organize AIG Federal Savings Bank. AIG is subject to OTS regulation, examination, supervision and reporting requirements. In addition, the OTS has enforcement authority over AIG and its subsidiaries. Among other things, this permits the OTS to restrict or prohibit

13      AIG 2009 Form 10-K

Table of Contents

American International Group, Inc., and Subsidiaries

activities that are determined to be a serious risk to the financial safety, soundness or stability of AIG's subsidiary savings association, AIG Federal Savings Bank.

Under prior law, a unitary savings and loan holding company, such as AIG, was not restricted as to the types of business in which it could engage, provided that its savings association subsidiary continued to be a qualified thrift lender. The Gramm-Leach-Bliley Act of 1999 (GLBA) provides that no company may acquire control of an OTS regulated institution after May 4, 1999 unless it engages only in the financial activities permitted for financial holding companies under the law or for multiple savings and loan holding companies. The GLBA, however, grandfathered the unrestricted authority for activities with respect to a unitary savings and loan holding company existing prior to May 4, 1999, so long as its savings association subsidiary continues to be a qualified thrift lender under the HOLA. As a unitary savings and loan holding company whose application was pending as of May 4, 1999, AIG is grandfathered under the GLBA and generally is not restricted under existing laws as to the types of business activities in which it may engage, provided that AIG Federal Savings Bank continues to be a qualified thrift lender under the HOLA.

Certain states require registration and periodic reporting by insurance companies that are licensed in such states and are controlled by other corporations. Applicable legislation typically requires periodic disclosure concerning the corporation that controls the registered insurer and the other companies in the holding company system and prior approval of intercorporate services and transfers of assets (including in some instances payment of dividends by the insurance subsidiary) within the holding company system. AIG's subsidiaries are registered under such legislation in those states that have such requirements.

AIG's insurance subsidiaries, in common with other insurers, are subject to regulation and supervision by the states and by other jurisdictions in which they do business. Within the United States, the method of such regulation varies but generally has its source in statutes that delegate regulatory and supervisory powers to an insurance official. The regulation and supervision relate primarily to approval of policy forms and rates, the standards of solvency that must be met and maintained, including risk-based capital, the licensing of insurers and their agents, the nature of and limitations on investments, restrictions on the size of risks that may be insured under a single policy, deposits of securities for the benefit of policyholders, requirements for acceptability of reinsurers, periodic examinations of the affairs of insurance companies, the form and content of reports of financial condition required to be filed, and reserves for unearned premiums, losses and other purposes. In general, such regulation is for the protection of policyholders rather than the equity owners of these companies.

AIG has taken various steps to enhance the capital positions of the Chartis U.S. companies. AIG entered into capital maintenance agreements with these companies that set forth procedures through which AIG has provided, and expects to continue to provide, capital support. Also, in order to allow the Chartis companies to record as an admitted asset at December 31, 2009 certain reinsurance ceded to non-U.S. reinsurers (which has the effect of maintaining the level of the statutory surplus of such companies), AIG obtained and entered into reimbursement agreements for approximately $1.5 billion of letters of credit issued by several commercial banks in favor of certain Chartis companies and funded trusts totaling $2.8 billion.

In the U.S., the Risk-Based Capital (RBC) formula is designed to measure the adequacy of an insurer's statutory surplus in relation to the risks inherent in its business. Thus, inadequately capitalized general and life insurance companies may be identified. The U.S. RBC formula develops a risk-adjusted target level of statutory surplus by applying certain factors to various asset, premium and reserve items. Higher factors are applied to more risky items and lower factors are applied to less risky items. Thus, the target level of statutory surplus varies not only as a result of the insurer's size, but also based on the risk profile of the insurer's operations.

The RBC Model Law provides for four incremental levels of regulatory attention for insurers whose surplus is below the calculated RBC target. These levels of attention range in severity from requiring the insurer to submit a plan for corrective action to placing the insurer under regulatory control.

The statutory surplus of each of the U.S.-based life and property and casualty insurance subsidiaries exceeded their RBC minimum required levels as of December 31, 2009.

AIG 2009 Form 10-K     14

To the extent that any of AIG's insurance entities would fall below prescribed levels of statutory surplus, it would be AIG's intention, subject to FRBNY approval, to provide appropriate capital or other types of support to that entity.

A substantial portion of AIG's general insurance business and a majority of its life insurance business is conducted in foreign countries. The degree of regulation and supervision in foreign jurisdictions varies. Generally, AIG, as well as the underwriting companies operating in such jurisdictions, must satisfy local regulatory requirements. Licenses issued by foreign authorities to AIG subsidiaries are subject to modification or revocation by such authorities, and these subsidiaries could be prevented from conducting business in certain of the jurisdictions where they currently operate.

In addition to licensing requirements, AIG's foreign operations are also regulated in various jurisdictions with respect to currency, policy language and terms, advertising, amount and type of security deposits, amount and type of reserves, amount and type of capital to be held, amount and type of local investment and the share of profits to be returned to policyholders on participating policies. Some foreign countries regulate rates on various types of policies. Certain countries have established reinsurance institutions, wholly or partially owned by the local government, to which admitted insurers are obligated to cede a portion of their business on terms that may not always allow foreign insurers, including AIG subsidiaries, full compensation. In some countries, regulations governing constitution of technical reserves and remittance balances may hinder remittance of profits and repatriation of assets.

See Management's Discussion and Analysis of Financial Condition and Results of Operations — Capital Resources and Liquidity — Regulation and Supervision and Note 17 to Consolidated Financial Statements.

**Competition**

AIG's businesses operate in highly competitive environments, both domestically and overseas. Principal sources of competition are insurance companies, banks, investment banks and other non-bank financial institutions.

The insurance industry in particular is highly competitive. Within the United States, Chartis subsidiaries compete with approximately 3,300 other stock companies, specialty insurance organizations, mutual companies and other underwriting organizations. AIG's Domestic Life Insurance & Retirement Services subsidiaries compete in the United States with approximately 1,900 life insurance companies and other participants in related financial services fields. Overseas, AIG's subsidiaries compete for business with the foreign insurance operations of large U.S. insurers and with global insurance groups and local companies in particular areas in which they are active.

As a result of the reduction of the credit ratings of AIG and its subsidiaries, uncertainty relating to AIG's financial condition and AIG's asset disposition plan, AIG's businesses have faced and continue to face intense competition to retain existing customers and to maintain business with existing customers and counterparties at historical levels. Further, AIG has been and continues to be at a significant disadvantage in certain markets in soliciting new customers. Although surrender rates have begun to stabilize, AIG expects these difficult conditions to continue for the foreseeable future.

Competition is also intense for key employees. The announced asset dispositions, limitations placed by the American Recovery and Reinvestment Act of 2009 and the Special Master for Troubled Asset Relief Program (TARP) Executive Compensation on compensation arrangements and programs, decline in AIG's common stock price and uncertainty surrounding AIG's financial condition have adversely affected AIG's ability to retain and motivate key employees and to attract new employees. It is unclear whether, for the foreseeable future, AIG will be able to create a compensation structure that permits AIG to retain and motivate key employees.

For a further discussion of the risks relating to retaining existing customers, soliciting new customers and retaining key employees, see item 1A. Risk Factors.

**Other Information about AIG**

At December 31, 2009, AIG and its subsidiaries had approximately 96,000 employees.

Table of Contents

American International Group, Inc., and Subsidiaries

AIG's Internet address for its corporate website is *www.aigcorporate.com*. AIG makes available free of charge, through the Investor Information section of AIG's corporate website, Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and Proxy Statements on Schedule 14A and amendments to those reports or statements filed or furnished pursuant to Sections 13(a), 14(a) or 15(d) of the Securities Exchange Act of 1934 (the Exchange Act) as soon as reasonably practicable after such materials are electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). AIG also makes available on its corporate website copies of the charters for its Audit, Nominating and Corporate Governance and Compensation and Management Resources Committees, as well as its Corporate Governance Guidelines (which include Director Independence Standards), Director, Executive Officer and Senior Financial Officer Code of Business Conduct and Ethics, Employee Code of Conduct and Related-Party Transactions Approval Policy. Except for the documents specifically incorporated by reference into this Annual Report on Form 10-K, information contained on AIG's website or that can be accessed through its website is not incorporated by reference into this Annual Report on Form 10-K.

### Directors and Executive Officers of AIG

All directors of AIG are elected for one-year terms at the annual meeting of shareholders. In addition, the terms of each of the AIG Series E Fixed Rate Non-Cumulative Perpetual Preferred Stock, par value $5.00 per share, (AIG Series E Preferred Stock) and the AIG Series F Fixed Rate Non-Cumulative Perpetual Preferred Stock, par value $5.00 per share, (AIG Series F Preferred Stock) provide for the election of the greater of two additional directors or up to 20 percent of the total number of AIG directors (rounded up after giving effect to the election) upon a failure of AIG to make four quarterly dividend payments, whether or not consecutive. These preferred directors would be elected by a majority of the votes cast by the holder of the AIG Series E Preferred Stock and the AIG Series F Preferred Stock, voting together as a single class. If elected, such preferred directors would hold office until the next annual meeting (or special meeting called to elect directors) or until all dividends payable on all outstanding shares of the AIG Series E Preferred Stock and the AIG Series F Preferred Stock have been declared and paid in full for four consecutive quarters. As of February 17, 2010, the holder of the AIG Series E Preferred Stock and the AIG Series F Preferred Stock had not elected any directors pursuant to the provision, although AIG had failed to make four quarterly dividend payments.

All executive officers are elected to one-year terms, but serve at the pleasure of the Board of Directors. Except as hereinafter noted, each of the executive officers has, for more than five years, occupied an executive position with AIG or companies that are now its subsidiaries. There are no arrangements or understandings between any executive officer and any other person pursuant to which the executive officer was elected to such position. Prior to joining AIG in August 2009, Mr. Benmosche served as a member of the Board of Directors of Credit Suisse Group since 2002. Mr. Benmosche was former Chairman, President, and Chief Executive Officer of MetLife, a leading provider of insurance and other financial services. Earlier in his career he served as Executive Vice President for PaineWebber, Inc. Mr. Hancock served as Vice Chairman of Key Corp. from January 2008 until joining AIG in February 2010. Mr. Hancock was Managing Director of Trinsum Group, Inc., an asset management and strategic advisory firm from 2007 to January 2008 and President and Co-Founder of Integrated Finance Limited, an asset management and strategic advisory firm from 2002 to 2007. Mr. Russo was Senior Counsel at Patton Boggs LLP prior to joining AIG in February 2010. Mr. Russo served as Executive Vice President and Chief Legal Officer of Lehman Brothers Holdings Inc. for more than five years prior to December 2008. Mr. Wilson spent 18 years with AXA Asia Pacific Holdings Limited, a leading provider of life insurance, wealth management and advice businesses in the Asia-Pacific region, where he held a number of senior management positions until joining AIA as Deputy President in December 2006. In 2007, he was promoted to President and Chief Operating Officer of AIA, and in May 2009 he became Chief Executive Officer and President of AIA Group Limited.

AIG 2009 Form 10-K    16

Table of Contents

American International Group, Inc., and Subsidiaries

**Set forth below is information concerning the directors and executive officers of AIG as of February 25, 2010.**

| Name | Title | Age | Served as Director or Officer Since |
|------|-------|-----|-------------------------------------|
| Robert H. Benmosche | Director and Chief Executive Officer | 65 | 2009 |
| Dennis D. Dammerman | Director | 64 | 2008 |
| Harvey Golub | Director and Chairman of the Board of Directors | 70 | 2009 |
| Laurette T. Koellner | Director | 55 | 2009 |
| Christopher S. Lynch | Director | 52 | 2009 |
| Arthur C. Martinez | Director | 70 | 2009 |
| George L. Miles, Jr. | Director | 68 | 2005 |
| Robert S. Miller | Director | 68 | 2009 |
| Suzanne Nora Johnson | Director | 52 | 2008 |
| Morris W. Offit | Director | 73 | 2005 |
| Douglas M. Steenland | Director | 58 | 2009 |
| Peter D. Hancock | Executive Vice President — Finance, Risk and Investments | 51 | 2010 |
| David L. Herzog | Executive Vice President and Chief Financial Officer | 50 | 2005 |
| Rodney O. Martin, Jr. | Executive Vice President — Life Insurance | 57 | 2002 |
| Kristian P. Moor | Executive Vice President — Domestic General Insurance | 50 | 1998 |
| Thomas A. Russo | Executive Vice President — Legal, Compliance, Regulatory Affairs, Government Affairs and General Counsel | 66 | 2010 |
| Nicholas C. Walsh | Executive Vice President — Foreign General Insurance | 59 | 2005 |
| Mark A. Wilson | Executive Vice President — Life Insurance | 43 | 2010 |
| Jay S. Wintrob | Executive Vice President — Domestic Life and Retirement Services | 52 | 1999 |
| William N. Dooley | Senior Vice President — Financial Services | 57 | 1992 |
| Jeffrey J. Hurd | Senior Vice President — Human Resources and Communications | 43 | 2010 |
| Robert E. Lewis | Senior Vice President and Chief Risk Officer | 58 | 1993 |
| Monika M. Machon | Senior Vice President and Chief Investment Officer | 49 | 2009 |
| Brian T. Schreiber | Senior Vice President — Strategic Planning | 44 | 2002 |

## Item 1A.  Risk Factors

AIG has been significantly and adversely affected by the market turmoil in late 2008 and early 2009, and, despite the recovery in the markets in mid and-late 2009, is subject to significant risks, as discussed below. Many of these risks are interrelated and occur under similar business and economic conditions, and the occurrence of certain of them may in turn cause the emergence, or exacerbate the effect, of others. Such a combination could materially increase the severity of the impact on AIG. As a result, should certain of these risks emerge, AIG may need additional support from the U.S. government. Without additional support from the U.S. government, in the future there could exist substantial doubt about AIG's ability to continue as a going concern. See Management's Discussion and Analysis of Financial Condition and Results of Operations — Consideration of AIG's Ability to Continue as a Going Concern and Note 1 to the Consolidated Financial Statements for a further discussion.

Since September 2008, AIG has been working to protect and enhance the value of its key businesses, to execute an orderly asset disposition plan and to position itself for the future, with the primary goal of enabling it to repay U.S. taxpayers for the support it has received. AIG's efforts have been and continue to be subject to risks, the most significant of which are the following:

### Execution of Restructuring Plan

*A number of factors outside AIG's control could impair AIG's ability to implement its asset disposition plan, which is a critical component of AIG's plan to repay U.S. taxpayers for the support provided under the Credit Facility (FRBNY Credit Facility) provided by the FRBNY under the Credit Agreement, dated as of September 22, 2008 (as amended, the FRBNY*

17      AIG 2009 Form 10-K

Table of Contents

American International Group, Inc., and Subsidiaries

Item 6.  Selected Financial Data

The Selected Consolidated Financial Data should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations and the Consolidated Financial Statements and accompanying notes included elsewhere herein.

| Years Ended December 31,<br>(in millions, except per<br>share data) | 2009[a] | 2008[a] | 2007[a] | 2006[a] | 2005[a] |
|---|---|---|---|---|---|
| Revenues[b] | | | | | |
| Premiums and other considerations | $  64,702 | $  78,564 | $  74,753 | $  69,565 | $  65,588 |
| Net investment income | 25,239 | 11,433 | 30,051 | 27,612 | 24,480 |
| Net realized capital gains (losses) | (6,854) | (52,705) | (3,501) | 62 | 601 |
| Unrealized market valuation gains (losses) on AIGFP super senior credit default swap portfolio | 1,418 | (28,602) | (11,472) | | |
| Other income | 11,499 | (1,794) | 13,801 | 9,687 | 12,060 |
| Total revenues | 96,004 | 6,896 | 103,632 | 106,926 | 102,729 |
| Benefits, claims and expenses: | | | | | |
| Policyholder benefits and claims incurred | 61,436 | 58,839 | 62,452 | 57,052 | 60,834 |
| Policy acquisition and other insurance expenses[c] | 20,674 | 26,284 | 19,819 | 19,003 | 17,310 |
| Interest expense[d] | 15,369 | 17,007 | 4,751 | 3,657 | 2,572 |
| Restructuring expenses and related asset impairment and other expenses | 1,386 | 804 | - | - | - |
| Net loss on sale of divested businesses | 1,271 | | | | |
| Other expenses[c] | 9,516 | 10,490 | 8,476 | 6,224 | 7,143 |
| Total benefits, claims and expenses | 109,652 | 113,424 | 95,498 | 85,936 | 87,859 |
| Income (loss) from continuing operations before income tax expense (benefit) and cumulative effect of change in accounting principles[b][e][f] | (13,648) | (106,528) | 8,134 | 20,990 | 14,870 |
| Income tax expense (benefit)[g] | (1,878) | (8,894) | 1,267 | 6,368 | 4,224 |
| Income (loss) from continuing operations before cumulative effect of change in accounting principles | (11,770) | (97,634) | 6,867 | 14,622 | 10,646 |
| Income (loss) from discontinued operations, net of tax | (543) | (2,753) | 621 | 528 | 309 |
| Net income (loss) | (12,313) | (100,387) | 7,488 | 15,150 | 10,955 |
| Net income (loss) attributable to AIG | (10,949) | (99,289) | 6,200 | 14,048 | 10,477 |
| Earnings per common share attributable to AIG: | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Basic** | | | | | |
| Income (loss) from continuing operations before cumulative effect of change in accounting principles | (86.30) | (737.12) | 43.40 | 103.60 | 78.43 |
| Income (loss) from discontinued operations | (4.18) | (19.73) | 4.58 | 3.87 | 2.26 |
| Cumulative effect of change in accounting principles, net of tax | - | - | - | 0.26 | |
| Net income (loss) attributable to AIG | (90.48) | (756.85) | 47.98 | 107.73 | 80.69 |
| **Diluted** | | | | | |
| Income (loss) before cumulative effect of change in accounting principles | (86.30) | (737.12) | 43.17 | 103.07 | 77.63 |
| Income (loss) from discontinued operations | (4.18) | (19.73) | 4.56 | 3.85 | 2.23 |
| Cumulative effect of change in accounting principles, net of tax | | | | 0.26 | |
| Net income (loss) attributable to AIG | (90.48) | (756.85) | 47.73 | 107.18 | 79.86 |
| Dividends declared per common share | | 8.40 | 15.40 | 13.00 | 12.60 |
| **Year-end balance sheet data:** | | | | | |
| Total investments | 601,165 | 636,912 | 829,468 | 767,812 | 665,166 |
| Total assets | 847,585 | 860,418 | 1,048,361 | 979,414 | 851,847 |
| Commercial paper and other short-term debt[j] | 4,739 | 15,718 | 13,114 | 13,028 | 9,208 |
| Long-term debt[j] | 136,733 | 177,485 | 162,935 | 135,650 | 100,641 |
| Total AIG shareholders' equity | 69,824 | 52,710 | 95,801 | 101,677 | 86,317 |
| Total equity | $ 98,076 | $ 60,805 | $ 104,273 | $ 107,037 | $ 90,076 |

33     AIG 2009 Form 10-K

Table of Contents

American International Group, Inc., and Subsidiaries

(a)
Certain reclassifications have been made to prior period amounts to conform to the current period presentation. See Note 1 to the Consolidated Financial Statements.

(b)
In 2009, 2008, 2007, 2006, and 2005, includes other-than-temporary impairment charges on investments of $7.8 billion, $48.6 billion, $4.6 billion, $912 million, and $572 million, respectively. Also 2009, 2008, 2007, 2006 and 2005 results include gains (losses) from hedging activities that did not qualify for hedge accounting treatment, including the related foreign exchange gains and losses, of $1.2 billion, $(3.7) billion, $(1.4) billion, $(1.9) billion, and $2.4 billion, respectively, in revenues and in income from continuing operations before income tax expense. These amounts result primarily from interest rate and foreign currency derivatives that are effective economic hedges of investments and borrowings.

(c)
Includes goodwill impairment charges of $81 million and $3.3 billion, respectively, in Policy acquisition and other insurance expenses and $612 million and $791 million, respectively, in Other expenses for 2009 and 2008.

(d)
In 2009 and 2008, includes $10.4 billion and $11.4 billion, respectively, of interest expense on the FRBNY Credit Facility which was comprised of $8.4 billion and $9.3 billion, respectively, of amortization on the prepaid commitment fee asset associated with the FRBNY Credit Facility and $2.0 billion and $2.1 billion, respectively, of accrued compounding interest.

(e)
Includes catastrophe-related losses of $53 million in 2009, $1.8 billion in 2008, $276 million in 2007, and $3.28 billion in 2005.

(f)
Reduced by fourth quarter charges of $2.3 billion in 2009 and $1.8 billion in 2005 related to the annual review of General Insurance loss and loss adjustment reserves. In 2006 and 2005, includes charges related to changes in estimates for asbestos and environmental reserves of $198 million, and $873 million, respectively.

(g)
In 2008, includes a $20.6 billion valuation allowance to reduce AIG's deferred tax asset to an amount AIG believes is more likely than not to be realized, and a $4.8 billion deferred tax expense attributable to the potential sale of foreign businesses. In 2009, includes a $2.9 billion valuation allowance to reduce AIG's deferred tax asset to an amount AIG believes is more likely than not to be realized.

(h)
Includes borrowings of $2.7 billion and $2.0 billion for AIGFP (through Curzon Funding LLC, AIGFP's asset-backed commercial paper conduit) and AIG Funding, respectively, under the CPFF at December 31, 2009 and $6.8 billion, $6.6 billion and $1.7 billion for AIGFP (through Curzon Funding LLC), AIG Funding and ILFC, respectively, at December 31, 2008.

(i)
Includes that portion of long-term debt maturing in less than one year. See Note 14 to the Consolidated Financial Statements.

See Note 1(y) to the Consolidated Financial Statements for effects of adopting new accounting standards.

AIG 2009 Form 10-K    34

Source: AMERICAN INTERNATIONAL GROUP INC, 10-K, February 26, 2010        Powered by Morningstar® Document Research℠

**EXHIBIT F**
**to the Declaration of John R. Coleman**

**Saudi Arabia Background Note**



Home » Under Secretary for Public Diplomacy and Public Affairs » Bureau of Public Affairs » Bureau of Public Affairs: Electronic Information and Publications Office » Background Notes » Saudi Arabia

**On this page:**

**Profile**

**People**

**History**

**Government**

**Political Conditions**

**Economy**

**Foreign Relations**

**U.S. Relations**

**Travel/Business**

**Background Notes A-Z**

April 5, 2010 | Bureau of Near Eastern Affairs



# Background Note: Saudi Arabia

**Official Name:** **Kingdom of Saudi Arabia**



**PROFILE**

**Geography**

Area: 1,960,582 million sq. km. (784,233 sq. mi.), slightly more than one-fifth the size of the continental United States.

Cities (2006 est.): *Capital*--Riyadh (pop. 4.3 million). *Other cities*--Jeddah (3.4 million), Makkah, (1.6 million), Dammam/Khobar/Dhahran, (1.6 million).

Terrain: Primarily desert with rugged mountains in the southwest.

Climate: Arid, with great extremes of temperature in the interior; humidity and temperature are

both high along the coast.

## People

Nationality: *Noun*--Saudi(s). *Adjective*--Saudi Arabian or Saudi.

Population (July 2008 est.): 28 million (22.6 million Saudis, 5.6 million foreign nationals).

Annual growth rate: (2008 est.): 1.9%.

Ethnic groups: Arab (90% of native pop.), Afro-Asian (10% of native pop.).

Religion: Islam.

Language: Arabic (official).

Education: *Literacy*--total 78.8% (male 84.7%, female 70.8%).

Health: *Infant mortality rate* (2008 est.)--12.01 deaths/1,000 live births. *Life expectancy*--male 74 years, female 78 years.

Work force: 6.49 million, about 35% foreign workers (2005 est.); *industry*--25%; *services* (including government)--63%; *agriculture*--12%.

## Government

Type: Monarchy with Council of Ministers and Consultative Council.

Unification: September 23, 1932.

Constitution: The Holy Qur'an (governed according to Islamic Law), Shari'a, and the Basic Law.

Branches: *Executive*--King (chief of state and head of government; rules under the title Custodian of the Two Holy Mosques). *Legislative*--a Consultative Council with advisory powers was formed September 1993. *Judicial*--Supreme Court, Supreme Judicial Council, Islamic Courts of First Instance and Appeals.

Administrative divisions: 13 provinces.

Political parties: None.

## Economy

GDP (2008 est.): $527 billion.

Annual growth rate (2008 est.): 6.1%.

Per capita GDP (2008): $21,062.

Natural resources: Hydrocarbons, gold, uranium, bauxite, coal, iron, phosphate, tungsten, zinc, silver, copper.

Agriculture: *Products*--dates, grains, livestock, vegetables. *Arable land*--1.76%.

Industry: *Types*--petroleum, petrochemicals, cement, fertilizer, light industry.

Trade (2008 est.): *Exports*--$364 billion: petroleum and petroleum products. *Imports*--$103 billion: manufactured goods, transportation equipment, clothing and textiles, processed food products. *Major trading partners*--China, France, Germany, Italy, Japan, Singapore, South Korea, Taiwan, U.K., U.S. (2006).

## PEOPLE

Saudi Arabia's 2008 population was estimated to be about 28 million, including about 5.6 million resident foreigners. Until the 1960s, most of the population was nomadic or seminomadic; due to rapid economic and urban growth, more than 95% of the population now is settled. Some cities and oases have densities of more than 1,000 people per square

kilometer (2,600 per sq. mi).

Saudi Arabia is known as the birthplace of Islam, which in the century following the Prophet
Muhammad's death in 632 A.D. spread west to Spain and east to India. Islam obliges all
Muslims to make the Hajj, or pilgrimage to Makkah, at least once during their lifetime if they
are able to do so. The cultural environment in Saudi Arabia is highly conservative; the country
officially adheres to the strict Wahhabi interpretation of Islamic religious law (Shari'a). Cultural
presentations must conform to narrowly defined standards of ethics. Men and women are not
permitted to attend public events together and are segregated in the work place.

Most Saudis are ethnically Arab. Some are of mixed ethnic origin and are descended from
Turks, Iranians, Indonesians, Indians, Africans, and others, most of whom immigrated as
pilgrims and reside in the Hijaz region along the Red Sea coast. Many Arabs from nearby
countries are employed in the kingdom. There also are significant numbers of Asian
expatriates mostly from India, Pakistan, Bangladesh, Indonesia, and the Philippines.
Westerners in Saudi Arabia number under 100,000.

## HISTORY

Except for a few major cities and oases, the harsh climate historically prevented much
settlement of the Arabian Peninsula. People of various cultures have lived in the peninsula
over a span of more than 5,000 years. The Dilmun culture, along the Gulf coast, was
contemporaneous with the Sumerians and ancient Egyptians, and most of the empires of the
ancient world traded with the states that existed on the peninsula, which lay along important
trade routes.

The Saudi state began in central Arabia in about 1750. A local ruler, Muhammad bin Saud,
joined forces with an Islamic reformer, Muhammad Abd Al-Wahhab, to create a new political
entity. Over the next 150 years, the fortunes of the Saud family rose and fell several times as
Saudi rulers contended with Egypt, the Ottoman Empire, and other Arabian families for control
on the peninsula. The modern Saudi kingdom was founded by the late King Abdul Aziz Al
Saud (known internationally as Ibn Saud, or "Son of Saud"). In 1902, Abdul Aziz recaptured
Riyadh, the Al Saud dynasty's ancestral capital, from the rival Al-Rashid family. Continuing his
conquests, Abdul Aziz subdued Al-Hasa in the east, the rest of the central Nejd region, and
the Hijaz along the Red Sea coast between 1913 and 1926. In 1932, Abdul Aziz declared
these regions unified as the Kingdom of Saudi Arabia.

Boundaries with Jordan, Iraq, and Kuwait were established by a series of treaties negotiated
in the 1920s, with two "neutral zones"--one with Iraq and the other with Kuwait--created. The
Saudi-Kuwaiti neutral zone was administratively partitioned in 1971, with each state
continuing to share the petroleum resources of the former zone equally. Tentative agreement
on the partition of the Saudi-Iraqi neutral zone was reached in 1981, and partition was
finalized by 1983. The country's southern boundary with Yemen was partially defined by the
1934 Treaty of Taif, which ended a brief border war between the two states. A June 2000
treaty further delineated portions of the boundary with Yemen. The location and status of
Saudi Arabia's boundary with the United Arab Emirates is not final; a de facto boundary

reflects a 1974 agreement. The border between Saudi Arabia and Qatar was resolved in
March 2001. The border with Oman also is not demarcated.

King Abdul Aziz died in 1953 and was succeeded by his eldest son, Saud, who reigned for 11
years. In 1964, Saud abdicated in favor of his half-brother, Faisal, who had served as Foreign
Minister. Because of fiscal difficulties, King Saud had been persuaded in 1958 to delegate
direct conduct of Saudi Government affairs to Faisal as Prime Minister; Saud briefly regained
control of the government in 1960-62. In October 1962, Faisal outlined a broad reform
program, stressing economic development. Proclaimed King in 1964 by senior royal family
members and religious leaders, Faisal also continued to serve as Prime Minister. This
practice has been followed by subsequent kings.

The mid-1960s saw external pressures generated by Saudi-Egyptian differences over Yemen.
When civil war broke out in 1962 between Yemeni royalists and republicans, Egyptian forces
entered Yemen to support the new republican government, while Saudi Arabia backed the
royalists. Tensions subsided only after 1967, when Egypt withdrew its troops from Yemen.

Saudi forces did not participate in the Six-Day (Arab-Israeli) War of June 1967, but the
government later provided annual subsidies to Egypt, Jordan, and Syria to support their
economies. During the 1973 Arab-Israeli war, Saudi Arabia participated in the Arab oil boycott
of the United States and Netherlands. A founding member of the Organization of Petroleum
Exporting Countries (OPEC), Saudi Arabia had joined other member countries in moderate oil
price increases beginning in 1971. After the 1973 war, the price of oil rose substantially,
dramatically increasing Saudi Arabia's wealth and political influence.

In 1975, King Faisal was assassinated by a nephew, who was executed after an extensive
investigation concluded that he acted alone. Faisal was succeeded by his half-brother Khalid
as King and Prime Minister; their half-brother Prince Fahd was named Crown Prince and First
Deputy Prime Minister. King Khalid empowered Crown Prince Fahd to oversee many aspects
of the government's international and domestic affairs. Economic development continued
rapidly under King Khalid, and the kingdom assumed a more influential role in regional politics
and international economic and financial matters.

In June 1982, King Khalid died, and Fahd became King and Prime Minister in a smooth
transition. Another half-brother, Prince Abdallah, Commander of the Saudi National Guard,
was named Crown Prince and First Deputy Prime Minister. King Fahd's full brother, Prince
Sultan, the Minister of Defense and Aviation, became Second Deputy Prime Minister. Under
King Fahd, the Saudi economy adjusted to sharply lower oil revenues resulting from declining
global oil prices. Saudi Arabia supported neutral shipping in the Gulf during periods of the Iran
-Iraq war and aided Iraq's war-strained economy. King Fahd played a major part in bringing
about the August 1988 cease-fire between Iraq and Iran and in organizing and strengthening
the Gulf Cooperation Council (GCC), a group of six Arabian Gulf states dedicated to fostering
regional economic cooperation and peaceful development.

In 1990-91, King Fahd played a key role before and during the Gulf war, helping consolidate

the coalition of forces against Iraq and define the tone of the operation as a multilateral effort to reestablish the sovereignty and territorial integrity of Kuwait. Acting as a rallying point and personal spokesman for the coalition, King Fahd helped bring together his nation's GCC, Western, and Arab allies, as well as nonaligned nations from Africa and the emerging democracies of Eastern Europe. He used his influence as Custodian of the Two Holy Mosques to persuade other Arab and Islamic nations to join the coalition.

King Fahd suffered a stroke in November 1995. From 1997, Crown Prince Abdallah took on much of the day-to-day responsibilities of running the government. Upon King Fahd's death on August 1, 2005, Abdallah assumed the throne as King. Prince Sultan, Minister of Defense and Aviation, became Crown Prince and First Deputy Prime Minister. Since ascending to the throne, King Abdallah has continued to pursue an incremental program of social, economic, and political reforms. In September 2009, he inaugurated the King Abdallah University of Science and Technology (KAUST), a graduate-level research institution and Saudi Arabia's first co-educational university.

**GOVERNMENT AND POLITICAL CONDITIONS**

The central institution of Saudi Arabian Government is the monarchy. The Basic Law adopted in 1992 declared that Saudi Arabia is a monarchy ruled by the sons and grandsons of King Abd Al Aziz Al Saud, and that the Holy Qur'an is the constitution of the country, which is governed on the basis of Islamic law (Shari'a). There are no political parties or national elections; however, the country held its first municipal elections in 2005. The king's powers are limited because he must observe the Shari'a and other Saudi traditions. He also must retain a consensus of the Saudi royal family, religious leaders (ulema), and other important elements in Saudi society. In the past the leading members of the royal family chose the king from among themselves with the subsequent approval of the ulema. In November 2006, King Abdallah established an Allegiance Commission that will select future crown princes, a step designed to help formalize the selection process.

Saudi kings gradually have developed a central government. Since 1953, the Council of Ministers, appointed by and responsible to the king, has advised on the formulation of general policy and directed the activities of the growing bureaucracy. This council consists of a prime minister, the first and second deputy prime ministers, 20 ministers, two ministers of state, and a small number of advisers and heads of major autonomous organizations.

Legislation is by resolution of the Council of Ministers and the Shura Council, ratified by royal decree, and must be compatible with Shari'a. Justice is administered according to Shari'a by a system of religious courts. A 2007 law created a new Supreme Court to replace the Supreme Judicial Council (SJC) as Saudi Arabia's highest court authority. The same law transfers powers that the Ministry of Justice formerly exercised to the SJC, such as the authority to ability to establish and abolish courts, and name judges to the Courts of Appeal and First Instance. The independence of the judiciary is protected by law. The king has the authority to hear appeals and has the power to pardon in cases where the punishment is not ordained in the Qur'an. Access to high officials (usually at a majlis, or public audience) and the right to petition them directly are well-established traditions.

The kingdom is divided into 13 provinces governed by princes or close relatives of the royal family. All governors are appointed by the King.

In March 1992, King Fahd issued several decrees outlining the basic statutes of government and codifying for the first time procedures concerning the royal succession. Fahd's political reform program also provided for the establishment of a national Consultative Council, with appointed members having advisory powers to review and give advice on issues of public interest. It also outlined a framework for councils at the provincial level.

In September 1993, King Fahd issued additional reform decrees, appointing the members of the national Consultative Council and spelling out procedures for the new council's operations. He announced reforms regarding the Council of Ministers, including term limitations of 4 years and regulations to prohibit conflict of interest for ministers and other high-level officials. The members of 13 provincial councils and the councils' operating regulations also were announced in September 1993. In February, March, and April 2005, Saudis voted in the country's first municipal elections in more than 50 years. Women and male members of the military were not permitted to vote.

In July 1997, the membership of the Consultative Council was expanded from 60 to 90 members, and again in May 2001 from 90 to 120 members. In 2005, membership was expanded to 150 members. Membership has changed significantly during expansions of the council as many members have not been reappointed. The role of the Council is gradually expanding as it gains experience.

In November 2006, King Abdallah announced the formation of an Allegiance Commission which, in the future, will select crown princes upon the death or incapacitation of the king or crown prince. A December 2007 royal decree named the initial members of the Commission, all of whom are sons, grandsons, or great-grandsons representing each branch of the descendants of the Kingdoms' founder, King Abdul Aziz. Only direct male descendants of Abdul Aziz are eligible to become crown prince or king.

**Principal Government Officials**
King, Prime Minister, Custodian of the Two Holy Mosques--King Abdallah bin Abd al-Aziz Al Saud
Minister of Foreign Affairs--Prince Saud al-Faisal bin Abdul Aziz Al Saud
Ambassador to the U.S.--Adel al-Jubeir

The **Embassy** of the Kingdom of Saudi Arabia is located at 601 New Hampshire Avenue NW, Washington, DC 20037; tel. 202-342-3800.

**ECONOMY**
Oil was discovered in Saudi Arabia by U.S. geologists in the 1930s, although large scale production did not begin until after World War II. Oil wealth has made possible rapid economic development, which began in earnest in the 1960s and accelerated spectacularly in the

1970s, transforming the kingdom.

Saudi oil reserves are the largest in the world, and Saudi Arabia is the world's leading oil producer and exporter. Oil accounts for more than 90% of the country's exports and nearly 75% of government revenues. Proven reserves are estimated to be 263 billion barrels, about one-quarter of world oil reserves.

More than 95% of all Saudi oil is produced on behalf of the Saudi Government by the parastatal giant Saudi ARAMCO. In June 1993, Saudi ARAMCO absorbed the state marketing and refining company (SAMAREC), becoming the world's largest fully integrated oil company. Most Saudi oil exports move by tanker from Gulf terminals at Ras Tanura and Ju'aymah. The remaining oil exports are transported via the east-west pipeline across the kingdom to the Red Sea port of Yanbu.

Due to a sharp rise in petroleum revenues in 1974 following the 1973 Arab-Israeli war, Saudi Arabia became one of the fastest-growing economies in the world. It enjoyed a substantial surplus in its overall trade with other countries; imports increased rapidly; and ample government revenues were available for development, defense, and aid to other Arab and Islamic countries.

But higher oil prices led to development of more oil fields around the world and reduced global consumption. The result, beginning in the mid-1980s, was a worldwide oil glut, which introduced an element of planning uncertainty for the first time in a decade. Saudi oil production, which had increased to almost 10 million barrels per day (b/d) during 1980-81, dropped to about 2 million b/d in 1985. Budgetary deficits developed, and the government drew down its foreign assets. Responding to financial pressures, Saudi Arabia gave up its role as the "swing producer" within OPEC in the summer of 1985 and accepted a production quota. Since then, Saudi oil policy has been guided by a desire to maintain market and quota shares and to support stability in the international oil market.

Saudi Arabia was a key player in coordinating the successful 1999 campaign of OPEC and other oil-producing countries to raise the price of oil to its highest level since the Gulf War by managing production and supply of petroleum. That same year saw establishment of the Supreme Economic Council to formulate and better coordinate Saudi economic development policies in order to accelerate institutional and industrial reform.

In response to increasing international demand for oil, Saudi ARAMCO engaged in an expansion of its oil production capacity and planned to raise its capacity from 11 million barrels/day (mb/d) to 12 mb/d by 2009. Saudi ARAMCO is also increasing production of associated and non-associated natural gas to feed the expanding petrochemical sector. Notably, Saudi Arabia has awarded contracts to foreign companies to conduct gas exploration in selected regions of the country--the first such foreign participation in the petroleum sector upstream since the nationalization of ARAMCO began in the 1970s.

Saudi Arabia continues to pursue rapid industrial expansion, led by the petrochemical sector.

The Saudi Basic Industries Corporation (SABIC), a parastatal petrochemical company, is now one of the world's leading petrochemical producers, and the government promotes private sector involvement in petrochemicals. The government also plans new investments in the mining sector and in refining,

After Saudi Arabia announced its intention to join the World Trade Organization, negotiations focused on increasing market access to foreign goods and services and the timeframe for becoming fully compliant with WTO obligations. In April 2000, the government established the Saudi Arabian General Investment Authority to encourage foreign direct investment in the country. Saudi Arabia signed a Trade Investment Framework Agreement with the U.S. in July 2003, and joined the WTO in December 2005.

Through 5-year development plans, the government has sought to allocate its petroleum income to transform its relatively undeveloped, oil-based economy into that of a modern industrial state while maintaining the kingdom's traditional Islamic values and customs. Although economic planners have not achieved all their goals, the economy has progressed rapidly. Oil wealth has increased the standard of living of most Saudis. However, significant population growth has strained the government's ability to finance further improvements in the country's standard of living. Heavy dependence on petroleum revenue continues, but industry and agriculture now account for a larger share of economic activity. The mismatch between the job skills of Saudi graduates and the needs of the private job market at all levels remains the principal obstacle to economic diversification and development; about 4.6 million non-Saudis are employed in the economy.

Saudi Arabia's first two development plans, covering the 1970s, emphasized infrastructure. The results were impressive--the total length of paved highways tripled, power generation increased by a multiple of 28, and the capacity of the seaports grew tenfold. For the third plan (1980-85), the emphasis changed. Spending on infrastructure declined, but it rose markedly on education, health, and social services. The share for diversifying and expanding productive sectors of the economy (primarily industry) did not rise as planned, but the two industrial cities of Jubail and Yanbu--built around the use of the country's oil and gas to produce steel, petrochemicals, fertilizer, and refined oil products--were largely completed.

In the fourth plan (1985-90), the country's basic infrastructure was viewed as largely complete, but education and training remained areas of concern. Private enterprise was encouraged, and foreign investment in the form of joint ventures with Saudi public and private companies was welcomed. The private sector became more important, rising to 70% of non-oil GDP by 1987. While still concentrated in trade and commerce, private investment increased in industry, agriculture, banking, and construction companies. These private investments were supported by generous government financing and incentive programs. The objective was for the private sector to have 70% to 80% ownership in most joint venture enterprises.

The fifth plan (1990-95) emphasized consolidation of the country's defenses; improved and more efficient government social services; regional development; and, most importantly, creating greater private-sector employment opportunities for Saudis by reducing the number

of foreign workers.

The sixth plan (1996-2000) focused on lowering the cost of government services without cutting them and sought to expand educational training programs. The plan called for reducing the kingdom's dependence on the petroleum sector by diversifying economic activity, particularly in the private sector, with special emphasis on industry and agriculture. It also continued the effort to "Saudiize" the labor force.

The seventh plan (2000-2004) focused more on economic diversification and a greater role of the private sector in the Saudi economy. For the period 2000-04, the Saudi Government has aimed at an average GDP growth rate of 3.16% each year, with projected growths of 5.04% for the private sector and 4.01% for the non-oil sector. The government also has set a target of creating 817,300 new jobs for Saudi nationals.

The eighth plan (2005-2010) again focuses on economic diversification in addition to education and inclusion of women in society. The plan calls for establishing new universities and new colleges with technical specializations. Privatization as well as emphases on a knowledge-based economy and tourism will help in the goal of economic diversification.

**FOREIGN RELATIONS**

Saudi foreign policy objectives are to maintain its security and its paramount position on the Arabian Peninsula, defend general Arab and Islamic interests, promote solidarity among Islamic governments, and maintain cooperative relations with other oil-producing and major oil-consuming countries.

Saudi Arabia signed the UN Charter in 1945. The country plays a prominent and constructive role in the International Monetary Fund, the World Bank, and Arab and Islamic financial and development assistance institutions. One of the largest aid donors in the world, it still gives some aid to a number of Arab, African, and Asian countries. Jeddah is the headquarters of the Secretariat of the Organization of the Islamic Conference and its subsidiary organization, the Islamic Development Bank, founded in 1969.

Membership in the 11-member OPEC and in the technically and economically oriented Arab producer group--the Organization of Arab Petroleum Exporting Countries--facilitates coordination of Saudi oil policies with other oil-exporting governments. As the world's leading exporter of petroleum, Saudi Arabia has a special interest in preserving a stable and long-term market for its vast oil resources by allying itself with healthy Western economies which can protect the value of Saudi financial assets. It generally has acted to stabilize the world oil market and tried to moderate sharp price movements.

The Saudi Government frequently helps mediate regional crises and supports the Israeli-Palestinian peace negotiations. A charter member of the Arab League, Saudi Arabia supports the position that Israel must withdraw from the territories which it occupied in June 1967, as called for in United Nations Security Council Resolution 242. Saudi Arabia supports a peaceful resolution of the Arab-Israeli conflict but rejected the Camp David accords, claiming

that they would be unable to achieve a comprehensive political solution that would ensure Palestinian rights and adequately address the status of Jerusalem. Although Saudi Arabia broke diplomatic relations with and suspended aid to Egypt in the wake of Camp David, the two countries renewed formal ties in 1987. In March 2002, then-Crown Prince Abdallah offered a Middle East peace plan, now known as the Arab Peace Initiative, at the annual summit of the Arab League in which Arab governments would offer "normal relations and the security of Israel in exchange for a full Israeli withdrawal from all occupied Arab lands, recognition of an independent Palestinian state with Jerusalem as its capital, and the return of Palestinian refugees." In March 2007 the Arab League reiterated its support for the Arab Peace Initiative by emphasizing that it could be the foundation for a broad Arab-Israeli peace. In November 2007, Saudi Foreign Minister Prince Saud al-Faisal attended the Annapolis Conference, along with more than 50 representatives of concerned countries and international organizations. The Conference was convened to express the broad support of the international community for the Israeli and Palestinian leaders' courageous efforts and was a launching point for negotiations designed to lead to the establishment of a Palestinian state and the realization of Israeli-Palestinian peace.

Saudi Arabia supports the establishment of a unified, independent, and sovereign Iraq. The Kingdom is a charter member of the International Compact with Iraq and participates in the Expanded Iraq Neighbors process. In January 2008, Foreign Minister Prince Saud al-Faisal reiterated Saudi Arabia's intention to open a diplomatic mission in Baghdad and appoint an ambassador.

In 1990-91, Saudi Arabia played an important role in the Gulf War, developing new allies and improving existing relationships between Saudi Arabia and some other countries, but also suffering diplomatic and financial costs. Relations between Saudi Arabia and Tunisia, Algeria, and Libya deteriorated. Each country had remained silent following Iraq's invasion of Kuwait but called for an end to violence once the deployment of coalition troops began. Relations between these countries and Saudi Arabia have returned to their pre-war status. Saudi Arabia's relations with those countries which expressed support for Saddam Hussein's invasion of Kuwait--Yemen, Jordan, and Sudan--were severely strained during and immediately after the war. For example, several hundred thousand Yemenis were expelled from Saudi Arabia after the Government of Yemen announced its position, thus exacerbating an existing border dispute. Saudi Arabia's relations with the Yemeni Government have improved, but the current instability in Yemen remains a significant concern to the Saudi Government. The Palestine Liberation Organization's support for Iraq cost it financial aid as well as good relations with Saudi Arabia and other Gulf states. Recently, though, Saudi Arabia's relations with Jordan and the Palestinian Authority have improved, with the Saudi Government providing assistance for the Palestinian Authority.

During and after the Gulf War, the Government of Saudi Arabia provided water, food, shelter, and fuel for coalition forces in the region, and also made monetary payments to some coalition partners. Saudi Arabia's combined costs in payments, foregone revenues, and donated supplies were $55 billion. More than $15 billion went toward reimbursing the United States alone.

Since ascending to the throne, King Abdallah has followed a more activist foreign policy, offering Saudi assistance and support in efforts to resolve regional crises in Lebanon, Sudan, and Somalia; fostering Israeli-Palestinian peace efforts; and increasing Saudi diplomatic engagement around the world. In particular, he has pursued an Interfaith Dialogue Initiative to encourage religious tolerance on a global level, which was endorsed in a session of the UN General Assembly in November 2008.

**U.S.-SAUDI ARABIAN RELATIONS**

Saudi Arabia's unique role in the Arab and Islamic worlds, its possession of the world's largest reserves of oil, and its strategic location make its friendship important to the United States. Diplomatic relations were established in 1933; the U.S. embassy opened in Jeddah in 1944 and moved to Riyadh in 1984. The Jeddah embassy became a U.S. consulate general. The U.S. consulate general in Dhahran opened in 1944 in response to the growing oil-related U.S. presence in eastern Saudi Arabia.

The United States and Saudi Arabia share common concerns about regional security, oil exports and imports, and sustainable development. Close consultations between the U.S. and Saudi Arabia have developed on international, economic, and development issues such as the Middle East peace process and shared interests in the Gulf. The continued availability of reliable sources of oil, particularly from Saudi Arabia, remains important to the prosperity of the United States as well as to Europe and Japan. Saudi Arabia is one of the leading sources of imported oil for the United States, providing more than one million barrels/day of oil to the U.S. market. The U.S. is Saudi Arabia's largest trading partner, and Saudi Arabia is the largest U.S. export market in the Middle East.

In addition to economic ties, a longstanding security relationship continues to be important in U.S.-Saudi relations. A U.S. military training mission established at Dhahran in 1953 provides training and support in the use of weapons and other security-related services to the Saudi armed forces. The United States has sold Saudi Arabia military aircraft (F-15s, AWACS, and UH-60 Blackhawks), air defense weaponry (Patriot and Hawk missiles), armored vehicles (M1A2 Abrams tanks and M-2 Bradley infantry fighting vehicles), and other equipment. The U.S. Army Corps of Engineers had a long-term role in military and civilian construction activities in the Kingdom. The U.S., as part of the Gulf Security Dialogue with individual Gulf Cooperation Council (GCC) members, has announced plans to sell advanced, primarily defensive, military equipment to GCC members, including Saudi Arabia, to support the efforts of these countries to increase their capacity for self-defense.

In August 2003, following the U.S.-led war in Iraq in March and April 2003, the United States withdrew its troops stationed in Saudi Arabia.

Saudi Arabia's relations with the United States were strained after the September 11, 2001, terrorist attacks in which 15 of the suicide bombers were Saudi citizens. In May 2003, a terrorist organization directly affiliated with al-Qaeda launched a violent campaign of terror in Saudi Arabia. On May 12, suicide bombers killed 35 people, including nine Americans, in

attacks at three housing compounds for Westerners in Riyadh. On November 8, 2003 terrorists attacked another compound housing foreign workers from mainly Arab countries. At least 18 people, including 5 children died in this attack, and more than 100 were injured. On May 1, 2004 terrorists killed two Americans in the Yanbu oil facility in the western part of the country. On May 29, 2004 terrorists killed one American and wounded several others in attacks on an official building and housing compound in al-Khobar in the Eastern Province. On June 6, terrorists shot and killed a BBC journalist. On June 9 and June 12, 2004 terrorists killed Americans Robert Jacobs and Kenneth Scroggs. On June 18, 2004 terrorists kidnapped and beheaded American Paul Johnson. On December 6, 2004 terrorists attacked the U.S. Consulate in Jeddah, killing five consulate employees. Terrorists also targeted and killed other foreign nationalities during this time.

Saudi security services have waged an active counterterrorism campaign that has largely neutralized this terrorist organization, though sporadic instances of terrorism still occur. In May 2006, terrorists attempted to attack the major ARAMCO oil-processing facility at Abqaiq. In February 2007, four French nationals were killed in western Saudi Arabia in a suspected terrorist attack. In August 2009, an Al Qaeda in the Arabian Peninsula (AQAP) suicide bomber attempted to assassinate a Saudi royal and senior Ministry of Interior official.

Saudi Arabia is an important partner in the campaign against terrorism, providing military, diplomatic, and financial cooperation. Counterterrorism cooperation between Saudi Arabia and the United States increased significantly after the May 12, 2003 bombings in Riyadh and continues today. In February 2005, the Saudi Government sponsored the first ever Counter-Terrorism International Conference in Riyadh.

**Human Rights**
Despite generally good relations, the United States remains concerned about human rights conditions in Saudi Arabia. Principal human rights issues include abuse of prisoners and incommunicado detention; prohibitions or severe restrictions on freedom of speech, press, peaceful assembly and association, and religion; denial of the right of citizens to change their government; systematic discrimination against women and ethnic and religious minorities; and suppression of workers' rights.

**Principal U.S. Officials**
Ambassador--James Smith
Deputy Chief of Mission--Susan Ziadeh
Counselor for Consular Affairs--Daniel Goodspeed
Counselor for Economic Affairs--Laird Treiber
Counselor for Management Affairs--Sandra Muench
Counselor for Political Affairs--Lisa Carle
Counselor for Political-Military Affairs--Scott McGehee
Counselor for Public Affairs--John Moran
Consul General, Dhahran--Joe Kenny
Consul General, Jeddah--Martin Quinn

The **U.S. Embassy** in Saudi Arabia is located in the Diplomatic Quarter of Riyadh (tel. 966-1-488-3800). The Consulate General in Jeddah is located on Palestine Road, Ruwais, Jeddah (tel. 966-2-667-0080); and the Consulate General in Dhahran is located between ARAMCO Headquarters and the King Abdul Aziz Airbase (tel. 966-3-330-3200). The embassy and consulates are open for business Saturday through Wednesday, in accordance with the official workweek of Saudi Arabia.

**TRAVEL AND BUSINESS INFORMATION**

The U.S. Department of State's Consular Information Program advises Americans traveling and residing abroad through Country Specific Information, Travel Alerts, and Travel Warnings. **Country Specific Information** exists for all countries and includes information on entry and exit requirements, currency regulations, health conditions, safety and security, crime, political disturbances, and the addresses of the U.S. embassies and consulates abroad. **Travel Alerts** are issued to disseminate information quickly about terrorist threats and other relatively short-term conditions overseas that pose significant risks to the security of American travelers. **Travel Warnings** are issued when the State Department recommends that Americans avoid travel to a certain country because the situation is dangerous or unstable.

For the latest security information, Americans living and traveling abroad should regularly monitor the Department's Bureau of Consular Affairs Internet web site at **http://www.travel.state.gov**, where the current **Worldwide Caution**, **Travel Alerts**, and **Travel Warnings** can be found. **Consular Affairs Publications**, which contain information on obtaining passports and planning a safe trip abroad, are also available at **http://www.travel.state.gov**. For additional information on international travel, see **http://www.usa.gov/Citizen/Topics/Travel/International.shtml**.

The Department of State encourages all U.S. citizens traveling or residing abroad to register via the **State Department's travel registration** website or at the nearest U.S. embassy or consulate abroad. Registration will make your presence and whereabouts known in case it is necessary to contact you in an emergency and will enable you to receive up-to-date information on security conditions.

Emergency information concerning Americans traveling abroad may be obtained by calling 1-888-407-4747 toll free in the U.S. and Canada or the regular toll line 1-202-501-4444 for callers outside the U.S. and Canada.

The **National Passport Information Center** (NPIC) is the U.S. Department of State's single, centralized public contact center for U.S. passport information. Telephone: 1-877-4-USA-PPT (1-877-487-2778); TDD/TTY: 1-888-874-7793. Passport information is available 24 hours, 7 days a week. You may speak with a representative Monday-Friday, 8 a.m. to 10 p.m., Eastern Time, excluding federal holidays.

Travelers can check the latest health information with the U.S. Centers for Disease Control and Prevention in Atlanta, Georgia. A hotline at 800-CDC-INFO (800-232-4636) and a web site at **http://wwwn.cdc.gov/travel/default.aspx** give the most recent health advisories, immunization recommendations or requirements, and advice on food and drinking water

safety for regions and countries. The CDC publication "Health Information for International Travel" can be found at **http://wwwn.cdc.gov/travel/contentYellowBook.aspx**.

**Further Electronic Information**

**Department of State Web Site**. Available on the Internet at **http://www.state.gov**, the Department of State web site provides timely, global access to official U.S. foreign policy information, including **Background Notes** and **daily press briefings** along with the directory of **key officers** of Foreign Service posts and more. The Overseas Security Advisory Council (OSAC) provides security information and regional news that impact U.S. companies working abroad through its website **http://www.osac.gov**

**Export.gov** provides a portal to all export-related assistance and market information offered by the federal government and provides trade leads, free export counseling, help with the export process, and more.

**STAT-USA/Internet**, a service of the U.S. Department of Commerce, provides authoritative economic, business, and international trade information from the Federal government. The site includes current and historical trade-related releases, international market research, trade opportunities, and country analysis and provides access to the **National Trade Data Bank**.

**Back to Top**

**EXHIBIT G**
**to the Declaration of John R. Coleman**

**Bahrain Background Note**



Home » Under Secretary for Public Diplomacy and Public Affairs » Bureau of Public Affairs » Bureau of Public Affairs: Electronic Information and Publications Office » Background Notes » Bahrain

**On this page:**

Profile
People
History
Government
Political Conditions
Economy
Defense
Foreign Relations
U.S. Relations
Travel/Business
Background Notes A-Z

January 29, 2010 │ Bureau of Near Eastern Affairs

# Background Note: Bahrain



**Official Name: Kingdom of Bahrain**



## PROFILE

### Geography

Area: 727 sq. km. (274 sq. mi.); approximately four times the size of Washington, DC. Bahrain is an archipelago of 36 islands located off the eastern coast of Saudi Arabia. The four main islands are joined by causeways, and make up about 95% of the total land area.

Cities: *Capital*--Manama, pop. (2002 est.) 148,000. *Other cities*--Al Muharraq.

Terrain: Low desert plain (highest elevation point--122 m).

Climate: Hot and humid from May-September, with average highs ranging from $30^{o}$-$40^{o}$ C

(86°-104° F). Maximum temperatures average 20°-30° C (68°-86° F) the remainder of the year.

## People

Nationality: *Noun and adjective*--Bahraini(s).

Population (January 2008 est.): 1,046,814, including about 517,368 non-nationals.

Annual growth rate (2008 est.): 3.6%.

Ethnic groups: Bahraini 63%, Asian 19%, other Arab 10%, Iranian 8%.

Religions: 98% Muslim (approximately Shi'a 70%, Sunni 30%), with small Christian, Jewish, Baha'i, and Hindu communities.

Languages: Arabic (official), English, Farsi, and Urdu are also widely spoken.

Education: Education is not compulsory, but is provided free to Bahrainis and non-nationals at all levels, including higher education. *Estimated net primary school attendance* (1991-2001)-- 84%. *Adult literacy, age 15 and over* (2003 est.)--89.1% for the overall population (male 91.9%, female 85%).

Health: *Infant mortality rate* (2007 est.)--16.18 deaths/1,000 live births. *Life expectancy*--72 yrs. males, 77 yrs. females.

Work force (2006 est.): 352,000 of which 44% are foreigners.

## Government

Type: Constitutional hereditary monarchy.

Independence: August 15, 1971 (from the United Kingdom).

Constitution: Approved and promulgated May 26, 1973; suspended on August 26, 1975; the National Action Charter was approved by a national popular referendum on February 14-15, 2001, and a new constitution was issued on February 14, 2002.

Branches: *Executive*--King (chief of state); Prime Minister (head of government); Council of Ministers (cabinet) is appointed by the King and headed by the Prime Minister. *Legislative*-- The bicameral parliament (al-Majlis al-Watani) consists of a 40-member elected Council of Representatives (elected in December 2006; next election scheduled for 2010) and a 40- member Shura (Consultative) Council appointed by the King. Members of both chambers serve four-year terms. *Judicial*--High Civil Appeals Court. The judiciary is independent with right of judicial review.

Administrative subdivisions: 12 municipalities (manatiq): Al Hidd, Al Manamah, Al Mintaqah al Gharbiyah, Al Mintaqah al Wusta, Al Mintaqah ash Shamaliyah, Al Muharraq, Ar Rifa' wa al Mintaqah al Janubiyah, Jidd Hafs, Madinat Hamad, Madinat 'Isa, Juzur Hawar, Sitrah.

Political societies represented in parliament: al Wifaq, al Asala, al Minbar, al Mustaqbil.

Suffrage: Universal at age 18.

## Economy

GDP (2007 est.): $18.44 billion.

Real GDP growth rate (2007 est.): 6.7%.

Per capita GDP (2007 est.): $17,615.

Natural resources: Oil, aluminum, textiles, natural gas, fish, pearls.

Agriculture (less than 1% of GDP): *Products*--fruit, vegetables, poultry, dairy products, shrimp, fish.

Industry: *Types*--oil and gas (13.1% of GDP), manufacturing (12.4% of GDP), aluminum.
Services: Finance (24.2% of GDP), transport and communications (8.9% of GDP), real estate
(9.2% of GDP); government services (14.8% of GDP).
Trade (2006 est.): *Exports*--$12.62 billion: oil and other mineral products, aluminum, textiles.
*Major markets*-- Saudi Arabia (3.2%), U.S. (3%), Japan (2.3%). *Imports*--$9.04 billion: crude
oil, machinery and appliances, transport equipment, foodstuffs. *Major suppliers*--Saudi Arabia
(37.3%), Japan (6.8%), U.S. (6.2%), U.K. (6.2%), Germany (5%), U.A.E. (4.2%).

## PEOPLE

Bahrain is one of the most densely populated countries in the world; about 89% of the
population lives in the two principal cities of Manama and Al Muharraq. Approximately 66% of
the indigenous population is originally from the Arabian Peninsula and Iran. Bahrain currently
has a sizeable foreign labor force (about 49% of the total population). The government's
policies on naturalization remain controversial. In June 2002, the King issued a decree
allowing citizens of the Gulf Cooperation Council (GCC) to take up dual Bahraini nationality.
Opposition political groups charge that the government is granting citizenship to foreign
nationals who have served in the Bahraini armed forces and security services to alter the
demographic balance of the country, which is primarily Shi'a. According to passport officials,
about 40,000 individuals have been naturalized over the past 50 years (about 10% of the total
population).

The indigenous population is 98% Muslim. Although some two-thirds of the indigenous
population is Shi'a Muslim, the ruling family and the majority of government, military, and
corporate leaders are Sunni Muslims. The small indigenous Christian and Jewish
communities make up the remaining 2% of the population. Roughly half of foreign resident
community are non-Muslim, and include Christians, Hindus, Baha'is, Buddhists and Sikhs.

Bahrain has invested its oil revenues in developing an advanced educational system. The first
public schools for girls and boys were opened in the 1920s. The government continues to pay
for all schooling costs. Although school attendance is not compulsory, primary and secondary
attendance rates are high, and literacy rates are currently among the highest in the region.
Higher education is available for secondary school graduates at the Bahrain University,
Arabian Gulf University and specialized institutes including the College of Health Sciences--
operating under the direction of the Ministry of Health--which trains physicians, nurses,
pharmacists, and paramedics. The government has identified providing educational services
to the Gulf Cooperation Council as a potential economic growth area, and is actively working
to establish Bahrain as a regional center for higher education.

## HISTORY

The site of the ancient Bronze Age civilization of Dilmun, Bahrain was an important center
linking trade routes between Mesopotamia and the Indus Valley as early as 5,000 years ago.
The Dilmun civilization began to decline about 2,000 B.C. as trade from India was cut off.
From 750 B.C. on, Assyrian kings repeatedly claimed sovereignty over the islands. Shortly
after 600 B.C., Dilmun was formally incorporated into the new Babylonian empire. There are
no historical references to Bahrain until Alexander the Great's arrival in the Gulf in the 4th

century B.C. Although Bahrain was ruled variously by the Arab tribes of Bani Wa'el and Persian governors, Bahrain continued to be known by its Greek name Tylos until the 7th century, when many of its inhabitants converted to Islam. A regional pearling and trade center, Bahrain came under the control of the Ummayad Caliphs of Syria, the Abbasid Caliphs of Baghdad, Persian, Omani and Portuguese forces at various times from the 7th century until the Al Khalifa family, a branch of the Bani Utbah tribe that have ruled Bahrain since the 18th century, succeeded in capturing Bahrain from a Persian garrison controlling the islands in 1783.

In the 1830s the Al Khalifa family signed the first of many treaties establishing Bahrain as a British Protectorate. Similar to the binding treaties of protection entered into by other Persian Gulf principalities, the agreements entered into by the Al Khalifas prohibited them from disposing of territory and entering into relationships with any foreign government without British consent in exchange for British protection against the threat of military attack from Ottoman Turkey. The main British naval base in the region was moved to Bahrain in 1935 shortly after the start of large-scale oil production.

In 1968, when the British Government announced its decision (reaffirmed in March 1971) to end the treaty relationships with the Persian Gulf sheikdoms, Bahrain initially joined the other eight states (Qatar and the seven Trucial Sheikhdoms now the United Arab Emirates) under British protection in an effort to form a union of Arab emirates. The nine sheikhdoms still had not agreed on terms of union by 1971, however, prompting Bahrain to declare itself fully independent on August 15, 1971.

Bahrain promulgated a constitution and elected its first parliament in 1973, but just two years later, in August 1975, the Amir disbanded the National Assembly after it attempted to legislate the end of Al-Khalifa rule and the expulsion of the U.S. Navy from Bahrain. In the 1990s, Bahrain suffered from repeated incidents of political violence stemming from the disaffection of the Shi'a majority. In response, the Amir instituted the first Bahraini cabinet change in 20 years in 1995 and also increased the membership of the Consultative Council, which he had created in 1993 to provide advice and opinion on legislation proposed by the cabinet and, in certain cases, suggest new laws on its own, from 30 to 40 the following year. These steps led to an initial decline in violent incidents, but in early 1996 a number of hotels and restaurants were bombed, resulting in several fatalities. Over 1,000 people were arrested and held in detention without trial in connection with these disturbances. The government has since released these individuals (see Government and Political Conditions Section below for details).

**GOVERNMENT AND POLITICAL CONDITIONS**

Shaikh Hamad bin Isa Al Khalifa acceded to the throne in March 1999, after the death of his father Shaikh Isa bin Hamad Al Khalifa, Bahrain's ruler since 1961. He championed a program of democratic reform shortly after his accession. In November 2000, Shaikh Hamad established a committee to create a blueprint to transform Bahrain from a hereditary emirate to a constitutional monarchy within 2 years. The resulting "National Action Charter" was presented to the Bahraini public in a referendum in February 2001. In the first comprehensive

public vote in Bahrain since the 1970s, 94.8% of voters overwhelmingly endorsed the charter. That same month, Shaikh Hamad pardoned all political prisoners and detainees, including those who had been imprisoned, exiled or detained on security charges. He also abolished the State Security Law and the State Security Court, which had permitted the government to detain individuals without trial for up to 3 years.

On February 14, 2002, one year after the referendum endorsing his National Action Charter, Shaikh Hamad pronounced Bahrain a constitutional monarchy and changed his status from Amir to King. He simultaneously announced that the first municipal elections since 1957 would be held in May 2002, and that a bicameral parliament, with a representative lower house, would be reconstituted with parliamentary elections in October 2002. As part of these constitutional reforms, the government created an independent financial watchdog empowered to investigate cases of embezzlement and violations of state expenditure in July 2002.

Turnout for the May 2002 municipal elections was 51%, with female voters making up 52% percent of voters. Turnout for the 2002 parliamentary elections--the first in almost three decades--was 53% in the first round and 43% in the second round, despite the fact that four political societies, including the largest Shi'a society, organized a boycott to protest constitutional provisions enacted by the King that gave the appointed upper chamber of parliament voting rights equal to the elected lower chamber. The new parliament held its first joint sitting in December 2002. Bahrain held its second set of parliamentary and municipal elections in November and December 2006. All registered political societies participated in the elections and a Shia society, Al Wifaq, now represents the largest single bloc inside the Council of Representatives. Thirty-two of the Council's 40 members represent Sunni and Shia Islamist societies. One woman, Lateefah Al-Qauod, ran uncontested and became the first woman elected to parliament in Bahrain.

Bahrain has a complex system of courts, based on diverse legal sources, including Sunni and Shi'a Sharia (religious law), tribal law, and other civil codes and regulations created with the help of British advisers in the early 20th century. In 2001, Shaikh Hamad created the Supreme Judicial Council to regulate these courts and separate the administrative and judicial branches of government.

**Principal Government Officials**

King--Shaikh Hamad bin Isa Al Khalifa
Crown Prince and Commander in Chief of the Bahrain Defense Force--Shaikh Salman bin Hamad bin Isa Al Khalifa
Prime Minister--Shaikh Khalifa bin Salman Al Khalifa
Deputy Premier--Jawad bin Salem Al Arrayed
Deputy Premier--Shaikh Mohammad bin Mubarak Al Khalifa
Deputy Premier--Shaikh Ali bin Khalifa Al Khalifa
Foreign Minister--Shaikh Khalid bin Ahmed Al Khalifa
Ambassador to the United States--Houda Nonoo
Ambassador to the United Nations--Tawfeeq Al-Ahmed Al-Mansoor

Bahrain maintains an **embassy** in the United States at 3502 International Drive NW, Washington, DC 20008; tel: [1] (202) 342-1111; fax: [1] (202) 362-2192. The Bahraini Mission to the UN is located at 866 Second Avenue, New York, NY 10017; tel: [1] (212)223-6200; fax [1] (212) 319-0687.

## ECONOMY

The first Gulf state to discover oil, Bahrain's reserves are expected to run out in 10-15 years. Accordingly, Bahrain has worked to diversify its economy over the past decade and has stabilized its oil production at about 40,000 barrels per day (b/d). Revenues from oil and natural gas currently account for approximately 10% of GDP yet currently provide about 75% of government income. The state-owned Bahrain Petroleum Company refinery built in 1935, the first in the Gulf, has a capacity of about 260,000 b/d. Saudi Arabia provides most of the crude for refinery operation via pipeline. Through an agreement with Saudi Arabia, Bahrain also receives half of the net output and revenues from Saudi Arabia's Abu Saafa offshore oilfield.

The Bahrain National Gas Company operates a gas liquefaction plant that utilizes gas piped directly from Bahrain's oilfields. Gas reserves should last about 50 years at present rates of consumption. However, rising domestic demand spurred by a recent development boom has highlighted the need to increase gas supplies. The Gulf Petrochemical Industries Company is a joint venture of the petrochemical industries of Kuwait, the Saudi Basic Industries Corporation, and the Government of Bahrain. The plant, completed in 1985, produces ammonia and methanol for export. Growth in the hydrocarbons sector will be contingent upon new discoveries--Bahrain awarded exploration rights to Malaysia's Petronas and the U.S.'s Chevron Texaco after the resolution of Bahrain's long-standing territorial dispute with Qatar, but no meaningful finds have been announced to date. Bahrain's other industries include the majority state-owned Aluminum Bahrain (Alba)--which operates the largest aluminum smelter in the world outside Eastern Europe with an annual production of about 843,000 metric tons (mt) in 2005 after the completion of an expansion program--and related factories, such as the Aluminum Extrusion Company and the Gulf Aluminum Rolling Mill. Other plants include the Arab Iron and Steel Company's iron ore pelletizing plant (4 million tons annually) and a shipbuilding and repair yard.

Bahrain's development as a major financial center has been the most widely heralded aspect of its diversification effort. Bahrain is a regional financial and business center; international financial institutions operate in Bahrain, both offshore and onshore, without impediments, and the financial sector is currently the largest contributor to GDP at 30%. Over 370 offshore banking units and representative offices are located in Bahrain, as well as 65 American firms. Bahrain has also made a concerted effort to become the leading Islamic finance center in the Arab world, standardizing regulations of the Islamic banking industry. It currently has 32 Islamic commercial, investment and leasing banks as well as Islamic insurance (takaful) companies--the largest concentration of Islamic financial institutions in the Middle East.

Bahrain is working to develop other service industries such as information technology,

healthcare and education. The government has used its oil revenues to build an advanced infrastructure in transportation and telecommunications. The state monopoly--Batelco--was broken in April 2003 following the establishment of the Telecommunications Regulatory Authority (TRA). Since that time, the TRA has granted some 63 licenses in the interest of promoting healthy industry competition.

Bahrain plans to expand its airport, one of the busiest in the Gulf. More than 4.8 million passengers transited Bahrain International Airport in 2005. A modern, busy port offers direct and frequent cargo shipping connections to the U.S., Europe, and the Far East. To boost its competitiveness as a regional center, Bahrain is building a new port and has privatized port operations.

The government of Bahrain moved toward privatizing the production of electricity and water by licensing Al Ezzal to construct an independent power plant at a cost of $500 million. The company commenced operations in May 2006. In January 2006, the government announced the sale of the Al Hidd Power Plant for $738 million to Hidd Power Company, a consortium of British, Japanese, and Belgian companies.

Regional tourism is also a significant source of income. The government continues to favor large-scale tourism projects. It opened the only Formula One race track in the Middle East in 2004, and has awarded tenders for several tourist complexes. New hotel and spa projects are progressing within the context of broader real estate development, much of which is geared toward attracting increased tourism.

Government revenues continue to be largely dependent on the oil industry. Bahrain has received significant budgetary support and project grants from Saudi Arabia, Kuwait, and the United Arab Emirates. Buoyed by rising oil revenues, the 2007-2008 budget approved by the parliament in July 2006 provided for sizable increases in urban development, education, and social spending. Ministry of Defense spending was expected to account for 13% of current spending in 2007 and 2008 based on the new budget. The Ministry of Education and Ministry of the Interior also received substantial budget allocations. Significant capital outlays were allocated to improving housing and infrastructure in line with government efforts to raise the standard of living of the Shi'a population and to attract foreign investment.

The government has also started to extend protections to workers. Private sector employees won permission to form unions in late 2002; King Hamad has given his tentative approval for the formation of unions in government departments. In June 2006, Bahrain passed laws legalizing the existence of multiple trade federations and codifying several protections for workers engaged in union activity. As part of the government's labor reform program, it has formed a Labor Market Regulatory Authority and established a fund to support the training of Bahraini workers

In 2006, bilateral trade exceeded $1 billion for the first time, representing almost 50% growth over 2005. The U.S.-Bahrain Free Trade Agreement took effect on August 1, 2006 and is generating increased U.S. commercial interest in Bahrain.

## DEFENSE

The Bahrain Defense Force (BDF) numbers about 12,000 personnel and consists of army, navy, air force, air defense, and royal guard units. The public security forces and the coast guard are separate from the BDF and report to the Ministry of the Interior. Bahrain also has a national guard that consists of about 1,200 personnel. Bahrain's defense spending since 1999 has been steady. The government spends around $630 million annually on the military, about 20% of current expenditures. The parliamentary process has produced spirited debate over government spending, particularly defense spending, but no actual reductions.

With the help of the U.S. and the Gulf Cooperation Council (GCC), Bahrain has made significant efforts to upgrade its defense systems and modernize its armed forces over the last 20 years. In 1982, the GCC gave Bahrain $1.7 billion for this purpose. Since the 1991 Gulf War, the U.S. has provided military and defense technical assistance and training to Bahrain from Foreign Military Sales (FMS), commercial sources, excess defense article sales (EDA) and under the International Military and Education Training (IMET) program. The U.S. Office of Military Cooperation in Bahrain is attached to the U.S. Embassy and manages the security assistance mission. U.S. military sales to Bahrain since 2000 total $1.4 billion. Principal U.S. military systems acquired by the BDF include eight Apache helicopters, 54 M60A3 tanks, 22 F-16C/D aircraft, 51 Cobra helicopters, 9 MLRS Launchers (with ATACMS), 20 M109A5 Howitzers, 1 Avenger AD system, and the TPS-59 radar system. Bahrain has received $195 million in FMF and $410 million in U.S. EDA acquisition value delivered since the U.S.-Bahraini program began in 1993. The Bahrain Defense Force also placed orders for 9 UH-60M Blackhawk helicopters and 2 Mk-V Fast Patrol Boats. Delivery of both systems was planned for 2009.

Military exercises are conducted on a regular basis to increase the BDF's readiness and improve coordination with the U.S. and other GCC forces. The BDF also sends personnel to the United States for military training. This training includes courses from graduate level professional military education down to entry level technical training.

## FOREIGN RELATIONS

Since achieving independence in 1971, Bahrain has pursued a policy of close consultation with neighboring states. Bahrain became a member of the United Nations and the Arab League in 1971. In 1981 it joined its five neighbors--Saudi Arabia, Oman, Kuwait, the U.A.E. and Qatar--to form the strategic Gulf Cooperation Council (GCC). Bahrain has complied with GCC efforts steps to coordinate economic development and defense and security planning. In December 1994, for example, Bahrain concurred with the GCC decision to drop secondary and tertiary boycotts against Israel. Bahrain also responded positively to Kuwait's request to deploy the GCC collective defense force, "Peninsula Shield," during the buildup and execution of Operation Iraqi Freedom (OIF) in 2003.

In addition to maintaining strong relations with its largest financial backers, Saudi Arabia, Kuwait and the U.A.E., Bahrain has worked to improve its relations with Qatar and has proper, but not warm, relations with Iran. Bahrain-Iran relations have been strained since the

discovery in 1981 of an Iran-sponsored coup plot in Bahrain. Bahraini suspicions of the Iranian role in local unrest in the mid-1990s remain. On March 16, 2001, the International Court of Justice (ICJ) announced its judgment on the long-standing maritime delimitation and territorial dispute between Bahrain and Qatar. The binding judgment awarded sovereignty over the Hawar Islands and Qit'at Jaradah to Bahrain and sovereignty over Zubarah (part of the Qatar Peninsula), Janan Island and Fasht ad Dibal to Qatar. The peaceful settlement of this dispute has allowed for renewed co-operation, including plans to construct a causeway between the two countries.

Bahrain's strategic partnership with the U.S. has intensified since 1991. Bahraini pilots flew strikes in Iraq during the 1991 Gulf War, and the country was used as a base for military operations in the Gulf. Bahrain also provided logistical and basing support to international Maritime Interdiction efforts to enforce UN sanctions and prevent illegal smuggling of oil from Iraq in the 1990s. Bahrain also provided extensive basing and overflight clearances for a multitude of U.S. aircraft operating in support of Operation Enduring Freedom (OEF) and Operation Iraqi Freedom (OIF). Bahrain also deployed forces in support of coalition operations during both OEF and OIF. Bahrain has delivered humanitarian support and technical training to support the reconstruction of the Iraqi banking sector, and has offered support for each stage of Iraq's political transformation. Bahrain has also cooperated effectively on criminal investigation issues in support of the campaign on terrorism; the Bahrain Monetary Agency (which became the Central Bank of Bahrain in September 2006) moved quickly to restrict terrorists' ability to transfer funds through Bahrain's financial system. In October 2006, Bahrain joined the U.S. and 23 other countries in a **Proliferation Security Initiative** interdiction exercise in the Persian Gulf.

**U.S.-BAHRAINI RELATIONS**

The American Mission Hospital, affiliated with the National Evangelical Church, has operated continuously in Bahrain for more than a century. Bahrain has also been a base for U.S. naval activity in the Gulf since 1947. When Bahrain became independent, the U.S.-Bahrain relationship was formalized with the establishment of diplomatic relations. The U.S. embassy at Manama was opened September 21, 1971, and a resident ambassador was sent in 1974. The Bahraini embassy in Washington, DC, opened in 1977. In October 1991, Amir Isa bin Salman Al Khalifa made a state visit to Washington. In 2001, Amir Hamad bin Isa Al-Khalifa made his first visit to the U.S. after succeeding his father in 1999. He returned to Washington on an official visit in January 2003. King Hamad made an official visit to Washington in November 2004 to meet with President George W. Bush and cabinet-level officials. In January 2008, President Bush made the first visit by a sitting President to Bahrain. King Hamad visited Washington in March 2008.

Bahrain and the United States signed a Defense Cooperation Agreement in October 1991 granting U.S. forces access to Bahraini facilities and ensuring the right to pre-position material for future crises. Bahrain is the headquarters of the U.S. Navy's Fifth Fleet. The U.S. designated Bahrain a Major Non-NATO Ally in October 2001. Bahrain and the United States signed a Free Trade Agreement in 2004.

**Principal U.S. Embassy Officials**

Ambassador--**Adam Ereli**

Deputy Chief of Mission--Christopher Henzel

Political/Economic Section Chief--Steven Butler

Economic/Commercial Officer--Benjamin Thomson

Consular Section Chief--Nausher Ali

Public Affairs Officer--Rachel Graaf

Management Officer--George Navadel

The **U.S. Embassy** in Bahrain is located off Sheikh Isa Highway, at Building 979, Road 3119, Block 321, Zinj, Manama, Bahrain. The mailing address is P.O. Box 26431, Manama, Bahrain; tel: [973] 242-700; fax: [973] 272-594. The embassy's hours of operation outside of Ramadan are 8:00 a.m. - 4:00 p.m., Sundays-Thursdays.

**TRAVEL AND BUSINESS INFORMATION**

The U.S. Department of State's Consular Information Program advises Americans traveling and residing abroad through Country Specific Information, Travel Alerts, and Travel Warnings. **Country Specific Information** exists for all countries and includes information on entry and exit requirements, currency regulations, health conditions, safety and security, crime, political disturbances, and the addresses of the U.S. embassies and consulates abroad. **Travel Alerts** are issued to disseminate information quickly about terrorist threats and other relatively short-term conditions overseas that pose significant risks to the security of American travelers. **Travel Warnings** are issued when the State Department recommends that Americans avoid travel to a certain country because the situation is dangerous or unstable.

For the latest security information, Americans living and traveling abroad should regularly monitor the Department's Bureau of Consular Affairs Internet web site at **http://www.travel.state.gov**, where the current **Worldwide Caution**, **Travel Alerts**, and **Travel Warnings** can be found. **Consular Affairs Publications**, which contain information on obtaining passports and planning a safe trip abroad, are also available at **http://www.travel.state.gov**. For additional information on international travel, see **http://www.usa.gov/Citizen/Topics/Travel/International.shtml**.

The Department of State encourages all U.S. citizens traveling or residing abroad to register via the **State Department's travel registration** website or at the nearest U.S. embassy or consulate abroad. Registration will make your presence and whereabouts known in case it is necessary to contact you in an emergency and will enable you to receive up-to-date information on security conditions.

Emergency information concerning Americans traveling abroad may be obtained by calling 1-888-407-4747 toll free in the U.S. and Canada or the regular toll line 1-202-501-4444 for callers outside the U.S. and Canada.

The **National Passport Information Center** (NPIC) is the U.S. Department of State's single, centralized public contact center for U.S. passport information. Telephone: 1-877-4-USA-PPT (1-877-487-2778); TDD/TTY: 1-888-874-7793. Passport information is available 24 hours, 7

days a week. You may speak with a representative Monday-Friday, 8 a.m. to 10 p.m., Eastern Time, excluding federal holidays.

Travelers can check the latest health information with the U.S. Centers for Disease Control and Prevention in Atlanta, Georgia. A hotline at 800-CDC-INFO (800-232-4636) and a web site at **http://wwwn.cdc.gov/travel/default.aspx** give the most recent health advisories, immunization recommendations or requirements, and advice on food and drinking water safety for regions and countries. The CDC publication "Health Information for International Travel" can be found at **http://wwwn.cdc.gov/travel/contentYellowBook.aspx**.

**Further Electronic Information**
**Department of State Web Site**. Available on the Internet at **http://www.state.gov**, the Department of State web site provides timely, global access to official U.S. foreign policy information, including **Background Notes** and **daily press briefings** along with the directory of **key officers** of Foreign Service posts and more. The Overseas Security Advisory Council (OSAC) provides security information and regional news that impact U.S. companies working abroad through its website **http://www.osac.gov**

**Export.gov** provides a portal to all export-related assistance and market information offered by the federal government and provides trade leads, free export counseling, help with the export process, and more.

**STAT-USA/Internet**, a service of the U.S. Department of Commerce, provides authoritative economic, business, and international trade information from the Federal government. The site includes current and historical trade-related releases, international market research, trade opportunities, and country analysis and provides access to the **National Trade Data Bank**.

   **Back to Top**

**EXHIBIT H**
**to the Declaration of John R. Coleman**

**Malaysia Background Note**



Home » Under Secretary for Public Diplomacy and Public Affairs » Bureau of Public Affairs » Bureau of Public Affairs: Electronic Information and Publications Office » Background Notes » Malaysia

**On this page:**

**Profile**

**People**

**History**

**Government**

**Political Conditions**

**Economy**

**Foreign Relations**

**U.S. Relations**

**Travel/Business**

**Background Notes A-Z**

January 28, 2010 | Bureau of East Asian and Pacific Affairs



# Background Note: Malaysia

**Official Name:** Malaysia



**PROFILE**

**Geography**

Area: 329,748 sq. km. (127,315 sq. mi.); slightly larger than New Mexico.

Cities: *Capital*--Kuala Lumpur. *Other cities*--Penang, Ipoh, Malacca, Johor Baru, Shah Alam, Klang, Kuching, Kota Kinabalu, Kota Baru, Kuala Terengganu, Miri, Petaling Jaya.

Terrain: Coastal plains and interior, jungle-covered mountains. The South China Sea separates peninsular Malaysia from East Malaysia on Borneo.

Climate: Tropical.

**People**

Nationality: *Noun and adjective*--Malaysian(s).

Population (2009): 28.3 million.

Annual growth rate: 2.0%.

Ethnic groups: Malay 53.3%, Chinese 26.0%, indigenous 11.8%, Indian 7.7%, others 1.2%.

Religions: Islam (60.4%), Buddhism (19.2%), Christianity (9.1%), Hinduism (6.3%), other/none (5.0%).

Languages: Bahasa Melayu (official), Chinese (various dialects), English, Tamil, indigenous.

Education: *Years compulsory*--6. *Attendance*--90.1% (primary), 60.0% (secondary). *Literacy*--93.5%.

Health: *Infant mortality rate* (2007)--6.7/1,000. *Life expectancy* (2007)--female 76.4 yrs., male 71.9 yrs.

Work force (10.89 million, 2007): *Services*--57%; *industry*--28% (*manufacturing*--19%, *mining and construction*--9%); *agriculture*--15%.

**Government**

Type: Federal parliamentary democracy with a constitutional monarch.

Independence: August 31, 1957. (Malaya, which is now peninsular Malaysia, became independent in 1957. In 1963 Malaya, Sabah, Sarawak, and Singapore formed Malaysia. Singapore became an independent country in 1965.)

Constitution: 1957.

Subdivisions: 13 states and three federal territories (Kuala Lumpur, Labuan Island, Putrajaya federal administrative territory). Each state has an assembly and government headed by a chief minister. Nine of these states have hereditary rulers, generally titled "sultans," while the remaining four have appointed governors in counterpart positions.

Branches: *Executive*--Yang di-Pertuan Agong (head of state and customarily referred to as the king; has ceremonial duties), prime minister (head of government), cabinet. *Legislative*--bicameral parliament, comprising 70-member Senate (26 elected by the 13 state assemblies, 44 appointed by the king on the prime minister's recommendation) and 222-member House of Representatives (elected from single-member districts). *Judicial*--Federal Court, Court of Appeals, high courts, session's courts, magistrate's courts, and juvenile courts. Sharia courts hear cases on certain matters involving Muslims only.

Political parties: Barisan Nasional (National Front)--a coalition comprising the United Malays National Organization (UMNO) and 12 other parties, most of which are ethnically based; Democratic Action Party (DAP); Parti Islam se Malaysia (PAS); Parti Keadilan Rakyat (PKR). There are more than 30 registered political parties, including the foregoing, not all of which are represented in the federal parliament.

Suffrage: Universal adult (voting age 21).

**Economy** (2008)

Nominal GDP: $211.1 billion.

Annual real GDP growth rate: 5.9% (2006); 6.3% (2007); 4.6% (2008).

Nominal per capita income (GNI): $7,355.

Natural resources: Petroleum, liquefied natural gas (LNG), tin, minerals.

Agricultural products: Palm oil, rubber, timber, cocoa, rice, tropical fruit, fish, coconut.

Industry: *Types*--electronics, electrical products, chemicals, food and beverages, metal and machine products, apparel.

Trade: *Merchandise exports*--$188.0 billion: electronic products, manufactured goods, petroleum, palm oil, liquid natural gas, apparel, timber, rubber. *Major markets*--U.S. 12.1%, Singapore 14.7%, Japan 10.8%, China 9.5%. *Merchandise imports*--$147.8 billion: electronic products, machinery, chemicals, manufactured goods, petroleum products. *Major suppliers*--Japan 12.5%, China 12.8%, Singapore 11.0%, U.S. 10.8%.

## PEOPLE

Malaysia's multi-racial society contains many ethnic groups. Malays comprise a majority of
just over 50%. By constitutional definition, all Malays are Muslim. About a quarter of the
population is ethnic Chinese, a group which historically played an important role in trade and
business. Malaysians of Indian descent comprise about 7% of the population and include
Hindus, Muslims, Buddhists, and Christians. Non-Malay indigenous groups combine to make
up approximately 11% of the population.

Population density is highest in peninsular Malaysia, home to some 20 million of the country's
28 million inhabitants. The rest live on the Malaysian portion of the island of Borneo in the
large but less densely-populated states of Sabah and Sarawak. More than half of Sarawak's
residents and about two-thirds of Sabah's are from indigenous groups.

## HISTORY

The early Buddhist Malay kingdom of Srivijaya, based at what is now Palembang, Sumatra,
dominated much of the Malay peninsula from the 9th to the 13th centuries AD. The powerful
Hindu kingdom of Majapahit, based on Java, gained control of the Malay peninsula in the 14th
century. Conversion of the Malays to Islam, beginning in the early 14th century, accelerated
with the rise of the state of Malacca under the rule of a Muslim prince in the 15th century.
Malacca was a major regional commercial center, where Chinese, Arab, Malay, and Indian
merchants traded precious goods.

Drawn by this rich trade, a Portuguese fleet conquered Malacca in 1511, marking the
beginning of European expansion in Southeast Asia. The Dutch ousted the Portuguese from
Malacca in 1641. The British obtained the island of Penang in 1786 and temporarily controlled
Malacca with Dutch acquiescence from 1795 to 1818 to prevent it from falling to the French
during the Napoleonic war. The British gained lasting possession of Malacca from the Dutch
in 1824, through the Anglo-Dutch treaty, in exchange for territory on the island of Sumatra in
what is today Indonesia.

In 1826, the British settlements of Malacca, Penang, and Singapore were combined to form
the Colony of the Straits Settlements. From these strongholds, in the 19th and early 20th
centuries the British established protectorates over the Malay sultanates on the peninsula.
During their rule the British developed large-scale rubber and tin production and established a
system of public administration. British control was interrupted by World War II and the
Japanese occupation from 1941 to 1945.

Popular sentiment for independence swelled during and after the war. The territories of
peninsular Malaysia joined together to form the Federation of Malaya in 1948 and eventually
negotiated independence from the British in 1957. Tunku Abdul Rahman became the first
prime minister. In 1963 the British colonies of Singapore, Sarawak, and Sabah joined the
Federation, which was renamed Malaysia. Singapore's membership was short-lived, however;
it left in 1965 and became an independent republic.

Neighboring Indonesia objected to the formation of Malaysia and began a program of

economic, political, diplomatic, and military "confrontation" against the new country in 1963, which ended only after the fall of Indonesia's President Sukarno in 1966. Internally, local communists, nearly all Chinese, carried out a long, bitter insurgency both before and after independence, prompting the imposition of a state of emergency from 1948 to 1960. Small bands of guerrillas remained in bases along the rugged border with southern Thailand, occasionally entering northern Malaysia. These guerrillas finally signed a peace accord with the Malaysian Government in December 1989. A separate, small-scale communist insurgency that began in the mid-1960s in Sarawak also ended with the signing of a peace accord in October 1990.

## GOVERNMENT

Malaysia is a constitutional monarchy, nominally headed by the Yang di-Pertuan Agong, customarily referred to as the king. The king is elected for 5-year terms from among the nine sultans of the peninsular Malaysian states. The king also is the leader of the Islamic faith in Malaysia.

Executive power is vested in the cabinet led by the prime minister; the Malaysian constitution stipulates that the prime minister must be a member of the lower house of parliament who, in the opinion of the Yang di-Pertuan Agong, commands a majority in parliament. The cabinet is chosen from among members of both houses of parliament and is responsible to that body.

The bicameral parliament consists of the Senate (Dewan Negara) and the House of Representatives (Dewan Rakyat). All 70 Senate members sit for 3-year terms, which are normally extended for an additional 3 years; 26 are elected by the 13 state assemblies, and 44 are appointed by the king following the prime minister's recommendation. Representatives of the House are elected from single-member districts by universal adult suffrage. The 222 members of the House of Representatives are elected to parliamentary terms lasting up to 5 years. Legislative power is divided between federal and state legislatures.

The Malaysian legal system is based on English common law. The Federal Court reviews decisions referred from the Court of Appeal; it has original jurisdiction in constitutional matters and in disputes between states or between the federal government and a state. Peninsular Malaysia and the East Malaysian states of Sabah and Sarawak each have a high court.

The federal government has authority over external affairs, defense, internal security, justice (except civil law cases among Malays or other Muslims and other indigenous peoples, adjudicated under Islamic and traditional law), federal citizenship, finance, commerce, industry, communications, transportation, and other matters.

## Principal Government Officials

Prime Minister--Dato' Sri Mohd Najib bin Tun Haji Razak
Foreign Minister--Datuk Anifah Haji Aman
Ambassador to the U.S.--Dato' Sri Jamaludin Jarjis
Ambassador to the UN--Datuk Hamidon bin Ali

Case 2:08-cv-15147-LPZ-MKM   Document 67-3   Filed 06/07/10   Page 98 of 146

Malaysia maintains an **embassy** in the U.S. at 3516 International Court NW, Washington, DC 20008, tel. (202) 572-9700; a Consulate General at 550 South Hope Street, Suite 400, Los Angeles, CA 90071, tel. (213) 892-1238; and a Consulate General at 313 East 43rd Street, New York City, NY 10017, tel. (212) 490-2722/23.

## POLITICAL CONDITIONS

Malaysia's predominant political party, the United Malays National Organization (UMNO), has held power in coalition with other parties continuously since independence in 1957. The UMNO coalition's share of the vote declined in national elections held in May 1969, after which riots broke out in Kuala Lumpur and elsewhere, mainly between Malays and ethnic Chinese. Several hundred people were killed or injured. The government declared a state of emergency and suspended all parliamentary activities.

In the years that followed, Malaysia undertook several initiatives that became integral parts of its socioeconomic model. The New Economic Policy (NEP), launched in 1971, contained a series of affirmative action policies designed to benefit Malays and certain indigenous groups (together known as bumiputera or "sons of the soil"). The constitution was amended to limit dissent against the specially-protected and sensitive portions of the constitution pertaining to the social contract. The government identified intercommunal harmony as one of its official goals. The previous alliance of communally based parties was replaced with a broader coalition--the Barisan Nasional (BN) or National Front. The BN won large majorities in the 1974 federal and state elections.

Mahathir Mohamad was Prime Minister between 1981 and 2003, leading UMNO and BN to successive election victories. Mahathir emphasized economic development during his tenure, in particular the export sector, as well as large-scale infrastructure projects. Mahathir attributed the success of the Asian tiger economies to the "Asian values" of its people, which he believed were superior to those of the West. Mahathir sharply criticized the International Monetary Fund (IMF), international financiers such as George Soros, and Western governments during the sharp economic and financial crisis that affected Asia in 1997-1998, and denied that the downturn was due to the failures of corruption and "crony capitalism."

The end of Mahathir's tenure was marred by a falling out with his deputy and presumed successor, Anwar Ibrahim. In September 1998, Mahathir dismissed Anwar and accused him of immoral and corrupt conduct. Although Anwar was convicted on both charges in 1999 and 2000, the trials were viewed as seriously flawed. Malaysia's Federal Court eventually freed Anwar after overturning his immoral conduct conviction in September 2004.

Mahathir stepped down as Prime Minister in October 2003 after 22 years in power, and his successor, Deputy Prime Minister Abdullah Ahmad Badawi, was sworn into office. Abdullah called elections and won an overwhelming victory in March 2004. Abdullah, an Islamic scholar, promoted the concept of "Islam Hadhari" or "civilizational Islam," emphasizing the importance of education, social harmony, and economic progress. His relationship with Mahathir eventually soured, with Mahathir expressing regret at supporting Abdullah to be his successor.

Malaysia held national elections in March 2008. UMNO and its coalition allies in the BN won a simple majority of the seats in the national parliament, but for the first time in history failed to gain the two-thirds majority necessary to amend the constitution. A loose coalition of opposition parties, called the Pakatan Rakyat or Peoples Alliance, led by Anwar Ibrahim, won 82 of 222 seats in parliament and took control of the state-level assemblies in five of Malaysia's thirteen states. However, in February 2009 the opposition Alliance lost control of one of the states through defections of its assembly members to the National Front. Prime Minister Abdullah, taking responsibility for his party's poor showing in the March 2008 general election, stepped down as Prime Minister in a carefully timed transfer of power to his deputy, Najib Tun Razak, in April 2009.

## ECONOMY

Since it became independent, Malaysia's economic record has been one of Asia's best. Real gross domestic product (GDP) grew by an average of 6.5% per year from 1957 to 2005. Performance peaked in the early 1980s through the mid-1990s, as the economy experienced sustained rapid growth averaging almost 8% annually. High levels of foreign and domestic investment played a significant role as the economy diversified and modernized. Once heavily dependent on primary products such as rubber and tin, Malaysia today is a middle-income country with a multi-sector economy based on services and manufacturing. Malaysia is one of the world's largest exporters of semiconductor devices, electrical goods, and information and communication technology (ICT) products.

The government continues to actively manage the economy. Malaysia's New Economic Policy (NEP), first established in 1971, was a 10-year plan that sought to rectify a situation whereby ethnic Malays and indigenous peoples ("bumiputera"), who comprised nearly 60% of the population, held less than 3% of the nation's wealth. Policy makers implemented a complex network of racial preferences intended to promote the acquisition of economic assets by bumiputera. In 1981 when the racial preferences were set to expire, the government extended the NEP for another 10 years, stating that its goals had not been achieved. The policies again were extended in 1991 and in 2001. The Malaysian Government plans to release a new economic model in 2010 which will modify and in some cases eliminate NEP measures in an effort to stimulate higher levels of investment and GDP growth over the next decade.

The Malaysian economy went into sharp recession in 1997-1998 during the Asian financial crisis, which affected countries throughout the region, including South Korea, Indonesia, and Thailand. Malaysia's GDP contracted by more than 7% in 1998. Malaysia narrowly avoided a return to recession in 2001 when its economy was negatively impacted by the bursting of the dot-com bubble (which hurt the ICT sector) and slow growth or recession in many of its important export markets. The global financial crisis threw Malaysia into recession again in 2009, and the government expects a contraction in GDP of around 3% for the year. Economists expect Malaysia to return to a positive growth path in 2010.

In July 2005, the government removed the 7-year-old peg linking the ringgit's value to the U.S. dollar at an exchange rate of RM 3.8/U.S. $1.0. The dollar peg was replaced by a managed

float against an undisclosed basket of currencies. The new exchange rate policy was designed to keep the ringgit more broadly stable and to avoid uncertain currency swings which could harm exports.

The Malaysian financial system exhibited noteworthy resilience to the 2008 global financial crisis. Malaysian banks are well capitalized and have no measurable exposure to the U.S. sub-prime market. The central bank maintains a conservative regulatory environment, having prohibited some of the riskier assets in vogue elsewhere. However, decreasing demand in the U.S. and elsewhere is taking a toll on Malaysian exports, resulting in negative GDP growth for 2009 with recovery expected in 2010.

**FOREIGN RELATIONS**

Regional cooperation is a cornerstone of Malaysia's foreign policy. It was a founding member of the Association of Southeast Asian Nations (ASEAN) and served as the group's chair most recently in 2005-2006. It hosted the ASEAN Summit and East Asia Summit in December 2005, as well as the ASEAN Ministerial and the ASEAN Regional Forum in July 2006.

Malaysia is an active member of the Asia Pacific Economic Cooperation (APEC) forum, the Organization of the Islamic Conference (OIC), the Non-Aligned Movement (NAM), and the United Nations. It was chair of the OIC until March 2008 and has also chaired the NAM.

Malaysia is a frequent contributor to UN and other peacekeeping and stabilization missions, including recent deployments to Lebanon, Timor-Leste, Philippines, Indonesia, Pakistan, Sierra Leone, and Kosovo.

**U.S.-MALAYSIAN RELATIONS**

The United States and Malaysia share a diverse and expanding partnership. Economic ties are robust. The United States is Malaysia's largest trading partner and Malaysia is the sixteenth-largest trading partner of the U.S. Annual two-way trade amounts to $44 billion. The United States and Malaysia launched negotiations for a bilateral free trade agreement (FTA) in June 2006.

The United States is the largest foreign investor in Malaysia on a cumulative basis. American companies are particularly active in the energy, electronics, and manufacturing sectors. The U.S. direct investment position in Malaysia for 2007 was $15.7 billion.

The United States and Malaysia cooperate closely on security matters, including counterterrorism, maritime domain awareness, and regional stability. The relationship between the U.S. and Malaysian militaries is also strong with numerous exchanges, training, joint exercises, and visits. The U.S. and Malaysia signed a Mutual Legal Assistance Treaty (MLAT) in July 2006 during the visit to Kuala Lumpur by Secretary of State Condoleezza Rice.

The United States and Malaysia have a long history of people-to-people exchanges. Well over 100,000 Malaysians have studied in the U.S. At any one time there are over 7,000 Malaysians studying at U.S. universities. Last year approximately 130 Malaysians took part in U.S.

Government-sponsored exchange programs for professional development and study. Each year, about 50 Americans travel to Malaysia under U.S. Government auspices to share their experience as visiting academics or speakers.

There are approximately 1,500 alumni of the International Visitor Leadership Program (IVLP) and 2,000 from the Fulbright, Humphrey, Eisenhower, and Youth Exchange for Study (YES) programs. Prominent Malaysian alumni include federal ministers, deputy ministers, and members of parliament from both the ruling party and opposition parties. At least four current and past chief ministers (state governors) are alumni, and former Prime Minister Mahathir is an alumnus of a 1973 program. These alumni have used their educations to create a stronger Malaysian society and have built enduring understanding between Malaysia and America. Their contributions to Malaysian society will continue for many years to come.

**Principal U.S. Embassy Officials**
Ambassador--James R. Keith
Deputy Chief of Mission--Robert G. Rapson
Political Counselor--Brian D. McFeeters
Economic Counselor--Matt J. Matthews
Commercial Counselor--Nasir A. Abbasi
Public Affairs Officer--Marrie Y. Schaefer
Agricultural Attache--David W. Cottrell
Consul General--Charles J. Wintheiser

The **U.S. Embassy** in Malaysia is located at 376 Jalan Tun Razak, 50400 Kuala Lumpur (tel. 60-3-2168-5000, fax 60-3-2142-2207).

**TRAVEL AND BUSINESS INFORMATION**
The U.S. Department of State's Consular Information Program advises Americans traveling and residing abroad through Country Specific Information, Travel Alerts, and Travel Warnings. **Country Specific Information** exists for all countries and includes information on entry and exit requirements, currency regulations, health conditions, safety and security, crime, political disturbances, and the addresses of the U.S. embassies and consulates abroad. **Travel Alerts** are issued to disseminate information quickly about terrorist threats and other relatively short-term conditions overseas that pose significant risks to the security of American travelers. **Travel Warnings** are issued when the State Department recommends that Americans avoid travel to a certain country because the situation is dangerous or unstable.

For the latest security information, Americans living and traveling abroad should regularly monitor the Department's Bureau of Consular Affairs Internet web site at **http://www.travel.state.gov**, where the current **Worldwide Caution**, **Travel Alerts**, and **Travel Warnings** can be found. **Consular Affairs Publications**, which contain information on obtaining passports and planning a safe trip abroad, are also available at **http://www.travel.state.gov**. For additional information on international travel, see **http://www.usa.gov/Citizen/Topics/Travel/International.shtml**.

The Department of State encourages all U.S. citizens traveling or residing abroad to register via the **State Department's travel registration** website or at the nearest U.S. embassy or consulate abroad. Registration will make your presence and whereabouts known in case it is necessary to contact you in an emergency and will enable you to receive up-to-date information on security conditions.

Emergency information concerning Americans traveling abroad may be obtained by calling 1-888-407-4747 toll free in the U.S. and Canada or the regular toll line 1-202-501-4444 for callers outside the U.S. and Canada.

The **National Passport Information Center** (NPIC) is the U.S. Department of State's single, centralized public contact center for U.S. passport information. Telephone: 1-877-4-USA-PPT (1-877-487-2778); TDD/TTY: 1-888-874-7793. Passport information is available 24 hours, 7 days a week. You may speak with a representative Monday-Friday, 8 a.m. to 10 p.m., Eastern Time, excluding federal holidays.

Travelers can check the latest health information with the U.S. Centers for Disease Control and Prevention in Atlanta, Georgia. A hotline at 800-CDC-INFO (800-232-4636) and a web site at **http://wwwn.cdc.gov/travel/default.aspx** give the most recent health advisories, immunization recommendations or requirements, and advice on food and drinking water safety for regions and countries. The CDC publication "Health Information for International Travel" can be found at **http://wwwn.cdc.gov/travel/contentYellowBook.aspx**.

**Further Electronic Information**

**Department of State Web Site**. Available on the Internet at **http://www.state.gov**, the Department of State web site provides timely, global access to official U.S. foreign policy information, including **Background Notes** and **daily press briefings** along with the directory of **key officers** of Foreign Service posts and more. The Overseas Security Advisory Council (OSAC) provides security information and regional news that impact U.S. companies working abroad through its website **http://www.osac.gov**

**Export.gov** provides a portal to all export-related assistance and market information offered by the federal government and provides trade leads, free export counseling, help with the export process, and more.

**STAT-USA/Internet**, a service of the U.S. Department of Commerce, provides authoritative economic, business, and international trade information from the Federal government. The site includes current and historical trade-related releases, international market research, trade opportunities, and country analysis and provides access to the **National Trade Data Bank**.

   **Back to Top**

**EXHIBIT I**
**to the Declaration of John R. Coleman**

**Indonesia Background Note**



Home » Under Secretary for Public Diplomacy and Public Affairs » Bureau of Public Affairs » Bureau of Public Affairs: Electronic Information and Publications Office » Background Notes » Indonesia

**On this page:**

**Profile**

**People**

**History**

**Government**

**Political Conditions**

**Economy**

**Defense**

**Foreign Relations**

**U.S. Relations**

**Travel/Business**

**Background Notes A-Z**

January 21, 2010 | Bureau of East Asian and Pacific Affairs



# Background Note: Indonesia

---

**Official Name:** **Republic of Indonesia**



**PROFILE**

**Geography**

Area: 2 million sq. km. (736,000 sq. mi.), about three times the size of Texas; maritime area: 7,900,000 sq. km.

Cities: *Capital*--Jakarta (est. 8.8 million). *Other cities*--Surabaya 3.0 million, Medan 2.5 million, Bandung 2.5 million.

Terrain: More than 17,500 islands; 6,000 are inhabited; 1,000 of which are permanently settled. Large islands consist of coastal plains with mountainous interiors.

Climate: Equatorial but cooler in the highlands.

**People**

Nationality: *Noun and adjective*--Indonesian(s).

Population (July 2009 est.): 240.3 million.

Annual population growth rate (2009 est.): 1.136%.

Ethnic groups (2000 census): Javanese 40.6%, Sundanese 15%, Madurese 3.3%, Minangkabau 2.7%, others 38.4%.

Religions (2000 census): Muslim 86.1%, Protestant 5.7%, Catholic 3%, Hindu 1.8%, others

3.4%.

Languages: Indonesian (official), local languages, the most prevalent of which is Javanese.

Education: *Years compulsory*--9. *Enrollment*--94% of eligible primary school-age children. *Literacy*--90.4% (2007).

Health: *Infant mortality rate* (2009 est.)--29.97/1,000. *Life expectancy at birth* (2009 est.)-- 70.76 years.

Work force: 111.5 million (2008). *Agriculture*--42%, *industry*--12%, *services*--44%.

**Government**

Type: Independent republic.

Independence: August 17, 1945 proclaimed.

Constitution: 1945. Embodies five principles of the state philosophy, called Pancasila, namely monotheism, humanitarianism, national unity, representative democracy by consensus, and social justice.

Branches: *Executive*--president (head of government and chief of state) elected by direct popular vote. *Legislative*--The People's Consultative Assembly (MPR), which includes the 560 -member House of Representatives (DPR) and the 132-member Council of Regional Representatives (DPD), both elected to five-year terms. *Judicial*--Supreme Court is the final court of appeal. Constitutional Court has power of judicial review

Suffrage: 17 years of age universal, and married persons regardless of age.

**Economy**

GDP (2007): $433 billion; (2008 est.): $511 billion.

Annual growth rate (2007): 6.3%; (2008): 6.1%; (2009 est.): 3.5%.

Inflation (2007): 6.6%; (2008): 11.1%; (2009 end-February): 8.6%.

Per capita income (2008 est., PPP): $3,900.

Natural resources (11.0% of GDP): Oil and gas, bauxite, silver, tin, copper, gold, coal.

Agriculture (14.4% of GDP): *Products*--timber, rubber, rice, palm oil, coffee. *Land*--17% cultivated.

Manufacturing (27.9% of GDP): Garments, footwear, electronic goods, furniture, paper products.

Trade: *Exports* (2008)--$136.8 billion including oil, natural gas, crude palm oil, coal, appliances, textiles, and rubber. *Major export partners*--Japan, U.S., Singapore, China, Malaysia, and Republic of Korea. *Imports* (2008)--$128.8 billion including oil and fuel, food, chemicals, capital goods, consumer goods, iron and steel. *Major import partners*--Singapore, China, Japan.

**PEOPLE**

Indonesia's approximately 240.3 million people make it the world's fourth-most populous nation. The island of Java, roughly the size of New York State, is the most populous island in the world (124 million, 2005 est.) and one of the most densely populated areas in the world. Indonesia includes numerous related but distinct cultural and linguistic groups, many of which are ethnically Malay. Since independence, Bahasa Indonesia (the national language, a form of Malay) has spread throughout the archipelago and has become the language of most written communication, education, government, business, and media. Local languages are

still important in many areas, however. English is the most widely spoken foreign language. Education is compulsory for children through grade 9. In primary school, 94% of eligible children are enrolled whereas 57% of eligible children are enrolled in secondary school.

Constitutional guarantees of religious freedom apply to the six religions recognized by the state, namely Islam (86.1%), Protestantism (5.7%), Catholicism (3%), Hinduism (1.8%), Buddhism (about 1%), and Confucianism (less than 1%). On the resort island of Bali, over 90% of the population practices Hinduism. In some remote areas, animism is still practiced.

## HISTORY

By the time of the Renaissance, the islands of Java and Sumatra had already enjoyed a 1,000 -year heritage of advanced civilization spanning two major empires. During the 7th-14th centuries, the Buddhist kingdom of Srivijaya flourished on Sumatra. At its peak, the Srivijaya Empire reached as far as West Java and the Malay Peninsula. Also by the 14th century, the Hindu Kingdom of Majapahit had risen in eastern Java. Gadjah Mada, the empire's chief minister from 1331 to 1364, succeeded in gaining allegiance from most of what is now modern Indonesia and much of the Malay archipelago as well. Legacies from Gadjah Mada's time include a codification of law and an epic poem. Islam arrived in Indonesia sometime during the 12th century and, through assimilation, supplanted Hinduism by the end of the 16th century in Java and Sumatra. Bali, however, remains overwhelmingly Hindu. In the eastern archipelago, both Christian and Islamic proselytizing took place in the 16th and 17th centuries, and, currently, there are large communities of both religions on these islands.

Beginning in 1602, the Dutch slowly established themselves as rulers of Indonesia, exploiting the weakness of the small kingdoms that had replaced that of Majapahit. The only exception was East Timor, which remained under Portugal's control until 1975. During 300 years of rule, the Dutch developed the Netherlands East Indies into one of the world's richest colonial possessions.

During the first decade of the 20th century, an Indonesian independence movement began and expanded rapidly, particularly between the two World Wars. Its leaders came from a small group of young professionals and students, some of whom had been educated in the Netherlands. Many, including Indonesia's first president, Soekarno (1945-67), were imprisoned for political activities.

The Japanese occupied Indonesia for three years during World War II (1942-1945). On August 17, 1945, three days after the Japanese surrender to the Allies, a small group of Indonesians, led by Soekarno and Mohammad Hatta, proclaimed independence and established the Republic of Indonesia. They set up a provisional government and adopted a constitution to govern the republic until elections could be held and a new constitution written. Dutch efforts to reestablish complete control met strong resistance. After four years of warfare and negotiations, the Dutch transferred sovereignty to a federal Indonesian Government. In 1950, Indonesia became the 60th member of the United Nations.

Shortly after hostilities with the Dutch ended in 1949, Indonesia adopted a new constitution,

providing for a parliamentary system of government in which the executive was chosen by and accountable to parliament. Parliament was divided among many political parties before and after the country's first nationwide election in 1955, and stable governmental coalitions were difficult to achieve. The role of Islam in Indonesia became a divisive issue. Soekarno defended a secular state based on Pancasila, five principles of the state philosophy-- monotheism, humanitarianism, national unity, representative democracy by consensus, and social justice--codified in the 1945 constitution, while some Muslim groups preferred either an Islamic state or a constitution that included a preambular provision requiring adherents of Islam to be subject to Islamic law. At the time of independence, the Dutch retained control over the western half of New Guinea (known as Irian Jaya in the Soekarno and Suharto eras and as Papua since 2000) and permitted steps toward self-government and independence.

Negotiations with the Dutch on the incorporation of Irian Jaya into Indonesia failed, and armed clashes broke out between Indonesian and Dutch troops in 1961. In August 1962, the two sides reached an agreement, and Indonesia assumed administrative responsibility for Irian Jaya on May 1, 1963. The Indonesian Government conducted an "Act of Free Choice" in Irian Jaya under UN supervision in 1969 in which 1,025 Papuan representatives of local councils agreed by consensus to remain a part of Indonesia. A subsequent UN General Assembly resolution confirmed the transfer of sovereignty to Indonesia. Opposition to Indonesian administration of Papua gave rise to small-scale guerrilla activity in the years following Jakarta's assumption of control. In the more open atmosphere since 1998, there have been more explicit expressions within Papua calling for independence from Indonesia.

Unsuccessful rebellions on Sumatra, Sulawesi, West Java, and other islands beginning in 1958, plus a failure by the constituent assembly to develop a new constitution, weakened the parliamentary system. Consequently, in 1959, when President Soekarno unilaterally revived the provisional 1945 constitution that provided for broad presidential powers, he met little resistance. From 1959 to 1965, President Soekarno imposed an authoritarian regime under the label of "Guided Democracy." He also moved Indonesia's foreign policy toward nonalignment, a foreign policy stance supported by other prominent leaders of former colonies who rejected formal alliances with either the West or Soviet bloc. Under Soekarno's auspices, these leaders gathered in Bandung, West Java, in 1955 to lay the groundwork for what became known as the Non-Aligned Movement. In the late 1950s and early 1960s, President Soekarno moved closer to Asian communist states and toward the Indonesian Communist Party (PKI) in domestic affairs. Though the PKI represented the largest communist party outside the Soviet Union and China, its mass support base never demonstrated an ideological adherence typical of communist parties in other countries.

By 1965, the PKI controlled many of the mass civic and cultural organizations that Soekarno had established to mobilize support for his regime and, with Soekarno's acquiescence, embarked on a campaign to establish a "Fifth Column" by arming its supporters. Army leaders resisted this campaign. Under circumstances that have never been fully explained, on October 1, 1965, PKI sympathizers within the military, including elements from Soekarno's palace guard, occupied key locations in Jakarta and kidnapped and murdered six senior generals. Major General Suharto, the commander of the Army Strategic Reserve, rallied army

troops opposed to the PKI to reestablish control over the city. Violence swept throughout
Indonesia in the aftermath of the October 1 events, and unsettled conditions persisted through
1966. Right-wing gangs killed tens of thousands of alleged communists in rural areas.
Estimates of the number of deaths range between 160,000 and 500,000. The violence was
especially brutal in Java and Bali. During this period, PKI members by the tens of thousands
turned in their membership cards. The emotions and fears of instability created by this crisis
persisted for many years as the communist party remains banned from Indonesia.

Throughout the 1965-66 period, President Soekarno vainly attempted to restore his political
stature and shift the country back to its pre-October 1965 position. Although he remained
President, in March 1966, Soekarno transferred key political and military powers to General
Suharto, who by that time had become head of the armed forces. In March 1967, the
Provisional People's Consultative Assembly (MPRS) named General Suharto acting
President. Soekarno ceased to be a political force and lived under virtual house arrest until his
death in 1970.

President Suharto proclaimed a "New Order" in Indonesian politics and dramatically shifted
foreign and domestic policies away from the course set in Soekarno's final years. The New
Order established economic rehabilitation and development as its primary goals and pursued
its policies through an administrative structure dominated by the military but with advice from
Western-educated economic experts. In 1968, the People's Consultative Assembly (MPR)
formally selected Suharto to a full five-year term as President, and he was reelected to
successive five-year terms in 1973, 1978, 1983, 1988, 1993, and 1998. In mid-1997,
Indonesia suffered from the Asian financial and economic crisis, accompanied by the worst
drought in 50 years and falling prices for oil, gas, and other commodity exports. As the
exchange rate changed from a fixed to a managed float to fully floating, the rupiah (IDR or Rp)
depreciated in value, inflation increased significantly, and capital flight accelerated.
Demonstrators, initially led by students, called for Suharto's resignation. Amid widespread civil
unrest, Suharto resigned on May 21, 1998, three months after the MPR had selected him for a
seventh term. Suharto's hand-picked Vice President, B.J. Habibie, became Indonesia's third
President. President Habibie reestablished International Monetary Fund (IMF) and donor
community support for an economic stabilization program. He released several prominent
political and labor prisoners, initiated investigations into the unrest, and lifted controls on the
press, political parties, and labor unions.

In January 1999, Habibie and the Indonesian Government agreed to a process, with UN
involvement, under which the people of East Timor would be allowed to choose between
autonomy and independence through a direct ballot held on August 30, 1999. Some 98% of
registered voters cast their ballots, and 78.5% of the voters chose independence over
continued integration with Indonesia. Many people were killed by Indonesian military forces
and military-backed militias in a wave of violence and destruction after the announcement of
the pro-independence vote.

Indonesia's first elections in the post-Suharto period were held for the national, provincial, and
sub-provincial parliaments on June 7, 1999. Forty-eight political parties participated in the

elections. For the national parliament, Partai Demokrasi Indonesia Perjuangan (PDI-P, Indonesian Democratic Party of Struggle, led by Megawati Sukarnoputri) won 34% of the vote; Golkar ("Functional Groups" party) 22%; Partai Kebangkitan Bangsa (PKB, National Awakening Party, linked to the conservative Islamic organization Nadhlatul Ulama headed by former President Abdurrahman Wahid) 13%; and Partai Persatuan Pembangunan (PPP, United Development Party, led by Hamzah Haz) 11%. The MPR selected Abdurrahman Wahid as Indonesia's fourth President in November 1999 and replaced him with Megawati Sukarnoputri in July 2001.

The constitution, as amended in the post-Suharto era, provides for the direct election by popular vote of the president and vice president. Under the 2004 amendment, only parties or coalitions of parties that gained at least 3% of the House of Representatives (DPR) seats or 5% of the vote in national legislative elections were eligible to nominate a presidential and vice presidential ticket.

The 2004 legislative elections took place on April 5 and were considered to be generally free and fair. Twenty-four parties took part in the elections. Big parties lost ground, while small parties gained larger shares of the vote. However, the two Suharto-era nationalist parties, PDI-P and Golkar, remained in the lead. PDI-P (opposition party during the Suharto era) lost its plurality in the House of Representatives, dropping from 33% to 18.5% of the total vote (and from 33% to 20% of the seats). The Golkar Party (Suharto's political party) declined slightly from 1999 levels, going from 22% to 21% of the national vote (from 26% to 23% of DPR seats). The third- and fourth-largest parties (by vote share) were two Islamic-oriented parties, the United Development Party (PPP) (8% of the votes, 10.5% of the seats) and National Awakening Party (PKB) (10.5% of the vote, 9.45% of the seats). Susilo Bambang Yudhoyono's nationalist Democratic Party (PD) won 7.45% of the national vote and 10% of the DPR seats, making it the fourth-largest party in the DPR. Seven of the 24 parties won no DPR seats; six won 1-2 seats, and the other six won between 2%-6% of the national vote (between 5-52 DPR seats).

The first direct presidential election was held on July 5, 2004, contested by five tickets. As no candidate won at least 50% of the vote, a runoff election was held on September 20, 2004, between the top two candidates, President Megawati Sukarnoputri and retired General Susilo Bambang Yudhoyono. In this final round, Yudhoyono won 60.6% of the vote. Approximately 76.6% of the eligible voters participated, a total of roughly 117 million people, making Indonesia's presidential election the largest single-day election in the world. The Carter Center, which sent a delegation of election observers, issued a statement congratulating "the people and leaders of Indonesia for the successful conduct of the presidential election and the peaceful atmosphere that has prevailed throughout the ongoing democratic transition."

In 2009, national legislative elections were held on April 9 and presidential elections were held in July. They were peaceful and considered free and fair. New electoral rules required that a party win 2.5% of the national vote in order to enter parliament. A total of thirty-eight national and six local (Aceh only) parties contested the 2009 legislative elections. At least 171 million voters registered to vote in these elections. Voter turnout was estimated to be 71% of the

electorate. Nine parties won parliamentary seats in the House of Representatives (DPR). The top three winners were secular nationalist parties: President Yudhoyono's Partai Demokrat, with 20.85% of the vote; Vice President Jusuf Kalla's Golkar Party, 14.45%; and former president Megawati's opposition PDI-P party, with 14.03%. The next four largest parties were all Islamic-oriented parties: PKS, PAN (6%), PPP (5.3%), and PKB (4.9%). Only PKS maintained its 2004 vote share (7.88%); the other three declined significantly in popularity. The smallest two parties in Parliament, Gerindra and Hanura, with 4.46 and 3.77% of the vote respectively, are run by retired Suharto-era army generals Prabowo Subianto and Wiranto (one name only). The 2009 DPR members took their seats October 1.

Also in 2009, the threshold was revised so that only parties or coalitions of parties that gained at least 20% of the House of Representatives (DPR) seats or 25% of the vote in the 2009 national legislative elections would be eligible to nominate a presidential and vice presidential ticket. Partai Demokrat, Golkar, and PDI-P parties, the top winners in the legislative elections, nominated presidential candidates. To win in one round, a presidential candidate was required to receive more than 50% of the vote and more than 20% of the vote in 17 of Indonesia's 33 provinces. If no candidate did so, the top two candidates would have competed in a second round in September 2009.

Three tickets competed in the presidential elections. Incumbent President Yudhoyono and his running mate, non-partisan former Central Bank Chair and Economics Minister Boediono, won the election with such a significant plurality--60.6%--that it obviated the need for a second round of elections. Main challenger and former president and opposition leader Megawati Sukarnoputri and running mate Prabowo Subianto trailed with 28%. Meanwhile, Vice President Jusuf Kalla and running mate Wiranto came in last at 12.7%. Indonesia's Consultative Assembly (MPR) inaugurated President Susilo Bambang Yudhoyono for his second term as president on October 20, 2009.

Natural disasters have devastated many parts of Indonesia over the past few years. On December 26, 2004, a 9.1 to 9.3 magnitude earthquake took place in the Indian Ocean, and the resulting tsunami killed over 130,000 people in Aceh and left more than 500,000 homeless. On March 26, 2005, an 8.7 magnitude earthquake struck between Aceh and northern Sumatra, killing 905 people and displacing tens of thousands. After much media attention on the seismic activity on Mt. Merapi in April and May 2006, a 6.2 magnitude earthquake occurred 30 miles to the southwest. It killed more than 5,000 people and left an estimated 200,000 people homeless in the Yogyakarta region. An earthquake of 7.4 struck Tasikmalaya, West Java, on September 2, 2009, killing approximately 100 people. On September 30, 2009, a 7.6 magnitude earthquake struck Western Sumatra. There have been no official statistics released on deaths and injuries; however, press reports indicated more than 1,100 fatalities.

**GOVERNMENT AND POLITICAL CONDITIONS**

Indonesia is a republic based on the 1945 constitution providing for a separation of executive, legislative, and judicial power. Substantial restructuring has occurred since President Suharto's resignation in 1998 and the short, transitional Habibie administration in 1998 and

1999. The Habibie government established political reform legislation that formally set up new rules for the electoral system, the House of Representatives (DPR), the People's Consultative Assembly (MPR), and political parties without changing the 1945 Indonesian constitution. After these reforms, the constitution now limits the president to two terms in office.

Indonesia adopted a bicameral legislative system following the establishment of the DPD (Regional Representatives Council), which was first elected in 2004. The DPD is composed of four representatives from each of Indonesia's 33 provinces. Although it can make proposals and submit opinions on legislative matters concerning the regions, it does not have the power to create legislation. The MPR consists of both the DPD and the DPR. The MPR has the power to inaugurate and to impeach the president (upon the recommendation of the DPR). The current Speaker of the MPR is Taufik Kiemas (from the opposition PDI-P Party) and the Speaker of the DPR is Marzuki Alie (from the ruling Democrat Party). These speakers and four deputy speakers for the DPR and MPR took up their positions on October 5, 2009. The largest party in the DPR, now President Yudhoyono's Partai Demokrat, filled the influential DPR speaker position.

The president, elected for a 5-year term, is the top government and political figure. The president and the vice president were elected by popular vote for the first time on September 20, 2004. Previously, the MPR selected Indonesia's president. In 1999, the MPR selected Abdurrahman Wahid, also known as Gus Dur, as the fourth President. The MPR removed Gus Dur in July 2001, immediately appointing then-Vice President Megawati Sukarnoputri as the fifth President. Megawati brought a certain amount of stability to Indonesia, yet there were concerns over progress on combating corruption and encouraging economic growth. In 2004, Susilo Bambang Yudhoyono was elected to succeed Megawati. He was re-elected in 2009.

The president, assisted by an appointed cabinet, has the authority to conduct the administration of the government.

President Yudhoyono's Partai Demokrat (PD) holds 145 of the 560 seats in the House of Representatives (DPR), making it the largest political party represented in the legislature as of September 2009. Partai Demokrat has a coalition with the four largest Islamic parties. The coalition holds a majority of the seats in the DPR. The People's Consultative Assembly (MPR) has 692 members, including 560 members of the DPR and the 132 representatives of the Council of Regional Representatives (DPD). Since 2004, citizens have elected legislators for the DPR and DPD, but their vote was based on a party list system. This ensured that the party elite, placed at the top of the party candidate lists, were voted into office. In 2009, a "majority vote wins" system allowed voters for the first time to directly put the candidate who won a plurality of votes into office.

Prior to 2004, some legislative seats had been reserved for representatives of the armed forces. The military has been a significant political force throughout Indonesian history, though it had ceded its formal political role by 2004. The armed forces shaped the political environment and provided leadership for Suharto's New Order from the time it came to power in the wake of the abortive 1965 uprising. Military officers, especially from the army, were key

advisers to Suharto and Habibie and had considerable influence on policy. Under the dual function concept ("dwifungsi"), the military asserted a continuing role in socio-political affairs. This concept was used to justify placement of officers in the civilian bureaucracy at all government levels and in regional and national legislatures. Although the military retains influence and is one of the only truly national institutions, the wide-ranging democratic reforms instituted since 1999 abolished "dwifungsi" and ended the armed forces' formal involvement in government administration. The police have been separated from the military, further reducing the military's direct role in governmental matters. Control of the military by the democratically elected government has been strengthened.

As a reaction to Suharto's centralization of power and reflecting historically independent sentiment, Hasan di Tiro established the Free Aceh Movement (Gerakan Aceh Merdeka, GAM) in December 1976 to seek independence for Aceh. Some 15,000 died in military conflict in Aceh over the following three decades. Through peace talks led by former Finnish President Martti Ahtisaari, a peace agreement between GAM and the Indonesian Government that provided wide-ranging autonomy for Aceh was signed on August 15, 2005. By December 2005, GAM declared that it had disbanded the military wing of its organization, and the Indonesian Government had withdrawn the bulk of its security forces down to agreed levels. On December 11, 2006, Aceh held gubernatorial and district administrative elections, the first democratic elections in over half a century in Aceh, resulting in the election of a former separatist leader as governor. In 2009, Aceh participated in the national legislative and presidential elections and elected its own provincial legislature.

**Principal Government Officials**

President--Susilo Bambang Yudhoyono

Vice President--Boediono

Minister of Foreign Affairs--Marty Natalegawa

Ambassador to the United States--Salman Al-Farisi (Charge d'affaires)

Ambassador to the United Nations--Deputy Permanent Representative Hasan Kleib (acting)

The **Embassy** of Indonesia is at 2020 Massachusetts Avenue NW, Washington, DC 20036 (tel. 202-775-5200-5207; fax: 202-775-5365). Consulates General are in New York (5 East 68th Street, New York, NY 10021, tel. 212-879-0600/0615; fax: 212-570-6206); Los Angeles (3457 Wilshire Blvd., Los Angeles, CA 90010; tel. 213-383-5126; fax: 213-487-3971); Houston (10900 Richmond Ave., Houston, TX 77042; tel. 713-785-1691; fax: 713-780-9644). Consulates are in San Francisco (1111 Columbus Avenue, San Francisco, CA 94133; tel. 415 -474-9571; fax: 415-441-4320); and Chicago (2 Illinois Center, Suite 1422233 N. Michigan Avenue, Chicago, IL 60601; tel. 312-938-0101/4; 312-938-0311/0312; fax: 312-938-3148).

**ECONOMY**

Indonesia has a market-based economy in which the government plays a significant role. There are 139 state-owned enterprises, and the government administers prices on several basic goods, including fuel, rice, and electricity.

In the mid-1980s, the government began eliminating regulatory obstacles to economic activity.

The steps were aimed primarily at the external and financial sectors and were designed to stimulate employment and growth in the non-oil export sector. Annual real gross domestic product (GDP) growth averaged nearly 7% from 1987-97 and most analysts recognized Indonesia as a newly industrializing economy and emerging major market. The Asian financial crisis of 1997 altered the region's economic landscape. With the depreciation of the Thai currency, the foreign investment community quickly reevaluated its investments in Asia. Foreign investors dumped assets and investments in Asia, leaving Indonesia the most affected in the region. In 1998, Indonesia experienced a negative GDP growth of 13.1% and unemployment rose to 15-20%. In the aftermath of the 1997-98 financial crisis, the government took custody of a significant portion of private sector assets via debt restructuring, but subsequently sold most of these assets, averaging a 29% return. Indonesia has since recovered, albeit slower than some of its neighbors, by recapalizing its banking sector, improving oversight of capital markets, and taking steps to stimulate growth and investment, particularly in infrastructure. GDP growth has steadily risen this decade, achieving real growth of 6.3% in 2007 and 6.1% growth in 2008. While the government reduced its 2009 growth forecast to 4.2%-4.7% given reduced global demand, the consensus forecast was for growth of 3.5%.

In reaction to global financial turmoil and economic slowdown in late 2008, the government moved quickly to improve liquidity, secure alternative financing to fund an expansionary budget and secure passage of a fiscal stimulus program worth more than $6 billion. Key actions to stabilize financial markets included increasing the deposit insurance guarantee twentyfold, to IDR 2 billion (about U.S. $174,000); reducing bank reserve requirements; and introducing new foreign exchange regulations requiring documentation for foreign exchange purchases exceeding U.S. $100,000/month. As a G-20 member, Indonesia has taken an active role in the G-20 coordinated response to the global economic crisis.

**Economic Policy:** After he took office on October 20, 2004, President Yudhoyono moved quickly to implement a "pro-growth, pro-poor, pro-employment" economic program. He appointed a respected group of economic ministers who announced a "100-Day Agenda" of short-term policy actions designed to energize the bureaucracy. President Yudhoyono also announced an ambitious anti-corruption plan in December 2004. The State Ministry of National Development Planning (BAPPENAS) released in early 2005 a Medium Term Plan focusing on four broad objectives: creating a safe and peaceful Indonesia; creating a just and democratic Indonesia; creating a prosperous Indonesia; and establishing a stable macroeconomic framework for development. President Yudhoyono reshuffled his cabinet in December 2005, appointing former Finance Minister Boediono as Coordinating Minister for Economic Affairs and moving Sri Mulyani Indrawati from the National Development Planning Agency to the Finance Ministry. In May 2008, President Yudhoyono appointed Boediono as Governor of Bank Indonesia, the central bank. In June 2008, President Yudhoyono appointed Finance Minister Sri Mulyani Indrawati to also serve as Coordinating Minister for Economic Affairs. He re-appointed her as Finance Minister in his new cabinet in October 2009.

The Yudhoyono administration targeted average growth of 6.6% from 2004-2009 to reduce unemployment and poverty significantly. Indonesia's overall macroeconomic picture is stable.

By 2004, real GDP per capita returned to pre-financial crisis levels. In 2008, domestic consumption continued to account for the largest portion of GDP, at 61%, followed by investment at 27.7%, government consumption at 8.4%, and net exports at 0.6%. By all measures, investment realization has climbed in each of the past several years.

Following a significant run-up in global energy prices in 2007/2008, the Indonesian Government raised fuel prices by an average of 29% on May 24, 2008 in an effort to reduce its fuel subsidy burden. Fuel subsidies had been projected to reach Rp 265 trillion ($29.4 billion) in 2008, or 5.9% of GDP. The fuel price hikes, along with rising food prices, led consumer price inflation to a peak of 12.1% in September 2008. To help its citizens cope with higher fuel and food prices, the Indonesian Government implemented a direct cash compensation package for low-income families through February 2009 and an extra range of benefits including an expanded subsidized rice program and additional subsidies aimed at increasing food production. Subsequent declines in oil and gas prices allowed the government to reduce the prices for subsidized diesel and gasoline. As of March 2009, gasoline was selling for market rates but was subject to a subsidized price cap in the event of an increase in prices.

**Banking Sector:** Indonesia currently has 124 commercial banks, of which 10 are majority foreign-owned and 28 are foreign joint venture banks. The top 15 banks control about 70% of assets in the sector. Four state-owned banks (Bank Mandiri, BNI, BRI, BTN) control about 37.4% of assets. The Indonesian central bank, Bank Indonesia (BI), announced plans in January 2005 to strengthen the banking sector by encouraging consolidation and improving prudential banking and supervision. BI hopes to encourage small banks with less than Rp 100 billion (about U.S. $11 million) in capital to either raise more capital or merge with healthier "anchor banks" before end-2010, announcing the criteria for anchor banks in July 2005. In October 2006, BI announced a single presence policy to further prompt consolidation. The policy stipulates that a single party can own a controlling interest in only one banking organization. Controlling interest is defined as 25% or more of total outstanding shares or having direct or indirect control of the institution. BI planned to adopt Basel II standards beginning in 2009 and to improve operations of its credit bureau to centralize data on borrowers. Another important banking sector reform was the decision to eliminate the blanket guarantee on bank third-party liabilities. BI and the Indonesian Government completed the process of replacing the blanket guarantee with a deposit insurance scheme run by the independent Indonesian Deposit Insurance Agency (also known by its Indonesian acronym, LPS) in March 2007. The removal of the blanket guarantee did not produce significant deposit outflows from or among Indonesian banks. Sharia banking has grown in Indonesia in recent years, but represents only 2.05% of the banking sector, about $4.1 billion in assets as of November 2008.

**Exports and Trade:** Indonesia's exports grew to a record $136.8 billion in 2008, an increase of 10% from 2007. The largest export commodities for 2007 were oil and gas (19.4%), minerals (18.8%), electrical appliances (13.27%), rubber products (6.8%), and textiles (3.6%). The top four destinations for exports for 2008 were Japan (12.8%), the U.S. (11.6%), Singapore (9.4%), and China (7.2%). Meanwhile, total imports rose to $128.8 billion in 2008.

The U.S. trade deficit with Indonesia increased 1.9% in 2007 to $10.1 billion ($4.2 billion in exports versus $14.3 billion in imports).

**Oil and Minerals Sector:** Indonesia left the Organization of Petroleum Exporting Countries (OPEC) in 2008, as it had been a net petroleum importer since 2004. Crude and condensate output averaged 977,000 barrels per day (bpd) in 2008. In 2008, the oil and gas sector is estimated to have contributed $25.3 billion of government revenues, or 31.5% of the total. U.S. companies have invested heavily in the petroleum sector. Indonesia ranked eleventh in world gas production in 2007. In early 2007, Qatar passed Indonesia as the world's number one exporter of liquefied natural gas (LNG). Despite the declining trends, Indonesia's oil and gas trade balance remained positive at $2.3 billion for 2006 and $156 million in 2007, according to unofficial statistics.

Indonesia has a wide range of mineral deposits and production, including bauxite, silver, and tin, copper, nickel, gold, and coal. Although the coal sector was open to foreign investment in the 1990s, new investment was closed again after 2000. A new mining law, passed in December 2008, opened coal to foreign investment again. Total coal production reached 189.7 million metric tons in 2008, including exports of 140.3 million tons. Two U.S. firms operate two copper/gold mines in Indonesia, with a Canadian and a U.K. firm holding significant investments in nickel and gold, respectively. In 2007 Indonesia ranked fifth among the world's top gold concentrate producers. Since 1998, the number of new mines has declined compared with previous years. This decline does not reflect Indonesia's mineral prospects, which are high; rather, the decline reflects earlier uncertainty over mining laws and regulations, low competitiveness in the tax and royalty system, and investor concerns over divestment policies and the sanctity of contracts.

**Investment:** President Yudhoyono and his economic ministers have stated repeatedly their intention to improve the climate for private sector investment to raise the level of GDP growth and reduce unemployment. In addition to general corruption and legal uncertainty, businesses have cited a number of specific factors that have reduced the competitiveness of Indonesia's investment climate, including: corrupt and inefficient customs services; non-transparent and arbitrary tax administration; inflexible labor markets that have reduced Indonesia's advantage in labor-intensive manufacturing; increasing infrastructure bottlenecks; and uncompetitive investment laws and regulations. In each of the past three years, the Government of Indonesia has announced a series of economic policy packages aimed at stimulating investment and infrastructure improvements and implementing regulatory reform. A new investment law was enacted in 2007, which contains provisions to restrict the share of foreign ownership in a range of industries. The government is considering a review of Indonesia's negative list, but proposed revisions had not been enacted as of March 2009.

On September 2, 2008, the DPR passed long-awaited tax reform legislation. The legislation reduced corporate and personal income tax rates as of January 1, 2009. Corporate income tax rates fell from 30% to 28% in 2009 and will decline to 25% in 2010, with additional reductions for small and medium enterprises and publicly listed companies. The legislation raises the taxable income threshold for individuals, cuts the maximum personal income tax

from 35% to 30%, and provides lower marginal personal income tax rates across four income categories. Taxes on dividends will also fall from a maximum of 20% to a maximum of 10%. Long-planned labor reforms have been delayed.

The passage of a new copyright law in July 2002 and accompanying optical disc regulations in 2004 greatly strengthened Indonesia's intellectual property rights (IPR) regime. Despite the government's significantly expanded efforts to improve enforcement, IPR piracy remains a major concern to U.S. intellectual property holders and foreign investors, particularly in the high-technology sector. In March 2006, President Yudhoyono issued a decree establishing a National Task Force for IPR Violation Prevention. The IPR Task Force was intended to formulate national policy to prevent IPR violations and determine additional resources needed for prevention, as well as to help educate the public through various activities and improve bilateral, regional, and multilateral cooperation to prevent IPR violations. It has yet to fully realize these aims. In 2007, Indonesia was removed from the U.S. Trade Representative's "Priority Watch" list and placed on the "Watch" list.

**Environment:** President Yudhoyono's administration has significantly increased Indonesia's global profile on environmental issues, and U.S.-Indonesia cooperation on the environment has grown substantially. Indonesia is particularly vulnerable to the effects of climate change, which include rising sea levels and erosion of coastal areas, increased frequency and intensity of extreme weather events, species extinction, and the spread of vector-borne diseases. At the same time, Indonesia faces challenges in addressing the causes of climate change. Indonesia has the world's second-largest tropical forest and the fastest deforestation rate, making it the third-largest contributor of greenhouse gas emissions, behind China and the U.S. In December 2007, Indonesia hosted the 13th Conference of the Parties of the United Nations Framework Convention on Climate Change (UNFCCC), and led efforts to highlight the importance of forests and deforestation in the climate debate.

In 2004, President Yudhoyono initiated a multi-agency drive against illegal logging that has significantly decreased illegal logging through stronger enforcement activities. The State Department and the U.S. Trade Representative negotiated with the Indonesian Ministries of Trade and Forestry the U.S. Government's first *Memorandum of Understanding on Combating Illegal Logging and Associated Trade.* Presidents George W. Bush and Yudhoyono announced the MOU during President Bush's November 2006 visit to Indonesia. Implementation of the MOU includes collaboration on sustainable forest management, improved law enforcement, and improved markets for legally harvested timber products. This effort will strengthen the enabling conditions for avoiding deforestation, specifically addressing the trade issues that are involved.

The U.S. Government contributed to the start of the Heart of Borneo conservation initiative to conserve a high-biodiversity, transboundary area that includes parts of Indonesia, Malaysia, and Brunei. The three countries launched the Heart of Borneo initiative in February 2007. In 2009, the Governments of Indonesia and the U.S. concluded a Tropical Forest Conservation Act (TFCA) agreement. The agreement reduces Indonesia's debt payments to the U.S. over the next 8 years; these funds will be redirected toward tropical forest conservation in

Indonesia.

Indonesia is also home to the greatest marine biodiversity on the planet. President Yudhoyono called for a Coral Triangle Initiative (CTI) in August 2007. The Coral Triangle Initiative is a regional plan of action to enhance coral conservation, promote sustainable fisheries, and ensure food security in the face of climate change. In December 2007, the U.S. Government announced its support for the six CTI nations (Indonesia, Malaysia, Philippines, Timor-Leste, Papua New Guinea, and Solomon Islands). Since then, the United States has provided $8.4 million to this initiative. With projected funding of $32 million over five years, the U.S. is the largest bilateral donor to CTI, and President Bush endorsed the CTI proposal formally at the 2007 Asia-Pacific Economic Cooperation (APEC) Summit.

Indonesia hosted the first-ever World Oceans Conference in Manado, North Sulawesi, May 11 -15, 2009. The World Oceans Conference was also the venue for the Coral Triangle Initiative Summit, at which leaders from the six CTI nations launched the CTI Regional Plan of Action. Top government officials and other leaders discussed the scientific interplay between ocean degradation, climate and weather patterns, and fishing stocks.

**NATIONAL SECURITY**

Indonesia's armed forces (Tentara Nasional Indonesia, or TNI) total approximately 350,000 members, including the army, navy, marines, and air force. The army is the largest branch with about 280,000 active-duty personnel. Defense spending in the national budget accounts for 1.8% of GDP, but is supplemented by revenue from many military businesses and foundations.

The Indonesian National Police were a branch of the armed forces for many years. The police were formally separated from the military in April 1999, a process that was completed in July 2000. With 250,000 personnel, the police represent a much smaller portion of the population than in most nations.

Indonesia has peaceful relations with its neighbors. Without a credible external threat in the region, the military historically viewed its prime mission as assuring internal security. Military leaders have said that they wish to transform the military to a professional, external security force, providing domestic support to civilian security forces as necessary.

Throughout Indonesian history, the military maintained a prominent role in the nation's political and social affairs. A significant number of cabinet members have had military backgrounds, while active duty and retired military personnel occupied a large number of seats in the parliament. Commanders of the various territorial commands played influential roles in the affairs of their respective regions. With the inauguration of the newly-elected national parliament in October 2004, the military no longer has a formal political role, although it retains important political influence.

**FOREIGN RELATIONS**

Since independence in 1945, Indonesia has espoused a "free and active" foreign policy,

seeking to play a role in regional affairs commensurate with its size and location but avoiding involvement in conflicts among major powers. Indonesian foreign policy under the "New Order" government of President Suharto moved away from the stridently anti-Western, anti-American posturing that characterized the latter part of the Soekarno era. Following Suharto's ouster in 1998, Indonesia's Presidents have preserved the broad outlines of Suharto's independent, moderate foreign policy. The traumatic separation of East Timor from Indonesia after an August 1999 East Timor referendum, and subsequent events in East and West Timor, strained Indonesia's relations with the international community.

A cornerstone of Indonesia's contemporary foreign policy is its participation in the Association of Southeast Asian Nations (ASEAN), of which it was a founding member in 1967 with Thailand, Malaysia, Singapore, and the Philippines. Since then, Brunei, Vietnam, Laos, Burma, and Cambodia also have joined ASEAN. While organized to promote common economic, social, and cultural goals, ASEAN acquired a security dimension after Vietnam's invasion of Cambodia in 1979. The security policy aspect of ASEAN expanded with the establishment of the ASEAN Regional Forum in 1994, in which 22 countries participate, including the United States. At ASEAN's Singapore Summit in November 2007, the organization's members signed a new charter, a small step toward the agreed goal of creating an ASEAN Community to propel greater integration in the areas of political and security affairs, economics, and socio-cultural affairs. Indonesia was a strong proponent of further integration. Indonesia also was one of the founders of the Non-Aligned Movement (NAM) and has taken moderate positions in its councils. As NAM Chairman in 1992-95, Indonesia led NAM positions away from the rhetoric of North-South confrontation, advocating instead the broadening of North-South cooperation in the area of development. Indonesia continues to be a prominent leader of the Non-Aligned Movement.

Indonesia often supports NAM and Group of 77 (G-77) foreign policy views, taking positions regarding human rights contrary to the United States. In May 2005, the Yudhoyono administration, in a major effort to reinvigorate its leadership of the NAM and reset the movement's future course, hosted an Asia-Africa Summit to commemorate the founding of the NAM in Bandung, Indonesia in 1955.

A secular state, Indonesia has the world's largest Muslim population and is a member of the Organization of the Islamic Conference (OIC). It carefully considers the interests of Islamic solidarity in its foreign policy decisions while providing a moderating influence in the OIC. President Wahid, for example, pursued better relations with Israel; Foreign Minister Noer Hassan Wirajuda participated in the November 2007 Middle East peace conference in Annapolis.

After 1966, Indonesia welcomed and maintained close relations with the donor community, particularly the United States, Western Europe, Australia, and Japan, through the Intergovernmental Group on Indonesia (IGGI) and its successor, the Consultative Group on Indonesia (CGI), which have provided substantial foreign economic assistance. Donors in recent years have expanded assistance to Indonesia, due to its rapid democratic consolidation.

Case 2:08-cv-15147-LPZ-MKM   Document 67-3   Filed 06/07/10   Page 119 of 146

Indonesia has been a strong supporter of the Asia-Pacific Economic Cooperation (APEC) forum. Largely through the efforts of President Suharto at the 1994 meeting in Bogor, Indonesia, APEC members agreed to implement free trade in the region by 2010 for industrialized economies and 2020 for developing economies.

In 2008, Indonesia finalized its Economic Partnership Agreement (EPA) with Japan, a significant trade partner and Indonesia's biggest foreign investor. The agreement is Indonesia's first bilateral free trade deal and exempts Indonesia from 90% of Japanese import duties.

President Yudhoyono has sought a higher international profile for Indonesia. In March 2006, Yudhoyono traveled to Burma to discuss democratic reform and visited several Middle Eastern countries in April and May 2006. Yudhoyono delivered a major speech in Saudi Arabia, encouraging the Muslim world to embrace globalization and technology for greater social and economic progress. In November 2006, Indonesia sent about 1,000 peacekeeping troops to southern Lebanon to be part of the UN Interim Force in Lebanon (UNIFIL) and replaced those troops with a second contingent a year later. In 2007 and 2008, Indonesia held a non-permanent seat on the UN Security Council. President Yudhoyono has also developed strategic partnerships with several countries, including the Netherlands. In November 2008, President Yudhoyono suggested the U.S. and Indonesia work together to build a comprehensive partnership. Secretary of State Clinton's February 2009 visit to Indonesia helped move that partnership forward in a number of key areas. Since her visit, bilateral cooperation on education, climate change, science and technology, health, and other issues has continued to progress.

## U.S.-INDONESIAN RELATIONS

The United States has important economic, commercial, and security interests in Indonesia. It remains a linchpin of regional security due to its strategic location astride a number of key international maritime straits, particularly the Malacca Strait. Relations between Indonesia and the U.S. are positive and have advanced since the election of President Yudhoyono in October 2004. The U.S. played a role in Indonesian independence in the late 1940s and appreciated Indonesia's role as an anti-communist bulwark during the Cold War. Cooperative relations are maintained today, although no formal security treaties bind the two countries. The United States and Indonesia share the common goal of maintaining peace, security, and stability in the region and engaging in a dialogue on threats to regional security. Cooperation between the U.S. and Indonesia on counterterrorism has increased steadily since 2002, as terrorist attacks in Bali (October 2002 and October 2005), Jakarta (August 2003 and September 2004), and other regional locations demonstrated the presence of terrorist organizations, principally Jemaah Islamiyah, in Indonesia. The United States has welcomed Indonesia's contributions to regional security, especially its leading role in helping restore democracy in Cambodia and in mediating territorial disputes in the South China Sea. During Secretary's Clinton's visit to Indonesia in early 2009, she and Foreign Minister Wirajuda announced that the U.S. and Indonesia would begin discussions on developing a comprehensive partnership between the two countries.

Case 2:08-cv-15147-LPZ-MKM    Document 67-3    Filed 06/07/10    Page 120 of 146

The U.S. is committed to consolidating Indonesia's democratic transition and supports the territorial integrity of the country. Nonetheless, there are friction points in the bilateral political relationship. These conflicts have centered primarily on human rights, as well as on differences in foreign policy. The U.S. Congress cut off grant military training assistance through International Military Education and Training (IMET) to Indonesia in 1992 in response to a November 12, 1991, incident in East Timor when Indonesian security forces shot and killed East Timorese demonstrators. This restriction was partially lifted in 1995. Military assistance programs were again suspended, however, in the aftermath of the violence and destruction in East Timor following the August 30, 1999, referendum favoring independence.

Separately, the U.S. had urged the Indonesian Government to identify and bring to justice the perpetrators of the August 2002 ambush murders of two U.S. teachers near Timika in Papua province. In 2005, the Secretary of State certified that Indonesian cooperation in the murder investigation had met the conditions set by Congress, enabling the resumption of full IMET. Eight suspects were arrested in January 2006, and in November 2006 seven were convicted.

In November 2005, the Under Secretary of State for Political Affairs, under authority delegated by the Secretary of State, exercised a National Security Waiver provision provided in the FY 2006 Foreign Operations Appropriations Act (FOAA) to remove congressional restrictions on Foreign Military Financing (FMF) and lethal defense articles. These actions represented a reestablishment of normalized military relations, allowing the U.S. to provide greater support for Indonesian efforts to reform the military, increase its ability to respond to disasters and participate in global peacekeeping operations, and promote regional stability.

Under the terms of the FY 2008 FOAA, signed into law in December 2007, Congress did not reimpose restrictions. However, it prevented a portion of U.S. security assistance from being released before the Secretary of State reported on the status of certain measures of military reform, of accountability for past human rights abuses, of public access to Papua, and of the investigation into the 2004 murder of a prominent human rights activist.

Regarding worker rights, Indonesia was the target of several petitions filed under the Generalized System of Preferences (GSP) legislation arguing that Indonesia did not meet internationally recognized labor standards. A formal GSP review was suspended in February 1994 without terminating GSP benefits for Indonesia. Since 1998, Indonesia has ratified all eight International Labor Organization core conventions on protecting internationally recognized worker rights and allowed trade unions to organize. However, enforcement of labor laws and protection of workers' rights remain inconsistent and weak in some areas. Indonesia's slow economic recovery has pushed more workers into the informal sector, which reduces legal protection and could create conditions for increases in child labor.

**Development Assistance from the United States to Indonesia**
The U.S. Agency for International Development (USAID) and its predecessor agencies have provided development assistance to Indonesia since 1950. Initial assistance focused on the most urgent needs, including food aid, infrastructure rehabilitation, health care, and training.

Throughout the 1970s and 1980s, a time of great economic growth in Indonesia, USAID played a major role in helping the country achieve self-sufficiency in rice production and in reducing the birthrate. Today, USAID assistance programs focus on basic and higher education, democratic and decentralized governance, economic growth, health, water, sanitation, and the environment. Future programs will place a greater emphasis on energy.

The United States was one of the lead donors in the reconstruction efforts in the tsunami-hit area of Aceh. Most of the U.S. tsunami relief program is complete, although our efforts toward the construction of the Aceh west coast highway continues. The U.S. will remain actively engaged in conflict prevention and resolution efforts in Aceh.

**Improving the Quality of Education:** In October 2003, President Bush announced a $157 million Indonesia Education Initiative for 2004-2009 to improve the quality of education in Indonesia. This initiative is a cornerstone of the U.S. Government assistance program in Indonesia, directly responding to Indonesia's priorities and reflecting a joint Indonesia-U.S. commitment to revitalize education for the next generation of Indonesia's leaders. Since the initiative began in 2005, more than 1,476 schools, 23,612 educators, and 345,983 students have benefited from the assistance to improve teaching and learning, education governance, community involvement in school management, and public-private alliances. The initiative has also sparked donor interest toward increased coordination and cooperation both at the national and field levels. By 2010, the program will promote ownership of new methods for delivering basic education assistance directly to the local level where it can be more effectively and accountably targeted. Programs include:

Decentralized Basic Education (DBE): As the main component of the Indonesia Education Initiative, the Decentralized Basic Education Project focuses on improving the quality and relevance of basic education in primary and junior secondary schools. Through technical assistance and training, the program has three goals: to assist local governments and communities to manage education services more effectively; to enhance teaching and learning to improve student performance in key subjects such as math, science, and reading; and to ensure that Indonesia's youth gain more relevant life and work skills to better compete for jobs in the modern economy. USAID successfully utilizes public-private alliances to mobilize corporate sector resources for education. In partnership with ConocoPhillips, USAID is helping rehabilitate schools damaged by the May 2006 earthquake in Yogyakarta as well as Central Java; and Intel is helping teachers use technology in their classrooms. Partnerships with three U.S. universities--the University of Pittsburgh, Florida State University, and the University of Massachusetts--and 14 Indonesian universities are enabling teachers participating in the program to receive academic credit for their work, helping them meet new Government of Indonesia recertification requirements. DBE also promotes the use of information technology for education; the importance of early childhood education; in-service teacher training; and non-formal work and life skills.

Opportunities for Vulnerable Children: This program prepares the foundation for an inclusive education system by focusing on the educational rights and needs of children with visual impairments (blindness and low vision) by using an effective model for inclusion of students

with visual impairments within the public education infrastructure that benefits both students with visual impairments and other disenfranchised populations. These activities have led to a substantial increase in the number of children with visual impairments attending school, and increases in the availability and quality of inclusive education services. Replicable models are being developed to expand the reach of the program to Aceh, South Sulawesi, and Central Java. In partnership with Indonesian local universities and Hilton Perkins International, a pre-service university-level program is developed to equip new teachers with effective teaching strategies and clear understanding of children with special needs.

Sesame Street Indonesia/Jalan Sesama: In partnership with the Sesame Workshop, USAID is supporting the development of a new Indonesian co-production of the renowned *Sesame Street* television show. Indonesia's "Jalan Sesama" is one of the largest partnerships between USAID and the Sesame Workshop. By watching "Jalan Sesama" millions of Indonesian children will be better equipped to start and stay in school. The program went on the air in 2007 and more than 3 million Indonesian children have viewed the broadcast. The show is currently ranked second in its time slot.

Higher Education: The Indonesia Education Initiative, run by the Public Affairs Section (PAS) of the U.S. Embassy, complements USAID's Basic Education Programs with a range of educational scholarships and exchanges, and English language learning opportunities. A partnership with the University of Kentucky is assisting three Indonesian universities to upgrade their academic programs in areas critical for economic growth such as agriculture, business, engineering, and public administration. A three-way partnership between USAID, the Government of Aceh Province, and Chevron supports the development of the Aceh Polytechnic, a new institution to provide quality education in applied technology fields such as information technology and electrical engineering that are in high demand in the region.

**Effective Democracy and Decentralized Governance:** This objective aims to support democratic reforms by supporting effective and accountable local governance, addressing conflict and encouraging pluralism, and consolidating national-level democratic reforms.

Mitigation of Conflict and Support for Peace: USAID is a key donor working to mitigate conflict and build peace in post-conflict areas, such as Aceh, Papua, Central Sulawesi, and Maluku. Assistance activities focus on: conflict resolution/mitigation; civilian-military affairs; livelihoods development in conflict areas; drafting and monitoring of relevant legislation; and emergency and post-conflict transitional assistance to conflict-affected persons.

Fighting Trafficking in Persons: USAID has assisted the Government of Indonesia and civil society to develop policies and procedures to prevent trafficking in women, girls, and men and provide protection to survivors of trafficking. The USAID Trafficking in Persons program was expected to end in late 2009.

Justice Sector Reforms: This includes support for the bureaucratic reform efforts of the Attorney General's Office through technical assistance and training for prosecutors. USAID also works with the Supreme Court and the Constitutional Court to develop a more effective,

professional, transparent, accountable, and independent executive branch.

Legislative Strengthening: USAID provides institutional support to the National House of
Representatives, National Regional Representative Council, and over 60 district legislative
councils. Activities include promoting constituency and media outreach; developing the
capacity to draft and analyze legislation and operational budgets; and supporting legislative
commissions to carry out their functions.

Local Governance Strengthening and Decentralization Support: This activity supports
Indonesia's decentralization through assistance to more than 60 local governments to
increase governmental accountability and transparency, strengthen the local legislative
process, promote citizen engagement, improve the planning and budget process, and
promote more responsive public services. At the national level, USAID supports the
Government of Indonesia and civil society to improve decentralization policies.

Promoting Democratic Culture: USAID supports civil society organizations and government
institutions to strengthen democratic civic culture, respect for pluralism, religious diversity, and
the rights of women and minority groups. Activities under this program include civic education,
advocacy, engaging traditional leaders, building networks to support tolerance and pluralism,
and assisting the government in reviewing policies that conflict with the constitution and
human rights standards.

Elections and Political Process: USAID supported the 2009 parliamentary and presidential
elections through an elections support package that included political party development,
election administration, voter education, election monitoring, and oversight and strengthening
of the legal framework.

**Tsunami Reconstruction:** The U.S. Government was one of the first donors to respond to
the disaster. Through numerous grants to non-governmental organizations (NGOs),
international organizations, and UN agencies, USAID has helped stabilize the humanitarian
situation in Aceh, avert a public health crisis, and provide relief services to survivors.

Rebuilding Shelter and Key Infrastructure: USAID is assisting communities by providing much
needed shelter, working with the Indonesian Government to rebuild key infrastructure and
ensuring proper mapping and planning is considered through local cooperation.

Restoring Livelihoods: USAID enables communities to direct capacity building to benefit
people at the local level. USAID's Community Based Recovery Initiative is working with 59
villages to organize local capacity-building initiatives.

Strengthening Capacity and Governance: USAID is providing assistance to restore local
government services in Aceh, working to increase governmental accountability and
transparency, strengthen the local legislative process, promote citizen engagement and civil
service reform, and improve the delivery of basic services.

**Economic Growth Strengthened and Employment Created:** Assistance to the Indonesian Government and private sector focuses on sustaining growth and creating jobs by improving the trade and investment climate, increasing competitiveness in key agribusiness and industry sectors, and enhancing the safety and soundness of the financial system. USAID is working with Indonesians to ensure that future generations enjoy an increasingly prosperous, democratic, and stable country.

Trade and Investment Climate: Efforts to promote a transparent and predictable legal and regulatory business climate aim to reduce the hidden costs of doing business, increase certainty, promote good governance, enhance trade and investment, and create jobs.

Agribusiness and Industry Competitiveness: Assistance to leading agribusiness and industry sub-sectors fuels growth, exports, and jobs. These efforts also drive increased productivity and national competitiveness through the forging of public and private partnerships.

Financial Sector Safety and Soundness: Assistance to key financial and non-bank financial institutions helps build a sound financial infrastructure through improved oversight, transparency, and governance.

**Improving the Quality of Basic Human Services:** The USAID Basic Human Services Office provides assistance to Indonesia through an integrated strategy that aims to improve the health of local communities through support for maternal and child health, disease surveillance and control, food and nutrition, and access to safe drinking water through better watershed management and water treatment.

Environmental Services: This program supports better health through improved water resources management and expanded access to clean water and sanitation services. With a ridge to reef approach, partners improve water resource management from watershed sources, along rivers, through cities, and to coastal reefs. In the upper watershed, the program promotes forest management, biodiversity conservation, and land use planning to protect a steady, year-round source of clean water. Further downstream, the program strengthens municipal water utilities to improve and expand piped water and sanitation services to communities. Stakeholder forums link upstream and downstream communities to build consensus on water and waste management issues. Marginalized urban communities also benefit from the introduction of safe drinking water through *Air Rahmat*, a home chlorination product being introduced to the market through a public-private partnership.

Under the Maintaining Healthy Ecosystem special objective, the Orangutan Conservation Service program is targeting selected wild orangutan populations in Kalimantan and Sumatra. The USAID program will: 1) reduce the level of threat to select orangutan populations, 2) develop strategies that garner support by a multi-stakeholder constituency, 3) establish networks to support improved law enforcement and conservation management, and 4) set up sustainable financing schemes for long-term conservation at the sites. This project will not support orangutan rehabilitation, re-introductions, or translocation efforts. This approach is consistent with the scientific consensus that the first priority in orangutan conservation must

be the protection of habitat and populations in the wild.

Health Services: Working with the government, NGOs, and other partners, USAID focuses on maternal, neonatal, and child health; reproductive health; nutrition; HIV/AIDS, tuberculosis, malaria; and decentralization of the health sector. USAID works to strengthen government commitment to improve health services, ensure sustainability and local ownership, and to build capacity to expand and improve access to quality health services including health centers, hospitals, private providers and laboratory services; the principal beneficiaries include women, newborns, and children, and high-risk populations for HIV/AIDS and infectious diseases. Improved health-seeking behaviors within communities link key hygiene promotion interventions, such as hand-washing with soap to reduce diarrheal disease, a major cause of childhood death, and increased testing and treatment for infectious diseases. Engagement of civil society and the private sector to increase equity and access to health services is an important element of USAID's programs in the health arena.

USAID's avian influenza (AI) program includes integrated public and private sector AI surveillance and response for both animal and human outbreaks and behavior change communications to minimize behaviors that facilitate the transmission of AI to both poultry and people.

Food and Nutrition: Improving the nutritional status of Indonesians, USAID food assistance targets poor communities. These activities directly affect women and children through targeted supplemental feeding and nutritional education activities. The food assistance program works with villages to construct public latrines, washing facilities, and protected water stations and to organize solid waste disposal efforts to better protect community health. Over one million people will be direct recipients of USAID food assistance under this program.

**Principal U.S. Embassy Officials**

Ambassador--Cameron R. Hume

Deputy Chief of Mission--Ted Osius

Minister Counselor for Political and Economic Sections--Peter D. Haas

Political Counselor--Darcy Zotter

Economic Counselor--Debra Juncker

Management Counselor--Michael C. Mullins

USAID Director--Walter E. North

Defense Attache--COL Kevin E. Richards

Consul General--Jeffrey S. Tunis

Public Affairs Officer--Michael H. Anderson

Commercial Counselor--Joseph B. Kaesshaefer

Department of Agriculture Office--Dennis Voboril

Regional Security Officer--Jeffrey D. Lischke

Office of Defense Cooperation--LTC James O. Robinson

Legal Attache--(Acting) David C. Smith

Department of Justice Office--Gerald H. Heuett Jr.

The **U.S. Embassy** in Indonesia is located at Jalan Medan Merdeka Selatan 3-5, Jakarta (tel. (62-021) 3435-9000). U.S. mail to the Embassy may be addressed to FPO AP 96520.

The U.S. Consulate General in Surabaya is located at Jalan Dr. Sutomo 33, Surabaya, East Java (tel. (62-31) 568-2287).
Principal Officer--Caryn R. McClelland

The U.S. Consulate in Medan is located at Jl. Walikota no. 13, Medan, North Sumatra (tel. (62 -61) 415-2200).
Principal Officer--Sean Stein

The U.S. Consular Agency in Bali is located at Jalan Hayam Wuruk 188, Bali (tel. (62-361) 233-605.

The State Department lifted its travel warning for Indonesia in May 2008 due to objective improvements in the security situation in the country.

For information on economic trends, commercial development, production, trade regulations, and tariff rates, contact the **International Trade Administration**, U.S. Department of Commerce, Washington, DC 20230.

**TRAVEL AND BUSINESS INFORMATION**

The U.S. Department of State's Consular Information Program advises Americans traveling and residing abroad through Country Specific Information, Travel Alerts, and Travel Warnings. **Country Specific Information** exists for all countries and includes information on entry and exit requirements, currency regulations, health conditions, safety and security, crime, political disturbances, and the addresses of the U.S. embassies and consulates abroad. **Travel Alerts** are issued to disseminate information quickly about terrorist threats and other relatively short-term conditions overseas that pose significant risks to the security of American travelers. **Travel Warnings** are issued when the State Department recommends that Americans avoid travel to a certain country because the situation is dangerous or unstable.

For the latest security information, Americans living and traveling abroad should regularly monitor the Department's Bureau of Consular Affairs Internet web site at **http://www.travel.state.gov**, where the current **Worldwide Caution**, **Travel Alerts**, and **Travel Warnings** can be found. **Consular Affairs Publications**, which contain information on obtaining passports and planning a safe trip abroad, are also available at **http://www.travel.state.gov**. For additional information on international travel, see **http://www.usa.gov/Citizen/Topics/Travel/International.shtml**.

The Department of State encourages all U.S. citizens traveling or residing abroad to register via the **State Department's travel registration** website or at the nearest U.S. embassy or consulate abroad. Registration will make your presence and whereabouts known in case it is necessary to contact you in an emergency and will enable you to receive up-to-date information on security conditions.

Emergency information concerning Americans traveling abroad may be obtained by calling 1-888-407-4747 toll free in the U.S. and Canada or the regular toll line 1-202-501-4444 for callers outside the U.S. and Canada.

The **National Passport Information Center** (NPIC) is the U.S. Department of State's single, centralized public contact center for U.S. passport information. Telephone: 1-877-4-USA-PPT (1-877-487-2778); TDD/TTY: 1-888-874-7793. Passport information is available 24 hours, 7 days a week. You may speak with a representative Monday-Friday, 8 a.m. to 10 p.m., Eastern Time, excluding federal holidays.

Travelers can check the latest health information with the U.S. Centers for Disease Control and Prevention in Atlanta, Georgia. A hotline at 800-CDC-INFO (800-232-4636) and a web site at **http://wwwn.cdc.gov/travel/default.aspx** give the most recent health advisories, immunization recommendations or requirements, and advice on food and drinking water safety for regions and countries. The CDC publication "Health Information for International Travel" can be found at **http://wwwn.cdc.gov/travel/contentYellowBook.aspx**.

**Further Electronic Information**

**Department of State Web Site**. Available on the Internet at **http://www.state.gov**, the Department of State web site provides timely, global access to official U.S. foreign policy information, including **Background Notes** and **daily press briefings** along with the directory of **key officers** of Foreign Service posts and more. The Overseas Security Advisory Council (OSAC) provides security information and regional news that impact U.S. companies working abroad through its website **http://www.osac.gov**

**Export.gov** provides a portal to all export-related assistance and market information offered by the federal government and provides trade leads, free export counseling, help with the export process, and more.

**STAT-USA/Internet**, a service of the U.S. Department of Commerce, provides authoritative economic, business, and international trade information from the Federal government. The site includes current and historical trade-related releases, international market research, trade opportunities, and country analysis and provides access to the **National Trade Data Bank**.

   **Back to Top**

**EXHIBIT J**
**to the Declaration of John R. Coleman**

**Deposition Transcript of Michael Hsu (Selected Portions)**

# MURRAY v. GEITHNER, ET AL

# MICHAEL HSU

November 18, 2009

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888   FAX: 248.644.1120

www.bienenstock.com

MICHAEL HSU
November 18, 2009

Page 34

1    Q.   Such as?
2    A.   The General Accounting Office, the Special Inspector
3    General for TARP, the Congressional Oversight Panel.
4    Q.   And the inquiries other than ownership and the
5    trustees, what other type of inquiries were being made?
6    A.   Why did Treasury do what it did with regards to AIG?
7    I mean, the -- there were wide-ranging questions with regards
8    to, to the AIG restructuring.
9    Q.   In responding to these various inquiries, did you
10   gain any information relative to the purpose behind the
11   provision of the credit facility by the Federal Reserve Bank
12   of New York?
13        MS. STRAUS:  I'll just instruct the witness that to
14   the extent your answer may include deliberative process
15   information, don't answer that segment.
16        THE WITNESS:  In, in generality, yes; but I think I
17   could safely say that all of the public, all of the published
18   responses by Treasury to any questions about the trustees
19   reflects the full extent of my knowledge with regards to the
20   trust and its purpose and its -- and anything related to it,
21   quite frankly.
22   BY MR. YERUSHALMI:
23   Q.   Let me ask you a broader question then.
24   A.   Sure.
25   Q.   And your answer might be exactly that.

Page 35

1    A.   Okay.
2    Q.   After the Federal Reserve Bank of New York provided
3    the $85 billion credit line --
4    A.   Mm-hmm.
5    Q.   -- under the credit facility --
6    A.   Mm-hmm.
7    Q.   -- it was determined at some later point by Treasury
8    that AIG needed additional funds and it needed to apply those
9    funds to pay down that credit facility because AIG's risk
10   rating was at -- was threatened primarily because of too much
11   debt; and what I would like to ask you is do you have any
12   information regarding the Treasury Department's analysis and
13   decision about paying the additional monies under TARP to pay
14   down that credit facility?
15   A.   No.
16        MS. STRAUS:  I give the same instruction but --
17        THE WITNESS:  Yeah.  No.
18   BY MR. YERUSHALMI:
19   Q.   No?
20   A.   No.
21   Q.   So you were not part of any analysis or
22   deliberations or anything else relating to that decision?
23   A.   No.
24   Q.   And if you had any information, it would just simply
25   be the public information that we all have?

Page 36

1    A.   Yes.
2    Q.   I'd like to come back to the March restructuring.
3    Do you have any information regarding the conditions of the 30
4    billion equity line that was provided under that March
5    restructuring by the Treasury Department to AIG?
6        MS. STRAUS:  Same instruction.
7        THE WITNESS:  Sorry.  Do I have --
8    BY MR. YERUSHALMI:
9    Q.   Any information regarding the conditions of that
10   particular equity line?
11   A.   I mean, I recall that -- I'm sorry.  The conditions
12   -- to my -- if I understand your question correctly, the
13   conditions to that facility are in the agreement itself, and
14   the agreement is publicly available.  So I have nothing to add
15   to that, I guess.
16   Q.   So you would not have any knowledge, personal
17   information or knowledge regarding that particular
18   transaction, other than what's publicly available?
19   A.   I do because it was part of my responsibilities in
20   the period preceding, but it would be deliberative, highly
21   deliberative.
22   Q.   Meaning you were not -- when you say deliberative,
23   it was not any final analysis or final conclusions by the
24   Treasury?  It was just part of its deliberating on what
25   positions it was going to take?

Page 37

1    A.   What's the --
2    Q.   In other words, I want to understand what you
3    understand to be deliberative process.
4    A.   You want to understand --
5    Q.   I know you're an attorney, but just so you and I can
6    be speaking the same language.
7    A.   Sure.  My understanding of the deliberative process
8    with regards to the March transaction would be that to the
9    extent there's conversations, discussions, analysis, debate in
10   the period leading up to and related to that transaction,
11   those would be deliberative.
12   Q.   I think that's a pretty good definition.
13   A.   Okay.
14        MS. STRAUS:  You passed.
15   BY MR. YERUSHALMI:
16   Q.   In your capacity working at AIG working on -- excuse
17   me.  In your capacity of working at the Treasury on matters
18   relating to AIG -- and I'm speaking now any time period while
19   you were at the Treasury --
20   A.   Okay.
21   Q.   -- did you have any knowledge of AIG's Shariah-
22   compliant insurance product businesses?
23   A.   Only when I was informed of the lawsuit.
24   Q.   So --
25   A.   This particular lawsuit.

BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

MICHAEL HSU
November 18, 2009

Page 38

1    Q.   -- while you were employed by the Treasury, you had
2    no idea?
3       A.   I'm sorry?
4       Q.   While you were employed at the Treasury, you had no
5    idea?
6       A.   No. I, I was -- this particular suit against the
7    Secretary was brought to my attention while I was at Treasury.
8       Q.   Oh, I see. I misunderstood. You were pointing to
9    the Notice of your deposition.
10      A.   No, I'm sorry. So, so, so when I was informed of
11   this particular suit while I was at Treasury, that was the
12   first time I became aware of the -- that AIG had a Shariah-
13   compliant product.
14      Q.   And where did you learn of this information?
15      A.   I believe Joe --
16      Q.   Joe?
17      A.   Joe Samarias.
18      Q.   Oh.
19      A.   -- informed me that there was a lawsuit against the
20   Treasury Department, against the Secretary, related to AIG,
21   it's a First Amendment case, and he wanted to ask me about --
22         MS. STRAUS: I'll just instruct the witness --
23         THE WITNESS: Oh, this is client -- attorney/client
24   stuff.
25         MR. COLEMAN: Yeah, not --

Page 39

1          MS. STRAUS: -- not to discuss anything --
2          MR. COLEMAN: -- the content of your conversation.
3    I think --
4          MS. STRAUS: Yeah.
5          MR. COLEMAN: -- you answered the question about how
6    you learned about it.
7          THE WITNESS: Okay. So I learned about it from Joe
8    Samarias.
9          MR. COLEMAN: Agency counsel.
10         THE WITNESS: Agency counsel. Sorry.
11   BY MR. YERUSHALMI:
12      Q.   You indicated that you had worked on -- strike that.
13   You had indicated that you had gained some knowledge prior to
14   late December '08 about AIG in the context of the Treasury's
15   developing the SSFI program guidelines; correct?
16      A.   I would say I was made aware of, that there was a
17   situation with AIG because of the drafting of those
18   guidelines. So I didn't have any information as to AIG at
19   that time.
20      Q.   Were you given any information regarding what those
21   program guidelines were at the time?
22      A.   No. I was not directly involved in that.
23      Q.   Prior to your work on AIG beginning in late December
24   '08, are you aware of anyone else at the Treasury Department
25   who was doing risk analysis or analyzing AIG?

Page 40

1       A.   No, no.
2       Q.   And is that because you're simply not aware or you
3    know that there was no one else doing that work?
4       A.   I was not aware.
5       Q.   There could have been other people doing that work?
6       A.   Yes, there could have been.
7       Q.   You may or may not recall when you and I spoke on
8    the phone in terms of arranging the subpoena, I had indicated
9    that one of the issues that I would like to ask about would be
10   your interaction with people at AIG or Federal Reserve people
11   at AIG or Treasury people at AIG. I want to get into that
12   area a little bit. I will assume -- and you can correct me if
13   I'm wrong -- that you had no contact with AIG or any federal
14   employees who might be working on the AIG matter prior to late
15   December '08.
16      A.   I certainly had no contact with anybody at AIG prior
17   to December of '08. I had -- in my course of my duties at the
18   SEC, I had lots of contact with the New York Fed throughout
19   2007 and 2008. So I, I did know Steve Manzari and Sarah
20   Dahlgren prior to December of '08, and Mike Alix who is at the
21   New York Federal Reserve now was previously the Chief Risk
22   Officer at Bear Stearns. We supervised Bear Stearns for a
23   number of years so I knew Mike Alix from that time period. So
24   I knew them prior to December of '08.
25      Q.   So during this --

Page 41

1       A.   Sorry. Go ahead.
2       Q.   During this time period prior to December '08, you
3    were dealing with these individuals who obviously have contact
4    with AIG and were involved. Was your contact with these
5    individuals relating to AIG or other matters?
6       A.   No. Other matters.
7       Q.   So at the SEC you had no responsibilities relating
8    to AIG?
9       A.   No.
10      Q.   From this time period, December '08 when you began
11   working on AIG, what contact did you have, if any, with any --
12      A.   I'm sorry. Let me go back for one second.
13      Q.   Okay.
14      A.   When I was at the SEC, there was one matter which
15   came up related to AIG and I don't remember the time frame.
16   AIG has a small broker dealer.
17         MR. COLEMAN: Again, I mean, we don't represent the
18   SEC; but to the extent this is an investigation that the SEC
19   was conducting, it's not --
20         THE WITNESS: It was not an investigation. This
21   was, this was -- it was a a -- there was a regulatory filing
22   required of all broker dealers under the -- we just dub it
23   17 H. I'm not sure what -- it's just a filing.
24   BY MR. YERUSHALMI:
25      Q.   Right.

BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

MICHAEL HSU
November 18, 2009

| Page 58 | Page 60 |
|---|---|

**Page 58**

```
1                   * * *
2           ACKNOWLEDGMENT OF DEPONENT
3      I, MICHAEL HSU, do hereby acknowledge that I have
4  read and examined the foregoing testimony, and the same is a
5  true, correct and complete transcription of the testimony
6  given by me, and any corrections appear on the attached Errata
7  sheet signed by me.
8
9
10
11      (DATE)            (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 60**

```
1            E R R A T A   S H E E T
2  IN RE: MURRAY vs. GEITHNER
3  RETURN BY:
4  ============================
5  PAGE    LINE         CORRECTION AND REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  (DATE)            (SIGNATURE)
```

**Page 59**

```
1         CERTIFICATE OF SHORTHAND REPORTER
2      I, Janet A. Steffan, Registered Diplomate Reporter
3  and Notary Public before whom the foregoing deposition was
4  taken, do hereby certify that the foregoing transcript is a
5  true and correct record of the testimony given; that said
6  testimony was taken by me stenographically and thereafter
7  reduced to typewriting under my direction and that I am
8  neither counsel for, related to, nor employed by any of the
9  parties to this case and have no interest, financial or
10  otherwise, in its outcome.
11      IN WITNESS WHEREOF, I have hereunto set my hand this
12  30th day of November, 2009.
13
14
15
16
17
18  Registered Diplomate Reporter
19
20
21
22
23
24
25
```

**Page 61**

```
1            E R R A T A   S H E E T
2  IN RE: MURRAY vs. GEITHNER
3  RETURN BY:
4  ============================
5  PAGE    LINE         CORRECTION AND REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  (DATE)            (SIGNATURE)
```

BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

**EXHIBIT K**
**to the Declaration of John R. Coleman**

**Deposition Transcript of Jim Millstein (Selected Portions)**

MURRAY v. GEITHNER, ET AL

JIM MILLSTEIN

November 17, 2009

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888   FAX: 248.644.1120

www.bienenstock.com

Case 2:08-cv-15147-LPZ-MKM   Document 67-3   Filed 06/07/10   Page 135 of 146

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


KEVIN J. MURRAY,                    :

     Plaintiff,                    :

     v.                            :

TIMOTHY F. GEITHNER, in his         : Case No. 08-CV-15147

official capacity as Secretary,     :

U.S. Department of Treasury;        :

BOARD OF GOVERNORS OF THE           :

FEDERAL RESERVE SYSTEM,             :

     Defendants.                   :



30(b)(6) DEPOSITION OF THE BOARD OF GOVERNORS OF THE

FEDERAL RESERVE BOARD

BY AND THROUGH ITS REPRESENTATIVE JIM MILLSTEIN


Washington, D.C.

Tuesday, November 17, 2009

9:06 a.m.


Job No. 32-168061

Pages:  1 - 91

Reported by:  Janet A. Steffan, RDR



JIM MILLSTEIN
November 17, 2009

---

Page 2

1    30(b)(6) DEPOSITION OF THE BOARD OF GOVERNORS OF THE
2    FEDERAL RESERVE BOARD, BY AND THROUGH ITS REPRESENTATIVE JIM
3    MILLSTEIN, held at the office of:
4
5
6
7
8          Center for Security Policy
9          1901 Pennsylvania Avenue, Northwest
10         Suite 201
11         Washington, D.C.  20006
12
13
14
15
16
17
18
19
20
21
22
23         Pursuant to Notice, before Janet A. Steffan,
24    Registered Diplomate Reporter and Notary Public in and for the
25    District of Columbia.

---

Page 3

1              A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3          DAVID YERUSHALMI, ESQUIRE
4          Law Offices of David Yerushalmi, P.C.
5          P.O. Box 6358
6          Chandler, Arizona  85246
7          (646) 262-0500
8    ON BEHALF OF THE DEFENDANT:
9          JOHN R. COLEMAN, ESQUIRE
10         JULIE STRAUS, ESQUIRE
11         Federal Programs Branch
12         U.S. Department of Justice
13         20 Massachusetts Avenue, Northwest
14         Washington, D.C.  20001
15         (202) 514-7857
16
17    ALSO PRESENT:
18         JOSEPH J. SAMARIAS, ESQUIRE
19         Attorney-Advisor
20         U.S. Department of the Treasury
21         Office of Financial Stability
22         Washington, D.C.
23
24
25

---

Page 4

1                   I N D E X
2    EXAMINATION OF JIM MILLSTEIN              PAGE
3          By Mr. Yerushalmi............................ 5
4
5                 E X H I B I T S
6            (Attached to the transcript)
7    Plaintiff's Deposition Exhibit
8    No. 29   Notice of Deposition to US Department of..... 5
9             Treasury Pursuant to FRCP 30(b)(6)
10   No. 30   Testimony by Edward M. Liddy, Chairman....... 58
11            and CEO, AIG, before House Financial Services
12            Committee March 18, 2998
13   No. 31   Testimony by Edward M. Liddy, Chairman and... 60
14            CEO, AIG, before the House Committee on
15            Oversight and Government Reform May 13, 2009
16   No. 32   Statement of Chester Feldberg before the..... 62
17            Committee on Oversight and Government Reform
18            US House of Representatives
19            May 13, 2009
20
21
22
23
24
25

---

Page 5

1               P R O C E E D I N G S
2                      -----
3          (Plaintiff's Deposition Exhibit No. 29 was marked
4    for identification.)
5                 JIM MILLSTEIN,
6    a witness herein, being duly sworn, testified as follows:
7                      -----
8                  EXAMINATION
9
10   BY MR. YERUSHALMI:
11       Q.   State your name for the record and spell your last
12   name, please.
13       A.   It's Jim Millstein, M-I-L-L-S-T-E-I-N.  My legal
14   name is James.
15       Q.   Mr. Mallstein?
16       A.   Millstein.
17       Q.   Millstein.  Mr. Millstein, would you take a look at
18   the exhibit, what's been marked as Exhibit No. 1.  This is the
19   Notice of Deposition that you should have received.
20       A.   I don't mean to be difficult, but it's marked as
21   Exhibit No. 29.
22       Q.   I'm sorry.  No. 29.  Please correct me.  Exhibit 29.
23       A.   Yep.  I have it.
24       Q.   And are you familiar with this document?
25       A.   I am now.

---



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

JIM MILLSTEIN
November 17, 2009

Page 6

1    Q.   Did you see this document before today?
2    A.   I can't say that I did.
3    Q.   Would you please review on page 2, beginning at page
4    2, the three marked paragraphs 1, 2 and 3. Let me know when
5    you've reviewed those.
6    A.   Yes, I've reviewed this.
7    Q.   Paragraph 1 refers to the September 2008 transaction
8    between the Federal Reserve Bank of New York and AIG, and I
9    will refer to the American International Group, Inc. as AIG
10   and the credit facility of $85 million. Do you see that?
11   A.   Billion dollars.
12   Q.   Billion dollars. Do you see that?
13   A.   Yes, I do.
14   Q.   And are you prepared to testify as to that
15   transaction on behalf of the Treasury today?
16   A.   I am. Recognizing I didn't participate in the
17   transaction, but I am familiar with it.
18   Q.   You are here today as a 30(b)(6) deponent. Are you
19   aware of that?
20   A.   I am.
21   Q.   And you're testifying on behalf of the Treasury, not
22   in any capacity; is that correct?
23   A.   Correct.
24   Q.   Are you prepared to testify as to the substance of
25   the $85 billion transaction referenced in paragraph 1?

Page 7

1    A.   I am.
2    Q.   And the same question with regard to the Treasury
3    Department's November 2008 purchase of AIG preferred stock
4    pursuant to the Emergency Economic Stabilization Act of 2008
5    referenced in paragraph 2. Are you prepared to testify to
6    that transaction?
7    A.   I am.
8    Q.   And similarly with regard to paragraph 3,
9    information made available to the Office of Special Inspector
10   General and the Troubled Asset Relief Program, SIGTARP, are
11   you prepared to testify as to that?
12   A.   I am.
13   Q.   Thank you. Before we begin, Mr. Millstein, is there
14   any reason why I should not be taking your deposition today?
15   Are you on any medication that might impair your hearing or
16   your answering the questions?
17   A.   No, I'm, I'm competent.
18   Q.   And you've had your deposition taken before, as I
19   understand?
20   A.   I have.
21   Q.   So you understand that you'll need to respond to
22   each question audibly, and if you don't understand any
23   question, you'll ask me to rephrase it so you can respond
24   appropriately?
25   A.   (Witness nodded head.) Yes.

Page 8

1    Q.   Cute. Okay.
2    A.   I'm just turning off my phone. Okay. Sorry.
3    Q.   Let me ask you, Mr. Millstein, what have you done to
4    prepare for this deposition today? Have you reviewed any
5    materials, had any conversations with anyone?
6    A.   I spoke with counsel.
7    Q.   Any other preparation?
8    A.   No.
9    Q.   You did not review any other -- any documents?
10   A.   I am generally familiar with these documents in my
11   capacity at Treasury.
12   Q.   What exactly is your role at the Treasury
13   Department? And let me just for clarification purposes, I'm
14   going to try -- because later in this deposition it will be
15   important. I'm going to try to, when I'm referring to the US
16   Department of Treasury, to say the Treasury Department; and if
17   I refer to the treasury, I mean literally whatever that is,
18   and I hope to get some answers from you, the US treasury.
19   What is your role at the Treasury Department?
20   A.   My title is chief restructuring officer within the
21   Office of Financial Stability, which is a separate office at
22   the Treasury Department.
23   Q.   Okay. I'm going to ask you just to speak up a hair.
24   I'm a little hard of hearing, so --
25   A.   My title is chief restructuring officer.

Page 9

1    Q.   In what department or --
2    A.   The Office of Financial Stability.
3    Q.   And what does that role entail?
4    A.   Direct supervision of the department's investment in
5    AIG, among others.
6    Q.   And what might the others be? Are there any other
7    specific companies?
8    A.   Generally when there are -- when issues pertaining
9    to the restructuring of any of the department's TARP
10   investments, I'm generally consulted.
11   Q.   And who is your immediate supervisor?
12   A.   The Assistant Secretary, Herb Allison. Herb
13   Allison, A-L-L-I-S-O-N.
14   Q.   AIG has received funds under the Emergency Economic
15   Stabilization Act; correct?
16   A.   Yes.
17   Q.   And other than the -- well, let me ask you this.
18   Are you familiar with the TARP funds that are provided under
19   the Emergency Economic Stabilization Act which I will refer to
20   as EESA?
21       MR. COLEMAN: Objection; vague. Are you referring
22   to all the TARP funds or to AIG?
23   BY MR. YERUSHALMI:
24   Q.   You may answer.
25   A.   Yeah. The TARP is a colloquialism referring to the

3 (Pages 6 to 9)

JIM MILLSTEIN
November 17, 2009

Page 42

1  let's just move on.  We'll get through it.
2      THE WITNESS:  In March of 2009 the Treasury
3  Department committed to provide AIG with an incremental 30
4  billion -- no, not 30 billion, sorry -- 29.86 or 84 billion
5  dollars of incremental preferred stock financing; and that is
6  a sort of standby equity commitment that can be drawn by the
7  company so long as it hasn't filed for bankruptcy prior to the
8  draw.
9  BY MR. YERUSHALMI:
10     Q.   And as of today, how much of that equity commitment
11  has been drawn down?
12     A.   Approximately $3 billion.
13     Q.   And how have those funds been used by AIG?
14     A.   Generally to recapitalize its -- certain of its
15  insurance subsidiaries, certain of its insurance subsidiaries.
16     Q.   And is the Treasury Department aware of exactly
17  these funds have been invested by AIG?
18         MR. COLEMAN:  Objection; scope.
19         THE WITNESS:  Yes.  Before they draw the funds, they
20  review use of the draw with us.
21  BY MR. YERUSHALMI:
22     Q.   And does the Treasury Department have the authority
23  to deny an equity drawdown based upon use of funds?
24         MR. COLEMAN:  Objection; scope.
25         THE WITNESS:  No.  Under the terms of the Series F

Page 43

1  preferred stock facility, the conditions to draw are, are very
2  limited.  The conditions precedent to AIG's ability to draw
3  the funds are very limited.
4  BY MR. YERUSHALMI:
5      Q.   Are there any restrictions on use of funds at all?
6      A.   The --
7          MR. COLEMAN:  Objection; scope.
8          THE WITNESS:  No.  The Federal Reserve credit
9  facility requires a -- requires the -- effectively requires
10  the Federal Reserve Board to -- I'm sorry, the Federal Reserve
11  Bank of New York to approve any financing; and so this is
12  financing within the meaning of that credit facility, and
13  therefore indirectly the proceeds -- the use of proceeds have
14  to be approved by the Federal Reserve effectively.
15  BY MR. YERUSHALMI:
16     Q.   By the Federal Reserve Bank of New York?
17     A.   Yes.  But the Treasury Department does not have a
18  specific consent right to use the proceeds.
19     Q.   Does the Federal Reserve Bank of New York have
20  specific restrictions on use of funds when they do their
21  review?
22         MR. COLEMAN:  Objection; scope.
23         THE WITNESS:  The credit facility I think speaks for
24  itself, but they have -- the credit, the terms of the credit
25  facility have limitations on use of proceeds.

Page 44

1  BY MR. YERUSHALMI:
2      Q.   So if someone wanted to find out what those
3  restrictions are, you would just look at the credit
4  facility --
5      A.   That's correct.
6      Q.   -- to determine that?
7      A.   That's correct.
8      Q.   What -- strike that.  You indicated that the funds
9  have been used to recapitalize certain insurance subsidiaries;
10  correct?
11     A.   Correct.
12     Q.   Do you know which subsidiaries those are?
13         MR. COLEMAN:  Objection; scope.
14         THE WITNESS:  Yes.
15  BY MR. YERUSHALMI:
16     Q.   What are they?
17         MR. COLEMAN:  Objection; scope.
18         THE WITNESS:  The -- I'm -- the only reason I'm
19  hesitating is some of the -- I cannot -- sitting here now, I
20  cannot distinguish in my own mind as to which draws -- with
21  regard to the draws that have already been made, which
22  insurance companies the Series F proceeds went to recapitalize
23  versus draws that may be made in the future.  So I'm having
24  trouble distinguishing.
25         MR. COLEMAN:  If you don't remember.

Page 45

1          THE WITNESS:  Can't remember.
2          MR. COLEMAN:  It's publicly available.
3          MR. YERUSHALMI:  Where would it be publicly
4  available?
5          MR. COLEMAN:  In the filings of the company.
6          MR. YERUSHALMI:  I'm sorry?
7          MR. COLEMAN:  SEC filings of the company.
8  BY MR. YERUSHALMI:
9      Q.   Why did the Treasury Department authorize the Series
10  F transaction?
11         MR. COLEMAN:  Objection; scope.  And to the extent
12  it seeks deliberative process privilege, I instruct you not to
13  answer.
14  BY MR. YERUSHALMI:
15     Q.   And let me refine my question given the objection.
16  I'm not looking for the internal deliberations.  I'm looking
17  for the final rationale for that decision.
18         MR. COLEMAN:  Objection; scope.
19         THE WITNESS:  AIG required more liquidity in order
20  to satisfy its auditors that it was a going concern.  In
21  connection with the audit of a company's annual financial
22  statements, the auditors issue a letter and say that they have
23  reviewed the company's financial statements and that those
24  financial statements fairly present the financial condition of
25  the company.

BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

JIM MILLSTEIN
November 17, 2009

Page 46

1        The words "fairly present" is a -- in quotes,
2   "fairly presents" -- is a term of art that embraces a number
3   of standards; and among the standards embraced by those words
4   is that the company has sufficient capital and liquidity
5   available to it for the next 12 months or 15 -- some depends
6   on which company, but 12 to 15 months after -- from the date
7   of the auditor's opinion to meet its obligations in the
8   ordinary course of business.  Sufficient capital and liquidity
9   to meet its obligations in the ordinary course of business.
10       And the auditors of AIG were concerned in March of
11  2009 that AIG might not have sufficient capital and liquidity
12  to meet its obligations in the ordinary course of business
13  and, therefore, required incremental capital to be available
14  to AIG in order to maintain its status as a going concern.
15       If AIG failed to be a going concern in the eyes of
16  its auditors, that would have led to a ratings downgrade and
17  the entire parade of horribles that the rescue theretofore had
18  been intended to prevent would have once again ensued.  So it
19  was determined to provide AIG with an incremental $30 billion
20  of potential liquidity in the form of the Series F stock.
21  BY MR. YERUSHALMI:
22       Q.   And would it be fair to say that the Treasury
23  Department made this decision because private sources were not
24  available?
25            MR. COLEMAN:  Objection; scope.

Page 47

1            THE WITNESS:  Yes.  I think we were -- I think the
2   company had -- could not obtain the funding from other
3   sources.
4   BY MR. YERUSHALMI:
5        Q.   And this was the Treasury Department's determination
6   at that time?
7        A.   Yes.
8            MR. COLEMAN:  Objection; scope.
9   BY MR. YERUSHALMI:
10       Q.   Same question with regard to the Series D preferred
11  shares.  That purchase was authorized by the Treasury
12  Department because AIG did not have those kinds of funds
13  available to it in the private sector?
14       A.   Because AIG could not obtain them elsewhere, yes.
15       Q.   Since September 2008 until the passage of EESA, did
16  the Treasury Department have any officials or employees on
17  site at AIG?
18            MR. COLEMAN:  Objection; scope.
19            THE WITNESS:  Not that I'm aware.
20  BY MR. YERUSHALMI:
21       Q.   After the passage of EESA until today, does the
22  Treasury Department have any employees on site at AIG?
23            MR. COLEMAN:  Objection; scope.
24            THE WITNESS:  From time to time.  At least since the
25  beginning of the new administration there have been, there

Page 48

1   have been employees of the Treasury Department on site at AIG
2   offices in New York from time to time.
3   BY MR. YERUSHALMI:
4        Q.   And by the new administration you mean the Obama
5   administration?
6        A.   Yes.
7        Q.   And what is their role on site at AIG?
8        A.   Just --
9            MR. COLEMAN:  Objection; scope.  Objection to the
10  extent that -- well, you can answer the question.
11            THE WITNESS:  Yeah.  We're just -- we are monitoring
12  AIG's performance.
13  BY MR. YERUSHALMI:
14       Q.   What exactly are they monitoring?
15       A.   The -- its business and operations and the progress
16  they are making in the development of its strategic plan to
17  repay the taxpayers.
18       Q.   Do they just monitor or do they also provide
19  supervision or instruction?
20            MR. COLEMAN:  Objection; scope.
21            THE WITNESS:  We are -- the Treasury Department is a
22  significant investor in the equity of AIG.  The Federal
23  Reserve Bank of New York has established a trust into which a
24  Series C preferred stock has been deposited.  That Series C
25  stock is convertible into 79 percent of their common equity

Page 49

1   and votes with the common, and therefore is -- trustees have
2   significant influence over the election of directors.
3   BY MR. YERUSHALMI:
4        Q.   What do those trustees have to do with the Treasury
5   Department?
6        A.   They are part of the -- they're part of the
7   architecture of our investment as a government in this entity.
8        Q.   When you say our investment, you mean the Treasury
9   Department?
10       A.   I mean the government as a whole.
11       Q.   I'm going to show you what has been previously
12  marked Exhibit 6.  Are you familiar with this document?
13       A.   Yes.
14       Q.   What is that document?
15       A.   That's the credit agreement dated as of September
16  22nd, 2008, between AIG as borrower and the Federal Reserve
17  Bank of New York as lender.
18       Q.   And that is the credit facility that we have been
19  referring to when we've been speaking of the $85 billion
20  credit facility?
21       A.   Yes, sir.
22       Q.   I'm also going to show you what was marked as
23  Exhibit 7 in an earlier deposition.  Are you familiar with
24  that document?
25            MR. COLEMAN:  Take the time to review it.

JIM MILLSTEIN
November 17, 2009

Page 86

1  the US Treasury.  That's what we understand.
2      Q.   You had indicated earlier that the trustees consult
3  with and receive information from the Treasury Department, but
4  that the Treasury Department never instructs them how to act
5  in this capacity as trustee; is that correct?
6      A.   I have testified that I have not and I don't believe
7  anyone at the Treasury Department sitting in my seat before me
8  has instructed them how to vote their shares.
9          MR. YERUSHALMI:  Let me just review my notes and I
10  think we're done.
11         (Discussion off the record.)
12         MR. YERUSHALMI:  That's it, Mr. Millstein.
13         THE WITNESS:  Thank you very much.
14         MR. YERUSHALMI:  Thank you.
15         THE WITNESS:  Appreciate your expedition.
16         MR. COLEMAN:  Let me just take the opportunity to
17  request the opportunity to review the transcript.  And also,
18  David, we haven't really discussed this, but the terms of the
19  protective order that was entered by the court, I think, you
20  know, we need an opportunity to review the transcripts and I
21  think AIG probably will as well to see whether or not they
22  want to designate any portion of the transcript testimony as
23  protected by the protective order.  That's in the terms of the
24  protective order, so, just so we're clear on that.
25         MR. YERUSHALMI:  Okay.  I'm not going to agree to

Page 87

1  that.  I'll need to look at the protective order.
2          MR. COLEMAN:  That's fine.  But we'll work out the
3  logistics of that.
4          MR. YERUSHALMI:  Okay.
5          (Whereupon, signature having not been waived, the
6  30(b)(6) deposition of JIM MILLSTEIN was concluded at 12:15
7  p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 88

1                    * * *
2          ACKNOWLEDGMENT OF DEPONENT
3      I, JIM MILLSTEIN, do hereby acknowledge that I have
4  read and examined the foregoing testimony, and the same is a
5  true, correct and complete transcription of the testimony
6  given by me, and any corrections appear on the attached Errata
7  sheet signed by me.
8
9
10
11     (DATE)          (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 89

1          CERTIFICATE OF SHORTHAND REPORTER
2      I, Janet A. Steffan, Registered Diplomate Reporter
3  and Notary Public before whom the foregoing deposition was
4  taken, do hereby certify that the foregoing transcript is a
5  true and correct record of the testimony given; that said
6  testimony was taken by me stenographically and thereafter
7  reduced to typewriting under my direction and that I am
8  neither counsel for, related to, nor employed by any of the
9  parties to this case and have no interest, financial or
10  otherwise, in its outcome.
11         IN WITNESS WHEREOF, I have hereunto set my hand this
12  30th day of November, 2009.
13
14
15
16
17
18  Registered Diplomate Reporter
19
20
21
22
23
24
25

BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

JIM MILLSTEIN
November 17, 2009

Page 90

```
 1          E R R A T A   S H E E T
 2   IN RE:  MURRAY vs. GEITHNER
 3   RETURN BY:
 4   = = = = = = = = = = = = = = = = = = = = = = = = = = =
 5   PAGE    LINE       CORRECTION AND REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   (DATE)           (SIGNATURE)
```

Page 91

```
 1          E R R A T A   S H E E T
 2   IN RE:  MURRAY vs. GEITHNER
 3   RETURN BY:
 4   = = = = = = = = = = = = = = = = = = = = = = = = = = =
 5   PAGE    LINE       CORRECTION AND REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   (DATE)           (SIGNATURE)
```

**EXHIBIT L**
**to the Declaration of John R. Coleman**

**Third Tranche Report to Congress 12.2.08**

# UNITED STATES DEPARTMENT OF THE TREASURY
# THIRD TRANCHE REPORT TO CONGRESS
# DECEMBER 2, 2008

## I.  INTRODUCTION

This *Third Tranche Report to Congress* meets the requirement for reporting at the $200 billion commitment level under section 105(b) of the Emergency Economic Stabilization Act of 2008 (EESA).  The recent transaction with American International Group (AIG) under the Systemically Significant Failing Institution Program, when combined with the previous $161 billion of transactions under the Capital Purchase Program, exceeded the $200 billion commitment level. Treasury will submit the next report when transaction levels reach the $250 billion level.

The Report addresses the following six areas:

- A description of all the transactions made during the reporting period.
- A description of the pricing mechanism for the transaction.
- A justification of the price paid for, and other financial terms associated with, the transactions.
- A description of the impact of the exercise of such authority on the financial system.
- A description of the challenges that remain in the financial system, including any benchmarks yet to be achieved.
- An estimate of additional actions under the authority provided pursuant to EESA that may be necessary to address such challenges.

## II. TRANSACTION INFORMATION BY PROGRAM

This *Third Tranche Report* reflects transactions under two programs.  On November 17, 2008, Treasury closed $2.97 billion in transactions under the Capital Purchase Program (CPP). Treasury also closed a $40 billion transaction with AIG under the Systemically Significant Failing Institution (SSFI) Program on November 26, 2008.  A report of these transactions was posted on Treasury's web site and is attached here as Appendix 1.

### Capital Purchase Program

The purpose of the CPP is to encourage U.S. financial institutions to build their capital base, which in turn increases their capacity to lend to U.S. businesses and consumers and to support the U.S. economy.  Under the CPP, Treasury will purchase up to $250 billion of senior preferred shares on standardized terms.  The Program is available to qualifying U.S. controlled banks, savings associations, and certain bank and savings and loan holding companies engaged solely or predominately in financial activities permitted under the relevant law.  We reported in detail on the CPP in Treasury's *First Tranche Report to Congress* and *Second Tranche Report to*

DEF000000052

*Congress.*  There have been no changes to the purpose or use of the CPP since our last report.  To date, Treasury has signed final agreements under the CPP with 53 financial institutions, which is reflected in Appendix 1.

**Systemically Significant Failing Institution Program**

On November 25, Treasury issued guidelines for the SSFI Program and completed the first transaction under this program, a $40 billion purchase of senior preferred shares from AIG.

The SSFI Program is designed to provide stability and to prevent disruption to financial markets from the failure of a systemically significant institution.  Unlike the CPP, participation in the SSFI Program is on a case-by-case basis.  When considering an institution for this program, Treasury may consider these and other factors:

1. The extent to which the failure of an institution could threaten the viability of its creditors and counterparties because of their direct exposure to the institution.
2. The number and size of financial institutions that are seen by investors or counterparties as similarly situated to the failing institution, or that could otherwise be likely to experience indirect contagion effects from the failure of the institution.
3. Whether the institution is sufficiently important to the nation's financial and economic system that a disorderly failure would, with a high probability, cause major disruptions to credit markets or payments and settlement systems, seriously destabilize key asset prices, significantly increase uncertainty or losses of confidence thereby materially weakening overall economic performance.
4. The extent and probability of the institution's ability to access alternative sources of capital and liquidity, whether from the private sector or other sources of government funds.

The Federal Reserve Board, the Federal Reserve Bank of New York (FRBNY), and Treasury agreed that AIG's failure would pose a systemic risk.  As was determined at the time of FRBNY's intervention in mid-September, AIG's failure would likely have severe repercussions for global financial markets and the economy.  In order to protect the financial system, a comprehensive U.S. government sponsored restructuring plan was needed to stabilize the current AIG financial situation.

Under that plan, Treasury purchased $40 billion in the form of senior perpetual preferred stock in AIG, priced at par.  The equity has been used to pay down $40 billion of FRBNY's $85 billion senior secured credit facility.  Following Treasury's investment, the FRBNY's revolving credit facility will be reduced from $85 to $60 billion, and the draw down rate will decline from Libor+850 basis points to Libor+300 basis points.  The length of the facility will also be extended to five years.  The TARP's participation in the restructuring plan should create a more sustainable capital structure for AIG, which will in turn improve the ability of the firm to successfully execute the asset disposition plan.  This will reduce AIG's exposure to troubled assets will be reduced, as well its their leverage ratios.

DEF000000053

Appendix 2 contains the term sheet for the AIG transaction, which was posted to Treasury's web site on November 10, 2008.

## III.  ASSESSMENT OF CURRENT MEASURES AND THE CHALLENGES AHEAD

**Impact of the Transactions**

Treasury continues to act aggressively to implement EESA's Troubled Assets Relief Program (TARP).   Through the CPP, Treasury has committed over $161 billion to financial institutions of all sizes, increasing their capital strength and enabling them to increase lending and take losses as they write down or sell troubled assets.  We expect banks to increase their lending over time as a result of these efforts and as confidence is restored.  Treasury also averted a significant risk to the financial system by investing $40 billion under the SSFI Program in AIG.  With these measures, we are pursuing the right strategy to stabilize the financial system and to support the flow of credit into our economy, but the journey ahead will continue to be difficult.

**Challenges That Lie Ahead**

Although actions announced to date have had a positive effect on the market, significant challenges remain.  Equity, credit, and funding markets remain under considerable strain, as banks have been forced to reduce their leverage dramatically and have lowered their risk appetite.  In addition, the primary and secondary mortgage finance markets are impaired with reduced liquidity in the agency market.  There is no single action the Federal Government can take to eliminate the financial market turmoil and the economic downturn.  We are focused, therefore, on developing the most effective combination of tools to alleviate the pressure points in our system.

Treasury and the Federal Reserve announced one of those tools on November 25, a facility to finance the issuance of non-mortgage asset-backed paper.  This facility will support lending to consumers and small businesses for such needs as auto loans, student loans, and credit cards. Issuance of asset-backed securities in these areas reached an estimated $240 billion in 2007, but credit market stresses led to a steep decline in the third quarter of 2008, and the market essentially came to a halt in October.  As a result, millions of Americans cannot find affordable financing for their basic credit needs.  To address this need and to support the return of consumer lending, the Treasury will provide $20 billion of credit protection to the Federal Reserve in connection with its $200 billion Term Asset-Backed Securities Loan Facility.  By providing liquidity to issuers of consumer asset-backed paper, the Federal Reserve facility will enable a broad range of institutions to step up their lending, giving borrowers greater access to lower cost consumer finance and small business loans.  The facility may be expanded over time and eligible asset classes may be expanded later to include other assets, such as commercial mortgage-backed securities, non-agency residential mortgage-backed securities, or other asset classes.

On November 24, the Federal Government announced a comprehensive assistance plan for Citigroup.  As part of that plan, Treasury will use $20 billion of TARP authority to purchase

DEF000000054

additional preferred shares,[*] and will guarantee up to $5 billion of potential losses on a pool of Citigroup assets.  These actions, in conjunction with those of the Federal Reserve and FDIC, will provide additional assurance to the market and further support overall financial stability.

Treasury is actively engaged in developing other programs to strengthen our financial system so that lending flows into our economy.  These include programs to mitigate mortgage foreclosures, provide additional capital, and insure troubled assets as authorized by Section 102 of EESA.

---

[*] Treasury purchased the first group of preferred shares from Citigroup under the CPP on October 28, 2008.

DEF000000055