IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY,

Plaintiff,

v.

TIMOTHY F. GEITHNER, in his official
capacity as Secretary, U.S. Department of
Treasury; BOARD OF GOVERNORS OF
THE FEDERAL RESERVE SYSTEM,

Defendants.

Case No. 08-CV-15147

Hon. Lawrence P. Zatkoff

Magistrate Mona K. Majzoub

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001
Fax: (734) 930-7160
*Co-Counsel for Plaintiff*

U.S. DEPARTMENT OF JUSTICE
John R. Coleman, Esq.
Julie Straus, Esq.
Trial Attorneys
Civil Division, Federal Programs Branch
20 Massachusetts, Ave., N.W., Rm 6118
Washington, DC 20530
john.coleman3@usdoj.gov
(202) 514-4505
Fax: (202) 616-8460
*Counsel for Defendants*

LAW OFFICES OF DAVID YERUSHALMI, P.C.
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
P.O. Box 6358
Chandler, AZ 85246
david.yerushalmi@verizon.net
(646) 262-0500
Fax: (801) 760-3901
*Co-Counsel for Plaintiff*

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**ISSUES PRESENTED**

I.     Whether the use of taxpayer funds to approve, endorse, and support Shariah-based Islamic religious activities and religious indoctrination, including the use of such funds to acquire government ownership and control of a company that engages in such activities, violates the Establishment Clause of the First Amendment to the United States Constitution.

II.     Whether the government's ownership and control of a company that engages in Islamic religious activities and indoctrination violates the Establishment Clause of the First Amendment to the United States Constitution.

III.     Whether the government's approval and support of Shariah-based Islam is sufficiently likely to be perceived as conveying a message of endorsement of religion in violation of the Establishment Clause of the First Amendment to the United States Constitution.

## CONTROLLING AND MOST APPROPRIATE AUTHORITY

*American Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278 (6th Cir. 2009)

*Bowen v. Kendrick*, 487 U.S. 589 (1988)

*Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir. 2002)

*Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973)

*Flast v. Cohen*, 392 U.S. 83 (1968)

*Hunt v. McNair*, 413 U.S. 734 (1973)

*Larson v. Valente*, 456 U.S. 228 (1982)

*Lemon v. Kurtzman*, 403 U.S. 602 (1971)

*Murray v. Geithner*, 624 F. Supp. 2d 667 (E.D. Mich. 2009)

*Tilton v. Richardson*, 403 U.S. 672 (1971)

Defendants' motion invites this court to treat the Establishment Clause inquiry as if it "were so naive that any transparent claim to secularity would satisfy it," and they further invite this court to "cut context out of" this inquiry to the point of ignoring undisputed material facts. *See generally McCreary County v. A.C.L.U.*, 545 U.S. 844, 863-64 (2005). This invitation for error must be rejected. Indeed, Defendants' motion presents this court with a tendentious view of the facts and law in a feckless attempt to avoid the obvious conclusion: the Establishment Clause prohibits the federal government from officially endorsing and supporting with taxpayer funds Islamic religious activities. And there is no such thing as a *de minimis* constitutional violation.[1] As this court appropriately stated, "The circumstances of this case are historic, and the pressure upon the government to navigate this financial crisis is unfathomable. ***Times of crisis, however, do not justify departure from the Constitution***." *Murray v. Geithner*, 624 F. Supp. 2d 667, 676 (E.D. Mich. 2009) (emphasis added). Consequently, the court need not work off a blank slate. Plaintiff has proven the allegations in his complaint, and these proven, undisputed facts, when considered in light of the relevant law, compel this court to deny Defendants' motion and grant summary judgment in Plaintiff's favor.

## SUMMARY JUDGMENT STANDARD

When reviewing Defendants' motion, this court must view the evidence, all facts, and inferences that may be drawn from the facts in the light most favorable to Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see* Fed. R. Civ. P. 56(c).

---

[1] James Madison famously objected to "*three pence*" being used by the government to promote religion. *See Flast v. Cohen*, 392 U.S. 83, 103 (1968).

## STATEMENT OF MATERIAL FACTS[2]

*"AIG is the market leader in Sharia-compliant financing* ['*SCF*']*, which features financial products that comply with the dictates of Islamic law."*[3]   *Murray*, 624 F. Supp. 2d at 676.  SCF products and finance in general, and AIG's SCF activities in particular, are different from other financial products and activities in that they are developed, funded, and maintained according to the religious tenets and dictates of Islamic law.[4]   Thus, AIG's SCF activities and products are religious and Islamic in content and in practice.[5]   AIG describes "Sharia" as "Islamic law based on *Quran* [sic] and the teachings of the Prophet (PBUH)."[6]   *See id.* at 670, n.1 (taking judicial notice that "PBUH" is an acronym for "Peace Be Upon Him").  When AIG chooses to engage in Sharia-based Islamic practices, it is by necessity selecting among competing theological perspectives on Shariah and on the role of Shariah in Islam.[7] Consequently, AIG, and by clear extension and implication Defendants on behalf of the

---

[2] To avoid excessive court filings, Plaintiff's citations are mainly to the exhibits that were filed in support of his motion for summary judgment (Doc. No. 57).  Additional exhibits attached to this response are marked consecutively, beginning with Exhibit 38 and ending with Exhibit 40.

[3] *See* Defs.' Admis. at No. 110 at Ex.5; AIG Takaful (Defs.' Ex.I at Doc. No. 6-11) at 1 at Ex.6; AIG GC Aff. at ¶¶ 2, 4, 6 at Ex.1; AIA Takaful Aff. at ¶¶ 7, 9-10 at Ex.7; ALICO Aff. at ¶ 5 at Ex.8; AIA Financial Aff. at ¶ 7 at Ex.9; Takaful-Enaya Aff. at ¶ 5 at Ex.10; Lexington-A.I. Risk Aff. at ¶ 5 at Ex.11.

[4] Coughlin Decl., Ex.A at ¶¶ 7-9 at Ex.12; Spencer Decl., Ex.A at ¶¶ 1, 5, 17 at Ex.13.

[5] Defendants make the false claim that SCF is not a "specifically religious activity." (Defs.' Br. at 15).  Leaving aside the uncontested expert testimony and AIG's very own statements on the matter, Defendants concede the fact that AIG is fully engaged in theologically-driven behavior (a "specifically religious activity") in their responses to Plaintiff's requests for admissions.  For every request that sought a response relating to SCF business practices and to AIG's own statements about its SCF activities, Defendants objected, stating that the request was "seeking to establish a theological proposition."  (Defs.' Admis. at Nos. 110-15; 130; 132-38; 140-52; 158-69 at Ex.5).  In sum, a business activity that is fully subject to the dictates of Shariah—which is *the* Islamic law that calls for capital punishment for blasphemy, for example—is unquestionably religious.  (Coughlin Supp. Decl. at ¶¶ 4-13 at Ex.38) (filed under seal).

[6] AIG Takaful-FAQs at 1 at Ex.14; Defs.' Admis. at No. 131 at Ex.5.

[7] Coughlin Decl., Ex.A at ¶¶ 4-13 at Ex.12; Spencer Decl., Ex.A at ¶¶ 1-21 at Ex.13.

government, are taking a particular theological position by supporting a specific interpretation of Islam. *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425 (2d Cir. 2002).

AIG, through its wholly-owned subsidiaries, complies with Shariah by employing or otherwise engaging Shariah authorities who collectively act as "Shariah Supervisory Committees" for their SCF subsidiaries.[8] These Shariah authorities issue authoritative legal rulings (*fatawa*, singular *fatwa*) pursuant to Islamic legal tenets, which mandate certain behavior

---

[8] Defendants' argument that they are somehow insulated from AIG's direct and indirect religious activities despite Defendants' ownership and control over AIG and, through AIG, its subsidiaries (Defs.' Br. at 14-15), is neither supported by the facts or the law. Specifically, Defendants cite no case law for the proposition that the government can engage in religious activity through a company it owns and controls simply because the company itself engages in religious activity through subsidiaries that it owns and controls. If that were the case, Defendants could buy the Catholic Archdiocese of Detroit through a wholly-owned subsidiary of a wholly owned government company and proclaim no constitutional violation. In fact, the only case cited by Defendants stands for the proposition that a corporate parent is not liable for its subsidiary's debts or violations of environmental statutes (CERCLA) without "veil piercing" or some special statute imposing liability. (Defs.' Br. at 14-15) (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). But the legal fiction of "separateness" despite unified ownership and control has never been applied to the constitutional arena, and this is especially true in the First Amendment domain where corporate actors have been labeled governmental actors despite the maintenance of all the corporate formalities. *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995) (holding that Amtrak was an instrumentality of government for purposes of the First Amendment and stating, "It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form"). Moreover, as a practical matter, AIG exercises absolute control over its subsidiaries through its direct and indirect ownership interests, represented typically by 100% of the equity and voting rights of the subsidiaries. (*See* AIG GC Aff. at ¶¶ 5 at Ex.1; AIG 2009 SEC Form 10K filing (period ending Dec. 31, 2009) ("AIG 10K") at 3, 372-78 at Ex.2; *see generally* AIG 2010 SEC Form 10Q filing (period ending Mar. 31, 2010)). As AIG's own SEC filings report, it controls the liquidity of the corporate "enterprise" both downstream to its subsidiaries and upstream from its subsidiaries. (Pl.'s Br. (Doc. No. 57) at 2-3). **Consequently, if AIG wanted any one of its subsidiaries to stop engaging in SCF, it could direct the subsidiary to do so.**

by AIG (or its SCF subsidiaries).[9]   The role of Shariah authorities is central to all Shariah adherents.   Indeed, the role of AIG's Shariah authorities "is to review [AIG's] operations, supervise its development of Islamic products, and determine Shariah compliance of these products and [AIG's] investments."[10]   Thus, AIG's SCF business is pervasively sectarian in that its "secular" business purposes and its Islamic religious mission are inextricably intertwined.[11] *Bowen v. Kendrick*, 487 U.S. 589, 620 n.16 (1988) (stating that an entity is "pervasively sectarian" when its "secular purposes and religious mission are 'inextricably intertwined'").

   ***AIG is known to the*** <u>***public***</u> ***as a market leader in SCF.***   Shortly after the federal government acquired its majority ownership interest in AIG and infused the company with billions of dollars in federal money, AIG issued a press release announcing the "First Takaful Homeowners Products for U.S."   This announcement was released by AIG's public relations manager in New York City.   The release was on AIG letterhead, with the large, bold "AIG" logo appearing prominently.   The AIG address on the release was "70 Pine Street, New York, NY 10270"—AIG's corporate headquarters.   The press release informs the general public that AIG employs a "Shari'ah Supervisory Board."   The "Global Head of AIG Takaful Enaya" proudly proclaimed, "This is truly a global effort ***on the part of AIG***."   The press release stated further that "[a]ccording to Ernst & Young's 2008 World Takaful Report, Takaful was estimated to be a $5.7 billion market globally with over 130 providers in 2006. ***The Takaful market is estimated***

---

[9] AIG GC Aff. at ¶ 4 at Ex.1; AIA Takaful Aff. at ¶¶ 9-10 at Ex.7; ALICO Aff. at ¶ 7 at Ex.8; AIA Financial Aff. at ¶ 9 at Ex.9; Takaful-Enaya Aff. at ¶ 7 at Ex.10; Lexington-A.I. Risk Aff. at ¶ 7 at Ex.11; Spencer Decl., Ex.A at ¶¶ 15-16 at Ex.13.

[10] AIG Takaful-FAQs (Defs.' Ex.H at Doc. No. 6-10) at 3 at Ex.14; AIG GC Aff. at ¶ 4 at Ex.1; AIA Takaful Aff. at ¶¶ 9-10 at Ex.7; ALICO Aff. at ¶ 7 at Ex.8; AIA Financial Aff. at ¶ 9 at Ex.9; Takaful-Enaya Aff. at ¶ 7 at Ex.10; Lexington-A.I. Risk Aff. at ¶ 7 at Ex.11; Spencer Decl., Ex.A at ¶¶ 15-16 at Ex.13.

[11] Coughlin Decl. at Ex.A at ¶ 13 at Ex.12.

*to be in excess of $10 billion by 2010*."[12]   And if the reader wants "more information on" AIG's

SCF products, they are directed to contact Jim Crain at *aig.com*.[13]

Defendants seek to employ the "ostrich defense" by burying their heads in the sand and

claiming that they did not know that AIG was a world leader in SCF.  (*See* Defs.' Br. at 10).

However, a simple Google search would have revealed that information.  Indeed, Defendants

claim that "Jim Millstein, the Treasury Department official with primary responsibility for

*monitoring the Treasury Department's investment in AIG*, was not even aware that AIG

subsidiaries offered [SCF] products *until he was contacted regarding this lawsuit in October

2009*."  (Defs.' Br. at 10) (emphasis added).  This statement is remarkable for a number of

reasons.  First, the lawsuit was filed in December 2008 (Doc. No. 1), Defendants moved to

dismiss in February 2009 (Doc. No. 6), and this court denied the motion in a published opinion

in May 2009, finding that the complaint properly alleged a claim under the Establishment Clause

(Doc. No. 12).  The fact that government attorneys did not alert the appropriate officials until

October 2009, of a potential constitutional violation is troubling, to say the least.  Second, this

assertion is in essence an admission that Defendants have no idea where the funds to AIG are

going.  Third, despite claiming ignorance until October 2009, Defendants have still *to this day*

not taken any action to implement safeguards to ensure that taxpayer money is not being used to

promote Islam.  In fact, over $20 billion still remains available to AIG, *without any restrictions

on its use for SCF*.  And finally, Defendants' assertion is simply not credible in light of the

Treasury Departments' active endorsement of SCF through conferences, published writings on

---

[12] Defendants' effort to minimize the impact of SCF is unavailing.  (*See* Defs.' Br. at 9) (arguing that SCF businesses are "trivial" to AIG).

[13] A copy of this press release was previously filed as Doc. No. 6-12 (Defs.' Mot. to Dismiss) and as Exhibit C to the Coughlin Declaration at Exhibit 12 (Pl.'s Br. (Doc. No. 57)).

its website, and the creation of an official SCF position in the Treasury Department, among

others.  *See infra* at 13-14.

**"[T]he United States government has a majority interest in AIG."**  *Murray*, 624 F.

Supp. 2d at 676.  As this court observed:

> In September 2008, the Board of Governors for the Federal Reserve System
> ["FED"] acquired a majority ownership interest in [AIG] on behalf of the federal
> government.  The [FED] accomplished this by authorizing the Federal Reserve
> Bank of New York ("FRBNY") to create a credit facility that enabled AIG to
> draw up to $85 billion for general corporate purposes, including as a liquidity
> source.  The $85 billion credit line was collateralized by AIG's assets.  In return
> for the credit facility, AIG signed a Credit Agreement whereby it agreed to pay
> interest and fees to the FRBNY and to issue Series C preferred stock to a trust—
> the AIG Credit Facility Trust ("Trust")—that held the stock for the benefit of the
> United States Treasury on behalf of the taxpayers.  The credit agreement provided
> that holders of Series C preferred stock were entitled to 79.9% (subsequently
> reduced to 77.9%) of the dividend payments and 79.9% (subsequently reduced to
> 77.9%) of the aggregate voting power of the common stock.[14]

*Id.* at 669.  According to the Trust Agreement, the FED (<u>not</u> the FRBNY) retains absolute and

unilateral control over the existence of the Trust itself and the terms of the Trust Agreement.[15]

Defendants' *de facto* and *de jure* **absolute** control over AIG and how AIG spends its

---

[14] *See* Credit Agreement (excerpts) at Ex.21.

[15] Trust Agreement at Ex.22.  Section 1.03 of the Trust Agreement expressly permits the FED to
terminate or amend the Trust pursuant to its Section 13(3) authority under the Federal Reserve
Act ("FRA"), 12 U.S.C. § 343.  (Trust Agreement at 3 at Ex.22).  As such, the FED has control
over the Trustees and necessarily has a fiduciary obligation to the U.S. Treasury (the Trust
beneficiary) not unlike the Trustees and indeed entirely superior to the Trustees.  The result is
that the FED controls "legal title" to the Series C preferred stock as the real trustee authority, and
the U.S. Treasury holds beneficial title.  *See* Restatement (Third) of Trusts § 64(2) ("The terms
of a trust may grant a third party a power with respect to termination or modification of the trust;
such a third-party power is presumed to be held in a fiduciary capacity."); Restatement (Second)
of Trusts § 185 (stating that the power over trustees creates a fiduciary duty); *see also* 18 U.S.C.
§ 674 (stating that a trustor with power to control the trust res and modify the terms of the trust at
will renders the charitable grantor trust invalid).  Thus, the Trust did not create an "independent
trust" with "independent trustees" because the FED's authority to control the trust terms and
existence created a fiduciary power directly in the FED that was superior to that of the Trustees.

money and conducts its businesses is not in dispute in this case, as this court noted:

> On March 4, 2009, AIG filed a Form 8-K with the Securities Exchange Commission ("SEC") in which AIG reported the transfer of the preferred shares of its stock to the Trust.  The filing provided that "[a]s a result of the Transaction, a change in control of AIG has occurred.  Pursuant to the Purchase Agreement, AIG and AIG's Board of Directors are obligated to work in good faith with the Trust to ensure corporate governance arrangements satisfactory to the Trust."  In AIG's annual report to the SEC, it explained that "the Trust, which is overseen by three independent trustees, will hold a controlling interest in AIG, AIG's interests and those of AIG's minority shareholders may not be the same as those of the Trust of the United States Treasury."[16]

See *Murray*, 624 F. Supp. 2d at 670.  And the FED has absolute control over the Trustees, which might render the Trustees "independent" of AIG, but not independent of Defendants.

Indeed, Edward Liddy, the government-approved/appointed CEO of AIG,[17] testified before Congress on May 13, 2009, as follows: "The infusion of substantial U.S. government capital to AIG brought with it a substantial new set of relationships for the company: first and foremost, **with the American taxpayer as AIG's largest single shareholder**; with the **taxpayers' representatives here in Congress**; with the Federal Reserve and U.S. Treasury as our **primary**

---

[16] *See* Doc. No. 8-5 (Pl.'s Resp. to Mot. to Dismiss).  Ownership and control is *not* in dispute; it is a brute fact demonstrated by the very documentation created by Defendants, AIG, and the FRBNY.  The Credit Agreement explicitly defines "Control" to mean "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise."  (Credit Agreement at 4 at Ex.21).  "Change of Control" results when more than 20% of the voting rights is held by some investor other than the Trust (or some investor approved by the FRBNY).  (Credit Agreement at 3 at Ex.21).  These definitions of "control" and "'change of control" are common throughout federal and state securities law.  *See, e.g.*, 17 CFR 230.405 (rules promulgated under the 1933 Act) ("The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."); *see also Weinstein Enters. v. Orloff*, 870 A.2d 499, 506-07 (Del. 2005) (describing "control" under Delaware law [under which AIG is incorporated] as controlling a majority of voting shares and the ability to replace directors).

[17] *See* Defs.' Admis. at Nos. 74-75 at Ex.5; Test. of Liddy on March 18, 2009, at 1 at Ex.30.

*day-to-day partners in government*; and more recently, with the trustees also appearing today."[18]

Thus, the government not only acquired a majority interest in AIG, thereby obtaining *de jure* control of AIG through its voting rights, it has taken *de facto* control of the company. ***Consequently, there is simply no dispute that as a direct result of the expenditure of taxpayer funds—funds which permitted the government to gain ownership and control of AIG—if Defendants wanted AIG to get out of the SCF business today, it could force AIG to do so***.

In the final analysis, by supporting its ownership interest with taxpayer money, maintaining a vested interest in the success of AIG, and standing to profit from that success, the federal government has insinuated itself into a position of interdependence so that it is in effect a joint participant in AIG's activities, thereby creating a *symbiotic relationship* such that AIG's activities can be fairly attributed to the government.[19]

***"AIG utilizes consolidated financing whereby all funds flow through a single port to support all of its activities, including Sharia-compliant financing."*** *Murray*, 624 F. Supp. 2d at 676. Indeed, AIG "manages liquidity at both the parent and subsidiary levels." (Pl.'s Br. (Doc. No. 57) at 2). This means that AIG provides funds to its subsidiaries when necessary, and subsidiaries similarly provide money to AIG and to other AIG subsidiaries as liquidity requirements dictate.[20] Consequently, cash flows move from AIG through a single port to its subsidiaries and from and through its subsidiaries to AIG. Thus, the cash flows from AIG to its subsidiaries relevant here are neither sourced in nor destined for segregated accounts.[21]

---

[18] Test. of Liddy on May 13, 2009, at 5-6 at Ex.29 (emphasis added).
[19] *See* Millstein Dep. at  48-49 at Ex.18; *see also* Test. of Foshee (Trustee) at 1 at Ex.27; Test. of Feldberg (Trustee) at 3, 5 at Ex.28; Test. of Liddy on May 13, 2009, at 5-6 at Ex.29.
[20] *See* AIG 10K at 19 at Ex.2; AIG 10Q at 12 at Ex.3; AIG Treas. Aff. at ¶ 5 at Ex.4.
[21] AIG 10K at Ex.2; AIG Treas. Aff. at ¶¶ 5-7 at Ex.4.

*"Pursuant to the [Emergency Economic Stabilization Act of 2008 ('EESA'), 12 U.S.C. § 5201 et seq.,], the government has injected AIG with tens of billions of dollars, without restricting or tracking how this considerable sum of money is spent."* Murray, 624 F. Supp. 2d at 676.  Pursuant to this express congressional mandate and specific congressional appropriation, AIG, as the single largest recipient of TARP funds, received $40 billion in November 2008. These funds were used to replace $40 billion of the Credit Facility funds provided to AIG just a few weeks earlier—funds that were used to support SCF.[22]  And on April 17, 2009, AIG and the Treasury Department entered into the Securities Purchase Agreement ("SPA"), which, *inter alia*, provided that the Treasury Department would provide AIG with up to $30 billion in equity financing.  AIG would be able to draw down on this equity line as needed.  AIG has to date drawn down more than $7.5 billion under the SPA.[23]  And it has directly and indirectly provided financial support in excess of one billion dollars to its SCF businesses while receiving these taxpayer funds.[24]  *Because AIG uses consolidated accounting and receives and funnels money through an unsegregated single port, taxpayer funds have been effectively diverted to support AIG's Shariah-based Islamic activities and are divertible in the future for such uses with no meaningful restrictions or safeguards*.  Moreover, there is no contractual provision in the SPA, or in any government regulation, which precludes AIG from using the funds to support SCF.[25]

---

[22] AIG Treas. Aff. at Ex.4 at ¶¶ 8, 10 at Ex.4.

[23] For the dates and amounts of the specific drawdowns see AIG Treas. Aff. at ¶ 11 at Ex.4.

[24] Defendants spuriously claim that AIG has not used any of the government funds to support its SCF businesses (Defs.' Br. at 8), but it is undisputed that at least one foreign wholly-owned AIG subsidiary received TARP funding under the SPA, and this AIG subsidiary engaged in SCF during this period.  (*See* Ex.39) (filed under seal).

[25] While Section 3.10 of the SPA requires AIG to set up "internal controls with respect to compliance with the expected use of the funding received," there is no "compliance obligation" provision in the agreement and no definition of what "compliance" even means.  (SPA at 20 at

The future diversion of taxpayer funds in support of AIG's SCF businesses and Shariah-based Islamic practices is more than theoretical for two reasons. One, the TARP program continues. In fact, there remains approximately $215 billion available to distribute, of which the Treasury Department has contractually committed to providing AIG with an additional $22.5 billion under the $30 billion SPA.[26] And two, there are absolutely no statutory, regulatory, or contractual safeguards in place to prevent such diversions. Nothing in EESA, the TARP regulations, or the $30 billion SPA prohibits AIG from applying the TARP money to support AIG's Shariah-based Islamic activities. Indeed, AIG has provided extensive—and uncontested—testimony that there are "***no* [*AIG*] *policies, whether required by the U.S. government or otherwise, created or implemented to prevent the use of any government funds from promoting, supporting, or funding* [*AIG's Shariah-based Islamic practices*]."[27]

At the end of the day, however, the reality is that neither AIG nor Defendants can refute the fact that taxpayer funds have and will continue to be used to support SCF. As AIG's Treasurer candidly admitted, "The tracing of whether and which funds from [the government] were used to support [SCF] activities would entail a compilation and analysis of thousands of transactions for each month over the period in question, an effort which would require a significant deal of time and would require the allocation of substantial additional resources, *if even possible*."[28] And the reasons for this *impossibility* are obvious: (1) ***Defendants do <u>not</u> prohibit the use of taxpayer money to support SCF***, and (2) ***there are no constitutionally***

---

Ex.40). Indicative of this is the fact that AIG has used these funds in ways <u>not</u> included with its reporting of "expected uses." (Ex.O (notes (2)–(6)) to Ex.1 (Millstein Decl.) of Defs.' Br.).

[26] *See* Defs.' Admis. at No. 69 at Ex.5.

[27] Lexington-A.I. Risk Aff. at ¶ 10 at Ex.11; ALICO Aff. at ¶ 11 at Ex.8; AIA Takaful Aff. at ¶ 15 at Ex.7; AIA Financial Aff. at ¶ 14 at Ex.9; and Takaful-Enaya Aff. at ¶ 10 at Ex.10.

[28] AIG Treas. Aff. at ¶ 7 at Ex.4 (emphasis added).

***sufficient safeguards in place to ensure that taxpayer money is <u>not</u> being used to support SCF***. *See Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 774 (1973) ("Absent appropriate restrictions on expenditures for [religious] purposes, it simply cannot be denied that [the challenged statute] has a primary effect that advances religion."). Consequently, no reasonable and objective taxpayer would be convinced that his tax dollars are <u>not</u> being used to support SCF in violation of the Establishment Clause.

Beyond financial support, Defendants actively promote and endorse both SCF generally and in particular AIG's involvement in SCF. This is evidenced by the Treasury Department's active endorsement of SCF through published writings posted on its website (publications actually edited with updates by Treasury Department Staff),[29] providing for and publicly announcing the official position at the Treasury Department of the "Islamic Finance Scholar-in-Residence Program";[30] published presentations by senior Treasury Department officials lauding SCF and stating explicitly that the U.S. government "***places significant importance on promoting . . . Islamic finance***" and has "***recently deepened our engagement in Islamic finance in a number of ways,***" including a "***call***[] ***for harmonization of Shari'a standards at the national and international levels***."[31] All of this was followed by a promotion of SCF through a Treasury Department sponsored conference entitled "Islamic Finance 101." The conference, which took place immediately following the acquisition of AIG by Defendants, was specifically designated for *government policy makers*, and the published materials are replete with theological propositions that implicitly and explicitly inform the objective audience that the U.S.

---

[29] *See* Ex.31 ("Overview of Islamic Finance: Occasional Paper No. 4 (August 2006)").
[30] *See* Ex.32 (Treasury Department Press Release of June 2004).
[31] *See* Ex.33 (Treasury Department Press Release of May 2004) (emphasis added).

government is favorably endorsing SCF.[32]   *Murray*, 624 F. Supp. 2d at 676-77 ("[A]fter the

government acquired a majority interest in AIG and contributed substantial funds to AIG for

operational purposes, the government co-sponsored a forum entitled, 'Islamic Finance 101.'").

**ARGUMENT**

## I.    THE ESTABLISHMENT CLAUSE PROHIBITS DEFENDANTS FROM APPROVING, ENDORSING, AND SUPPORTING SHARIAH-BASED ISLAM.

The Establishment Clause famously states, "Congress shall make no law respecting an

establishment of religion."   U.S. Const. amend. I.   Despite the absence of precisely stated

prohibitions, it was intended to protect against "three main evils": ''[1] sponsorship, [2] financial

support, and [3] active involvement of the sovereign in religious activity.'"   *Lemon v. Kurtzman*,

403 U.S. 602, 612 (1971) (quoting *Walz v. Tax Commission*, 397 U.S. 664, 668 (1970)).   In

*Everson v. Board of Educ.*, 330 U.S. 1 (1947), the Court further emphasized: "*No tax in any*

*amount*, large or small, can be levied to support *any* religious activities or institutions, *whatever*

*they may be called*, or *whatever form they may adopt* to teach or practice religion."   *Id.* at 16

(emphasis added).   All of these "main evils" are present in this case.   Moreover, "the

Constitution . . . requires that [courts] keep in mind the myriad, subtle ways in which

Establishment Clause values can be eroded, and guard against other different, yet equally

important, constitutional injuries."   *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 314 (2000)

(internal citation omitted).   "[E]*very* government practice must be judged *in its unique*

*circumstances* to determine whether it constitutes an endorsement or disapproval of religion."

*Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor J., concurring) (emphasis added).

---

[32] Defs.' Admis. at Nos. 170-72 at Ex.5; Kiwan Dep. at 32-33 at Ex.34; *see also* Islamic Finance 101 presentation materials (Kiwan Dep. Ex.21) at Ex.35.

In this case, Establishment Clause "values" were more than eroded, they were *demolished* when Defendants used taxpayer money to not only fund Islamic religious activities (SCF), but to take *de facto* control of the company (AIG) that engages in SCF.  This "unique circumstance" is further worsened by the fact that Defendants favorably endorse the religious activities at issue. As controlling case law makes plain, the Establishment Clause prohibits the government from engaging in <u>any</u> activity that "*is sufficiently likely to be perceived*" as an endorsement of a particular religion.  *See County of Allegheny v. A.C.L.U.*, 492 U.S. 573, 597 (1989) (emphasis added).  For a reasonable and objective observer to *not* perceive impermissible endorsement in this case, he must be both unreasonable and, indeed, blind.

While the Supreme Court has struggled with creating a single test for determining when the government has violated the Establishment Clause, the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), remains the starting point for the court's analysis.  Under the *Lemon* test, a governmental action is unconstitutional if <u>any</u> one of the following applies: (1) it does not have a valid secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion.  *Id.* at 612-13.

As an initial matter, this case is *not* a facial challenge to EESA.  Rather, it is a challenge to the federal government's official endorsement of SCF, which is being supported by taxpayer funds through EESA.  (*See* Am. Compl. (Doc. No. 45) at ¶¶ 6, 7).  In fact, through the expenditure of taxpayer funds, the federal government has "entwined" itself with a company (AIG) that engages in SCF.  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 296 (2001) (identifying factors for holding that a challenged activity is government action for constitutional purposes, including, *inter alia*, "entwinement" between the government

and the private actor).  The reasonable observer in this case knows (1) that his tax money is being used to support the government's majority ownership interest in a company that is the market leader in SCF; (2) that his tax money is being used to support the company's operations, including its SCF operations, ***without restrictions***; and (3) that the government favorably endorses and promotes SCF.  Thus, this observer could only reach one *reasonable* conclusion: the "purpose" and "effect" of the government's actions are impermissible.

### A.   The "Purpose" of Endorsing and Supporting Shariah-Based Islam.

"The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act."  *McCreary County*, 545 U.S. at 862 (citation omitted). The Court admonished in *McCreary County* that a reviewing court should not treat the "purpose enquiry" as if it "were so naive that any transparent claim to secularity would satisfy it, and [*should not*] *cut context out of the enquiry, to the point of ignoring history*, no matter what bearing it actually had on the significance of current circumstances."  *Id.* at 863-64.  Here, an objective observer would conclude that Defendants *intended* for AIG to use federal funding to support *all* of its activities, including SCF, which Defendants favorably endorse.

### B.   The "Effect" of Endorsing and Supporting Shariah-Based Islam.

When evaluating the "effect" of the challenged acts under *Lemon*, the reviewing court is required to do so *irrespective* of the government's purpose.  Indeed, "the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions."  *Santa Fe Indep. Sch. Dist.,* 530 U.S. at 307, n.21 (internal quotations and citations omitted).  While "[t]he purpose prong of the *Lemon* test asks whether

government's actual purpose is to endorse or disapprove of religion[, t]he effect prong asks whether, irrespective of the government's actual purpose, the practice under review in fact *conveys a message of endorsement* or disapproval.  An affirmative answer to either question should render the challenged practice invalid."  *See Lynch*, 465 U.S. at 690 (O'Connor J., concurring) (emphasis added).  As Justice O'Connor explained in *Lynch,* "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."  *Id.* at 688 (O'Connor, J., concurring).  The inquiry as to whether the challenged acts are "sufficiently likely to be perceived" as "convey[ing] a message of endorsement" of religion is from the perspective of a "reasonable" and "reasonably informed observer."  *See American Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 292 (6th Cir. 2009); *Agostini v. Felton*, 521 U.S. 203, 235 (1997).

In this case, there can be little doubt that the government's approval and financial support of SCF through the use of taxpayer funds are "sufficiently likely to be perceived" by a reasonable and informed observed "as conveying a message of endorsement" of SCF—an Islamic religious practice.  Defendants' actions are particularly egregious here in that they endorse a *particular sect* of Islam (i.e., Shariah-based Islam).  *Larson*, 456 U.S. at 244 (preferring one religious denomination over another violates the Establishment Clause); *Commack Self-Service Kosher Meats, Inc.*, 294 F.3d at 427 (suggesting a "preference for the views of one branch" of a religion violates the First Amendment).

**C.      The "Effect" of Funding Shariah-Based Islamic Religious Activities.**

In *Hunt v. McNair*, 413 U.S. 734, 743 (1973), the Court made clear that federal aid will have "a primary effect of advancing religion . . . when it funds a specifically religious activity in an otherwise substantially secular setting," as in this case.  Consequently, *Hunt* compels this court to deny Defendants' motion and grant summary judgment in Plaintiff's favor.  *See also Murray*, 624 F. Supp. 2d at 676 (quoting *Hunt v. McNair*).  In *Agostini v. Felton*, 521 U.S. 203, 218, 232-33 (1997), the Court folded the entanglement inquiry into the primary effect inquiry for funding cases and suggested three factors for determining whether the funding has the impermissible *effect* of advancing religion: (1) whether it results in the indoctrination of religion; (2) whether it defines its recipients by reference to religion; or (3) whether it creates an excessive entanglement.  *Agostini*, 521 U.S. at 234.  The first and third factors are present here.  In fact, Defendants' (incorrect) argument that the infusion of billions of taxpayer dollars into AIG did not result in the indoctrination of religion is revealing.  First, Defendants claim that "no EESA funds have been used directly or indirectly to support the sale of [SCF]."  (Defs.' Br. at 14).  Consequently, Defendants acknowledge that *if* EESA funds have been used "directly or indirectly to support . . . SCF," then the government has violated the Constitution.  As the undisputed facts demonstrate, Plaintiff has proven such an impermissible use of these funds. (*See* Ex.39).  Second, acknowledging that their first argument is without merit, Defendants state that "even assuming *arguendo* that the sale of Shariah-compliant products has benefitted from AIG's receipt of EESA funds, this benefit would have resulted from the private choice of AIG employees, and could not be attributed to Treasury Department officials."  (Defs.' Br. at 14). This argument is facially invalid.  *See Murray*, 624 F. Supp. 2d at 676 ("The question in an as-

applied challenge is . . . how [the entity] spends the grant.") (quoting *Kendrick*, 487 U.S. at 624-25) (Kennedy, J., concurring).  Defendants' argument here is essentially the same as arguing that an open-ended, unrestricted grant of taxpayer money to a Church cannot result in religious indoctrination attributable to the government because the decision as to how to spend the money results from the private choice of the pastor.  And third, Defendants make the verifiably false claim that "the sale of Shariah-compliant products does not constitute religious indoctrination." (Defs.' Br. at 14).  This claim is overwhelmingly contradicted by the undisputed evidence and warrants no further response.  In fact, it demonstrates Defendants' desperation and the weakness of their position.  Additionally, in *Agostini*, the Court noted that among the factors for determining whether a government program results in indoctrination is whether a "symbolic link" between government and religion is created.  *Agostini*, 521 U.S. at 224.  That "link" is present here in spades.

> ### D.    The Lack of Constitutionally Required "Safeguards."

When the government provides open-ended money grants without effective safeguards against the diversion of such funds for religious purposes, as in this case, the government violates the Establishment Clause.  *See Tilton v. Richardson*, 403 U.S. 672, 682-84 (1971) (finding that "the statute's enforcement provisions are inadequate to ensure that the impact of the federal aid will not advance religion"); *American Atheists, Inc.* 567 F.3d at 293 ("[A] program may have the primary effect of advancing religion if the recipient diverts secular aid to further its religious mission.") (quotations and citation omitted); *see also id.* at 296 (finding that "the mechanics of the program ensured that the aid would go just to the approved [secular] uses"); *Mitchell v. Helms*, 530 U.S. 793, 861 (2000) (O'Connor J., concurring) (concluding that "[t]he

safeguards employed by the [funding] program are constitutionally sufficient"); *cf. Kendrick*, 487 U.S. at 621-22 (remanding to determine whether funds in particular cases were being used in violation of the Establishment Clause even though express restrictions were made).   In *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 774 (1973), the Court struck down the "maintenance and repair" provisions of a New York statute that permitted aid to nonpublic schools, finding that the grants were "given largely without restriction on usage" and stating:

> ***Nothing in the statute***, for instance, bars a qualifying school from paying out of state funds the salaries of employees who maintain the school chapel, or the cost of renovating classrooms in which religion is taught, or the cost of heating and lighting those same facilities. ***Absent appropriate restrictions*** on expenditures for these and similar purposes, ***it simply cannot be denied that this section has a primary effect that advances religion*** in that it subsidizes directly the religious activities of sectarian elementary and secondary schools.

*Id*. (emphasis added).   Similarly here, there is "nothing in the statute" that prohibits AIG from using government (taxpayer) funds to support its religious activities.   Thus, "it simply cannot be denied" that the use of government funds in this case has the primary effect of advancing religion in violation of the Establishment Clause.

## CONCLUSION

Plaintiff respectfully requests that the court deny Defendants' motion and grant his motion for summary judgment.

Respectfully submitted,

THOMAS MORE LAW CENTER         LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ Robert J. Muise                          /s/ David Yerushalmi
Robert J. Muise, Esq. (P62849)          David Yerushalmi, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2010, a copy of the foregoing PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with index of exhibits and exhibits was filed electronically. Certain exhibits were filed under seal pursuant to a protective order entered in this case. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None. Furthermore, I certify that a copy of each exhibit filed under seal has been served upon the following via email per the written agreement and stipulation of the parties:

> John R. Coleman, Esq.
> Julie Straus, Esq.
> U.S. DEPARTMENT OF JUSTICE
> Trial Attorney
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., N.W., Room 6118
> Washington, DC 20530
> john.coleman3@usdoj.gov
> julie.straus@usdoj.gov
>
> *Counsel for Defendants*
>
> THOMAS MORE LAW CENTER
>
> /s/ Robert J. Muise
> Robert J. Muise, Esq. (P62849)