UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KEVIN J. MURRAY

               Plaintiff,

     -vs-

TIMOTHY F. GEITHNER, Secretary, U.S.
Department of Treasury, and BOARD OF
GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

               Defendants.

_____/

CIVIL NO. 08-15147

HON. LAWRENCE P. ZATKOFF
MAG. JUDGE MONA K. MAJZOUB

## **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**ISSUE PRESENTED**

Whether the Emergency Economic Stabilization Act of 2008, as applied to the Secretary of the Treasury's purchase of American International Group, Inc. preferred stock, had either the predominant purpose or the primary effect of establishing religion.

## MOST PERTINENT AUTHORITY

*McCreary County, Ky. v. ACLU*, 545 U.S. 844 (2005)

*Mitchell v. Helms*, 530 U.S. 793 (2000)

*Agostini v. Felton*, 521 U.S. 203 (1997)

*Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278 (6th Cir. 2009)

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      No Reasonable Observer Could Conclude that the EESA Was Enacted or Has Been
        Implemented With the Purpose of Advancing Religion . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     No Reasonable Observer Could Conclude that the Primary Effect of the Secretary's
        Purchase of AIG Preferred Stock Pursuant to the EESA Has Been the Advancement of
        Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Plaintiff Cannot Demonstrate that the Treasury Department's Purchase of AIG
                Preferred Stock Pursuant to the EESA has Led to Religious Indoctrination
                Attributable to the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

                1.      EESA Funds Have Not Been Used to Market Shariah-Compliant
                        Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                2.      AIG's Presentation of its Financial Results on a Consolidated Basis is
                        Not a Basis for Concluding that AIG Has Directed EESA Funds to
                        Support the Sale of Shariah-Compliant Products . . . . . . . . . . . . . . . . . 4

                3.      Plaintiff's Claim Regarding AIG's Financial Support of Shariah-
                        Compliant Products is Factually Baseless and Legally Irrelevant . . . . . . . 6

                4.      AIG's Subsidiaries' Sale of Shariah-Compliant Products Cannot Be
                        Attributed to the Treasury Department . . . . . . . . . . . . . . . . . . . . . . . . . 9

                5.      The Sale of Shariah-Compliant Products is Not Religious
                        Indoctrination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      Facts Unrelated to the Treasury Department's Exercise of Authority Pursuant to
                the EESA Are Immaterial And, In any Event, Do Not Demonstrate an
                Endorsement of the Islamic Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        C.      Restrictions on AIG's Use of Funds Are Not Legally Required, but, Even
                Assuming Otherwise, the EESA and the Structure of the Treasury Department's
                Investment Are Sufficient Such that No Reasonable Observer Could Conclude
                that their Primary Effect Has Been the Advancement of Religion . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## INTRODUCTION

Neither the purpose nor the primary effect of the Secretary of the Treasury's ("Secretary") purchase of American International Group, Inc. ("AIG") preferred stock pursuant to the Emergency Economic Stabilization Act of 2008 ("EESA") was to advance the Islamic religion.  And Plaintiff's Motion for Summary Judgment fails to provide any basis for a reasonable observer to conclude otherwise.  Plaintiff's theory that AIG's use of consolidated accounting leads to the presumption that EESA funds provided to AIG have been used to support all its subsidiaries' activities, including the sale of shariah-compliant insurance products, is groundless and legally insufficient.  The undisputed evidence is that no EESA funds have gone to support the subsidiaries that sell these products (let alone the products themselves), and that, in any event, the products' contribution to AIG's consolidated revenue is *de minimis*.  Similarly baseless is plaintiff's contention that all of AIG's activities, including the sale of shariah-compliant products by its independent subsidiaries, are attributable to the defendants because AIG's controlling shareholder is an independent trust established for the benefit of the U.S. taxpayers (as a result of a statute not challenged in this case).  Further, plaintiff's proffered evidence of endorsement is both irrelevant to his claim and insufficient.  Finally, contrary to plaintiff's argument, the Constitution does not require explicit restrictions on AIG's use of EESA funds, and, even assuming otherwise, the relevant safeguards are more than sufficient to ensure that a reasonable, reasonably informed observer would not consider the "primary effect" of the Secretary's investment in AIG to be the advancement of religion.

## ARGUMENT

Plaintiff must demonstrate that the EESA, as applied to the Secretary's purchase of AIG preferred stock, either was motivated by a religious purpose or has had the "primary effect of

advancing or inhibiting religion." *Mitchell v. Helms*, 530 U.S. 793, 807-08 (2000) (plurality opinion) (citing *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997)).  Plaintiff has provided no evidence of an improper purpose.  Nor has plaintiff demonstrated that the Treasury Department's purchase of AIG preferred stock pursuant to the EESA had the "primary effect of advancing or inhibiting religion."  *Id.*

I.     **No Reasonable Observer Could Conclude that the EESA Was Enacted or Has Been Implemented With the Purpose of Advancing Religion**

There is no evidence that the EESA was enacted, or has been implemented, "with the ostensible or predominant purpose of advancing religion."  *McCreary County, Ky. v. ACLU*, 545 U.S. 844, 860 (2005).  Although plaintiff quotes the Supreme Court's admonition that courts should not naively accept "any transparent claim to secularity" when considering governmental purpose, *see* Pl. Mem. at 15 (quoting *McCreary*, 545 U.S. at 863-64), plaintiff presents no evidence nor even argues that the government's stated purpose in enacting and implementing the EESA, is "a sham, [or] merely secondary to a religious objective."  *McCreary*, 545 U.S. at 864. Indeed, the exhibits to plaintiff's memorandum corroborate that the government's purpose in enacting and implementing the EESA has been entirely secular.[1]  Thus, the undisputed facts demonstrate that the EESA has been implemented "for the sole purpose of restoring stability to financial institutions."  *Murray v. Geithner*, 624 F. Supp. 2d 667, 676 (E.D. Mich. 2009).

---

[1]  *See, e.g.,* 154 Cong. Rec. H10712 (Statement of Rep. Frank) ("This legislation is about making sure that there is enough credit in order for students and families to take out loans to afford to go to college.") (Pl. Ex. 24); *Id.* at 10702 (Statement of Rep. Slaughter) ("The bill before us is intended to rescue Main Street.  By rescuing the financial institutions, we rescue the jobs, the savings and the ability to get a loan for each hardworking American."); Letter from Bernanke to Paulson dated November 9, 2008 ("I believe that utilizing TARP funds to purchase preferred equity of American International Group, Inc. (AIG) is necessary to promote financial stability.") (Pl. Ex. 19).

**II.    No Reasonable Observer Could Conclude that the Primary Effect of the Secretary's Purchase of AIG Preferred Stock Pursuant to the EESA Has Been the Advancement of Religion**

The Supreme Court has identified three primary criteria for evaluating whether a government aid program impermissibly advances religion: (1) whether it results in religious indoctrination that could be attributed to the government; (2) whether it defines its recipients by reference to religion; and (3) whether it create an excessive entanglement between government and religion.  *See Mitchell*, 530 U.S. at 808 (plurality opinion) (citing *Agostini*, 521 U.S. at 234); *id.* at 845 (O'Connor, J., concurring in the judgment) (same).  Plaintiff concedes that the EESA does not define its recipients by reference to religion, Pl. Mem. at 16, and his arguments that the EESA runs afoul of the first and third *Mitchell* prongs are factually and legally groundless.

**A.    Plaintiff Cannot Demonstrate that the Treasury Department's Purchase of AIG Preferred Stock Pursuant to the EESA Has Led to Religious Indoctrination Attributable to the Government**

To show that the EESA, as-applied to the purchase of AIG preferred stock, has led to religious indoctrination attributable to the United States Department of the Treasury ("Treasury Department"), plaintiff must demonstrate—at a minimum—that AIG has *actually* diverted EESA funds to support the sale of shariah-compliant insurance products, and that the diverted funds are not *de minimis* in relation to the total amount of capital provided to AIG.  *See Mitchell*, 530 U.S. at 857-58, 861 (2000) (O'Connor, J., concurring in the judgment);[2] *Am. Atheists v. Detroit Downtown Dev. Auth.*, 567 F.3d 278, 293-94 (6th Cir. 2009).  Plaintiff must also show that "a reasonable, reasonably informed observer" would both attribute the sale of these products to the

---

[2]  The *Mitchell* plurality viewed actual diversion as irrelevant to the Establishment Clause inquiry, provided the aid itself is content neutral and distributed on a non-religious basis.  *Id.* at 820 (plurality opinion).  Justice O'Connor's concurring opinion, which rested on narrower grounds, is the controlling authority.  *Marks v. United States*, 430 U.S. 188, 193 (1977).

government, and perceive the offer of shariah-compliant insurance products, alongside a host of

conventional insurance products, as an endorsement of the Islamic religion.  *See Am. Atheists*,

567 F.3d at 291-92.  Plaintiff fails to satisfy any of these requirements.

       1.    *EESA Funds Have Not Been Used to Market Shariah-Compliant Products*

Without citation to the record, plaintiff simply asserts that "all funds going to AIG are

used to financially support AIG's activities, including its religious activities."  Pl. Mem. at 18-

19.  Even assuming that the sale of shariah-compliant insurance products is a religious activity

(*but see infra* Section II.A.5) this statement is contradicted by the undisputed record.  The direct

recipient of EESA funds, AIG, does not sell Shariah-compliant insurance products.  Lee Decl. ¶

5 (Def. Ex. 6).  And, although certain direct or indirect subsidiaries of AIG sell, or have sold,

shariah-compliant insurance products, *id.* at ¶ 6, the undisputed record demonstrates that *none of*

these subsidiaries have received any EESA funds.  *See* Millstein Decl. ¶¶ 10, 29 (Def. Ex. 1);

Gender Decl. ¶ 10 (Def. Ex. 4); Outlines of Expected Uses (Def. Ex. 1-K to 1-N); Suppl. Gender

Decl. ¶ 2 (Def. Ex. 5); Series F Actual Use of Funds (Def. Ex. 1-O); Section 3.10 Certification

(attached as Ex. 12-A hereto).  It follows necessarily that none of these subsidiaries have used

EESA funds to support the sale of Shariah-compliant insurance products.  Accordingly, plaintiff

has not provided any evidence sufficient to satisfy his burden of showing that EESA funds have

been diverted to support the sale of shariah-compliant products.

       2.    *AIG's Presentation of its Financial Results on a Consolidated Basis Is Not
            a Basis for Concluding that AIG Has Directed EESA Funds to Support the
            Sale of Shariah-Compliant Products*

Unable to evade these facts, plaintiff claims that "[b]ecause AIG uses consolidated

accounting and receives and funnels money through an unsegregated single port, taxpayer funds

have been effectively diverted to support AIG's Shariah-based Islamic activities and are

divertible in the future for such uses with no meaningful restrictions or safeguards."  Pl. Mem. at 11; *see also id.* at 2-3 ("the cash flows from AIG to its subsidiaries relevant to this litigation are neither sourced in nor destined for segregated accounts.").  The assumptions underlying this theory are baseless, and, even if accepted, this theory would not demonstrate an Establishment Clause violation.

      As a factual matter, it is undisputed that ██████████████████████████ ███████████████████████████████████████████████████ Lee Decl. ¶ 5. Nor can there be any dispute regarding how AIG has used the EESA funds.  As required by the Series D Securities Purchase Agreement dated November 25, 2008 ("Series D SPA"), AIG used the first $40 billion of EESA funds it received to pay down its debt with the Federal Reserve Bank of New York ("FRBNY").  *See* Gender Decl. ¶ 10 (Def. Ex. 4); Series D SPA § 1.2(b) (Def. Ex. 1-C).  And, as required by the Securities Purchase Agreement dated April 17, 2009 ("Series F SPA"), AIG provided detailed outlines of its intended use of the approximately $7.5 billion in Series F EESA funds it has drawn to date, and thereafter certified, under penalty of federal law, to its actual use of those funds.  *See* Series F SPA §§ 1.6(c), 3.10 (attached as Ex. 13 hereto); Outlines of Expected Uses (Def. Ex. 1-K to 1-N); Suppl. Gender Decl. ¶ 2 (Def. Ex. 5); Series F Actual Use of Funds (Def. Ex. 1-O); Section 3.10 Certification (Def. Ex. 12-A).[3]

      Thus, AIG's use of consolidated accounting does not mean, as plaintiff asserts, that AIG and its subsidiaries do not maintain separate accounts, but that these accounts are consolidated for *purposes of presentation* in its public financial filings, as required by the SEC.  *See generally*

---

[3]  In the few instances in which AIG did not use the Series F EESA funds as described in its Outlines of Expected Uses, it used the funds to ██████████████████████████████ ████████   *See* Section 3.10 Certification (Def. Ex. 12-A).

17 C.F.R. §§ 210.3A-01 to 210.3A-05.[4]  As a result, plaintiff's claim that EESA funds have been "effectively diverted" to support the sale of shariah-compliant products has absolutely no evidentiary support.

Furthermore, even if one were to accept plaintiff's unfounded assumption that "all funds going to AIG are used to support AIG's [consolidated business] activities, including its religious activities" on a proportional basis, *see* Pl. Mem. at 19, plaintiff's Establishment Clause claim would still fail because the sale of shariah-compliant products by AIG's subsidiaries is a *de minimis* part of AIG's consolidated business.  Indeed, even under the most conservative assumptions, these products contributed less than ███% to AIG's 2009 consolidated revenue.[5] Diversion of "'less than one percent of the total allocation' of aid under the program . . . is 'too insignificant to affect the constitutional inquiry.'" *Am. Atheists*, 567 F.3d at 294 (quoting *Mitchell*, 530 U.S. at 866-67 (O'Connor, J., concurring in the judgment)).  Thus, even if the Court were to accept plaintiff's baseless theory, he would not be entitled to summary judgment.

> 3.  *Plaintiff's Claim Regarding AIG's Financial Support of Shariah-Compliant Products Is Factually Baseless and Legally Irrelevant*

Unable to show actual diversion of EESA funds to support the sale of shariah-compliant

---

[4]  *See also* AIG 2009 Form 10-K at 202 (Note 1 to the Consolidated Financial Statements) ("Basis of Presentation. The consolidated financial statements include the *accounts* of [AIG], *its controlled subsidiaries*, and variable interest entities in which AIG is the primary beneficiary. . . . All material intercompany accounts and transactions have been eliminated.") (emphasis added) (attached as Ex. 14 hereto).

[5]  *Compare* Coleman Decl. ¶ 8 (Def. Ex. 1) (AIG's fiscal year revenue on a consolidated basis was approximately $96.0 billion) *with* █████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████

products, plaintiff claims instead that "to date AIG has directly and indirectly provided financial support in excess of one billion dollars to its [shariah-compliant finance] business while receiving taxpayer funds." Pl. Ex. 11.[6] This statement is both factually wrong and legally immaterial.

As an initial matter, there is no evidence to support plaintiff's assertion that AIG has provided funds (from any source) to support any shariah-compliant finance ("SCF") business.

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ *See* Gender Decl. ¶ 9(d) (Def. Ex 4). But, ALICO is not an "SCF business" as plaintiff baldly claims. ALICO is "a leading international life insurer that provides consumers and businesses with products and services for life insurance, accident and health insurance, retirement and wealth management solutions." *See* MetLife Press Release 3.8.2010 (attached as Ex. 15 hereto). Its total revenues for the first quarter of 2010 were $3.522 billion, or approximately $14.1 billion on an annualized basis. *See* AIG Form 10-Q for Period Ending March 31, 2010, at 112 (attached as Ex. 16 hereto). Indeed, plaintiff's claim that ALICO is an "SCF business" relies entirely on ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████

Likewise, Lexington Insurance Co. ("Lexington"), ████████████████████████

---

[6] Plaintiff's brief does not cite to any evidence to support this statement, but to two additional pages of argument that plaintiff attached to his brief as Exhibit 36. Pl. Mem. at 11. Plaintiff's additional argument should be stricken. *See* E.D. Mich. L. R. 7.1(d)(3)(A). But even if the Court were to consider it, Exhibit 36 does not support plaintiff's statement.

██████████████████████████████████████████████████████████

████████████████████████████████████████ Rather, "Lexington writes

surplus lines for risks on which conventional insurance companies do not provide coverage."

AIG 2009 Form 10-K at 5 (Def. Ex. 2-E).  Lexington's insurance products generated

approximately $6.2 billion in gross premiums in 2009 alone.  *See* Lexington Financial Data

(attached as Ex. 17 hereto).  As with ALICO, plaintiff's factual assertion relies entirely on

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ No

reasonable, reasonably informed observer could conclude, on the basis of this record, that either

ALICO or Lexington is a "shariah-compliant finance business."

In addition to being baseless, plaintiff's factual assertion is also immaterial.  First,

plaintiff fails to present any evidence (nor is it reasonable to presume) that ALICO's Saudi

Branch or Lexington have used any funds received from AIG to support the offer of their

respective shariah-compliant products.  Second, even if plaintiff could show that these two

subsidiaries have used funds provided by AIG to market their shariah-compliant products, it

would be immaterial because plaintiff is unable to show that these subsidiaries have used *EESA

funds* for this purpose.  In the context of the Establishment Clause, money is not fungible and

"[t]he Supreme Court has repeatedly rejected 'the recurrent argument that all aid is forbidden

because aid to one aspect of an institution frees it to spend its other resources on religious

ends.'" *Am. Atheists*, 567 F.3d at 296 (quoting *Hunt v. McNair*, 413 U.S. 734, 743 (1973)); *see

also Mitchell*, 530 U.S. at 824 (plurality opinion) (same).  As a result, plaintiff's assertion that

AIG has provided non-EESA funds to these two subsidiaries is immaterial to his Establishment

Clause claim.

        4.    *AIG's Subsidiaries' Sale of Shariah-Compliant Products Cannot Be Attributed to the Treasury Department*

As the foregoing illustrates, plaintiff is unable to show that EESA funds (or any other AIG funds) have been used to promote the Islamic religion.  But, even if he could, the decision to use EESA funds for this purpose could not be attributed to the government because Treasury Department employees do not manage the day-to-day operations of AIG and have had *no* involvement with the offer of shariah-compliant products by AIG's subsidiaries.  *See* Millstein Decl. ¶ 28 (Def. Ex. 1); Power Decl. ¶¶ 9-10 (Def. Ex. 7); Homsi Decl. ¶¶ 10-11 (Def. Ex. 8); Rahdi Decl. ¶¶ 9-10 (Def. Ex. 9); Zain Decl. ¶¶ 14-15 (Def. Ex. 10); Kamdani Decl. ¶¶ 13-14 (Def. Ex. 11).  As a result, no reasonable observer could attribute to the Treasury Department the sale of shariah-compliant products by AIG's subsidiaries.

In an attempt to evade the import of this evidence, plaintiff's "Statement of Material Facts" includes an entire section on the "implications of defendants' ownership and control of AIG."  Pl. Mem. at 5-10.  As this heading illustrates, this entire section is premised on a clear misstatement of fact.  Neither defendant owns AIG or controls the day-to-day operations of AIG or its subsidiaries.  Rather, AIG is owned by an independent trust, the AIG Credit Facility Trust ("Trust"), that holds approximately 80% of the ownership interest in AIG for the benefit of the taxpayers.  *See* AIG Form 10-K at 3 (Def. Ex. 2-E).  In all relevant matters, the trustees "have full discretionary power to Vote the Trust Stock."  *See* AIG Credit Facility Trust Agreement ("Trust Agreement") § 2.04(d) (Pl. Ex. 22).  The trustees may not be officials of either the Treasury Department, the FRBNY, or AIG, *id.* at § 3.01, and may not vote to elect officials of the Treasury Department or the FRBNY to AIG's board of directors.  *Id.* at § 2.04(e).  Thus, AIG

is owned by the Trust, not by the defendants, and the sale of shariah-compliant products cannot
be attributed to the defendants for this reason alone.

Moreover, although the Trust is AIG's controlling shareholder, the trustees are explicitly
prohibited from "becom[ing] directors of [AIG] or otherwise becom[ing] responsible for
directing or managing the day-to-day operations of [AIG] or any of its subsidiaries." *Id.* at
§ 2.04(f).  The separation between ownership and management is a fundamental principle of
corporate law.  *See In re ALH Holdings LLC*, 675 F. Supp. 2d 462, 477 (D. Del. 2009)
("Delaware law explicitly defines the separation of (and relationship between) an entity's
management and its ownership.") (citing 8 Del. C. § 141).  Plaintiff has provided no evidence
that the trustees violate this principle or the Trust Agreement's explicit prohibition on their
management of AIG's day-to-day operations.  Indeed, the evidence demonstrates that the
trustees exercise the voting stock in a manner appropriate for a majority owner of a corporation.[7]
As a result, actions of AIG may not be attributed to the trustees either.  Likewise, plaintiff has
provided no legal basis to attribute the sale of shariah-compliant products by AIG's independent
subsidiaries to AIG.  *Compare United States v. Bestfoods*, 524 U.S. 51, 61 (1998) *with* Lee Decl.
¶ 5n (Def. Ex. 6).  Thus, for all of these reasons, no reasonable observer could—on the basis of
the Trust's ownership of AIG—attribute the sale of shariah-compliant products by AIG's
independent subsidiaries to the defendants.

But, plaintiff's argument fails for an additional, independent reason.  The Trust's
ownership interest (in the form of AIG Series C Preferred Stock) was consideration for the
FRBNY's September 16, 2008 provision of credit pursuant to Section 13(3) of the Federal

---

[7]  *See, e.g,* Foshee Test. at 2 (trustee recognizing "allocation of responsibility" between AIG's
ownership, board of directors, and management) (Pl. Ex. 27); Feldberg Test. at 3 (trustee stating
that his role is to "exercis[e] the voting rights of the AIG shares held in the Trust") (Pl. Ex. 28).

Reserve Act.  *See* Trust Agreement at p.1 (Pl. Ex. 22) ("[T]he issuance of the [Series C Preferred Stock] to the Trust is intended to provide compensation for the assumption of the risks arising from the Credit Agreement and to reduce those risks.").  Plaintiff, however, is not challenging the constitutionality of the Federal Reserve Act; plaintiff is challenging the constitutionality of the EESA.  Am. Compl. ¶ 1.  Because the Trust's ownership did not result from the Secretary's actions pursuant to the EESA, such ownership is not relevant to whether *the EESA*, as applied to the Secretary's purchase of AIG preferred stock, has had the primary effect of advancing religion.

### 5.   The Sale of Shariah-Compliant Products Is Not Religious Indoctrination

Finally, plaintiff has failed to present evidence that would lead a reasonable observer to conclude that the sale of shariah-compliant products constitutes religious indoctrination. Plaintiff's attempt to show that AIG's subsidiaries' mere offer of shariah-compliant products advances an "Islamic religious mission," and "tak[es] a theological position on an ongoing debate among Muslims and between Muslims and non-Muslims," *see* Pl. Mem. at 4 (citing Pl. Exs. 12, 13, and 15), relies entirely on the reports submitted by Stephen C. Coughlin and Robert Spencer, each a self-described "expert" on "Islam, Shariah, and Shariah-compliant finance."  *See* Coughlin Decl. ¶ 2 (Pl. Ex. 12); Spencer Decl. ¶ 2 (Pl. Ex. 13).  This purported expert testimony, however, is irrelevant and thus does not raise a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

As courts have recognized, expert testimony is not relevant to determining whether a reasonable, objective observer (not an expert), on the basis of readily available facts (rather than specialized knowledge), would view government action as an endorsement of religion.  *See, e.g.*, *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) (excluding expert testimony as

irrelevant based on application of "reasonable observer standard" in Establishment Clause case); *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1382 (9th Cir. 1994) ("Instead of engaging in a 'battle of the experts' in deciding Establishment Clause cases, courts have relied upon assumptions about a 'hypothetical observer' to determine whether a government action conveys an endorsement of religion.  The expert testimony . . . has little relevance to this inquiry.") (internal citations omitted).

Moreover, even if the court were to consider expert testimony relevant to an Establishment Clause claim generally, the proffered expert testimony here is not entitled to weight because both Coughlin and Spencer admit that they did not review the evidence relating to the actual shariah-compliant products at issue in this case until *after* they formulated their opinions.  *Compare* Pl. Ex. 12 at ¶ 3 *with* Ex. A to Pl. Ex. 12, at 6, *and* Pl. Ex. 13 at ¶ 3 *with* Ex. A. to Pl. Ex. 13, at 5.  That their proffered opinions were reached without considering the specific activities that plaintiff alleges violate the Establishment Clause makes them of little use to the court because "determining whether the challenged program offends the Establishment Clause . . . requires the courts to draw lines, sometimes quite fine, based on the particular facts of each case."  *Mitchell*, 530 U.S. at 844 (2000) (O'Connor, J., concurring in the judgment); *see also Adland v. Russ*, 307 F.3d 471, 483 (6th Cir. 2002) (assessing whether Establishment Clause has been violated "hing[es] on the factual specifics of each case").  Thus, the Court, armed with the actual facts, can determine for itself whether a "reasonable, reasonably informed observer" would view the offer of the particular shariah-compliant products at issue in this case as a religious activity.  *Am. Atheists*, 567 F.3d at 292.  And, for the reasons set forth in defendants' opening brief, it should find that the offer of these products does not "inculcate religion." *Mitchell*, 530 U.S. at 847 (O'Connor, J., concurring in the judgment).

- 12 -

**B.**      **Facts Unrelated to the Treasury Department's Exercise of Authority Pursuant to the EESA Are Immaterial And, In any Event, Do Not Demonstrate an Endorsement of the Islamic Religion**

Finally, plaintiff fails to demonstrate that the Treasury Department's purchase of AIG preferred stock pursuant to the EESA constitutes an "endorsement" of religion. Pl. Mem. at 12. Plaintiff's legal challenge is limited to the EESA, Am. Compl. ¶ 1, but plaintiff's endorsement argument relies exclusively on actions—the issuance of two press releases and a scholarly paper, and a conference organized to educate policymakers about Islamic finance, *see* Pl. Mem. at 12—not taken pursuant to the EESA. Indeed, the press releases were issued on June 2, 2004 (Pl. Ex. 32) and May 8, 2004 (Pl. Ex. 33), and the paper was issued in August 2006 (Pl. Ex. 31), each years before the EESA was enacted. Likewise, the Islamic Finance 101 Conference was not organized by the Office of Financial Stability pursuant to the EESA, but by the Treasury Department's Office of International Affairs beginning in August 2008, two months before the EESA was enacted. *See* Kiwan Depo. at 15 (attached as Ex. 18 hereto). As a result, this evidence is wholly irrelevant to plaintiff's as-applied constitutional challenge to the EESA, the only claim for which plaintiff has been held to have standing. *See Murray v. Geithner*, 624 F. Supp. 2d 667, 671-75 (E.D. Mich. 2009).

Moreover, none of this material suggests that the Treasury Department "endorses" Islam. The article by Dr. El-Gamal contains an explicit disclaimer stating that such articles "are not statements of U.S. Government, Department of the Treasury, or Administration policy and reflect solely the views of their authors." Overview of Islamic Finance: Occasional Paper No. 4, at 2 (August 2006) (Pl. Ex. 31). In any event, no reasonable observer could view Dr. El-Gamal's paper as an endorsement of Islam. In his paper, he simply describes different Islamic financial products, and concludes that "Islamic finance is an industry which in many ways tries to

- 13 -

'reinvent the wheel,' producing successive approximations of western financial practices." *Id.* at 11.[8] Despite these approximations, Dr. El-Gamal opines that Islamic finance remains intrinsically inefficient, and that "one should *not* encourage regulatory adjustments to accommodate Islamic financial practices." *Id.* at 12 (emphasis added).[9]

Likewise, the press release announcing Dr. El-Gamal's appointment states that "[t]he purpose of the Islamic Finance Scholar-in-Residence program is to promote broader awareness of Islamic finance practices internationally and domestically for U.S. government policymakers, regulators, and the public at large." Pl. Ex. 32. And, former Under Secretary Taylor's May 2004 remarks were not an "endorsement" of any particular type of finance (let alone a particular religion), but rather a call for "transparency, good governance and an internationally-accepted regulatory framework that will govern [Islamic finance]." Pl. Ex. 33. Finally, the Islamic Finance 101 conference was organized for a similar purpose: to provide "the regulatory and policy communities . . . with some basic information about Islamic finance." Kiwan Depo. at 32. As a reasonable observer would conclude, the conference was not organized to "endorse" Islam, but because Islamic finance "is a significant part of the global financial system, and it's important in certain parts of the world that are [of] strategic importance to the U.S. government." *Id.* at 10. Accordingly, plaintiff has provided no evidence that the Treasury Department's

---

[8] Similarly, Dr. El-Gamal states that "[t]he main idea behind *Takaful* is similar to mutual insurance, wherein there is no commutative financial contract that allows one to interpret premium payments as prices and insurance claim fulfillment as an object of sale. Rather, policy holders are viewed as contributors to a pool of money, which they agree voluntarily to share in cases of loss to any of them." *Id.* at 7.

[9] In this respect, Dr. El-Gamal's views are consistent with those of the Office of the Comptroller of the Currency ("OCC"), which has opined that certain Islamic financial products are "functionally equivalent" to conventional banking products, and therefore subject to standard regulation. *See id.* at 4 & n. 7 & 8 (quoting OCC interpretative opinions).

investment in AIG pursuant to the EESA constitutes an "endorsement" of the Islamic religion.

    **C.**    **Restrictions on AIG's Use of Funds Are Not Legally Required, but, Even Assuming Otherwise, the EESA and the Structure of the Treasury Department's Investment Are Sufficient Such that No Reasonable Observer Could Conclude that their Primary Effect Has Been the Advancement of Religion**

Plaintiff's sole legal argument in support of his motion for summary judgment is that the lack of an explicit restriction on AIG's hypothetical diversion of EESA funds to support the sale of shariah-compliant insurance products by its subsidiaries "is sufficient to find a constitutional violation." *See* Pl. Mem. at 19 (citing *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973); *Tilton v. Richardson*, 403 U.S. 672 (1971)). As an initial matter, plaintiff's argument fails because a reasonable observer would not perceive the sale of shariah-compliant products as a religious activity. *See* Def. Mem. at 17-19. The Court need not decide that issue, however, because plaintiff's argument fails as a matter of law for additional reasons as well.

First, a plurality of the Supreme Court has abandoned the "'no divertibility' rule [a]s inconsistent with our more recent case law and [a]s unworkable." *Mitchell*, 530 U.S. at 820 (plurality opinion); *see also id.* at 834 (plurality opinion) ("[T]he evidence of actual diversion and the weakness of the safeguards against actual diversion are not relevant to the constitutional inquiry, whatever relevance they may have under the statute and regulations."). Justice O'Connor, joined by Justice Breyer, likewise rejected the suggestion that the "mere divertibility" of aid would be grounds for striking down a federal statute. *See id.* at 857 (O'Connor, J., concurring in the judgment). Rather, according to Justice O'Connor, "[t]o establish a First Amendment violation, plaintiffs must prove that the aid in question *actually is, or has been,* used for religious purposes." *Id.* (emphasis added). The Supreme Court's rejection of the no-

- 15 -

divertibility rule relied upon by plaintiff has been acknowledged by the lower courts.[10]  And of course, the record contains *no evidence of actual diversion* of EESA funds to support shariah-compliant products.  *See supra* Section II.A.1.  Accordingly, for this reason alone, plaintiff's argument fails.

In addition, even if the "no divertibility" line of precedent survives *Mitchell*, it has never applied to the provision of funds to secular entities like AIG.  Instead, restrictions on the use of government funds have only been required when the direct recipient of the funds is a religious institution.  *See, e.g., Tilton*, 403 U.S. at 677 (plurality opinion) (citing legislative history demonstrating that Congress contemplated "aid to institutions with religious affiliations[,]" including the defeat of amendments designed to prevent such aid); *Nyquist*, 413 U.S. at 767-68 (1973) (vast majority of beneficiaries of program were religiously-oriented elementary and secondary schools).  In such cases, the Supreme Court has reasonably presumed that, absent restrictions, the religious institution will use the money to support its religious mission.

For example, in *Nyquist*, the Supreme Court observed that "virtually all" of the beneficiaries of a state program to reimburse nonpublic elementary and secondary schools for maintenance and repair expenses were "Roman Catholic schools in low income areas."  *Nyquist*, 413 U.S. at 774.  It assumed that these schools were likely to "(a) impose religious restrictions on admissions; (b) require attendance of pupils at religious activities; (c) require obedience by

---

[10]  *See, e.g., Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) ("Thus, *Mitchell* stands for the proposition that *actual diversion* of secular government aid to religious indoctrination violates the Establishment Clause.") (emphasis added); *Columbia Union Coll. v. Oliver*, 254 F.3d 496, 504 (4th Cir. 2001) ("Justice O'Connor would require plaintiffs to 'prove that the aid in question is, or has been, used for religious purposes.'") (quoting *Mitchell*, 530 U.S. at 857 (O'Connor, J., concurring in the judgment)); *Christianson v. Leavitt*, 482 F. Supp. 2d 1237, 1247 (W.D. Wash. 2007) (requiring, based on Justice O'Connor's concurrence in *Mitchell*, evidence of actual diversion).

- 16 -

students to the doctrines and dogmas of a particular faith; (d) require pupils to attend instruction in the theology or doctrine of a particular faith; (e) are an integral part of the religious mission of the church sponsoring it; (f) have as a substantial purpose the inculcation of religious values; (g) impose religious restrictions on faculty appointments; and (h) impose religious restrictions on what or how the faculty may teach." *Id.* at 767-68.  Given the overwhelmingly religious nature of the aid recipients, the Supreme Court reasonably concluded that, without any restriction on the use of funds, the effect of the aid, "*inevitably*, is to subsidize and advance the religious mission of sectarian schools." *Id.* at 779-80 (emphasis added).

Thus, the Supreme Court precedent cited by plaintiff does not, as plaintiff suggests, require every disbursement of federal funds to be accompanied by a restriction on the use of such funds for religious purposes.  Rather, such restrictions have only been deemed necessary when there is, due to the sectarian nature of the recipient, a "substantial risk" that the unrestricted funds will be used for religious purposes.  *See Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736, 753 (1976) (quoting *Levitt v. Comm. for Pub. Educ.*, 413 U.S. 472, 480 (1973)).  Indeed, even Justice Souter's dissent from the abandonment of this line of cases in *Mitchell* recognized that only "a 'substantial risk' of [actual diversion] suffices to invalidate a government aid program on establishment grounds." *Mitchell*, 530 U.S. at 908 (Souter, J., dissenting) (citing cases).  Furthermore, the Supreme Court has recognized that "[o]nly in the context of aid to 'pervasively sectarian' institutions [has it] invalidated an aid program on the grounds that there was a 'substantial risk' that aid to these religious institutions would, knowingly or unknowingly, result in religious indoctrination." *Bowen v. Kendrick*, 487 U.S. 589, 612 (1988) (citing cases).[11]

---

[11]  For this reason, the Sixth Circuit's recent opinion in *American Atheists* does not support plaintiff's argument.  The as-applied challenge considered there involved direct aid to churches, and, even then, the Sixth Circuit recognized that *Tilton* and *Nyquist* were inapplicable to the

No "substantial risk" of diversion exists here.  AIG is not a pervasively religious institution, or religiously affiliated in any manner.  AIG, itself, does not even offer shariah-compliant insurance products.  Lee Decl. ¶ 5 (Def. Ex. 6).  And, although a handful of its 290 subsidiaries have offered shariah-compliant insurance products, these products' contribution to AIG's consolidated results is trivial, accounting for less than ███ % of AIG's fiscal year 2009 consolidated revenue, or ████████████████████████████████████████ ████████████████████████████████████, is excluded.  *See supra* note 5.  Thus, unlike the situation in *Tilton* and *Nyquist*, it is simply not reasonable to presume that funds provided to AIG pursuant to the EESA will be used to inculcate religion absent a restriction on their usage, even assuming (counter to fact) that the sale of shariah-compliant products inculcates religion.  As a result, *Tilton* and *Nyquist* are simply inapplicable here.

Finally, the minimal risk of diversion owing to the nature of AIG is further mitigated by the oversight provisions contained in the EESA and the securities purchase agreements that govern the Treasury Department's investments in AIG.  The Secretary's actions under the EESA are subject to the oversight and audits of numerous bodies, including the Congressional Oversight Panel, the Comptroller General, and the Special Inspector General for the TARP ("SIGTARP"), all of which have broad authority to investigate financial institutions' use of funds provided pursuant to the TARP.  *See* 12 U.S.C. §§ 5226(a)(2), 5231(d), 5233(e).  These entities have issued numerous reports relating to the Treasury Department's purchase of AIG preferred stock without questioning its constitutionality, a fact which, by itself, is compelling evidence that a reasonable observer would not perceive the Treasury Department's investment in

---

neutral program at issue in that case, and potentially in "tension, if not outright conflict, with later cases."  *See Am. Atheists*, 567 F.3d at 298-300.

AIG as an endorsement of the Islamic religion.[12]

Further, the EESA gives the Secretary broad discretion to determine "the terms and conditions" upon which he will purchase troubled assets. 12 U.S.C. § 5211(a)(1). Pursuant to this authority, the Secretary has entered into two contracts with AIG for the purchase of preferred stock. The Series D SPA could not have permitted any diversion of EESA funds to religious purposes because the funds were sent directly to the FRBNY to pay down AIG's outstanding indebtedness. *See* Gender Decl. ¶ 10 (Def. Ex. 4); Series D SPA § 1.2 (Def. Ex. 1-D). Likewise, the Series F SPA includes numerous provisions that allow AIG's use of EESA funds to "be monitored to determine whether the funds are, in effect, being used by [AIG] in such a way as to advance religion." *Bowen*, 487 U.S. at 615. For example, AIG was required to provide, prior to the consummation of the agreement, a use of capital plan describing its intended use of the EESA funds. *See* Millstein Decl. ¶¶ 18-20 (Def. Ex. 1); Series F SPA § 1.5(e)(vii) (Def. Ex. 13). As a result, the government was able to confirm, prior to any funding, that AIG intended to use the funds for secular purposes. Millstein Decl. ¶ 19-20 (Def. Ex. 1); *see also* Initial Capital Use Plan (Def. Ex. 1-F). And, as AIG's reports on its use of Series F funds illustrate, AIG has used EESA funds for entirely secular purposes. *See* Outlines of Expected Uses (Def. Ex. 1-K to 1-N); Suppl. Gender Decl. ¶ 2; Millstein Decl. ¶ 29; Series F Actual Use of Funds (Def. Ex. 1-O); Section 3.10 Certification (Def. Ex. 12-A). In light of these undisputed

---

[12] *See, e.g.,* Congressional Oversight Panel, *The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy* (June 10, 2010); SIGTARP, *July 2009 Quarterly Report to Congress* (July 2009); SIGTARP, *Extent of Federal Agencies' Oversight of AIG Compensation Varied, and Important Challenges Remain* (Oct. 2009); SIGTARP, *Factors Affecting Efforts to Limit Payments to AIG Counterparties* (Nov. 2009); GAO, *Update of Government Assistance Provided to AIG* (April 2010); GAO, *Status of Government Assistance Provided to AIG* (Sept. 2009). These reports are available at cop.senate.gov, www.sigtarp.gov and www.gao.gov, respectively.

facts, and given the trivial nature of AIG's subsidiaries' shariah-compliant insurance business,

*see supra* note 5, no reasonable observer could conclude that the "primary effect" of the

Treasury Department's investment in AIG has been the advancement of Islamic religion.

### Conclusion

For the foregoing reasons, defendants respectfully request that the Court deny plaintiff's

motion for summary judgment.

<div style="margin-left: 40%;">

Respectfully submitted,

TONY WEST
Assistant Attorney General

BARBARA L. MCQUADE
United States Attorney

JOHN R. GRIFFITHS
Assistant Director, Federal Programs Branch

/s/ John R. Coleman
JOHN R. COLEMAN
JULIE STRAUS
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8460
Email: John.Coleman3@usdoj.gov

</div>

DATED: June 28, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2010, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system, which will send notification of such filing to the

following: Robert J. Muise, David Yerushalmi.  I further certify that I provided unredacted

copies of Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment and any

exhibits filed under seal to Robert J. Muise and David Yerushalmi by electronic mail.

/s/ John R. Coleman
John R. Coleman
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch