# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

KEVIN J. MURRAY,

      Plaintiff,

                                          Civil No. 08-15147

v.                                    Hon. Lawrence P. Zatkoff

TIMOTHY F. GEITHNER and
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

      Defendants.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on January 14, 2011

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Plaintiff's motion for summary judgment [dkt 57],

Defendants' motion for summary judgment [dkt 66/67],[1] and Plaintiff's motion to strike [dkt 79].

The parties have fully briefed the motions. The Court finds that the facts and legal arguments are

adequately presented in the parties' papers such that the decision process would not be significantly

aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED

that the motions be resolved on the briefs submitted. For the reasons set forth below, Plaintiff's

motion for summary judgment is DENIED, Defendants' motion for summary judgment is

---

[1]Defendants filed two nearly identical motions for summary judgment—the difference
being that the latter [dkt 67] is redacted to comply with a protective order. In deciding
Defendants' motion, the Court will consider the un-redacted papers filed in connection
therewith.

GRANTED, and Plaintiff's motion to strike is DENIED.

## II. BACKGROUND

The basic facts surrounding the government's assistance to American International Group, Inc. ("AIG") are a matter of public record.  In the fall of 2008, what the parties describe as a large-scale economic crises erupted, purportedly threatening the liquidity and stability of financial institutions both domestically and abroad.  At that time, AIG was one of the world's largest and most complex financial institutions, prompting officials from the Board of Governors of the Federal Reserve System ("Board of Governors"), in consultation with the United States Department of the Treasury ("Treasury Department"), to conclude that AIG's failure would be "catastrophic" for the United States and the world economy.

On September 16, 2008, the Federal Reserve Bank of New York ("FRBNY"), with authorization from the Board of Governors, agreed to create a credit facility that enabled AIG to draw up to $85 billion for general corporate purposes, including as a liquidity source, pursuant to the "unusual and exigent circumstances clause" of Section 13(3) of the Federal Reserve Act ("FRA"), 12 U.S.C. § 343—purportedly the only mechanism then available for providing government financial assistance to institutions such as AIG.  In return for the credit facility, AIG signed a trust agreement whereby it agreed to pay interest and fees to the FRBNY and to issue Series C preferred stock to a trust—the AIG Credit Facility Trust ("Trust")—that would hold the stock for the benefit of the Treasury Department.  The trust agreement provided that holders of Series C preferred stock were entitled to 79.9% (subsequently reduced to 77.9%) of the dividend payments and 79.9% (subsequently reduced to 77.9%) of the aggregate voting power of the common stock. The trust agreement permitted the Board of Governors to terminate or amend the Trust pursuant to

its authority under the FRA.

In AIG's Form 8-K filed with the United States Securities and Exchange Commission ("SEC") in March 2009, AIG reported the transfer of the preferred shares of its stock to the Trust. The filing stated that "[a]s a result of the Transaction, a change in control of AIG has occurred. Pursuant to the Purchase Agreement, AIG and AIG's Board of Directors are obligated to work in good faith with the Trust to ensure corporate governance arrangements satisfactory to the Trust." In AIG's annual report to the SEC, it explained that "the Trust, which is overseen by three independent trustees, will hold a controlling interest in AIG, [and] AIG's interests and those of AIG's minority shareholders may not be the same as those of the Trust or the United States Treasury."

On October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA"), 12 U.S.C. § 5201 *et seq.*, with the following stated purpose:

> [T]o immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States . . . in a manner that (A) protects home values, college funds, retirement accounts, and life savings; (B) preserves homeownership and promotes jobs and economic growth; (C) maximizes overall returns to the taxpayers of the United States; and (D) provides public accountability for the exercise of such authority.

12 U.S.C. § 5201.

To accomplish this purpose, the EESA provides the Secretary of the Treasury Department ("Secretary") with the authority "to establish the Troubled Asset Relief Program (or 'TARP') to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary." 12 U.S.C. § 5211(a)(1).  The EESA defines "troubled assets" as, *inter alia*, "financial instrument[s] that the

Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System, determines the purchase of which is necessary to promote financial market stability." 12 U.S.C. § 5202(9)(B).  In exercising this authority, the Secretary must "take into consideration" several goals, including, *inter alia*, "protecting the interests of taxpayers," "providing stability and preventing disruption to financial markets in order to limit the impact on the economy and protect American jobs, savings, and retirement security," and "ensuring that all financial institutions are eligible to participate in the program, without discrimination based on size, geography, form of organization, or the size, type, and number of assets eligible for purchase." 12 U.S.C. § 5213.

Despite the credit given to AIG under the FRA, the Board of Governors believed that AIG remained extremely vulnerable to an ongoing and intensifying financial crisis due to falling asset prices and substantial losses on its balance sheet.  On November 25, 2008, the Secretary exercised the authority granted to him under the EESA to purchase $40 billion of newly issued AIG Series D preferred stock on the condition that AIG use the proceeds solely to pay down it's indebtedness to the FRBNY.  The Treasury Department paid the $40 billion purchase price for the Series D preferred stock directly to the FRBNY.

On March 2, 2009, when AIG reported a net loss of $61.7 billion for the fourth quarter of 2008, the Treasury Department announced that it would further restructure the government's assistance to AIG.  Accordingly, on April 17, 2009, the Secretary entered into an agreement to purchase AIG Series F preferred shares ("Series F SPA") pursuant to the EESA.  The Series F SPA created an equity capital commitment ("Commitment") of just under $30 billion, which allows AIG to draw capital from the Commitment over time.   As of the date of Plaintiff's summary judgment motion, AIG had drawn down approximately $7.5 billion from the Commitment.

As required by the Series F SPA, AIG provided a capital use plan prior to the closing of the agreement ("Initial Capital Use Plan"), which stated that the capital provided by the Commitment would be used to achieve four objectives: (1) maintaining adequate capital levels at its principal insurance operations; (2) facilitating divestitures and restructuring; (3) supporting and accelerating the orderly wind-down of AIG Financial Products; and (4) paying general corporate expenses related to the rationalization of AIG's operations.  AIG is a holding company that is the corporate parent to approximately 290 direct and indirect subsidiaries that operate around the world.  EESA funds are distributed to AIG, which is then able to divert funds to its subsidiaries.  The Series F SPA requires AIG to certify the manner in which it actually diverts funds.

AIG has advertised itself as the market leader in Sharia-compliant financing ("SCF"), *i.e.*, financial and insurance products that comply with certain dictates of Islamic law, such that Islamic adherents are not prohibited from purchasing the products for religious reasons.[2]  AIG defines "Sharia" as "Islamic law based on *Quran* [sic] and the teachings of the Prophet (PBUH)."[3]  A prominent example of SCF is Takaful—a form of insurance acceptable to purchase by certain Islamic adherents because: (1) policyholder funds are separated from shareholder funds; (2) funds are not invested in anything that is *haram*, *i.e.*, prohibited elements in Islam according to Sharia; (3) a certain percentage of any net surplus, if any, derived from the collection of premiums is paid to charitable organizations, and (4) policyholder funds are not used to borrow, lend, or enter into any

---

[2]In the parties' papers, they refer to "Sharia," "Shariah," "Shari'a," and "Shari'ah." While the Court will hereinafter refer to "Sharia," the Court takes no position on the correct spelling of the term.

[3]The Court takes judicial notice that "PBUH" is an acronym meaning "Peace be upon him" and that practicing Muslims often include the acronym after naming a prophet of Islam.

financial transaction that is "unislamic." AIG, through several of its subsidiaries, offers products that comply with Sharia by employing or otherwise engaging individuals knowledgeable in Sharia ("Sharia authorities"), who act as "Sharia Supervisory Committees." The role of the Sharia authorities is to review AIG's operations, supervise its development of SCF, and determine whether AIG's products comply with Sharia. In December 2008, AIG issued a press release announcing the "First Takaful Homeowners Products for U.S." The press release stated that "[a]ccording to Ernst & Young's 2008 World Takaful Report, Takaful was estimated to be a $5.7 billion market globally with over 130 providers in 2006. The Takaful market is estimated to be in excess of $10 billion by 2010." Of AIG's approximate 290 subsidiaries, six have engaged in SCF since the enactment of the EESA.

In the Court's opinion and order denying Defendants' motion to dismiss, the Court held that Plaintiff has standing to bring an as-applied challenge to the EESA on the basis that the "appropriated funds are being used to finance Sharia-based Islamic religious activities in violation of the Establishment Clause." Plaintiff asks the Court to declare that (1) Defendants violated the Establishment Clause of the First Amendment, (2) Congress' disbursement of EESA funds violated the Establishment Clause of the First Amendment, and (3) Defendants' endorsement of SCF violates the Establishment Clause of the First Amendment. Plaintiff also seeks to permanently enjoin (1) the disbursement of EESA funds to AIG, (2) Defendants' policy and practice of endorsing SCF, and (3) the United States' ownership and control of AIG. Defendants maintain that Plaintiff has not stated a cognizable Establishment Clause claim.

### III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or;
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other

materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine

dispute as to a material fact, and all inferences should be made in favor of the nonmoving party.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The moving party discharges its burden by

"'showing'—that is, pointing out to the district court—that there is an absence of evidence to

support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing

*Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving

party, who "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere

existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient

[to defeat a motion for summary judgment]; there must be evidence on which the jury could

reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986).

# IV.  ANALYSIS

## A.  CROSS MOTIONS FOR SUMMARY JUDGMENT

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion."  U.S. CONST. amend. I.  "The defining principle of Establishment Clause jurisprudence is that the 'First Amendment mandates government neutrality between religion and religion, and between religion and nonreligion.'" *ACLU v. Grayson Cnty.*, 591 F.3d 837, 844 (6th Cir. 2010) (citing *McCreary Cnty. v. ACLU*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))).  "Neutrality, however, 'is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation.'"  *Grayson Cnty.*, 591 F.3d at 844 (citing  *McCreary Cnty.*, 545 U.S. at 876 (quoting *Sherbert v. Verner*, 374 U.S. 398, 422 (1963) (Harlan, J., dissenting)).  That "government must remain neutral in matters of religion does not foreclose it from ever taking religion into account." *Lee v. Weisman*, 505 U.S. 577, 627 (1992) (Souter, J., concurring).

As the parties agree, the Court must examine Plaintiff's Establishment Clause challenge under the test first articulated in *Lemon v. Kurtzman,* 403 U.S. 602 (1971).  Under the *Lemon* test, a statute will be upheld under the Establishment Clause if (1) it has a secular legislative purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not foster an excessive government entanglement with religion. *Id.* at 612–13 (citations and quotation marks omitted).  Recent Supreme Court decisions have modified the test slightly by "fold[ing] entanglement analysis into the effect analysis because 'entanglement is . . . an aspect of the inquiry into a statute's effect.'" *Smith v. Jefferson Cnty. Sch. Bd. of Comm'rs*, 549 F.3d 641, 656 (6th Cir. 2008), *rev'd in part on other grounds*, 549 F.3d 641 (quoting *Agostini v. Felton*, 521 U.S. 203, 233

(1997)).  When determining the purpose of government action or the effect of its implementation, the Court must view the evidence from the perspective of a reasonable observer.  *See Am. Atheists, Inc. v. Detroit Downtown Dev. Auth.*, 567 F.3d 278, 292–95 (6th Cir. 2009).  A reasonable observer is credited with knowledge of "readily discoverable fact," including "the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act."  *McCreary Cnty.*, 545 U.S. at 860, 862 (quotations omitted).

## 1. Purpose

The Court must first analyze whether a reasonable observer would conclude that the EESA, as applied to the Secretary's purchase of AIG preferred stock, has had "the ostensible and predominant purpose of advancing religion."  *McCreary Cnty.*, 545 U.S. at 860 (citing *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987)).  "[A]lthough a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty.*, 545 U.S. at 864 (citations omitted); *see also Grayson Cnty.,* 591 F.3d at 848 ("'Even if the text and official history of a statute express no secular purpose, the statute should be held to have an improper purpose only if it is beyond purview that endorsement of religion or a religious belief 'was and is the law's reason for existence.''") (quoting *Wallace v. Jaffree*, 472 U.S. 38, 75 (1985) (O'Connor, J., concurring) (quoting *Epperson*, 393 U.S. at 108)).

Plaintiff argues that a reasonable observer would conclude that the government purchased AIG stock under the EESA with the purpose of advancing religion because "Defendants *intended* for AIG to use federal funding to support *all* of its activities, including SCF, which Defendants favorably endorse."  However, this lone statement constitutes the extent of Plaintiff's argument with

respect to the government's purpose in purchasing AIG preferred stock under the EESA. Defendants, on the other hand, have presented evidence that the government enacted the EESA for the secular purpose of restoring liquidity and stability to the financial system of the United States, and that the Secretary purchased AIG preferred stock pursuant to his authority under the EESA because he believed that AIG's failure would be catastrophic for the United States and the world economy. Furthermore, Defendants have presented evidence showing that AIG's SCF activities accounted for less than 0.03% of AIG's consolidated revenue when the Treasury Department first provided funds to AIG. Even assuming government officials were aware of AIG's SCF activities, the Court finds it highly unlikely that a reasonable observer would determine that the government's ostensible and predominant purpose in providing financial assistance to AIG was to support such a small aspect of AIG's business. Thus, the Court finds that Plaintiff has failed to produce evidence sufficient for a reasonable observer to conclude that the government's stated reasons for purchasing AIG preferred stock under the EESA are disingenuous, a sham, or merely secondary to a religious objective.

### 2. Primary Effect/Entanglement

The unique facts of this case impact the Court's analysis of the *Lemon* test's "effect" prong. The Supreme Court has analyzed the effect prong differently depending on whether the challenge relates to a government-aid program, *e.g.*, grants to parochial schools, or direct governmental action, *e.g.*, displaying the Ten Commandments. *See Mitchell v. Helms*, 530 U.S. 793, 808 (2000) (plurality opinion); *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 597 (1989). Although unspecified in Plaintiff's papers, it appears that Plaintiff's challenge to the EESA is twofold: (1) Plaintiff challenges the EESA as a government-aid program, inasmuch as EESA funds have been used to support SCF

10

activities; and (2) Plaintiff challenges the EESA to the extent funds have been used to gain ownership and control of AIG, purportedly rendering AIG's SCF activities direct governmental action.

However, the Court finds that Plaintiff's second basis for challenging the EESA is unfounded and irrelevant. Whatever ownership interest the government has in AIG, it was not created by the appropriation of EESA funds. The evidence clearly indicates that the Trust holds the 77.9% ownership interest in AIG for the benefit of the Treasury Department, and that the Trust's ownership interest was established by actions taken pursuant to Section 13(3) of the FRA—not the EESA. *See* Pl.'s Br. Summ. J. at 7 (acknowledging that the government gained ownership and control over AIG pursuant to the Trust Agreement established under the FRA). Thus, to the extent Plaintiff objects to the government's purported entwinement with AIG, this occurred prior to the enactment of the EESA, which merely permitted the Secretary to purchase troubled assets. Therefore, the Court will not consider Plaintiff's argument that AIG's sale of SCF products is direct governmental action due to the government's ownership interest in AIG, as this is irrelevant to Plaintiff's as-applied challenge to the EESA.

The Supreme Court has identified three criteria for evaluating whether the effect of a government-aid program impermissibly advances religion: (1) whether it results in religious indoctrination attributable to the government; (2) whether it defines its recipients by reference to religion; and (3) whether it creates an excessive entanglement with religion. *See Mitchell*, 530 U.S. at 808 (plurality opinion) (citing *Agostini*, 521 U.S. at 234); *see also Am. Atheists, Inc.*, 567 F.3d at 291–94. Plaintiff contends that factors one and three are present here. Plaintiff also argues that the effect of the Secretary's purchase of AIG preferred shares pursuant to the EESA was exacerbated

by the Treasury Department's independent acts demonstrating its endorsement of SCF.

### a.) Religious Indoctrination Attributable to the Government

#### i.) Religious Indoctrination

Before the Court considers whether the government is responsible for religious indoctrination, the Court must determine whether religious indoctrination has occurred in the first place. In the Establishment Clause context, religious indoctrination occurs where the recipient of government funds provides instruction in religious beliefs for the purpose of instilling those beliefs in others or furthering a religious mission. *See Agostini*, 521 U.S. at 226–27 ("As we have repeatedly recognized, government *inculcation of religious beliefs* has the impermissible effect of advancing religion.") (emphasis added); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 18 (1993) (Blackmun, J., Concurring) (noting that a Roman Catholic school indoctrinated religion in students where its stated purpose was to "instill a sense of Christian values" and inculcate its students with "the faith and morals of the Roman Catholic Church"). *See also Mitchell*, 530 U.S. at 840 (O'Connor, J., concurring) (noting that in prior cases, "we rested our approval of the relevant programs in part on the fact that the aid had not been used to advance the *religious missions* of the recipient schools") (emphasis added) (citations omitted). Mere recitation of religious doctrine does not constitute indoctrination. *Id.* at 823 (plurality opinion) (noting that "a government interpreter does not herself inculcate a religious message—even when she is conveying one").

Not surprisingly, allegations of religious indoctrination frequently accompany challenges to government-aid programs involving churches or parochial schools. In such cases, indoctrination is often presumed by courts without discussion, and the focus generally shifts to whether the acknowledged indoctrination is attributable to the government. *See id.* at 809 ("The question

whether governmental aid . . . results in governmental indoctrination is ultimately a question whether any religious indoctrination that occurs . . . could reasonably be attributed to governmental action.") (collecting cases).  Here, Plaintiff asks the Court to take a similar approach, arguing that the present facts are comparable to an "unrestricted grant of taxpayer money to a Church."  Thus, Plaintiff argues, Defendants' assertion that the sale of SCF products does not constitute religious indoctrination is "verifiably false" and "overwhelmingly contradicted by the undisputed evidence and warrants no further response."

However, the Court finds that the circumstances of this case are not comparable to a grant of taxpayer money to a church or religious institution, such that the Court should presume AIG has engaged in religious indoctrination.  Despite its recent financial difficulties, AIG is, after all, a profit-motivated company.[4]  Moreover, Defendants have placed this issue in dispute, arguing that AIG's sale of SCF products does not result in religious indoctrination because consumers are not provided religious instruction, and that AIG does not develop or sell SCF products with the purpose or effect of instilling religious beliefs in consumers or furthering a religious mission.

---

[4]Plaintiff attempts to use expert testimony to demonstrate that AIG's secular business purpose is "inextricably intertwined" with "an Islamic religious mission."  However, expert testimony is irrelevant with respect to how a reasonable observer would view the conduct at issue.  *See Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) (rejecting the applicability of expert testimony in determining a reasonable observer's perception); *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1382 (9th Cir. 1994) ("Instead of engaging in a 'battle of the experts' in deciding Establishment Clause cases, courts have relied upon assumptions about a 'hypothetical observer' . . . to determine whether a government action conveys an endorsement of religion.").  Moreover, as Defendants point out, Plaintiff's purported experts rely heavily on their knowledge of SCF generally, but offer little, if any, discussion on how *AIG's* use of SCF affected their opinions.  *See Adland v. Russ*, 307 F.3d 471, 483 (6th Cir. 2002) (stating that whether the Establishment Clause has been violated "hing[es] on the factual specifics of each case").  Plaintiff also declined to rebut Defendants' assertion that his experts formed their opinions *before* reviewing AIG's SCF activities.

Plaintiff is reminded that the summary judgment stage is the time at which parties must designate facts in support of their claims. Plaintiff cannot defeat Defendants' motion for summary judgment, or prevail on its own, by arguing that the evidence in support of his claim is so overwhelming that he need not present any to the Court. In the absence of evidence showing that AIG's development and sale of SCF products has resulted in the instruction of religious beliefs for the purpose of instilling those beliefs in others or furthering a religious mission, Plaintiff has failed to demonstrate that a reasonable observer could conclude that AIG has engaged in religious indoctrination by supplying SCF products.

ii.) Government Attribution

Even assuming, *arguendo*, that AIG, through several of its subsidiaries, has engaged in religious indoctrination by supplying SCF products, the Court finds that any such indoctrination would not be attributable to the government. In determining whether religious indoctrination is attributable to the government, courts must examine whether the recipient of government funds is pervasively sectarian. *See Hunt v. McNair*, 413 U.S. 734, 743 (1973); *Am. Atheists, Inc.*, 567 F.3d at 295–96 (noting that "six members of the [Supreme] Court have questioned whether the religious nature of an aid recipient is helpful, or even appropriate, in evaluating neutral government aid programs under the Establishment Clause" but that "no majority opinion of the Court has overruled the pervasively sectarian doctrine, and that means we must follow it") (citations omitted). An institution is pervasively sectarian when "a substantial portion of its functions are subsumed in [a] religious mission," *Hunt*, 413 U.S. at 743, such that its "religious functions cannot be separated from its non-religious functions." *Johnson v. Economic Dev. Corp.*, 241 F.3d 501, 510 (6th Cir. 2001).

When the recipient of government funds is pervasively sectarian, it is presumed that, without

evidence to the contrary, religious indoctrination is attributable to the government due to "the risk that direct government funding, even if it is designated for specific secular purposes, may nonetheless advance the pervasively sectarian institution's 'religious mission.'" *Bowen v. Kendrick*, 487 U.S. 589, 610 (1988) (citation omitted); *Am. Atheists, Inc.*, 567 F.3d at 295 ("[T]he Court has presumed that direct aid to a pervasively sectarian institution will inevitably result in government sponsored indoctrination because the institution is so 'subsumed in the religious mission' that it is impossible to separate the religious from the secular and to channel aid only to the latter.") (citations omitted).   When the recipient of government funds is not pervasively sectarian, religious indoctrination is attributable to the government only when it is proven that (1) government funds have actually resulted in religious indoctrination, *Hunt*, 413 U.S. at 743, and (2) the diverted funds are not *de minimus* in relation to the total amount distributed.  *See Am. Atheists, Inc.*, 567 F.3d at 294 (stating that "a program may have the primary effect of advancing religion if the recipient 'divert[s]' secular aid to further its religious mission[,]" but that evidence of diversion of "'less than one percent of the total allocation' of aid under [a] program . . . is 'too insignificant to affect the constitutional inquiry.'") (quoting *Mitchell*, 530 U.S. at 866–67 (O'Connor, J., concurring)).

The Court finds that evidence is lacking to support the conclusion that AIG is substantially subsumed with furthering a religious mission, such that it could be considered a pervasively sectarian institution.  Plaintiff has not even presented evidence showing that a substantial portion of AIG's activities are subsumed with SCF.  Instead, the evidence reflects that SCF is a *de minimus* aspect of AIG's business, accounting for approximately 0.022% of AIG's consolidated revenue in 2009.  Thus, Plaintiff must prove that EESA funds were actually diverted to support AIG's SCF activities and that the diverted funds were not *de minimus* in relation to the total amount distributed.

15

In examining AIG's distribution of EESA funds, the Court first notes that the Secretary's $40 billion purchase of Series D preferred shares is not at issue, as these funds were paid directly to the FRBNY. Thus, the challenged appropriations relate solely to AIG's use of the $30 billion Commitment under the Series F SPA. AIG has drawn down from the Commitment on four occasions between May 2009 and February 2010, for a total of approximately $7.5 billion.

Of AIG's approximate 290 subsidiaries, AIG has identified six that have offered SCF products since the enactment of the EESA. Plaintiff argues that AIG has diverted over $1 billion to two of those subsidiaries—American Life Insurance Company ("ALICO") and Lexington Insurance Company ("Lexington")—while receiving taxpayer funds. ALICO maintains branch offices in countries around the world, including Japan, the United Kingdom, Aruba, and Saudi Arabia. The Japan, United Kingdom and Aruba branches do not offer SCF products. Pursuant to a request from a client, ALICO's Saudi Arabia branch agreed to modify one of its products, until June 2010, to make it Sharia-compliant as specified by the client. Plaintiff alleges that ALICO received a total of $409 million from AIG after the EESA was enacted in two distributions: (1) in March 2009, a subsidiary of AIG (AIG Funding, Inc.) provided ALICO with a loan of $300 million; and (2) in March 2010, AIG repurchased over $109 million of AIG stock held by ALICO.[5] However, the March 2009 loan of $300 million occurred before AIG made its first drawdown from the Commitment. Thus, there is no evidence to support the conclusion that the loan was made with EESA funds.

_____

[5]Plaintiff also contends that AIG gave ALICO an additional $600 million in the form of capital contributions in September 2008, but since this occurred prior to the enactment of the EESA, the Court finds that this evidence is irrelevant to Plaintiff's as-applied challenge to the EESA.

The $109 million repurchase of stock, on the other hand, occurred pursuant to AIG's February 19, 2010, drawdown from the Commitment.  The shares that AIG repurchased from ALICO were held in ALICO's home office in Delaware, and by its branches in Japan, the United Kingdom, and Aruba.  According to Defendants, this evidence fails to show that (1) EESA funds were used to support the only ALICO branch that has engaged in SCF, and (2) even if EESA funds benefitted the Saudi Arabia branch, such funds were used to support the sale of its lone SCF product. The Court agrees.  Without evidence that EESA funds have been used to support ALICO's SCF activities, Plaintiff cannot demonstrate that the alleged religious indoctrination is attributable to the government.  *See Am. Atheists, Inc.*, 567 F.3d at 296 ("The Supreme Court has repeatedly rejected 'the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.'") (quoting *Hunt*, 413 U.S. at 743 ).  Furthermore, the $109 million at issue constitutes significantly less than 1% of the total amount of EESA funds authorized for AIG's use ($70 billion) and the total amount of EESA funds distributed to AIG ($47.5 billion).

Like ALICO, Lexington sells a single SCF product among a host of non-SCF products, and that SCF product accounted for 0.0006% of Lexington's gross premiums in 2009.[6]  While Plaintiff contends that AIG diverted nearly $44 million in capital contributions to Lexington after enactment of the EESA, Plaintiff presents no evidence that these contributions originated from the EESA or

---

[6] Lexington's "Takaful Homeowners Policy" differs from a standard insurance policy in two ways: (1) premiums and technical reserves are placed into a non-interest bearing account; and (2) after a specified period of time, a certain percentage of the net surplus, if any, derived from the collection of premiums is paid out to either the National Children's Fund or the International Federation of Red Cross & Red Crescent Societies.  Defendants contend that these organizations were selected precisely because they lack religious affiliations.

were used to support the sale of Lexington's lone SCF product.[7]  Once more, the $44 million at issue is significantly less than 1% of the total amount of EESA funds authorized for AIG's use ($70 billion), as well as the total amount distributed to AIG ($47.5 billion).[8]

Plaintiff also argues that AIG is free to divert EESA funds in the future to support Islamic religious activities because there are no government-imposed restrictions that would prevent such diversions.  However, the Supreme Court has only required the imposition of such restrictions when the recipient of government funds is a sectarian institution, *i.e.*, when there is a substantial risk that funds will be used for religious purposes.  *See Bowen*, 487 U.S. at 612 (1988) (citation omitted) ("Only in the context of aid to 'pervasively sectarian' institutions have we invalidated an aid program on the grounds that there was a 'substantial' risk that aid to these religious institutions would, knowingly or unknowingly, result in religious indoctrination."); *id.* at 614 ("[W]e have never stated that a statutory restriction is constitutionally required."); *Comm. for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 774 (1973) ("Absent appropriate restrictions on expenditures for these and similar purposes, it simply cannot be denied that this section has a primary effect that advances religion in that it subsidizes directly the religious activities of *sectarian* elementary and secondary schools.") (emphasis added).  Given that Plaintiff has failed to present evidence sufficient for a reasonable observer to conclude that AIG is a sectarian institution or that AIG's SCF activities have resulted in religious indoctrination, a reasonable observer would not consider there to be a

---

[7]Plaintiff also contends that AIG provided Lexington capital contributions in the amount of $7.5 million in September 2008, but since this occurred prior to the enactment of the EESA, the evidence is irrelevant.

[8]The combined total of EESA funds allegedly distributed to ALICO and Lexington ($153 million) also constitutes less than 1% of the total amount of EESA funds authorized for AIG's use and the total amount of EESA funds distributed to AIG.

substantial risk that federal funds will be used to indoctrinate religion even absent restrictions explicitly preventing such diversions.

### iii.) Conclusion

Accordingly, the Court finds that Plaintiff has failed to present evidence that would allow a reasonable observer to conclude that the EESA, as applied to the Secretary's purchase of AIG stock, has resulted in religious indoctrination attributable to the government.

### b.) *Excessive Entanglement*

While Plaintiff states in his motion for summary judgment that the EESA has created an excessive entanglement, Plaintiff declined to analyze this prong of the *Lemon* test with any degree of specificity.  Plaintiff also declined to respond to the arguments advanced in Defendants' motion for summary judgment that the EESA has not created an excessive entanglement with religion. Thus, the Court finds that Plaintiff concedes this issue.  *See Ctr. For Biological Diversity v. Rural Utils. Serv.*, No. 5:08-292-JMH, 2009 WL 3241607, at *3 (E.D. Ky. Oct. 2, 2009) ("When a party fails to respond to a motion or argument therein, the Sixth Circuit has held that the lack of response is grounds for the district court to assume opposition to the motion is waived, and grant the motion.") (citing *Humphrey v. U.S. Attorney General's Office*, 279 Fed. Appx. 328, 331 (6th Cir. 2008)).

Nevertheless, the Court agrees with Defendants that the EESA has not created an excessive entanglement with religion.  "Not all entanglements, of course, have the effect of advancing or inhibiting religion.  Interaction between church and state is inevitable, and [the Supreme Court] ha[s] always tolerated some level of involvement between the two.  Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini*, 521 U.S. at 233 (internal citations

omitted).  "[T]o assess entanglement, [the Supreme Court] ha[s] looked to 'the character and purposes of the institutions that are benefited [sic], the nature of the aid that the [government] provides, and the resulting relationship between the government and religious authority.'" *Agostini*, 521 U.S. at 232 (quoting *Lemon*, 403 U.S. at 615).  Courts have found excessive entanglement where government-aid programs require the government to make inspections or evaluations of the religious content of a religious organization, delegate government power to a religious body, or closely monitor contact between secular and religious bodies.  *See Am. Atheists, Inc.*, 567 F.3d at 294 ("The program did not *require* city officials to make judgments about the religious content of particular projects, nor did it *impose* a scheme of 'comprehensive, discriminating, and continuing state surveillance' that *required* the city to stay enmeshed in the churches' affairs on an ongoing basis.") (emphasis added) (citing *Lemon*, 403 U.S. at 619–20).

Here, the Secretary's purchase of AIG stock did not require AIG, let alone the government, to inspect or evaluate the religious content of religious organizations, delegate power to a religious body, or closely monitor the contact between AIG and a religious body. *Cf. Commack Self-Service Kosher Meats, Inc. et al. v. Weiss et al.*, 294 F.3d 415, 425–30 (2d Cir. 2002) (holding that laws prohibiting the sale of food products represented to be "kosher" that had not been prepared in accordance with "Orthodox Hebrew religious requirements" excessively entangled government and religion because they "(1) t[ook] sides in a religious matter, effectively discriminating in favor of the Orthodox Hebrew view of dietary requirements; (2) require[d] the State to take an official position on religious doctrine; and (3) create[d] an impermissible fusion of governmental and religious functions by delegating civic authority to individuals apparently chosen according to religious criteria"). While Plaintiff contends that AIG's subsidiaries must interpret Islamic law to

20

supply SCF products, Plaintiff has not demonstrated that EESA funds have been appropriated for such a purpose.  Furthermore, since AIG's SCF activities account for approximately 0.022% of its consolidated revenue, and less than 1% of the funds distributed to AIG under the EESA allegedly benefitted AIG's subsidiaries that have engaged in SCF, any interaction between government and religion has been incidental at best.  Therefore, a reasonable observer would not conclude that the EESA *excessively* entangled government with religion such that the *primary* effect of the EESA has been the advancement of Islamic religious beliefs.

### c.) Treasury Department Acts Unrelated to the EESA

Plaintiff argues that the effects of the EESA were exacerbated by the Treasury Department's independent acts demonstrating the government's endorsement of SCF.  Plaintiff maintains that the Treasury Department has given its stamp of approval on Sharia-based Islam by: (1) posting on its website a published writing titled, "Overview of Islamic Finance"; (2) providing an "Islamic Finance Scholar-in-Residence Program"; (3) posting on its website a press release advertising the Under Secretary of the Treasury Department's key note address at a forum on Islamic Finance at Harvard University, which stated that the government promotes Islamic finance, has deepened its engagement in Islamic finance, and calls for harmonization of Sharia standards at the national and international levels; and (4) sponsoring an "Islamic Finance 101" conference.  The Court, however, finds these alleged acts insufficient to demonstrate an Establishment Clause violation.

First, the Court notes that Plaintiff brings an as-applied challenge to the EESA.  Thus, Plaintiff must show that the alleged wrongful acts were related to the EESA.  Plaintiff, however, is unable to make such a showing because the alleged wrongful acts occurred prior to the enactment of the EESA.  The EESA was enacted in October 2008, but the first three alleged wrongful acts

occurred in 2004 and 2006.  The fourth alleged wrongful act took place shortly after the EESA was enacted, but the evidence indicates that it was planned and organized in early August 2008—nearly two months before the EESA was enacted.  Moreover, Plaintiff has not presented any evidence that EESA funds were used to support these activities.

Second, and more importantly, the Court finds that the alleged wrongful acts fail to show that the government favorably endorses Sharia-based Islam or religion in general, as Plaintiff contends. With respect to the published writing, titled "Overview of Islamic Finance," the writing states that its does not reflect statements of the U.S. Government, the Department of the Treasury, or Administration policy, and reflects solely the views of the authors.  With respect to the "Islamic Finance Scholar-in-Residence Program," the press release advertising the program makes clear that it was offered to "promote broader *awareness* of Islamic finance practices internationally and domestically for U.S. government policymakers, regulators, and the public at large." (emphasis added).  With respect to the press release advertising the Under Secretary of the Treasury Department's key note address at the forum on Islamic Finance at Harvard University, the writing indicated that the purpose of the forum was to generate a "strong platform to generate critical thinking to inform academics and policymakers on Islamic finance."  Lastly, with respect to the "Islamic Finance 101" conference, the evidence clearly indicates that it was organized for the purpose of providing "the regulatory and policy communities . . . with some basic information about Islamic finance."

Viewing Plaintiff's allegations collectively, there is no evidence to suggest that the government used the writings, forums or conferences to encourage others to adhere to Islamic tenets or that the government otherwise commented on the propriety of Islam or Islamic financing.  The

Court finds that a reasonable observer would not, after considering this evidence, conclude anything other than that the government merely endorsed the *study* of Islamic finance due to the increasingly significant role Islamic finance plays in the financial industry and world economy.  *See*, *e.g.*, *Grayson Cnty.,* 591 F.3d at 848, 855 (holding that a county's display of the Ten Commandments "endorse[d] an educational message, rather than a religious one," due to the display's emphasis on the historical significance of the Ten Commandments); *Stone v. Graham*, 449 U.S. 39, 42 (1980) (per curiam) ("[T]he Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like."); *Epperson*, 393 U.S. at 106 ("[S]tudy of religions and of the Bible from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition.").

### 3.  Conclusion

Accordingly, the Court finds that the evidence is insufficient for a reasonable observer to conclude that the EESA, as applied to the Secretary's purchase of AIG preferred stock, has had an unlawful purpose or effect under the Establishment Clause.

### B.  MOTION TO STRIKE

In his motion to strike, Plaintiff seeks to exclude evidence that Defendants submitted to Plaintiff after the discovery deadline under Fed. R. Civ. P. 37(c)(1).  Plaintiff also requests reasonable attorney fees incurred in connection with bringing this motion.  On July 14, 2009, Plaintiff served his request for production of documents on Defendant Geithner.  On May 11, 2010, Defendants produced documents responsive to Plaintiff's request, with an accompanying letter stating that Defendants had completed their search for documents and that the attached documents constituted their final production.  The letter also stated that should Defendants locate additional

documents responsive to Plaintiff's request, they would timely produce such documents after reviewing them for privilege and information subject to protective orders. The period for discovery ended on May 15, 2010.

On June 7, 2010, Plaintiff and Defendants filed motions for summary judgment. In Defendants' motion, Defendants relied on evidence produced during the discovery period regarding the actual use of the Series F SPA funds, which included the distribution to ALICO. Plaintiff, however, argued in his motion that Defendants were unable to account for the Series F SPA distributions. In preparing their response to Plaintiff's motion, Defendants assert that they uncovered additional evidence certifying the manner in which the Series F SPA funds were used—evidence that was created on May 7, 2010, after Defendants had completed their search for documents responsive to Plaintiff's request, and which Defendants did not discover until Friday, June 18, 2010. On Monday, June 21, 2010, Defendants produced these documents to Plaintiff, stating that they had been recently discovered. Plaintiff argues that this evidence should be excluded from consideration, both at trial and for purposes of dispositive motions, pursuant to Fed. R. Civ. P. 37(c)(1).

Fed. R. Civ. P. 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 26(e) provides:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:

24

(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

(B) as ordered by the court.

In his motion to strike, Plaintiff claims that Defendants offered no explanation for why they failed to produce the disputed evidence prior to the discovery deadline. As described above, Defendants respond that they did not disclose the discovery prior to the discovery deadline because (1) it was created eight days prior to the discovery deadline and after they had completed their search for documents, and (2) they did not discover it until after the discovery deadline. This is supported by the fact that Defendants did not rely on the disputed evidence in their motion for summary judgment. Furthermore, Defendants respond that their conduct did not constitute a violation of Rules 26 or 37. According to Defendants' unrebutted argument, they first learned of the evidence on a Friday and produced it for Plaintiff the following Monday. Thus, Defendants argue, they timely supplemented their production in accordance with Rules 26 and 37. The Court agrees, and finds that the exclusion of evidence and an award of attorney fees would not be proper under the circumstances.

Plaintiff also seeks to exclude a declaration that accompanied the evidence purportedly certifying AIG's use of Series F SPA funds on the basis that the individual making the declaration was not listed as a witness prior to the witness-list exchange deadline. In its scheduling order, the Court ordered the parties to exchange witness lists by May 3, 2010, and stated that no witness may be called at trial unless that witness's name and address is listed.

While the declarant at issue here was not listed as a witness prior to May 3, 2010, the Court

finds that Defendants have not violated the Court's scheduling order.  Notably, Defendants assert that they do not wish to call the declarant as a witness at trial.  According to Defendants, the declaration is provided for the sole purpose of authenticating evidence submitted in opposition to Plaintiff's summary judgment motion. *See Ryder Auto. Carrier Group, Inc. v. Gen. Teamsters Sales & Serv. & Indus. Union Local No. 654*, Nos. 96-3712, 96-3738, 1997 WL 540893, at *3 (6th Cir. Sept. 2, 1997) (Table Opinion) ("We agree . . . that Rule 56 of the Federal Rules of Civil Procedure does not require that affiants be included in a witness list before their affidavits may be used to support a motion for summary judgment.").

Moreover, the Court finds that Plaintiff's motion is moot because exclusion of the challenged evidence would not alter the disposition of this case.  The challenged evidence relied upon by Defendants in their response to Plaintiff's motion for summary judgment purports to certify the manner in which AIG distributed the Series F SPA funds.  However, Defendants have produced other evidence regarding AIG's actual use of the Series F SPA funds, and there is no indication that the challenged evidence provides any link between the Series F SPA funds and SCF activities.  The insignificance of the challenged evidence is further reflected in Plaintiff's decision to ignore such evidence in both his response to Defendants' motion for summary judgment and his reply. Defendants produced the challenged evidence, which is by no means voluminous, to Plaintiff approximately one week before Plaintiff's response was due and approximately three weeks before his reply was due, yet Plaintiff did not find it significant enough to address.  Therefore, Plaintiff's motion is denied.

## V.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment [dkt

57] is DENIED.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment [dkt 66/67] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion to strike [dkt 79] is DENIED.

IT IS SO ORDERED.


S/Lawrence P. Zatkoff_____
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  January 14, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on January 14, 2011.


S/Marie E. Verlinde_____
Case Manager
(810) 984-3290

27